| | | | |
|---|---|---|---|
| BENAHDAM HURT, | ) | | |
| | ) | | |
| Plaintiff, | ) | | |
| | ) | | |
| v. | ) | No. | 17 C 7909 |
| | ) | | |
| JAMES P. CORCORAN, et al., | ) | | |
| | ) | Judge Rebecca R. Pallmeyer | |
| Defendants. | ) | | |
| | ) | | |
| MARK OWENS, | ) | | |
| | ) | | |
| Plaintiff, | ) | | |
| | ) | | |
| v. | ) | No. | 18 C 334 |
| | ) | | |
| JAMES P. CORCORAN, et al., | ) | Judge Rebecca R. Pallmeyer | |
| | ) | | |
| Defendants. | ) | | |
| | ) | | |

## MEMORANDUM OPINION AND ORDER

At different periods between 2011 and 2017, Plaintiffs Benahdam Hurt (17-cv-7909) and Mark Owens (18-cv-334) were patients at the Elgin Mental Health Center ("EMHC") under the care of social worker Defendant Christy Lenhardt. Hurt and Owens allege that Lenhardt sexually abused them during their time there, and a separate criminal case against Lenhardt is pending in Kane County. *See People of Illinois v. Lenhardt*, 18-CF-667 (Kane Co. 2018).[1] In the present civil case, Hurt and Owens allege that Lenhardt's sexual abuse violated their constitutional rights. They also bring a host of claims against the Illinois Department of Human Services ("DHS") and various doctors and staff at EMHC. All Defendants except for Lenhardt move to dismiss both

---

[1] Lenhardt's next court date was set for September 6, 2019 at the time of this opinion's publication. She is charged with 28 Class 3 Felonies under 720 ILL. COMP. STAT. 5/11-9.5(b)(1) and 720 ILL. COMP. STAT. 5/33-3(a)(2).

Plaintiffs' claims for failure to state a claim. FED. R. CIV. P. 12(b)(6). The case is effectively stayed as to Lenhardt, pending any guilty plea in her criminal case. (*See, e.g.*, Minute Entry [Hurt 85].) For the following reasons, Defendants' motions [Hurt 48, Hurt 60, Owens 58, Owens 70] are granted in part and denied in part.

## BACKGROUND

When considering a 12(b)(6) motion to dismiss, the court assumes the truth of the plaintiff's allegations. *Simpson v. Brown Cty.*, 860 F.3d 1001, 1009 (7th Cir. 2017). The court need "need not, however, 'accept as true any legal assertions or recital of the elements of a cause of action supported by mere conclusory statements.' " *Zahn v. N. Am. Power & Gas, LLC*, 815 F.3d 1082, 1087 (7th Cir. 2016) (quoting *Vesely v. Armslist LLC*, 762 F.3d 661, 664–65 (7th Cir. 2014)).

## I.    Benahdam Hurt

On August 14, 2014, Benahdam Hurt was interned at EMHC after he was "found Not Guilty by Reason of Insanity [ ] on a charge of Aggravated Battery on a Police Officer."[2] (Third Amended Complaint ("Hurt TAC") [Hurt 56] ¶ 1.) EMHC is "a hospital operated by" Defendant DHS. (*Id.* at ¶ 44.) Hurt spent nearly three years at EMHC before being released on July 22, 2017, evidently his "mandatory release date." (*Id.* at ¶¶ 34, 44.) The Complaint provides no further explanation regarding that date or the conditions of Hurt's confinement.

While at EMHC, Hurt was served by a clinical treatment team. That team included at least a licensed social worker and a psychiatrist, and "was assigned the task of formulating and periodically reviewing a treatment plan to improve [Hurt's] mental condition sufficiently that he could be released back into the community." (*Id.* at ¶ 2.) Hurt's Complaint largely lacks chronological information, but it appears he was first housed in the "L unit," where his licensed

---

[2]    Hurt's Complaint does not specify which court ordered his commitment.

social worker was Defendant Lenhardt. (*Id.* at ¶ 4.) Hurt describes a licensed social worker as someone who "administer[s] the business of [a patient's] treatment plan, and who essentially guide[s], record[s], over[sees], and document[s] the work of the treatment team" within the patient's Unit. (*Id.*) He asserts that Lenhardt "was fully in charge of the evaluation and documentation of [his] progress and the administration of his court-ordered mental health care, as well as the evaluation of [his] eligibility for release." (*Id.* at ¶ 13.)

Much of Hurt's Complaint focuses on Defendant Lenhardt, who has not moved for dismissal. Hurt alleges that Lenhardt "commenced her scheme to sexually seduce, assault, manipulate and rape" him on the day he arrived at EMHC. (*Id.* at ¶ 6.) By Thanksgiving of that year, Lenhardt had initiated sexual contact with him. (*Id.* at ¶ 11.) Their "relationship" quickly escalated to the point of Hurt and Lenhardt "frequently engaging in sexual activities in her office during 'counseling' sessions." (*Id.* at ¶¶ 12, 13.) She also "demand[ed] sexual favors in her office" and sent Hurt e-mail messages and nude pictures of herself. (*Id.* at ¶¶ 13, 31.)

Hurt's Complaint asserts that "Lenhardt and [Hurt] were 'caught' during sexual activities numerous times by other Facility staff." (*Id.* at ¶ 22.) It recounts, however, only one incident involving any staff other than Lenhardt. Specifically, in the "spring of 2017," Hurt and Lenhardt "became accidentally locked" in another staff member's office on K Unit, where Lenhardt had no patients, after entering the empty office to have sex. (*Id.* at ¶ 23.) Lenhardt and Hurt "had to get the attention of" two EMHC employees, neither of whom are alleged to be Defendants here. (*Id.*) "Those staff opened the door, and then asked multiple questions about why Lenhardt and Plaintiff had been inside [the] empty office alone." (*Id.*) "Other staff also asked questions . . . but the Facility, its staff and administrators never conducted a follow-on investigation, nor was there any other consequence, regardless of the apparent widespread suspicion." (*Id.*) The Complaint contains no allegation that this incident was ever reported to EMHC administrators, the State, nor to any of the Defendants here.

Hurt asserts that "other such 'close call' incidents were ignored, covered up or swept under the rug by suspicious staff of the Facility," but he does not specify which staff were suspicious, and the only other "close call" incident Hurt describes involved no staff at all. (*Id.* at ¶ 24.) He explains that "[o]ne patient on K or L Unit often made a point of waiting outside whatever office Plaintiff and Lenhardt were sexually engaged in, and on one occasion he called out loudly as they came out after a sexual encounter, 'Hey! I want to get my dick sucked, too.' " (*Id.*) Hurt does not allege that any of the Defendants here heard this statement.[3]

By early 2017, Hurt had been moved from L Unit to K Unit; Hurt does not explain the reason for this move, nor does he state when the move occurred. (*Id.* at ¶ 5.) In K Unit, Defendant Drew Beck became Hurt's licensed social worker. (*Id.*) The Complaint refers to Beck as "Plaintiff's nominal social worker," but does not explain why Beck was only "nominal." (*Id.* at ¶ 25.) Beck's supervisor was Defendant Colleen Delaney, who reported to administrative supervisor Defendant Diana Hogan. (*Id.* at ¶¶ 28, 48, 49.) Defendant psychiatrists Hasina Javed and Faisa Kareemi also served as the "clinical leaders of [Hurt's] treatment plan" at unspecified times. (*Id.* at ¶ 27.) Hurt alleges that psychiatrist James Corcoran "trained and supervised Defendants Javed, Kareemi, Delaney, and Hogan," who, "in turn, . . . trained and supervised Defendants Lenhardt and Beck." (*Id.* at ¶¶ 43, 51.)

Hurt's assertions with respect to Defendants Corcoran, Javed, Kareemi, Beck, Delaney, and Hogan are limited. He often refers generically to "the administration" or the "staff" at EMHC instead of to particular named Defendants. Hurt broadly alleges, for example, that Lenhardt told him in late 2016 that "the administration" "suspect[ed]" their relationship and was "investigating."

---

[3]      In his response brief, Hurt asks the court to understand this specific incident in "context." (Pls.' Resp. [Hurt 66], at 18.) He claims that such an incident "could only have failed to cause a scene sufficient to be copiously documented and inspire official investigation . . . if everybody already knew what was always going on anyway." (*Id.*) No such conclusion appears in the Complaint, however, and the court disregards it.

4

(*Id.* at ¶ 26.)  Hurt also notes the "frequently expressed suspicions of many staff at the Facility," without explaining how he knows about those suspicions, and he claims there were "numerous incidents of obvious sightings of Plaintiff and Lenhardt in compromising situations," without describing any incidents beyond those discussed above.  (*Id.* at ¶ 32.)  He has not alleged that any incidents were reported to Defendants; he only broadly alleges that "Defendants Corcoran, Javed, Kareemi, Delaney, Hogan and Beck . . . deliberately ignor[ed] or refus[ed] to investigate reports from other staff about Lenhardt's observed suspicious conduct."  (*Id.* at ¶ 62.)

Hurt's complaint does contain some allegations specific to some Defendants, however. He asserts that Beck "asked Plaintiff several times why he and Lenhardt were 'so close,' " and alleges that "Plaintiff was very certain . . . that Beck must have been fully aware that something sexual was going on with Lenhardt."  (*Id.* at ¶ 25.)  By early 2017, Hurt asserts that Beck "became quite certain that Defendant Lenhardt and the Plaintiff were sexually involved" and that Beck "took his concerns" to Defendant Delaney.  (*Id.* at ¶ 28.)  Beck, Delaney, and Defendant Hogan then met, "discussed Beck's suspicions, and collaborated to avoid any report to [the Office of the Inspector General]" and to "cover up the ongoing sexual abuse of the Plaintiff."  (*Id.* at ¶ 29.)[4]

Hurt asserts that Javed and Kareemi, "during the time they treated Plaintiff," also "pointedly voiced telltale observations and asked questions of the Plaintiff, which indicated that they must have suspected him and Lenhardt of sexual activity" (*id.* at ¶ 27); he does not describe what those comments were, nor why they led him to believe as much.  Hurt further alleges that Javed, Kareemi, and Corcoran all "ignored, covered up, never reported, never stopped or even discouraged" Lenhardt's sexual activity with him, making them "complicit in the sexual abuse."

---

[4]     As a failure to investigate, Hurt asserts that a security camera would have captured Lenhardt's arrival in Plaintiff's room every day in early 2017, and that no "authority" figure "ever noticed or acted upon" such a video.  (*Id.* at ¶ 30.)  He alleges that Corcoran "had the ultimate clear duty to guard the safety of all patients at the Facility," implying that Corcoran should have been watching the security video.  (*Id.*)  But Hurt does not allege that Corcoran, nor any other Defendant, saw such video footage or had reason to watch it.  (*Id.*)

(*Id.* at ¶¶ 32, 33.)  And he claims that Javed, Kareemi, and Corcoran "falsified evidence in court reports and in Plaintiff's psychiatric and medical records, to falsely implicate Plaintiff as dangerously mentally ill and in continuing need of secure confinement in the Facility."  (*Id.* at ¶ 62.)  The court presumes, though Hurt does not so explicitly state, that he was potentially eligible for some type of earlier release than he ultimately received.

By Spring 2017, Hurt had "surreptitiously recorded several conversations with Lenhardt, and saved that evidence as audio files on electronic devices he owned."  (*Id.* at ¶ 34.)  He does not explain why he made those recordings.  In July 2017, before Hurt's "mandatory release date," "security personnel conducted an exhaustive search of Plaintiff's room."  (*Id.* at ¶¶ 34, 35.)  They "confiscated" Hurt's electronics, "which [Hurt] believes included at least four or five flash drives and two iPods," and appear to have contained the recordings.  (*Id.* at ¶¶ 35, 36.)  Hurt claims he was never given any explanation for the search and confiscation, was never provided with an inventory of the seized items, and that no "formal restriction of rights was ever documented."  (*Id.* at ¶ 35.)  Hurt now believes that his "digital files became evidence against Lenhardt, resulting in her being fired from the Facility, and causing the advent of an active investigation by the Illinois State Police."  (*Id.* at ¶ 38.)  Following the confiscation of his property, Hurt was "restricted to his room on K Unit, [and] denied all phone use and all communication with others . . . until his release on July 22, 2017."  (*Id.* at ¶ 37.)

Hurt filed his original complaint, through counsel, on November 2, 2017.  He then filed several amended complaints [Hurt 23, 39, 56].  He raises a host of constitutional claims pursuant to 42 U.S.C. § 1983, making all claims under the umbrella of the "Fourth and Fourteenth Amendments."  (Hurt TAC ¶ 17.)  Notably, Hurt does not specify which legal claims he raises against each particular Defendant; instead, he broadly refers to the "Defendants," or the

"Defendants, and each of them."[5]  (*See, e.g.*, *id.* at ¶¶ 77, 79.)  His "first claim for relief" is for "42 U.S.C. § 1983 – Excessive Force, Battery and Unlawful Search and Seizure, in violation of the Fourth and Fourteenth Amendments."  (*Id.* at 17.)  Within this claim, Hurt notes his "constitutional right[s] . . . to bodily integrity and freedom from unlawful searches and seizures of his property and person, and from sexual abuse and psychological manipulation."  (*Id.* at ¶ 72.)  He also asserts that Defendants failed to take "reasonable steps to protect" him from Lenhardt, and that they all "acted in concert."  (*Id.* at ¶¶ 76, 82.)

Hurt's "second claim for relief" asserts violations "of 42 U.S.C. § 1983 – Unlawful Search and Seizure, False Imprisonment in violation of the Fourth and Fourteenth Amendments."  (*Id.* at 20.)  He claims that "[t]he Defendants, and each of them, conducted malicious and sadistic violations to harm the Plaintiff, making him submit to enslavement as well as unlawful searches and seizures of his property and person, false imprisonment and violations of privacy."  (*Id.* at ¶ 101.)  He again asserts that "Defendants acted in concert," (*id.* at ¶ 103), and he claims that the Defendants were deliberately indifferent to the violation of his "fundamental human and constitutional rights" when they "refus[ed] to investigate or adequately handle violations" of his rights.  (*Id.* at ¶ 110.)

Though the allegations levied in Hurt's Complaint are difficult to parse, the court understands Hurt to bring due process, Fourth Amendment, and tort claims (including false imprisonment and battery) against each and every Defendant.

---

[5]  In an exception to this general pleading pattern, Hurt does make some specific allegations as to Lenhardt:  "The actions and enslavement as well as the force used by Defendant Lenhardt, as described herein, were malicious and/or involved reckless, callous, and deliberate indifference to Plaintiff's established, federally protected rights.  The failure to protect Plaintiff's constitutional rights, and the use of unlawful excessive force, assault, battery, sexual assault and rape by Lenhardt violated the Plaintiff's rights under the Fourth and Fourteenth Amendments."  (Hurt TAC ¶ 74.)

## II.   Mark Owens

Plaintiff Mark Owens entered DHS' care in August 2011 after being "adjudicated not guilty by reason of insanity [ ] in the Circuit Court of Will County, for a criminal charge of disarming a police officer."  (Owens' Fourth Amended Complaint ("Owens FAC") [Owens 65] ¶ 1.)  Owens was initially placed at Chester Mental Health Center, but he was later moved to EMHC, where he spent "years" (*id.* at ¶¶ 2, 11); he is currently interned at Chicago-Read Mental Health Center. (*Id.* at 2.)  His Complaint does not specify when or why he moved from Chester to EMHC, nor from EMHC to Chicago-Read.

Like Hurt, Owens was placed under Lenhardt's care on L Unit at EMHC.  (*Id.* at ¶ 2.)  He was also under the care of Defendant Javed on L Unit.  (*Id.* at ¶ 6.)  Owens spent at least some time on K Unit and N Unit, in addition to L Unit.  Owens asserts that "the clinical staff on K and L Units worked together and were familiar with each other's patients."  (*Id.* at ¶ 2.)

"Within a few months" of Owens' arrival at EMHC, Lenhardt made advances on him during a private counseling session.  (*Id.* at ¶ 3.)  Owens became uncomfortable and left the session; he then requested that his sessions be held "somewhere other than in [Lenhardt's] private office."[6] (*Id.* at ¶¶ 4, 5.)  Owens asserts that this "irritated" Lenhardt, who "react[ed] to [Owens'] earlier rejection of her sexual advance by implying that [he] was 'paranoid.' "  (*Id.* at ¶ 6.)  Lenhardt then suggested that Defendant psychiatrist Javed change Owens' "diagnosis . . . to bipolar disorder." (*Id.* at ¶¶ 6, 22.)  "Fortunately, Plaintiff [Owens] was able to prevail upon Dr. Javed" in 2012 "not to follow Lenhardt's suggestion."  (*Id.* at ¶¶ 7, 12.)  In the same session, Owens described to Javed "the general details and clear impropriety of Lenhardt's earlier sexual advance."  (*Id.* at

---

[6]     Owens does not specify to whom he made this request, nor does he note the ultimate outcome of the request.

¶ 7.)  Still, "Javed never reported the alleged incident to the Office of the Inspector General."  (*Id.* at ¶ 8.)

Owens additionally asserts that his psychiatrist on K Unit—Defendant Kareemi—"repeatedly recommended a diagnosis of lifelong major mental illness for him: schizoaffective disorder . . . [which] would have conveniently implied a prescription for stronger, debilitating anti-psychotic drugs which would likely have impaired Plaintiff's thinking and credibility."  (*Id.* at ¶ 9.) Owens does not allege that his diagnosis was, in fact, ever changed, however, nor does he assert that Lenhardt had any communication or contact with Kareemi regarding Owens' diagnosis.[7] Instead, Owens makes only a general allegation of "collu[sion]" among all individual Defendants to "make [Owens] available at Defendant Lenhardt's disposal for her own personal, perverted purpose of sexual abuse."  (*Id.* at ¶ 10.)

Lenhardt "repeatedly sexually abused" Owens "on at least three more occasions."  (*Id.* at ¶ 11.)  Owens alleges that:

> Defendant Lenhardt strongly "came on" to the Plaintiff so as to make her willful and wanton sexual assault into sexual battery, unlawfully touching and engaging in sex acts with the Plaintiff while he was confined, imprisoned, under her complete control, and under the control of her fellow staff on K and L Units who could change his diagnosis and drug him at their whim.

(*Id.* at ¶ 14.)  He offers no more specific information about the repeated abuse.

Owens makes some allegations that do not clearly pertain to his own treatment at EMHC. He alleges, for example, that Defendants Beck, Delaney, and Hogan "met together and explicitly agreed to conceal and not report sexual abuse of a disabled person."  (*Id.* at ¶ 15.)  This roughly matches Hurt's allegation about Beck, Delaney, and Hogan's meeting in 2017, but Owens does not explicitly state as much—this is puzzling, given that both Plaintiffs are represented by the same counsel and have filed a single response brief to all Defendants' motions to dismiss.  (*See*

---

[7]     In fact, Owens never states what his initial diagnosis was.

Plaintiff's Response in Opposition to Defendants' 12(b)(6) Motions to Dismiss [Hurt 66]; Plaintiff's Response in Opposition to Defendants' 12(b)(6) Motions to Dismiss [Owens 73] (hereinafter, collectively referred to as "Pls.' Resp.").)  Even if Owens is referring to Beck, Delaney, and Hogan's alleged meeting about Hurt, Owens has not alleged that Beck, Delaney, or Hogan— Hurt's treatment team—knew anything about Lenhardt's advances on Owens, nor that they had any involvement with Owens.[8]

In fact, Owens' Complaint contains no other allegations specific to Beck, Delaney, or Hogan.  Owens only alleges that Beck was "a social worker on K Unit"; he does not say that Beck was ever *his* assigned social worker.  (*Id.* at ¶ 24.)  He identifies Delaney as "a unit supervisor and officer employed by" DHS at EMHC (*id.* at 25), and Hogan "as an administrative supervisor and officer employed by" DHS and EMHC.  (*Id.* at ¶ 26.)  The Complaint contains no information about Beck, Delaney, or Hogan's individual actions with respect to Owens.  Owens also mirrors Hurt's assertion that Corcoran "trained and supervised Defendants Javed, Kareemi, Delaney, and Hogan; in turn, Defendants Javed, Kareemi, Delaney, and Hogan each trained and supervised Defendants Lenhardt and Beck."  (*Id.* at ¶¶ 20, 28.)  Owens adds, however, that Corcoran was the Medical Director at EMHC.[9]

Broadly, Owens alleges that all Defendants "fail[ed] to properly or neutrally investigate complaints of excessive force, false imprisonment and sexual abuse of Facility patients."  (*Id.* at ¶ 33(d).)  He also asserts that all "Defendants actively work to find no fault with staff conduct" (*id.*

_____

[8]     Similarly to Hurt, Owens airs some generalized grievances against EMHC and DHS that do not pertain to any particular Defendant.  For example, he claims that "[v]arious corrupt and/or criminal acts, and violations of clear written policy, were regular or typical practices contributing to a pervasive culture of abuse, sexual perversion and promiscuity at Elgin Mental Health Center and throughout the forensic psychiatric system of the Illinois Department of Human Services.  In the context of such a counter-therapeutic and degrading culture, the Plaintiff in this case was utterly unable to protect himself or his individual dignity."  (Owens FAC ¶ 16.)

[9]     Interestingly, Hurt's Complaint does *not* identify Corcoran as the medical director of EMHC, only as "a psychiatrist and officer" there.  (Hurt TAC ¶ 43.)

at ¶ 38); that they "routinely ratify, acquiesce, rubber stamp, and tolerate . . . unconstitutional actions of staff by routinely ignoring serious complaints of sexual misconduct" (*id.* at ¶ 39); that "they have provided cover-up support to members of the staff who were violating the constitutional and statutory rights of patients" (*id.* at ¶ 41); and that they "conducted a malicious and sadistic use of force to cause harm to the Plaintiff by forcing him to submit to excessive force, assault, battery, sexual abuse and rape." (*Id.* at ¶ 59.)  The claims laid out in Owens' Complaint look much like those of Hurt: pursuant to § 1983, Owens alleges an unlawful use of "excessive force, unlawful search and seizure," "false imprisonment and violation of privacy," all in violation of the Fourth and Fourteenth Amendments.  Owens does not mention due process in his complaint, but he does refer to his "clearly established constitutional right . . . to bodily integrity" (*id.* at ¶ 51), and to his right to privacy.  (*Id.* at ¶¶ 73–77.)

### III.     Procedural History

Defendants DHS, Corcoran, Javed, Kareemi, Beck, Delaney, and Hogan have filed motions to dismiss each case, pursuant to FED. R. CIV. P. 12(b)(6).  (Corcoran, DHS, Javed, and Kareemi's MTD [Hurt 48]; Beck, Delaney, and Hogan's MTD [Hurt 60]; Corcoran, DHS, Javed, and Kareemi's MTD [Owens 58]; Beck, Delaney, and Hogan's MTD [Owens 70].)  In both cases, Plaintiffs filed an identical response brief.  (*See* Pls.' Resp. [Hurt 66, Owens 73].)  Defendants then filed separate reply briefs in each case.  (Reply in Support of State Defendants' Motions to Dismiss [Hurt 67]; DHS Defendants' Reply in Support of their Motion to Dismiss Plaintiffs' Fourth Amended Complaint [Owens 79].)  Because of the similarity of Plaintiffs' claims and the overlapping legal issues, the court addresses Defendants' motions in both cases together.

**DISCUSSION**

### I.     Legal Standard

To survive a Rule 12(b)(6) motion to dismiss, "a complaint must 'state a claim to relief that is plausible on its face.' " *Kanter v. Barr*, 919 F.3d 437, 441 (7th Cir. 2019) (quoting *Bell Atl. Corp.*

*v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Forgue v. City of Chicago*, 873 F.3d 962, 966 (7th Cir. 2017) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  A complaint must also "sufficiently give to the defendants 'fair notice of what the . . . claim is and the grounds upon which it rests.' " *Bell v. City of Country Club Hills*, 841 F.3d 713, 716 (7th Cir. 2016) (modification in original) (quoting *Twombly*, 550 U.S. at 555).  *See also Bank of Am., N.A. v. Knight*, 725 F.3d 815, 818 (7th Cir. 2013) ("The Rules of Civil Procedure set up a system of notice pleading.  Each defendant is entitled to know what he or she did that is asserted to be wrongful.  A complaint based on a theory of collective responsibility must be dismissed.").

## II.    Official Capacity Claims

The Eleventh Amendment "bars [damages] actions in federal court against a state, state agencies, or state officials acting in their official capacities." *Indiana Prot. & Advocacy Servs. v. Indiana Family & Soc. Servs. Admin.*, 603 F.3d 365, 370 (7th Cir. 2010) (en banc) (citing *Edelman v. Jordan*, 415 U.S. 651, 662–63 (1974)).  A state may waive that immunity, or immunity may be abrogated by Congress "through a valid exercise of [Congress'] powers." *Indiana Prot.*, 603 F.3d at 371.  Here, the State of Illinois has not waived its immunity, and Congress has not abrogated the State's immunity.  Plaintiffs' claims against DHS and all officials in their official capacity are dismissed.

Plaintiffs' challenges to this conclusion are meritless.  (*See* Pls.' Resp. at 5–10.)  In their response brief, Plaintiffs assert, without citation, that "the Eleventh Amendment could only immunize states against lawsuits for actions that are *not prohibited* under the U.S. Constitution." (Pls.' Resp. at 4 (emphasis in original).)  This is an incorrect statement of the law. *Edelman*, 415 U.S. at 662–63 ("[T]his Court has consistently held that an unconsenting State is immune from suits brought in federal courts . . .") (citing, inter alia, *Hans v. Louisiana*, 134 U.S. 1 (1890)).

12

Plaintiffs' brief also argues that "[n]o one is immune who is complicit in [the] felon[ies]" of custodial sexual misconduct or sexual misconduct with a person with a disability. (Pls.' Resp., at 7 (citing 720 ILL. COMP. STAT. 5/11-9.2, 11-9.5).)[10] The brief provides no case law supporting this proposition, and statutes to which Plaintiffs cite do not mention waiver of immunity. Plaintiffs' brief *does* correctly explain "that state officials sued in their *individual* capacities are 'persons' within the meaning of § 1983, and the Eleventh Amendment does not bar suits against them." (Pls.' Resp. at 5 (emphasis added).) *See Hafer v. Melo*, 502 U.S. 21, 25 (1991). But, this argument does not save Plaintiffs' *official* capacity claims.

Next, Plaintiffs argue that their allegations are "very similar to excessive force claims against police." (Pls.' Resp. at 6 (citing cases).) Their theory appears to be that police officers accused of using excessive force may not be entitled to qualified immunity; therefore, the Defendants here must be subject to suit, too. (*See, e.g.*, *id.* (citing *Phillips v. Community Ins. Corp.*, 678 F.3d 513 (7th Cir. 2012) for the proposition that police "officers were not entitled to qualified immunity on arrestee's excessive force claim"); *see also* Pls.' Resp. at 6 ("If an officer handcuffs a suspect detainee to a chair and beats him to death with a baton while other officers stand by and let him do it, there is no issue of immunity merely because the cops are state actors.").) The problem with this argument is that, unlike states and state officials, municipalities and municipal officials may be sued directly under § 1983. *Compare Swanigan v. City of Chicago*, 775 F.3d 953, 961 (7th Cir. 2015) ("Municipalities 'can be sued directly under § 1983 for monetary, declaratory, or injunctive relief.' ") (quoting *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 690 (1978)) *with Illinois Dunesland Pres. Soc'y v. Illinois Dep't of Nat. Res.*, 584 F.3d 719, 721 (7th Cir. 2009) (explaining that "damages suits against state officials in their official

---

[10]     Though Plaintiffs cite 720 ILL. COMP. STAT. 5/11-9.2, it does not appear that Lenhardt was charged under that statute. *See People of Illinois v. Lenhardt*, 18-CF-667 (Kane Co. 2018) (charging Lenhardt under 720 ILL. COMP. STAT. 5/11-9.5(b)(1) and 5/33-3(a)(2)).

capacity are deemed suits against the state," and "states are not 'persons' within the meaning of Section 1983 can so cannot be sued under that section") (citing *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 65–66 (1989); *Green v. Mansour*, 474 U.S. 64, 73 (1985)).  State officials, like municipal officials, may be sued in their *individual* capacities under § 1983, but those claims are separate and distinct from official capacity claims.

Finally, Plaintiffs discuss 59 ILL. ADMIN. CODE § 50.20 (Reporting an Allegation of Abuse, Neglect, or Financial Exploitation and Death Reports) in the apparent belief that Defendants' alleged failure to report Lenhardt's sexual abuse constitutes a due process violation.  Whatever the merits of that theory, it does not overcome sovereign immunity.

The damages claims against DHS are dismissed, as are all official capacity damages claims against Defendants Corcoran, Javed, Kareemi, Beck, Delaney, and Hogan.

## II.    Claims for Injunctive and Declaratory Relief

The Eleventh Amendment does not immunize states, state agencies, or state officials from suits for declaratory and injunctive relief.  *See, e.g.*, *Verizon Maryland, Inc. v. Pub. Serv. Comm'n of Maryland*, 535 U.S. 635, 645 (2002).  Plaintiffs ask the court to grant "declaratory and injunctive relief . . . to redress the Defendants' ongoing, continuing deliberate indifference to fundamental human and constitutional rights . . . and with respect to their failure or willful refusal to investigate or adequately hand violations of the same."  (Hurt TAC ¶ 110; Owens FAC ¶ 90.)  They also request that the court order "equitable and injunctive relief from all contact or communication by the Defendants."  (Hurt TAC at 24; Owens FAC at 21.)  Defendants argue that Plaintiffs lack standing to seek prospective relief, and the court agrees.

Article III of the Constitution requires that plaintiffs "who seek to invoke the jurisdiction of the federal courts . . . alleg[e] an actual case or controversy."  *Lopez-Aguilar v. Marion Cty. Sheriff's Dep't*, 924 F.3d 375, 384 (7th Cir. 2019) (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 101 (1983)).  Plaintiffs' allegations in this case deal solely with past events.  Neither Hurt nor

14

Owens remains at EMHC, and there are no allegations that any individual Defendants have had contact with Hurt or Owens since they left EMHC. Owens remains in Defendant DHS's custody, but he has made no allegations against DHS nor the individual Defendants relating to his time outside of EMHC. These past events are insufficient to establish a case or controversy that would permit the court to enter declaratory or prospective relief. *See O'Shea v. Littleton*, 414 U.S. 488, 495–96 (1974) ("Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief [ ] if unaccompanied by any continuing, present adverse effects."); *Cornucopia Inst. v. U.S. Dep't of Agric.*, 560 F.3d 673, 676 (7th Cir. 2009) (explaining that a party seeking a declaratory judgment must "demonstrate that the court's adjudication would affect it in some way"). Plaintiffs' claims for declaratory and injunctive relief are dismissed.

### III.    Damages Claims against Defendants in Their Individual Capacities

All that remain are Plaintiffs' individual capacity claims against Defendants Corcoran, Javed, Kareemi, Beck, Delaney, and Hogan. These claims are essentially that each Defendant failed to intervene in the abuse perpetrated by Defendant Lenhardt. Plaintiffs bring their claims under 42 U.S.C. § 1983, which creates a private cause of action against any person who, acting under the color of state law, "subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." *Id.* As the Supreme Court has explained, Section 1983 "is not itself a source of substantive rights, but merely provides a method for vindicating federal rights elsewhere conferred." *Graham v. Connor*, 490 U.S. 386, 393–94 (1989) (internal quotation marks and citations omitted). Thus, the court's analysis of Hurt and Owens' 1983 claims requires identification of a "specific constitutional right allegedly infringed." *Id. See Grason v. Hardy*, No. 15 C 09290, 2017 WL 2834532, at *3 (N.D. Ill. June 30, 2017).

In addition, regardless of the type of constitutional violation alleged, a defendant is liable under Section 1983 only if he or she was "personally responsible for the alleged deprivation of

the plaintiff's constitutional rights." *Mitchell v. Kallas*, 895 F.3d 492, 498 (7th Cir. 2018) (citing *Wilson v. Warren Cnty.*, 830 F.3d 464, 469 (7th Cir. 2016)). Section 1983 "does not permit suits against parties merely for their supervision of others." *Green v. Beth*, No. 18-2900, — Fed. Appx. —, 2019 WL 2082020, at *2 (7th Cir. May 13, 2019). Instead, a deprivation of rights must have occurred "at a defendant's direction or with her knowledge or consent." *Mitchell*, 895 F.3d at 498. For a supervisor to be liable for the conduct of a subordinate, "the supervisor 'must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what [he] might see.' " *Gill v. City of Milwaukee*, 850 F.3d 335, 344 (7th Cir. 2017) (quoting *Matthews v. City of E. St. Louis*, 675 F.3d 703, 708 (7th Cir. 2012)); *see J.H. ex rel. Higgin v. Johnson*, 346 F.3d 788, 795 (7th Cir. 2003) ("[T]here is no liability under § 1983 for what a defendant 'should have known.' ") (quoting *Pacelli v. DeVito*, 872 F.2d 871, 876 (7th Cir. 1991)).

### A.      Pleading Adequate Personal Responsibility under Section 1983

#### 1.      Plaintiff Hurt

##### i.      Kareemi and Javed

Hurt makes few allegations specific to Drs. Kareemi or Javed in his twenty-five-page Complaint; most of his allegations are either vague or conclusory. (*See, e.g.*, Hurt TAC ¶ 61 (alleging that all individual Defendants "habitually resorted to coercion, excessive force, battery, false imprisonment and sexual abuse to obtain what they called 'treatment adherence' and 'insight' ").) Hurt also alleges, for example, that "many staff" at EMHC "frequently expressed suspicions . . . [about] Lenhardt's sexual abuse and enslavement [of him]." (*Id.* at ¶ 32.) Such an allegation does not indicate that any of the Defendants in this case knew of or turned a blind eye to that activity.

Hurt alleges, further, that Kareemi and Javed "pointedly voiced telltale observations and asked questions of the Plaintiff," meaning, according to Plaintiff, "that they must have suspected him and Lenhardt of sexual activity." (*Id.* at ¶ 27.) But Plaintiff Hurt's own perception of what

other individuals thought or knew does not establish that Kareemi or Javed facilitated, condoned, or turned a blind eye to Lenhardt's sexual abuse. *See Gill*, 850 F.3d at 344.

Still, one allegation from Hurt's Complaint allows the court to infer that Kareemi and Javed plausibly knew of or turned a blind eye to Lenhardt's activity: Hurt asserts that all Defendants "falsified evidence in court reports and in Plaintiff's psychiatric and medical records, to falsely implicate Plaintiff as dangerously mentally ill and in continuing need of secure confinement in [EMHC]." (*Id.* at ¶ 62.) Both Javed and Kareemi were Hurt's treating psychiatrists at some point during his internment, and presumably they would have had access to and some responsibility for Hurt's records. The court can infer that Defendants would not falsify medical records without a reason, and that reason could be that they knew of and sought to cover up Lenhardt's sexual activity with Hurt. Thus, the Complaint sufficiently alleges, if only barely, the personal responsibility of Hurt's treating psychiatrists.

### ii. Beck, Delaney, and Hogan

The allegations against Beck, Delaney, and Hogan are slightly more substantive than those against Kareemi and Javed. Hurt alleges that they, too, falsified reports and records that kept him confined. (*Id.* at ¶ 62.) He additionally asserts that Beck asked him "several times why [Hurt] and Lenhardt were 'so close,' " (*id.* at ¶ 25), and that Beck "took his concerns" about Hurt and Lenhardt to Delaney. (*Id.* at ¶ 28.) "Beck and Delaney then . . . met with Delaney's superior, Defendant Diana Hogan." (*Id.* at ¶ 28.) Those three Defendants "met together . . . discussed Beck's suspicions, and collaborated to avoid any report to" the Office of the Inspector General. (*Id.* at ¶ 29.) Instead of filing a report, they "purposefully cover[ed] up the ongoing sexual abuse of [Hurt]." (*Id.*) These alleged actions are sufficient to satisfy the personal responsibility requirement of Section 1983.[11]

---

[11] The court notes that this meeting allegedly happened in "early 2017." (Hurt TAC ¶ 28). Hurt's room at EMHC was raided in July 2017 as part of an investigation, and Lenhardt

17

### iii.    Corcoran

Hurt has not alleged personal responsibility on the part of Corcoran.  He alleges that Corcoran "had the ultimate clear duty to guard the safety of all patients at [EMHC]," (*id.* at ¶ 30), that Corcoran never investigated Lenhardt (*id.* at ¶ 32), that Corcoran was "complicit in the sexual abuse perpetrated . . . by Lenhardt," (*id.* at ¶ 33), and that Corcoran trained and supervised some of the other defendants.  (*Id.* at ¶ 51.)  Significantly, however, Hurt has not made allegations that support an inference that Corcoran knew of Lenhardt's sexual abuse.  And Hurt's allegation that Corcoran (and all other Defendants) "gave, failed to refuse, and/or countenanced orders for Facility staff to use excessive force, battery, false imprisonment and sexual abuse against the Plaintiff" is simply conclusory.  (*Id.* at ¶ 58.)

Hurt's allegation that all Defendants falsified evidence and medical records supports an inference of personal responsibility for the other individual Defendants, but not for Corcoran.  The Complaint does not suggest that Corcoran ever knew Hurt, treated Hurt, spoke with any other person about Hurt, or had access to Hurt's medical records.  Instead, the allegations against Corcoran are purely supervisory, and supervisory liability is non-cognizable under Section 1983.  Nor does Plaintiffs' brief bolster Hurt's claims against Corcoran.  The brief cites no law, and instead makes sweeping claims of widespread wrongdoing, for example, this:

> Defendant Corcoran holds an unusual and somewhat hidden position of authority within the Illinois Department of Human Services, described informally as "Statewide Forensic Medical Director". [sic]  The "game" of the state mental health system has Defendant Corocran as the "quarterback" over all plays executed.

(Pls.' Resp. at 17.)  The brief further claims that "clinical and administrative personnel at Elgin Mental Health Center hesitate to question Defendant Corcoran's authority . . . or to act on their

_____

was fired as a result of that investigation.  (Hurt TAC ¶¶ 35, 38.)  Thus, it is entirely possible that Beck's suspicions, rather than resulting in a cover-up, in fact led to the investigation.  "The plausibility standard," however, "does not amount to a 'probability requirement.' "  *Di Joseph v. Standard Ins. Co.*, No. 18-2178, — Fed. Appx. —, 2019 WL 2406629, at *3 (7th Cir. June 7, 2019) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  Hurt's allegations survive this motion.

own initiative without his explicit or presumed approval." (*Id.*)  And Plaintiffs' counsel insists that "[t]he Court must take judicial notice . . . of the extensive and pervasive power possessed by Defendant Corcoran over the freedom or imprisonment of the Plaintiffs," likening Corcoran to Dr. T. J. Eckleburg of *The Great Gatsby*.  (*Id.* at 17–18.)  The court disagrees—none of those "facts" appear in Hurt's Complaint.  Even if they did, they would not cure the flaws in Hurt's Section 1983 claims against Corcoran.  Those claims are dismissed.

### 2. Plaintiff Owens

#### i. Kareemi[12]

Plaintiff Owens' Complaint also contains largely conclusorily-pleaded facts and opinions about Kareemi and the other Defendants.  (*See, e.g.*, Owens FAC ¶ 34 ("Defendants ordered and/or permitted staff members at the Facility, under a 'mental health' pretense, to use excessive force, battery, sexual abuse of disabled individuals and false imprisonment when such activities and perversion are unnecessary"); *id.* at ¶ 36 (alleging that all "Defendants used excessive force, battery, false imprisonment and sexual abuse to punish and threaten patients at the Facility into robotic lip service and enforced, totalistic faith in the orthodoxy of mental-illness-as-brain-disease").)  Owens alleges, for example, that all "Defendants actively work to find no fault with staff conduct," (*id.* at ¶ 38), and that the "Defendants routinely ratify, acquiesce, rubber stamp, and tolerate malicious collusive conduct and unconstitutional actions of staff by routinely ignoring serious complaints of sexual misconduct."  (*Id.* at ¶ 39).  Owens makes these allegations without ever alleging that anyone ever made a report to any Defendants about Lenhardt's purported abuse of Owens.

---

[12]     Defendants do not move to dismiss Javed on lack of personal responsibility grounds.  Presumably, this is because Owens disclosed to Javed "the general details and clear impropriety of Lenhardt's [first] sexual advance."  (*Id.* at ¶ 7.)

Owens' only allegation specific to Kareemi is that she "repeatedly recommended a diagnosis of lifelong major mental illness for him: schizoaffective disorder, which the Plaintiff did not understand and with which he did not agree." (*Id.* at ¶ 9.) This does not raise a plausible inference that any deprivation of rights occurred at Kareemi's "direction or with her knowledge or consent." *Mitchell*, 895 F.3d at 498.

### ii. Beck, Delaney, and Hogan

Owens similarly fails to state a claim against Beck, Delaney, and Hogan. Owens makes the same general allegations against Beck, Delaney, and Hogan as he does against Defendant Kareemi. Those allegations are insufficient here for the same reasons. Few other allegations refer to Beck, Hogan, or Delaney at all. Generously reading the Complaint, the court can infer that Beck, a "social worker on K unit," and Owens, a resident at some point on K Unit, interacted. (Owens FAC ¶ 24.) But the Complaint does not say whether Owens was on K Unit before or after the advances of Lenhardt, nor whether Owens was a patient of Beck's. Owens fails to levy any allegations against Hogan or Delaney, beyond describing their job titles.

The closest Owens comes to asserting that Beck had any knowledge of Lenhardt's wrongdoing is the assertion that Beck met with Delaney and Hogan to "agree[ ] to conceal and not report sexual abuse of a disabled person." (*Id.* at ¶ 15.) Nothing about that assertion leads the court to believe that disabled person was Owens, and Owens does not purport to bring suit on behalf of any other class of individuals. Accordingly, Owens' Section 1983 allegations against Beck are dismissed.

### iii. Corcoran

Finally, Owens fails to allege that Corcoran, as Medical Director at EMHC, had any personal involvement with any alleged violations of his constitutional rights. (*Id.* at ¶ 20.) Owens only makes generalized allegations against Corcoran, without providing any facts that would allow the court to infer that Corcoran was personally responsibile for any unlawful activity. (*See, e.g.*,

*id.* at ¶ 37 ("Defendants . . . were, effectively, overseers on a plantation, not medical professionals in a hospital."); *id.* at ¶ 38 ("Defendants actively work to find no fault with staff conduct.").) Plaintiffs' briefing with respect to Corcoran is unhelpful, as discussed above. Owens' claims against Corcoran are dismissed.

### B. Stating a Claim for a Constitutional Violation

The court now turns to Plaintiffs' underlying constitutional claims, as required by Section 1983. "The Fourth Amendment protects '[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable . . . seizures.' " *Manuel v. City of Joliet, Ill.*, 137 S. Ct. 911, 917 (2017) (quoting U.S. Const. amend. IV). "The Fourteenth Amendment's guarantee of due process," on the other hand, "is triggered when the state deprives a person of 'life, liberty, or property.' " *Beley v. City of Chicago*, 901 F.3d 823, 826 (7th Cir. 2018) (quoting U.S. Const. amend. XIV, § 1).

As the court understands Plaintiffs' unlawful seizure argument, they claim not that they were unlawfully confined when they were sent to EMHC, but rather that they were unlawfully continually held there when, perhaps, they would otherwise have been eligible for release or moved away from EMHC. (*See, e.g.*, Hurt TAC ¶ 93.) All Defendants argue that the Fourth Amendment is inapplicable in this case, given that there was probable cause for Plaintiffs' initial commitment at EMHC. (Memo. in Support of Corcoran, DHS, Javed, and Kareemi's MTD [Hurt 49], at 7; Corcoran, DHS, Javed, and Kareemi's MTD [Owens 58] at ¶ 13 (citing *Villanova v. Abrams*, 972 F.2d 792, 795 (7th Cir. 1992).) *See Villanova*, 972 F.2d at 797 ("The deprivation of liberty brought about by confining . . . a person civilly committed[ ] is tested under the due process clause.") Plaintiffs do little to respond to this argument, beyond insisting that they did not lose their Fourth and Fourteenth Amendment rights "merely by being involuntarily hospitalized," and noting that "an involuntary patient's rights [are] to be construed similar to those of a pre-trial

detainee."  (Pls.' Resp. at 9 (citing *Webber v. Pharis*, No. 14 CV 5987, 2015 WL 475956, at *4 (N.D. Ill. Feb. 3, 2015)).)

Recent precedent on the constitutional provisions governing pretrial detention suggests that pretrial detainees, and thus the involuntarily committed, may challenge the fact of their detention under the Fourth Amendment.  *See Manuel*, 137 S. Ct. at 914–15 (overturning Seventh Circuit precedent that required a pretrial detainee to bring § 1983 challenges to pretrial detention under the Due Process Clause, and holding that a Plaintiff could "challenge his pretrial detention on the ground that it violated the Fourth Amendment," in a case where the pretrial detainee was held based on fabricated evidence); *Lewis v. City of Chicago*, 914 F.3d 472, 479 (7th Cir. 2019) (noting that "all § 1983 claims for wrongful pretrial detention—whether based on fabricated evidence or some other defect—sound in the Fourth Amendment.").  To the extent that Plaintiffs argue that their detention—not their treatment while detained, but the detention itself—was caused by the Defendants' actions or inactions, Plaintiffs' claim may be cognizable under the Fourth Amendment.  That does not mean that all claims by all pretrial detainees become Fourth Amendment claims.  *See, e.g.*, *Green v. Beth*, —Fed. Appx.—, No. 18-2900, 2019 WL 2082020, at *2 (7th Cir. May 13, 2019) (assessing a pretrial detainee's § 1983 deliberate indifference claims under the Fourteenth Amendment, where the detainee injured his teeth on the food in a county detention center); *see also Webber*, 2015 WL 475956 at *1 (explaining that neither the Supreme Court nor the Seventh Circuit have "directly addressed whether the involuntarily committed may seek relief under the Fourth Amendment for claims of excessive force" and determining that the Due Process Clause, and not the Fourth Amendment, govern Fourth, Eighth, and Fourteenth Amendment claims by the involuntarily committed).  The court need not determine at this stage whether the Fourth Amendment applies, given that Plaintiffs have successfully stated claims under the Fourteenth Amendment's due process clause.  *See Alioto v. Town of Lisbon*, 651 F.3d

715, 721 (7th Cir. 2011) ("[W]e have stated repeatedly (and frequently) that a complaint need not plead legal theories, which can be learned during discovery.").[13]

The Due Process Clause has both substantive and procedural components; Plaintiffs' complaints plead facts relevant to both.  "The two elements of a procedural due process claim are '(1) deprivation of a protected interest and (2) insufficient procedural protections surrounding that deprivation.' "  *Tucker v. City of Chicago*, 907 F.3d 487, 491 (7th Cir. 2018) (quoting *Michalowicz v. Vill. of Bedford Park*, 528 F.3d 530, 534 (7th Cir. 2008)).  Both Plaintiffs have a protected interest in their bodily integrity.  *See Gibson v. Am. Cyanamid Co*., 760 F.3d 600, 615 (7th Cir. 2014) (explaining that "[s]ubstantive due process protections" traditionally include " 'the right to bodily integrity' ") (quoting *Albright v. Oliver*, 510 U.S. 266, 272 (1994) (plurality opinion)).  Each has pleaded facts that plausibly suggest he was denied procedural protections with respect to his bodily integrity.  Hurt alleges that his medical records were falsified to indicate that he was dangerously ill, resulting in a longer hospitalization and therefore extended subjection to Lenhardt's aggressions.  He also alleges that EMHC employees met and conspired to hide his sexual abuse.  Owens asserts that he informed Javed of Lenhardt's illegal sexual advances and that Javed did nothing to protect him.[14]  These basic facts give Kareemi, Javed, Beck, Delaney,

---

[13]    The Defendants argue that that Owens' claims "do not read as due process claims" and therefore should be dismissed.  (Dfs' Reply [Owens 79], at 5 (noting that "[t]he phrase 'due process' does not appear even once in [Owens'] complaint, and defendants understood the complaint's combined references to the 'Fourth and Fourteenth Amendments' [ ] to be based on the incorporation doctrine").)   "[P]laintiffs are not required to identify legal theories in their complaint," *Zurbriggen v. Twin Hill Acquisition Co., Inc.*, 338 F. Supp. 3d 875, 898 n.19 (N.D. Ill. 2018), and Defendants' assumptions regarding Plaintiffs' claims do not control the court's objective 12(b)(6) analysis.

[14]    Plaintiffs' response brief cites 59 ILL. ADMIN. CODE § 50.20 to suggest that Defendants had a legal duty to report Lenhardt's abuse to the Office of the Inspector General. Plaintiffs are reminded, however, that "a state actor's violations of state law do not form the basis of a federal constitutional claim."  *Mitchell v. Richard*, 745 F. App'x 251, 253 (7th Cir. 2018).

and Hogan sufficient notice of Hurt's procedural due process claims, and give Javed sufficient notice of Owens' claims.

Substantive due process protects individuals against a state's "exercise of power without any reasonable justification in the service of a legitimate governmental objective." *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998). "There are two types of substantive due process violations. The first occurs when the state actor's conduct is such that it 'shocks the conscience.' " *T.E. v. Grindle*, 599 F.3d 583, 589 (7th Cir. 2010) (quoting *Rochin v. California*, 342 U.S. 165, 172–73 (1952)). "The second occurs when the state actor violates an identified liberty or property interest protected by the Due Process Clause." *Grindle*, 599 F.3d at 589 (citing *Meyer v. Nebraska*, 262 U.S. 390, 399 (1923)). While the shocks-the-conscious standard is demanding, *see Viehweg v. City of Mount Olive*, 559 F. App'x 550, 552 (7th Cir. 2014) ("[A]buse that is merely tortious or even 'abhorrent' does not offend substantive due process."), Plaintiffs have alleged that state actors have violated a protected liberty interest, as explained above. The court, thus, denies Javed's motion to dismiss both Plaintiffs' constitutional claims, and it denies Kareemi, Beck, Delaney, and Hogan's motion to dismiss Hurt's constitutional claims.

The court notes, however, that Hurt has no constitutional right protecting the electronics in his room at EMHC, nor his privacy there. *See Hudson v. Palmer*, 468 U.S. 517, 526, 533 (1984) (holding that the Fourth Amendment does not protect prisoners in prison cells because prisoners do not have "any subjective expectation of privacy" there, and that "intentional deprivations [of property] do not violate [the Due Process] Clause provided . . . that adequate state post-deprivation remedies are available.") His claims based on the taking of his personal property are dismissed.

**III.    Supplemental Jurisdiction**

Defendants' arguments for dismissal focus solely on Plaintiffs' constitutional claims. Defendants have not moved to dismiss any potential supplemental state claims. Thus, the court continues to exercise jurisdiction over those claims.  28 U.S.C. § 1367.

## CONCLUSION

Defendants' motions to dismiss [Hurt 48, Hurt 60, Owens 58, Owens 70] are granted in part and denied in part . Plaintiffs' claims against DHS are dismissed, as are their official capacity claims.  Plaintiffs' claims for declaratory and injunctive relief are also dismissed.   Both Plaintiffs' claims against Javed, acting in her individual capacity, and Hurt's claims against Kareemi, Beck, Delaney, and Hogan, acting in their individual capacities, survive Defendants' motions.  Defendant Corcoran is dismissed.

ENTER:

Dated:  August 15, 2019

REBECCA R. PALLMEYER
United States District Judge