# **<u>EXHIBIT C</u>**

OWEN v. JAVED, et al.                              No. 18 CV 334
DEPOSITION OF: CHRISTY LENHARDT            February 1, 2022

Page 1

1          IN THE UNITED STATES DISTRICT COURT
              NORTHERN DISTRICT OF ILLINOIS
2                   EASTERN DIVISION

3

4   MARK OWENS,                        )
                                       )
5              Plaintiff,              )
                                       )
6   vs.                                ) No. 18-cv-334
                                       )
7   HASINA JAVED,                      )
                                       )
8              Defendant.              )
    *****************************)
9   BENAHDAM HURT,                     )
                                       )
10             Plaintiff,              )
                                       )
11  vs.                                )
                                       )
12  HASINA JAVED, et al.,              )
                                       )
13             Defendants.             )

14

15          The deposition of CHRISTY LENHARDT

16  called by the Defendants for examination, taken

17  pursuant to the Federal Rules of Civil Procedure

18  for the United States District Courts pertaining

19  to the taking of depositions, taken before Gay

20  Dall, CSR and RPR, via Zoom on the 1st day of

21  February, 2022, at 9:15 a.m.

22

23

24

OWEN v. JAVED, et al.                          No. 18 CV 334
DEPOSITION OF:  CHRISTY LENHARDT          February 1, 2022

```
                                                  Page 2
 1              A P P E A R A N C E S:

 2

 3   KRETCHMAR & CECALA

 4   18 South Northwest Highway

 5   Suite 200

 6   Park Ridge, Illinois 60068

 7   (312)235-6752

 8   BY:  Mr. Joseph John Cecala
             jcecala@expansionfunding.com
 9

10   and

11   STUART RANDOLPH KRETCHMAR

12   Attorney at Law

13   Wilmette, Illinois 60091

14   (847)853-8106

15   BY:  Mr. Stuart Randolph Kretchmar
             srandolphk@gmail.com
16
         on behalf of Benahdam Hurt
17       and Mark Owens;

18

19

20

21

22

23

24
```

OWEN v. JAVED, et al.                                    No. 18 CV 334
DEPOSITION OF:  CHRISTY LENHARDT                   February 1, 2022

```
                                                        Page 3
 1   APPEARANCES: (Continued)

 2   OFFICE OF THE ILLINOIS ATTORNEY GENERAL

 3   General Law Bureau

 4   100 West Randolph Street

 5   13th Floor

 6   Chicago, Illinois 60601

 7   (312)814-4417

 8   BY:  Ms. Mary A. Johnston
          Assistant Attorney General
 9        mary.johnston@ilag.gov

10        Appeared on behalf of Hasina Javed
          (Owens) and Hasina Javed, Faiza Kareemi,
11        Colleen Delaney, Diana Hogan (Hurt);

12

13   OFFICE OF THE ILLINOIS ATTORNEY GENERAL

14   General Law Bureau

15   100 West Randolph Street

16   13th Floor

17   Chicago, Illinois 60601

18   (312)814-6534

19   BY:  Ms. Amanda Kozar
          Assistant Attorney General
20        amanda.kozar@ilag.gov

21        Appeared on behalf of Drew Beck (Hurt);

22

23

24
```

OWEN v. JAVED, et al.                                    No. 18 CV 334
DEPOSITION OF:  CHRISTY LENHARDT                  February 1, 2022

Page 4

1   APPEARANCES: (Continued)

2   OFFICE OF THE ILLINOIS ATTORNEY GENERAL

3   General Law Bureau

4   100 West Randolph Street

5   13th Floor

6   Chicago, Illinois 60601

7   (312)814-6131

8   BY:  Ms. Sarah H. Newman
         Civil Rights Unit Supervisor
9        sarah.newman@ilag.gov

10       Appeared on behalf of Hasina Javed, Faiza
         Kareemi, Colleen Delaney and Diana Hogan
11       (Hurt);

12

13  STEVEN J. BRODY & ASSOCIATES

14  1095 Pingree Road

15  Suite 213

16  Crystal Lake, Illinois 60014

17  (815)374-7783

18  BY:  Mr. Steven J. Brody
         sjbrodylaw.com
19       on behalf of the witness, Christy Lenhardt;

20

    ALSO PRESENT:
21
         Mr. Rory Cannon, Illinois Department of
22       Health and

23       Mr. Sean Gunderson.

24

OWEN v. JAVED, et al.                                      No. 18 CV 334
DEPOSITION OF:  CHRISTY LENHARDT                    February 1, 2022

```
                                                          Page 5
 1                        I N D E X

 2

 3   THE WITNESS:                          PAGE

 4   CHRISTY LENHARDT

 5   Direct Examination by Ms. Johnston        6

 6   Direct Examination by Ms. Kozar         140

 7   Cross-Examination by Mr. Cecala         147

 8

 9

10                    E X H I B I T S

11                                    Referenced

12                                       PAGE

13   Exhibit 1                              67

14   Exhibit 2                             135

15   Exhibit 3                             110

16   Exhibit 4                             111

17

18

19

20

21

22

23

24
```

OWEN v. JAVED, et al.                        No. 18 CV 334
DEPOSITION OF:  CHRISTY LENHARDT            February 1, 2022

Page 6

```
 1            (The witness was duly sworn.)

 2                 CHRISTY LENHARDT,

 3      being first duly sworn to testify to the

 4      truth and nothing but the truth, was examined

 5      and testified as follows:

 6                 DIRECT EXAMINATION

 7      BY MS. JOHNSTON:

 8            Q.   First of all, Mr. Lenhardt, can you

 9      please state and spell your name on the record.

10            A.   Christy Lenhardt, C-H-R-I-S-T-Y,

11      L-E-N-H-A-R-D-T.

12                 MS. JOHNSTON:  And if we want to,

13      everybody can hit their cameras off, if they're

14      so inclined.  Shall we get everybody else's

15      appearances on the record quickly.

16                 MR. BRODY:  Steven Brody, attorney

17      for Christy Lenhardt.

18                 MR. CECALA:  Joseph Cecala,

19      C-E-C-A-L-A, attorney for Mark Owens and Ben

20      Hurt.

21                 MR. KRETCHMAR:  S. Randolph

22      Kretchmar.  That's first initial S, as in

23      Stuart, R-A-N-D-O-L-P-H, K-R-E-T-C-H-M-A-R,

24      also attorney for Ben Hurt and Mark Owens.
```

OWEN v. JAVED, et al.                                No. 18 CV 334
DEPOSITION OF:  CHRISTY LENHARDT         February 1, 2022

Page 7

```
 1              MS. JOHNSTON:  Mary Johnston,

 2      J-O-H-N-S-T-O-N, attorney for defendants,

 3      Javed, Kareemi, Delaney and Hogan in the Hurt

 4      matter, and attorney for defendant Javed in the

 5      Owens case.

 6              MS. KOZAR:  Amanda Kozar, attorney

 7      for the defendant, Drew Beck, in the Hurt case.

 8              MS. NEWMAN:  Sarah Newman attorney

 9      for defendants, Javed, Kareemi, Hogan and

10      Delaney in the Hurt case.

11              And before we all mute, if I could

12      ask, could we please don't forget to swear in

13      the witness.

14              THE STENOGRAPHER:  I swore her in

15      already.

16              MS. NEWMAN:  I didn't hear that

17      part.  Sorry.

18              MS. JOHNSTON:  And then Rory and

19      Sean, did you want to put your appearances on.

20              MR. CANNON:  Sure.  Rory Cannon,

21      assistant general counsel, Illinois Department

22      of Human Services.

23              MR. CECALA:  Sean, you can just

24      give her your information as our paralegal.
```

OWEN v. JAVED, et al.                           No. 18 CV 334
DEPOSITION OF:  CHRISTY LENHARDT           February 1, 2022

Page 8

1              MR. GUNDERSN:  Yes.  Sean

2     Gunderson, paralegal for Kretchmar and Cecala

3     Law Firm.

4     BY MS. JOHNSTON:

5          Q.   Okay.  We're going to go ahead and

6     get started, but before I get into any

7     questions, I'm just going to go over a couple

8     of ground rules with you, Ms. Lenhardt.

9              Have you ever been deposed before?

10         **A.   No.**

11         Q.   Okay.  So these are just a couple

12    of ground rules to make it a little bit easier

13    so that we can get a clean record.

14             As you can see, Gay here is a court

15    reporter, so we need her to be able to take

16    down everything we're saying accurately.

17             So the first is to make sure that

18    you use verbal answers.  So yeses and nos, as

19    opposed to uh-huhs, huh-huhs or you know,

20    nodding and shaking of the head.

21             Then please wait for myself or

22    whoever is asking the questions to fully finish

23    their question before you start answering.  And

24    I will do the same, and let you fully finish

OWEN v. JAVED, et al.                                    No. 18 CV 334
DEPOSITION OF:  CHRISTY LENHARDT              February 1, 2022

Page 9

1     your answer before I move on to the next

2     question.  That just helps avoid having any

3     issues with the record once we get the

4     transcript back.

5                  We can take breaks, if you need to,

6     but I do ask that if you need to take a break

7     for any reason, if I've asked a question, just

8     make sure you answer that question before we

9     take the break.

10                 And if you don't understand one of

11    the questions that I ask, tell me.  If you

12    answer a question, we are going to assume that

13    you understood what was being asked, and that

14    you answered as you intended to.  So if you're

15    unsure about something, let me know, and I will

16    rephrase it to make sure that you know what I'm

17    asking.

18                 Do you understand that right now

19    you are under oath and required to tell the

20    truth?

21        **A.    Yes.**

22        Q.    Okay.  And I ask this of everybody,

23    but is there any reason that you cannot testify

24    truthfully today?

OWEN v. JAVED, et al.                           No. 18 CV 334
DEPOSITION OF:  CHRISTY LENHARDT          February 1, 2022

                                                    Page 10

 1          **A.    No.**
 2          Q.    You're not on any medications that
 3    would impact your ability to tell the truth?
 4          **A.    No.**
 5          Q.    Or any medications that would
 6    impact your ability to remember, you know, the
 7    recent past?
 8          **A.    No.**
 9          Q.    Okay.
10              MR. CECALA:  One other ground rule,
11    Christy.  If Steven or Randy or I make an
12    objection, just -- the court reporter can't
13    take down two people talking at the same time.
14              THE WITNESS:  Okay.
15              MR. CECALA:  You want to let the
16    person objecting finish.  Same as the question,
17    let everyone finish saying what they're saying
18    before you start your answer or get an
19    instruction from Steven or whatever the case
20    may be.  You just want to make sure that the
21    record -- the court reporter can't take down
22    two people talking at the same time.  So if
23    we're talking as well, and there's an
24    objection, just wait until they finish the

OWEN v. JAVED, et al.                          No. 18 CV 334
DEPOSITION OF: CHRISTY LENHARDT          February 1, 2022

                                              Page 11

1     objection, and then you give your answer.

2     Okay?

3                    THE WITNESS:  Okay.

4                    MS. NEWMAN:  And before we begin, I

5     just -- I have a question.  You said Sean

6     Gunderson is you paralegal.  Is this the same

7     Sean Gunderson that has at least one lawsuit

8     pending against various defendants at Elgin

9     Mental Health Center?

10                    MR. CECALA:  He does.

11                    MS. NEWMAN:  Does he have any

12    lawsuits pending against the defendants in this

13    case?

14                    MR. CECALA:  No.

15                    MS. NEWMAN:  We're just concerned

16    that that represents of a bit of a conflict for

17    him because he is a, you know --

18                    MS. JOHNSTON:  Yeah.

19                    MS. NEWMAN:  Yeah.  I'm afraid I do

20    kind of have to object to having him present

21    during the deposition, given his personal --

22                    MR. CECALA:  Noted.  He's been our

23    paralegal before his claim against the --

24    against other defendants.  So noted.

OWEN v. JAVED, et al.                                    No. 18 CV 334
DEPOSITION OF:  CHRISTY LENHARDT                    February 1, 2022

Page 12

 1              We believe Rory has a conflict of

 2      interest as well.  But we went on the record

 3      last time asserting that, you know, someone

 4      who's not participating, but is listening --

 5      and he's an employee.  So he is a valuable

 6      paralegal in these cases to us.  And he has

 7      been working on this case long before he had

 8      his own suit against the other defendants.  So

 9      he's not here for some nefarious reasons.  He's

10      here because he does paralegal work on this

11      case.

12              MS. JOHNSTON:  The objection is

13      noted on the record, and we'll move forward

14      with the deposition.

15      BY MS. JOHNSTON:

16              Q.  And so, Ms. Lenhardt, sorry about

17      that.

18              I'm going to just get a little bit

19      of a personal background from you.  First, what

20      is your date of birth?

21              **A.**  ▇▇▇▇▇▇▇▇

22              Q.  And where did you grow up?

23              **A.   Melrose Park and Addison and Elk**

24      **Grove Village.**

OWEN v. JAVED, et al.                                    No. 18 CV 334
DEPOSITION OF:  CHRISTY LENHARDT                 February 1, 2022

                                                           Page 13
 1            Q.   And what is the highest level of

 2    education that you've completed?

 3            A.   **Master's degree in social work.**

 4            Q.   Okay.  Let's backtrack there.

 5    Where did you go to college?

 6            A.   **University of Illinois at Chicago.**

 7            Q.   UIC?

 8            A.   **Uh-huh.**

 9            MR. BRODY:  You have to answer --

10    excuse me.  You have to answer yes or no

11    verbally and loud enough.  "Uh-huh" is

12    something that the court reporter can't take

13    down.

14            THE WITNESS:  Oh, okay.

15            MS. JOHNSTON:  It's a very common

16    thing to do, so don't feel bad if any of us

17    mention it again.  It takes a while to get used

18    to.

19    BY MS. JOHNSTON:

20            Q.   When did you graduate from UIC?

21            A.   **1987.**

22            Q.   What was your degree in?

23            A.   **Social work.**

24            Q.   And you stated you received a

OWEN v. JAVED, et al.                                    No. 18 CV 334
DEPOSITION OF:  CHRISTY LENHARDT                    February 1, 2022

Page 14

1     master's?

2              **A.    Yes.**

3              Q.    Where did you obtain that master's

4     degree?

5              **A.    University of Illinois at Chicago.**

6              Q.    And was that a master's in social

7     work?

8              **A.    Yes.**

9              Q.    When did you get that master's

10    degree?

11             **A.    In '87.**

12             Q.    At the same time you were doing

13    both programs kind of concurrently?

14             **A.    What do you mean "both programs"?**

15             Q.    Well, you said that you graduated

16    from UIC.  Was that undergrad that you

17    graduated in 1987?

18             **A.    That was my master's degree.**

19             Q.    Okay.  When did you graduate from

20    undergrad?

21             **A.    I'm sorry.  I didn't realize the**

22    **difference in the questions.  I graduated with**

23    **my undergraduate degree in 1986.**

24             Q.    So then you went straight into that

OWEN v. JAVED, et al.                          No. 18 CV 334
DEPOSITION OF:  CHRISTY LENHARDT          February 1, 2022

```
                                                   Page 15

 1     master's in social work program?
 2            A.   Correct.
 3            Q.   And then did you become a social
 4     worker in 1987?
 5            A.   Yes.
 6            Q.   And what was your first job as a
 7     social worker?
 8            A.   I was a social worker at Allendale
 9     in Waukegan.
10            Q.   Did you say Allendale, like, A-L --
11            A.   Allendale, uh-huh.
12            Q.   Okay.
13                 MR. BRODY:  You did it again with
14     the uh-huh.
15                 THE WITNESS:  Sorry.
16                 MR. BRODY:  That's all right.
17     Relax.  You're fine.
18     BY MS. JOHNSTON:
19            Q.   Allendale in Waukegan.  And when
20     did you start at Allendale?
21            A.   I need to look at my resume.
22     Sometime in 1987.
23            Q.   And how long were you there?
24            A.   I'm not sure these answers are
```

OWEN v. JAVED, et al.                                    No. 18 CV 334
DEPOSITION OF:  CHRISTY LENHARDT                    February 1, 2022

Page 16

1      going to be completely correct.  I didn't

2      expect these kind of questions to be answered.

3      I haven't reviewed my resume.  This is 30 --

4      20-something years ago.

5            Q.    That's okay.

6                  Roughly, how long were you there?

7            A.    A year and a half.

8            Q.    And what did you -- what kind of

9      facility is Allendale?

10           A.    I worked in one of their group

11     homes for emotionally disturbed boys.

12           Q.    And after leaving Allendale roughly

13     sometime in 1989 or maybe 1990, again,

14     that's -- I understand this is a long time

15     ago -- where did you work next?

16           A.    Jane Addams School of Social Work.

17           Q.    And what did you do there?

18           A.    I was the social worker.  I did

19     therapy with the students who were emotionally

20     disturbed.

21           Q.    And, roughly, how long were you at

22     the Jane Addams School of Social Work?

23           A.    Two years; maybe, two and a half.

24           Q.    And after Jane Addams?

OWEN v. JAVED, et al.                           No. 18 CV 334
DEPOSITION OF:  CHRISTY LENHARDT              February 1, 2022

                                                    Page 17

1          **A.   I worked at -- I'm sorry.  I worked**
2     **at -- I can't remember.  It was on Irving Park**
3     **Road.  I wish you told me, I would have brought**
4     **my resume.  At the moment, I can't remember the**
5     **name.  We could go back.**
6          Q.   That's okay.
7          **A.   Oh, Streamwood.  Streamwood**
8     **Behavioral Health.**
9          Q.   And do you have a rough time frame
10    for how long you were at Streamwood?
11         **A.   A couple of years, two or three**
12    **years.**
13         Q.   And after Streamwood, where did you
14    work?
15         **A.   I went into independent contract**
16    **work.  I worked with the Institute for Stress**
17    **Management.**
18         Q.   Where is that located?
19         **A.   They were -- they're no longer.**
20    **They were located in Hoffman Estates.**
21         Q.   And do you have an estimate as to
22    how long you were doing that independent
23    contract work with them?
24         **A.   It was during my pregnancy with my**

Page 18

1    **oldest son.  And he was born in -- was about**

2    **six months old.  So 1990 -- nineteen -- he was**

3    **born in February.  1994.**

4                    MR. BRODY:  Speak up a little bit.

5                    THE WITNESS:  Okay.

6    BY MS. JOHNSTON:

7            Q.    And after that, where did you work

8    next?

9            **A.    Lifecore.**

10           Q.    Is that, again, as a social worker?

11           **A.    Yes.**

12           Q.    Okay.  What kind of business or

13   company is that?

14           **A.    They worked -- Dr. Delosantos**

15   **(phonetically) had patients at various group**

16   **homes -- not group homes -- nursing homes, and**

17   **I went in and did mental statuses on the**

18   **patients and assigned them to groups and did**

19   **the groups.**

20           Q.    And do you have an estimate as to

21   how long you were at Lifecore?

22           **A.    I guess another two years.**

23           Q.    And where did you go after you were

24   at Lifecore?

OWEN v. JAVED, et al.                                    No. 18 CV 334
DEPOSITION OF:  CHRISTY LENHARDT                   February 1, 2022

                                                            Page 19
1         **A.    Elgin Mental Health Center.**

2         Q.   Okay.  And do you remember when you

3    started at Elgin?

4         **A.   I used to -- I worked there 20**

5    **years and that ended in 2017.**

6         Q.   All right.  So probably somewhere

7    around 1997 or so?

8         **A.   Yeah.**

9         Q.   Okay.  And so you started at Elgin

10   in roughly 1997, and I understand that we're

11   giving that as an estimated date for right now.

12             So when you started at Elgin, what

13   was your job title?

14        **A.   Social worker on the civil side.**

15        Q.   You say the "civil side," can you

16   explain what that means?

17        **A.   Where patients from the community**

18   **are hospitalized, psychiatrically hospitalized.**

19        Q.   And when you say "From the

20   community," is that different -- well, you

21   mentioned the civil side.  What is the other

22   side of Elgin?

23        **A.   Forensics.**

24        Q.   And is that where the patients who

OWEN v. JAVED, et al.                                No. 18 CV 334
DEPOSITION OF:  CHRISTY LENHARDT            February 1, 2022

                                                        Page 20

 1      are required to be there --

 2            A.    Court ordered, yes.

 3            Q.    So the individuals on the civil

 4      side, are those individuals who have

 5      voluntarily entered the Elgin Mental Health

 6      Center?

 7            A.    Some of them.  Some of them were on

 8      petitions.

 9            Q.    Okay.  And do you remember what

10      unit that would have been called, or was it

11      called something completely different?

12            A.    I'm nervous, so I can't remember

13      stuff.  Kate Lee.  Kate Lee.

14            Q.    Kate Lee?

15            A.    Yes.  Kate is a person.  Kate,

16      K-A-T-E, Lee, L-E-E.

17            Q.    Okay.  And --

18            A.    Then I switched over to one that

19      started with a W.  And the one that started

20      with a W, I cannot recall the name at this

21      moment.

22            Q.    Was that unit with a W also on the

23      civil side?

24            A.    Yes.

OWEN v. JAVED, et al.                                No. 18 CV 334
DEPOSITION OF:  CHRISTY LENHARDT          February 1, 2022

Page 21

```
 1          Q.   Okay.  And what were your

 2    responsibilities while you were working at the

 3    Kate Lee unit and the W unit?

 4          A.   Whittman.  Whittman.  That was the

 5    name.  W-H-I-T-T-M-A-N, I believe.

 6               So my responsibilities were to

 7    admit people.  I did the admission paperwork,

 8    did their social assessments, wrote their

 9    treatment plans, did their counseling,

10    attended, and -- I don't think I led them, but

11    attended their treatment plan meetings once a

12    month.  Discharged them.  Helped them develop a

13    relapse prevention.  I'm sorry.  Developed

14    their discharge plan for where they were going

15    to go live after their discharge, and where

16    they were going to get their treatment.

17          Q.   And what was the make up of -- the

18    demographic of the patients on these units;

19    meaning, was it co-ed, all men, all woman?

20          A.   It was co-ed.  One side was the

21    men, and one side had the women.  And one

22    hallway had the men and one hallway had the

23    women with, I think, a nurse's station in

24    between.
```

OWEN v. JAVED, et al.                                      No. 18 CV 334
DEPOSITION OF: CHRISTY LENHARDT                    February 1, 2022

Page 22

1          They were age 21 and over.  No.

2    18.  I think when they were 18, they could be

3    hospitalized there.

4          Q.   Okay.  So you were at the -- call

5    it the -- whatever you said.

6          A.   The Kate Lee.

7          Q.   The Kate Lee and the Whittman units

8    on the civil side.  And it sounds like it

9    was -- a lot of the work that you were doing

10   there overlapping the same general stuff just

11   on two different units?

12         A.   Yes, they were both exactly the

13   same.

14         Q.   Okay.  And how long were you on the

15   civil side?

16         A.   Eight years.

17         Q.   And so that's putting us until

18   approximately 2005 give or take?

19         A.   Yes.

20         Q.   And where did you go then in 2005?

21         A.   To the forensics side of the

22   hospital.  The forensic psychiatric units.

23         Q.   And which unit were you first

24   assigned to on the forensic side?

OWEN v. JAVED, et al.                              No. 18 CV 334
DEPOSITION OF:  CHRISTY LENHARDT               February 1, 2022

Page 23

1          **A.   M.  They were all letters.  M,**
2      **like, Mary.**
3          Q.   Okay.  And what was the make up of
4      that unit?  Was it co-ed?  Is it all men, all
5      women?
6          **A.   Just all men.  Wait.  Yeah, all**
7      **men.  Sorry.**
8          Q.   And how long were you on the M
9      unit?
10         **A.   Maybe four years.  Three.**
11         Q.   Do you know why it is that you were
12     transferred from the civil side to the
13     psychiatric side?
14         **A.   I asked for it.**
15         Q.   Why did you request that transfer?
16         **A.   I applied.  Sorry.  Because the pay**
17     **was higher on the forensic side, and I was**
18     **interested in changing my work up.**
19         Q.   You said changing your work up,
20     meaning just kind of switching what it --
21         **A.   Yeah.**
22         Q.   -- was you were doing?
23         **A.   Yeah.**
24         Q.   Okay.  So you were on the M Unit

OWEN v. JAVED, et al.                          No. 18 CV 334
DEPOSITION OF:  CHRISTY LENHARDT          February 1, 2022

Page 24

1    for about four years until, roughly, 2009.  And
2    where did you go after being on the M Unit?
3         **A.    To the L Unit.**
4         Q.    Okay.  And do you know why you were
5    transferred from M to L?
6         **A.    They were concerned about my**
7    **boundaries with patients.**
8         Q.    And did they tell you that?
9         **A.    Yes.**
10        Q.    Before you were transferred?
11        **A.    Yes.**
12        Q.    What did they say about their
13   concerns?
14        **A.    I don't know if a lot was said,**
15   **just that I was being transferred.**
16        Q.    Who told you that?
17        **A.    Jeff Pharis.**
18        Q.    And you said -- well, tell me what
19   you do remember that was said.
20        **A.    So you're going to find that I**
21   **don't remember a lot about conversations.  It's**
22   **just not the way my brain works.  I remember**
23   **there was tension.  I remember he wanted me to**
24   **transfer, and at some point, he just wanted me**

OWEN v. JAVED, et al.                          No. 18 CV 334
DEPOSITION OF: CHRISTY LENHARDT          February 1, 2022

Page 25

1      to get my things and go to the other unit.

2           Q.   And I understand that you're saying

3      that -- you know, specifics of conversations is

4      not your strong suit it sounds like, but I will

5      be needing to ask you for anything that you do

6      remember that is important on my end.

7                So it was in conversation with Jeff

8      Pharis where you were told that you were going

9      to be transferred?

10          A.   Correct.

11          Q.   Was anybody else in the room?

12          A.   No.  It was -- if I remember

13     correctly, it was in the dayroom and nobody was

14     there.

15          Q.   And, again, he -- do you remember

16     him giving you a specific reason for being

17     transferred?

18          A.   No.

19          Q.   He did not say anything specific as

20     to why it was you were being transferred?

21          A.   If I were -- if I'm to speak

22     truthfully, I would not be able to remember

23     exactly what he said.

24          Q.   But you thought it was because of

OWEN v. JAVED, et al.                        No. 18 CV 334
DEPOSITION OF:  CHRISTY LENHARDT            February 1, 2022

                                                    Page 26

 1    boundary issues?

 2           **A.    Yeah.**

 3           Q.    What makes you think that?

 4           **A.    It may have been after an incident**

 5    **in which I was with that patient, and it --**

 6           Q.    I'm going to ask, what patient?

 7                 MR. BRODY:  You can say the name of

 8    the patient.

 9                 THE WITNESS:  ███████  ███████

10    BY MS. JOHNSTON:

11           Q.    And I'm sorry that I interrupted

12    you there.  I just wanted to make sure I was

13    aware of who we were discussing.

14                 So you said it may have been after

15    an incident with  ███████  and I apologize

16    for --

17                 MR. BRODY:  I'm going to object to

18    that.  You're misconstruing what she said,

19    after an incident.  She said after -- I think

20    she said after she was -- did you use the word

21    incident, or did you use another word?

22                 THE WITNESS:  I used the word

23    incident.

24                 MR. BRODY:  Oh, never mind.  She

OWEN v. JAVED, et al.                         No. 18 CV 334
DEPOSITION OF:  CHRISTY LENHARDT        February 1, 2022

                                                    Page 27

1    used the word incident.

2              MS. JOHNSTON:  No problem.

3    BY MS. JOHNSTON:

4         Q.   Okay.  I'm so sorry about that,

5    Ms. Lenhardt, if you could continue with what

6    it was you were discussing.

7         **A.   So we were in the activity**

8    **therapist's office cleaning her office, the**

9    **three of us, Becky Nikolov, ███████ and myself.**

10        Q.   And was there more to that as to

11   why you think that you would have been

12   transferred because of having been in a room

13   with ███████ and another -- I believe Becky

14   Nikolov was another DHS employee?

15        **A.   Yes.  Because we were in there**

16   **after she left, and people -- the STAs and**

17   **people reported it to whoever they reported it**

18   **to.**

19        Q.   They reported that you were in

20   Becky Nikolov's office alone with ███████

21        **A.   Yes.**

22        Q.   But during your conversation with

23   Jeff Pharis about being transferred from the

24   M Unit to the L Unit, he did not -- did he

OWEN v. JAVED, et al.                                      No. 18 CV 334
DEPOSITION OF:  CHRISTY LENHARDT                    February 1, 2022

                                                              Page 28

1      mention ██████  ██████ at any point in time?

2           **A.   Yes.**

3           Q.   Well, what did he say then?

4           **A.   I really don't remember exactly**

5      **what he said.**

6           Q.   And previously you had also said

7      that you didn't remember, but do you remember

8      that he mentioned ██████ specifically?

9           **A.   Yes.  I knew it was about ████████**

10          Q.   Because Jeff Pharis told you?

11          **A.   Yeah, I guess.  I guess.**

12          Q.   Well, and I'm just wanting to

13     clarify where we are because previously you had

14     said that you didn't remember any of the

15     specifics about what it was that you said

16     during the conversation.  So I just want to

17     know, was it your thought that it was because

18     of ██████ just based on your kind of read of

19     the room, if you will, or was it based on what

20     Jeff Pharis specifically said to you about why

21     you were being transferred?

22          **A.   Yeah, it may have been because of**

23     **what he specifically said.**

24          Q.   But you don't remember what he

OWEN v. JAVED, et al.                        No. 18 CV 334
DEPOSITION OF:  CHRISTY LENHARDT           February 1, 2022

                                                    Page 29

 1    specifically said?

 2          A.    No, I don't.

 3          Q.    Or if he specifically mentioned

 4    ██████████████

 5          A.    He must have -- he must have

 6    mentioned ████████████

 7          Q.    So then you were transferred in --

 8    I think you said it would probably be sometime

 9    in approximately 2009, that you were

10    transferred to the L Unit?

11          A.    Think it was 2005.  I think you

12    said 2005.

13          Q.    Well, I think 2005 was when you

14    went from the civil side to the forensic side.

15          A.    Oh, you're right.  You're right.

16    You're right.  Yeah, it would have been about

17    2009.

18          Q.    Okay.  And, again, I understand

19    we're working with some approximations here

20    kind of just to help us keep track of the

21    narrative.  We would obviously be able to

22    confirm any of these dates later on, and

23    that's -- okay.  I just want to give us sort of

24    a timeline that we can work with here.

OWEN v. JAVED, et al.                              No. 18 CV 334
DEPOSITION OF:  CHRISTY LENHARDT              February 1, 2022

---

                                                      Page 30

1              So you were transferred to L.  And

2      how long were you on the L Unit?

3          A.   To make it eight years, so 1997 is

4      when I started at Elgin Mental Health Center.

5          Q.   Okay.

6          A.   So eight years from then.

7          Q.   Well, now, we're talking about when

8      you were on the L Unit, on the forensics side.

9          A.   Oh.

10          Q.   So that's after you had done the

11      eight years.

12          A.   Oh, right, on the civil side.  And

13      then I was on M, and then I was transferred.

14      Okay.

15              So, yeah, it would have been around

16      2009.  I'm sorry.

17          Q.   And how long were you on the

18      L Unit?

19          A.   For the rest of my stay there.

20          Q.   Okay.  That's the last place that

21      you -- the last unit that you were assigned to?

22          A.   Uh-huh.

23          Q.   Okay.

24          A.   Yes.

---

OWEN v. JAVED, et al.                          No. 18 CV 334
DEPOSITION OF:  CHRISTY LENHARDT          February 1, 2022

                                                    Page 31

 1          Q.   And I believe we may have gone over

 2    this, but bear with me.  Is the L Unit a co-ed

 3    unit as well, or is it all male, all female?

 4          A.   All male.  On the forensic side

 5    they did not mix genders.

 6          Q.   And on the L Unit, can you give me

 7    a little bit of an idea of what your duties

 8    were there?

 9          A.   I admitted patients.  They would

10    come from jail to Elgin Mental Health Center

11    after they were found not guilty by reason of

12    insanity or unfit to stand trial.  We had

13    the -- the largest portion of our population

14    was NGRI, not guilty by reason of insanity.

15              I did their admissions.  I did all

16    their paperwork.  Did their social assessments.

17    I did their treatment plans.  Went to their

18    treatment plan staffings and presented a

19    treatment plan and -- sorry.  And how they were

20    doing.  The treatment team would be there, the

21    psychiatrist, the psychologist -- I'm sorry.

22    The psychiatrist, psychologist, activity

23    therapist and nurse.

24              The job also entailed doing a

Page 32

1     relapse -- doing group treatment, having your

2     own group that you did counseling of the

3     patients, development of the relapse prevention

4     plan, court reporting, court -- so if someone

5     came in not guilty by reason of insanity, I

6     wrote their court report, their NGRI court

7     report that -- that outlined their plan for

8     treatment and their reasons they needed to be

9     continued -- in continued psychiatric treatment

10    before they're discharged.

11                Updated court reports, we had to do

12    court reports every -- how can I forget?  Maybe

13    every three months?  Maybe every other month.

14    Every other month to every three months, we

15    wrote court reports to the court explaining

16    where they were in their treatment, and then

17    discharge planning.

18         Q.   So --

19         A.   And writing their conditional

20    release packets.

21         Q.   Typically, and I understand that,

22    of course, things ebb and flow, how many

23    patients would you say on average were on the

24    L Unit at a given time?

OWEN v. JAVED, et al.                    No. 18 CV 334
DEPOSITION OF:  CHRISTY LENHARDT        February 1, 2022

                                              Page 33

1        **A.    I believe that the capacity for the**

2   **unit was 25 to 30.  I have to give an estimate**

3   **because I can't remember exactly, and it was**

4   **always full.**

5        Q.   And how many social workers,

6   including yourself, were working on the L Unit?

7        **A.    Two to three.**

8        Q.   And how many patients would you

9   estimate that you were working with at any

10  given time?

11       **A.    Eight to 11.**

12       Q.   And you mentioned that there were a

13  couple of different types of in-person meetings

14  that would occur with your patients, correct?

15       **A.    Uh-huh.**

16            MR. BRODY:  Yes.

17            THE WITNESS:  I'm sorry.  Yes.

18            MS. JOHNSTON:  And, again, it's so

19  hard because even I know what you're saying

20  right now.  It's just later that this will be

21  an issue.  So thank you, Steve.

22  BY MS. JOHNSTON:

23       Q.   So when you would meet with

24  patients, so what were the types of in-person

OWEN v. JAVED, et al.                                   No. 18 CV 334
DEPOSITION OF:  CHRISTY LENHARDT              February 1, 2022

Page 34

1      meetings that you would do where you were

2      actually with the patient?

3            **A.    Counseling.**

4            Q.   And would those typically be

5      one-on-one meetings or group meetings?

6            **A.    One-on-one meetings, and there were**

7      **also group meetings, but...**

8            Q.   I guess what would be kind of the

9      breakdown you would think of what percentage of

10     the meetings that you would have would be

11     one-on-one, versus what percentage were in a

12     group setting?

13           **A.    One on -- one-on-one sessions would**

14     **be weekly, unless there was some conflicts in**

15     **the schedule.  Group treatment would be weekly,**

16     **so 50/50.**

17           Q.   And when you did the group

18     treatment, was that typically with everybody

19     that would have been on your caseload at the

20     time, or was that further broken down by kind

21     of their needs?

22           **A.    It was broken down by their needs.**

23           Q.   And when you would do your

24     one-on-one sessions, where did you typically

OWEN v. JAVED, et al.                                    No. 18 CV 334
DEPOSITION OF:  CHRISTY LENHARDT                 February 1, 2022

                                                        Page 35
1    meet with your patients?

2         **A.    In my office.**

3         Q.   And where would the group sessions

4    typically take place?

5         **A.    In the group room or in the**

6    **serenity room.**

7         Q.   You said serenity?

8         **A.    Yeah.**

9         Q.   Thank you.

10             And, you know, did the other social

11   workers also meet with their patients

12   one-on-one on a weekly -- or roughly a weekly

13   basis?

14        **A.    Yes.**

15        Q.   And where did the other social

16   workers on the L Unit typically meet with their

17   patients, to your knowledge?

18        **A.    In their office.**

19        Q.   And when you would meet with a

20   patient in your office, you know, can you

21   briefly sort of describe what the layout of

22   your office was, if you can remember?

23        **A.    So you walked in, and to the right**

24   **was a desk for another social worker or an**

OWEN v. JAVED, et al.                                    No. 18 CV 334
DEPOSITION OF:  CHRISTY LENHARDT               February 1, 2022

Page 36

1    intern.  Next to that desk would be a computer.

2    On the back wall was a window that faced to

3    the -- oh, what do you call it?  The porch, and

4    where they would go outside for outside time.

5              Then on my back wall was a type of

6    bookshelf with books.  In that corner was a

7    bookshelf with books, and then my desk started.

8    It was an L shape.  And then file cabinets that

9    were not high ones, low ones.  And then the

10   door.

11        Q.   And typically when you met with

12   patients, would it be with the door opened,

13   with the door closed?

14        A.   The rule was the door closed but

15   unlocked.

16        Q.   And you said that was a rule at

17   Elgin?

18        A.   Uh-huh.

19             MR. BRODY:  Yes.

20             THE WITNESS:  Yes.  Yes, that was a

21   rule at Elgin.

22             MR. BRODY:  By the end of the day,

23   we're going to get you trained.

24             MS. JOHNSTON:  Exactly.  It just

OWEN v. JAVED, et al.                                      No. 18 CV 334
DEPOSITION OF:  CHRISTY LENHARDT                    February 1, 2022

Page 37

 1      takes a little while.

 2      BY MS. JOHNSTON:

 3           Q.   Okay.  And so when you were on the

 4      L Unit -- or really at your time at Elgin, you

 5      can tell me if I'm talking about the wrong

 6      unit, did you work with Dr. Hasina Javed?

 7           **A.   Yes.**

 8           Q.   And when did you work with

 9      Dr. Javed?

10           **A.   The entire time I was on the**

11      **L Unit.**

12           Q.   L Unit.  Okay.

13           **A.   She was the psychiatrist for our**

14      **unit for the entire time.**

15           Q.   And so you said she was the

16      psychiatrist.  So what did that -- can you

17      explain to me just sort of what that working

18      relationship looked like.

19           **A.   So Dr. Javed was the head of the**

20      **treatment team.  So she was the head of the**

21      **patient's treatment.  She met with them once a**

22      **month to review their medications.  Sorry.  She**

23      **met with them once a month to review their**

24      **medications.  We had their treatment plan**

OWEN v. JAVED, et al.                               No. 18 CV 334
DEPOSITION OF:  CHRISTY LENHARDT              February 1, 2022

Page 38

```
 1    staffings once a month.
 2         Q.    And how often did you interact with
 3    Dr. Javed while you were on the L Unit?
 4         A.    Daily.
 5         Q.    Was that typically to discuss
 6    different patients, or was it just seeing each
 7    other around because you worked in the same,
 8    you know, general vicinity?
 9         A.    Every meeting -- we had a morning
10    meeting.  There's two units facing each other.
11    There's a locked door, and then an open area,
12    and then a locked door.  And so K and L were
13    considered -- we considered them sister units.
14              So K treatment team and L treatment
15    team would meet every morning in a conference
16    room to discuss the previous 24 hours.
17         Q.    And when you said that you guys
18    would meet to discuss the previous 24 hours,
19    what did the -- without, you know, getting into
20    the specifics of other patients or anything,
21    but what did those meeting generally encompass?
22    What types of things did you discuss?
23         A.    The behavior of the patients.  If
24    there were any incidents, changes in
```

OWEN v. JAVED, et al.                    No. 18 CV 334
DEPOSITION OF:  CHRISTY LENHARDT         February 1, 2022

Page 39

1    medication, I suppose.  Updates on their

2    treatment, if it was important.  If somebody

3    was medically compromised, we would do updates

4    of their medical condition.  We've had patients

5    in the hospital, and things like that.

6         Q.   Would you say that those morning

7    meetings were -- the topics discussed in those

8    morning meetings focused on the patients, not,

9    like, administrative or Elgin staffing or

10   operations?

11        A.   No.  We would discuss changes in

12   rules or administrative decisions, so the

13   goings on of the hospital.

14        Q.   And so you saw Dr. Javed every

15   morning in these meetings, and then were

16   involved with her with the forming of the

17   treatment plans and reviews for the patients

18   that were on your caseload?

19        A.   Yes.  We would review treatment

20   plans and court reports before they were

21   submitted.

22        Q.   And how close would you say that

23   you and Dr. Javed were in terms of your working

24   relationship?  A close work friend?

OWEN v. JAVED, et al.                                    No. 18 CV 334
DEPOSITION OF: CHRISTY LENHARDT                      February 1, 2022

Page 40

1              A.     We were close.

2              Q.     And what about outside of work, did

3     you two have much or any of a relationship

4     outside of being at Elgin?

5              A.     Only when -- only when we would go

6     out for lunch as a treatment team.

7              Q.     And how often --

8              A.     One day -- one Christmas,

9     Dr. Kareemi and Dr. Javed put together a

10    Christmas party for us that we had at

11    Dr. Kareemi's house.

12                  We would celebrate different

13    things.  I don't know.  People's birthdays,

14    social work month, nurses' month -- actually,

15    it was only nurses' week.  And have --

16    everybody would bring something.  I forgot what

17    you call that when everybody brings in

18    something to eat, and then we have -- you know,

19    have --

20                  MR. BRODY:  Pot luck.

21                  THE WITNESS:  Pot luck.  That's it.

22                  Or you have, you know, an hour or

23    so when people were off-shift or whatever, to

24    go in the room, eat and socialize.

LISA A. KOTRBA & ASSOCIATES, LTD.
312-855-1834

OWEN v. JAVED, et al.                               No. 18 CV 334
DEPOSITION OF:  CHRISTY LENHARDT           February 1, 2022

                                                      Page 41

 1   BY MS. JOHNSTON:

 2        Q.   Most of those things would be

 3   work-related, even if they happened off-site,

 4   it was still more or less a work event for

 5   Elgin employees?

 6        A.   **Yes, for our unit.  Uh-huh.**

 7        Q.   Understood.

 8             And since you left Elgin in 2017,

 9   have you spoken with Dr. Javed?

10        A.   **I believe I may have texted her**

11   **asking for a work recommendation.**

12        Q.   And outside of that text message,

13   have there been any other communications with

14   Dr. Javed since you left --

15        A.   **No.**

16        Q.   -- Elgin?

17        A.   **No.**

18        Q.   And then did you know a Dr. Faiza

19   Kareemi?

20        A.   **Yes.  Faiza.**

21        Q.   Faiza.  My mistake.

22             So where did you work with

23   Dr. Kareemi?  At what stage?

24        A.   **Dr. Kareemi was the psychiatrist on**

OWEN v. JAVED, et al.                         No. 18 CV 334
DEPOSITION OF:  CHRISTY LENHARDT            February 1, 2022

Page 42

 1      the K Unit, which was our sister unit.

 2           Q.   So --

 3           A.   We didn't have much contact in

 4      terms of discussing patients or anything.

 5                There would be times when Dr. Javed

 6      was on vacation, and so then Dr. Kareemi would

 7      cover the L Unit.

 8                So if there were things happening

 9      with the patient, we would have meetings

10      together, me, myself, the patient, a nurse.

11           Q.   And then you would have seen her in

12      the morning meetings, I assume?

13           A.   Yes.

14           Q.   But outside of that, you didn't

15      really have as much interaction with her unless

16      it sounds like Dr. Javed was on vacation or

17      unavailable for some reason?

18           A.   Yeah, we talked sometimes, and --

19      sorry.  We talked sometimes, and these lunches

20      were always done between Dr. Javed and

21      Dr. Kareemi.  It was like they were taking out

22      the two treatment teams.

23           Q.   Understood.

24                And so how would you describe then

OWEN v. JAVED, et al.                          No. 18 CV 334
DEPOSITION OF:  CHRISTY LENHARDT            February 1, 2022

                                                    Page 43

 1     your working relationship with Dr. Kareemi?

 2     How close it was?

 3          **A.    We liked each other.**

 4          Q.    But there was less interaction with

 5     her on a day-to-day basis than there would have

 6     been with Dr. Javed?

 7          **A.    Yes.**

 8          Q.    And what about outside of work, did

 9     you socialize with Dr. Kareemi?

10          **A.    Just the times that I've told you**

11     **about when we did lunches, and when we had that**

12     **Christmas party at her house.**

13          Q.    What about since you left Elgin,

14     have you communicated with Dr. Kareemi at all?

15          **A.    Not at all.  I do have to -- there**

16     **was an incident.  I work at Panera, and she**

17     **came in to buy gift cards.  It was not this**

18     **past Christmas, but the Christmas before.  She**

19     **was buying gift cards for her -- they would**

20     **give us Christmas presents, and she was buying**

21     **gift cards, obviously, for the treatment team.**

22     **And I was there, and I was the cashier.  And it**

23     **was very awkward.  And we said hi, and nothing**

24     **else, except for the transaction, and she left.**

OWEN v. JAVED, et al.                              No. 18 CV 334
DEPOSITION OF:  CHRISTY LENHARDT              February 1, 2022

                                                        Page 44
 1          Q.   So there was no further substance
 2    to that conversation when you saw her that
 3    Christmas?
 4          **A.   No.  It was very awkward.**
 5          Q.   And then what about Colleen
 6    Delaney?  Did you know her when you worked at
 7    Elgin?
 8          **A.   Yes.**
 9          Q.   And what was Colleen -- what was
10    Ms. Delaney's position?
11          **A.   For awhile she was nurse manager of**
12    **our unit.**
13          Q.   And which unit would that have
14    been?
15          **A.   L.**
16          Q.   I'm sorry.  That was me.  Did you
17    say L --
18          **A.   L.**
19          Q.   -- as in Lisa?
20          **A.   Yes.**
21          Q.   Okay.  Do you know when she was the
22    nurse manager of the L Unit or roughly?
23          **A.   No.  It was -- let me see.  She**
24    **wasn't -- she wasn't the first nurse manager I**

OWEN v. JAVED, et al.                                    No. 18 CV 334
DEPOSITION OF:  CHRISTY LENHARDT              February 1, 2022

Page 45

1    experienced on L.

2         Q.   Okay.

3         A.   I can't remember who was the nurse

4    manager before her.  Maybe she was.  No.  She

5    came in after somebody else, and I don't

6    remember who that nurse manager was.  And then

7    we had her.

8              And for a period, we had -- I want

9    to say we had Marianne Zuwanski for a period of

10   time.  And then we had -- oh, boy.  Her first

11   name started an N.  I will remember it when I

12   stop trying to remember it.

13             And then Tom.  Tom.  I can't

14   remember his last name right now.

15        Q.   Okay.  Well, do you remember for

16   Colleen Delaney, you said it was a period of

17   time while you were on L Unit.  Do you remember

18   if she was the nurse manager when you left

19   Elgin?

20        A.   Yes.  No.  No.  It was Tom.

21        Q.   So somewhere in that middle period

22   you can say she was the nurse manager?

23        A.   For a long portion of time.

24        Q.   So then she was the nurse manager,

OWEN v. JAVED, et al.                              No. 18 CV 334
DEPOSITION OF:  CHRISTY LENHARDT              February 1, 2022

Page 46

1     and you were a social worker on the same unit.

2     Can you describe to me what that working

3     relationship would look like or did look like?

4          **A.   Started out to be a good**

5     **relationship, and it ended to be a bad**

6     **relationship, I guess you would say.**

7          Q.   Why did it change from a good

8     relationship to a bad relationship, in your

9     opinion?

10         **A.   She had this thing with me.**

11         Q.   Okay.

12         **A.   She would -- she would attack me in**

13    **the morning meetings verbally, and I would end**

14    **up crying.**

15         Q.   And when you say attack you in the

16    morning meetings, can you provide some more

17    information about that?

18         **A.   I'm trying to remember all the**

19    **circumstances.  Okay.  So there was one time I**

20    **think it happened in the morning meeting, I had**

21    **called out something that she told some brand**

22    **new STAs.  STA stands for security therapy**

23    **aide.  And I took that -- I asked that STA to**

24    **come into my office and spoke with her.  And**

OWEN v. JAVED, et al.                                    No. 18 CV 334
DEPOSITION OF:  CHRISTY LENHARDT                  February 1, 2022

Page 47

1      **Colleen was not happy about that.**

2           Q.   Do you remember what it was that

3      you spoke to the STA about?

4           **A.   Yes, I do.**

5           Q.   What was that?

6           **A.   Okay.  She was orienting the STAs,**

7      **and she told them to watch out for Ben Hurt**

8      **because he masturbated in his room when people**

9      **were coming to check on him.**

10          Q.   So that's what Delaney told this

11     group of new STAs?

12          **A.   Yes.  And I took great offense to**

13     **that because Ben was my patient, and men are**

14     **going to masturbate in their bedrooms, and that**

15     **was really unfair of her to give that**

16     **preconception to the STAs.**

17          Q.   So what did you then say to the STA

18     about it?

19          **A.   I asked her what Colleen said.  And**

20     **I may have told her, you know, what I just**

21     **said.**

22          Q.   And when you say you may have told

23     her what you just said, that was the --

24          **A.   This is the normal --**

OWEN v. JAVED, et al.                                No. 18 CV 334
DEPOSITION OF:  CHRISTY LENHARDT                February 1, 2022

Page 48

1          Q.   -- the men will masturbate in their
2     private room?
3          A.   Right.
4          Q.   Did you tell the STA anything else
5     about Ben Hurt?
6          A.   I don't -- I don't recall.  I don't
7     think so.
8          Q.   Did you tell the STA anything about
9     your relationship with Mr. Hurt?
10         A.   No.
11         Q.   So that was the situation where you
12    said then that --
13         A.   Colleen called me out in a morning
14    meeting.  It may have been in the morning
15    meeting.  It may have been privately.  I -- it
16    may have been both.  She was pretty mad.
17         Q.   Do you remember what she said?
18         A.   That I had no right, and it wasn't
19    my responsibility to bring up a young,
20    impressional STA into my office and talk with
21    her.
22         Q.   And were there other incidents
23    between you and Colleen Delaney?
24         A.   Yes.

OWEN v. JAVED, et al.                                    No. 18 CV 334
DEPOSITION OF:  CHRISTY LENHARDT                    February 1, 2022

                                                              Page 49

 1            Q.   Do you remember any of those?

 2            **A.   There was one that had to do**

 3    **something with some STAs, and the incident I do**

 4    **not remember, but the STAs were completely out**

 5    **of order in the way they had treated me.  And**

 6    **we had a meeting to discuss it.  And Colleen**

 7    **did not defend me or -- or -- it's not that I**

 8    **wanted her to defend me, it's that I wanted her**

 9    **to call the STAs out on their behavior, and she**

10    **did not.**

11                 **And then I wrote her a letter**

12    **explaining how I felt about that, and brought**

13    **it to her -- well, I went to her office, and**

14    **said, You haven't mentioned the letter.  And I**

15    **was with an intern.  And she was very upset**

16    **that the intern was in the office with me with**

17    **her thinking that should be private between me**

18    **and her, and that my intern shouldn't know.**

19            Q.   Do you remember what it is that the

20    STAs in question were doing that was so out of

21    line?

22            **A.   I cannot remember.**

23            Q.   And then can you think of any other

24    incidents with Colleen Delaney that were

OWEN v. JAVED, et al.                                    No. 18 CV 334
DEPOSITION OF:  CHRISTY LENHARDT                    February 1, 2022

                                                           Page 50

 1    hostile?

 2         A.   Just -- just the ones during the

 3    treatment team meetings.

 4         Q.   But were there more incidents than

 5    what it is that we've discussed now?

 6         A.   Yes.

 7         Q.   Do you remember what the hostility

 8    would typically relate to?

 9         A.   I don't remember them clearly, no.

10    I can't --

11         Q.   Do you remember if there was kind

12    of a general theme of what it is that these

13    incidents of hostility would relate to?

14         A.   Like, a personal vendetta against

15    me.  Just I -- I don't know.

16         Q.   Is there anything else that you

17    remember right now about those incidents of

18    hostility with Ms. Delaney?

19         A.   Just that she would talk about it

20    and look at me and be hostile and -- until I

21    cried.  I'm -- I'm -- I'm sometimes a very

22    sensitive person.

23         Q.   So it sounds like it was a somewhat

24    fraught relationship.  But in her capacity as

OWEN v. JAVED, et al.                                    No. 18 CV 334
DEPOSITION OF:  CHRISTY LENHARDT              February 1, 2022

                                                        Page 51

1    the -- what was her --

2            **A.    Nurse manager.**

3            Q.    Nurse manager.  So what was your

4    workplace interaction in that sense outside of

5    the morning meetings, which I know would have

6    had both of you?

7            **A.    She ran the unit.  She was over the**

8    **nurses and the STAs.  So that was her capacity.**

9                   **And then -- so she was also**

10   **involved in the patients and their treatment.**

11   **She would have to know that because the nurses**

12   **were also treating the patients.**

13           Q.    So how often would you actually

14   have to -- and, again, outside of the morning

15   meetings, about how often did you actually

16   interact with Colleen Delaney sort of on a

17   day-to-day basis?

18           **A.    One day a week we could not**

19   **interact at all.  The next day we could**

20   **interact one time, occasionally.**

21           Q.    Okay.  Did you have any sort of

22   relationship with Ms. Delaney outside of work?

23           **A.    No.  She was -- she was on my**

24   **Facebook.  We were friends on Facebook when we**

OWEN v. JAVED, et al.                                   No. 18 CV 334
DEPOSITION OF:  CHRISTY LENHARDT                  February 1, 2022

                                                            Page 52

1      first got to know each other.  She would talk

2      about her personal life at -- during the

3      treatment team meetings.  She was married to

4      another woman who worked at Elgin Mental Health

5      Center.  That woman was actually a psychology

6      intern on another unit, and they had a

7      relationship and got married.  And they had

8      triplets, I believe.  Maybe it was twins,

9      triplets, twins.  Two sets, actually.

10              So she would talk about them and

11     show us pictures, and that's when things were

12     good.

13              But she continued to talk about

14     personal stuff at the morning meetings.

15        Q.   And, again, it was in the morning

16     meetings or in more of an open situation with

17     other Elgin employees, not specific

18     conversations between you two where she

19     confided in you?

20        A.   No.

21        Q.   Okay.  And have you had any

22     interaction with Mr. Delaney since you left

23     Elgin?

24        A.   No.

OWEN v. JAVED, et al.                                    No. 18 CV 334
DEPOSITION OF:  CHRISTY LENHARDT                    February 1, 2022

                                                            Page 53

 1          Q.   Did you know Diana Hogan when you

 2     were at Elgin?

 3          **A.   Yes.**

 4          Q.   And what was her position?

 5          **A.   Assistant nursing supervisor.**

 6          Q.   And so what would that mean about

 7     how it is that you interacted with her through

 8     work?

 9          **A.   Not very often.**

10          Q.   If she was the assistant nursing

11     supervisor, would that be for all of Elgin or

12     just for certain units?

13          **A.   All of Elgin -- all of -- all of**

14     **the forensics treatment program.**

15          Q.   Okay.  The forensics side at least,

16     not necessarily the civil side?

17          **A.   No.  They had their own**

18     **administrators.**

19          Q.   Okay.  And do you actually remember

20     how many different forensic units are there at

21     Elgin?  We know that there's L and K.

22          **A.   There were four UST units.  There**

23     **was M and N.  K and L.  And then -- yeah.  So**

24     **there were four units for the NGRIs and some of**

OWEN v. JAVED, et al.                                    No. 18 CV 334
DEPOSITION OF:  CHRISTY LENHARDT                  February 1, 2022

Page 54

1      the USTs.  And then there were just UST units.

2      That was H and I, F and G -- F and G, H and I.

3                  So -- oh, and then there was an all

4      women's unit.  I don't think there were men on

5      that unit, too.  Wait.  It started with a W.

6                  THE STENOGRAPHER:  Ma'am, you have

7      to speak up, please.

8                  THE WITNESS:  I'm so sorry.

9                  So F and G, H and I were the UST

10     units.  That's where the USTs came when they

11     first came to the hospital.  And then NGRI

12     units were K and L, M and N.  And then there

13     was another unit that started with a W.  I

14     can't remember now.  Sean would know.  And I

15     believe there were men and women on that unit.

16                 But then there was another unit,

17     right, Sean with --

18          Q.   That's okay.  Just either way,

19     Diana Hogan was supervising a number -- or she

20     was the assistant nursing supervisor to, you

21     know --

22          A.   To the entire forensics population.

23          Q.   Okay.  So she was not

24     necessarily -- how involved would you say she

OWEN v. JAVED, et al.                                    No. 18 CV 334
DEPOSITION OF:  CHRISTY LENHARDT                    February 1, 2022

Page 55

1     was in the day-to-day operations of the L Unit

2     when you were there?

3            A.    Not very involved.

4            Q.    Okay.  And when would you interact

5     with Diana Hogan?

6            A.    When I went up to administration

7     sometimes to be in her office.

8            Q.    Was Diana Hogan one of the people

9     who would be present at the morning meetings?

10           A.    No.  Administration didn't come to

11    the morning meetings unless they had something

12    to announce or --

13           Q.    So if you were going to describe

14    your relationship with Diana Hogan, how would

15    you describe that?

16           A.    The only word I can think of is

17    affable.  It was -- there was no tension or

18    anything.  She was a nice person.

19           Q.    Okay.  Would you say that you two

20    were close at all?

21           A.    No.

22           Q.    Did you ever socialize with Diana

23    Hogan or see her outside of work?

24           A.    No.

OWEN v. JAVED, et al.                           No. 18 CV 334
DEPOSITION OF:  CHRISTY LENHARDT           February 1, 2022

Page 56

```
 1            Q.   And have you spoken to her in any
 2      capacity since having left Elgin?
 3            A.   No.
 4            Q.   And then did you know Drew Beck
 5      while you were at Elgin?
 6            A.   Yes.
 7            Q.   What was his position?
 8            A.   Social worker on the K Unit.
 9            Q.   So if he was a social worker on the
10      K Unit, I understand that he would have been at
11      the morning meeting because you guys were
12      sister units.
13            A.   Uh-huh.
14            Q.   Then outside of that, what was
15      really your working relationship with Drew
16      Beck?
17            A.   In terms of work?
18            Q.   Yes.
19            A.   Just -- just the treatment --
20      morning treatment meetings conferring about
21      patients, and -- so Drew was a -- probably
22      still is, a professor at ECC, and I don't know
23      why that makes any difference, except that he
24      had interns, just like I did.  And he had a
```

OWEN v. JAVED, et al.                                    No. 18 CV 334
DEPOSITION OF:  CHRISTY LENHARDT              February 1, 2022

                                                          Page 57

 1      group that he did with the interns that were on
 2      K and L.  And he had a group that he had where
 3      he imposed his knowledge to the interns of
 4      other people and his own.
 5            Q.    So kind of like small --
 6            A.    Like, a supervision kind of
 7      meeting.
 8            Q.    Okay.
 9            A.    I'm sorry.
10            Q.    No, not a problem.  I was just
11      going to say, like, a mentorship or small group
12      clinic type of thing with the interns?
13            A.    Correct.
14                  And then there was a time when he,
15      I and Michelle -- I can't remember her name.
16      She's the director of the forensics -- no.
17      She's the director of the whole hospital now.
18      Michelle -- I'll think of her name.  And she
19      and I and him also ran a group together with
20      the interns.  I think twice, maybe once was
21      just Drew and I.  Yes.  Once was just Drew and
22      I, and once was Michelle, Drew and I.
23            Q.    So when you say you were in that
24      group, does that mean you were doing a bit more

OWEN v. JAVED, et al.                                     No. 18 CV 334
DEPOSITION OF:  CHRISTY LENHARDT                    February 1, 2022

Page 58

1      work with him in order to prepare for running

2      that group with the interns?

3             A.    Yeah, a little bit.

4             Q.    How close would you say that you

5      and Drew Beck were when you worked at Elgin?

6             A.    In the beginning, we would sit and

7      talk about personal stuff.  But then toward the

8      end, not so much.  He took a more supervisory

9      role because that's just the kind of person he

10     was.  He wasn't a Social Worker III, but he

11     wasn't over the other social workers, but

12     sometimes he acted like he was.

13            Q.    And you said at the beginning you

14     guys would talk about personal stuff, and then

15     that did switch?

16            A.    Yeah.  We --

17            Q.    Do you know --

18            A.    Do I know why?  We just -- we just

19     drifted a part.  I don't think there was any

20     particular reason.  Maybe we were too busy.  We

21     got -- we got -- we got really busy because we

22     didn't have enough social workers.

23            Q.    And did you ever have a

24     relationship or a friendship with Drew Beck

OWEN v. JAVED, et al.                                   No. 18 CV 334
DEPOSITION OF:  CHRISTY LENHARDT                  February 1, 2022

Page 59

1    outside of work?

2         **A.   One -- once we went shopping, and I**

3    **can't remember why.  We went to Kohl's.  And**

4    **once I was the -- I planned a retirement for**

5    **one of the social workers who left, and he**

6    **helped me.  He and I went to Costco to pick up**

7    **food and cake and stuff for the retirement**

8    **party.**

9              **That was way more than in the**

10   **beginning of my time at L.**

11        Q.   Your time in the L Unit then?

12        **A.   Uh-huh.**

13        Q.   Do you know, was Drew Beck -- had

14   he been on the L -- or the K Unit the entire

15   time that you were on L?

16        **A.   Was he on K the entire time I was**

17   **on L?  Yes.**

18        Q.   Meaning that you guys were also

19   working on the sister units?

20        **A.   Yes.**

21        Q.   Okay.  And have you spoken with

22   Drew Beck at all since you left Elgin?

23        **A.   You know what, he may have come**

24   **after -- no, he came after some time.  I can't**

OWEN v. JAVED, et al.                              No. 18 CV 334
DEPOSITION OF:  CHRISTY LENHARDT               February 1, 2022

Page 60

1      remember who the other social worker was, but

2      he did replace somebody at some point.

3            Q.   Okay.  So he wasn't there right

4      when you started on L Unit?

5            A.   No, I don't think so.  I think he

6      replaced the man who retired, but that doesn't

7      make sense because then me and Drew wouldn't

8      have done that.  So he replaced somebody.

9            Q.   But then since you've left Elgin,

10     have you spoken to or communicated with Drew

11     Beck at all --

12           A.   No, I have not.

13                MS. JOHNSTON:  I actually think I

14     know we've been going for just about an hour,

15     maybe a little bit more.  Do you want a five

16     minute break to stretch your legs, whatever?

17     Have a glass of water.  Is everybody okay with

18     five?

19                THE WITNESS:  Yes, I'd like a glass

20     of water.  That would be nice.

21                MS. JOHNSTON:  We'll just take a

22     quick few minutes and then we'll reconvene.

23     Okay?

24                THE WITNESS:  Okay.

OWEN v. JAVED, et al.                             No. 18 CV 334
DEPOSITION OF:  CHRISTY LENHARDT                February 1, 2022

```
                                              Page 61
 1                (A recess was had.)
 2                MS. JOHNSTON:  Let's go back on the
 3      record.  It is 10:33 a.m.
 4      BY MS. JOHNSTON:
 5           Q.   Okay.  Christy, so getting back
 6      into our questioning.
 7                When you were working at Elgin, did
 8      you know a patient named Mark Owens?
 9           A.   Yes.
10           Q.   And when, roughly, did you meet
11      Mr. Owens?
12           A.   I don't remember.  Whenever he was
13      admitted.  I'm sure you have that information.
14           Q.   And --
15           A.   I admitted him.
16           Q.   Okay.  So you were his admitting
17      social worker, if you will?
18           A.   Yes.
19           Q.   And then did you continue to be his
20      social worker?
21           A.   Yes.
22           Q.   So would you say when you first met
23      Mark Owens, your relationship with him was
24      social worker patient?
```

OWEN v. JAVED, et al.                                      No. 18 CV 334
DEPOSITION OF:  CHRISTY LENHARDT                    February 1, 2022

                                                           Page 62
1          **A.**   **Correct.**

2          Q.   And do you know that his lawsuit is

3    one of the reasons that we're here today?

4          **A.**   **Yes.**

5          Q.   And is it true that you're no

6    longer a defendant in that lawsuit?

7          **A.**   **Yes.**

8          Q.   Did you settle with Mr. Owens in

9    that case?

10         **A.**   **Yes.**

11         Q.   And I believe the settlement was

12   for $1?

13         **A.**   **Yes.**

14         Q.   And as a part of that, you also

15   signed an affidavit?

16         **A.**   **Yes.**

17              MS. JOHNSTON:  Okay.  And, Amanda,

18   if you could help me out now when you have -- I

19   know you might need a minute.  I should have

20   given you a heads up.  If you could go ahead,

21   and it's Exhibit 1, the Mark Owens settlement

22   agreement.

23              MS. KOZAR:  Okay.  Hang on.

24              MS. JOHNSTON:  While you're pulling

Page 63

 1     that up, I can actually say because I might be

 2     able to streamline this a bit more.

 3                 So previously, Randy and Joe, I

 4     know that we just agreed to stipulate to the

 5     authenticity of the agreement.  It's, you know,

 6     a file, court document.

 7                 MR. CECALA:  Yes.

 8                 MS. JOHNSTON:  Steve, if you -- and

 9     I think you had it before, but Steve, would you

10     also be willing to stipulate to the

11     authenticity of the settlement agreement and

12     waiver?

13                 MR. BRODY:  Yes.

14                 MS. JOHNSTON:  Okay.  And,

15     obviously, if you have any time where you want

16     to look at it in more detail, I sent it last

17     night, you can take a moment if you need to.

18                 MR. BRODY:  If it would be easier,

19     I could print it so Christy has a hard copy in

20     front of her, or you can use the screen share.

21     We're indifferent.

22                 MS. JOHNSTON:  I mean, Christy, I

23     would say that that's really your decision.

24     It's not going to be a huge amount of looking

OWEN v. JAVED, et al.                                    No. 18 CV 334
DEPOSITION OF:  CHRISTY LENHARDT                  February 1, 2022

Page 64

1      at it, but if it's easier for you to read it

2      off a piece of paper, and if Steve has a

3      printer readily available, we can give it a

4      minute so you can look at it that way.

5                  THE WITNESS:  Since maybe you might

6      not be scrolling to the right spot, that would

7      be helpful.

8                  MR. CECALA:  I don't want to be

9      talking over.  I was going to say, we're

10     stipulating to the settlement agreement.  I was

11     going to make an objection that, you know, the

12     settlement agreement is significantly more than

13     $1.  There's -- the contents of it speak for

14     themselves.  So just making a clean record of

15     what the contents of the settlement agreement

16     are in the settlement agreement, it's not a $1

17     settlement.

18                 THE WITNESS:  I agree with you on

19     that.

20                 MS. JOHNSTON:  And I will stipulate

21     that the agreement speaks for itself.

22                 MS. KOZAR:  Mary, so do you still

23     want me to share my screen?

24                 MS. JOHNSTON:  Steve, if you're

OWEN v. JAVED, et al.                                No. 18 CV 334
DEPOSITION OF:  CHRISTY LENHARDT             February 1, 2022

Page 65

1    able to print that out.  Everybody on our

2    end --

3                MR. BRODY:  I'm able to print it.

4    Which one do you want?  The Owens' one first?

5                MS. JOHNSTON:  Yeah, that would be

6    the first one.  I mean, honestly, we'll look at

7    all four of the e-mails that I sent over.  So

8    if you just want to go ahead and get going on

9    it, that's fine.  But I don't know --

10               MR. BRODY:  I'm doing it now.

11               MS. JOHNSTON:  I don't have any

12   objection to all of us just looking at it on

13   our respective screens, if that's fine for

14   everybody else.  I know I sent out copies of

15   the exhibits in advance.

16               MS. NEWMAN:  Mary, I just might --

17   Amanda, if you have problems pointing, you

18   might want me to point out a specific place in

19   the agreement.  Maybe Amanda might be ready to

20   screen share just in case we have any

21   difficulty finding the exact passage that you

22   want to point to.

23               MS. JOHNSTON:  Yeah.  And

24   realistically, I can tell you now that as we

OWEN v. JAVED, et al.                                No. 18 CV 334
DEPOSITION OF:  CHRISTY LENHARDT              February 1, 2022

                                                         Page 66

 1     have stipulated to the agreement itself, we're

 2     not going to go through all of it.  So what

 3     will be getting pulled up is on page 11 out of

 4     13 is where we'll focus.

 5                    MR. BRODY:  On the Owens one, I've

 6     got nine pages.

 7                    So you were mentioning page 11.  It

 8     ends on page nine.

 9                    MR. CECALA:  Were you talking about

10     the Hurt one possibly?

11                    MS. JOHNSTON:  I don't know.

12                    THE STENOGRAPHER:  Do you want this

13     on the record?

14                    MS. JOHNSTON:  No, we can take --

15     thanks, Gay.  We can off the record.

16                            (Discussion had off the

17                             record.)

18     BY MS. JOHNSTON:

19          Q.   So, Ms. Lenhardt, you may have

20     heard earlier, all of the attorneys here have

21     stipulated that this is an accurate copy of the

22     settlement agreement and the affidavit that you

23     signed in the Owens case, and you have been

24     given a copy of this printed out by your

OWEN v. JAVED, et al.                                No. 18 CV 334
DEPOSITION OF:  CHRISTY LENHARDT              February 1, 2022

                                                    Page 67

 1    lawyer.

 2              But if you want to take a quick

 3    look at it just to familiarize yourself with

 4    it.

 5              Do you recognize this as the

 6    affidavit that you signed in the Owens case?

 7         **A.   Yes.**

 8         Q.   Okay.  And if you can look to

 9    paragraph nine of the affidavit there.  I

10    believe, that Mr. Brody previously pointed it

11    out to you?

12         (Exhibit No. 1 referenced.)

13         **A.   Yes.**

14         Q.   Okay.  And would you be able to

15    read that paragraph 9 starting with "In the

16    past," into the record.

17         **A.   Okay.  In the past I have made the**

18    **serious mistake of becoming sexually involved**

19    **with a patient.  No such thing occurred with**

20    **the plaintiff, Mark Owens.  I'm aware that**

21    **Mr. Owens claims he interpreted my behavior**

22    **toward him as seductive, and that because he is**

23    **religious, that made him feel uncomfortable.  I**

24    **cannot account for Mr. Owens' statement about**

OWEN v. JAVED, et al.                             No. 18 CV 334
DEPOSITION OF:  CHRISTY LENHARDT          February 1, 2022

Page 68

1     this, but I did not intend to seduce him.  It

2     may be that he was hypervigilant because of

3     rumors at EMHC.  I believe that due to his

4     discomfort, he told Hasina Javed he did not

5     want to continue counseling sessions in my

6     private office.

7             In response, his counseling

8     sessions were held in the unit conference room.

9     (As read).

10         Q.   And then if we could look at the

11    next page starting with paragraph 10.  If you

12    could just read that paragraph 10.

13         A.   Paragraph 10.  I did not want

14    Dr. Javed to have any knowledge or suspicion

15    that I was involved in a sexual relationship

16    with a patient, nor did I want her to suspect

17    that I was acting in a seductive manner towards

18    any patient.  (As read).

19         Q.   And you know that when you signed

20    this affidavit, you were swearing that these

21    statements were true and accurate?

22         A.   Yes.

23         Q.   And were those two paragraphs that

24    you read just now accurate?

OWEN v. JAVED, et al.                              No. 18 CV 334
DEPOSITION OF:  CHRISTY LENHARDT            February 1, 2022

                                                    Page 69

1          A.    Yes.

2          Q.    And as such, you never had a sexual

3      relationship with Mark Owens?

4          A.    No.

5          Q.    And did you ever touch Mr. Owens in

6      a sexual manner?

7          A.    No.

8          Q.    Did you ever fondle Mr. Owens?

9          A.    No.

10         Q.    Did he ever fondle you?

11         A.    No.

12         Q.    Did he ever expose himself to you?

13         A.    No.

14         Q.    Did you ever expose yourself to

15     him?

16         A.    No.

17         Q.    Did you ever kiss Mr. Owens?

18         A.    No.

19         Q.    Did you ever engage in any sexual

20     intercourse, including, you know, oral or

21     penetrative sexual intercourse with Mr. Owens?

22         A.    No.

23         Q.    Okay.  And what is your

24     understanding of why Mr. Owens filed the

OWEN v. JAVED, et al.                                    No. 18 CV 334
DEPOSITION OF:  CHRISTY LENHARDT                      February 1, 2022

```
                                                          Page 70
 1    lawsuit?

 2         A.   My understanding is that he

 3    believed there was (audio distortion), is lying

 4    that there was, but there was not.

 5         Q.   And you stated there that Mr. Owens

 6    stated he was uncomfortable, and -- let me pull

 7    up the exact language.  I apologize.

 8              That Mr. Owens told Javed that he

 9    did not want to continue the counseling

10    sessions in your office?

11         A.   Correct.

12         Q.   Okay.  And do you remember

13    discussing that at all with Dr. Javed?

14         A.   It was my understanding that

15    because he had become Muslim, a lot of the

16    black patients because -- become Muslim when

17    they enter into Elgin Mental Health Center.

18    Part of that reason is we had a patient named

19    Omar who would speak to them and read to them

20    through the Koran, and influence them to become

21    Muslim.

22              And his intention was good.  It

23    wasn't -- I can't think of the word.  It wasn't

24    evil or anything.
```

OWEN v. JAVED, et al.                          No. 18 CV 334
DEPOSITION OF:  CHRISTY LENHARDT          February 1, 2022

Page 71

1              MR. CECALA:  I'm having trouble

2      hearing Christy's testimony.  Sorry, Christy.

3              MS. JOHNSTON:  A little bit, yeah.

4              THE WITNESS:  All right.  It was my

5      understanding that the reason that the sessions

6      moved to the conference room is because he was

7      uncomfortable as a person following the Muslim

8      faith to be in a room with a woman.

9      BY MS. JOHNSTON:

10             Q.   So it was your understanding that

11     that would have just been discomfort really

12     with any woman that he would have been meeting

13     alone with?

14             **A.   Yes.**

15             Q.   And to clarify, that is your

16     understanding as to why it is that he asked to

17     have your counseling sessions conducted in the

18     conference room from that point forward?

19             **A.   Yes.  No one told me anything about**

20     **any sexual behavior.**

21             Q.   Okay.  So when you discussed this

22     with Dr. Javed, what did she say to you about

23     why the meetings would be taking place in the

24     conference room as opposed to in your

OWEN v. JAVED, et al.                                    No. 18 CV 334
DEPOSITION OF:  CHRISTY LENHARDT                    February 1, 2022

Page 72

```
 1     individual office?
 2          A.    That he was uncomfortable meeting
 3     with me in my office.
 4          Q.    Did Dr. Javed say anything else
 5     about why?
 6          A.    No, not that I recall.
 7          Q.    And did you ever discuss the
 8     decision to meet with -- or to stop meeting
 9     with Mr. Owens in your office with Dr. Kareemi?
10          A.    No.
11          Q.    Did you ever discuss --
12          A.    She wasn't -- she wasn't his
13     psychiatrist.  She was on the other unit.
14          Q.    Did you ever discuss that decision
15     to stop meeting with Mr. Owens in your office
16     with Colleen Delaney?
17          A.    No.
18          Q.    Did you ever discuss that decision
19     with Diana Hogan?
20          A.    No, not that I recall discussing it
21     with anybody, except Dr. Javed.
22          Q.    Okay.  So -- and that was going to
23     be my next question.  Did you discuss it with
24     Drew Beck at any point in time?
```

OWEN v. JAVED, et al.                                    No. 18 CV 334
DEPOSITION OF:  CHRISTY LENHARDT                   February 1, 2022

Page 73

 1          A.    With who?

 2                MR. BRODY:  Drew Beck.

 3     BY MS. JOHNSTON:

 4          Q.    Drew Beck.

 5          A.    Oh.  No.

 6          Q.    And you said that you think that

 7     you only just --

 8                THE STENOGRAPHER:  I didn't hear

 9     you.

10                THE WITNESS:  No, I do not recall.

11     Not that I recall, did I ever speak to Drew

12     Beck about it.

13     BY MS. JOHNSTON:

14          Q.    Okay.  And is there anybody else

15     outside of Dr. Javed that you think that you

16     ever discussed that with?

17          A.    No, I don't think so.

18          Q.    And is that everything that you

19     remember right now about why it is that you

20     stopped meeting with Mark Owens in your office

21     and started meeting with him in the conference

22     room?

23          A.    It is everything I remember right

24     now.

OWEN v. JAVED, et al.                            No. 18 CV 334
DEPOSITION OF:  CHRISTY LENHARDT              February 1, 2022

Page 74

```
 1           Q.   Okay.  And then when you were at

 2      Elgin, did you have -- or did you know a

 3      patient named Ben Hurt?

 4           A.   Yes.

 5           Q.   And how did you meet Mr. Hurt?

 6           A.   I admitted Ben Hurt to the

 7      hospital.

 8           Q.   So you admitted him, and then were

 9      you his social worker as well?

10           A.   Yes.

11           Q.   And do you remember, roughly -- and

12      as you said, I know that we can get the exact

13      dates, but do you have an estimate in your mind

14      as to when it was that Mr. Hurt was admitted to

15      Elgin?

16           A.   Well, if he had a three year date

17      for release and it was in 2017, then it would

18      have been 2014.

19           Q.   Okay.  And do you remember why Ben

20      Hurt was admitted to the L Unit at Elgin?

21           A.   Aggravated battery toward a police

22      officer.

23           Q.   When Mr. Hurt was first admitted to

24      Elgin and you did his admitting paperwork and
```

LISA A. KOTRBA & ASSOCIATES, LTD.
312-855-1834

OWEN v. JAVED, et al.                                    No. 18 CV 334
DEPOSITION OF:  CHRISTY LENHARDT                  February 1, 2022

                                                        Page 75

 1    were assigned as his social worker, what was

 2    your relationship with Mr. Hurt like when he

 3    first came to the L Unit?

 4         **A.    Strictly social worker and patient.**

 5         Q.    And I know that we've talked a bit

 6    before about kind of your general duties as a

 7    social worker, but is there any -- can you just

 8    give me some background about what that exactly

 9    meant, as it relates to Mr. Hurt?  What would

10    you do with him, and how often would you see

11    him?

12         **A.    So I admitted him, and got his**

13    **background information for the admission papers**

14    **and the start of his social assessment.  I**

15    **welcomed him to the unit.  I tried to make**

16    **people feel comfortable when they come in.**

17         Q.    Okay.  And so how often would you

18    meet with Mr. Hurt?

19         **A.    Once a week.  Maybe not in the**

20    **beginning, but I had to meet with him to get**

21    **his social assessment information and develop a**

22    **treatment plan and do his NGRI evaluation.  The**

23    **NGRI evaluation is the document that goes to**

24    **court that explains everything, why he's in the**

OWEN v. JAVED, et al.                            No. 18 CV 334
DEPOSITION OF:  CHRISTY LENHARDT          February 1, 2022

                                                    Page 76

1      hospital.

2                  From all the information that we

3      get, I compile it and summarize it, make the --

4      it's not exactly a treatment plan, but there

5      are points that you have to cover.  And then

6      you're explaining why they continue to need

7      psychiatric treatment and need to stay in the

8      hospital.

9          Q.   And so you said you would meet with

10     him, maybe not once a week at the very

11     beginning, but then did it turn into having

12     weekly individual meetings with him?

13         A.   Yes.

14         Q.   And was he also in any group

15     meetings?

16         A.   Yes.

17         Q.   Do you remember what his group was

18     in terms -- sorry.

19         A.   I --

20         Q.   Also to just clarify, in terms of

21     the content of the meeting, not who else was in

22     the meeting.

23         A.   Aspects of healthy living.  And I

24     can't remember what I called it.  It was a

OWEN v. JAVED, et al.                              No. 18 CV 334
DEPOSITION OF:  CHRISTY LENHARDT           February 1, 2022

Page 77

1    **group about meditation.**

2          Q.   What did aspects of healthy living

3    cover?

4          **A.   Aspects of healthy living.  Coping**

5    **skills -- coping skills.  Ways to handle your**

6    **emotions.  Ways to handle your mental health**

7    **issues.  How to navigate life.**

8          Q.   Okay.  So that is the aspects of

9    healthy living, as you said.

10               And so at any point in time, did

11   you enter into a sexual relationship with

12   Mr. Hurt?

13         **A.   Yes, I did.**

14         Q.   Do you know roughly when that

15   happened?

16         **A.   No.**

17         Q.   I guess put another way, would you

18   be able to estimate how long he was there

19   before the relationship took that turn?

20         **A.   I can't remember the month he was**

21   **admitted.  I'm just guessing eight months.**

22               MR. BRODY:  Don't guess.

23               THE WITNESS:  Okay.  I can't guess.

24   You said I can't guess.

OWEN v. JAVED, et al.                                No. 18 CV 334
DEPOSITION OF:  CHRISTY LENHARDT              February 1, 2022

Page 78

 1    BY MS. JOHNSTON:

 2         Q.   No, that's fine.  We want to know

 3    what you know.  And, again, if you don't -- if

 4    you know something, that's okay.

 5              I just wanted to know if you had an

 6    estimate as to how long you were his social

 7    worker before the relationship also went to a

 8    sexual one, and not purely social worker and a

 9    patient relationship.

10              But so when you did enter into a

11    relationship with Mr. Hurt, is -- did you try

12    to hide that relationship?

13         **A.   Yes.**

14         Q.   Why?

15         **A.   Because it wasn't appropriate, and**

16    **I could lose my job, and he could get into**

17    **trouble.**

18         Q.   So you said that you and -- you

19    could get into trouble if this was found out,

20    correct?

21         **A.   Along with him, yes.**

22         Q.   How would he get into trouble?

23         **A.   It would go in his court report and**

24    **affect whether he could leave earlier or not.**

OWEN v. JAVED, et al.                              No. 18 CV 334
DEPOSITION OF:  CHRISTY LENHARDT                February 1, 2022

Page 79

1          Q.   Okay.  And then in terms of the

2     impact this could have on you if the

3     relationship was discovered, so you stated that

4     you could lose your job?

5          A.   Yes.

6          Q.   And would that involve losing your

7     social worker's license?

8          A.   **I hadn't thought that far ahead,**

9     **but yes.**

10         Q.   Let's talk about what it is that

11    has happened since this information came to

12    light.

13              So you are no longer employed at

14    Elgin?

15         A.   **Uh-huh.**

16              MR. BRODY:  Yes.

17              THE WITNESS:  Yes.

18    BY MS. JOHNSTON:

19         Q.   And do you still have your social

20    worker's license?

21         A.   **I do not.**

22         Q.   Okay.  What about did you have a

23    pension through your employment at Elgin?

24         A.   **Yes.**

OWEN v. JAVED, et al.                                    No. 18 CV 334
DEPOSITION OF:  CHRISTY LENHARDT                  February 1, 2022

                                                              Page 80

1          Q.    Were you able to retain that

2     pension?

3          **A.    No.  I got the value of it, like,**

4     **what -- I got what I contributed to it.  I did**

5     **not get the pension where you get the**

6     **monthly --**

7          Q.    Okay.  But you basically got back

8     what you had paid in?

9          **A.    What I contributed, yeah.**

10         Q.    Okay.  And then were criminal

11    charges ever filed against you in relation to

12    this?

13         **A.    Yes.**

14         Q.    And were you convicted?

15         **A.    I took a plea deal.**

16         Q.    Okay.

17         **A.    I did not want it to go to trial**

18    **and affect my family.**

19         Q.    And now has this impacted your

20    relationship with your family?

21         **A.    Yes.**

22         Q.    How so?

23              MR. BRODY:  Objection.  Relevance.

24              MS. JOHNSTON:  You can go ahead and

LISA A. KOTRBA & ASSOCIATES, LTD.
312-855-1834

OWEN v. JAVED, et al.                                  No. 18 CV 334
DEPOSITION OF:  CHRISTY LENHARDT              February 1, 2022

Page 81

1      answer.

2                MR. BRODY:  Go ahead.

3                THE WITNESS:  Well, obviously, I

4      had to work it out with my husband, my parents.

5      My husband's family refused to allow me to

6      attend any of their events.  Weddings,

7      Thanksgiving, Christmas, they did not want me

8      to associate with them.

9      BY MS. JOHNSTON:

10          Q.   So, generally speaking, you were

11     aware that there would be or could be very

12     serious consequences if your relationship with

13     Mr. Hurt was discovered?

14          **A.   Yes.**

15          Q.   And as such, you actively tried to

16     keep people from finding out about the sexual

17     relationship between you two?

18          **A.   Yes.  And I want to state the**

19     **sexual relationship was completely secondary.**

20     **We had an intimate relationship before that**

21     **ever happened.  An emotional relationship.**

22     **That was the most important, not the sexual**

23     **part.**

24          Q.   How long do you think that you had

OWEN v. JAVED, et al.                                    No. 18 CV 334
DEPOSITION OF:  CHRISTY LENHARDT                   February 1, 2022

Page 82

1     had more than an emotional relationship with

2     Mr. Hurt before the sexual relationship began?

3          **A.   I can't even guess.**

4          Q.   And you stated that you didn't

5     discuss this relationship with your friends?

6          **A.   No.**

7          Q.   And did you discuss the

8     relationship with your family at all?

9          **A.   No.  Well, after it came to light,**

10    **yes.**

11         Q.   And I mean before.

12         **A.   No.**

13         Q.   And did you --

14         **A.   Oh, I -- go ahead.**

15         Q.   No.  I'm sorry.  I didn't mean to

16    interrupt you.

17         **A.   I never discussed it with anyone.**

18         Q.   And that includes people at work?

19         **A.   Yes.**

20         Q.   So -- and I know that this might

21    get redundant, but did you ever discuss your

22    relationship outside of the social

23    worker-patient context with Ben Hurt with

24    Dr. Javed?

OWEN v. JAVED, et al.                                     No. 18 CV 334
DEPOSITION OF:  CHRISTY LENHARDT                     February 1, 2022

                                                            Page 83

1          A.    No.

2          Q.    Did you ever discuss it with

3    Dr. Kareemi?

4          A.    No.

5          Q.    Did you ever discuss it with

6    Colleen Delaney?

7          A.    No.

8          Q.    Did you ever discuss it with Diana

9    Hogan?

10         A.    No.

11         Q.    Did you ever discuss it with Drew

12   Beck?

13         A.    No.

14         Q.    Did you ever --

15         A.    There were -- there were times when

16   they came to talk to me presumably about it,

17   but I never went and told them about it or told

18   them about it during those meetings.

19         Q.    Okay.  So when you say that there

20   were times when they came to talk to you, can

21   you tell me more about any of those instances.

22         A.    Dr. Javed came to my office, and I

23   can't explain it, but we're talking very

24   professional people who can talk around things,

OWEN v. JAVED, et al.                          No. 18 CV 334
DEPOSITION OF:  CHRISTY LENHARDT             February 1, 2022

                                                    Page 84
1      and it was talked around.  It was never

2      explicitly mentioned, but it was, obviously,

3      about my inappropriate relationship with him.

4      Not about sex, but about being too close to

5      him.

6                  And she said, "Every time I come to

7      your door, Ben is in your office."  She said,

8      "You have a lovely, beautiful family."  That's

9      about all I remember.

10          Q.   Do you remember when this

11     conversation took place?

12          A.   No.

13          Q.   And you said that you believe that

14     kind of the tenor of the conversation was about

15     your relationship with Ben Hurt being overly

16     close, correct?

17          A.   Yes.

18          Q.   But that it didn't necessarily

19     relate to there being an actual sexual

20     relationship?

21          A.   Correct.

22          Q.   So what do you think that could

23     have meant if they thought the relationship was

24     close, but not sexual?

OWEN v. JAVED, et al.                                No. 18 CV 334
DEPOSITION OF:  CHRISTY LENHARDT                February 1, 2022

Page 85

1          **A.    That I crossed boundaries.**

2          Q.   What kind of boundaries would those

3     be then that could be crossed out having a

4     sexual relationship?

5          **A.    That it was -- that my relationship**

6     **had become -- had crossed boundaries between a**

7     **treatment professional relationship and a**

8     **personal relationship.**

9               MR. CECALA:  I'm going to make an

10    objection.  It's calling for her to speculate

11    on what Dr. Javed was thinking, or what

12    Dr. Javed's viewpoints were.  I think she's

13    asked and answered the question.  And we can

14    ask Dr. Javed what she thought when she was

15    telling her they were too close.

16              MS. JOHNSTON:  Okay.  And yeah, I

17    was just also asking what it is that Christy

18    thought because she specifically stated that

19    Dr. Javed didn't say anything explicit.  So I

20    was just making sure I understood what her read

21    of the situation was.

22    BY MS. JOHNSTON:

23         Q.   But you do state that Dr. Javed

24    never told you that she thought that you and

OWEN v. JAVED, et al.                          No. 18 CV 334
DEPOSITION OF:  CHRISTY LENHARDT              February 1, 2022

                                                    Page 86

1      Mr. Hurt were engaged in a sexual relationship?

2           **A.   Correct.**

3           Q.   And do you have any reason to

4      believe that Dr. Javed had ever seen you and

5      Mr. Hurt engage in any sort of sexual activity?

6           **A.   Not that I know of.**

7           Q.   Okay.  Typically speaking, where

8      would any encounters that you had with Mr. Hurt

9      take place?

10          **A.   In my office.  And later in Bob**

11     **Hamlin's office.**

12          Q.   And when you were in your office,

13     would that be kind of -- you previously

14     described that there was a window in your

15     office, correct?

16          **A.   Yeah.  There's -- well, yeah.  I**

17     **talked about the window that went out to the**

18     **outside where they --**

19               MR. BRODY:  The courtyard.

20               THE WITNESS:  The courtyard.

21     That's what it was called, the courtyard.  And

22     then there's a door and a window -- I mean,

23     there's a window in the door.

24

OWEN v. JAVED, et al.                          No. 18 CV 334
DEPOSITION OF:  CHRISTY LENHARDT          February 1, 2022

Page 87

 1   BY MS. JOHNSTON:
 2        Q.   Okay.  Would you and Mr. Hurt kind
 3   of purposely position yourself to reduce the
 4   likelihood that you would be seen?
 5        **A.   Yes.**
 6        Q.   Okay.  And you said that, to your
 7   knowledge, Dr. Javed never actually saw
 8   something physical happen between you and
 9   Mr. Hurt?
10        **A.   To my knowledge.  He was in front**
11   **of me, so I could not see the door -- or the**
12   **window.  He would turn and look and make sure**
13   **nobody was looking in the window.**
14        Q.   And at no point in time, did he
15   ever tell you that Dr. Javed just looked in?
16        **A.   Right.**
17        Q.   And she never mentioned having seen
18   an actual physical interaction between you and
19   Mr. Hurt?
20        **A.   Correct.**
21        Q.   And there's one situation that you
22   said where she mentioned that Mr. Hurt was
23   always in your office when she walked by, but
24   that was the extent of that conversation?

OWEN v. JAVED, et al.                                    No. 18 CV 334
DEPOSITION OF:  CHRISTY LENHARDT                February 1, 2022

Page 88

1          A.    It was kind of like a warning.

2          Q.    But, again, she never actually said

3     that she thought that you had crossed a line in

4     terms of a sexual relationship with Mr. Hurt?

5          A.    Correct.

6          Q.    And was that the only time that you

7     ever had a conversation like that with

8     Dr. Javed, that you remember?

9          A.    No.

10         Q.    And what -- when did you have the

11    next conversation or was it a previous

12    conversation?

13         A.    After -- it was after the incident

14    in Bob Hamlin's office, she told me to stop

15    going to K --

16         Q.    Okay.

17         A.    -- Unit.

18         Q.    Understood.

19               And let's actually just discuss the

20    incident in Bob Hamlin's office.

21         A.    Okay.

22         Q.    Can you tell me what happened?

23         A.    I would go over -- you don't need

24    to know the reason.

OWEN v. JAVED, et al.                              No. 18 CV 334
DEPOSITION OF:  CHRISTY LENHARDT             February 1, 2022

                                                      Page 89

1            I was in Bob Hamlin's office.  He
2     came to talk to me like he usually did.  He
3     came in and eventually closed the door, and I
4     went "No," because there was something wrong
5     with the door where it was -- Bob told me about
6     it.  And told me that they had put in two or
7     three work orders to get it fixed because it
8     would lock from the inside.  It -- they would
9     have trouble getting it open.
10           So he closed the door.  He ended up
11    wanting to have sex, and we had sex.  And then
12    when we went to leave, the door was locked, and
13    we couldn't get out.
14           And then we tried really hard for a
15    long time to try to get it to open.  And then I
16    called the nurse's station to tell them that I
17    was locked in the office with Ben.  And I -- we
18    needed help getting out.
19        Q.  I assume at some point somebody did
20    come and help you get out of the --
21        A.  First the nurse and the STA came
22    and tried to open the door.  And they were
23    freaking out.  They were pretty nervous about
24    it.

OWEN v. JAVED, et al.                          No. 18 CV 334
DEPOSITION OF: CHRISTY LENHARDT              February 1, 2022

Page 90

1          And then they called security and
2     security came. And then, like, a locksmith,
3     whoever worked at Elgin Mental Health Center
4     with his orders came, and they couldn't get it
5     open. And they drilled it so that it would
6     open.
7          Q.   Okay.
8          A.   So it was a big hullabaloo.
9     Patients were standing around. Lots of
10    security. It was very embarrassing.
11         Q.   And you said that you were in Bob
12    Hamlin's office. Where is Bob Hamlin's office
13    located?
14         A.   On K Unit.
15         Q.   And why were you in there?
16         A.   So Bob had a patient who was
17    transferred to me. And he had developed an
18    incentive program with that patient where if
19    the patient -- he was a developmentally
20    disabled patient. And if he did well for the
21    day, then he got a snack. And Bob was a very
22    conscientious person, and he didn't want me to
23    pay for the snacks since he started the
24    program.

OWEN v. JAVED, et al.                              No. 18 CV 334
DEPOSITION OF:  CHRISTY LENHARDT              February 1, 2022

Page 91

1           So I would go to his office at the

2     end of every day to get the snacks to put in

3     Nathaniel's nutrition box.

4           Q.   Okay.  And so at this point in

5     time, where was Mr. Hurt residing?

6           A.   Mr. Hurt had moved; had been

7     transferred to K.

8           Q.   Do you know why Mr. Hurt was

9     transferred to the K Unit?

10          A.   They wanted -- oh, initially it was

11    because of a fight that had occurred between

12    him and another patient, and they needed to

13    get -- they needed to separate them.

14          Q.   Okay.

15          A.   The patient had harassed him and

16    harassed him and harassed him until he started

17    a physical fight.

18          Q.   And do you know who Mr. Hurt's

19    social worker on the K Unit was?

20          A.   Initially it was Bob Hamlin.

21          Q.   And then did it become somebody

22    else?

23          A.   Drew's.  It -- he became Drew

24    Beck's.  Drew Beck became his social worker.

OWEN v. JAVED, et al.                              No. 18 CV 334
DEPOSITION OF:  CHRISTY LENHARDT              February 1, 2022

                                                        Page 92

1          Q.   And then during that time when he

2     was on the K Unit, it means that his, like,

3     treating psychiatrist would have been

4     Dr. Kareemi instead of Dr. Javed?

5          **A.   Correct.**

6          Q.   Okay.  So you went to Bob Hamlin's

7     office that day, which is on the K Unit, to get

8     the snack for the incentive program that had

9     already been established related to this other

10    patient?

11         **A.   Uh-huh, my patient now.**

12         Q.   Your patient now?

13         **A.   Yes.  That patient had been**

14    **transferred from K to L.  He had been Bob**

15    **Hamlin's patient, and we continued the**

16    **incentive program, which Bob continued to pay**

17    **for, and he kept the snacks in his office.  And**

18    **so I would go to K to get the snacks.**

19         Q.   And you previously said that you

20    would go to the K Unit every day to get these

21    snacks out of Mr. Hamlin's office?

22         **A.   Yes.  Because he got a snack every**

23    **day unless he acted up.**

24         Q.   All right.  So it was not unusual

OWEN v. JAVED, et al.                                    No. 18 CV 334
DEPOSITION OF:  CHRISTY LENHARDT                    February 1, 2022

                                                              Page 93

 1    for you to go into Bob Hamlin's office to get a

 2    snack?

 3          **A.    For that purpose, it was not**

 4    **unusual, no.**

 5          Q.    And how long had that been going on

 6    with you going over to Bob Hamlin's office to

 7    get the snack for the incentive program before

 8    the incident happened with you and Mr. Hurt

 9    being locked in?

10          **A.    I can't even guess.  Months.**

11          Q.    Okay.  So a little while though?

12    More than -- it wasn't, you know, day four of

13    you going over there?

14          **A.    No.  No way.**

15          Q.    Okay.  And so then you said

16    Mr. Hurt came in while you were already in

17    Mr. Hamlin's' office?

18          **A.    He would come and talk to me at the**

19    **doorway, and then come in to take the box off**

20    **the -- the tall filing cabinet, so I could get**

21    **the snacks, and then we would talk for awhile.**

22          Q.    Okay.  And was that pretty typical

23    for when you would go and get the incentive

24    snack?

Page 94

1          **A.   Yeah, it happened every day --**

2          Q.   And did more than Mr. Hurt talking

3     with you and lifting the box up happen every

4     day?  Was there any --

5          **A.   Yes.**

6          Q.   -- sort of -- sorry.

7          **A.   Yes.**

8          Q.   Okay.  But this was the only time

9     when -- was this the only time that you two had

10    sex in Bob Hamlin's office?

11         **A.   It's the only time we had**

12    **intercourse in Bob Hamlin's office.**

13         Q.   Okay.  And is that the only time

14    that you got locked into the office?

15         **A.   Correct.**

16         Q.   Okay.  And when you had to call --

17    sorry.  Who did you call first?  Was it the

18    nurses' station?

19         **A.   I called the nurses' station.**

20         Q.   Okay.  Do you remember what you

21    told them?

22         **A.   That I was in Bob Hamlin's office**

23    **with Ben Hurt, and we couldn't open the door.**

24         Q.   And do you remember what they said

OWEN v. JAVED, et al.                                    No. 18 CV 334
DEPOSITION OF:  CHRISTY LENHARDT                    February 1, 2022

Page 95

1      in response to that?

2             A.    Just that they were going to come

3      and help let me out.

4             Q.    And how long did it take for

5      somebody to get over from the nurses' station

6      to Bob's office?

7             A.    A minute.

8             Q.    And you stated that then they

9      weren't able to open the door.  Did you call

10     security then, or did one of those --

11            A.    No.  They did.

12            Q.    Sorry?

13            A.    No, they did.

14            Q.    And you mentioned that a lot of

15     people were around.  Who did you see that

16     actually kind of witnessed the unlocking or

17     process of unlocking the office?

18            A.    Well, definitely Chief Epperson.

19     Actually, he was -- actually, I don't know if

20     he was there.  I know he was in the nurses'

21     station.  So it would have been other security

22     guards.  It would have been patients.  Patients

23     and security guards.

24            Q.    Do you remember if Dr. Javed came

OWEN v. JAVED, et al.                                    No. 18 CV 334
DEPOSITION OF:  CHRISTY LENHARDT              February 1, 2022

                                                         Page 96

1      by at any time when you were locked in the

2      office?

3              A.    No.  It was after.  She left at

4      3:00, and I left at 4:00.  So I would do this

5      around 3:30.  Neither -- but Dr. Kareemi and

6      Dr. Javed left at 3:00.

7              Q.    And what about Colleen Delaney, was

8      she in the area --

9              A.    No.  She was --

10             Q.    -- or Diana?

11             A.    She was assistant nursing director

12     by that time, and Diana Hogan was the nursing

13     director.  So, no, they wouldn't have any

14     reason to be walking around the unit.

15             Q.    And it sounds like -- does that

16     mean that they were on -- it sounds like you

17     referred to it before more as administration?

18             A.    Yes.

19             Q.    And where did administration work

20     in proximity to the forensic units?

21             A.    So you have the -- along -- so you

22     come into the building through security.  You

23     have to pass the security, go through security

24     doors.  Walk down a hallway.  To the left was

OWEN v. JAVED, et al.                          No. 18 CV 334
DEPOSITION OF:  CHRISTY LENHARDT          February 1, 2022

                                                    Page 97
1    UST units.  To the right was the NGRI units.

2    You would turn right, and go down a very long

3    hallway until you got to the double doors.

4              And then the double doors opened,

5    and each unit was on either side of the closed

6    double doors.  So about five minutes.

7         Q.   So it was a little bit of a hike?

8         A.   It was a hike.

9         Q.   Okay.  They wouldn't just kind of

10   randomly be walking by the area?

11        A.   No.

12        Q.   Okay.

13        A.   Administration -- you had asked me

14   where administration was.  Administration

15   was -- so you had the lobby, and administration

16   was to the left behind -- there was a door.

17   And then you walked in, and we called that

18   administration.  There were offices and

19   cubicles.

20        Q.   Okay.  And so then after you were

21   let out -- I believe, drilled out of Bob

22   Hamlin's office, what happened next?

23        A.   Bob Hamlin came and said that Chief

24   Epperson wanted to speak with me.  He was the

OWEN v. JAVED, et al.                           No. 18 CV 334
DEPOSITION OF:  CHRISTY LENHARDT          February 1, 2022

Page 98

1      head of security, and that he was sitting in

2      the nurses' station.

3           Q.   Okay.  And did you go speak with

4      Chief Epperson at that time?

5           A.   Yes.

6           Q.   And what did you two discuss?

7           A.   He wanted to know why Ben and I

8      were in the office behind the locked door.

9           Q.   And what did you say?

10          A.   It wasn't supposed to be locked.

11     It was unlocked, and it was closed, and that

12     door had been malfunctioning for quite a while,

13     and work orders had been put in because they

14     knew it was malfunctioning, and it just

15     happened to lock that day.

16          Q.   And you've previously said that it

17     was not an uncommon practice -- or I think it

18     was standard practice for social workers to

19     meet one on one with patients with the door

20     closed, but not locked?

21          A.   Correct.

22          Q.   Okay.  And then you told

23     Mr. Epperson that it wasn't supposed to be

24     locked and that was a malfunction.  What did he

OWEN v. JAVED, et al.                           No. 18 CV 334
DEPOSITION OF:  CHRISTY LENHARDT              February 1, 2022

                                                    Page 99

1    say?

2         **A.    He was mad that --**

3         Q.    I'm sorry.

4         **A.    He was mad.  He said things about**

5    **security, and not being in the office alone**

6    **with a patient and all this other stuff.**

7         Q.    Okay.  But you had previously said

8    that being alone in the office with a patient

9    was not unusual?

10        **A.    Security didn't like that we were**

11   **alone in offices with patients.**

12        Q.    Okay.  But it still was a common

13   practice at Elgin, they just didn't like it?

14        **A.    But it would not have been a common**

15   **practice for me and Ben, since Ben was not my**

16   **patient at that time.**

17        Q.    Okay.  And did Mr. Epperson seem to

18   blame you for what happened?

19        **A.    Yeah, I suppose since I was the**

20   **social worker and should have been in control**

21   **of the situation.  But I told him that**

22   **unbeknownst to me, that Ben just grabbed the**

23   **door and shut it.**

24        Q.    And do you think that Mr. Epperson

OWEN v. JAVED, et al.                                No. 18 CV 334
DEPOSITION OF:  CHRISTY LENHARDT              February 1, 2022

Page 100

```
 1     doubted the sincerity of what you told him

 2     about how this was an accident?

 3               MR. CECALA:  I'm going to make an

 4     objection again.  We can't just keep having her

 5     speculate about what everyone else was

 6     thinking, whether he doubted it or not.  What

 7     did he say?  What did she say is perfectly

 8     fine, but I'm kind of letting it go.  But she

 9     can't testify to Bob Hamlin's speculation.

10     What did he say?

11     BY MS. JOHNSTON:

12          Q.   Did he tell you didn't believe you?

13          A.   No.  He was mad.

14          Q.   And did he tell you what he was mad

15     at --

16          A.   He was disgruntled.

17          Q.   Oh, go ahead.

18          A.   Disgruntled.

19          Q.   Did he tell you he was mad at you?

20          A.   Yeah.  I mean, he didn't say, I'm

21     mad at you, but he acted mad while we were

22     talking.

23          Q.   Okay.  So then after you had the

24     incident in Mr. Hamlin's office, you said that
```

OWEN v. JAVED, et al.                                    No. 18 CV 334
DEPOSITION OF:  CHRISTY LENHARDT                  February 1, 2022

                                                            Page 101

1      you talked with -- or that Dr. Javed told you

2      not to go to K Unit?

3             A.   Correct.

4             Q.   How long after the incident was

5      that?

6             A.   **The next week -- the next week.  I**

7      **think it was on a Friday because I had all**

8      **weekend to stew and worry about what was going**

9      **to happen on Monday.**

10            Q.   And what did Dr. Javed say to you?

11            A.   **That there was no reason for me to**

12     **be going to K Unit; that Bob was going to move**

13     **the snacks into my office; and that she did not**

14     **want to hear about me being on K Unit at all.**

15                 **She was --**

16            Q.   So then the snacks that you had

17     gone to K Unit on a mostly daily basis to get,

18     were removed from Bob Hamlin's office?

19            A.   **Correct.**

20            Q.   And put in your office?

21            A.   **Correct.**

22            Q.   And she just told you that then you

23     had no reason to go to K Unit anymore?

24            A.   **Correct.**

OWEN v. JAVED, et al.                    No. 18 CV 334
DEPOSITION OF:  CHRISTY LENHARDT        February 1, 2022

                                              Page 102

1          Q.   Did she say anything else about

2    what had happened in Mr. Hamlin's office?

3          **A.   She may have alluded to the fact,**

4    **but I don't remember her saying anything**

5    **specific.**

6          Q.   When you say "She may alluded to

7    the fact," what does that mean?

8          **A.   I would assume that it would mean**

9    **that I didn't need to be in Bob's office with**

10   **Ben because Ben wasn't my patient.**

11         Q.   But what did she say?

12         **A.   I don't remember.**

13         Q.   Did she tell you that she was

14   worried about the fact that you were in the

15   office with Ben?

16         **A.   No.**

17         Q.   Did she ask if anything happened in

18   the office with Ben?

19         **A.   No.**

20         Q.   Did she ask you why Ben was in the

21   office with you?

22         **A.   She may have.  She may have because**

23   **I know that at some point I would have**

24   **explained that Ben had been my patient, and he**

OWEN v. JAVED, et al.                           No. 18 CV 334
DEPOSITION OF:  CHRISTY LENHARDT          February 1, 2022

Page 103

1    **wanted to tell me what was going on in his**

2    **treatment and how he was doing, and that he**

3    **would come in and get the box off the file**

4    **cabinets and -- in a helpful way.**

5          Q.   But you didn't say that he was in

6    the office because you two had any sort of

7    sexual relationship?

8          **A.   No.**

9          Q.   And did Dr. Javed ask if you had a

10   sexual relationship with Ben Hurt at that time?

11         **A.   No.**

12         Q.   And then had -- you already said

13   you had that conversation then with Dr. Javed.

14   Did you talk with anybody else outside of

15   Dr. Javed and Mr. Epperson about the incident

16   being locked into Bob Hamlin's office?

17         **A.   Bob and Cara.**

18         Q.   Bob and -- let's just go over, what

19   did you say with Bob about -- when did you talk

20   with Bob about the incident?

21         **A.   He was maybe going out to the**

22   **parking lot or something, walking down the**

23   **hall, walking out to the parking lot maybe.**

24   **And he said that, yeah, that lock has been --**

OWEN v. JAVED, et al.                               No. 18 CV 334
DEPOSITION OF:  CHRISTY LENHARDT              February 1, 2022

Page 104

 1    that door has not been functioning, and we put

 2    in work orders.  And it was -- it was -- it

 3    was -- I don't know if he said ironic or it was

 4    weird that it locked or something.

 5              I think they talked around it.

 6    Nobody ever said anything specific.

 7         Q.   But he did tell you that the lock

 8    had been broken, and he had put in several work

 9    orders to get it fixed?

10         A.   Yes.

11         Q.   And so it was common knowledge to

12    him that it wasn't working properly at least?

13         A.   Yes.  Yes.  And so people were --

14    and it was an accident.  All of sudden he went

15    to close the door, and I was freaking out

16    because the door wasn't supposed to be shut

17    because it was malfunctioning.

18         Q.   And -- but I think you said that

19    you talked about it with Cara?

20         A.   Yeah.  I was worried about -- I

21    was -- what?

22         Q.   And is that Cara Wueste?

23         A.   Wueste.

24         Q.   W-U-E-S-T-E, I believe?

OWEN v. JAVED, et al.                          No. 18 CV 334
DEPOSITION OF:  CHRISTY LENHARDT         February 1, 2022

Page 105

1          A.    Correct.

2          Q.    Okay.  And who is she?

3          A.    She was my friend.  She was a

4     social worker on the unit I worked on.

5          Q.    On the L Unit?

6          A.    Yes.

7          Q.    Okay.  And when did you talk with

8     Cara about this?

9          A.    I think coming into the facility

10    the next morning or the Monday, if it was on a

11    Friday.  And I was talking about how I was

12    worried about what was going to happen at the

13    morning meeting when they talk about the

14    incident, and -- and how odd it was that the

15    door malfunctioned, and we got locked in.

16               And she was like, Christy, it will

17    be okay.  You just got locked in, you know, to

18    a room and you didn't do it on purpose.

19          Q.    And did you tell her anything about

20    what happened with Ben Hurt while you were

21    locked in the office?

22          A.    No.  Cara knew nothing.

23          Q.    So you never discussed having any

24    sort of nonprofessional relationship with

OWEN v. JAVED, et al.                          No. 18 CV 334
DEPOSITION OF:  CHRISTY LENHARDT           February 1, 2022

Page 106

 1    Mr. Hurt with Cara?

 2         **A.    Uh-huh.  No.**

 3         Q.    Okay.  And you never discussed it

 4    with Bob Hamlin either?

 5         **A.    No.**

 6         Q.    You didn't -- did you talk about it

 7    with anybody that you worked with at Elgin?

 8         **A.    No.**

 9         Q.    And were there any other incidents

10    that you can think of where you feel that

11    Dr. Javed was trying to talk with you about

12    your relationship with Ben Hurt or that was

13    your impression?

14         **A.    That -- those two times.**

15         Q.    Okay.  And is that all you remember

16    about those two conversations that we have been

17    discussing?

18         **A.    Yes.**

19         Q.    And I believe that you also earlier

20    mentioned that Drew Beck said something that

21    you perceived as related to --

22         **A.    Yes.**

23         Q.    -- your relationship?

24              Okay.  Well, do you remember --

OWEN v. JAVED, et al.                                    No. 18 CV 334
DEPOSITION OF:  CHRISTY LENHARDT                    February 1, 2022

Page 107

 1        A.    Yes.

 2        Q.    -- generally speaking when that

 3   was?  Was it before or after the incident in

 4   Bob's office, how about that?

 5        A.    I want to say it was after, but I'm

 6   not sure.

 7        Q.    And what did he say?

 8        A.    It might have been before.  I think

 9   it might have been before.

10             Okay.  So he came to my office, and

11   he said that administration was watching me,

12   and that -- I don't know if he said I needed to

13   be careful.  It was a warning about

14   administration watching me and Ben.  And that

15   he had had conversations with administration.

16             And, see, administration talked to

17   him like more than Bob Hamlin, who's actually

18   the Social Worker III.  Drew had connections up

19   there because at one time he had another

20   position up there.

21             So anyways they talked to him about

22   my relationship with Ben, and he came to tell

23   me that they were watching it.  And I should be

24   careful, I guess, was his intention.

OWEN v. JAVED, et al.                              No. 18 CV 334
DEPOSITION OF:  CHRISTY LENHARDT            February 1, 2022

Page 108

1              And before he left, he said, "I

2      don't know what it is with you and black guys."

3              And then I went to say something.

4      I was really caught off guard.  And I have no

5      idea what I was going to say, but I went to say

6      something, and he said, "I don't want to know."

7      And he left.

8          Q.   And do you remember where that

9      conversation took place?

10         A.   In my office.  Basically, people

11     suspected that something was going on between

12     myself and Ben; that there was, obviously, a

13     romantic relationship, but I believed that if

14     nobody knew it was sexual, that I was safe.

15             I believed that people had to see

16     it.  I thought the OIG rule -- which I was

17     wrong.  I thought the OIG rule was that you had

18     to see and have evidence of to report it.  And

19     unbeknownst to me when I researched that later,

20     all you needed to do was suspect a relationship

21     with somebody, and people suspected I had a

22     relationship with Ben.

23         Q.   But nobody ever told you that they

24     suspected?

OWEN v. JAVED, et al.                              No. 18 CV 334
DEPOSITION OF:  CHRISTY LENHARDT              February 1, 2022

                                                   Page 109

1          **A.   Whether it was sexual or not, they**

2     **should have reported it.**

3              **I think they did report it to**

4     **protect me because everybody -- because we had**

5     **relationships that -- what was your question?**

6          Q.   But nobody actually told you that

7     they thought you were having a sexual

8     relationship with Ben Hurt?

9          **A.   No.**

10         Q.   And then you also entered into a

11    settlement agreement with Mr. Hurt in this

12    case, correct?

13         **A.   Yes.**

14             MS. JOHNSTON:  And actually while

15    we do this, let's go off the record real quick.

16                   (Discussion had off the

17                    record.)

18    BY MS. JOHNSTON:

19         Q.   Ms. Lenhardt, in August of 2020,

20    you entered into a settlement agreement with

21    Mr. Hurt in this case; is that correct?

22         **A.   Yes.**

23         Q.   Okay.  Sorry.  I couldn't hear you

24    there.

OWEN v. JAVED, et al.                           No. 18 CV 334
DEPOSITION OF:  CHRISTY LENHARDT              February 1, 2022

```
                                                 Page 110
 1          A.   I'm sorry.  I'm not usually a loud

 2      person.  This is very difficult.  Just like

 3      when I have to do it at work, I have to scream

 4      for people to hear me.

 5          Q.   Well, I understand.  And we're

 6      asking you to kind of communicate in a lot of

 7      abnormal ways with the no nonverbal

 8      communication, and the stilted way that you

 9      have to answer questions here.

10               MS. JOHNSTON:  And let me just

11      clarify, Gay, we went back on the record,

12      correct?

13               THE STENOGRAPHER:  Yes.

14      BY MS. JOHNSTON:

15          Q.   Okay.  So in August of 2020 you

16      entered into a settlement agreement with

17      Mr. Hurt.  And I believe that your attorney has

18      given you what's marked as Exhibit 3, which is

19      the settlement agreement in that case?

20          (Exhibit No. 3 referenced.)

21          A.   Yes.

22          Q.   And I'll give you a second to take

23      a look at it.

24          A.   Okay.
```

OWEN v. JAVED, et al.                              No. 18 CV 334
DEPOSITION OF:  CHRISTY LENHARDT          February 1, 2022

                                                    Page 111

1            Q.    I believe you heard us say earlier,

2       so all of the attorneys, we are stipulating as

3       to the authenticity of the settlement

4       agreement, but feel free to take a minute to

5       look at it, if you like, just to refresh

6       yourself as to what it says.

7            **A.    Okay.**

8            Q.    You don't have to read the whole

9       thing word-for-word, but just so that you're

10      comfortable.

11           **A.    Okay.**

12           Q.    And so, Christy, do you recognize

13      this settlement agreement?

14           **A.    Yes.**

15           Q.    And as a part of this, did you also

16      sign an affidavit and provide a signed

17      affidavit in this case?

18           **A.    Yes.**

19           Q.    Okay.  And now move on to Exhibit

20      4, which I believe Steve also has, which is the

21      affidavit for the Hurt case.

22               (Exhibit No. 4 referenced.)

23           **A.    Yes.**

24           Q.    Okay.  Do you have a copy of that

OWEN v. JAVED, et al.                           No. 18 CV 334
DEPOSITION OF:  CHRISTY LENHARDT        February 1, 2022

Page 112

1      there with you?

2           A.   Yes.

3           Q.   And do you recognize this as the

4      affidavit that you signed?

5           A.   It looks like it, yes.

6           Q.   And to clarify, we have also

7      stipulated as to the authenticity of the

8      affidavit.

9           A.   Okay.

10          Q.   And so before you signed this

11     affidavit, did you go over all the information

12     that was in it with your attorney?

13          A.   Yes, I did.

14          Q.   And you understood when you signed

15     that affidavit that you were swearing that all

16     of the information in that affidavit was true

17     and accurate?

18          A.   Yes.

19          Q.   And did you say, is this a -- the

20     information that you put in that affidavit, is

21     that a complete statement; meaning, is that all

22     of the information that you had that you would

23     want to put into the affidavit in this case?

24               MR. BRODY:  Objection to the form

OWEN v. JAVED, et al.                              No. 18 CV 334
DEPOSITION OF:  CHRISTY LENHARDT              February 1, 2022

                                                      Page 113

1       of the question.

2       BY MS. JOHNSTON:

3             Q.   Did you leave out information about

4       what it is that anybody at Elgin may have known

5       about your relationship with Ben Hurt when --

6                  MR. BRODY:  Same -- go ahead.

7       Finish your question.

8       BY MS. JOHNSTON:

9             Q.   (Continued) -- when helping draft

10      this affidavit?

11                 MR. BRODY:  Same objection.  The

12      form of the question.

13                 MR. CECALA:  I have the same

14      objection.  The affidavit speaks for itself.

15                 THE WITNESS:  I --

16                 MR. CECALA:  It's a sworn affidavit

17      under oath.  There's no question pending.  It's

18      a sworn affidavit under oath.

19                 MR. BRODY:  Here's the other

20      problem.  You're asking if she's left anything

21      out.  I don't recall -- but it's my

22      understanding that it was not necessarily meant

23      to be all inclusive of everything she knew or

24      could have known or what have you.

OWEN v. JAVED, et al.                          No. 18 CV 334
DEPOSITION OF:  CHRISTY LENHARDT              February 1, 2022

Page 114

 1                And given the form of the question,

 2      you're asking if that's got everything.  If

 3      there's something specific you think that may

 4      be missing or otherwise, please ask her.

 5                But as Joe said, the affidavit is

 6      the affidavit, and it says what it says.

 7      BY MS. JOHNSTON:

 8           Q.   Okay.  And just going back -- we

 9      can turn back to Exhibit 3, which is the

10      settlement agreement.

11                And then at paragraph 1, a, iv, it

12      states, Defendant's statement to her best

13      recollection, summarizing each otherwise

14      undocumented conversation she has had with

15      co-defendants in the litigation occurring at

16      any time subsequent to October 1, 2014,

17      including the time and place of such

18      conversation, which relate to any statement or

19      assertion made in defendant's affidavit

20      identified as Exhibit A, regarding any staff or

21      employee of the State of Illinois, Department

22      of Human Services, located or employed at Elgin

23      Mental Health Center, the facility.  (As read).

24                So it appears that this affidavit

OWEN v. JAVED, et al.                                    No. 18 CV 334
DEPOSITION OF:  CHRISTY LENHARDT                  February 1, 2022

                                                        Page 115

 1    was intended to kind of document any otherwise

 2    undocumented conversations that you have had

 3    with either, you know, defendants Javed,

 4    Kareemi, Delaney, Hogan or Beck?

 5               MR. CECALA:  I have an objection.

 6    That's actually not the language that you just

 7    read.  The language speaks for itself.  It's

 8    improper impeachment.

 9               So to impeach her on the affidavit

10    or the settlement agreement, you have to ask

11    about the settlement agreement and use

12    language.  And what you just read is

13    defendant's statement, to her best

14    recollection, summarizing otherwise

15    undocumented conversations.  It's a summary.

16               You have the right to depose her,

17    and ask her anything else, which is what we're

18    doing today, but you can't --

19               MS. JOHNSTON:  Did you have -- Joe,

20    it's a speaking objection.  I can go ahead

21    and --

22               MR. CECALA:  My objection.

23    BY MS. JOHNSTON:

24               Q.  Do you have any --

OWEN v. JAVED, et al.                         No. 18 CV 334
DEPOSITION OF:  CHRISTY LENHARDT            February 1, 2022

Page 116

 1              MR. CECALA:  It's improper

 2     impeachment.  I need to make the record.  It's

 3     improper impeachment.  The documents speaks for

 4     themselves, and you can't use the document to

 5     then speculate on what the meaning of the

 6     document is to impeach her.

 7     BY MS. JOHNSTON:

 8          Q.   Are there other conversations that

 9     were not documented -- and we'll go through the

10     affidavit.  And what I was going to ask is, Are

11     there other conversations that you had that you

12     didn't include in this affidavit that you think

13     were relevant to whether or not anybody at

14     Elgin had knowledge about a relationship with

15     Ben Hurt?

16              But let's go to the affidavit.

17              So you have a copy of that in front

18     of you?

19          **A.   Yes.  Yes.**

20          Q.   Sorry.  I could hear then.

21              So if we go to page two, there's

22     paragraph 10.

23              MS. JOHNSTON:  Now, given that

24     we're having some difficulty with the court

OWEN v. JAVED, et al.                           No. 18 CV 334
DEPOSITION OF:  CHRISTY LENHARDT              February 1, 2022

                                                     Page 117

1      reporter being able to hear Christy all the

2      time, does anybody object -- because I don't

3      think that Gay's having that difficulty with

4      myself, and we all have a copy of this.  Does

5      anybody object if I just read some of these

6      paragraphs in instead to help make sure that

7      she can hear what we're saying?

8                    MR. CECALA:  Sure.  I mean, we'll

9      stipulate to paragraph 10.

10                   MS. JOHNSTON:  But I'm going to

11     have specific questions.  So we'll just make

12     sure that we have it all in there.

13                   So paragraph 10 --

14                   THE WITNESS:  Can you explain to

15     where we are on this document?

16                   MR. BRODY:  Here.  Let me

17     (indicating).

18                   MS. JOHNSTON:  Sure.

19                   THE WITNESS:  He's going to help

20     me.

21                   MR. BRODY:  She's at paragraph 10.

22     Okay.  You're talking paragraph 10 of the

23     affidavit, correct?

24                   MS. JOHNSTON:  Paragraph 10 of the

OWEN v. JAVED, et al.                    No. 18 CV 334
DEPOSITION OF:  CHRISTY LENHARDT          February 1, 2022

Page 118

 1    affidavit, yeah.

 2              MR. BRODY:  And that's Exhibit 4 of

 3    the affidavit.  She had the wrong document.

 4              MS. JOHNSTON:  Oh.  And does she

 5    have the affidavit in front of her now?

 6              MR. BRODY:  She will momentarily.

 7              Paragraph 10 starts with, "Drew

 8    Beck and Hasina Javed," correct?

 9              MS. JOHNSTON:  Yes.

10              MR. BRODY:  All right.  She's got

11    it.

12    BY MS. JOHNSTON:

13         Q.   So that paragraph 10 reads, Drew

14    Beck and Hasina Javed indicated that my

15    relationship with Ben Hurt was overly close.

16    Drew Beck advised me that administrators were

17    watching me and that I needed to be careful.

18    Hasina Javed told me that every time she came

19    to my office, she noticed Ben Hurt in there.  I

20    believe these statements were made in an effort

21    to tell me they suspended something about my

22    relationship with Ben Hurt and were warnings

23    about suspicions by superiors at the EMHC.

24              I do not believe either of them

OWEN v. JAVED, et al.                                No. 18 CV 334
DEPOSITION OF:  CHRISTY LENHARDT              February 1, 2022

Page 119

1    knew about any specific encounters between Ben

2    Hurt and me, except the incident described in

3    paragraph 18 hereof.

4              And I will also state that

5    paragraph 18 discusses the incident in Bob

6    Hamlin's office, if anybody would like to look

7    for it there to confirm as much.

8              And so, Christy, previously we

9    discussed a situation where Dr. Javed told you

10   that she noticed that Ben Hurt would be in your

11   office a lot, and then there's a -- well, is

12   that what you're referring to in this paragraph

13   10 here?

14       **A.   Yes.**

15       Q.   So we've already discussed that

16   conversation in detail here today?

17       **A.   Yes.**

18       Q.   Are there any other details that

19   you remember about that conversation that you

20   would like to discuss now?

21              MR. BRODY:  Objection to the form

22   of the question.

23              Would she like to discuss -- she

24   doesn't want to discuss any of this.

OWEN v. JAVED, et al.                                    No. 18 CV 334
DEPOSITION OF:  CHRISTY LENHARDT                    February 1, 2022

Page 120

```
 1    BY MS. JOHNSTON:
 2           Q.   Fair enough.
 3                Is there anything else that you
 4    remember about that conversation?
 5                THE WITNESS:  Can I talk to you?
 6                MR. BRODY:  Not while there's a
 7    question pending.
 8                Is there anything else that -- she
 9    asked, is there anything else you remember
10    about it?  Yes or no.  It's that simple.
11                THE WITNESS:  The -- just the part
12    about where she said I had a beautiful family.
13    BY MS. JOHNSTON:
14           Q.   But you said that earlier today?
15           A.   Correct.
16           Q.   Right.
17                And outside of what's -- what we've
18    said earlier today during this deposition, is
19    there anything else you remember about that
20    conversation?
21           A.   No.
22           Q.   And --
23           A.   Not that I recall.  Not that I
24    recall, no.
```

OWEN v. JAVED, et al.                                    No. 18 CV 334
DEPOSITION OF:  CHRISTY LENHARDT                  February 1, 2022

                                                            Page 121

1           Q.    And then I'm going to move to

2     paragraph 11 now, and this is on page three, I

3     believe.

4                 But it says, Hasina Javed and other

5     staff in general would have observed or been

6     aware of my frequent contact with Ben Hurt in

7     my office on Unit L.  Hasina Javed and other

8     unit staff would have observed our interactions

9     on Unit L and should have interpreted these

10    actions as indication that our relationship

11    exceeded the bounds of an appropriate

12    therapist-patient relationship.  Hasina Javed

13    may have been aware of my frequent visits to

14    Unit K after that Ben Hurt's transfer to that

15    unit through discussions with other staff.  I

16    visited Ben Hurt in Unit K frequently, so Drew

17    Beck observed such visits on numerous

18    occasions.  (As read).

19                And so you state that Javed would

20    have seen you interact with Mr. Hurt while you

21    were on L Unit?

22          **A.    Yes.**

23          Q.    Okay.  But he was your patient

24    while you were on L Unit, correct?

OWEN v. JAVED, et al.                          No. 18 CV 334
DEPOSITION OF:  CHRISTY LENHARDT              February 1, 2022

Page 122

1          **A.    Yes.**
2          Q.    So it would be normal for you to
3     interact with him on a regular basis?
4          **A.    Not as much as we did, no.**
5          Q.    But it's still normal that you
6     would interact with him?
7          **A.    Yes.**
8          Q.    And Javed wasn't necessarily always
9     there looking at exactly how often you saw
10    Mr. Hurt.  She wasn't, you know, working in the
11    same office as you, correct?
12         **A.    No.  She had an office in the**
13    **hallway on the unit.**
14         Q.    Okay.  And she also had her own
15    patients that she would be seeing and her own
16    workload?
17         **A.    Yes.**
18         Q.    And you mentioned that Dr. Javed
19    may have known that you visited Mr. Hurt on
20    K Unit?
21         **A.    Yes.**
22         Q.    And, obviously, I'm aware that
23    there was -- after the incident in Bob Hamlin's
24    office, she told you not to go to K Unit,

OWEN v. JAVED, et al.                           No. 18 CV 334
DEPOSITION OF:  CHRISTY LENHARDT            February 1, 2022

Page 123

1      correct?

2            **A.    Yes.**

3            Q.   Do you know if she was aware of any

4      prior visits that you had with Mr. Hurt on

5      K Unit before the incident in Bob's office?

6            **A.    Not specifically, but everybody**

7      **knew I went to the K Unit.  I mean, they could**

8      **see me walk down the hall.**

9            Q.   Right.

10           And you also were going to the

11     K Unit to get the food for the incentive

12     program for the patient that you had?

13           **A.    Correct.**

14           Q.   Okay.  And outside of the two

15     conversations that we have talked about today,

16     specifically, when she said that Mr. Hurt was

17     in your office frequently and told you -- and

18     then when she told you that you didn't have to

19     go to the K Unit, did you ever have any other

20     conversations with Dr. Javed about Mr. Hurt?

21           **A.    Well, sure, in terms of treatment**

22     **planning, yes.**

23           Q.   And I apologize.  That was a bad

24     question.

OWEN v. JAVED, et al.                          No. 18 CV 334
DEPOSITION OF:  CHRISTY LENHARDT              February 1, 2022

Page 124

1          Did you ever have conversations

2     with Dr. Javed about your relationship with

3     Mr. Hurt outside of the standard, you know,

4     meetings regarding his treatment?

5          **A.   Not that I can recall.**

6          Q.   And then if you want to take a look

7     back at -- paragraph 12 states that Hasina

8     Javed and Drew Beck clearly suspected an overly

9     close, possibly a romantic relationship between

10    Ben Hurt and me.  This was evident by the

11    statements they made to me.  (As read).

12              To confirm, as it relates to

13    Dr. Javed, are you basing the statement made in

14    paragraph 12 on the two conversations that

15    we've discussed here today?

16         **A.   Yes.**

17         Q.   And are there any other

18    conversations that you would base that

19    statement on that we have not discussed here

20    today?

21         **A.   There may have been, but I don't**

22    **recall.  Those were the two most important**

23    **ones.**

24         Q.   And so you say there may have been,

OWEN v. JAVED, et al.                           No. 18 CV 334
DEPOSITION OF:  CHRISTY LENHARDT          February 1, 2022

                                                    Page 125

 1    but you don't recall?

 2          **A.   Yes.**

 3          Q.   So it's also possible that there

 4    were no other conversations?

 5          **A.   Yes.**

 6          Q.   And then let me jump down a bit to

 7    paragraph 23, which is -- well, at the top it

 8    says it's page six of 11.  Do you have page

 9    six?

10               And in paragraph 23 it says, Diana

11    Hogan was the nursing director and Colleen

12    Delaney was the assistant nursing director at

13    the time of the incident in Bob Hamlin's

14    office.  They would have received a report of

15    this incident and should have attempted to

16    learn more about what happened.  Yet, to my

17    knowledge, they did not talk to Drew Beck, who

18    was then Ben Hurt's therapist, or others about

19    the incident, nor did they speak to me.  (As

20    read).

21               Is that an accurate recitation of

22    that paragraph?

23          **A.   Yes.**

24          Q.   Okay.  And do you know if Colleen

OWEN v. JAVED, et al.                        No. 18 CV 334
DEPOSITION OF:  CHRISTY LENHARDT          February 1, 2022

                                              Page 126

1    Delaney or Diana Hogan ever spoke with anybody

2    about the incident in Bob Hamlin's office?

3         **A.   No, I don't have knowledge of it,**

4    **but -- I don't have knowledge of it, but I know**

5    **that that's what would have happened.  Security**

6    **puts out this report, and it goes to everybody.**

7         Q.   But you do not know what

8    conversations, if any, they had with other

9    people about this?

10        **A.   No.  They're administration.  They**

11   **would have had those conversations amongst**

12   **themselves, not me.**

13        Q.   Right.

14             So you're unable to say whether or

15   not any of those conversations did take place?

16        **A.   I am sure they did, but I can't say**

17   **yes for sure.**

18        Q.   And then in paragraph 27, which is

19   the first full paragraph of page eight.

20        **A.   Yes.**

21        Q.   And if we look down -- well, I'll

22   let you go ahead and read that paragraph again.

23   We have stipulated to everything.  But,

24   Ms. Lenhardt, if you wouldn't mind looking at

OWEN v. JAVED, et al.                                No. 18 CV 334
DEPOSITION OF:  CHRISTY LENHARDT              February 1, 2022

Page 127

1      paragraph 27, specifically, the second

2      sentence.

3            You state that, Ben Hurt and I,

4      meaning yourself, positioned ourselves in such

5      manner that the sexual contact could not be

6      seen from outside the office.  (As read).

7      **A.    Yes.  We were hoping that the**

8      **sexual contact could not be seen, yes.**

9            Q.   But, again, so you were taking

10     specific steps to try to hide what you were

11     doing in the office?

12     **A.    Yes.**

13           Q.   And you did not want any patients

14     or other Elgin staff to know what was going on?

15     **A.    Yes.  Why would you want to?**

16           Q.   And then in paragraph 28, you say

17     that, Some time before the spring of 2017, I

18     was becoming concerned that EMHC staff,

19     including Drew Beck, Hasina Javed, various

20     security therapy aides and others, were

21     becoming suspicious of Ben Hurt and me and that

22     the administration would learn of our

23     relationship.  Ben Hurt and I told each other a

24     number of times that we had to be very careful.

OWEN v. JAVED, et al.                          No. 18 CV 334
DEPOSITION OF:  CHRISTY LENHARDT          February 1, 2022

                                                    Page 128

 1      I felt I was in danger of losing control.  (As

 2      read).

 3              Again, so to reiterate, you and

 4      Mr. Hurt discussed specifically being careful

 5      and not getting caught?

 6          **A.    Yes.**

 7          Q.    Okay.  I went over it a few times,

 8      but at no point in time did anybody from Elgin

 9      ever tell you that they thought you were having

10      a sexual relationship with Ben Hurt?

11          **A.    No.**

12          Q.    And nobody ever asked you if you

13      were having a sexual relationship with Ben

14      Hurt?

15          **A.    No.**

16          Q.    And then in paragraph 31, it

17      says -- and this is the bottom of page nine.

18              And paragraph 31 reads that,

19      Ultimately the sexual relationship between Ben

20      Hurt and me was discovered through an odd

21      coincidence.  I had allowed Ben Hurt to take a

22      picture with my cell phone.  He then posted it

23      on Instagram.  Nanette Mangahas, a retired EMHC

24      employee saw the picture and called Colleen

OWEN v. JAVED, et al.                           No. 18 CV 334
DEPOSITION OF:  CHRISTY LENHARDT            February 1, 2022

                                                    Page 129

 1    Delaney to discuss it.  Apparently, Colleen

 2    Delaney reported the matter and the

 3    administration ordered a security search of Ben

 4    Hurt's room, which turned up multiple items of

 5    digitally recorded evidence of my relationship

 6    with Ben Hurt.  If not for the fortuitous

 7    discovery by Mangahas, I am sure my

 8    relationship with Ben Hurt would have remained

 9    unreported for a significantly longer period of

10    time. (As read).

11              So ultimately it looks like Colleen

12    Delaney was the person who actually made the

13    report to OIG regarding your relationship with

14    Mr. Hurt?

15         A.    That's what I was to understand.

16    That's what Marva, the unit -- the unit --

17    that's what Marva, the -- what is it called?

18    The union -- the union president told me.

19    There were a couple meetings where she rushed

20    me out for a meeting -- just a time when she

21    rushed me out of Elgin Mental Health Center,

22    and she told me -- she said, I'm not supposed

23    to tell you, but this is what's going on.

24         Q.    Okay.

OWEN v. JAVED, et al.                          No. 18 CV 334
DEPOSITION OF:  CHRISTY LENHARDT         February 1, 2022

                                                  Page 130

```
 1              MR. CECALA:  And one objection, for
 2      the record.  The affidavit doesn't say that
 3      Delaney reported it to OIG.  It just says, She
 4      reported it.  I don't think we know who she
 5      reported it to.
 6              MS. JOHNSTON:  Noted.
 7      BY MS. JOHNSTON:
 8          Q.   But either way, Colleen Delaney is
 9      the one who, to your knowledge, reported it to
10      some entity or higher up?
11          A.   Yes, that is what I understood.
12          Q.   Okay.
13          A.   I mean, there's gossip and...
14          Q.   And you previously said that you
15      and Colleen Delaney didn't have a particularly
16      smooth relationship towards the end of your
17      time at Elgin?
18          A.   Yes.
19          Q.   And I believe you said that you
20      felt that she had a personal vendetta against
21      you?
22          A.   Yeah.  I feel like she had some
23      kind of -- this is just my professional
24      opinion, from my training, that she had some
```

Page 131

1    kind of -- it's a word you use when people have

2    a -- like, that somebody reminds you of

3    somebody else or some situation.

4         Q.   I'm not sure if that's

5    transference, but --

6         A.   Yes.  Counter-transference.  Thank

7    you.

8         Q.   There you go.

9         A.   I believe that she -- no.  It's

10   just -- she didn't like me because -- I always

11   thought she didn't like me because I was

12   feminine and she wasn't.  She was a lesbian,

13   and she was very masculine.

14        Q.   But either way, it is your opinion

15   that she did not like you?

16        A.   Yeah.  Yes.

17        Q.   And you don't think that Colleen

18   Delaney would have been going out of her way to

19   do you many favors?

20        A.   No.  No, she wouldn't have been.

21   No.

22        Q.   And we've gone over a good amount

23   of information here, and we're not necessarily

24   quite done.  I know other people have

OWEN v. JAVED, et al.                                     No. 18 CV 334
DEPOSITION OF:  CHRISTY LENHARDT                   February 1, 2022

                                                              Page 132

 1      questions, too.

 2                   Before I look over my notes one

 3      last time, is there any -- have you told me

 4      everything that you remember out of what it is

 5      that I've asked you about?  Is there anything

 6      else that you remember?

 7           A.    My memory is not good, so yes, that

 8      is all I remember.

 9           Q.    Okay.

10           A.    You have to understand that this

11      was traumatic for me, and I blanked out certain

12      things so that I could function.  I couldn't

13      function if I kept thinking about conversations

14      where people were suspicious of me.  I had to

15      keep thinking that it would be okay.

16                   And -- and I took steps to try to

17      stop our sexual relationship, and Ben wouldn't

18      let me.

19                   MR. BRODY:  You don't need to get

20      into a narrative about this.

21                   THE WITNESS:  Okay.  All right.

22                   MS. JOHNSTON:  Let me go ahead, and

23      everybody, I just want to look over my notes

24      here.  Can we take five minutes?

OWEN v. JAVED, et al.                                    No. 18 CV 334
DEPOSITION OF:  CHRISTY LENHARDT                 February 1, 2022

                                                            Page 133

 1              MR. BRODY:  Sure.  Come back 12:05?

 2              MS. JOHNSTON:  Yes, 12:05 should

 3      work.

 4              (A recess was had.)

 5              MR. BRODY:  We are ready.

 6              MS. JOHNSTON:  Okay.  Back on the

 7      record.

 8      BY MS. JOHNSTON:

 9          Q.   Ms. Lenhardt, I just have a couple

10      last questions for you.

11              One, I believe -- so were you in a

12      union when you were employed at Elgin?

13          **A.   Yes.**

14          Q.   What is the name of that union?

15          **A.   Afscme.  It's letters.  I think**

16      **it's A-S -- I don't know -- S-C-M-E or --**

17      **Afscme.**

18          Q.   Okay.

19          **A.   I'm sorry.  I don't know what it**

20      **stands for.  Afscme.  A-F-S-M-E-E or --**

21          Q.   Don't worry.  I'm sure we'll be

22      able to figure it out.

23              I believe you mentioned that you

24      had a union rep that you spoke with.  Do you

OWEN v. JAVED, et al.                                No. 18 CV 334
DEPOSITION OF:  CHRISTY LENHARDT              February 1, 2022

Page 134

1    know who that was?

2         **A.    Marva Stroud, M-A-R-V-A,**

3    **S-T-R-O-U-D.**

4         Q.   And when you were at Elgin, I kind

5    of understand the team that you worked with

6    when you were on the L Unit, but who was your

7    actual then supervisor as a social worker?

8         **A.    Bob Hamlin.**

9         Q.   And who would have been above Bob

10   then?

11        **A.    Joanne Langley.**

12        Q.   And was anybody above Joanne

13   Langley?

14        **A.    The -- Jeff Pharis.  Jeff Pharis**

15   **left.  I'm trying to remember who was after --**

16   **I'm sorry.  Jeff Pharis left, and he was the**

17   **director -- the forensics director?  I don't**

18   **remember the title.  And he left.  And then it**

19   **was -- all I remember is -- oh, Peggy.  Peggy**

20   **Gibble.**

21        **And for awhile it was Salvador -- I**

22   **can't remember his last name.  And then it was**

23   **Tom-something.**

24        Q.   Okay.  But, generally speaking,

OWEN v. JAVED, et al.                          No. 18 CV 334
DEPOSITION OF:  CHRISTY LENHARDT         February 1, 2022

                                                    Page 135

1      when you were on the L Unit, your immediate

2      supervisor was Bob Hamlin?

3               **A.    Correct.**

4                    MS. JOHNSTON:  Okay.  And your

5      attorney has printed out, and Joe and Randy,

6      you were gone for this.  We're just going to

7      pull up Exhibit 2.  That's that one page

8      e-mail.

9               (Exhibit No. 2 referenced.)

10                   And I believe that Steve has a copy

11     for you, or will be able to give you a copy.

12                   MR. BRODY:  She has it.

13     BY MS. JOHNSTON:

14          Q.   Okay.  And, Christy, you don't need

15     to read it out loud, but can you just take a

16     look at that e-mail.

17               **A.    I have.**

18          Q.   And can you confirm that if you see

19     in purple writing about half -- or I don't

20     know, a third of the way down the page, it

21     says, On Thursday November 17, 2016, at 15:30.

22     So 2:30 p.m.  Christy Lenhardt from

23     ██████████████████Gmail.com wrote.

24                   And, Christy, is that your -- or

OWEN v. JAVED, et al.                          No. 18 CV 334
DEPOSITION OF:  CHRISTY LENHARDT            February 1, 2022

Page 136

 1    was that your e-mail address on November 17,

 2    2016?

 3         A.   Yes.

 4         Q.   Is that still an e-mail address

 5    that you use?

 6         A.   Yes.

 7         Q.   And did you write that e-mail to

 8    Ben Hurt?

 9         A.   Yes.

10         Q.   And then did you send that to

11    him -- we can all agree, you sent that to that

12    same e-mail address that Mr. Hurt used to

13    forward it to Mr. Kretchmar, the

14    █████████████████yahoo.com?

15         A.   No.  What I would do is -- no, I

16    did not send it to his e-mail address.  I would

17    write the e-mails, put them in drafts, and then

18    I would show them to him when we met.

19         Q.   Okay.  But that is an e-mail that

20    you wrote into a draft that you showed to Ben

21    Hurt?

22         A.   Correct.

23         Q.   And the e-mail -- at least the

24    draft was made on or about that November 17 --

OWEN v. JAVED, et al.                                    No. 18 CV 334
DEPOSITION OF:  CHRISTY LENHARDT                  February 1, 2022

Page 137

1          **A.    How did he send it?**

2          Q.    Right.  How did he obtain those

3     e-mails then?

4               MR. BRODY:  Could you have sent

5     that?

6               THE WITNESS:  I could have sent

7     that, yeah.

8               MR. BRODY:  Did you send it, if you

9     remember?

10              THE WITNESS:  I don't -- I

11    didn't -- I could have sent it.  What I

12    remember is I mostly just wrote them and didn't

13    e-mail him because that would be damning

14    evidence.  So the thing I e-mailed to him was

15    the stupid pictures, but he insisted that I do

16    that.

17    BY MS. JOHNSTON:

18          Q.    So at least on some occasions,

19    though, you did e-mail him?

20          **A.    Yes.**

21          Q.    Okay.  And this message, be it a

22    draft or a sent message, though, was written

23    from your e-mail address on November 17, 2016,

24    and you wrote it?

LISA A. KOTRBA & ASSOCIATES, LTD.
312-855-1834

OWEN v. JAVED, et al.                                    No. 18 CV 334
DEPOSITION OF:  CHRISTY LENHARDT                    February 1, 2022

                                                         Page 138

1           **A.    Yes, I wrote it.**

2           Q.    Okay.  And it would have been

3     directed to or intended for Ben Hurt to see?

4           **A.    Yes.**

5           Q.    Okay.  And I'm going to lastly,

6     other than what we have discussed here today,

7     do you have any reason to believe that

8     Dr. Javed knew that you were engaged in a

9     sexual relationship with Ben Hurt?

10          **A.    I believe she suspected, but I**

11    **don't know that to be for sure.**

12          Q.    And do you base that on anything

13    other than what -- anything more than what we

14    have discussed here today?

15          **A.    Just the vibes I got from people.**

16    **I was in fear that people knew.**

17          Q.    Again, it was not -- did Dr. Javed

18    ever tell you anything other than what we've

19    discussed here today?  Did she ever say

20    anything to you that made you think that she

21    knew or suspected you were in a sexual

22    relationship with Ben Hurt?

23          **A.    No.**

24          Q.    Okay.  And some general questions,

OWEN v. JAVED, et al.                              No. 18 CV 334
DEPOSITION OF:  CHRISTY LENHARDT              February 1, 2022

Page 139

1      other than what we have discussed here today,

2      do you have any reason to believe that

3      Dr. Kareemi knew that you were engaged in a

4      sexual relationship with Ben Hurt?

5           **A.    No.  She even knew less than**

6      **Dr. Javed.**

7           Q.   And other than what we have

8      discussed today -- here today, do you have any

9      reason to believe that Colleen Delaney knew

10     that you were engaged in a sexual relationship

11     with Ben Hurt?

12          **A.   No, not a sexual relationship.**

13          Q.   And other than what we've discussed

14     here today, do you have any reason to believe

15     that Diana Hogan knew that you were engaged in

16     a sexual relationship with Ben Hurt?

17          **A.   No, not a sexual relationship.**

18          Q.   And other than we've discussed

19     today, do you have any reason to believe that

20     Drew Beck knew you were engaged in a sexual

21     relationship with Ben Hurt?

22          **A.   No, not for sure.**

23               MS. JOHNSTON:  And that is all that

24     I have.  I know that -- I believe that Amanda

OWEN v. JAVED, et al.                                    No. 18 CV 334
DEPOSITION OF:  CHRISTY LENHARDT                   February 1, 2022

Page 140

1     has some questions, and then Randy and Joe.

2              MS. KOZAR:  Yes, I do.

3              Hi, Ms. Lenhardt.  My name is

4     Amanda Kozar, and I represent defendant Drew

5     Beck in the Hurt lawsuit.  So I just have a few

6     additional questions that I'm going to ask you

7     that pertains specifically to him.  It

8     shouldn't take too long.

9              DIRECT EXAMINATION

10    BY MS. KOZAR:

11         Q.   So, actually, if I could just

12    direct you back to what has previously been

13    marked as Exhibit 4.  It's to your affidavit in

14    the Hurt case.

15         **A.   Got it.**

16         Q.   Okay.  Great.

17              So if I could just direct you to

18    paragraph 10 of that affidavit, please.

19         **A.   Okay.**

20         Q.   So the first sentence of that

21    paragraph 10 reads, Drew Beck and Hasina Javed

22    indicated that my relationship with Ben Hurt

23    was overly close, correct?

24         **A.   Yes.**

OWEN v. JAVED, et al.                          No. 18 CV 334
DEPOSITION OF:  CHRISTY LENHARDT          February 1, 2022

                                                    Page 141

1          Q.   Okay.  So talking about Drew Beck,
2     specifically, how many times did he indicate to
3     you that your relationship with Ben Hurt was
4     overly close?
5          **A.   Once.**
6          Q.   And do you remember when that was?
7          **A.   I do not remember the time, nor the**
8     **date.**
9          Q.   Okay.  Was he -- were the two of
10    you alone when he made that indication to you
11    or were others present?
12         **A.   He came to my office, and we were**
13    **alone.**
14         Q.   Okay.  Do you know why he had come
15    to your office on that particular occasion?
16         **A.   He told me that administration had**
17    **been talking to him, and that they were**
18    **watching me and suspicious about my**
19    **relationship with Ben or suspicious about**
20    **something.**
21         Q.   Wait.  I'm sorry.  So did he say
22    specifically that administration was suspicious
23    about your relationship with Ben, or just that
24    they were suspicious about something?

OWEN v. JAVED, et al.                                  No. 18 CV 334
DEPOSITION OF:  CHRISTY LENHARDT              February 1, 2022

                                                        Page 142

 1          **A.    No.  It was Ben, because Ben had**
 2     **made that comment.  So, yes, it was Ben.**
 3          Q.   Okay.  Did he indicate why
 4     administration had been talking to him about
 5     that?
 6          **A.    No.**
 7          Q.   Okay.  So what specifically did
 8     he -- no.  Strike that.  Let me rephrase.
 9             When he stated that administration
10     was suspicious of your relationship with Ben
11     Hurt, did he elaborate on that?
12          **A.    No.**
13          Q.   So that's the only thing he said?
14          **A.    That it was, like, a warning that I**
15     **should be careful, and -- a warning that I**
16     **should be careful, and that -- and not a**
17     **disagreement, but I could tell he was -- I**
18     **could tell he was not -- disapproval.  There**
19     **was a sense of disapproval towards me.**
20          Q.   Okay.  Did he actually say that he
21     disapproved of you in some way, or was that
22     just the feeling that you got?
23          **A.    That was the feeling that I got.**
24          Q.   Okay.  During that conversation,

OWEN v. JAVED, et al.                          No. 18 CV 334
DEPOSITION OF:  CHRISTY LENHARDT            February 1, 2022

                                                    Page 143

1    did he -- did he say anything to you indicating

2    that he was aware of a sexual relationship

3    between you and Ben Hurt?

4        **A.    No.**

5        Q.    Did he say anything during that

6    conversation that indicated that he had

7    observed a romantic or otherwise inappropriate

8    relationship between you and Ben Hurt?

9        **A.    He said to me, "I don't know what**

10   **it is with you and black guys."**

11       Q.    Okay.  Did he say anything after he

12   made that comment?

13       **A.    No, he was leaving.  And I went to**

14   **answer, and he said, "No," he put up his hand,**

15   **"I don't want to know."**

16       Q.    Okay.  Okay.  All right.  So aside

17   from that incident, were there any other times

18   that Drew Beck indicated to you in some way

19   that he -- that your relationship with Ben Hurt

20   was overly close?

21       **A.    Not that I can recall.**

22       Q.    Okay.

23       **A.    I know he saw a few times when I**

24   **went to the K Unit and went in Bob's office,**

Page 144

1      **and that Ben and I were talking.**

2           Q.   Okay.  And so on those occasions

3      when you went to K Unit and you Ben and were

4      talking, did Drew Beck ever approach the two of

5      you?

6           **A.   I don't think so, no.**

7           Q.   Okay.  So do you recall him ever

8      telling Ben Hurt to leave you alone while you

9      were on K Unit?

10          **A.   If he did, I wasn't privy to that**

11     **information or conversation.**

12          Q.   You don't remember that?

13          **A.   No.  I wasn't there, if it was**

14     **said, no.**

15          Q.   Okay.  Okay.  Let's see.

16               Do you recall whether Drew Beck was

17     present at EMHC on the occasion that you and

18     Ben Hurt got locked in Bob Hamlin's office?

19          **A.   I cannot completely recall.  He**

20     **could have been there.  If it was before**

21     **4:00 o'clock that I tried to leave the office,**

22     **and he would have been there, if he was**

23     **working, but I know there was a period of time**

24     **when he was out because he had knee surgery.**

OWEN v. JAVED, et al.                                  No. 18 CV 334
DEPOSITION OF:  CHRISTY LENHARDT              February 1, 2022

Page 145

1       And I don't know if that was the time.

2              Q.   Okay.  As far as you can recall,

3       what was the date range that Drew Beck served

4       as Ben Hurt's social worker?

5              A.   From the time he transferred

6       until -- I know this is -- I know that -- no,

7       no, no.  When he transferred, he was Ben -- he

8       was Bob's patient.

9                   Then for some reason they

10      transferred him from Bob to Drew.  And Drew was

11      his social worker until everything came out,

12      and I was walked out of Elgin Mental Health

13      Center and put on leave of absence -- not leave

14      of absence.  I'm so sorry.  I was put on light

15      duty.  First, I was put on light duty.  Then I

16      was put on leave of absence.

17                  I know he changed social workers

18      because the records that were obtained by Steve

19      and Randy that Steve Brody has, was given to

20      me.  And I read through every one of the pieces

21      of documents, and I know that his discharge

22      summary was written by Robert Lee.

23                  So I'm going to assume that he was

24      transferred from Drew to Robert Lee.

OWEN v. JAVED, et al.                                    No. 18 CV 334
DEPOSITION OF:  CHRISTY LENHARDT                February 1, 2022

                                                        Page 146

1          Q.   Okay.  And I'm sorry.  I believe

2     you said you think that Drew Beck was his

3     social worker until the day that you were

4     escorted out and placed on light duty, or did I

5     misunderstand?

6          **A.   You misunderstood.**

7          **After I was walked out of the**

8     **hospital, I didn't know anything of what was**

9     **going on.  So I would assume that he continued**

10    **to be Drew's social worker until close to Ben's**

11    **discharge because Ben's discharge papers were**

12    **written by Robert Lee.**

13         Q.   Okay.  I understand.  Thank you.

14         **A.   But I don't know when Drew -- I**

15    **don't know when Drew became not his social**

16    **worker.**

17         Q.   Okay.  Okay.  All right.  So aside

18    from that incident that we talked about earlier

19    when Drew Beck came to your office to talk to

20    you, were there any other times that we've not

21    spoken about when Drew Beck came to you and

22    indicated that he suspected an inappropriate

23    relationship between you and Ben Hurt?

24         **A.   Not that I can recall.**

OWEN v. JAVED, et al.                              No. 18 CV 334
DEPOSITION OF:  CHRISTY LENHARDT              February 1, 2022

                                                        Page 147

 1            MS. KOZAR:  Okay.  All right.
 2     Well, those are all the questions that I have.
 3     So thank you, Ms. Lenhardt.
 4            THE WITNESS:  You're welcome.
 5            MS. JOHNSTON:  And, I guess, now,
 6     Randy and Joe, I don't know what you have.
 7     It's 12:30.  Depending on that, is this a time
 8     to take a slightly longer break, or --
 9            MR. CECALA:  We have two questions.
10            MS. JOHNSTON:  Okay.  Well, then
11     that's not necessary.  Power through.
12            MR. CECALA:  Yeah.
13              CROSS-EXAMINATION
14     BY MR. CECALA:
15            Q.   So, Christy, I know earlier --
16     you've testified a lot today, so I'm going to
17     try to go back to something that was -- I'll
18     try to refresh the testimony that you were
19     giving, so you can kind of remember what you
20     were saying about the consequences that
21     occurred to you once your -- it was found out
22     by everyone at Elgin and the police and
23     everything that happened to you related to the
24     incident with Ben -- or incidents with Ben, or

OWEN v. JAVED, et al.                                       No. 18 CV 334
DEPOSITION OF:  CHRISTY LENHARDT                    February 1, 2022

Page 148

1       your relationship with Ben.

2                   So do you recall testifying about

3       all those consequences earlier today?

4            **A.    Yeah.  To some of them, not all of**

5       **them.**

6            Q.    Well, one of the consequences is

7       that the -- to engage in a romantic

8       relationship or to go across the boundary of

9       social worker-patient where you're romantically

10      involved, even emotionally involved with a

11      patient, can have serious consequences both to

12      the professional licenses that you have and in

13      the law as far as crimes.  You understand that,

14      right?

15           **A.    Yeah, I didn't know at the time**

16      **that it was illegal, and that I would be**

17      **criminally prosecuted, but, yes, I know that**

18      **now.**

19           Q.    But you certainly understood that

20      these relationships with -- any relationship

21      between a social worker and a patient that was

22      romantic, could have serious consequences, to

23      being fired, for example?

24           **A.    Yes, I knew that.**

OWEN v. JAVED, et al.                                    No. 18 CV 334
DEPOSITION OF:  CHRISTY LENHARDT                    February 1, 2022

                                                             Page 149

1          Q.    Okay.  So if you had admitted to

2     someone that you were seducing a patient, that

3     admission would be something that you could

4     have been fired for; isn't that true?

5          **A.    Yes.**

6          Q.    And you understood that throughout

7     your employment at Elgin throughout all of

8     these circumstances; isn't that true?

9          **A.    Yes.  I knew that they could**

10    **immediately file an OIG report, Office of**

11    **Inspector General, and that I would then be**

12    **investigated and fired.**

13         Q.    Right.

14              And there would also potentially be

15    consequences to people who suspected that or

16    knew; in other words, their employment knowing

17    about this and keeping it a secret, could put

18    them in jeopardy of their own employment

19    status, as well; isn't that true?

20         **A.    Yes.  Because you're supposed to**

21    **report it to OIG.**

22         Q.    Okay.  I just want to make sure

23    that I cleared this up for the record.

24              So Mary and Amanda were asking you

OWEN v. JAVED, et al.                          No. 18 CV 334
DEPOSITION OF:  CHRISTY LENHARDT              February 1, 2022

                                                   Page 150

 1    about all these various times that someone may

 2    have talked to you or you may have suspected in

 3    the conversation that they knew something or

 4    didn't know something, and those aren't

 5    conversations where you and the other

 6    participant would have openly been saying

 7    things like, you know, I'm romantically

 8    involved with Ben, or I'm romantically involved

 9    with a patient, because the consequences were

10    so severe, that's just not something anyone

11    would say, correct?

12          **A.   No.  And no one would even -- no**

13    **one -- like, another person would not even want**

14    **to ask or know about it because then they would**

15    **have to file an OIG report on me.  And I was**

16    **very well liked, and they didn't want anything**

17    **bad to happen to me.  That's why I think they**

18    **didn't do it.**

19          Q.   Okay.  Good.

20                And then just one other question.

21    Just to clarify this.

22                You talked about the fact that Mark

23    had complained to Dr. Javed about meeting alone

24    in your office, and that it pertained to his

OWEN v. JAVED, et al.                          No. 18 CV 334
DEPOSITION OF:  CHRISTY LENHARDT          February 1, 2022

                                                    Page 151

1    Muslim or Islamic beliefs of being alone with

2    you in the office.  Do you remember talking

3    about that?

4          **A.    Yes.**

5          Q.   Now, after that, you continued to

6    be Mark's social worker, correct?

7          **A.    Yes.**

8          Q.   And you and Mark then met outside

9    the office for the social work counseling

10   sessions, correct?

11         **A.    Yes.**

12         Q.   And when you met, you were alone

13   outside the office?  It wasn't a shared

14   conversation with the public.  You were having

15   a private counseling session with him; isn't

16   that true?

17         **A.    Yes.**

18         Q.   So whether you were alone in the

19   office or whether you were alone outside the

20   office, you and Mark were still alone, correct?

21         **A.    Yes.**

22         Q.   Okay.

23         **A.    It may have been because -- it may**

24   **have been because the -- my office was small,**

OWEN v. JAVED, et al.                          No. 18 CV 334
DEPOSITION OF:  CHRISTY LENHARDT              February 1, 2022

Page 152

1       and so the -- there would be no more closeness.

2       And in the -- in the office, in the conference

3       room, there's a large window.  And it's in the

4       dayroom where everybody walks by and sits in.

5       And so he may have felt more comfortable

6       because --

7                Q.   It was less intimate?

8                A.   Yes.

9                Q.   Okay.  But suffice it to say, he

10      was meeting alone with a woman both in the

11      office and in the conference room, correct?

12               A.   Yes.  You make a point, yes.

13               Q.   Okay.  Give us one minute.

14                    Okay.  One last question, Christy.

15               A.   Yes.

16               Q.   So Dr. Javed is a woman, right?

17               A.   Yes, she is.

18               Q.   And to your knowledge, when

19      patients meet with their psychiatrist, they

20      meet alone in their office as well, don't they?

21               A.   Yes.  She would often meet alone in

22      her office with patients.

23               Q.   Okay.  And so -- and Mark Owens was

24      a patient of Dr. Javed, correct?

OWEN v. JAVED, et al.                          No. 18 CV 334
DEPOSITION OF:  CHRISTY LENHARDT           February 1, 2022

                                                    Page 153

 1          **A.    Correct.**
 2          Q.   And are you aware that he met alone
 3     with Dr. Javed in her office as a patient
 4     psychiatrist?
 5          **A.    Yes.**
 6               MR. CECALA:  Okay.  That's all we
 7     have, Amanda and Mary, Sarah, Rory, Steve.
 8               THE WITNESS:  And Sean.
 9               MR. CECALA:  And Sean.  Sorry.
10               MS. JOHNSTON:  Steve, did you have
11     anything you wanted to ask?
12               MR. BRODY:  Who me?
13               MS. JOHNSTON:  Yeah.
14               MR. BRODY:  No.
15               MS. JOHNSTON:  I figured as much,
16     but, obviously, wanted to give you the
17     opportunity.
18               MR. BRODY:  Well, as usual, I got
19     nothing.
20               MS. JOHNSTON:  And I have nothing
21     further.
22               MR. BRODY:  Then that concludes us
23     for today, doesn't it?
24               MR. CECALA:  Great.

OWEN v. JAVED, et al.                              No. 18 CV 334
DEPOSITION OF:  CHRISTY LENHARDT            February 1, 2022

Page 154

1            Are we going off the record?

2            MS. JOHNSTON:  Yeah, we can go off

3     the record now.

4            MR. CECALA:  Oh, what about

5     signature?

6            MR. BRODY:  We'll reserve.

7            MR. CECALA:  Okay.  Great.

8            And, Gay, we'd like a transcript

9     sent to us like last time.

10           THE STENOGRAPHER:  Okay.

11           MS. JOHNSTON:  And I'll be ordering

12    as well.  And I'll send you the exhibits right

13    now and copy Lisa.

14           THE STENOGRAPHER:  Thank you.

15                  (The proceedings in the above

16                   matter concluded at 12:40

17                   p.m.)

18     (AND FURTHER DEPONENT SAITH NOT.)

19

20

21

22

23

24

OWEN v. JAVED, et al.                          No. 18 CV 334
DEPOSITION OF:  CHRISTY LENHARDT         February 1, 2022

```
                                               Page 155
 1           IN THE UNITED STATES DISTRICT COURT
                NORTHERN DISTRICT OF ILLINOIS
 2                    EASTERN DIVISION

 3

 4   MARK OWENS,                    )
                                    )
 5              Plaintiff,          )
                                    )
 6   vs.                            ) No. 18-cv-334
                                    )
 7   HASINA JAVED,                  )
                                    )
 8              Defendant.          )

 9

        I hereby certify that I have read the
10   foregoing transcript of my deposition given at
     the time and place aforesaid, consisting of pages
11   1 through 154, inclusive, and I do again
     subscribe and make oath that the same is a true,
12   correct and complete transcript of my deposition
     given as aforesaid, with corrections, if any,
13   appearing on the attached correction sheet(s).

14

15

16        _____ correction sheet(s) attached.

17

18

         _____
19                    CHRISTY LENHARDT

20

21

     Subscribed and sworn to
22   before me this____day of
     _____, A.D.   2022.
23
     _____
24     Notary Public
```

LISA A. KOTRBA & ASSOCIATES, LTD.
312-855-1834

OWEN v. JAVED, et al.                          No. 18 CV 334
DEPOSITION OF:  CHRISTY LENHARDT          February 1, 2022

Page 156

 1

 2              REPORTER'S CERTIFICATE

 3

 4              The foregoing deposition of

 5  CHRISTY LENHARDT, was taken before GAY DALL, CSR,

 6  RPR, via videoconference, commencing at 9:15 p.m.

 7  on February 1, 2022.

 8              That previous to the

 9  commencement of the examination of the witness,

10  the witness was duly sworn to testify to the

11  whole truth concerning the matters herein;

12              That the foregoing deposition

13  transcript was reported stenographically by me,

14  was thereafter reduced to typewriting under my

15  personal direction, and constitutes a true record

16  of the testimony given and the proceedings had;

17              That the said deposition was

18  taken before me at the time and place specified;

19              That the reading and signing by

20  the witness of the deposition transcript was

21  agreed upon as stated herein;

22              That I am not a relative or

23  employee of attorney or counsel, nor a relative

24  or employee of any such attorney or counsel for

LISA A. KOTRBA & ASSOCIATES, LTD.
312-855-1834

OWEN v. JAVED, et al.                                    No. 18 CV 334
DEPOSITION OF:  CHRISTY LENHARDT                  February 1, 2022

Page 157

1    any of the parties hereto, nor interested

2    directly in the outcome of this action.

3

4

5          Dated this 15th day of February, 2022.

6

7

8

9                          Gay Dall, CSR, RPR

10                         CSR NO. 084-001169

11

12

13

14

15

16

17

18

19

20

21

22

23

24

OWEN v. JAVED, et al.                    No. 18 CV 334
DEPOSITION OF:  CHRISTY LENHARDT       February 1, 2022

Page 1

**A**

**A-F-S-M-E-E** 133:20
**A-L** 15:10
**A-S** 133:16
**A.D** 155:22
**a.m** 1:21 61:3
**ability** 10:3,6
**able** 8:15 25:22 29:21 63:2 65:1,3 67:14 77:18 80:1 95:9 117:1 133:22 135:11
**abnormal** 110:7
**absence** 145:13 145:14,16
**accident** 100:2 104:14
**account** 67:24
**accurate** 66:21 68:21,24 112:17 125:21
**accurately** 8:16
**acted** 58:12 92:23 100:21
**acting** 68:17
**action** 157:2
**actions** 121:10
**actively** 81:15
**activity** 27:7 31:22 86:5
**actual** 84:19 87:18 134:7
**Addams** 16:16 16:22,24
**Addison** 12:23
**additional** 140:6
**address** 136:1,4 136:12,16 137:23
**administration** 55:6,10 96:17 96:19 97:13,14

97:14,15,18
107:11,14,15
107:16 126:10
127:22 129:3
141:16,22
142:4,9
**administrative** 39:9,12
**administrators** 53:18 118:16
**admission** 21:7 75:13 149:3
**admissions** 31:15
**admit** 21:7
**admitted** 31:9 61:13,15 74:6 74:8,14,20,23 75:12 77:21 149:1
**admitting** 61:16 74:24
**advance** 65:15
**advised** 118:16
**affable** 55:17
**affect** 78:24 80:18
**affidavit** 62:15 66:22 67:6,9 68:20 111:16 111:17,21 112:4,8,11,15 112:16,20,23 113:10,14,16 113:18 114:5,6 114:19,24 115:9 116:10 116:12,16 117:23 118:1,3 118:5 130:2 140:13,18
**aforesaid** 155:10 155:12
**afraid** 11:19
**Afscme** 133:15

133:17,20
**age** 22:1
**Aggravated** 74:21
**ago** 16:4,15
**agree** 64:18 136:11
**agreed** 63:4 156:21
**agreement** 62:22 63:5,11 64:10 64:12,15,16,21 65:19 66:1,22 109:11,20 110:16,19 111:4,13 114:10 115:10 115:11
**ahdambenahd...** 136:14
**ahead** 8:5 62:20 65:8 79:8 80:24 81:2 82:14 100:17 113:6 115:20 126:22 132:22
**aide** 46:23
**aides** 127:20
**al** 1:12
**Allendale** 15:8 15:10,11,19,20 16:9,12
**allow** 81:5
**allowed** 128:21
**alluded** 102:3,6
**Amanda** 3:19 7:6 62:17 65:17,19 139:24 140:4 149:24 153:7
**amanda.kozar...** 3:20
**amount** 63:24 131:22
███ 26:9

27:9 28:1
**announce** 55:12
**answer** 9:1,8,12 10:18 11:1 13:9,10 81:1 110:9 143:14
**answered** 9:14 16:2 85:13
**answering** 8:23
**answers** 8:18 15:24
**anybody** 25:11 72:21 73:14 103:14 106:7 113:4 116:13 117:2,5 119:6 126:1 128:8 134:12
**anymore** 101:23
**anyways** 107:21
**apologize** 26:15 70:7 123:23
**Apparently** 129:1
**appearances** 3:1 4:1 6:15 7:19
**Appeared** 3:10 3:21 4:10
**appearing** 155:13
**appears** 114:24
**applied** 23:16
**approach** 144:4
**appropriate** 78:15 121:11
**approximately** 22:18 29:9
**approximations** 29:19
**area** 38:11 96:8 97:10
**aside** 143:16 146:17
**asked** 9:7,13 23:14 46:23

47:19 71:16
85:13 97:13
120:9 128:12
132:5
**asking** 8:22 9:17 41:11 85:17 110:6 113:20 114:2 149:24
**aspects** 76:23 77:2,4,8
**asserting** 12:3
**assertion** 114:19
**assessment** 75:14,21
**assessments** 21:8 31:16
**assigned** 18:18 22:24 30:21 75:1
**assistant** 3:8,19 7:21 53:5,10 54:20 96:11 125:12
**associate** 81:8
**ASSOCIATES** 4:13
**assume** 9:12 42:12 89:19 102:8 145:23 146:9
**attached** 155:13 155:16
**attack** 46:12,15
**attempted** 125:15
**attend** 81:6
**attended** 21:10 21:11
**attorney** 2:12 3:2,8,13,19 4:2 6:16,19,24 7:2 7:4,6,8 110:17 112:12 135:5 156:23,24
**attorneys** 66:20

OWEN v. JAVED, et al.　　　　　　　　　　　　No. 18 CV 334
DEPOSITION OF:　CHRISTY LENHARDT　　　February 1, 2022

Page 2

111:2
**audio** 70:3
**August** 109:19
　110:15
**authenticity**
　63:5,11 111:3
　112:7
**available** 64:3
**average** 32:23
**avoid** 9:2
**aware** 26:13
　67:20 81:11
　121:6,13
　122:22 123:3
　143:2 153:2
**awhile** 44:11
　93:21 134:21
**awkward** 43:23
　44:4

**B**
**B** 5:10
**back** 9:4 17:5
　36:2,5 61:2,5
　80:7 110:11
　114:8,9 124:7
　133:1,6 140:12
　147:17
**background**
　12:19 75:8,13
**backtrack** 13:4
**bad** 13:16 46:5,8
　123:23 150:17
**base** 124:18
　138:12
**based** 28:18,19
**basically** 80:7
　108:10
**basing** 124:13
**basis** 35:13 43:5
　51:17 101:17
　122:3
**battery** 74:21
**bear** 31:2
**beautiful** 84:8

120:12
**Beck** 3:21 7:7
　56:4,16 58:5
　58:24 59:13,22
　60:11 72:24
　73:2,4,12
　83:12 91:24
　106:20 115:4
　118:8,14,16
　121:17 124:8
　125:17 127:19
　139:20 140:5
　140:21 141:1
　143:18 144:4
　144:16 145:3
　146:2,19,21
**Beck's** 91:24
**Becky** 27:9,13
　27:20
**becoming** 67:18
　127:18,21
**bedrooms** 47:14
**began** 82:2
**beginning** 58:6
　58:13 59:10
　75:20 76:11
**behalf** 2:16 3:10
　3:21 4:10,19
**behavior** 38:23
　49:9 67:21
　71:20
**Behavioral** 17:8
**beliefs** 151:1
**believe** 12:1 21:5
　27:13 31:1
　33:1 41:10
　52:8 54:15
　62:11 67:10
　68:3 84:13
　86:4 97:21
　100:12 104:24
　106:19 110:17
　111:1,20
　118:20,24
　121:3 130:19

131:9 133:11
133:23 135:10
138:7,10 139:2
139:9,14,19,24
146:1
**believed** 70:3
　108:13,15
**Ben** 6:19,24 47:7
　47:13 48:5
　74:3,6,19
　82:23 84:7,15
　89:17 94:23
　98:7 99:15,15
　99:22 102:10
　102:10,15,18
　102:20,24
　103:10 105:20
　106:12 107:14
　107:22 108:12
　108:22 109:8
　113:5 116:15
　118:15,19,22
　119:1,10 121:6
　121:14,16
　124:10 125:18
　127:3,21,23
　128:10,13,19
　128:21 129:3,6
　129:8 132:17
　136:8,20 138:3
　138:9,22 139:4
　139:11,16,21
　140:22 141:3
　141:19,23
　142:1,1,2,10
　143:3,8,19
　144:1,3,8,18
　145:4,7 146:23
　147:24,24
　148:1 150:8
**Ben's** 146:10,11
**Benahdam** 1:9
　2:16
**best** 114:12
　115:13

**big** 90:8
**birth** 12:20
**birthdays** 40:13
**bit** 8:12 11:16
　12:18 18:4
　31:7 57:24
　58:3 60:15
　63:2 71:3 75:5
　97:7 125:6
**black** 70:16
　108:2 143:10
**blame** 99:18
**blanked** 132:11
**Bob** 86:10 88:14
　88:20 89:1,5
　90:11,12,16,21
　91:20 92:6,14
　92:16 93:1,6
　94:10,12,22
　97:21,23 100:9
　101:12,18
　103:16,17,18
　103:19,20
　106:4 107:17
　119:5 122:23
　125:13 126:2
　134:8,9 135:2
　144:18 145:10
**Bob's** 95:6 102:9
　107:4 123:5
　143:24 145:8
**books** 36:6,7
**bookshelf** 36:6,7
**born** 18:1,3
**bottom** 128:17
**boundaries** 24:7
　85:1,2,6
**boundary** 26:1
　148:8
**bounds** 121:11
**box** 91:3 93:19
　94:3 103:3
**boy** 45:10
**boys** 16:11
**brain** 24:22

**brand** 46:21
**break** 9:6,9
　60:16 147:8
**breakdown** 34:9
**breaks** 9:5
**briefly** 35:21
**bring** 40:16
　48:19
**brings** 40:17
**Brody** 4:13,18
　6:16,16 13:9
　15:13,16 18:4
　26:7,17,24
　33:16 36:19,22
　40:20 63:13,18
　65:3,10 66:5
　67:10 73:2
　77:22 79:16
　80:23 81:2
　86:19 112:24
　113:6,11,19
　117:16,21
　118:2,6,10
　119:21 120:6
　132:19 133:1,5
　135:12 137:4,8
　145:19 153:12
　153:14,18,22
　154:6
**broken** 34:20,22
　104:8
**brought** 17:3
　49:12
**building** 96:22
**Bureau** 3:3,14
　4:3
**business** 18:12
**busy** 58:20,21
**buy** 43:17
**buying** 43:19,20

**C**
**C** 2:1
**C-E-C-A-L-A**
　6:19

OWEN v. JAVED, et al.
DEPOSITION OF: CHRISTY LENHARDT

No. 18 CV 334
February 1, 2022

Page 3

**C-H-R-I-S-T-Y**
6:10
**cabinet** 93:20
**cabinets** 36:8
103:4
**cake** 59:7
**call** 22:4 36:3
40:17 49:9
94:16,17 95:9
**called** 1:16
20:10,11 46:21
48:13 76:24
86:21 89:16
90:1 94:19
97:17 128:24
129:17
**calling** 85:10
**cameras** 6:13
**Cannon** 4:21
7:20,20
**capacity** 33:1
50:24 51:8
56:2
**Cara** 103:17
104:19,22
105:8,22 106:1
**cards** 43:17,19
43:21
**careful** 107:13
107:24 118:17
127:24 128:4
142:15,16
**case** 7:5,7,10
10:19 11:13
12:7,11 62:9
65:20 66:23
67:6 109:12,21
110:19 111:17
111:21 112:23
140:14
**caseload** 34:19
39:18
**cases** 12:6
**cashier** 43:22
**caught** 108:4

128:5
**Cecala** 2:3,8 5:7
6:18,18 7:23
8:2 10:10,15
11:10,14,22
63:7 64:8 66:9
71:1 85:9
100:3 113:13
113:16 115:5
115:22 116:1
117:8 130:1
147:9,12,14
153:6,9,24
154:4,7
**celebrate** 40:12
**cell** 128:22
**Center** 11:9 19:1
20:6 30:4
31:10 52:5
70:17 90:3
114:23 129:21
145:13
**certain** 53:12
132:11
**certainly** 148:19
**CERTIFICATE**
156:2
**certify** 155:9
**change** 46:7
**changed** 145:17
**changes** 38:24
39:11
**changing** 23:18
23:19
**charges** 80:11
**check** 47:9
**Chicago** 3:6,17
4:6 13:6 14:5
**Chief** 95:18
97:23 98:4
**Christmas** 40:8
40:10 43:12,18
43:18,20 44:3
81:7
**Christy** 1:15

4:19 5:4 6:2,10
6:17 10:11
61:5 63:19,22
71:2 85:17
105:16 111:12
117:1 119:8
135:14,22,24
147:15 152:14
155:19 156:5
**Christy's** 71:2
**christylenhar...**
135:23
**circumstances**
46:19 149:8
**civil** 1:17 4:8
19:14,15,21
20:3,23 22:8
22:15 23:12
29:14 30:12
53:16
**claim** 11:23
**claims** 67:21
**clarify** 28:13
71:15 76:20
110:11 112:6
150:21
**clean** 8:13 64:14
**cleaning** 27:8
**cleared** 149:23
**clearly** 50:9
124:8
**clinic** 57:12
**close** 39:22,24
40:1 43:2
55:20 58:4
84:4,16,24
85:15 104:15
118:15 124:9
140:23 141:4
143:20 146:10
**closed** 36:13,14
89:3,10 97:5
98:11,20
**closeness** 152:1
**co-defendants**

114:15
**co-ed** 21:19,20
23:4 31:2
**coincidence**
128:21
**Colleen** 3:11
4:10 44:5,9
45:16 47:1,19
48:13,23 49:6
49:24 51:16
72:16 83:6
96:7 125:11,24
128:24 129:1
129:11 130:8
130:15 131:17
139:9
**college** 13:5
**come** 31:10
46:24 55:10
59:23 75:16
84:6 89:20
93:18,19 95:2
96:22 103:3
133:1 141:14
**comfortable**
75:16 111:10
152:5
**coming** 47:9
105:9
**commencement**
156:9
**commencing**
156:6
**comment** 142:2
143:12
**common** 13:15
99:12,14
104:11
**communicate**
110:6
**communicated**
43:14 60:10
**communication**
110:8
**communicatio...**

41:13
**community**
19:17,20
**company** 18:13
**compile** 76:3
**complained**
150:23
**complete** 112:21
155:12
**completed** 13:2
**completely** 16:1
20:11 49:4
81:19 144:19
**compromised**
39:3
**computer** 36:1
**concerned** 11:15
24:6 127:18
**concerning**
156:11
**concerns** 24:13
**concluded**
154:16
**concludes**
153:22
**concurrently**
14:13
**condition** 39:4
**conditional**
32:19
**conducted** 71:17
**conference**
38:15 68:8
71:6,18,24
73:21 152:2,11
**conferring** 56:20
**confided** 52:19
**confirm** 29:22
119:7 124:12
135:18
**conflict** 11:16
12:1
**conflicts** 34:14
**connections**
107:18

Case: 1:17-cv-07909 Document #: 218-3 Filed: 09/15/22 Page 162 of 179 PageID #:2033

OWEN v. JAVED, et al.                                    No. 18 CV 334
DEPOSITION OF:  CHRISTY LENHARDT                 February 1, 2022

Page 4

**conscientious** 90:22
**consequences** 81:12 147:20 148:3,6,11,22 149:15 150:9
**considered** 38:13,13
**consisting** 155:10
**constitutes** 156:15
**contact** 42:3 121:6 127:5,8
**content** 76:21
**contents** 64:13 64:15
**context** 82:23
**continue** 27:5 61:19 68:5 70:9 76:6
**continued** 3:1 4:1 32:9,9 52:13 92:15,16 113:9 146:9 151:5
**contract** 17:15 17:23
**contributed** 80:4 80:9
**control** 99:20 128:1
**conversation** 25:7 27:22 28:16 44:2 84:11,14 87:24 88:7,11,12 103:13 108:9 114:14,18 119:16,19 120:4,20 142:24 143:6 144:11 150:3 151:14
**conversations**

24:21 25:3
52:18 106:16
107:15 115:2
115:15 116:8
116:11 123:15
123:20 124:1
124:14,18
125:4 126:8,11
126:15 132:13
150:5
**convicted** 80:14
**copies** 65:14
**coping** 77:4,5
**copy** 63:19 66:21,24
111:24 116:17
117:4 135:10
135:11 154:13
**corner** 36:6
**correct** 15:2
16:1 25:10
33:14 57:13
62:1 70:11
78:20 84:16,21
86:2,15 87:20
88:5 92:5
94:15 98:21
101:3,19,21,24
105:1 109:12
109:21 110:12
117:23 118:8
120:15 121:24
122:11 123:1
123:13 135:3
136:22 140:23
150:11 151:6
151:10,20
152:11,24
153:1 155:12
**correction**
155:13,16
**corrections**
155:12
**correctly** 25:13
**Costco** 59:6

**counsel** 7:21
156:23,24
**counseling** 21:9
32:2 34:3 68:5
68:7 70:9
71:17 151:9,15
**Counter-trans...**
131:6
**couple** 8:7,11
17:11 33:13
129:19 133:9
**course** 32:22
**court** 1:1 8:14
10:12,21 13:12
20:2 32:4,4,6,6
32:11,12,15,15
39:20 63:6
75:24 78:23
116:24 155:1
**Courts** 1:18
**courtyard** 86:19
86:20,21
**cover** 42:7 76:5
77:3
**cried** 50:21
**crimes** 148:13
**criminal** 80:10
**criminally**
148:17
**Cross-Examin...**
5:7 147:13
**crossed** 85:1,3,6
88:3
**crying** 46:14
**Crystal** 4:16
**CSR** 1:20 156:5
157:9,10
**cubicles** 97:19

_____
D
_____
**D** 5:1
**daily** 38:4
101:17
**Dall** 1:20 156:5
157:9

**damning** 137:13
**danger** 128:1
**date** 12:20 19:11
74:16 141:8
145:3
**Dated** 157:5
**dates** 29:22
74:13
**day** 1:20 36:22
40:8 51:18,19
90:21 91:2
92:7,20,23
93:12 94:1,4
98:15 146:3
155:22 157:5
**day-to-day** 43:5
51:17 55:1
**dayroom** 25:13
152:4
**deal** 80:15
**decision** 63:23
72:8,14,18
**decisions** 39:12
**defend** 49:7,8
**defendant** 1:8
7:4,7 62:6
140:4 155:8
**defendant's**
114:12,19
115:13
**defendants** 1:13
1:16 7:2,9 11:8
11:12,24 12:8
115:3
**definitely** 95:18
**degree** 13:3,22
14:4,10,18,23
**Delaney** 3:11
4:10 7:3,10
44:6 45:16
47:10 48:23
49:24 50:18
51:16,22 52:22
72:16 83:6
96:7 115:4

125:12 126:1
129:1,2,12
130:3,8,15
131:18 139:9
**Delaney's** 44:10
**Delosantos**
18:14
**demographic**
21:18
**Department**
4:21 7:21
114:21
**Depending**
147:7
**DEPONENT**
154:18
**depose** 115:16
**deposed** 8:9
**deposition** 1:15
11:21 12:14
120:18 155:10
155:12 156:4
156:12,17,20
**depositions** 1:19
**describe** 35:21
42:24 46:2
55:13,15
**described** 86:14
119:2
**desk** 35:24 36:1
36:7
**detail** 83:16
119:16
**details** 119:18
**develop** 21:12
75:21
**developed** 21:13
90:17
**development**
32:3
**developmental...**
90:19
**DHS** 27:14
**Diana** 3:11 4:10
53:1 54:19

OWEN v. JAVED, et al.                                    No. 18 CV 334
DEPOSITION OF:  CHRISTY LENHARDT                February 1, 2022

Page 5

| | | | | |
|---|---|---|---|---|
| 55:5,8,14,22 | 72:14,18,23 | 57:24 65:10 | **drafts** 136:17 | 147:15 148:3 |
| 72:19 83:8 | 82:5,7,21 83:2 | 103:2 115:18 | **Drew** 3:21 7:7 | **easier** 8:12 |
| 96:10,12 | 83:5,8,11 | 127:11 | 56:4,15,21 | 63:18 64:1 |
| 125:10 126:1 | 88:19 98:6 | **door** 36:10,12,13 | 57:21,21,22 | **EASTERN** 1:2 |
| 139:15 | 119:20,23,24 | 36:14 38:11,12 | 58:5,24 59:13 | 155:2 |
| **difference** 14:22 | 129:1 | 84:7 86:22,23 | 59:22 60:7,10 | **eat** 40:18,24 |
| 56:23 | **discussed** 39:7 | 87:11 89:3,5 | 72:24 73:2,4 | **ebb** 32:22 |
| **different** 19:20 | 50:5 71:21 | 89:10,12,22 | 73:11 83:11 | **ECC** 56:22 |
| 20:11 22:11 | 73:16 82:17 | 94:23 95:9 | 91:23,24 | **education** 13:2 |
| 33:13 38:6 | 105:23 106:3 | 97:16 98:8,12 | 106:20 107:18 | **effort** 118:20 |
| 40:12 53:20 | 119:9,15 | 98:19 99:23 | 118:7,13,16 | **eight** 22:16 30:3 |
| **difficult** 110:2 | 124:15,19 | 104:1,15,16 | 121:16 124:8 | 30:6,11 33:11 |
| **difficulty** 65:21 | 128:4 138:6,14 | 105:15 | 125:17 127:19 | 77:21 126:19 |
| 116:24 117:3 | 138:19 139:1,8 | **doors** 96:24 97:3 | 139:20 140:4 | **either** 54:18 |
| **digitally** 129:5 | 139:13,18 | 97:4,6 | 140:21 141:1 | 97:5 106:4 |
| **direct** 5:5,6 6:6 | **discusses** 119:5 | **doorway** 93:19 | 143:18 144:4 | 115:3 118:24 |
| 140:9,12,17 | **discussing** 26:13 | **double** 97:3,4,6 | 144:16 145:3 | 130:8 131:14 |
| **directed** 138:3 | 27:6 42:4 | **doubted** 100:1,6 | 145:10,10,24 | **elaborate** 142:11 |
| **direction** 156:15 | 70:13 72:20 | **Dr** 18:14 37:6,9 | 146:2,14,15,19 | **Elgin** 11:8 19:1 |
| **directly** 157:2 | 106:17 | 37:19 38:3 | 146:21 | 19:3,9,12,22 |
| **director** 57:16 | **Discussion** | 39:14,23 40:9 | **Drew's** 91:23 | 20:5 30:4 |
| 57:17 96:11,13 | 66:16 109:16 | 40:9,11 41:9 | 146:10 | 31:10 36:17,21 |
| 125:11,12 | **discussions** | 41:14,18,23,24 | **drifted** 58:19 | 37:4 39:9 40:4 |
| 134:17,17 | 121:15 | 42:5,6,16,20 | **drilled** 90:5 | 41:5,8,16 |
| **disabled** 90:20 | **disgruntled** | 42:21 43:1,6,9 | 97:21 | 43:13 44:7 |
| **disagreement** | 100:16,18 | 43:14 68:14 | **due** 68:3 | 45:19 52:4,17 |
| 142:17 | **distortion** 70:3 | 70:13 71:22 | **duly** 6:1,3 | 52:23 53:2,11 |
| **disapproval** | **District** 1:1,1,18 | 72:4,9,21 | 156:10 | 53:11,21 56:2 |
| 142:18,19 | 155:1,1 | 73:15 82:24 | **duties** 31:7 75:6 | 56:5 58:5 |
| **disapproved** | **disturbed** 16:11 | 83:3,22 85:11 | **duty** 145:15,15 | 59:22 60:9 |
| 142:21 | 16:20 | 85:12,14,19,23 | 146:4 | 61:7 70:17 |
| **discharge** 21:14 | **DIVISION** 1:2 | 86:4 87:7,15 | | 74:2,15,20,24 |
| 21:15 32:17 | 155:2 | 88:8 92:4,4 | **E** | 79:14,23 90:3 |
| 145:21 146:11 | **document** 63:6 | 95:24 96:5,6 | **E** 2:1,1 5:1,10 | 99:13 106:7 |
| 146:11 | 75:23 115:1 | 101:1,10 103:9 | **e-mail** 135:8,16 | 113:4 114:22 |
| **discharged** | 116:4,6 117:15 | 103:13,15 | 136:1,4,7,12 | 116:14 127:14 |
| 21:12 32:10 | 118:3 | 106:11 119:9 | 136:16,19,23 | 128:8 129:21 |
| **discomfort** 68:4 | **documented** | 122:18 123:20 | 137:13,19,23 | 130:17 133:12 |
| 71:11 | 116:9 | 124:2,13 138:8 | **e-mailed** 137:14 | 134:4 145:12 |
| **discovered** 79:3 | **documents** | 138:17 139:3,6 | **e-mails** 65:7 | 147:22 149:7 |
| 81:13 128:20 | 116:3 145:21 | 150:23 152:16 | 136:17 137:3 | **Elk** 12:23 |
| **discovery** 129:7 | **doing** 14:12 | 152:24 153:3 | **earlier** 66:20 | **else's** 6:14 |
| **discuss** 38:5,16 | 17:22 22:9 | **draft** 113:9 | 78:24 106:19 | **embarrassing** |
| 38:18,22 39:11 | 23:22 31:20,24 | 136:20,24 | 111:1 120:14 | 90:10 |
| 49:6 72:7,11 | 32:1 49:20 | 137:22 | 120:18 146:18 | **EMHC** 68:3 |

LISA A. KOTRBA & ASSOCIATES, LTD.
312-855-1834

OWEN v. JAVED, et al.                                    No. 18 CV 334
DEPOSITION OF:   CHRISTY LENHARDT                      February 1, 2022

Page 6

118:23 127:18
128:23 144:17
**emotional** 81:21
82:1
**emotionally**
16:11,19
148:10
**emotions** 77:6
**employed** 79:13
114:22 133:12
**employee** 12:5
27:14 114:21
128:24 156:23
156:24
**employees** 41:5
52:17
**employment**
79:23 149:7,16
149:18
**encompass**
38:21
**encounters** 86:8
119:1
**ended** 19:5 46:5
89:10
**ends** 66:8
**engage** 69:19
86:5 148:7
**engaged** 86:1
138:8 139:3,10
139:15,20
**entailed** 31:24
**enter** 70:17
77:11 78:10
**entered** 20:5
109:10,20
110:16
**entire** 37:10,14
54:22 59:14,16
**entity** 130:10
**Epperson** 95:18
97:24 98:4,23
99:17,24
103:15
**escorted** 146:4

**established** 92:9
**Estates** 17:20
**estimate** 17:21
18:20 33:2,9
74:13 77:18
78:6
**estimated** 19:11
**et** 1:12
**evaluation** 75:22
75:23
**event** 41:4
**events** 81:6
**eventually** 89:3
**everybody** 6:13
6:14 9:22
34:18 40:16,17
60:17 65:1,14
109:4 123:6
126:6 132:23
152:4
**evidence** 108:18
129:5 137:14
**evident** 124:10
**evil** 70:24
**exact** 65:21 70:7
74:12
**exactly** 22:12
25:23 28:4
33:3 36:24
75:8 76:4
122:9
**examination**
1:16 5:5,6 6:6
140:9 156:9
**examined** 6:4
**example** 148:23
**exceeded** 121:11
**excuse** 13:10
**Exhibit** 5:13,14
5:15,16 62:21
67:12 110:18
110:20 111:19
111:22 114:9
114:20 118:2
135:7,9 140:13

**exhibits** 65:15
154:12
**expect** 16:2
**experienced**
45:1
**explain** 19:16
37:17 83:23
117:14
**explained**
102:24
**explaining** 32:15
49:12 76:6
**explains** 75:24
**explicit** 85:19
**explicitly** 84:2
**expose** 69:12,14
**extent** 87:24

**F**

**F** 54:2,2,9
**Facebook** 51:24
51:24
**faced** 36:2
**facility** 16:9
105:9 114:23
**facing** 38:10
**fact** 102:3,7,14
150:22
**Fair** 120:2
**faith** 71:8
**Faiza** 3:10 4:10
41:18,20,21
**familiarize** 67:3
**family** 80:18,20
81:5 82:8 84:8
120:12
**far** 79:8 145:2
148:13
**favors** 131:19
**fear** 138:16
**February** 1:21
18:3 156:7
157:5
**Federal** 1:17
**feel** 13:16 67:23

75:16 106:10
111:4 130:22
**feeling** 142:22
142:23
**felt** 49:12 128:1
130:20 152:5
**female** 31:3
**feminine** 131:12
**fight** 91:11,17
**figure** 133:22
**figured** 153:15
**file** 36:8 63:6
103:3 149:10
150:15
**filed** 69:24 80:11
**filing** 93:20
**find** 24:20
**finding** 65:21
81:16
**fine** 15:17 65:9
65:13 78:2
100:8
**finish** 8:22,24
10:16,17,24
113:7
**fired** 148:23
149:4,12
**Firm** 8:3
**first** 6:3,8,22
8:17 12:19
15:6 22:23
44:24 45:10
52:1 54:11
61:22 65:4,6
74:23 75:3
89:21 94:17
126:19 140:20
145:15
**five** 60:15,18
97:6 132:24
**fixed** 89:7 104:9
**Floor** 3:5,16 4:5
**flow** 32:22
**focus** 66:4
**focused** 39:8

**following** 71:7
**follows** 6:5
**fondle** 69:8,10
**food** 59:7 123:11
**foregoing**
155:10 156:4
156:12
**forensic** 22:22
22:24 23:17
29:14 31:4
53:20 96:20
**forensics** 19:23
22:21 30:8
53:14,15 54:22
57:16 134:17
**forget** 7:12
32:12
**forgot** 40:16
**form** 112:24
113:12 114:1
119:21
**forming** 39:16
**fortuitous** 129:6
**forward** 12:13
71:18 136:13
**found** 31:11
78:19 147:21
**four** 23:10 24:1
53:22,24 65:7
93:12
**frame** 17:9
**fraught** 50:24
**freaking** 89:23
104:15
**free** 111:4
**frequent** 121:6
121:13
**frequently**
121:16 123:17
**Friday** 101:7
105:11
**friend** 39:24
105:3
**friends** 51:24
82:5

OWEN v. JAVED, et al.                                    No. 18 CV 334
DEPOSITION OF:  CHRISTY LENHARDT                February 1, 2022

Page 7

**friendship** 58:24
**front** 63:20
  87:10 116:17
  118:5
**full** 33:4 126:19
**fully** 8:22,24
**function** 132:12
  132:13
**functioning**
  104:1
**further** 34:20
  44:1 153:21
  154:18

**G**

**G** 54:2,2,9
**Gay** 1:19 8:14
  66:15 110:11
  154:8 156:5
  157:9
**Gay's** 117:3
**genders** 31:5
**general** 3:2,3,8
  3:13,14,19 4:2
  4:3 7:21 22:10
  38:8 50:12
  75:6 121:5
  138:24 149:11
**generally** 38:21
  81:10 107:2
  134:24
**getting** 38:19
  61:5 66:3 89:9
  89:18 128:5
**Gibble** 134:20
**gift** 43:17,19,21
**give** 7:24 11:1
  22:18 29:23
  31:6 33:2
  43:20 47:15
  64:3 75:8
  110:22 135:11
  152:13 153:16
**given** 11:21
  32:24 33:10

62:20 66:24
110:18 114:1
116:23 145:19
155:10,12
156:16
**giving** 19:11
  25:16 147:19
**glass** 60:17,19
**go** 8:5,7 13:5
  17:5 18:23
  21:15 22:20
  24:2 25:1 36:4
  40:5,24 61:2
  62:20 65:8
  66:2 78:23
  80:17,24 81:2
  82:14 88:23
  91:1 92:18,20
  93:1,23 96:23
  97:2 98:3
  100:8,17 101:2
  101:23 103:18
  109:15 112:11
  113:6 115:20
  116:9,16,21
  122:24 123:19
  126:22 131:8
  132:22 147:17
  148:8 154:2
**goes** 75:23 126:6
**going** 8:5,7 9:12
  12:18 16:1
  21:14,16 24:20
  25:8 26:6,17
  36:23 47:14
  55:13 57:11
  60:14 63:24
  64:9,11 65:8
  66:2 72:22
  85:9 88:15
  93:5,6,13 95:2
  100:3 101:8,12
  101:12 103:1
  103:21 105:12
  108:5,11 114:8

116:10 117:10
117:19 121:1
123:10 127:14
129:23 131:18
135:6 138:5
140:6 145:23
146:9 147:16
154:1
**goings** 39:13
**good** 46:4,7
  52:12 70:22
  131:22 132:7
  150:19
**gossip** 130:13
**grabbed** 99:22
**graduate** 13:20
  14:19
**graduated** 14:15
  14:17,22
**great** 47:12
  140:16 153:24
  154:7
**ground** 8:8,12
  10:10
**group** 16:10
  18:15,16 32:1
  32:2 34:5,7,12
  34:15,17 35:3
  35:5 47:11
  57:1,2,11,19
  57:24 58:2
  76:14,17 77:1
**groups** 18:18,19
**Grove** 12:24
**grow** 12:22
**guard** 108:4
**guards** 95:22,23
**guess** 18:22
  28:11,11 34:8
  46:6 77:17,22
  77:23,24 82:3
  93:10 107:24
  147:5
**guessing** 77:21
**guilty** 31:11,14

32:5
**GUNDERSN**
  8:1
**Gunderson** 4:23
  8:2 11:6,7
**guys** 38:17 56:11
  58:14 59:18
  108:2 143:10

**H**

**H** 4:8 5:10 54:2
  54:2,9
**half** 16:7,23
  135:19
**hall** 103:23
  123:8
**hallway** 21:22
  21:22 96:24
  97:3 122:13
**Hamlin** 91:20
  97:23 106:4
  107:17 134:8
  135:2
**Hamlin's** 86:11
  88:14,20 89:1
  90:12,12 92:6
  92:15,21 93:1
  93:6 94:10,12
  94:22 97:22
  100:9,24
  101:18 102:2
  103:16 119:6
  122:23 125:13
  126:2 144:18
**Hamlin's'** 93:17
**hand** 143:14
**handle** 77:5,6
**Hang** 62:23
**happen** 87:8
  94:3 101:9
  105:12 150:17
**happened** 41:3
  46:20 77:15
  79:11 81:21
  88:22 93:8

94:1 97:22
98:15 99:18
102:2,17
105:20 125:16
126:5 147:23
**happening** 42:8
**happy** 47:1
**harassed** 91:15
  91:16,16
**hard** 33:19
  63:19 89:14
**Hasina** 1:7,12
  3:10,10 4:10
  37:6 68:4
  118:8,14,18
  121:4,7,12
  124:7 127:19
  140:21 155:7
**head** 8:20 37:19
  37:20 98:1
**heads** 62:20
**health** 4:22 11:9
  17:8 19:1 20:5
  30:4 31:10
  52:4 70:17
  77:6 90:3
  114:23 129:21
  145:12
**healthy** 76:23
  77:2,4,9
**hear** 7:16 73:8
  101:14 109:23
  110:4 116:20
  117:1,7
**heard** 66:20
  111:1
**hearing** 71:2
**held** 68:8
**help** 29:20 62:18
  89:18,20 95:3
  117:6,19
**helped** 21:12
  59:6
**helpful** 64:7
  103:4

Case: 1:17-cv-07909 Document #: 218-3 Filed: 09/15/22 Page 166 of 179 PageID #:2037

OWEN v. JAVED, et al.                                      No. 18 CV 334
DEPOSITION OF:  CHRISTY LENHARDT                  February 1, 2022

Page 8

**helping** 113:9
**helps** 9:2
**hereof** 119:3
**hereto** 157:1
**hi** 43:23 140:3
**hide** 78:12
　127:10
**high** 36:9
**higher** 23:17
　130:10
**highest** 13:1
**Highway** 2:4
**hike** 97:7,8
**hit** 6:13
**Hoffman** 17:20
**Hogan** 3:11 4:10
　7:3,9 53:1
　54:19 55:5,8
　55:14,23 72:19
　83:9 96:12
　115:4 125:11
　126:1 139:15
**homes** 16:11
　18:16,16,16
**honestly** 65:6
**hoping** 127:7
**hospital** 22:22
　39:5,13 54:11
　57:17 74:7
　76:1,8 146:8
**hospitalized**
　19:18,18 22:3
**hostile** 50:1,20
**hostility** 50:7,13
　50:18
**hour** 40:22
　60:14
**hours** 38:16,18
**house** 40:11
　43:12
**huge** 63:24
**huh-huhs** 8:19
**hullabaloo** 90:8
**Human** 7:22
　114:22

**Hurt** 1:9 2:16
　3:11,21 4:11
　6:20,24 7:3,7
　7:10 47:7 48:5
　48:9 66:10
　74:3,5,6,14,20
　74:23 75:2,9
　75:18 77:12
　78:11 81:13
　82:2,23 84:15
　86:1,5,8 87:2,9
　87:19,22 88:4
　91:5,6,8 93:8
　93:16 94:2,23
　103:10 105:20
　106:1,12 109:8
　109:11,21
　110:17 111:21
　113:5 116:15
　118:15,19,22
　119:2,10 121:6
　121:16,20
　122:10,19
　123:4,16,20
　124:3,10 127:3
　127:21,23
　128:4,10,14,20
　128:21 129:6,8
　129:14 136:8
　136:12,21
　138:3,9,22
　139:4,11,16,21
　140:5,14,22
　141:3 142:11
　143:3,8,19
　144:8,18
　146:23
**Hurt's** 91:18
　121:14 125:18
　129:4 145:4
**husband** 81:4
**husband's** 81:5
**hypervigilant**
　68:2

**I**
**idea** 31:7 108:5
**identified**
　114:20
**III** 58:10 107:18
**illegal** 148:16
**Illinois** 1:1 2:6
　2:13 3:2,6,13
　3:17 4:2,6,16
　4:21 7:21 13:6
　14:5 114:21
　155:1
**immediate** 135:1
**immediately**
　149:10
**impact** 10:3,6
　79:2
**impacted** 80:19
**impeach** 115:9
　116:6
**impeachment**
　115:8 116:2,3
**important** 25:6
　39:2 81:22
　124:22
**imposed** 57:3
**impression**
　106:13
**impressional**
　48:20
**improper** 115:8
　116:1,3
**in-person** 33:13
　33:24
**inappropriate**
　84:3 143:7
　146:22
**incentive** 90:18
　92:8,16 93:7
　93:23 123:11
**incident** 26:4,15
　26:19,21,23
　27:1 43:16
　49:3 88:13,20

93:8 100:24
　101:4 103:15
　103:20 105:14
　107:3 119:2,5
　122:23 123:5
　125:13,15,19
　126:2 143:17
　146:18 147:24
**incidents** 38:24
　48:22 49:24
　50:4,13,17
　106:9 147:24
**inclined** 6:14
**include** 116:12
**includes** 82:18
**including** 33:6
　69:20 114:17
　127:19
**inclusive** 113:23
　155:11
**independent**
　17:15,22
**indicate** 141:2
　142:3
**indicated** 118:14
　140:22 143:6
　143:18 146:22
**indicating**
　117:17 143:1
**indication**
　121:10 141:10
**indifferent**
　63:21
**individual** 72:1
　76:12
**individuals** 20:3
　20:4
**influence** 70:20
**information**
　7:24 46:17
　61:13 75:13,21
　76:2 79:11
　112:11,16,20
　112:22 113:3
　131:23 144:11

**initial** 6:22
**initially** 91:10
　91:20
**insanity** 31:12
　31:14 32:5
**inside** 89:8
**insisted** 137:15
**Inspector**
　149:11
**Instagram**
　128:23
**instances** 83:21
**Institute** 17:16
**instruction**
　10:19
**intend** 68:1
**intended** 9:14
　115:1 138:3
**intention** 70:22
　107:24
**interact** 38:2
　51:16,19,20
　55:4 121:20
　122:3,6
**interacted** 53:7
**interaction**
　42:15 43:4
　51:4 52:22
　87:18
**interactions**
　121:8
**intercourse**
　69:20,21 94:12
**interest** 12:2
**interested** 23:18
　157:1
**intern** 36:1
　49:15,16,18
　52:6
**interns** 56:24
　57:1,3,12,20
　58:2
**interpreted**
　67:21 121:9
**interrupt** 82:16

OWEN v. JAVED, et al.
DEPOSITION OF: CHRISTY LENHARDT

No. 18 CV 334
February 1, 2022

Page 9

**interrupted**
26:11
**intimate** 81:20
152:7
**investigated**
149:12
**involve** 79:6
**involved** 39:16
51:10 54:24
55:3 67:18
68:15 148:10
148:10 150:8,8
**ironic** 104:3
**Irving** 17:2
**Islamic** 151:1
**issue** 33:21
**issues** 9:3 26:1
77:7
**items** 129:4
**iv** 114:11

**J**

**J** 4:13,18
**J-O-H-N-S-T-...**
7:2
**jail** 31:10
**Jane** 16:16,22,24
**Javed** 1:7,12
3:10,10 4:10
7:3,4,9 37:6,9
37:19 38:3
39:14,23 40:9
41:9,14 42:5
42:16,20 43:6
68:4,14 70:8
70:13 71:22
72:4,21 73:15
82:24 83:22
85:11,14,19,23
86:4 87:7,15
88:8 92:4
95:24 96:6
101:1,10 103:9
103:13,15
106:11 115:3

118:8,14,18
119:9 121:4,7
121:12,19
122:8,18
123:20 124:2,8
124:13 127:19
138:8,17 139:6
140:21 150:23
152:16,24
153:3 155:7
**Javed's** 85:12
**jcecala@expa...**
2:8
**Jeff** 24:17 25:7
27:23 28:10,20
134:14,14,16
**jeopardy** 149:14
**Joanne** 134:11
134:12
**job** 15:6 19:13
31:24 78:16
79:4
**Joe** 63:3 114:5
115:19 135:5
140:1 147:6
**John** 2:8
**Johnston** 3:8 5:5
6:7,12 7:1,1,18
8:4 11:18
12:12,15 13:15
13:19 15:18
18:6 26:10
27:2,3 33:18
33:22 36:24
37:2 41:1
60:13,21 61:2
61:4 62:17,24
63:8,14,22
64:20,24 65:5
65:11,23 66:11
66:14,18 71:3
71:9 73:3,13
78:1 79:18
80:24 81:9
85:16,22 87:1

100:11 109:14
109:18 110:10
110:14 113:2,8
114:7 115:19
115:23 116:7
116:23 117:10
117:18,24
118:4,9,12
120:1,13 130:6
130:7 132:22
133:2,6,8
135:4,13
137:17 139:23
147:5,10
153:10,13,15
153:20 154:2
154:11
**Joseph** 2:8 6:18
**jump** 125:6

**K**

**K** 38:12,14 42:1
53:21,23 54:12
56:8,10 57:2
59:14,16 88:15
90:14 91:7,9
91:19 92:2,7
92:14,18,20
101:2,12,14,17
101:23 121:14
121:16 122:20
122:24 123:5,7
123:11,19
143:24 144:3,9
**K-A-T-E** 20:16
**K-R-E-T-C-H...**
6:23
**Kareemi** 3:10
4:10 7:3,9 40:9
41:19,23,24
42:6,21 43:1,9
43:14 72:9
83:3 92:4 96:5
115:4 139:3
**Kareemi's** 40:11

**Kate** 20:13,13
20:14,15,15
21:3 22:6,7
**keep** 29:20
81:16 100:4
132:15
**keeping** 149:17
**kept** 92:17
132:13
**kind** 11:20 14:13
16:2,8 18:12
23:20 28:18
29:20 34:8,20
50:11 57:5,6
58:9 75:6
84:14 85:2
86:13 87:2
88:1 95:16
97:9 100:8
110:6 115:1
130:23 131:1
134:4 147:19
**kiss** 69:17
**knee** 144:24
**knew** 28:9 98:14
105:22 108:14
113:23 119:1
123:7 138:8,16
138:21 139:3,5
139:9,15,20
148:24 149:9
149:16 150:3
**know** 8:19 9:15
9:16 10:6
11:17 12:3
23:11 24:4,14
25:3 28:17
33:19 35:10,20
38:8,19 40:13
40:18,22 41:18
44:6,21 47:20
49:18 50:15
51:5,11 52:1
53:1,21 54:14
54:21 56:4,22

58:17,18 59:13
59:23 60:14
61:8 62:2,19
63:4,5 64:11
65:9,14 66:11
68:19 69:20
74:2,12 75:5
77:14 78:2,3,4
78:5 82:20
86:6 88:24
91:8,18 93:12
95:19,20 98:7
102:23 104:3
105:17 107:12
108:2,6 115:3
122:10 123:3
124:3 125:24
126:4,7 127:14
130:4 131:24
133:16,19
134:1 135:20
138:11 139:24
141:14 143:9
143:15,23
144:23 145:1,6
145:6,17,21
146:8,14,15
147:6,15
148:15,17
150:4,7,14
**knowing** 149:16
**knowledge**
35:17 57:3
68:14 87:7,10
104:11 116:14
125:17 126:3,4
130:9 152:18
**known** 113:4,24
122:19
**Kohl's** 59:3
**Koran** 70:20
**Kozar** 3:19 5:6
7:6,6 62:23
64:22 140:2,4
140:10 147:1

OWEN v. JAVED, et al.                              No. 18 CV 334
DEPOSITION OF:  CHRISTY LENHARDT            February 1, 2022

Page 10

**Kretchmar** 2:3
  2:11,15 6:21
  6:22 8:2
  136:13

**L**

**L** 24:3,5 27:24
  29:10 30:1,2,8
  30:18 31:2,6
  32:24 33:6
  35:16 36:8
  37:4,11,12
  38:3,12,14
  42:7 44:15,17
  44:18,22 45:1
  45:17 53:21,23
  54:12 55:1
  57:2 59:10,11
  59:14,15,17
  60:4 74:20
  75:3 92:14
  105:5 121:7,9
  121:21,24
  134:6 135:1
**L-E-E** 20:16
**L-E-N-H-A-R...**
  6:11
**Lake** 4:16
**Langley** 134:11
  134:13
**language** 70:7
  115:6,7,12
**large** 152:3
**largest** 31:13
**lastly** 138:5
**law** 2:12 3:3,14
  4:3 8:3 148:13
**lawsuit** 11:7
  62:2,6 70:1
  140:5
**lawsuits** 11:12
**lawyer** 67:1
**layout** 35:21
**learn** 125:16
  127:22

**leave** 78:24
  89:12 113:3
  144:8,21
  145:13,13,16
**leaving** 16:12
  143:13
**led** 21:10
**Lee** 20:13,13,14
  20:16 21:3
  22:6,7 145:22
  145:24 146:12
**left** 27:16 41:8
  41:14 43:13,24
  45:18 52:22
  56:2 59:5,22
  60:9 96:3,4,6
  96:24 97:16
  108:1,7 113:20
  134:15,16,18
**legs** 60:16
**Lenhardt** 1:15
  4:19 5:4 6:2,8
  6:10,17 8:8
  12:16 27:5
  66:19 109:19
  126:24 133:9
  135:22 140:3
  147:3 155:19
  156:5
**lesbian** 131:12
**let's** 13:4 61:2
  79:10 88:19
  103:18 109:15
  116:16 144:15
**letter** 49:11,14
**letters** 23:1
  133:15
**letting** 100:8
**level** 13:1
**license** 79:7,20
**licenses** 148:12
**life** 52:2 77:7
**Lifecore** 18:9,21
  18:24
**lifting** 94:3

**light** 79:12 82:9
  145:14,15
  146:4
**liked** 43:3
  150:16
**likelihood** 87:4
**line** 49:21 88:3
**Lisa** 44:19
  154:13
**listening** 12:4
**litigation** 114:15
**little** 8:12 12:18
  18:4 31:7 37:1
  58:3 60:15
  71:3 93:11
  97:7
**live** 21:15
**living** 76:23 77:2
  77:4,9
**lobby** 97:15
**located** 17:18,20
  90:13 114:22
**lock** 89:8 98:15
  103:24 104:7
**locked** 38:11,12
  89:12,17 93:9
  94:14 96:1
  98:8,10,20,24
  103:16 104:4
  105:15,17,21
  144:18
**locksmith** 90:2
**long** 12:7 15:23
  16:6,14,21
  17:10,22 18:21
  22:14 23:8
  30:2,17 45:23
  77:18 78:6
  81:24 89:15
  93:5 95:4 97:2
  101:4 140:8
**longer** 17:19
  62:6 79:13
  129:9 147:8
**look** 15:21 46:3

  46:3 50:20
  63:16 64:4
  65:6 67:3,8
  68:10 87:12
  110:23 111:5
  119:6 124:6
  126:21 132:2
  132:23 135:16
**looked** 37:18
  87:15
**looking** 63:24
  65:12 87:13
  122:9 126:24
**looks** 112:5
  129:11
**lose** 78:16 79:4
**losing** 79:6
  128:1
**lot** 22:9 24:14,21
  70:15 95:14
  103:22,23
  110:6 119:11
  147:16
**Lots** 90:9
**loud** 13:11 110:1
  135:15
**lovely** 84:8
**low** 36:9
**luck** 40:20,21
**lunch** 40:6
**lunches** 42:19
  43:11
**lying** 70:3

**M**

**M** 23:1,1,8,24
  24:2,5 27:24
  30:13 53:23
  54:12
**M-A-R-V-A**
  134:2
**Ma'am** 54:6
**mad** 48:16 99:2
  99:4 100:13,14
  100:19,21,21

**making** 64:14
  85:20
**male** 31:3,4
**malfunction**
  98:24
**malfunctioned**
  105:15
**malfunctioning**
  98:12,14
  104:17
**man** 60:6
**Management**
  17:17
**manager** 44:11
  44:22,24 45:4
  45:6,18,22,24
  51:2,3
**Mangahas**
  128:23 129:7
**manner** 68:17
  69:6 127:5
**Marianne** 45:9
**Mark** 1:4 2:17
  6:19,24 61:8
  61:23 62:21
  67:20 69:3
  73:20 150:22
  151:8,20
  152:23 155:4
**Mark's** 151:6
**marked** 110:18
  140:13
**married** 52:3,7
**Marva** 129:16
  129:17 134:2
**Mary** 3:8 7:1
  23:2 64:22
  65:16 149:24
  153:7
**mary.johnsto...**
  3:9
**masculine**
  131:13
**master's** 13:3
  14:1,3,6,9,18

OWEN v. JAVED, et al.                                          No. 18 CV 334
DEPOSITION OF:  CHRISTY LENHARDT                      February 1, 2022

Page 11

15:1
**masturbate**
47:14 48:1
**masturbated**
47:8
**matter** 7:4 129:2
154:16
**matters** 156:11
**mean** 14:14 53:6
57:24 63:22
65:6 82:11,15
86:22 96:16
100:20 102:7,8
117:8 123:7
130:13
**meaning** 21:19
23:20 59:18
112:21 116:5
127:4
**means** 19:16
92:2
**meant** 75:9
84:23 113:22
**medical** 39:4
**medically** 39:3
**medication** 39:1
**medications**
10:2,5 37:22
37:24
**meditation** 77:1
**meet** 33:23 35:1
35:11,16,19
38:15,18 61:10
72:8 74:5
75:18,20 76:9
98:19 152:19
152:20,21
**meeting** 38:9,10
38:21 46:20
48:14,15 49:6
56:11 57:7
71:12 72:2,8
72:15 73:20,21
76:21,22
105:13 129:20

150:23 152:10
**meetings** 21:11
33:13 34:1,5,5
34:6,7,10 39:7
39:8,15 42:9
42:12 46:13,16
50:3 51:5,15
52:3,14,16
55:9,11 56:20
71:23 76:12,15
83:18 124:4
129:19
**Melrose** 12:23
**memory** 132:7
**men** 21:19,21,22
23:4,6,7 47:13
48:1 54:4,15
**mental** 11:9
18:17 19:1
20:5 30:4
31:10 52:4
70:17 77:6
90:3 114:23
129:21 145:12
**mention** 13:17
28:1
**mentioned** 19:21
28:8 29:3,6
33:12 49:14
84:2 87:17,22
95:14 106:20
122:18 133:23
**mentioning** 66:7
**mentorship**
57:11
**message** 41:12
137:21,22
**met** 36:11 37:21
37:23 61:22
136:18 151:8
151:12 153:2
**Michelle** 57:15
57:18,22
**middle** 45:21
**mind** 26:24

74:13 126:24
**minute** 60:16
62:19 64:4
95:7 111:4
152:13
**minutes** 60:22
97:6 132:24
**misconstruing**
26:18
**missing** 114:4
**mistake** 41:21
67:18
**misunderstand**
146:5
**misunderstood**
146:6
**mix** 31:5
**moment** 17:4
20:21 63:17
**momentarily**
118:6
**Monday** 101:9
105:10
**month** 21:12
32:13,14 37:22
37:23 38:1
40:14,14 77:20
**monthly** 80:6
**months** 18:2
32:13,14 77:21
93:10
**morning** 38:9,15
39:6,8,15
42:12 46:13,16
46:20 48:13,14
51:5,14 52:14
52:15 55:9,11
56:11,20
105:10,13
**move** 9:1 12:13
101:12 111:19
121:1
**moved** 71:6 91:6
**multiple** 129:4
**Muslim** 70:15

70:16,21 71:7
151:1
**mute** 7:11

_____

**N**

**N** 2:1 5:1 45:11
53:23 54:12
**name** 6:9 17:5
20:20 21:5
26:7 45:11,14
57:15,18
133:14 134:22
140:3
**named** 61:8
70:18 74:3
**Nanette** 128:23
**narrative** 29:21
132:20
**Nathaniel's** 91:3
**navigate** 77:7
**necessarily**
53:16 54:24
84:18 113:22
122:8 131:23
**necessary**
147:11
**need** 8:15 9:5,6
15:21 62:19
63:17 76:6,7
88:23 102:9
116:2 132:19
135:14
**needed** 32:8
89:18 91:12,13
107:12 108:20
118:17
**needing** 25:5
**needs** 34:21,22
**nefarious** 12:9
**Neither** 96:5
**nervous** 20:12
89:23
**never** 26:24 69:2
82:17 83:17
84:1 85:24

87:7,17 88:2
105:23 106:3
**new** 46:22 47:11
**Newman** 4:8 7:8
7:8,16 11:4,11
11:15,19 65:16
**NGRI** 31:14
32:6 54:11
75:22,23 97:1
**NGRIs** 53:24
**nice** 55:18 60:20
**night** 63:17
**Nikolov** 27:9,14
**Nikolov's** 27:20
**nine** 66:6,8 67:9
128:17
**nineteen** 18:2
**nodding** 8:20
**nonprofessional**
105:24
**nonverbal** 110:7
**normal** 47:24
122:2,5
**NORTHERN**
1:1 155:1
**Northwest** 2:4
**nos** 8:18
**Notary** 155:24
**noted** 11:22,24
12:13 130:6
**notes** 132:2,23
**noticed** 118:19
119:10
**November**
135:21 136:1
136:24 137:23
**number** 54:19
127:24
**numerous**
121:17
**nurse** 31:23
42:10 44:11,22
44:24 45:3,6
45:18,22,24
51:2,3 89:21

OWEN v. JAVED, et al.                                    No. 18 CV 334
DEPOSITION OF:  CHRISTY LENHARDT                    February 1, 2022

Page 12

nurse's 21:23
  89:16
nurses 51:8,11
nurses' 40:14,15
  94:18,19 95:5
  95:20 98:2
nursing 18:16
  53:5,10 54:20
  96:11,12
  125:11,12
nutrition 91:3

**O**

o'clock 144:21
oath 9:19 113:17
  113:18 155:11
object 11:20
  26:17 117:2,5
objecting 10:16
objection 10:12
  10:24 11:1
  12:12 64:11
  65:12 80:23
  85:10 100:4
  112:24 113:11
  113:14 115:5
  115:20,22
  119:21 130:1
observed 121:5
  121:8,17 143:7
obtain 14:3
  137:2
obtained 145:18
obviously 29:21
  43:21 63:15
  81:3 84:2
  108:12 122:22
  153:16
occasion 141:15
  144:17
occasionally
  51:20
occasions 121:18
  137:18 144:2
occur 33:14

occurred 67:19
  91:11 147:21
occurring
  114:15
October 114:16
odd 105:14
  128:20
off-shift 40:23
off-site 41:3
offense 47:12
office 3:2,13 4:2
  27:8,8,20 35:2
  35:18,20,22
  46:24 48:20
  49:13,16 55:7
  68:6 70:10
  72:1,3,9,15
  73:20 83:22
  84:7 86:10,11
  86:12,15 87:23
  88:14,20 89:1
  89:17 90:12,12
  91:1 92:7,17
  92:21 93:1,6
  93:17 94:10,12
  94:14,22 95:6
  95:17 96:2
  97:22 98:8
  99:5,8 100:24
  101:13,18,20
  102:2,9,15,18
  102:21 103:6
  103:16 105:21
  107:4,10
  108:10 118:19
  119:6,11 121:7
  122:11,12,24
  123:5,17
  125:14 126:2
  127:6,11
  141:12,15
  143:24 144:18
  144:21 146:19
  149:10 150:24
  151:2,9,13,19

151:20,24
  152:2,11,20,22
  153:3
officer 74:22
offices 97:18
  99:11
oh 13:14 17:7
  26:24 29:15
  30:9,12 36:3
  45:10 54:3
  73:5 82:14
  91:10 100:17
  118:4 134:19
  154:4
OIG 108:16,17
  129:13 130:3
  149:10,21
  150:15
okay 8:5,11 9:22
  10:9,14 11:2,3
  13:4,14 14:19
  15:12 16:5
  17:6 18:5,12
  19:2,9 20:9,17
  21:1 22:4,14
  23:3,24 24:4
  27:4 29:18,23
  30:5,14,20,23
  37:3,12 44:21
  45:2,15 46:11
  46:19 47:6
  51:21 52:21
  53:15,19 54:18
  54:23 55:4,19
  57:8 59:21
  60:3,17,23,24
  61:5,16 62:17
  62:23 63:14
  67:8,14,17
  69:23 70:12
  71:21 72:22
  73:14 74:1,19
  75:17 77:8,23
  78:4 79:1,22
  80:7,10,16

83:19 85:16
  86:7 87:2,6
  88:16,21 90:7
  91:4,14 92:6
  93:11,15,22
  94:8,13,16,20
  97:9,12,20
  98:3,22 99:7
  99:12,17
  100:23 105:2,7
  105:17 106:3
  106:15,24
  107:10 109:23
  110:15,24
  111:7,11,19,24
  112:9 114:8
  117:22 121:23
  122:14 123:14
  125:24 128:7
  129:24 130:12
  132:9,15,21
  133:6,18
  134:24 135:4
  135:14 136:19
  137:21 138:2,5
  138:24 140:16
  140:19 141:1,9
  141:14 142:3,7
  142:20,24
  143:11,16,16
  143:22 144:2,7
  144:15,15
  145:2 146:1,13
  146:17,17
  147:1,10 149:1
  149:22 150:19
  151:22 152:9
  152:13,14,23
  153:6 154:7,10
old 18:2
oldest 18:1
Omar 70:19
once 9:3 21:11
  37:21,23 38:1
  57:20,21,22

59:2,4 75:19
  76:10 141:5
  147:21
one-on-one 34:5
  34:6,11,13,24
  35:12
ones 36:9,9 50:2
  124:23
open 38:11
  52:16 89:9,15
  89:22 90:5,6
  94:23 95:9
opened 36:12
  97:4
openly 150:6
operations 39:10
  55:1
opinion 46:9
  130:24 131:14
opportunity
  153:17
opposed 8:19
  71:24
oral 69:20
order 49:5 58:1
ordered 20:2
  129:3
ordering 154:11
orders 89:7 90:4
  98:13 104:2,9
orienting 47:6
outcome 157:2
outlined 32:7
outside 36:4,4
  40:2,4 41:12
  42:14 43:8
  51:4,14,22
  55:23 56:14
  59:1 73:15
  82:22 86:18
  103:14 120:17
  123:14 124:3
  127:6 151:8,13
  151:19
overlapping

OWEN v. JAVED, et al.                                    No. 18 CV 334
DEPOSITION OF:  CHRISTY LENHARDT              February 1, 2022

Page 13

22:10
**overly** 84:15
  118:15 124:8
  140:23 141:4
  143:20
**Owens** 1:4 2:17
  3:10 6:19,24
  7:5 61:8,11,23
  62:8,21 66:5
  66:23 67:6,20
  67:21 69:3,5,8
  69:17,21,24
  70:5,8 72:9,15
  73:20 152:23
  155:4
**Owens'** 65:4
  67:24

_____
        **P**
**P** 2:1,1
**p.m** 135:22
  154:17 156:6
**packets** 32:20
**page** 5:3,12 66:3
  66:7,8 68:11
  116:21 121:2
  125:8,8 126:19
  128:17 135:7
  135:20
**pages** 66:6
  155:10
**paid** 80:8
**Panera** 43:16
**paper** 64:2
**papers** 75:13
  146:11
**paperwork** 21:7
  31:16 74:24
**paragraph** 67:9
  67:15 68:11,12
  68:13 114:11
  116:22 117:9
  117:13,21,22
  117:24 118:7
  118:13 119:3,5

119:12 121:2
124:7,14 125:7
125:10,22
126:18,19,22
127:1,16
128:16,18
140:18,21
**paragraphs**
  68:23 117:6
**paralegal** 7:24
  8:2 11:6,23
  12:6,10
**parents** 81:4
**Park** 2:6 12:23
  17:2
**parking** 103:22
  103:23
**part** 7:17 58:19
  62:14 70:18
  81:23 111:15
  120:11
**participant**
  150:6
**participating**
  12:4
**particular** 58:20
  141:15
**particularly**
  130:15
**parties** 157:1
**party** 40:10
  43:12 59:8
**pass** 96:23
**passage** 65:21
**patient** 26:5,6,8
  34:2 35:20
  42:9,10 47:13
  61:8,24 67:19
  68:16,18 70:18
  74:3 75:4 78:9
  90:16,18,19,20
  91:12,15 92:10
  92:11,12,13,15
  99:6,8,16
  102:10,24

121:23 123:12
145:8 148:11
148:21 149:2
150:9 152:24
153:3
**patient's** 37:21
**patients** 18:15
  18:18 19:17,24
  21:18 24:7
  31:9 32:3,23
  33:8,14,24
  35:1,11,17
  36:12 38:6,20
  38:23 39:4,8
  39:17 42:4
  51:10,12 56:21
  70:16 90:9
  95:22,22 98:19
  99:11 122:15
  127:13 152:19
  152:22
**pay** 23:16 90:23
  92:16
**Peggy** 134:19,19
**pending** 11:8,12
  113:17 120:7
**penetrative**
  69:21
**pension** 79:23
  80:2,5
**people** 10:13,22
  21:7 27:16,17
  40:23 47:8
  55:8 57:4
  75:16 81:16
  82:18 83:24
  95:15 104:13
  108:10,15,21
  110:4 126:9
  131:1,24
  132:14 138:15
  138:16 149:15
**People's** 40:13
**perceived**
  106:21

**percentage** 34:9
  34:11
**perfectly** 100:7
**period** 45:8,9,16
  45:21 129:9
  144:23
**person** 10:16
  20:15 50:22
  55:18 58:9
  71:7 90:22
  110:2 129:12
  150:13
**personal** 11:21
  12:19 50:14
  52:2,14 58:7
  58:14 85:8
  130:20 156:15
**pertained**
  150:24
**pertaining** 1:18
**pertains** 140:7
**petitions** 20:8
**Pharis** 24:17
  25:8 27:23
  28:10,20
  134:14,14,16
**phone** 128:22
**phonetically**
  18:15
**physical** 87:8,18
  91:17
**pick** 59:6
**picture** 128:22
  128:24
**pictures** 52:11
  137:15
**piece** 64:2
**pieces** 145:20
**Pingree** 4:14
**place** 30:20 35:4
  65:18 71:23
  84:11 86:9
  108:9 114:17
  126:15 155:10
  156:18

**placed** 146:4
**plaintiff** 1:5,10
  67:20 155:5
**plan** 21:11,14
  31:18,19 32:4
  32:7 37:24
  75:22 76:4
**planned** 59:4
**planning** 32:17
  123:22
**plans** 21:9 31:17
  39:17,20
**plea** 80:15
**please** 6:9 7:12
  8:21 54:7
  114:4 140:18
**point** 24:24 28:1
  60:2 65:18,22
  71:18 72:24
  77:10 87:14
  89:19 91:4
  102:23 128:8
  152:12
**pointed** 67:10
**pointing** 65:17
**points** 76:5
**police** 74:21
  147:22
**population**
  31:13 54:22
**porch** 36:3
**portion** 31:13
  45:23
**position** 44:10
  53:4 56:7 87:3
  107:20
**positioned** 127:4
**possible** 125:3
**possibly** 66:10
  124:9
**posted** 128:22
**Pot** 40:20,21
**potentially**
  149:14
**Power** 147:11

OWEN v. JAVED, et al.                          No. 18 CV 334
DEPOSITION OF: CHRISTY LENHARDT            February 1, 2022

Page 14

98:18 99:13,15
**preconception**
47:16
**pregnancy** 17:24
**prepare** 58:1
**present** 4:20
11:20 55:9
141:11 144:17
**presented** 31:18
**presents** 43:20
**president** 129:18
**presumably**
83:16
**pretty** 48:16
89:23 93:22
**prevention**
21:13 32:3
**previous** 38:16
38:18 88:11
156:8
**previously** 28:6
28:13 63:3
67:10 86:13
92:19 98:16
99:7 119:8
130:14 140:12
**print** 63:19 65:1
65:3
**printed** 66:24
135:5
**printer** 64:3
**prior** 123:4
**private** 48:2
49:17 68:6
151:15
**privately** 48:15
**privy** 144:10
**probably** 19:6
29:8 56:21
**problem** 27:2
57:10 113:20
**problems** 65:17
**Procedure** 1:17
**proceedings**
154:15 156:16

**process** 95:17
**professional**
83:24 85:7
130:23 148:12
**professor** 56:22
**program** 15:1
53:14 90:18,24
92:8,16 93:7
123:12
**programs** 14:13
14:14
**properly** 104:12
**prosecuted**
148:17
**protect** 109:4
**provide** 46:16
111:16
**proximity** 96:20
**psychiatric**
22:22 23:13
32:9 76:7
**psychiatrically**
19:18
**psychiatrist**
31:21,22 37:13
37:16 41:24
72:13 92:3
152:19 153:4
**psychologist**
31:21,22
**psychology** 52:5
**public** 151:14
155:24
**pull** 70:6 135:7
**pulled** 66:3
**pulling** 62:24
**purely** 78:8
**purple** 135:19
**purpose** 93:3
105:18
**purposely** 87:3
**pursuant** 1:17
**put** 7:19 40:9
77:17 89:6
91:2 98:13

101:20 104:1,8
112:20,23
136:17 143:14
145:13,14,15
145:16 149:17
**puts** 126:6
**putting** 22:17

_____
**Q**
_____
**question** 8:23
9:2,7,8,12
10:16 11:5
49:20 72:23
85:13 109:5
113:1,7,12,17
114:1 119:22
120:7 123:24
150:20 152:14
**questioning** 61:6
**questions** 8:7,22
9:11 14:22
16:2 110:9
117:11 132:1
133:10 138:24
140:1,6 147:2
147:9
**quick** 60:22 67:2
109:15
**quickly** 6:15
**quite** 98:12
131:24

_____
**R**
_____
**R** 2:1
**R-A-N-D-O-L...**
6:23
**ran** 51:7 57:19
**Randolph** 2:11
2:15 3:4,15 4:4
6:21
**randomly** 97:10
**Randy** 10:11
63:3 135:5
140:1 145:19
147:6

**range** 145:3
**read** 28:18 64:1
67:15 68:9,12
68:18,24 70:19
85:20 111:8
114:23 115:7
115:12 117:5
121:18 124:11
125:20 126:22
127:6 128:2
129:10 135:15
145:20 155:9
**readily** 64:3
**reading** 156:19
**reads** 118:13
128:18 140:21
**ready** 65:19
133:5
**real** 109:15
**realistically**
65:24
**realize** 14:21
**really** 28:4 37:4
42:15 47:15
56:15 58:21
63:23 71:11
89:14 108:4
**reason** 9:7,23
25:16 31:11,14
32:5 42:17
58:20 70:18
71:5 86:3
88:24 96:14
101:11,23
138:7 139:2,9
139:14,19
145:9
**reasons** 12:9
32:8 62:3
**recall** 20:20 48:6
72:6,20 73:10
73:11 113:21
120:23,24
124:5,22 125:1
143:21 144:7

144:16,19
145:2 146:24
148:2
**received** 13:24
125:14
**recess** 61:1
133:4
**recitation**
125:21
**recognize** 67:5
111:12 112:3
**recollection**
114:13 115:14
**recommendati...**
41:11
**reconvene** 60:22
**record** 6:9,15
8:13 9:3 10:21
12:2,13 61:3
64:14 66:13,15
66:17 67:16
109:15,17
110:11 116:2
130:2 133:7
149:23 154:1,3
156:15
**recorded** 129:5
**records** 145:18
**reduce** 87:3
**reduced** 156:14
**redundant**
82:21
**referenced** 5:11
67:12 110:20
111:22 135:9
**referred** 96:17
**referring** 119:12
**refresh** 111:5
147:18
**refused** 81:5
**regarding**
114:20 124:4
129:13
**regular** 122:3
**reiterate** 128:3

OWEN v. JAVED, et al.                                   No. 18 CV 334
DEPOSITION OF:  CHRISTY LENHARDT                   February 1, 2022

relapse 21:13
32:1,3
relate 50:8,13
84:19 114:18
related 92:9
106:21 147:23
relates 75:9
124:12
relation 80:11
relationship
37:18 39:24
40:3 43:1 46:3
46:5,6,8,8 48:9
50:24 51:22
52:7 55:14
56:15 58:24
61:23 68:15
69:3 75:2
77:11,19 78:7
78:9,11,12
79:3 80:20
81:12,17,19,20
81:21 82:1,2,5
82:8,22 84:3
84:15,20,23
85:4,5,7,8 86:1
88:4 103:7,10
105:24 106:12
106:23 107:22
108:13,20,22
109:8 113:5
116:14 118:15
118:22 121:10
121:12 124:2,9
127:23 128:10
128:13,19
129:5,8,13
130:16 132:17
138:9,22 139:4
139:10,12,16
139:17,21
140:22 141:3
141:19,23
142:10 143:2,8
143:19 146:23

148:1,8,20
relationships
109:5 148:20
relative 156:22
156:23
Relax 15:17
release 32:20
74:17
Relevance 80:23
relevant 116:13
religious 67:23
remained 129:8
remember 10:6
17:2,4 19:2
20:9,12 24:19
24:21,22,23
25:6,12,15,22
28:4,7,7,14,24
33:3 35:22
45:3,6,11,12
45:14,15,17
46:18 47:2
48:17 49:1,4
49:19,22 50:7
50:9,11,17
53:19 54:14
57:15 59:3
60:1 61:12
70:12 73:19,23
74:11,19 76:17
76:24 77:20
84:9,10 88:8
94:20,24 95:24
102:4,12
106:15,24
108:8 119:19
120:4,9,19
132:4,6,8
134:15,18,19
134:22 137:9
137:12 141:6,7
144:12 147:19
151:2
reminds 131:2
removed 101:18

rep 133:24
rephrase 9:16
142:8
replace 60:2
replaced 60:6,8
report 32:6,7
78:23 108:18
109:3 125:14
126:6 129:13
149:10,21
150:15
reported 27:17
27:17,19 109:2
129:2 130:3,4
130:5,9 156:13
reporter 8:15
10:12,21 13:12
117:1
REPORTER'S
156:2
reporting 32:4
reports 32:11,12
32:15 39:20
represent 140:4
represents 11:16
request 23:15
required 9:19
20:1
researched
108:19
reserve 154:6
residing 91:5
respective 65:13
response 68:7
95:1
responsibilities
21:2,6
responsibility
48:19
rest 30:19
resume 15:21
16:3 17:4
retain 80:1
retired 60:6
128:23

retirement 59:4
59:7
review 37:22,23
39:19
reviewed 16:3
reviews 39:17
Ridge 2:6
right 9:18 15:16
19:6,11 29:15
29:15,16 30:12
33:20 35:23
45:14 48:3,18
50:17 54:17
60:3 64:6 71:4
73:19,23 87:16
92:24 97:1,2
115:16 118:10
120:16 123:9
126:13 132:21
137:2 143:16
146:17 147:1
148:14 149:13
152:16 154:12
Rights 4:8
Road 4:14 17:3
Robert 145:22
145:24 146:12
role 58:9
romantic 108:13
124:9 143:7
148:7,22
romantically
148:9 150:7,8
room 25:11
27:12 28:19
35:5,6 38:16
40:24 47:8
48:2 68:8 71:6
71:8,18,24
73:22 105:18
129:4 152:3,11
Rory 4:21 7:18
7:20 12:1
153:7
███████ 26:9,15

27:13,20 28:1
28:8,9,18 29:4
29:6
rough 17:9
roughly 16:6,12
16:21 19:10
24:1 35:12
44:22 61:10
74:11 77:14
RPR 1:20 156:6
157:9
rule 10:10 36:14
36:16,21
108:16,17
rules 1:17 8:8,12
39:12
rumors 68:3
running 58:1
rushed 129:19
129:21

─────────
        S
─────────
S 2:1 5:10 6:21
6:22
S-C-M-E 133:16
S-T-R-O-U-D
134:3
safe 108:14
SAITH 154:18
Salvador 134:21
Sarah 4:8 7:8
153:7
sarah.newma...
4:9
saw 39:14 44:2
87:7 122:9
128:24 143:23
saying 8:16
10:17,17 25:2
33:19 102:4
117:7 147:20
150:6
says 111:6 114:6
114:6 121:4
125:8,10

OWEN v. JAVED, et al.                               No. 18 CV 334
DEPOSITION OF: CHRISTY LENHARDT                    February 1, 2022

Page 16

| | | | | |
|---|---|---|---|---|
| 128:17 130:3 | **sensitive** 50:22 | 128:13,19 | 52:16 85:21 | 95:5 108:21 |
| 135:21 | **sent** 63:16 65:7 | 132:17 138:9 | 87:21 99:21 | 131:2,3 |
| **schedule** 34:15 | 65:14 136:11 | 138:21 139:4 | 119:9 131:3 | **somewhat** 50:23 |
| **School** 16:16,22 | 137:4,6,11,22 | 139:10,12,16 | **six** 18:2 125:8,9 | **son** 18:1 |
| **scream** 110:3 | 154:9 | 139:17,20 | **sjbrodylaw.com** | **sorry** 7:17 12:16 |
| **screen** 63:20 | **sentence** 127:2 | 143:2 | 4:18 | 14:21 15:15 |
| 64:23 65:20 | 140:20 | **sexually** 67:18 | **skills** 77:5,5 | 17:1 21:13 |
| **screens** 65:13 | **separate** 91:13 | **shaking** 8:20 | **slightly** 147:8 | 23:7,16 26:11 |
| **scrolling** 64:6 | **serenity** 35:6,7 | **shape** 36:8 | **small** 57:5,11 | 27:4 30:16 |
| **Sean** 4:23 7:19 | **serious** 67:18 | **share** 63:20 | 151:24 | 31:19,21 33:17 |
| 7:23 8:1 11:5,7 | 81:12 148:11 | 64:23 65:20 | **smooth** 130:16 | 37:22 42:19 |
| 54:14,17 153:8 | 148:22 | **shared** 151:13 | **snack** 90:21 92:8 | 44:16 54:8 |
| 153:9 | **served** 145:3 | **sheet(s)** 155:13 | 92:22 93:2,7 | 57:9 71:2 |
| **search** 129:3 | **Services** 7:22 | 155:16 | 93:24 | 76:18 82:15 |
| **second** 110:22 | 114:22 | **shopping** 59:2 | **snacks** 90:23 | 94:6,17 95:12 |
| 127:1 | **session** 151:15 | **show** 52:11 | 91:2 92:17,18 | 99:3 109:23 |
| **secondary** 81:19 | **sessions** 34:13 | 136:18 | 92:21 93:21 | 110:1 116:20 |
| **secret** 149:17 | 34:24 35:3 | **showed** 136:20 | 101:13,16 | 133:19 134:16 |
| **security** 46:22 | 68:5,8 70:10 | **shut** 99:23 | **social** 13:3,23 | 141:21 145:14 |
| 90:1,2,10 | 71:5,17 151:10 | 104:16 | 14:6 15:1,3,7,8 | 146:1 153:9 |
| 95:10,21,23 | **sets** 52:9 | **side** 19:14,15,21 | 16:16,18,22 | **sort** 29:23 35:21 |
| 96:22,23,23 | **setting** 34:12 | 19:22 20:4,23 | 18:10 19:14 | 37:17 51:16,21 |
| 98:1 99:5,10 | **settle** 62:8 | 21:20,21 22:8 | 21:8 31:16 | 86:5 94:6 |
| 126:5 127:20 | **settlement** 62:11 | 22:15,21,24 | 33:5 35:10,15 | 103:6 105:24 |
| 129:3 | 62:21 63:11 | 23:12,13,17 | 35:24 40:14 | **sounds** 22:8 25:4 |
| **seduce** 68:1 | 64:10,12,15,16 | 29:14,14 30:8 | 46:1 56:8,9 | 42:16 50:23 |
| **seducing** 149:2 | 64:17 66:22 | 30:12 31:4 | 58:10,11,22 | 96:15,16 |
| **seductive** 67:22 | 109:11,20 | 53:15,16 97:5 | 59:5 60:1 | **South** 2:4 |
| 68:17 | 110:16,19 | **sign** 111:16 | 61:17,20,24 | **speak** 18:4 25:21 |
| **see** 8:14 44:23 | 111:3,13 | **signature** 154:5 | 74:9 75:1,4,7 | 54:7 64:13 |
| 55:23 75:10 | 114:10 115:10 | **signed** 62:15 | 75:14,21 78:6 | 70:19 73:11 |
| 87:11 95:15 | 115:11 | 66:23 67:6 | 78:8 79:7,19 | 97:24 98:3 |
| 107:16 108:15 | **severe** 150:10 | 68:19 111:16 | 82:22 91:19,24 | 125:19 |
| 108:18 123:8 | **sex** 84:4 89:11 | 112:4,10,14 | 98:18 99:20 | **speaking** 81:10 |
| 135:18 138:3 | 89:11 94:10 | **significantly** | 105:4 107:18 | 86:7 107:2 |
| 144:15 | **sexual** 68:15 | 64:12 129:9 | 134:7 145:4,11 | 115:20 134:24 |
| **seeing** 38:6 | 69:2,6,19,21 | **signing** 156:19 | 145:17 146:3 | **speaks** 64:21 |
| 122:15 | 71:20 77:11 | **simple** 120:10 | 146:10,15 | 113:14 115:7 |
| **seen** 42:11 86:4 | 78:8 81:16,19 | **sincerity** 100:1 | 148:9,21 151:6 | 116:3 |
| 87:4,17 121:20 | 81:22 82:2 | **sister** 38:13 42:1 | 151:9 | **specific** 25:16,19 |
| 127:6,8 | 84:19,24 85:4 | 56:12 59:19 | **socialize** 40:24 | 52:17 65:18 |
| **send** 136:10,16 | 86:1,5 88:4 | **sit** 58:6 | 43:9 55:22 | 102:5 104:6 |
| 137:1,8 154:12 | 103:7,10 | **sits** 152:4 | **somebody** 39:2 | 114:3 117:11 |
| **sense** 51:4 60:7 | 108:14 109:1,7 | **sitting** 98:1 | 45:5 60:2,8 | 119:1 127:10 |
| 142:19 | 127:5,8 128:10 | **situation** 48:11 | 89:19 91:21 | **specifically** 28:8 |

OWEN v. JAVED, et al.                                    No. 18 CV 334
DEPOSITION OF:  CHRISTY LENHARDT                         February 1, 2022

Page 17

28:20,23 29:1
29:3 85:18
123:6,16 127:1
128:4 140:7
141:2,22 142:7
**specifics** 25:3
28:15 38:20
**specified** 156:18
**speculate** 85:10
100:5 116:5
**speculation**
100:9
**spell** 6:9
**spoke** 46:24 47:3
126:1 133:24
**spoken** 41:9
56:1 59:21
60:10 146:21
**spot** 64:6
**spring** 127:17
**srandolphk@ ...**
2:15
**STA** 46:22,23
47:3,17 48:4,8
48:20 89:21
**staff** 114:20
121:5,8,15
127:14,18
**staffing** 39:9
**staffings** 31:18
38:1
**stage** 41:23
**stand** 31:12
**standard** 98:18
124:3
**standing** 90:9
**stands** 46:22
133:20
**start** 8:23 10:18
15:20 75:14
**started** 8:6 19:3
19:9,12 20:19
20:19 30:4
36:7 45:11
46:4 54:5,13

60:4 73:21
90:23 91:16
**starting** 67:15
68:11
**starts** 118:7
**STAs** 27:16
46:22 47:6,11
47:16 49:3,4,9
49:20 51:8
**state** 6:9 81:18
85:23 114:21
119:4 121:19
127:3
**stated** 13:24
70:5,6 79:3
82:4 85:18
95:8 142:9
156:21
**statement** 67:24
112:21 114:12
114:18 115:13
124:13,19
**statements**
68:21 118:20
124:11
**states** 1:1,18
114:12 124:7
155:1
**station** 21:23
89:16 94:18,19
95:5,21 98:2
**status** 149:19
**statuses** 18:17
**stay** 30:19 76:7
**STENOGRAP...**
7:14 54:6
66:12 73:8
110:13 154:10
154:14
**stenographica...**
156:13
**steps** 127:10
132:16
**Steve** 33:21 63:8
63:9 64:2,24

111:20 135:10
145:18,19
153:7,10
**Steven** 4:13,18
6:16 10:11,19
**stew** 101:8
**stilted** 110:8
**stipulate** 63:4,10
64:20 117:9
**stipulated** 66:1
66:21 112:7
126:23
**stipulating**
64:10 111:2
**stop** 45:12 72:8
72:15 88:14
132:17
**stopped** 73:20
**straight** 14:24
**streamline** 63:2
**Streamwood**
17:7,7,10,13
**Street** 3:4,15 4:4
**Stress** 17:16
**stretch** 60:16
**Strictly** 75:4
**Strike** 142:8
**strong** 25:4
**Stroud** 134:2
**Stuart** 2:11,15
6:23
**students** 16:19
**stuff** 20:13 22:10
52:14 58:7,14
59:7 99:6
**stupid** 137:15
**submitted** 39:21
**subscribe**
155:11
**Subscribed**
155:21
**subsequent**
114:16
**substance** 44:1
**sudden** 104:14

**suffice** 152:9
**suit** 12:8 25:4
**Suite** 2:5 4:15
**summarize** 76:3
**summarizing**
114:13 115:14
**summary**
115:15 145:22
**superiors** 118:23
**supervising**
54:19
**supervision** 57:6
**supervisor** 4:8
53:5,11 54:20
134:7 135:2
**supervisory** 58:8
**suppose** 39:1
99:19
**supposed** 98:10
98:23 104:16
129:22 149:20
**sure** 7:20 8:17
9:8,16 10:20
15:24 26:12
61:13 85:20
87:12 107:6
117:6,8,12,18
123:21 126:16
126:17 129:7
131:4 133:1,21
138:11 139:22
149:22
**surgery** 144:24
**suspect** 68:16
108:20
**suspected**
108:11,21,24
124:8 138:10
138:21 146:22
149:15 150:2
**suspended**
118:21
**suspicion** 68:14
**suspicions**
118:23

**suspicious**
127:21 132:14
141:18,19,22
141:24 142:10
**swear** 7:12
**swearing** 68:20
112:15
**switch** 58:15
**switched** 20:18
**switching** 23:20
**swore** 7:14
**sworn** 6:1,3
113:16,18
155:21 156:10

_____
          **T**
_____

**T** 5:10
**take** 8:15 9:5,6,9
10:13,21 13:12
22:18 35:4
60:21 63:17
66:14 67:2
86:9 93:19
95:4 110:22
111:4 124:6
126:15 128:21
132:24 135:15
140:8 147:8
**taken** 1:16,19
156:5,18
**takes** 13:17 37:1
**talk** 48:20 50:19
52:1,10,13
58:7,14 79:10
83:16,20,24
89:2 93:18,21
103:14,19
105:7,13 106:6
106:11 120:5
125:17 146:19
**talked** 42:18,19
75:5 84:1
86:17 101:1
104:5,19
107:16,21

Case: 1:17-cv-07909 Document #: 218-3 Filed: 09/15/22 Page 176 of 179 PageID #:2047

OWEN v. JAVED, et al.                                        No. 18 CV 334
DEPOSITION OF:  CHRISTY LENHARDT                      February 1, 2022

Page 18

123:15 146:18
150:2,22
**talking** 10:13,22
   10:23 30:7
   37:5 64:9 66:9
   83:23 94:2
   100:22 105:11
   117:22 141:1
   141:17 142:4
   144:1,4 151:2
**tall** 93:20
**team** 31:20
   37:20 38:14,15
   40:6 43:21
   50:3 52:3
   134:5
**teams** 42:22
**tell** 9:11,19 10:3
   24:8,18 37:5
   48:4,8 65:24
   83:21 87:15
   88:22 89:16
   100:12,14,19
   102:13 103:1
   104:7 105:19
   107:22 118:21
   128:9 129:23
   138:18 142:17
   142:18
**telling** 85:15
   144:8
**tenor** 84:14
**tension** 24:23
   55:17
**terms** 39:23 42:4
   56:17 76:18,20
   79:1 88:4
   123:21
**testified** 6:5
   147:16
**testify** 6:3 9:23
   100:9 156:10
**testifying** 148:2
**testimony** 71:2
   147:18 156:16

**text** 41:12
**texted** 41:10
**thank** 33:21
   35:9 131:6
   146:13 147:3
   154:14
**thanks** 66:15
**Thanksgiving**
   81:7
**theme** 50:12
**therapist** 31:23
   125:18
**therapist's** 27:8
**therapist-pati...**
   121:12
**therapy** 16:19
   46:22 127:20
**thing** 13:16
   46:10 57:12
   67:19 111:9
   137:14 142:13
**things** 25:1
   32:22 38:22
   39:5 40:13
   41:2 42:8
   52:11 83:24
   99:4 132:12
   150:7
**think** 21:10,23
   22:2 26:3,19
   27:11 29:8,11
   29:11,13 34:9
   46:20 48:7
   49:23 54:4
   55:16 57:18,20
   58:19 60:5,5
   60:13 63:9
   70:23 73:6,15
   73:17 81:24
   84:22 85:12
   98:17 99:24
   101:7 104:5,18
   105:9 106:10
   107:8 109:3
   114:3 116:12

117:3 130:4
131:17 133:15
138:20 144:6
146:2 150:17
**thinking** 49:17
   85:11 100:6
   132:13,15
**third** 135:20
**thought** 25:24
   28:17 79:8
   84:23 85:14,18
   85:24 88:3
   108:16,17
   109:7 128:9
   131:11
**three** 17:11
   23:10 27:9
   32:13,14 33:7
   74:16 89:7
   121:2
**Thursday**
   135:21
**time** 10:13,22
   12:3 14:12
   16:14 17:9
   28:1 32:24
   33:10 34:20
   36:4 37:4,10
   37:14 45:10,17
   45:23 46:19
   51:20 57:14
   59:10,11,15,16
   59:24 63:15
   72:24 77:10
   84:6 87:14
   88:6 89:15
   91:5 92:1 94:8
   94:9,11,13
   96:1,12 98:4
   99:16 103:10
   107:19 114:16
   114:17 117:2
   118:18 125:13
   127:17 128:8
   129:10,20

130:17 132:3
141:7 144:23
145:1,5 147:7
148:15 154:9
155:10 156:18
**timeline** 29:24
**times** 42:5 43:10
   83:15,20
   106:14 127:24
   128:7 141:2
   143:17,23
   146:20 150:1
**title** 19:13
   134:18
**today** 9:24 62:3
   115:18 119:16
   120:14,18
   123:15 124:15
   124:20 138:6
   138:14,19
   139:1,8,8,14
   139:19 147:16
   148:3 153:23
**told** 17:3 24:16
   25:8 28:10
   43:10 46:21
   47:7,10,20,22
   68:4 70:8
   71:19 83:17,17
   85:24 88:14
   89:5,6 94:21
   98:22 99:21
   100:1 101:1,22
   108:23 109:6
   118:18 119:9
   122:24 123:17
   123:18 127:23
   129:18,22
   132:3 141:16
**Tom** 45:13,13,20
**Tom-something**
   134:23
**top** 125:7
**topics** 39:7
**touch** 69:5

**track** 29:20
**trained** 36:23
**training** 130:24
**transaction**
   43:24
**transcript** 9:4
   154:8 155:10
   155:12 156:13
   156:20
**transfer** 23:15
   24:24 121:14
**transference**
   131:5
**transferred**
   23:12 24:5,10
   24:15 25:9,17
   25:20 27:12,23
   28:21 29:7,10
   30:1,13 90:17
   91:7,9 92:14
   145:5,7,10,24
**traumatic**
   132:11
**treated** 49:5
**treating** 51:12
   92:3
**treatment** 21:9
   21:11,16 31:17
   31:18,19,20
   32:1,8,9,16
   34:15,18 37:20
   37:21,24 38:14
   38:14 39:2,17
   39:19 40:6
   42:22 43:21
   50:3 51:10
   52:3 53:14
   56:19,20 75:22
   76:4,7 85:7
   103:2 123:21
   124:4
**trial** 31:12 80:17
**tried** 75:15
   81:15 89:14,22
   144:21

OWEN v. JAVED, et al.                                    No. 18 CV 334
DEPOSITION OF:  CHRISTY LENHARDT                  February 1, 2022

Page 19

triplets 52:8,9
trouble 71:1
  78:17,19,22
  89:9
true 62:5 68:21
  112:16 149:4,8
  149:19 151:16
  155:11 156:15
truth 6:4,4 9:20
  10:3 156:11
truthfully 9:24
  25:22
try 78:11 89:15
  127:10 132:16
  147:17,18
trying 45:12
  46:18 106:11
  134:15
turn 76:11 77:19
  87:12 97:2
  114:9
turned 129:4
twice 57:20
twins 52:8,9
two 10:13,22
  16:23,23 17:11
  18:22 22:11
  33:7 38:10
  40:3 42:22
  52:9,18 55:19
  68:23 81:17
  89:6 94:9 98:6
  103:6 106:14
  106:16 116:21
  123:14 124:14
  124:22 141:9
  144:4 147:9
type 36:5 57:12
types 33:13,24
  38:22
typewriting
  156:14
typical 93:22
typically 32:21
  34:4,18,24

35:4,16 36:11
38:5 50:8 86:7

_____

**U**

uh-huh 13:8,11
  15:11,14 30:22
  33:15 36:18
  41:6 56:13
  59:12 79:15
  92:11 106:2
uh-huhs 8:19
UIC 13:7,20
  14:16
ultimately
  128:19 129:11
unable 126:14
unavailable
  42:17
unbeknownst
  99:22 108:19
uncomfortable
  67:23 70:6
  71:7 72:2
uncommon
  98:17
undergrad
  14:16,20
undergraduate
  14:23
understand 9:10
  9:18 16:14
  19:10 25:2
  29:18 32:21
  56:10 110:5
  129:15 132:10
  134:5 146:13
  148:13
understanding
  69:24 70:2,14
  71:5,10,16
  113:22
understood 9:13
  41:7 42:23
  85:20 88:18
  112:14 130:11

148:19 149:6
undocumented
  114:14 115:2
  115:15
unfair 47:15
unfit 31:12
union 129:18,18
  133:12,14,24
unit 4:8 20:10
  20:22 21:3,3
  22:23 23:4,9
  23:24 24:2,3
  25:1 27:24,24
  29:10 30:2,8
  30:18,21 31:2
  31:3,6 32:24
  33:2,6 35:16
  37:4,6,11,12
  37:14 38:3
  41:6 42:1,1,7
  44:12,13,22
  45:17 46:1
  51:7 52:6 54:4
  54:5,13,15,16
  55:1 56:8,10
  59:11,14 60:4
  68:8 72:13
  74:20 75:3,15
  88:17 90:14
  91:9,19 92:2,7
  92:20 96:14
  97:5 101:2,12
  101:14,17,23
  105:4,5 121:7
  121:8,9,14,15
  121:16,21,24
  122:13,20,24
  123:5,7,11,19
  129:16,16
  134:6 135:1
  143:24 144:3,9
United 1:1,18
  155:1
units 21:18 22:7
  22:11,22 38:10

38:13 53:12,20
  53:22,24 54:1
  54:10,12 56:12
  59:19 96:20
  97:1,1
University 13:6
  14:5
unlocked 36:15
  98:11
unlocking 95:16
  95:17
unreported
  129:9
unsure 9:15
unusual 92:24
  93:4 99:9
Updated 32:11
updates 39:1,3
upset 49:15
use 8:18 26:20
  26:21 63:20
  115:11 116:4
  131:1 136:5
UST 53:22 54:1
  54:9 97:1
USTs 54:1,10
usual 153:18
usually 89:2
  110:1

_____

**V**

vacation 42:6,16
valuable 12:5
value 80:3
various 11:8
  18:15 127:19
  150:1
vendetta 50:14
  130:20
verbal 8:18
verbally 13:11
  46:13
versus 34:11
vibes 138:15
vicinity 38:8

videoconference
  156:6
viewpoints
  85:12
Village 12:24
visited 121:16
  122:19
visits 121:13,17
  123:4
voluntarily 20:5
vs 1:6,11 155:6

_____

**W**

W 20:19,20,22
  21:3 54:5,13
W-H-I-T-T-M...
  21:5
W-U-E-S-T-E
  104:24
wait 8:21 10:24
  23:6 54:5
  141:21
waiver 63:12
walk 96:24
  123:8
walked 35:23
  87:23 97:17
  145:12 146:7
walking 96:14
  97:10 103:22
  103:23
walks 152:4
wall 36:2,5
want 6:12 7:19
  10:15,20 28:16
  29:23 45:8
  60:15 63:15
  64:8,23 65:4,8
  65:18,22 66:12
  67:2 68:5,13
  68:16 70:9
  78:2 80:17
  81:7,18 90:22
  101:14 107:5
  108:6 112:23

OWEN v. JAVED, et al.

DEPOSITION OF: CHRISTY LENHARDT

No. 18 CV 334

February 1, 2022

Page 20

| | | | | |
|---|---|---|---|---|
| 119:24 124:6 | 60:21,22 65:6 | 21:4 22:7 | 39:24 40:2,14 | 59:19 61:7 |
| 127:13,15 | 66:4 116:9 | **willing** 63:10 | 41:4,11,22 | 104:12 122:10 |
| 132:23 143:15 | 117:8,11 | **Wilmette** 2:13 | 43:8,16 51:22 | 144:23 |
| 149:22 150:13 | 133:21 154:6 | **window** 36:2 | 53:8 55:23 | **workload** |
| 150:16 | we're 8:5,16 | 86:14,17,22,23 | 56:17 58:1 | 122:16 |
| **wanted** 24:23,24 | 10:23 11:15 | 87:12,13 152:3 | 59:1 81:4 | **workplace** 51:4 |
| 26:12 49:8,8 | 19:10 29:19 | **wish** 17:3 | 82:18 89:7 | **works** 24:22 |
| 78:5 91:10 | 30:7 36:23 | **witness** 4:19 5:3 | 96:19 98:13 | **worried** 102:14 |
| 97:24 98:7 | 62:3 63:21 | 6:1 7:13 10:14 | 104:2,8 110:3 | 104:20 105:12 |
| 103:1 153:11 | 64:9 66:1 | 11:3 13:14 | 133:3 151:9 | **worry** 101:8 |
| 153:16 | 83:23 110:5 | 15:15 18:5 | **work-related** | 133:21 |
| **wanting** 28:12 | 115:17 116:24 | 26:9,22 33:17 | 41:3 | **wouldn't** 60:7 |
| 89:11 | 117:7 131:23 | 36:20 40:21 | **worked** 16:10 | 96:13 97:9 |
| **warning** 88:1 | 135:6 | 54:8 60:19,24 | 17:1,1,16 | 126:24 131:20 |
| 107:13 142:14 | we've 39:4 50:5 | 64:5,18 71:4 | 18:14 19:4 | 132:17 |
| 142:15 | 60:14 75:5 | 73:10 77:23 | 38:7 44:6 52:4 | **write** 136:7,17 |
| **warnings** 118:22 | 119:15 120:17 | 79:17 81:3 | 58:5 90:3 | **writing** 32:19 |
| **wasn't** 44:24,24 | 124:15 131:22 | 86:20 113:15 | 105:4 106:7 | 135:19 |
| 48:18 58:10,11 | 138:18 139:13 | 117:14,19 | 134:5 | **written** 137:22 |
| 60:3 70:23,23 | 139:18 146:20 | 120:5,11 | **worker** 15:4,7,8 | 145:22 146:12 |
| 72:12,12 78:15 | **Weddings** 81:6 | 132:21 137:6 | 16:18 18:10 | **wrong** 37:5 89:4 |
| 93:12 98:10,23 | **week** 40:15 | 137:10 147:4 | 19:14 35:24 | 108:17 118:3 |
| 102:10 104:12 | 51:18 75:19 | 153:8 156:9,10 | 46:1 56:8,9 | **wrote** 21:8 32:6 |
| 104:16 122:8 | 76:10 101:6,6 | 156:20 | 58:10 60:1 | 32:15 49:11 |
| 122:10 131:12 | **weekend** 101:8 | **witnessed** 95:16 | 61:17,20,24 | 135:23 136:20 |
| 144:10,13 | **weekly** 34:14,15 | **woman** 21:19 | 74:9 75:1,4,7 | 137:12,24 |
| 151:13 | 35:12,12 76:12 | 52:4,5 71:8,12 | 78:7,8 91:19 | 138:1 |
| **watch** 47:7 | **weird** 104:4 | 152:10,16 | 91:24 99:20 | **Wueste** 104:22 |
| **watching** 107:11 | **welcome** 147:4 | **women** 21:21,23 | 105:4 107:18 | 104:23 |
| 107:14,23 | **welcomed** 75:15 | 23:5 54:15 | 134:7 145:4,11 | |
| 118:17 141:18 | **went** 12:2 14:24 | **women's** 54:4 | 146:3,10,16 | _____ |
| **water** 60:17,20 | 17:15 18:17 | **word** 26:20,21 | 148:21 151:6 | **X** |
| **Waukegan** 15:9 | 29:14 31:17 | 26:22 27:1 | **worker's** 79:7 | **X** 5:1,10 |
| 15:19 | 49:13 55:6 | 55:16 70:23 | 79:20 | |
| **way** 24:22 49:5 | 59:2,3,6 78:7 | 131:1 | **worker-patient** | _____ |
| 54:18 59:9 | 83:17 86:17 | **word-for-word** | 82:23 148:9 | **Y** |
| 64:4 77:17 | 89:4,12 92:6 | 111:9 | **workers** 33:5 | **yeah** 11:18,19 |
| 93:14 103:4 | 104:14 108:3,5 | **words** 149:16 | 35:11,16 58:11 | 19:8 23:6,21 |
| 110:8 130:8 | 110:11 123:7 | **work** 12:10 13:3 | 58:22 59:5 | 23:23 26:2 |
| 131:14,18 | 128:7 143:13 | 13:23 14:7 | 98:18 145:17 | 28:11,22 29:16 |
| 135:20 142:21 | 143:24,24 | 15:1 16:15,16 | **working** 12:7 | 30:15 35:8 |
| 143:18 | 144:3 | 16:22 17:14,16 | 21:2 29:19 | 42:18 53:23 |
| **ways** 77:5,6 | **weren't** 95:9 | 17:23 18:7 | 33:6,9 37:17 | 58:3,16 65:5 |
| 110:7 | **West** 3:4,15 4:4 | 22:9 23:18,19 | 39:23 43:1 | 65:23 71:3 |
| **we'll** 12:13 | **Whittman** 21:4 | 29:24 37:6,8 | 46:2 56:15 | 80:9 85:16 |
| | | | | 86:16,16 94:1 |
| | | | | 99:19 100:20 |

OWEN v. JAVED, et al.                                    No. 18 CV 334
DEPOSITION OF:  CHRISTY LENHARDT                   February 1, 2022

Page 21

| | | | |
|---|---|---|---|
| 103:24 104:20 | **13** 66:4 | 157:5 | 4:17 |
| 118:1 130:22 | **135** 5:14 | **21** 22:1 | **847)853-8106** |
| 131:16 137:7 | **13th** 3:5,16 4:5 | **213** 4:15 | 2:14 |
| 147:12 148:4 | **140** 5:6 | **23** 125:7,10 | **87** 14:11 |
| 148:15 153:13 | **147** 5:7 | **24** 38:16,18 | |
| 154:2 | **15:30** 135:21 | **25** 33:2 | **9** |
| **year** 16:7 74:16 | **154** 155:11 | **27** 126:18 127:1 | **9** 67:15 |
| **years** 16:4,23 | **15th** 157:5 | **28** 127:16 | **9:15** 1:21 156:6 |
| 17:11,12 18:22 | **17** 135:21 136:1 | | |
| 19:5 22:16 | 136:24 137:23 | **3** | |
| 23:10 24:1 | **18** 2:4 22:2,2 | **3** 5:15 110:18,20 | |
| 30:3,6,11 | 119:3,5 | 114:9 | |
| **yeses** 8:18 | **18-cv-334** 1:6 | **3:00** 96:4,6 | |
| **young** 48:19 | 155:6 | **3:30** 96:5 | |
| | **1986** 14:23 | **30** 16:3 33:2 | |
| **Z** | **1987** 13:21 | **31** 128:16,18 | |
| **Zoom** 1:20 | 14:17 15:4,22 | **312)235-6752** | |
| **Zuwanski** 45:9 | **1989** 16:13 | 2:7 | |
| | **1990** 16:13 18:2 | **312)814-4417** | |
| **0** | **1994** 18:3 | 3:7 | |
| **084-001169** | **1997** 19:7,10 | **312)814-6131** | |
| 157:10 | 30:3 | 4:7 | |
| | **1st** 1:20 | **312)814-6534** | |
| **1** | | 3:18 | |
| **1** 5:13 62:12,21 | **2** | | |
| 64:13,16 67:12 | **2** 5:14 135:7,9 | **4** | |
| 114:11,16 | **2:30** 135:22 | **4** 5:16 111:20,22 | |
| 155:11 156:7 | **20** 19:4 | 118:2 140:13 | |
| **10** 68:11,12,13 | **20-something** | **4:00** 96:4 144:21 | |
| 116:22 117:9 | 16:4 | | |
| 117:13,21,22 | **200** 2:5 | **5** | |
| 117:24 118:7 | **2005** 22:18,20 | **5/1/1964** 12:21 | |
| 118:13 119:13 | 29:11,12,13 | **50/50** 34:16 | |
| 140:18,21 | **2009** 24:1 29:9 | | |
| **10:33** 61:3 | 29:17 30:16 | **6** | |
| **100** 3:4,15 4:4 | **2014** 74:18 | **6** 5:5 | |
| **1095** 4:14 | 114:16 | **60014** 4:16 | |
| **11** 33:11 66:3,7 | **2016** 135:21 | **60068** 2:6 | |
| 121:2 125:8 | 136:2 137:23 | **60091** 2:13 | |
| **110** 5:15 | **2017** 19:5 41:8 | **60601** 3:6,17 4:6 | |
| **111** 5:16 | 74:17 127:17 | **67** 5:13 | |
| **12** 124:7,14 | **2020** 109:19 | | |
| **12:05** 133:1,2 | 110:15 | **7** | |
| **12:30** 147:7 | **2022** 1:21 | | |
| **12:40** 154:16 | 155:22 156:7 | **8** | |
| | | **815)374-7783** | |