# **EXHIBIT E**

```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                      EASTERN DIVISION

 3

 4      BENAHDAM HURT,                    )
                                         )
 5                   Plaintiff,          )
                                         )
 6           -vs-                        )  No. 17-cv-7909
                                         )
 7      HASINA JAVED, FAIZA              )
        KAREEMI, COLLEEN DELANEY,        )
 8      DIANA HOGAN & DREW BECK,         )
                                         )
 9                   Defendants.         )
        _____      )
10      MARK OWENS,                      )
                                         )
11                   Plaintiff,          )
                                         )
12           -vs-                        )  No. 18-cv-0334
                                         )
13      HASINA JAVED,                    )
                                         )
14                   Defendant.          )

15

16

17              The deposition of COLLEEN McBEAN-DELANEY,

18      taken before STACEY L. PARR, C.S.R., taken through

19      Zoom video conferencing, taken pursuant to the

20      Federal Rules of Civil Procedure of the United States

21      District Courts pertaining to the taking of

22      depositions for the purpose of discovery, at 10:02

23      a.m., on the 29th day of June, 2022.

24
```

```
 1        PRESENT (via Zoom):

 2

 3              KRETCHMAR & CECALA, PC
          BY:  MR. JOSEPH JOHN CECALA
                  18 South Northwest Highway
 4                Suite 200
                  Park Ridge, Illinois 60068
 5                (312) 235-6752
                  joe@kretchmarcecalalaw.com
 6
                  on behalf of the Plaintiffs;
 7
                KRETCHMAR & CECALA, PC
 8          BY:  MR. S. RANDOLPH KRETCHMAR
                  1170 Michigan Avenue
 9                Wilmette, Illinois 60091
                  (847) 370-5410
10                srandolphk@gmail.com

11                on behalf of the Plaintiffs;

12              KWAME RAOUL, ATTORNEY GENERAL
                OF THE STATE OF ILLINOIS
13          BY:  MS. MARY JOHNSTON
                  100 West Randolph Street
14                13th Floor
                  Chicago, Illinois 60601
15                (312) 814-3739
                  mary.johnston@ilag.gov
16
                  on behalf of the Defendants Hasina Javed,
17                Faiza Kareemi, Colleen Delaney and Diana
                  Hogan in Case No. 17-cv-7909, and
18                Defendant Dr. Hasina Javed in Case
                  No. 18-cv-0334.
19

20        Also present:  Mr. Rory Cannon
                          Illinois Department of Human Services
21
                          Mr. Sean Gunderson
22                        Kretchmar & Cecala

23
          Reported By:  Stacey L. Parr, CSR
24                       License No. 084-004502
```

```
 1                    DEPOSITION OF
               COLLEEN McBEAN-DELANEY
 2                 taken 6-29-2022

 3
       EXAMINATION BY                      PAGE
 4
 5     Mr. Kretchmar:                   5, 21, 23
                                     220, 222, 227
 6
 7     Mr. Cecala:                     20, 22, 25
                                     221, 223, 228
 8
 9
                          EXHIBITS
10                      (Attached)

11                                          PAGE
12     Exhibit Number 1                       11
13
       Exhibit Number 2                       32
14
15     Exhibit Number 3                       44
16
       Exhibit Number 4                       65
17
18     Exhibit Number 5                       89
19
       Exhibit Number 6                      103
20
21     Exhibit Number 7                      133
22
       Exhibit Number 8                      204
23
24                    *   *   *   *   *
```

LISA A. KOTRBA & ASSOCIATES, LTD.   (312) 855-1834

1          THE REPORTER:  Before we proceed, I will ask

2     counsel to agree on the record that under the current

3     National Emergency pursuant to Section 319 of the

4     Public Health Service Act, there is no objection to

5     this officer administering a binding oath to the

6     witness remotely.

7               Please state your agreement on the

8     record.

9          MR. KRETCHMAR:  Yes.  Randolph Kretchmar for

10    the plaintiffs, Ben Hurt and Mark Owens, no -- no

11    problem.  I agree.

12         MR. CECALA:  Joseph Cecala for both

13    plaintiffs, Hurt and Owens, no objection.

14         MS. JOHNSTON:  Mary Johnston on behalf of

15    defendants Javed, Kareemi, Delaney and Hogan in Hurt,

16    and defendant Javed in Owens, no objection

17         MR. CANNON:  I'm just observing, but I don't

18    object.

19               COLLEEN McBEAN-DELANEY,

20    called as a witness herein, having been first duly

21    sworn, was examined upon oral interrogatories and

22    testified though Zoom as follows:

23

24

```
 1                       EXAMINATION
 2    BY MR. KRETCHMAR:
 3        Q.  Ms. Delaney, I'll start off.  Just -- I don't
 4    know.  Have you ever been in a deposition before?
 5        A.  I have.  Last week, actually, was my first
 6    experience, so...
 7        Q.  Okay.  Well, fair enough.  Just some ground
 8    rules.  Basically don't talk over other people.
 9    It's -- it's very easy to do that, and it screws up
10    the court reporter's ability to get an accurate
11    transcript.  So if somebody's objecting, wait until
12    they're done; if somebody's asking a question,
13    wait -- wait until the full question is asked.
14                    You have to -- you have to say yes
15    and no as opposed to nodding or -- or shaking your
16    head because she can't necessarily catch the nod.  It
17    has to be verbal.
18                    And if there are any questions, any
19    clarification that's needed, you know, we're happy to
20    restate questions or -- or explain or -- or whatever.
21    If you don't understand something, don't -- don't
22    hesitate to say so.
23                    Lastly, if you need a break or you
24    want a break, just ask; however, on any breaks
```

1   don't -- don't be on a phone call with anybody other

2   than your attorney.

3       A.  Okay.

4       Q.  Can you please state and spell your name for

5   the record?

6       A.  Colleen McBean-Delaney.  C-o-l-l-e-e-n, last

7   name is M-c-B-e-a-n, hyphen, D-e-l-a-n-e-y.

8       Q.  Are you taking any medications that might

9   make it difficult for you to recall or answer

10  truthfully and accurately in this deposition?

11      A.  No.

12      Q.  Now, I presume -- correct me if I'm wrong --

13  are you aware or at least initially or somewhat

14  familiar with this lawsuit in which you are a

15  defendant?

16      A.  Yes.

17      Q.  You understand the allegations against you

18  and against the other defendants?

19      A.  Yes.

20      Q.  Can you please summarize your education and

21  your professional qualifications to work in a state

22  forensic psychiatric hospital?

23      A.  My educational background is I have a

24  bachelor's of science in nursing, and I have been

1          employed here for 28 years in August.

2              Q.  Are you a registered nurse?

3              A.  Oh, yeah, sorry.  Yeah, I'm a -- I have a

4          nursing license in the state of Illinois.

5              Q.  How long have you had a license?

6              A.  Since 2003.

7              Q.  Okay.  So you say 28 years.  That takes us

8          back to, what, 1994 is when you started?

9              A.  Correct.

10             Q.  Okay.

11             A.  Correct.

12             Q.  Can you outline the sequence of jobs or

13         positions that you held from 1994 until today and as

14         best you can recall the dates in which that, you

15         know, changed?

16             A.  Yes.  So in 1994 I was hired as a mental

17         health tech trainee and then I went through the

18         mental health tech series and then, I want to say, it

19         was either late of 1999 or 2000, early 2000, my job

20         title changed to STA, security therapy aide.

21             Q.  Just out of curiosity, by the way.  I'm sorry

22         to interrupt.  I know you were going to go on, but I

23         think to myself, okay, why do you change from ST --

24         or from mental health tech to STA?

1    A.  Well, I -- I didn't.  I didn't -- my job

2    didn't change.  It was more a contractual change at

3    the time that the union had negotiated.  So it had

4    more to do with the location of my title.  So I

5    didn't move positions, I didn't move shifts or units

6    or anything.  Essentially my job title just changed.

7    Q.  Oh, okay.  Mental health tech to STA was more

8    or less the same job?

9    A.  Yes.

10   Q.  Okay.  Fair enough.

11   A.  Yeah.

12   Q.  Hang on.

13        MR. CECALA:  Sorry.  I'm just not clear.

14            So is that something that the state

15   did, changing the designation of a mental health tech

16   to an STA at that time?

17        THE WITNESS:  Yes, because I -- at the time

18   I worked in the forensic treatment program, so the

19   mental health tech series became the security therapy

20   aide series if you were assigned in the forensic

21   building.

22   BY MR. KRETCHMAR:

23   Q.  Okay.  Great.  Continue then.  What --

24   what was the next development after that?

1    A. Then in 2003 I became an RN 1, registered

2  nurse 1, 2000 -- that was 2003, and then in 2011-ish

3  I became a nurse manager, and then in 2015, I believe

4  it was 2015, I became the associate director of

5  nursing for the forensic treatment program, and then

6  in 2019 I became the interim director of nursing.

7    Q. When were you the nurse manager on -- on

8  L-Unit?

9    A. That was my first assignment, so that would

10  have been 2011.

11    Q. And how long were you nurse manager there?

12    A. Actually, I apologize. It may have been till

13  2014. So probably three years.

14    Q. Were you nurse manager on a different unit

15  after L before you became associate director of

16  nursing?

17    A. Well, I did -- at -- there was a period of

18  time I managed two units, Hartman and K and L, so I

19  can't recall the -- the exact period of time, but I

20  did do both units.

21    Q. Okay. Maybe 2014 to 2015, something like

22  that?

23    A. I'd have to go back and look. I -- I

24  honestly can't recall. It was -- it was actually

1    earlier in my -- when I was a nurse manager.  It was

2    in the beginning, so it may have even been 2012.

3         Q.  Okay.  Was there -- was there anything in

4    between nurse manager on L-Unit and associate

5    director of nursing?

6         A.  Anything?  No.

7         Q.  Okay.  In other words, you went -- you went

8    directly from being the nurse manager on L-Unit to

9    being the associate director of nursing for the

10   forensic treatment program?

11        A.  I believe so.  Again, I'm kind of foggy on

12   when the Hartman piece came in, but, yes, I believe I

13   left K and L -- I'm sorry.  It's K and L.  It was

14   both modules.

15        Q.  Right, right.

16        A.  I believe I was assigned to K and L and then

17   went to associate director, but there is an interim

18   period where I was also temporarily assigned as the

19   ADON prior to getting the position full-time.

20        Q.  Okay.

21        A.  That's why I'm saying it may have been 2014

22   when I was TA'd -- excuse me.  Sorry.  I'm using

23   initials.  Temporarily assigned.  And then 2015 is

24   when I -- I believe I got the position permanently.

```
 1        Q.  This ADON?

 2        A.  Correct.

 3        Q.  I want to practice using these initials.

 4        A.  I know.  We have a lot of them.

 5        Q.  I understand.

 6           (Deposition Exhibit Number 1 was marked for

 7            identification.)

 8   BY MR. KRETCHMAR:

 9        Q.  I'd like you to take a look at Exhibit 1

10   or -- or -- Joe or Mary, somebody's going to bring

11   this up.

12             MR. CECALA:  I'm going to try my best.

13             MR. KRETCHMAR:  Yeah.  There we go.

14   BY MR. KRETCHMAR:

15        Q.  This is entitled transcript of Colleen

16   McBain-Delaney, interview on the 9th of November

17   2017.

18             MR. CECALA:  Give me one second to just --

19   I'm going to try this.  My computer is just a little

20   bit slow, so give me one second.

21   BY MR. KRETCHMAR:

22        Q.  Well, while Joe is playing with this, I -- I

23   just want to ask you do you recall being questioned

24   by the Illinois State Police on November 9, 2017?
```

1          A.  Yes.

2          Q.  Were you thinking?  It sounded like you were

3     a little hesitant.

4          A.  I -- I have a recollection of meeting with

5     the State Police in our FTP building, and I -- I

6     don't recall any other situation that I would have

7     met with them, so I'm assuming that's the instance.

8          Q.  Okay.  Fair enough.  When you met with the

9     police and they questioned you, were you truthful

10    with them when you answered their questions?

11         A.  I hope I was.  I would -- I don't -- I can't

12    think of any reason I wouldn't have been.

13         Q.  Good.  Do you understand that when the police

14    ask you questions, you have to tell them the truth,

15    right?

16         A.  Yes.

17         Q.  And you -- you were generally familiar with

18    that concept at the time when you met with them?

19         A.  Yes.

20         Q.  Okay.  I'll take that.

21                   Can we go to page 3?  There we go.

22    Line 11 --

23              MR. CECALA:  Let me -- let me just ask.

24    Colleen, can you see this?

```
1            THE WITNESS:  Yeah.  Yeah, sorry.

2            MR. CECALA:  If I shrink it a little bit

3     more, can you see it?

4            THE WITNESS:  Yes.

5            MR. CECALA:  Is that too small?

6            THE WITNESS:  Yes.

7            MR. CECALA:  It's too small?

8            THE WITNESS:  Right there is too small.

9     Sorry.

10            MR. CECALA:  That's okay.

11            THE WITNESS:  Right there is good.

12            MR. CECALA:  Okay.  Great.

13     BY MR. KRETCHMAR:

14       Q.  Okay.  On line 11 -- they had asked you how

15     long have you been associate director of nursing, and

16     you answered -- this is actually line 8.  Line 9 you

17     say, "This is so terrible.  I forget.  I think two

18     years."  "Since 2015?"  "Yes."  And you were

19     temporarily assigned, then became permanent.

20                That's consistent with what you

21     stated a minute ago.

22                The temporary assignment is what is

23     confusing your memory, I presume; is that correct?

24       A.  Yes, because -- well, yes.
```

```
 1                    MR. CECALA:  Give us one second.

 2              (Pause.)

 3      BY MR. KRETCHMAR:

 4         Q.  Colleen, could you tell me what were your

 5      responsibilities as associate director of nursing in

 6      the forensic treatment program?

 7         A.  Supervise the areas that were assigned to me

 8      as far as specific nursing units -- oh, there it is

 9      right there.  I oversee the nursing department for

10      the forensic program.

11         Q.  Okay.  So that's the whole forensic program,

12      in other words?  All of the -- the UST and NGRI

13      units?

14         A.  Yes.

15         Q.  And when you say the areas assigned to you,

16      did you supervise only nurses or did you supervise

17      STAs or social workers?  Who actually was under your

18      supervision?

19         A.  Nurses, STAs, support service workers.  I see

20      in this transcript it says sport service workers, but

21      it's support, which means essentially housekeeping.

22         Q.  Oh, I see.  I see.  You're talking about on

23      line --

24         A.  21.
```

```
 1            Q.  Yeah, yeah.  That should have been support
 2       rather than sport?
 3            A.  Correct.
 4            Q.  Now, what about activity therapists?
 5            A.  No.
 6            Q.  Those -- activity therapists were not under
 7       your supervision?
 8            A.  No.
 9            Q.  Who supervised the ATs?
10            A.  At that time or now?
11            Q.  Both.
12            A.  20 -- you know, I don't -- it may have been
13       Allan Snyder at that time.
14            Q.  And what was his position?
15            A.  I think they had him -- director of rehab
16       services may have been his title.
17            Q.  Okay.  And in present time, is it also a
18       director of rehab services who supervises activity
19       therapists?
20            A.  Yeah, yes.
21            Q.  Okay.  Who would that be now?
22            A.  Heidi Weisman.
23            Q.  So STAs, in any event, reported directly to
24       you when you were associate director of nursing,
```

1  correct?

2      A.  No, STAs reported directly to the -- the

3  nurse manager and the nurse managers reported

4  directly to me.

5      Q.  Okay.  Indirectly.  I understand.  The nurse

6  manager was a different person on each unit or maybe

7  a couple units, as you were at one point, right?

8      A.  Correct.

9      Q.  Okay.  And whom did you report to when you

10  were associate director of nursing?

11      A.  The director of nursing, Diana Hogan.

12      Q.  Okay.  Then you became director of nursing;

13  is that correct?

14      A.  Interim.  Again, this -- this is that weird

15  TA situation.  So -- sorry.  That's actually my work

16  phone.  My -- when Diana Hogan retired, I was

17  selected to be in the position until it was filled.

18      Q.  Was it filled by someone else or was it

19  filled by you eventually?

20      A.  It actually has currently been filled by

21  someone else.

22      Q.  So -- so were you -- but you were director of

23  nursing at some point, right?

24      A.  Yes, I have been since -- I did a TA -- let

LISA A. KOTRBA & ASSOCIATES, LTD.  (312) 855-1834

1    me use TA.  I was temporarily assigned as interim

2    director of nursing from March of 2019, and this I

3    remember because it was very specific, until October

4    of 2019, and then again in January of 2020 and

5    actually my interim ends as of Thursday.  So almost

6    three years.

7        Q.  When you were associate director of nursing

8    for the forensic treatment program and when you were

9    either temporarily assigned or acting or officially

10   the director of nursing, in those two positions,

11   however qualified, associate director of nursing,

12   director of nursing, were you a member of the

13   administration at Elgin Mental Health Center?

14       A.  Yes.

15       Q.  Okay.  Now I want to go to page --

16           MR. CECALA:  One second.

17           MR. KRETCHMAR:  Hang on.  Hang on.

18           MS. JOHNSTON:  Randy, while you're looking

19   at that, and I apologize here, Stacey, could you just

20   read back the last question and answer?  I apologize.

21   My audio went out for a minute.

22          (Record read back as requested.)

23   BY MR. KRETCHMAR:

24       Q.  I'm going to tell you the next question and

1      then we're going to look at the transcript.

2                     During your Illinois State Police

3      interview, you told them that you had learned about

4      the situation with Ben Hurt and Christy Lenhardt

5      because you were in leadership.  Do you recall that?

6      We're looking at page 4, lines 5 through 8.

7                     Let's see.  I'd like you to actually

8      read your answer out loud, lines 7 -- 7 to 11.

9          A.   Okay.  Answer:  "I was aware, because I'm in

10     leadership, that -- so there were discussions that

11     Mr. Hurt had, I think, numerous flash drives or

12     computer paraphernalia, and that there was

13     potentially some evidence of him and a staff member

14     having an inappropriate relationship."

15         Q.   Thank you.

16             MR. CECALA:  I just want to make sure the

17     record is clear.  So the police asked you in line 5,

18     "What was your understanding -- what did you hear

19     prior to it going on all over the news?"  Referring

20     to Ben and Christy's situation.  And that -- you just

21     read the answer you gave the police.

22     BY MR. KRETCHMAR:

23         Q.   Does that -- does that sound consistent with

24     your recollection of that interview?

1      A.  I don't recall specifics of that interview,

2   but...

3      Q.  It doesn't sound inconsistent with any

4   recollection, though.  Is that safe to say?

5      A.  Correct.

6      Q.  Okay.  You were attending administrative

7   meetings at the time, right?

8                  Again, we're looking at page 4 here,

9   and this is all the way from line 1 through line 20,

10   I think, is relevant.  Feel free to refer to that.

11      A.  Okay.

12          MR. CECALA:  Hold on one second.

13        (Pause.)

14   BY MR. KRETCHMAR:

15      Q.  So the question is is it correct that you

16   were attending administrative meetings at the time?

17      A.  Correct.  And as I'm reading this in No. 7

18   where it says because I'm in leadership and looking

19   at the context, I meant leadership -- we called our

20   morning meetings a leadership meeting.

21      Q.  Good.

22          MR. CECALA:  Can I help clarify that?

23

24

```
 1                        EXAMINATION

 2    BY MR. CECALA:

 3         Q.  So -- but -- the leadership meeting, you mean

 4    the administrative leadership, right?

 5         A.  Well -- administrative leadership.  It was --

 6    the -- the meeting -- like all the department heads

 7    met in the morning meeting.

 8         Q.  Right.  So -- because there's -- there's

 9    other morning meetings that are the --

10              MR. KRETCHMAR:  On the unit.

11    BY MR. CECALA:

12         Q.  -- on the unit that are treatment teams,

13    correct?

14         A.  Correct.

15         Q.  So on lines 16 and 17 the police ask you,

16    "And you said that was for like directors and like

17    command meeting, if you will?"  And you said, "Yeah,

18    administrative."  Question:  "Administrative

19    meeting?"  And you say "Yeah."

20                   So the meeting we're wanting to

21    differentiate here is this wasn't a meeting of the

22    treatment team with the social workers and the

23    psychiatrists and the psychologists and the patients.

24    This is a different meeting, right?  It's -- you're
```

 1      calling it -- I don't know the exact term you used,

 2      but...

 3              MR. KRETCHMAR:  Leadership or

 4      administrative.

 5      BY MR. CECALA:

 6          Q.  The administrators are -- they have a

 7      separate meeting than the -- than the unit meetings,

 8      correct?

 9          A.  Correct.

10              MR. CECALA:  Okay.

11                      EXAMINATION

12      BY MR. KRETCHMAR:

13          Q.  Can you -- can you recall who else was in

14      these meetings?  You gave a few examples, the head of

15      departments, but, for example, how about head of

16      security, Bill Epperson?

17          A.  Yeah, the chief was in -- and, I'm sorry,

18      this was 2017?

19          Q.  Yes.

20          A.  Are you asking names or just like titles

21      who -- who would be?

22              MR. CECALA:  Wait.  Wait.  One second.

23          (Pause.)

24

```
1     BY MR. KRETCHMAR:

2         Q.  During what time periods were you

3     "administration"?

4         A.  Well, I don't -- I don't know.  I -- I don't

5     know if we would consider the associate directors of

6     nursing administration, so -- I could clearly state

7     that I was part of administration from March of 2019

8     until current.

9                         EXAMINATION

10    BY MR. CECALA:

11        Q.  So when you were answering these particular

12    questions here, you were a participant, though, in

13    leadership meetings, right?

14        A.  Correct.

15        Q.  Okay.  So the time period for these questions

16    is during, let's just make -- I'll give you a window,

17    from, say, January of 2017 until August of 2017.

18    Those are the administrative meetings you were

19    talking about here and that's -- appears to be what

20    you were telling the police, right?

21        A.  I'm sorry?

22        Q.  So the time period, you were -- you were

23    asking about it, and we want to clear up the time

24    period.  So from January of 2017 until August of 2017
```

1     you were in administrative meetings, right?

2          A.  Correct.

3          Q.  Okay.  So that's the time frame we're talking

4     about, and he was asking now who else was part of

5     that.

6               MR. CECALA:  So go ahead, Randy.

7                         EXAMINATION

8     BY MR. KRETCHMAR:

9          Q.  Yeah.  We got chief of security was part of

10    it.  Who else was in those administrative meetings?

11         A.  It was usually -- I mean, you know, give or

12    take on any specific date, some people weren't

13    present, but it was usually the HA, so the hospital

14    administrator, the medical --

15         Q.  And at that time was the hospital

16    administrator Mr. Dawson?

17         A.  You know what, I -- I don't recall if it was

18    Mr. Dawson or Meredith Kiss.

19         Q.  Fair enough.

20         A.  It was one of them.  I can't recall when

21    Mr. Dawson took the position.

22         Q.  Well, fair enough.  Who else was generally in

23    these administrative meetings, if not every single

24    day?

```
1        A.  So the -- the hospital administrator, the
2    medical director -- do you want names or just the
3    titles?
4        Q.  Well, was the -- was the medical director Dan
5    Hardy at that time?
6        A.  Well, it -- Dan Hardy and Malini Patel.
7        Q.  Okay.  And who else?  I mean, start with just
8    titles, I suppose.
9        A.  Okay.  So the hospital administrator, medical
10   director, director of nursing, the associate
11   directors of nursing.  Who else was in there?  Chief
12   of security.  I mean, for a while the HR director was
13   attending; I mean, periodically the chief, the
14   engineer, the chief of engineering.  Oh, the business
15   administrator.
16       Q.  What about court services?
17       A.  No, they didn't attend.  It would -- oh,
18   there.  It would have been the -- the FTP director,
19   the clinical director.  Yeah, I think that's about
20   everyone.
21       Q.  Fair enough.
22       A.  Did I say the HR director?
23           MR. CECALA:  I think you did mention the HR
24   director.
```

```
 1              THE WITNESS:  Okay.
 2      BY MR. KRETCHMAR:
 3          Q.  Was that -- was that Darrell Williamson at
 4      the time?
 5          A.  Boy.  No, I think Derek was gone.  God, I
 6      can't -- what was that guy's name?  Roger Pedan
 7      (phonetic.)  It may have been Roger Pedan.
 8                           EXAMINATION
 9      BY MR. CECALA:
10          Q.  Okay.  So -- is it okay if I call you
11      Colleen?
12          A.  Please.
13          Q.  Okay.  Great.  So we're looking at the
14      transcript, lines 7 through 11.  You already read
15      this answer in where you became aware.  And the
16      question was prior to the things going over the news
17      about the flash drives and paraphernalia and evidence
18      of -- of a staff member having an inappropriate
19      relationship, and you -- you say you found that out
20      at an administrative meeting.
21                      What -- what do you recall that was
22      said about that at the administrative meeting?
23          A.  I don't -- I don't really recall specifics
24      anymore, but I know it sort of came to light that
```

LISA A. KOTRBA & ASSOCIATES, LTD.  (312) 855-1834

1    something was going on because we had to seal the

2    office, so that's -- I remember that we had

3    something -- that we had to seal the office because

4    ISP was going to do an investigation.

5        Q.  Okay.  And just so I'm clear.  Does the --

6    do the administrative meetings happen every day?

7        A.  They do now, but at -- there was a period

8    where they were only being held like Mondays and

9    Fridays, so...

10        Q.  So was it -- was it Mondays and Fridays in

11    the 2017 time frame?

12        A.  I can't recall.

13        Q.  Maybe -- do you recall when -- like

14    approximately when it would have shifted to an every

15    day versus a Monday/Friday?

16        A.  Ms. Kiss was -- was still here when we

17    started every day, so it would be aligning with when

18    she was the HA.

19        Q.  So -- and was she the HA before Brian Dawson?

20        A.  Yes.

21        Q.  So the everyday shift for administrative

22    meetings would happen during her tenure as HA and

23    then Brian Dawson continued that practice as HA,

24    where he was administrator?

 1          A.  Correct.

 2          Q.  So, you know, just also out of curiosity.

 3     About what time did the administrative meetings

 4     happen?  Were they first thing in the morning or

 5     afternoon?

 6          A.  No, it was -- it was always in the morning.

 7     I think we -- right now we meet at 8:45, so I'm

 8     guessing that was the same then.

 9          Q.  And -- okay.  And was it 8:45 when it was

10     just Monday/Fridays as well?

11          A.  Yeah, it was always in the morning.

12          Q.  So was the administrative meeting where the

13     discussion about the flash drives and paraphernalia

14     happened the same day?  So the -- I think counsel can

15     probably stipulate that the flash drives were

16     discovered on June 30, 2017.  That's a -- kind of a

17     well-known date and all over the records.

18                    Was the administrative meeting that

19     you're referring to, did that happen on the same day

20     that the discovery happened, if you recall?

21          A.  I don't recall.

22          Q.  Well, you were saying that you had to seal

23     off the room for the State Police, right?

24          A.  I'm sorry?  I was saying I had to seal off

1      the room?

2          Q.  You were saying that administration discussed

3      sealing off the room for the State Police to

4      investigate, correct?

5          A.  Correct.

6          Q.  And that was part of the administration

7      discussion, right?  I think you testified about that

8      earlier.

9          A.  I don't recall at this time.

10         Q.  Do you recall what room it was?  Was it

11     Christy Lenhardt's office that they were needing to

12     seal off?

13         A.  Yes.

14         Q.  Right, because the police ask you on line 12

15     which staff member, pertaining to this inappropriate

16     relationship, and on line 13 you answered "Christy

17     Lenhardt."

18               So you -- do you recall that as part

19     of the meeting, they went -- they had to go seal off

20     Christy's office because she was the one that was the

21     kind of target of what became an investigation?

22         A.  I mean, that's the assumption.  I don't know

23     if I knew all this after the fact of it being sealed

24     off or -- but it was the office she occupied.

```
 1          Q.  Okay.

 2               MR. CECALA:  One second.

 3          (Pause.)

 4    BY MR. CECALA:

 5          Q.  Okay.  So the -- the administrative meeting

 6    where the flash drives and computer paraphernalia

 7    were discussed, I was -- I was asking you earlier

 8    whether it was the same day.  June 30, 2017 was on a

 9    Friday.  That would make July 3, 2017 a Monday.

10               So do you recall whether that

11    administrative meeting where this was discussed was

12    the same day, which would have been Friday, or was it

13    after the weekend, which would have been the

14    following Monday?

15          A.  No clue.

16          Q.  Was it -- but it was an ongoing situation

17    when it was being discussed, right?

18          A.  After -- after the office was sealed?

19          Q.  Yes.

20          A.  I -- I can't -- I can't say it was an ongoing

21    discussion because I know once -- I can't recall.

22          Q.  Well, was it -- it wasn't like four months

23    later, right?

24          A.  Four months?  I'm sorry?  Four months later
```

1    that what?

2        Q.  It wasn't -- it wasn't four -- it wasn't

3    like -- this happened on June 30th when the flash

4    drives and computer paraphernalia were revealed in

5    the administrative meeting.  That revelation didn't

6    happen in October, right, that would have been months

7    later?  Was it -- the administration was having a

8    meeting about the unfolding, kind of, oh, boy, look

9    what happened situation, right?

10       A.  I can't recall.

11       Q.  So do you recall that during this

12   administrative meeting where the flash drives and

13   computer paraphernalia were discussed, do you recall

14   whether Bill Epperson was at that meeting?

15       A.  Yes, because I -- no.  Let me retract that.

16   I shouldn't say, yes, he was at that specific meeting

17   or a specific meeting, but I recall that he would

18   have -- he would -- as the chief, he would have been

19   the one to -- to indicate to us that ISP was going to

20   be on grounds doing an investigation or that, you

21   know, there's an area that's being sealed off, so

22   that would have come from the chief.

23       Q.  So -- so you -- do you recall anything more

24   specific about what he may have said to you in the

LISA A. KOTRBA & ASSOCIATES, LTD.  (312) 855-1834

1      meeting or to the group?

2           A.  No, not at this time.

3           Q.  Do you recall whether he was coming and going

4      from that meeting when it was had, or did he deliver

5      all the information about ISP coming for the

6      investigation at one time?

7           A.  I don't -- I'm sorry.  I don't recall.  I

8      mean, I'm -- I assume maybe in 2017 when I was

9      questioned by ISP, I may have had better recall, but

10     I don't right now.

11          Q.  No worries.  You know, just so you know, I

12     know taking -- being deposed isn't easy.  If you can

13     remember things, I appreciate -- you appear to be

14     sincerely trying to remember, so, you know, if you

15     can't recall it, that's okay.

16          A.  Okay.

17          Q.  So -- and I'll ask you -- please don't be

18     offended.  I'm trying to get what is your memory of

19     this, and I may ask you questions to help refresh

20     your memory of things.  Okay?

21          A.  Yeah.

22          Q.  So did -- as part of Bill providing the

23     information, do you ever remember him sharing a

24     journal which belonged to Ben Hurt that security had

1    confiscated from Ben's room?  Did he share any

2    information about a journal?

3        A.  I have a vague recollection of something

4    about a journal, but I don't know if I actually ever

5    saw the journal or if it was just stated that there

6    was a journal.

7        Q.  Okay.  Do you remember what, if anything, he

8    said about what was written in the journal?

9        A.  I don't.

10       (Deposition Exhibit Number 2 was marked for

11        identification.)

12   BY MR. CECALA:

13       Q.  So I'm going to ask you to take a look at

14   Exhibit 2.  For the record, this is documents that

15   were delivered from the Illinois State Police, and

16   they're Bates stamped ISP, the first page, 111 and I

17   think it goes to 114.

18               Have you ever seen this report from

19   the State Police?

20       A.  No.

21       Q.  Okay.  So on page 3 of what the State Police

22   provided, this is an Elgin security report.

23               I'm going to shrink it a little bit,

24   see if you can still read it.  Can you -- can you

```
1      make that out?

2           A.  Yeah.

3           Q.  Okay, great.  Could you take a look at this

4      document?  It's ISP 113.

5           A.  I'm sorry.  Did you want me to read it?

6           Q.  Well, I want you to take a -- take a look at

7      it to see if this is anything you've ever seen

8      before.  I'll ask questions about it, but once you've

9      seen the whole document, let me know.

10          A.  No, I've -- I have not seen this specific

11     document.  I've seen security reports, but not this

12     one.

13          Q.  Okay.  And I think it goes on to page 2.

14     Does anything on this second page, which is ISP page

15     114, ring a bell?

16          A.  It rings a bell that there were flash drives

17     and apparently contraband found in his room.  Can I

18     read the first report?

19          Q.  Sure.  Sure.  You mean the State Police

20     summary?

21          A.  This right here.  Is this our internal?

22          Q.  So let's just make a record here.  So this is

23     a document prepared by -- reporting officer at the

24     bottom is Epperson.  I guess that's his employee
```

1    number, No. 57, and Security Shift Charge Jackson,

2    No. 81, but the reporting officer is Bill Epperson;

3    and it's a security report documenting the search and

4    the incident on June 30th of discovering information

5    in Ben's room, but you're welcome to read it, yes.

6    When you're finished, let me know.

7         A.  Okay.

8         Q.  You've read it?

9         A.  Yeah.

10        Q.  Do you want to see the second page as well?

11   Or were you able to read that?

12        A.  No, that's fine.  Thank you.

13        Q.  Okay.  No, no worries.

14             So do you see on this report, which

15   apparently was prepared by Chief Epperson, it says

16   date of occurrence, June 30, 2017?  Do you see that

17   day?

18        A.  I'm sorry.  Date of occurrence?  Yes.

19        Q.  Okay.  And then next to that is a set of

20   boxes.  It says time of occurrence, 0730 hours.  Do

21   you see that?

22        A.  Yep.

23        Q.  And the date of the report, it's the same day

24   of the occurrence, June 30, 2017.  Do you see that?

1         A.  Yes.

2         Q.  And then it says time of report, 1100 hours,

3    correct?

4         A.  Yes.

5         Q.  So this -- this is a report that indicates

6    that by 11:00 a.m. the audio recordings of Ben and

7    Christy had been -- the room had been searched, the

8    audio recordings were obtained, and they were

9    reviewed by Chief Epperson.  And the last line of the

10   report says, at the very bottom, hospital

11   administrator notified by 11:00 a.m.

12                    Is that your understanding of your

13   reading of this report?

14        A.  That the hospital administrator was notified?

15        Q.  Well, that's what Bill said, right?

16        A.  Correct.

17        Q.  And the report was prepared by 11:00 a.m.,

18   right?

19        A.  Time of report, 11:00 a.m.

20        Q.  Is that correct?

21        A.  That's what it says on the document.  I can't

22   indicate whether that's accurate or not.

23        Q.  Sure.  No, I'm -- I'm not expecting you to --

24   to attest to the truth of the document.  I'm asking

LISA A. KOTRBA & ASSOCIATES, LTD.  (312) 855-1834

1    you just to look at what's in there so we have

2    reference points for my next questions.  Okay?

3        A.  Yep.

4        Q.  Okay.  So in the middle of the report,

5    there's a sentence that begins "First download had

6    conversation."

7                    Can you read from "First download"

8    all the way to, it looks like, four lines down, the

9    sentence that's ending with "Patient ███████?"  Can

10   you read that?

11       A.  "First download had conversation with

12   Lenhardt and patient Hurt.  Talking about oral sex,

13   kissing, and how deep of a relationship they have

14   together.  It also had the act of Lenhardt performing

15   oral sex on patient Hurt.  Second audio file had them

16   discussing how Lenhardt assisted with the UA (escape)

17   of patient ███████."

18       Q.  I'll stop you right there.

19       A.  Okay.

20       Q.  So here the audio recording that Chief

21   Epperson listened to, he says that it included

22   discussions between Ben and Christy about oral sex

23   and about Christy having helped ███████████

24   escape, right?

1      A.  Correct.

2      Q.  So I want to go back to here.  So when the

3   State Police spoke to you -- you read this answer

4   earlier.  The police asked you on page 4 of

5   Exhibit 1, line 5, they asked, "What was your

6   understanding -- what did you hear prior to it going

7   on all over the news?"

8              And then in your answer you say "I

9   was aware, because I'm in leadership, that -- so

10  there were discussions that Mr. Hurt had."

11             Were you referring to the

12  conversations or discussions of the audio files that

13  Chief Epperson talked about in his report?

14     A.  I don't recall, but from context, I would

15  assume yes.

16     Q.  So you were referring to the contents of the

17  audio files which had discussions between Mr. Hurt

18  and Christy Lenhardt when you were referring to

19  discussions, right?

20     A.  I was not aware of audio files.

21     Q.  Well, I think a little bit earlier you --

22  you -- or a little -- right after this you say I -- I

23  think, numerous flash drives or computer

24  paraphernalia, there was evidence of a staff member

1    having an inappropriate relationship, right?

2        A.  Correct.

3        Q.  So how did you know that there were

4    discussions between Mr. Hurt and Ms. Lenhardt?

5        A.  I don't think I'm -- what this looks like to

6    me, it says that there were -- "so there were

7    discussions that Mr. Hurt had, I think."  So the

8    discussions were about him having -- I'm saying that

9    there were discussions in leadership, apparently,

10   that Mr. Hurt was found with flash drives and

11   computer paraphernalia.  I'm not referencing

12   discussions that Mr. Hurt had with someone else.

13       Q.  Okay.  I'm not sure I understand your answer.

14   The last line on line 11 -- or 10 and 11, you say

15   "some evidence of him and a staff member having an

16   inappropriate relationship," right?

17       A.  Correct.

18       Q.  So the contents of the audio file reveal them

19   having oral sex and talking about a deep personal

20   relationship and kissing, right?

21       A.  Yeah, but I wouldn't have been privy to that

22   information.  I -- I -- that -- those details were

23   never revealed, not to me -- I'll say to me.  That --

24   that's the first time I've seen that -- that much

1    detail about what was on those -- well, I don't know

2    if they were on flash drives; I assume they are,

3    that's where they came from.

4        Q.  What did you mean by inappropriate

5    relationship then?

6        A.  I -- at the time?  You're asking right now

7    what would be an inappropriate relationship or what

8    did I mean in 2017?

9        Q.  I'm asking about the statement you gave to

10    the State Police in 2017.

11        A.  Inappropriate relationship would be any type

12    of personal relationship that wasn't part of the

13    therapeutic relationship.  And at -- you know, out of

14    context, looking at this, I'm not -- I don't recall

15    how much I was aware of at -- in 2017.  Obviously,

16    you know, five years later and it all over the media,

17    there's a lot of things that I'm aware of now, but I

18    can't speak for certain as to at that time.  I know

19    for sure I did not know the details of -- or I never

20    heard the files or anything.

21        Q.  Well, when you said inappropriate

22    relationship in 2017 to the police and you were at a

23    meeting where this was discussed or revealed, how

24    much of the information about an inappropriate

1     relationship was revealed by Chief Epperson at the

2     meeting?

3         A.  I don't recall.

4         Q.  What did you suspect when you said

5     inappropriate relationship that was on the flash

6     drives or computer paraphernalia?

7         A.  I don't recall.

8         Q.  So you don't recall what you were suspecting

9     was on the drives back then?

10         A.  No.

11         Q.  But you knew the State Police were being

12     called, right?

13         A.  Correct.

14         Q.  So you knew it wasn't just something where

15     Christy perhaps was giving Ben some candy, right?

16         A.  Yeah, I knew that there was suspect --

17     suspicion of a crime if ISP's involved.

18         Q.  So on the last line of page 4, going on to

19     page 5, the State Police ask you "So what was -- have

20     you heard anything and what was on the audio or what

21     they were partaking in specifically?"

22              And your answer on line 3 of page 5

23     was "Nothing."

24              So at the time the State Police

| | |
|---|---|
| 1 | interviewed you, which is consistent with what you |
| 2 | said today, you're saying you knew nothing about the |
| 3 | contents of the discussions between Ben Hurt and |
| 4 | Christy Lenhardt, correct? |
| 5 | A.  Correct. |
| 6 | MR. CECALA:  Give me one second. |
| 7 | (Pause.) |
| 8 | BY MR. CECALA: |
| 9 | Q.  Okay.  So just a final question.  So if we're |
| 10 | parsing out the knowledge you had from the |
| 11 | administrative meeting, you knew that there were |
| 12 | audio files and computer paraphernalia of some type |
| 13 | of an inappropriate relationship, but you didn't know |
| 14 | what the contents were, correct? |
| 15 | A.  No.  I was not aware of audio files.  I knew |
| 16 | that they -- there was flash drives and some computer |
| 17 | stuff and that, you know, again, ISP -- the -- the |
| 18 | office was sealed off and ISP was coming. |
| 19 | Q.  Okay.  So I'm just -- I need to clarify this. |
| 20 | So I just want to go back to line 8 of your answer on |
| 21 | page 4, where you said "so there were discussions |
| 22 | that Mr. Hurt had." |
| 23 | A.  No, I'm not saying he had discussions.  I'm |
| 24 | saying there were discussions or there was -- it must |

```
1     have been discussed that Mr. Hurt had numerous flash
2     drives or computer paraphernalia.
3          Q.  I see.  So you didn't know whether Mr. -- on
4     the flash drives or computer paraphernalia that Ben
5     Hurt was talking?
6          A.  No.
7          Q.  You -- you knew that at the administrative
8     meeting the administration was -- your -- your team
9     was talking about the fact that there were numerous
10    flash drives and computer paraphernalia that were --
11    when you say that Mr. Hurt had, that were in
12    possession of Mr. Hurt, right?
13         A.  Correct, because having flash drives at the
14    time, that would have been considered contraband.
15         Q.  Okay.  We'll get to that, but the point is
16    that there were flash drives and computer
17    paraphernalia in possession of Mr. Hurt and that was
18    discussed at the meeting and that's what you knew
19    about, right?
20         A.  Yes.
21         Q.  Okay.  So then -- and -- and you were also
22    aware, because they were calling State Police, that
23    there were evidence of him and Christy Lenhardt
24    having an inappropriate relationship somehow,
```

```
 1      correct?
 2           A.  Correct.
 3           Q.  You didn't know whether there were
 4      photographs or videotapes on the flash drives or
 5      computer paraphernalia at that time, did you?
 6           A.  No.
 7           Q.  And you've already said you didn't know if
 8      there were audio recordings on the flash drives or
 9      computer paraphernalia, correct?
10           A.  No.
11           Q.  What did you think was on the flash drives or
12      computer paraphernalia that was the evidence of an
13      inappropriate relationship?  What did you conclude
14      that may have been on there?
15           A.  I had no idea.
16           Q.  Okay.  Great.  I'm going to ask you now to
17      look at -- I'm going to shrink this and tell me
18      when -- I'm sorry.  My eyes are not good either,
19      so -- but it's easier to move the document when it's
20      smaller.  Can you read it now?
21           A.  Yeah.
22           Q.  How about try one more shrink, can you still
23      read it?
24           A.  Yeah.
```

```
 1              (Deposition Exhibit Number 3 was marked for
 2                identification.)
 3      BY MR. CECALA:
 4          Q.  Okay.  Great.  So this is Exhibit Number 3.
 5      It is Bates stamp No. 27404, and it's a 15-page
 6      exhibit of an e-mail dated January 19, 2017.
 7                        Do you recall ever seeing this e-mail
 8      before?
 9          A.  No, not at this time.
10          Q.  Well, does this help refresh your memory
11      of -- of an e-mail like this?
12          A.  "Policy review at morning meeting today."  I
13      mean, yeah, if -- yeah, Ann would send out, you know,
14      a synopsis of what was, you know, reviewed.
15          Q.  Okay.  And that's in the "to" section, where
16      it says Colleen Delaney, that's you, right?
17          A.  Yes.
18          Q.  So you would have received this e-mail, I
19      don't know if you remember the day you received it,
20      but this is -- there's no reason to believe it
21      wouldn't have arrived at your e-mail box, right?
22          A.  Correct.
23          Q.  Okay.  And then you said the subject says
24      "Policy review at morning meeting today."  And the
```

```
 1        date is Thursday, January 19, 2017, at about 1:13
 2        p.m., correct?
 3            A.  Correct.
 4            Q.  And then there's a list of attachments to the
 5        document, correct?
 6            A.  Yes.
 7            Q.  And so it's -- it has -- the ones we're
 8        concerned with are the attachments that are
 9        PPM1870.doc and then Exhibit A, B and C with PPM1870
10        preceding it.  Do you see those?
11            A.  Yes.
12            Q.  Okay.  So I'm going to go down.  So are you
13        familiar with the Elgin policy about nonconsensual
14        sex between patients?
15            A.  Yes.
16            Q.  What is that policy?
17            A.  What is it?
18            Q.  What is your understanding of it?
19            A.  If -- if a patient alleges that they were,
20        you know -- I don't want to say forcibly because
21        that's a different -- let's say somebody -- a patient
22        touches another patient in a sexual manner or tries
23        to engage them in a sexual activity and the patient,
24        it's nonconsensual, they're telling -- you know,
```

```
 1        saying this is not -- I don't want this, that we --
 2        it's how we address those types of situations.
 3            Q.  Okay.  Is there any similar policy,
 4        statement -- and PPM from the exhibit says -- it
 5        stands for policy and procedure manual, correct?
 6            A.  Yes.
 7            Q.  And that's -- that would be the Elgin policy,
 8        right?
 9            A.  Correct.
10            Q.  So are you aware of a similar policy or
11        procedure pertaining to sex between patients and
12        staff?
13            A.  Well, that -- that would be out of our -- you
14        know, that -- that's something we wouldn't deal with
15        internally.  We would call OIG and, you know, that
16        would be the security route, and I assume they
17        contact ISP.
18            Q.  Right.  So, in fact, does there even really
19        need to be a policy for sex between patients and
20        staff at Elgin?
21            A.  Does there need to be a policy about it?
22            Q.  Well, it's the law, right?
23            A.  Right.  We -- we're mandated reporters.  We
24        would have to -- if there were any reports or, you
```

```
1        know, suspicions of that, we would call OIG.
2             Q.  We'll get to the reporting in a minute.  What
3        I'm suggesting is that if there's sex between a
4        patient and a staff person, that's actually a crime;
5        isn't it?
6             A.  Yes.
7             Q.  So you don't need a policy that says don't
8        break this particular law, right?  You have to obey
9        the law anyway?
10            A.  Well, you don't have to, but you should.
11            Q.  Okay.  Fair enough.
12            A.  Because obviously we're here because somebody
13       didn't.
14            Q.  Correct.  I mean -- absolutely.  So I'm
15       looking now at this document, which is a document
16       Bates stamped 27412.  It's policy and procedure 1870,
17       Nonconsensual Sexual Contact Among Patients.  Do you
18       see that?
19            A.  Yes.
20            Q.  And what's the point of having a policy on
21       nonconsensual sex between patients?
22            A.  I'm sorry.  What's the point of it?
23            Q.  Yeah.  From your understanding, what's the
24       purpose of having this policy?
```

```
 1          A.  To ensure the safety and, you know -- you
 2     know, if somebody's being exposed to somebody who
 3     they feel has traumatized them, we want to ensure
 4     that that doesn't happen.
 5          Q.  Okay.  Well, what is -- what does
 6     nonconsensual mean?
 7          A.  Do you want me to read the definition?
 8          Q.  You can -- I mean, the definition is in Roman
 9     numeral 2.  You can read it, if you'd like, but
10     I'm -- I'm wondering what your understanding of
11     nonconsensual is.
12          A.  Unwanted.
13          Q.  So unwanted makes a distinction between
14     consensual and nonconsensual sex in your view, right?
15          A.  In my view?
16          Q.  Well --
17          A.  Or according to the policy?
18          Q.  Well, you know, in the definition of
19     nonconsensual sexual contact it just doesn't -- you
20     know, it doesn't give the single word definition of
21     unwanted, but that's a fair definition.  You gave
22     your understanding of it.  It's not a gotcha
23     question.  I'm just trying to get what your
24     understanding of what are complex policy rules.
```

1              So, I mean, I can withdraw the

2     question.  It's not that important.  I'm just trying

3     to clarify your understanding.  Okay?

4              So maybe I'll just ask it this way.

5     Is it possible for two involuntarily committed

6     patients to have any type of consensual sex at Elgin

7     Mental Health Center?

8        A.  Yeah, that's -- that's such a -- that's so

9     gray.  So the -- I guess the answer would be no.

10       Q.  Okay.  So there's -- there seems to be

11    considerable procedure here starting on 27412,

12    Roman 3, and going down on 27413, it ends on 27414.

13    It's very detailed.  I don't have -- I'm not asking

14    you to go through all of it, but it's fairly

15    extensive.

16             Why do you think there's so much

17    procedure for dealing with a situation where patients

18    are having nonconsensual sex?

19       A.  Why do I think there's so much procedure?

20       Q.  Yeah.  What is your viewpoint as to why this

21    very detailed procedure exists?

22       A.  Well, I'll just keep it simple.  You don't

23    want somebody who's a victim of a trauma to have

24    repeated exposure to the person that created the

LISA A. KOTRBA & ASSOCIATES, LTD.  (312) 855-1834

1    trauma.

2       Q.  Right.  And if someone is a victim of a

3    trauma in a psychiatric hospital, like nonconsensual

4    sex, you really have to pay close attention to making

5    sure the victim is properly treated, right?

6       A.  Correct.

7          MR. KRETCHMAR:  Let me ask her a quick

8    clarification.

9          MR. CECALA:  Yeah, go ahead.  Randy has a

10   clarification.

11         MR. KRETCHMAR:  When Joe asked you whether

12   it's possible for two involuntary patients at Elgin

13   Mental Health Center to have consensual sex, you

14   thought about that for quite a little while and you

15   said it's -- it's so gray.  It's a complex question

16   to you, apparently; is that correct?  Can you explain

17   that?

18         MS. JOHNSTON:  Objection, relevance.  You

19   can answer, Colleen.

20         THE WITNESS:  If we had two individuals

21   who -- who were, say, you know, found in the act

22   of -- or engaged in sexual activity, two patients,

23   and, you know, we stop whatever the behavior is and

24   separate them, then we would find out if this was --

1    was either of them coerced or forced or do they feel,

2    you know, threatened or are they unsafe.  If both of

3    them report that they -- I don't want to say -- yeah,

4    I guess, willingly engaged in the activity, we're

5    going to have a different response as opposed to

6    someone saying, you know, I was -- this was forced

7    upon me, I feel unsafe.

8                MR. CECALA:  Okay.  I think that answers it.

9    BY MR. CECALA:

10       Q.  Now, on page -- sorry for my computer being

11    slow.  This is Bates stamp 27415.  Do you see this

12    page?

13       A.  Yes.

14       Q.  Okay.  It's titled Response to Allegations of

15    Nonconsensual Sexual Contact Checklist, right?

16       A.  Correct.

17       Q.  And it looks like there's a very detailed

18    checklist of steps for the nurse manager to take in

19    the event of a reported sexual abuse.

20                Do you see that, items, it looks

21    like, 1 through 10 on this checklist?

22       A.  That's the charge nurse, not the nurse

23    manager.

24       Q.  Ah, okay.  Good.  So the charge nurse has

LISA A. KOTRBA & ASSOCIATES, LTD.  (312) 855-1834

```
 1        certain functions, right?

 2            A.  Correct.

 3            Q.  And then the -- beneath that is the AOD and

 4        then the CNM.  Can you -- do you know what those

 5        initials stand for?

 6            A.  AOD stands for administrator on duty, so that

 7        would be the on or off shifts -- or I should say

 8        evening shift and night shift, in lieu of the nurse

 9        manager, there's an AOD who -- and CNM is certified

10        nurse manager.

11            Q.  Okay.  So the certified nurse manager is not

12        necessarily the -- is not necessarily a director of

13        nursing, right?  She's -- like your post was nurse

14        manager, that would have been a similar post,

15        sometimes you may have been the CNM, correct?

16            A.  Well, it's interchangeable.  Nurse manager

17        and CNM is the same thing.

18            Q.  Okay.  So -- and there's two items there;

19        No. 1, notify medical director, hospital

20        administrator and the director of nursing of the

21        event; 2, document the event in the AOD or the

22        morning report, correct?

23            A.  Yes.

24            Q.  So when I look at these procedures, this
```

1     obviously, per policy, only applies to the victim of

2     nonconsensual sexual contact between patients in this

3     policy, right?

4         A.  Yes.

5         Q.  Do you believe there would be a similar

6     procedure for a victim of sexual abuse who was the

7     victim of a staff member abusing them?

8         A.  Yes.

9         Q.  So are you aware of whether any of these

10    procedures were followed for Ben Hurt in July of 2017

11    after it was discovered he was being abused by

12    Christy Lenhardt?

13        A.  I am not.

14        Q.  When you were associate director of nursing,

15    were you ever notified about Ben Hurt being a victim

16    of sexual abuse by Christy Lenhardt?

17        A.  I assume at some point after the ISP

18    investigation.

19        Q.  Well, approximately when would you have

20    gotten that notification?

21        A.  I can't -- I can't say.  I don't recall.

22        Q.  Was Ben Hurt -- was Ben Hurt still a patient

23    at the hospital when you were notified?

24        A.  Yes.

1    Q.  Do you recall how soon after June 30th it

2    would have been?  Was it more than a week?

3    A.  I don't recall, but I do know generally that

4    ISP investigations are -- take a while.

5    Q.  Right.  Well, this is different than the ISP

6    investigation, though, right?  This is a checklist to

7    examine the victim of abuse, to make sure they're

8    properly treated, right?

9    A.  Yeah, but if we didn't know he was the victim

10   of abuse, this wouldn't have been initiated.  So,

11   again, the contents of those flash drives would not

12   have been known on the unit level for anybody to, you

13   know, initiate anything.  Like I'm saying, ISP

14   investigations, they can take months, so it could

15   have been long after the fact that we were made aware

16   that there was evidence to any type of sexual

17   encounters.

18   Q.  Are you aware of the date that Ben Hurt was

19   released from Elgin Mental Health Center?

20   A.  No.  I mean, I have access to that

21   information, but I don't know it offhand.

22   Q.  I think counsel may stipulate that Ben's

23   Thiem date was July 22nd of 2017.

24        MR. CECALA:  Would you stipulate to that,

1    Mary?

2            MS. JOHNSTON:  Yeah, that's fine.

3    BY MR. CECALA:

4        Q.  So, Colleen, from June 30th to July 22nd, Ben

5    was a patient at Elgin.  My question is were you

6    notified between June 30th and July 22nd as associate

7    director of nursing that Ben was sexually abused, so

8    that this check sheet could be applied to him as a

9    victim?

10       A.  No.  Or let me -- not that I recall.  I don't

11   recall that there was any clear we have evidence to

12   believe that this occurred.

13       Q.  So when you say there wasn't clear evidence

14   of the sexual abuse, you don't mean that the audio

15   recordings didn't exist, right?

16       A.  No.  I said I don't recall that I was ever

17   told between June 30th and July 22nd that we have

18   credible evidence.  Like there was never any clear

19   like, hey, this -- this probably occurred and we have

20   a potential victim, like -- yeah, there wasn't those

21   discussions.

22       Q.  So in your experience both as nurse

23   manager -- actually, you have a long tenure, 28

24   years, at Elgin.  So your whole experience at Elgin,

LISA A. KOTRBA & ASSOCIATES, LTD.  (312) 855-1834

1    meaning all 28 years, are there repercussions or

2    ramifications that are negative or derogatory if a

3    patient is found to have nonconsensual sex with

4    another patient?

5         MS. JOHNSTON:  Objection, relevance, but go

6    ahead and answer, Colleen.

7         THE WITNESS:  I'm not sure I understand the

8    question.

9    BY MR. CECALA:

10        Q.  So I'll ask it another way, and I can ask it

11   both -- in any sexual context.  Is a patient -- do

12   you think the patients might be in fear of being

13   charted or in some way having it negatively reflect

14   in their mental health record if they're caught

15   having sex either with another patient or a staff

16   member?

17        A.  I can't speculate on what they think.

18        Q.  Well, it's not a speculation.  It's your

19   viewpoint.  It's your -- from your experience.

20        A.  From my experience, do I think the patients

21   think that it would be negative if they were to be

22   found to have sex?

23        Q.  Yes.

24        A.  Yeah, I can't -- I can't -- I'm sorry.  I

1     don't -- I can't answer for them.

2        Q.  Well, I'll ask a foundation question.  Do you

3     have any experience where patients are -- the

4     psychiatric term is hypersexual or touching other

5     patients when they're at Elgin?

6        A.  Yes.  Do I have experience?  I've -- I've

7     observed patients who, in the course of their

8     illness, have, you know, exhibited hypersexual

9     behavior, but in those instances, the person is

10    symptomatic and, you know, we know it's a

11    manifestation of their illness.  And so, of course,

12    we want to keep other people safe and -- and dissuade

13    that type of behavior; but from my experience, it

14    would be viewed as part of the illness.

15       Q.  Would having sex with another person, be it

16    patient or staff member, be part of their mental

17    illness?

18       A.  Could be.  Could be a result of

19    hypersexuality.

20       Q.  Are patients ever punished for engaging in

21    sex with other patients?

22       A.  No, we don't punish patients, so...

23       Q.  So would a -- would a patient view

24    restriction of rights or loss of privileges as a form

1      of punishment?

2          A.  We don't punish patients, so it -- it would

3      never be a form of punishment.  Have we had to

4      restrict the use of a building pass?  Yes, we've had

5      to do that in the past.  If we -- if we're -- if it's

6      brought to the treatment team that, you know, a

7      patient -- sorry?

8              MS. JOHNSTON:  Sorry.  That may have been

9      background noise on my end.

10             MR. CECALA:  No worries.

11             MS. JOHNSTON:  I apologize.

12             THE WITNESS:  I thought someone was saying

13     hold on.  Sorry.

14             MS. JOHNSTON:  No, I think that was just

15     someone in the hallway on my end.  Sorry about that,

16     Colleen.

17             THE WITNESS:  So we've -- we've -- a patient

18     has had their -- the use of a building pass, you

19     know, restricted based on engaging in -- in sexual

20     activity in, say, like a -- like the library, if they

21     were going to the library to meet or something like

22     that.

23     BY MR. CECALA:

24         Q.  So restrictions of rights and loss of

```
 1          privilege actions limiting a patient's privileges or
 2          rights are not used as a form of punishment to the
 3          patients.  Is that what you're saying?
 4               A.   Correct.
 5               Q.   Has, in your experience, a patient ever been
 6          transferred to Chester Mental Health Center because
 7          it was discovered he was having sex with other
 8          patients or a staff person?
 9               A.   Not that I recall specifically, just -- I
10          mean, that may have been part of the presentation
11          with the patient, that may have been, you know, part
12          of the illness; but as far as specifically being
13          transferred due to having sex with another patient, I
14          don't recall that.
15               Q.   So do patients suffer psychological trauma or
16          complications, in your experience, from sexual
17          encounters with other patients or staff?
18                    MS. JOHNSTON:  Objection, form.
19                    THE WITNESS:  I can't -- I can't comment on
20          that.
21          BY MR. CECALA:
22               Q.   Okay.  Well, are there clinicians at EMHC who
23          specialize in sexual trauma?
24               A.   I don't know if they specialize in it, but we
```

1      do have psychologists and psychiatrists.

2          Q.  So there's experienced staff people that deal

3      with the psychological effects of sexual trauma at

4      Elgin, right?

5          A.  Yes.

6          Q.  And would sexual abuse or trauma, in your

7      experience, be a significant issue for mentally ill

8      people?

9              MS. JOHNSTON:  Objection, form.  Please

10     answer, Colleen.  Sorry.

11             THE WITNESS:  I'm sorry.  Would sexual abuse

12     or trauma -- say it again.

13     BY MR. CECALA:

14         Q.  Would sexual abuse or trauma be a significant

15     issue for mentally ill people?

16         A.  I would say sexual abuse or trauma is a

17     significant issue for any people.

18         Q.  So that would include the mentally ill,

19     including the patients at Elgin, right?

20         A.  Correct.

21         Q.  From your experience, what are the likely

22     problems or complications that a person has after

23     being sexually abused?

24         A.  I -- I'm not -- I have -- I don't have the

```
 1        qualifications to answer that.

 2             Q.   Do you have experience with it?

 3             A.   I'm trying to think if there's been specific

 4        patients who -- I mean, it -- we have --

 5        unfortunately, a high percentage of our female

 6        patients have sexual abuse histories, so it's -- it's

 7        hard to say, you know, if it's their circumstance,

 8        their mental illness, their -- their trauma history

 9        what leads to what.  So I can't say specifically

10        what's a result of sexual abuse.

11             Q.   Okay.  But this chart and checklist that we

12        have as an exhibit, isn't this part of the policy

13        that is intended to deal with any sexual abuse or

14        trauma for the victim of that at Elgin?

15             A.   Can you scroll up, please, so I can see

16        the -- the policy?

17             Q.   You want to see the policy and not the

18        checklist?

19             A.   Yeah, I want to see the policy.

20             Q.   Sure.

21             A.   Because -- right -- okay.  Thank you.  Yeah.

22        As I stated previously, I mean, the intent of the

23        policy is to make sure that the person isn't exposed

24        to the person that they're indicating traumatized
```

1    them.

2        Q.   Sure.  I mean, if you want me to, I can pull

3    from the policy.  If you look at Roman numeral 1

4    policy, it says nonconsensual sexual conduct (sic) in

5    line -- midway through the first sentence,

6    nonconsensual sexual contact and traumatization,

7    correct?  So it's about the trauma that results from

8    nonconsensual sexual contact, right?

9        A.   Correct.

10       Q.   Then it's giving some purpose here -- well,

11   and some policy, which is it doesn't tolerate or

12   condone -- "EMHC does not tolerate or condone

13   nonconsensual contact between patients."  And it says

14   it is -- "and is committed to taking immediate steps

15   to ensure the health and safety of individuals served

16   by responding quickly when such acts are committed in

17   this treatment setting," right?  Is that what it

18   says?

19       A.   Yes.

20       Q.   And it uses the word immediately or immediate

21   steps and quickly, right?

22       A.   Yes.

23       Q.   All right.  And "EMHC is also committed to

24   addressing and minimizing the trauma experienced by

LISA A. KOTRBA & ASSOCIATES, LTD.  (312) 855-1834

1          alleged victims by offering treatment services

2          subsequent to their experience of nonconsensual

3          sexual contact," right?

4              A.  Yes.

5              Q.  So is it a fair summary to say that when

6          someone experiences nonconsensual sexual abuse, that

7          quickly and immediately the policy is to treat that

8          person to minimize the trauma, right?

9              A.  If we are aware, correct.

10             Q.  Well, does it say anything about if you're

11         aware in the policy?

12             A.  Well, no.  I mean, but if -- if we're not

13         aware of something, we can't address it.

14             Q.  Sure.  Understood.  But the policy doesn't

15         have anything to do with whether you're aware or not,

16         right?

17             A.  Well, again, we can't enact something that

18         we're not aware of.  So we can't --

19             Q.  Sure.

20             A.  We can't do things to address a situation

21         unless we're aware of it.  So if the patient reported

22         the nonconsensual sexual activity when it was

23         occurring or occurred, then it could have been

24         addressed.

```
 1        Q.  Right.  So if the patient doesn't report it,

 2    then you're saying you have no way of knowing it,

 3    right?

 4        A.  Well, I mean, the patient doesn't necessarily

 5    have to report it.  If they do, then we can address

 6    it immediately, but -- or if somebody else witnesses

 7    it or if there's, you know -- there's got to be some

 8    sort of indication that something is occurring.

 9    Like, you know, for instance, we've had other

10    patients tell us that some two patients are engaging

11    in, you know, sexual activity and -- and that's how

12    we'll find out.

13        Q.  Right.  So there are -- the point is this

14    policy addresses what to do once you found out, and

15    there are numerous ways in which one could possibly

16    find out, right?

17        A.  Correct.

18        Q.  And just going back to this.  But the policy

19    is, you know, quickly and immediately -- once found

20    out, quickly and immediately take steps to minimize

21    the trauma, correct?

22        A.  Correct.

23            MS. JOHNSTON:  Randy and Joe?

24            MR. CECALA:  Yes, ma'am.
```

```
1              MS. JOHNSTON:  Looks like we're moving on to

2      a new exhibit.  Would this be an okay time to take a

3      quick five?  Sorry.  We've been going for almost two

4      hours, and I think everybody might...

5              MR. CECALA:  Yeah.  It's 11:44.  If we want

6      to take a five-minute break, come back at 11:50.

7              MS. JOHNSTON:  Yeah.  Does that work for

8      everybody?

9              THE WITNESS:  Yes, please.  Sorry.  I didn't

10     want to say I have to use the washroom.

11             MR. CECALA:  No worries.  Don't hesitate to

12     say so, Colleen.

13             MR. KRETCHMAR:  Yeah, yeah, don't hesitate.

14        (A brief recess was taken.)

15        (Deposition Exhibit Number 4 was marked for

16         identification.)

17     BY MR. CECALA:

18        Q.  So we're on to Exhibit Number 4.

19                  Do you recognize what this is,

20     Colleen?

21        A.  Yes, a progress note.

22        Q.  And it's from -- the recipient name, it's Ben

23     Hurt's chart, correct?

24        A.  Correct.
```

1    Q.  So this is Bates stamp 14508 through --

2    continuously through 14529.

3                    So the first chart note is a chart

4    note on June 29th, right?  Is that the date and time

5    off to the left there?

6    A.  Correct.

7    Q.  So that's not the one I'm looking at with

8    you.  I want to look at the next note.  So do you see

9    the next note there, 6-30-17?

10   A.  Yes.

11   Q.  And it's written at 9:30 in the morning,

12   right?

13   A.  Yes.

14   Q.  And it says psychiatric note on the first

15   line?

16   A.  Yeah.

17   Q.  Now, we've done a lot of trying to get this

18   in.  I'm going to read it, and if there's a word or

19   something that you think I'm mistaking, please let me

20   know, but I'm going to read this note into the

21   record.  Okay?

22                    It says:  Mr. Hurt had a room search

23   by security.  There is a security investigation going

24   on, and it was recommended by security to hold his

1    pass and not allow any off-unit activities.  He was

2    also recommended to transport him in waist belt, hand

3    and ankle cuffs.  The team met with Mr. Hurt, and he

4    stated, "I have no clue what is going on."  He agreed

5    to cooperate with the investigation.  Counseling

6    patient.  And I think it's signed by Dr. Kareemi, MD.

7    Do you see that?

8        A.  Yeah, I think the -- the last word is

9    counseling provided.

10        Q.  Oh, okay, great.  Counseling provided.  Thank

11    you.

12                And this was a chart note made on

13    June 30th at 9:30 in the morning, right?

14        A.  Yes.

15        Q.  So this would -- if you recall, the security

16    report that was written by Bill Epperson had a time

17    of about 11:00 a.m., right?

18        A.  Yes.

19        Q.  So the room search, according to this note,

20    would have been completed by at least 9:30, with

21    enough time to inform Dr. Kareemi, so that she could

22    counsel Ben about the room search by 9:30, correct?

23        A.  Yes.

24        Q.  And just -- I forgot to ask this, but this

1     looks like a standard chart of a patient at Elgin,

2     correct?

3         A.  Yes.

4         Q.  And you would know what those charts look

5     like?  You've been dealing with them for 28 years,

6     right?

7         A.  Yes.

8         Q.  So in the administrative meeting on Friday,

9     June 30th, which you said usually starts around 8:45

10    in the morning, was it ever brought up about

11    restricting Ben with a waist belt, hand and ankle

12    cuffs?

13        A.  I don't recall.

14        Q.  Did you know about the fact that Ben had a

15    doctor's appointment on that day at the

16    administrative meeting?

17        A.  No, I wouldn't.  The process regarding

18    whether to use -- or what type of transport devices

19    are used or not used is -- they do that at the unit

20    level.

21        Q.  Okay.  So it would not be something

22    administration would have voiced their viewpoint on,

23    for him to be restrained for his doctor's

24    appointment?

```
 1          A.   Well, no.  I mean, it's -- it's done at the

 2     unit level and then it's signed off -- I believe the

 3     FTP director and the medical director sign off on

 4     that form.

 5          Q.   So the unit would have had to have decided to

 6     transport him in restraints sometime before 9:30,

 7     right?

 8          A.   I would say that, yeah, or at least around

 9     that time because Dr. Kareemi would have been -- they

10     would have had to sign the -- the transport form.

11          Q.   Is the FTP director part of administration?

12          A.   Yeah.

13          Q.   So you don't know whether the form was signed

14     before, during or after the administrative meeting,

15     do you?

16          A.   No.

17          Q.   But someone, FTP director in particular, has

18     to sign a form to impose these restraints on a

19     patient, correct?

20          A.   I apologize for the delay.  I'm just trying

21     to -- because I've been out of that position, I'm

22     fairly sure the FTP director signs off and the

23     medical director or designee.  It might be the

24     designee.
```

1          Q.  So who would the designee be?  Would that be

2     another member of administration or is it someone

3     else?

4          A.  No, it would be a -- well, it would be -- for

5     the medical director, it would be whoever she assigns

6     to do that or somebody who -- who stands in when

7     she's not there.

8          Q.  But it -- it wouldn't be something that the

9     treatment team could do on their own accord, right?

10         A.  No.

11         Q.  And I don't remember what you said.  Did you

12    know about this on -- on June 30th at the time of the

13    administrative meeting?

14         A.  Not that I recall, no.

15         Q.  Did you ever find out about it?

16         A.  That Ben was required this level of

17    restraint?

18         Q.  Yes.

19         A.  Not that I recall.

20         Q.  So the next page, which is Bates stamp 14509,

21    there's -- at the top of this there's another note

22    dated June 30, 2017 at 15:15 -- sorry, I'm familiar

23    with military time, but it's 3:15 p.m., right?

24         A.  Correct.

1        Q.   Can you read that note?

2        A.   It says, PCP note, which would be primary

3    care physician.  Per Brian Dawson quote, unquote --

4    excuse me (hospital administrator), effective 6-30-17

5    at 15:15 through 7-3-17 at 16:00 for ROR of telephone

6    use.

7        Q.   So this was the hospital administrator

8    issuing a restriction of rights to Ben Hurt at 3 --

9    by 3:15 on June 30th, right?

10       A.   Correct.

11       Q.   Did you know about this restriction of

12   telephone use by 3:15 on June 30th?

13       A.   No, not that I recall.

14       Q.   Did you find out about the restriction of

15   telephone use?

16       A.   I -- I don't recall if it was ever discussed

17   in an administration meeting.  I don't have a

18   recollection of it being discussed.

19       Q.   So on the next page there's a 15 -- I'm

20   sorry, Bates stamp 14510, there's another chart note

21   6-30-17 at 16:00.  Do you see that note?

22       A.   Yeah.  I'm sorry.  Did you say the first note

23   at the top or the third?

24       Q.   The first note at the top.

1    A.  Yeah, I see that.

2    Q.  So -- and this is an NSG note.  Does that

3    stand for nursing?

4    A.  Yes.

5    Q.  So can you read the first line?

6    A.  It says, P, which stands for -- I don't know

7    if you need to know that, but it says "P - ROR for

8    phone use per administration."

9    Q.  Okay.  And then the next line, what does that

10   say?

11   A.  I cannot read that first word.

12   Q.  I think it says MOD.

13   A.  Oh, MOD -- nope.  No idea what that says.

14   Q.  Does it look like called?

15   A.  Okay.  MOD called -- nope.

16   Q.  There's two words there, I don't know what

17   they are, but then it looks like it says for ROR for

18   phone use?

19   A.  Yeah, MOD called to -- I don't know what that

20   says either -- for ROR for phone use from 15:15 to

21   16:00 on 7-3-17.

22   Q.  Yeah, this one's more difficult to read.  And

23   then what's the next note?

24   A.  I'm sorry.  The next note on 7-3?

1          Q.  Yeah, the next -- no, no, on -- I'm sorry,

2      the next line of the 6-30 note.  It looks like it

3      says ROR for phone use was completed by social

4      worker?

5          A.  Yeah.

6          Q.  And explained something patient?

7          A.  Explained to the patient.

8          Q.  To the patient.

9          A.  Yeah.

10         Q.  And then it says something of ROR given to

11     patient.  It looks like copy of ROR given to patient.

12         A.  Yeah.  Patient voiced understanding of ROR

13     when approached and stated that the social worker

14     explained it to him.

15         Q.  And the last line is continue to monitor

16     patient, right?

17         A.  Yeah.

18         Q.  Okay.  Right.  Then there's a 7-3 note, which

19     looks to be a medical note about an injury.

20         A.  Yeah.

21         Q.  Then the next note is on June 30th by a

22     social worker II, also at 15:15 p.m.  And this

23     note -- yeah, go ahead.

24         A.  Sorry.  I'm just looking at the format.

```
 1        Actually, it was written on 7-3 of '17 at 11:00 a.m.,
 2        and -- so when that's written like that, it's a late
 3        entry for 6-30-17 at 15:15.
 4            Q.  Right.  So the social worker is writing on
 5        July 3rd, Monday, at 11:00 about something that
 6        happened at 3:15 on Friday, right?
 7            A.  Correct.
 8            Q.  And I think this says this writer met with
 9        patient by request of nurse manager.  Do you see
10        that?
11            A.  Yeah.
12            Q.  Patient given ROR for telephone use until
13        Monday, 7-3, 16:00, right?
14            A.  Yeah.
15            Q.  Patient informed this is due to
16        administrative directive due to investigation
17        involving patient, correct?
18            A.  Patient informed this is due to
19        administrative directive due to investigation
20        involving -- yeah.
21            Q.  Then it says patient asked about what --
22        patient asked what would happen if he appeal (sic) it
23        and then it says ignored --
24            A.  I don't know if it says appeal it.  It says
```

1    patient informed --

2         Q.  Well, it says patient asked about would

3    happen if he appeal it.

4         A.  I can't say whether that says appeal or not.

5         Q.  Okay.  But after that it says patient

6    informed -- I can't read the next word.

7         A.  Me neither.  Sorry.  Something, something

8    needed.

9         Q.  Right.  And then it says patient then asked

10   what would happen if he used phone.  Patient informed

11   that security would likely have to be called.  He

12   agreed to the restriction.  Patient denied to take

13   copy of ROR and then closed mind as we left

14   conference.

15        A.  Yeah, I don't know.

16        Q.  Which word are you uncertain of there?

17        A.  Patient declined to take copy of ROR and --

18   oh, then he closed something as we left conference.

19        Q.  Okay.  Then it says patient was calm

20   throughout discussions, but was clearly not pleased,

21   right?

22        A.  Yeah.

23        Q.  And that would have been a recording of what

24   happened on June 30th at 3:15 p.m., right?

```
 1        A.  Correct.
 2        Q.  So in there it does say that the writer --
 3   the writer met with the patient by the request of the
 4   nurse manager to give him this ROR, correct?
 5        A.  Correct.
 6        Q.  So were you aware on June 30th, as part of
 7   administration, that Ben's telephone rights were
 8   restricted until July 3rd?
 9        A.  No, not -- not that I recall.
10        Q.  Was the nurse manager someone who reported to
11   you?
12        A.  Yes.
13        Q.  So someone would have had to tell her to do
14   this, right?
15        A.  Correct.  Her or him.
16        Q.  Her or him.  I apologize.  You're right.  I
17   don't know who the nurse manager was.  I don't want
18   to assume.
19             But whoever the nurse manager was,
20   would have been told to tell the social worker to
21   issue the ROR, correct?
22        A.  Correct.
23        Q.  So do you know who the nurse manager was at
24   that time?
```

1       A.  It may have been Tom Comford (phonetic) at

2    that time.

3       Q.  Okay.  Do you recall telling Tom to issue

4    this ROR?

5       A.  No.

6       Q.  Would someone else have bypassed you as Tom's

7    immediate supervisor and told him to issue the ROR?

8       A.  Well, I mean, he could have -- he -- as a

9    unit -- or a nurse manager, you can get directives

10    from the associate director, the director, the HA.

11       Q.  But it would have had to have been somebody

12    from administration to issue the ROR, right, because

13    it's an administrative directive, right?

14       A.  Well, I mean, didn't it say in the previous

15    note that the directive was issued by Brian Dawson,

16    the HA?

17       Q.  It just -- well, the original note said Brian

18    Dawson, then it says phone use per administration.

19    So are you saying that Brian Dawson would have gone

20    and told Tom Comford to issue this ROR?  Is that what

21    you're saying?

22       A.  I'm saying he could have.

23       Q.  So it could have been -- it could have been

24    the hospital administrator.  Who else could it have

```
 1    been?
 2         A.  The chief of security if -- you know, again,
 3    if ISP is saying there's, you know -- I don't know.
 4    I -- you know what, now I'm just speculating, so I'm
 5    going to actually -- I have a -- I don't know.  I'm
 6    going to say that it was probably Brian Dawson based
 7    on the note that was indicated earlier.
 8         Q.  Right.  I understand.  And that's a factual
 9    question about whether you spoke to somebody and have
10    direct knowledge.
11                  I'm just asking procedure-wise.  If
12    administration is issuing an ROR, it would have had
13    to have been Brian as hospital administrator and then
14    Chief Epperson as chief of security --
15         A.  FTP director.
16         Q.  FTP director it could have been.  Could it
17    have been Diana Hogan, who was the director of
18    nursing at that time?
19         A.  Could have been.
20         Q.  And it could have been you, too?  You were
21    the associate director of nursing.  You had the
22    authority to do that, right?
23         A.  Yeah, but it -- it didn't come from me in
24    this instance.
```

1     Q.  So down a little further in the chart, now

2     there's a -- this is page 14512.  Do you see this?

3     This is a typewritten note.  It looks like by Robert

4     Lee, social worker II, correct?

5     A.  Yes.  I'm sorry.  Something -- when seeing

6     Robert Lee's name, it just reminded me of something.

7     The nurse manager also could have been Danette

8     Jungles (phonetic).

9     Q.  Oh, okay.

10    A.  She was there for a time.

11    Q.  Okay.  So it could have been Tom or Janet

12    that was --

13    A.  Danette.  D-a-n.

14    Q.  Okay.  It could have been Tom or Danette that

15    issued the order to the social worker, correct?

16    A.  Correct.

17    Q.  But that doesn't change your answers about an

18    administrative order, correct?

19    A.  No, no, no.  It just...

20    Q.  Okay.  Okay.  So in -- it looks like in the

21    last two lines -- I'm going to try to move my mouse

22    to show you this.  Beginning here on 7-3 -- can you

23    see that section of this note?

24    A.  Yeah.

1          Q.  It says, "On 7-3-2017, his social worker was

2     advised by nursing and security to extend his ROR.

3     He was asked if he wanted a copy sent to anyone

4     (including guardian advocate), and he replied 'no.'

5     He was provided a copy, and the original was filed in

6     the chart."

7                    This is nicer because it's

8     typewritten.

9          A.  Yeah.

10         Q.  You agree that's what it says, right?

11         A.  Yes.

12         Q.  Okay.  So this is another instance where

13    Robert Lee now was advised by nursing, and this is

14    now Monday, July the 3rd.

15                    Do you recall if you were part of the

16    decision to extend the ROR on July 3rd as part of

17    nursing?

18         A.  No, I wasn't.

19         Q.  Did you ever talk to Diana Hogan about this

20    ROR as your boss?

21         A.  Not that I recall, no.

22         Q.  So can you explain why Ben received these

23    RORs?

24         A.  No, I can't.  I wasn't part of the

1     decision-making.

2         Q.  So wasn't the investigation that we're

3     talking about actually an investigation concerning

4     Christy Lenhardt and -- by the State Police and not

5     Ben Hurt?

6         A.  Well, I mean, after the fact, having, you

7     know, the knowledge that I have, it would -- the

8     answer would be yes, but at the time I -- I wouldn't

9     have known.

10        Q.  I mean, are you aware of whether Christy was

11    ever charged with a crime?

12        A.  Well, now I am.

13        Q.  Right.  And you're aware that she was

14    punished for that, right?

15        A.  Yes.

16        Q.  And wasn't Ben Hurt the victim of that crime?

17        A.  Yes.

18        Q.  So if Ben Hurt was the victim of a crime,

19    sexual abuse, why do you think, as part of

20    administration, that Ben's rights would have been

21    restricted, making it appear as if he was the subject

22    of the investigation?

23        A.  I can't speak to that.  I wasn't part of that

24    decision-making chain.

1          Q.  So RORs are imposed at Elgin for violations

2     of some policy by a patient, right?

3          A.  Okay.  So, I'm sorry, you said RORs are

4     issued based on a policy infraction?

5               MR. CECALA:  Can you read back the question?

6             (From the record above, the reporter read the

7              following:

8             "Q  So RORs are imposed at Elgin for

9                 violations of some policy by a patient,

10                right?")

11              THE WITNESS:  Violation of a policy?  No,

12     sometimes, for instance, we'll get -- a patient may

13     have a restraining order placed against them or no

14     contact order, so the ROR will be issued and it will

15     be like modified that, you know -- I don't -- I don't

16     know, so -- no.  The answer is, no, not necessarily.

17     BY MR. CECALA:

18          Q.  Well, the patient will have had to have done

19     something to elicit restricting their rights,

20     correct?

21          A.  No.  We've had to restrict someone's rights

22     to visitation based on them being contagious of an

23     illness.

24          Q.  Who's them?

LISA A. KOTRBA & ASSOCIATES, LTD.  (312) 855-1834

1      A.  We've -- if a patient has a contagious

2  illness and we're not allowing them to leave the unit

3  due to quarantine, we still issue the restriction of

4  rights even if they're in agreement because due to

5  their infection or infectious process, we have to

6  restrict the right of visitation.  So it's on -- it's

7  not something they've done or violated.

8      Q.  Right.  So fair enough.  A patient gets sick

9  and you have to restrict their rights for their

10  safety, right, and everyone else's safety?

11      A.  Correct.

12      Q.  But there's usually some explanation like

13  that, where the patient is either doing something,

14  done something, is sick, it's the patient who is

15  causing the need to restrict that individual person,

16  right?

17      A.  Not necessarily.

18      Q.  So it could be someone else that causes a

19  patient to receive a restriction of rights other than

20  the patient?

21      A.  Yeah, if -- if we get a court order.

22      Q.  So a court order for what?

23      A.  To not allow an individual to contact certain

24  people.

1    Q.  Well, you're then restricting the person that

2    is contacting the patient, right?

3    A.  No, we restrict the patient from contacting

4    the person.

5    Q.  Okay.  So there's some possible external

6    influence that could restrict a patient's rights is

7    what you're saying?

8    A.  Correct.

9    Q.  So a restriction of rights because it's --

10   well, who has the rights?

11   A.  Who has the rights?

12   Q.  Well, you're restricting rights.  Whose

13   rights are you restricting?

14        MS. JOHNSTON:  Objection, form.

15   BY MR. CECALA:

16   Q.  Do you understand the question?

17   A.  Well, the patient -- the person -- the

18   patient is having their rights restricted.

19   Q.  Right.  So you're asking permission to take

20   away the rights of the patient for some particular

21   reason, right?

22   A.  Well, we're not asking permission.  We're

23   actually restricting the right.

24   Q.  Well -- right.  You're -- you're providing

1    the documentation for the reason that a right that a

2    patient has is being restricted, is that correct, in

3    a restriction of rights?

4        A.  Correct.

5        Q.  So there's some reason for it; perhaps it's

6    another person that wants to see the patient and is

7    not good for the patient, so they're restricted from

8    seeing that person.  Is that one instance that you

9    gave?

10       A.  I'm sorry.  Can you repeat that?

11       Q.  Sure.  There's some person who might present

12   some harmful effect to the patient and the patient

13   ordinarily has a right to have anyone visit them; but

14   because someone might be harmful, like a court order

15   you gave an example of, you would issue a restriction

16   on the patient's right to see that person for the

17   benefit of the patient, right?

18       A.  Correct.

19       Q.  So that's a restriction of the patient's

20   rights for the benefit of the patient, right?

21       A.  Correct.

22       Q.  And if the patient is sick, it's another

23   instance where the patient, through whatever medical

24   issue occurred, might be infectious to themselves or

1    others, so you restrict the patient's rights to

2    protect them and others from the patient spreading a

3    contagious disease; that's another example, right?

4    A.  Correct.

5    Q.  And there are other examples, perhaps where a

6    patient has done something, where they need to be

7    restricted in some activity, and you take away their

8    right for some particular thing the patient is doing

9    or has done to protect the patient and to properly

10    give treatment to the patient, correct?

11    A.  Correct.

12    Q.  Can you think of what Ben Hurt was doing on

13    July 3rd -- well, I'm sorry, on June 30th to begin

14    with?  What was he doing to impose a near total

15    restriction on his ability to communicate by phone?

16    MS. JOHNSTON:  Objection, form.

17    THE WITNESS:  I can't speak to that.  That

18    would have to be the treatment team.

19    BY MR. CECALA:

20    Q.  Well, the administration is the one who

21    issues -- signs off on the -- on restrictions of

22    rights, correct?

23    A.  No, no.  Anyone -- a nurse, social worker,

24    physician can write a restriction of rights.

1      Q.  And the restriction doesn't have to be

2      approved by one of the members of the administration

3      team?

4      A.  No.

5      Q.  I thought you testified --

6      A.  The clinical -- clinical decision.

7      Q.  So the clinical team can issue a restriction

8      of rights, correct?

9      A.  Correct.

10      Q.  But this was an administrative restriction of

11      rights on Ben, wasn't it?

12      A.  I was not a participant in this specific ROR,

13      so I can't speak to that.

14      Q.  Well, we looked at it in the chart.  I didn't

15      ask whether you were a participant or not.  This

16      restriction of rights, according to the chart, was

17      issued by administration, correct?

18      A.  Brian Dawson.

19      Q.  It appears Brian Dawson.  It also says that

20      nursing requested the social worker to speak to the

21      patient to issue the restriction of rights, correct?

22      A.  Yes, nursing would be nursing on the unit.

23      Q.  The point is the restriction of rights was an

24      administrative restriction, correct?

1          A.   Per the documentation.

2          Q.   Okay.  And I'm -- I'm just asking you if

3     you -- if you know.  What was Ben Hurt doing that

4     caused him to receive a restriction on his ability to

5     communicate with anyone on June 30th?

6          A.   As I stated, I was not there.  I do not know.

7          Q.   The documents also say in addition to it

8     being an administrative directive, it said earlier

9     that it was due to an ongoing investigation.  Do you

10    recall that?

11         A.   Yes.

12         Q.   So that's the foundation for whoever it was

13    in administration to impose this restriction,

14    correct?  The investigation was the reason.

15         A.   I don't know.

16         Q.   Well, that's what the documents say, though,

17    right?

18         A.   That's what the documents say.  That's what

19    was charted.

20         Q.   Okay.

21              MR. KRETCHMAR:  A couple times you've said,

22    well, that's what the documents say.  Are you

23    implying that maybe the documents are not correct?

24              THE WITNESS:  No.  I'm implying that I'm

```
1    being asked about things that we've already read and

2    stated, that I'm just referencing back to that, yes,

3    we've read that already.

4    BY MR. CECALA:

5        Q.  So there -- I mean, you don't have any reason

6    to dispute the truth of what was in the documents is

7    Randy's point.

8        A.  No, I don't have any reason to dispute it.

9           (Deposition Exhibit Number 5 was marked for

10           identification.)

11   BY MR. CECALA:

12       Q.  Okay.  So I'm going to show you Exhibit 5.

13   This is another document.  It's a 16-page exhibit

14   given to us by the State Police.  It's ISP 090 and it

15   goes sequentially to ISP 105.  I don't know if you've

16   ever seen the Department of Internal Investigation

17   reports before.

18                    Have you ever seen a document from

19   the State Police like this before?

20       A.  Just the previous one you put up as an

21   exhibit.

22       Q.  Okay.  So that was your -- it's your first

23   foray into looking at police documents, never saw

24   anything like this before?
```

1          A.  No, not that I recall.

2          Q.  So these were documents that were given to

3     the State Police as part of this investigation into

4     Christy, where they outline certain policies at

5     Elgin.

6               So -- can you -- do you see this

7     document?  It's ISP 92.  Have you ever seen this

8     document before?

9          A.  Yes.

10         Q.  So you're familiar with the policy on patient

11    possession and use of personal computers, printers,

12    and CD-ROM, and CDs?

13         A.  I mean, I wouldn't say I'm versed at its

14    content, but I am familiar of -- with the policy.

15         Q.  Okay.  Well, this one looks like it was

16    issued on June 28, 2002.  Do you see where it says

17    that?

18         A.  Yeah.

19         Q.  And then it was revised September 25th of

20    2006, right?

21         A.  Yeah.

22         Q.  So this seems to outline in Roman numeral 3

23    the procedures pertaining to letter A, purchasing or

24    obtaining laptops; letter B, use of the laptop; and

```
1          then letter C is continuous quality improvement; and
2          D, the staff training.
3                      This is -- and it's only a two-page
4          policy, correct?
5              A.  Correct.
6              Q.  And then I'm going to show you what was ISP
7          document No. 94.  This is another policy.  It's the
8          exact same policy, possession and use of computers,
9          modems and other electronic equipment.  Do you see
10         that?
11             A.  Yeah, but -- I'm sorry.  Can you scroll back
12         up to the previous policy?
13             Q.  Sure.  Same title anyway.
14             A.  I know, but I want to look.  Yeah, these are
15         different manuals.
16             Q.  It's a different manual at Elgin?
17             A.  Yeah, the first -- the first one comes from
18         the EMHC manual and then the second one is specific
19         to forensics.
20             Q.  Okay.  So this is a refinement policy of the
21         general policy at EMHC, the second one, on page 94?
22             A.  Well, it's not a refinement.  It's two
23         different manuals.  The EMHC policy is over -- it's
24         an umbrella policy over the whole hospital, both
```

```
 1        programs, civil and forensic, and then this is out of
 2        the FTP manual.
 3            Q.  Right.  So this is in the forensic treatment
 4        program manual?
 5            A.  Correct.
 6            Q.  Further, perhaps, specifications as they
 7        apply to forensics of what the umbrella policy is for
 8        all of Elgin, right?
 9            A.  Correct.
10            Q.  So this policy, possession and use of
11        computers, modems and other electronic equipment, was
12        issued on April 15, 1989, correct?
13            A.  Correct.
14            Q.  And then it was revised July 11, 2017?
15            A.  Correct.
16            Q.  So in this policy there are some very -- if
17        you look at Roman numeral 3, item No. 4, so it says,
18        "Patients with computers or related equipment will
19        not be permitted to store any information in the
20        memory bank directly related to other patients or
21        staff," right?
22            A.  Correct.  Sorry.
23            Q.  And then in item No. 6 it says, inappropriate
24        use of computers or related equipment will result in
```

1          the confiscation -- in their confiscation.

2          Confiscated equipment will be placed in the personal

3          property department or sent home for safe keeping

4          until discharge of the patient from the facility,

5          correct?

6               A.   Uh-huh, yes.

7               Q.   And it looks like this was -- and it refers

8          back -- both of these policies, this one refers back

9          here in Item 3, No. 2, letter B, to DHS policy 109,

10         which is the Illinois Administrative Code for DHS.

11         And as does -- I can show you the other one.  It says

12         the same reference to the Administrative Code

13         regarding personal computers.

14                         We'll get to that in a minute.  I'll

15         actually show you the code.  But, suffice it to say,

16         that's what it says, right?

17              A.   Yeah.

18              Q.   Now, forensics reissued a policy in 2017 that

19         was nearly 18 years old in this new policy, right?  I

20         can show you the top again.  It says that it was --

21              A.   No, I know.  I know the dates, but I'm just

22         thinking about my -- my policy manual, the nursing

23         manual.

24              Q.   I'm not asking you about the nursing manual.

1    I'm asking you about this one.

2         A.  I'm responding to how we revise and review

3    policies.  So we'll -- we'll indicate on our table of

4    contents if a policy has been reviewed because we

5    review them every three years, so --

6         Q.  Well, this one was revised and reviewed on

7    July 11, 2017.  Is there any reason to doubt that?

8         A.  For me, yes.

9         Q.  So you don't think this was revised on July

10   11th and reviewed on July 11, 2017?

11        A.  No, I think -- I think it was.  I'm -- my

12   point in saying is that there was probably reviews

13   throughout -- from '89 to '17, which may not be

14   reflected on this document.  So sometimes on the

15   table of contents it will say review date, and we

16   just sign off if there -- so that's what I'm saying.

17        Q.  I see.  So there may have been other

18   revisions and reviews of this policy between July

19   of --

20        A.  '89, when it was issued, and 2017.

21        Q.  Oh, okay.  Fair enough.  But it was -- I

22   mean, that doesn't much matter to me right now.  I

23   just want to make sure that you're in agreement that

24   on July 11th it was revised and reviewed, correct?

1      A.  Correct.

2      Q.  Now, it -- it gives a policy on inappropriate

3   use of computers, item No. 6, correct?  Sorry.

4      A.  Yes.

5      Q.  So the term "inappropriate use" -- the policy

6   refers to Section 109.  This is the Administrative

7   Code.  This was also given by Elgin to the State

8   Police.  And this is the section.  It says

9   definitions, 109.1.  And we're looking now at page

10   ISP 97.  It gives the definition of inappropriate

11   use.

12            Can you read the definition of

13   inappropriate use in the code?

14      A.  "'Inappropriate use' means the use of a

15   computer in violation of this part or facility policy

16   or to harass or otherwise harm another person.

17   Unless instructed otherwise by the court, it does not

18   include using the computer to prepare for litigation

19   to seek relief or against the Department."

20      Q.  So what is your understanding of using the

21   computer to prepare for litigation or to seek relief

22   or against the Department?  Do you understand what

23   that means?

24      A.  Does not include using the computer to

```
 1        prepare -- so to assist in their defense if they're

 2        going through a legal proceeding.  Seek relief or

 3        against the Department?  I assume or -- or filing

 4        some sort of lawsuit against the Department.

 5             Q.  Could it -- could it also include that if a

 6        patient had evidence on his computer that was against

 7        the Department, that that's not computer information

 8        that would fall under the term inappropriate use?

 9                  MS. JOHNSTON:  Objection, form.

10                  THE WITNESS:  Yeah, I'm sorry.  I have no

11        idea what the question was.

12        BY MR. CECALA:

13             Q.  So the term here says inappropriate use and

14        it includes what is not appropriate, right?  Then it

15        creates an exception, unless; is that correct?  So

16        we're talking about an exception to inappropriate use

17        in the plain language of the statute, right?  These

18        are exceptions to what's inappropriate use?

19             A.  Correct.

20             Q.  And one of the exceptions is using the

21        computer to prepare for litigation, which you

22        answered was maybe they're defending themselves in

23        their criminal case or they have a lawsuit of some

24        kind and they're using it to prepare for litigation,
```

1    that's not an inappropriate use under the law.  Is

2    that what -- how you understand the plain language of

3    these words?

4        A.  Does not include -- correct.

5        Q.  Now, seek relief, I agree with you, a little

6    vague.  I don't know what they might be looking for

7    relief from, but usually relief is an illegal term,

8    and I'll leave that alone, as I'm not looking for

9    your legal opinion on what the term relief means.

10   But it does say or against the Department.  Meaning,

11   they can use the computer to keep information that

12   would be against the DHS interests; isn't that

13   correct?

14            MS. JOHNSTON:  Objection, form.

15            THE WITNESS:  Yeah, I can't -- I can't

16   respond to that.  Use of the computer -- yeah, it

17   doesn't say flash drives or storage.  It says use of

18   the computer, which I interpret as writing documents.

19   BY MR. CECALA:

20       Q.  So once they write the document, they have to

21   delete it.  Is that what you're implying?

22       A.  I'm not implying anything.  I said I -- I

23   interpret that to mean helping prepare documents,

24   writing documents.

```
1          Q.  And that's all it means to you, that they use

2     a computer to write a document?

3               MS. JOHNSTON:  Objection, form.

4               MR. CECALA:  It's her answer, Mary.

5               MS. JOHNSTON:  She can answer.

6     BY MR. CECALA:

7          Q.  I'll withdraw the question.  When someone's

8     using a computer, is it a normal regular practice to

9     save the information that they create on the

10    computer?

11         A.  Yes.

12         Q.  So use of a computer also may include keeping

13    the information you create on the computer, correct?

14         A.  If -- not unless the person being recorded is

15    aware they're being recorded.

16         Q.  I didn't ask you about a recording.  I asked

17    you about appropriate uses of a computer.  You store

18    information on a computer.  That's a use of a

19    computer, correct?

20         A.  Yes.

21         Q.  And here they're saying use of a computer is

22    inappropriate, unless the computer is used to prepare

23    for litigation -- and we've talked about that one --

24    or against the Department.  Meaning, they can use the
```

1    computer against the Department's interests, correct?

2        A.  Against the Department's interests?  I don't

3    know.

4        Q.  Well, what does it say?

5        A.  I don't know if that's what it means.

6        Q.  What does it mean to you?

7        A.  It means that they can use the computer to

8    prepare documents.

9        Q.  In relation to the Department, what does it

10   mean to you?

11       A.  That they can use the computer to prepare

12   documents.

13       Q.  And we already fenced about this.  I'm not

14   trying to fence with you.  They can store documents,

15   that's part of a use of a computer as well.  I'm not

16   asking about that.  I'm asking about what do the

17   words against the Department mean to you?

18       A.  Against the Department.  Anti the Department.

19       Q.  Right.  So something that is not helpful to

20   the Department, right?  It's the opposite of helpful,

21   isn't it?

22       A.  It's not pro the Department.

23       Q.  Okay.  Good.  It wasn't a gotcha question.

24   It just -- that's -- that's what the plain language

1       of the statute says, right?  Is that right?

2           A.  That's -- that's -- you're saying that's what

3       it says, so...

4           Q.  Well, I'm not saying what it says.  You can

5       look at the document.  I'm not -- I'm not making it

6       up.  Is that what it says or not?

7           A.  We've already read what it says.

8           Q.  So --

9           A.  I'm not going to keep repeating it.  I've

10      said what it says.

11          Q.  Okay.  There seems to be some, I don't know,

12      disagreement as it's untruthful or that it doesn't

13      actually say that.  That's the only reason I keep

14      bringing it up.

15          A.  It says against the Department.

16          Q.  Okay.  So this is a continuation of the

17      Illinois Administrative Code.  It goes down -- I'll

18      show you the citation.  So this is another section,

19      109.3, where it talks about procedures, and then

20      there's letter A, General Provisions.  They're

21      talking about individual use of computers in this

22      section, B.  So under B(4), Section B(4), this is

23      discussing -- it says, "If an individual at a mental

24      health facility uses a computer, any peripheral,

1     power cord and/or other associated part in an attack

2     or assault on another individual, employee or

3     visitor, the computer and all accompanying devices

4     and equipment shall be confiscated and placed in

5     personal property storage."  Is that what that says?

6          A.  Yes.

7          Q.  And then it goes on to say, "The 'Notice

8     Regarding Restriction of Rights of Individuals',

9     Form IL 462-2004M, will be completed according to

10    facility procedure."

11               So is that the common restriction of

12    rights forms that you -- are you familiar with

13    restriction of rights forms?

14         A.  Yes.

15         Q.  And that's the common nomenclature for what a

16    restriction of rights is?

17         A.  Yes.

18         Q.  And then it says, "If an individual at a

19    developmental disabilities facility uses a computer

20    related item to harm or attempt to harm another

21    person, the computer will be removed" until the

22    individual -- "from the individual until the

23    interdisciplinary team meets (within 3 working days)

24    to determine the programmatic action warranted."

```
 1                      Then another reference to the Notice
 2      Regarding Restriction of Rights of an Individual,
 3      same form number, and the "SODC Operations
 4      'Supplemental Report On the Use of Restraints and/or
 5      Emergency Behavior Intervention Procedures' are to be
 6      completed if an individual's computer is restricted
 7      and the forms processed in accordance with the
 8      developmental disabilities facility's procedures for
 9      processing documents," correct?  That's what it says?
10          A.  Yep.
11          Q.  Now, the second part is developmental
12      disabilities facility's; that's not what -- that's
13      inapplicable to Elgin right here, correct?
14          A.  Correct.
15          Q.  So this is providing guidance from the
16      statute on imposing a restriction of rights by a
17      facility over confiscation of a -- of a computer,
18      correct?
19          A.  Yes.
20          Q.  And it's outlining that the computer must be
21      used in an attack or assault on another individual
22      employee or visitor, that's when it would be
23      confiscated, correct?
24          A.  Correct.
```

```
 1              (Deposition Exhibit Number 6 was marked for

 2               identification.)

 3     BY MR. CECALA:

 4         Q.  Now I'm putting on the screen what has been

 5     Bates stamped by DHS as document 16246 sequentially

 6     through document 16257.

 7                        These are the documents which are the

 8     total of restriction of rights that were imposed on

 9     Ben Hurt during his entire stay at Elgin.

10                        Do you see this document?

11         A.  Yes.

12         Q.  Have you ever prepared a document like this?

13         A.  Yes.

14         Q.  And have you reviewed documents like this?

15         A.  Yes.

16         Q.  And as part of your responsibilities in

17     administration, did you ever give approval for

18     restrictions of rights from other people who prepared

19     these documents?

20         A.  No.

21         Q.  So you've never authorized a restriction of

22     rights as an associate director of nursing?

23         A.  No.

24         Q.  And you've never authorized a restriction of
```

1    rights as director of nursing in your -- when you

2    were TA'd there?

3        A.  No.

4        Q.  But you have prepared them?

5        A.  Yeah.

6        Q.  So you're very familiar with the documents?

7        A.  Uh-huh.

8        Q.  You have to answer yes or no for the court

9    reporter.

10       A.  Yes.

11       Q.  So this -- can you -- can you read it?  I

12   made it a little smaller.  Can you still read it?

13       A.  Yes.

14       Q.  So on page 16246, this indicates a

15   restriction of rights to Ben Hurt.  It looks like it

16   was issued on August 22, 2015 at 14:50.  Do you see

17   that?

18       A.  Uh-huh, yes.  Sorry.

19       Q.  And that's what the document is indicating in

20   box 1, where it says -- maybe you can read it --

21   patient was exhibiting to the -- what does it say

22   there?

23       A.  "Patient was exhibiting agitated behavior,

24   yelling and cursing at a peer and staff.  Staff was

1     unable to verbally prompt patient to calm down.

2     Patient took PRN medication by mouth with security

3     present."

4        Q.  Okay.  And then it's signed by the RN, right?

5        A.  Yes.

6        Q.  Okay.  So this is a restriction that came

7     from nursing, correct?

8        A.  It came from that nurse.

9        Q.  Well, does she work in the nursing

10    department?

11       A.  Yes.

12       Q.  Okay.  And we talked about this earlier.  Did

13    she on her own accord issue this ROR or did she have

14    to get approval from someone?

15       A.  She issued it on her own accord.

16       Q.  I mean -- and my last question.  Because it

17    doesn't say otherwise, right?  It just -- she's the

18    only one on that document, right?

19       A.  The only one signing, yes.

20       Q.  And it doesn't even reference anyone else,

21    right?

22       A.  No.  Sorry.  But in those instances -- I

23    mean, if there's medication being issued, there's a

24    physician collaborating with the RN.  The RN

1    generally does the paperwork, but the doctor is

2    present and says, you know, issue this.

3        Q.  So the doctor would have instructed her to

4    issue this -- this restriction of rights, or are you

5    saying the doctor would have been the one to give the

6    PRN?

7        A.  The doctor would have given the PRN

8    medication order, but just from looking at what the

9    content of this document indicates, we -- our

10   practice is that -- you know, for instance, if -- if

11   Ben in this situation was, you know, escalating,

12   getting upset and they called security for a

13   walk-through, which is just our process to have

14   security walk on the unit, we immediately take that

15   as -- it could be perceived as coercion by the

16   patient; so even if he willingly, which it says he --

17   he took it by mouth, that means he had to put it in

18   his mouth, we don't put it in his mouth for him.

19   Even though he willingly took it, just with the

20   presence of security, we do a ROR because that can be

21   perceived as coercive, to have a security officer

22   standing near you.

23       Q.  Sure.  So this -- but that's after the fact.

24   The restriction of rights is something that the RN,

1    in this case, would have been the primary person.

2    She didn't need the doctor to instruct her to give a

3    ROR?  Or maybe I'm wrong.

4              Was the ROR given so as to provide

5    noncoercive medication to the patient?  Is that the

6    purpose of this one?

7        A.  No.  I'm saying we would issue -- it's -- the

8    fact that the security officer is standing there,

9    we -- we, being our facility, still says that -- that

10   that in and of itself could be perceived as coercion

11   by the patient.  So they really aren't -- we still

12   say that even security standing there, even if the

13   patient takes it by mouth willingly, it's still a

14   restriction of their rights because you have this

15   authority figure standing, you know, in your

16   presence.

17       Q.  Okay.  And what would be the reason that she

18   wrote down patient was exhibiting agitated behavior,

19   yelling and cursing at peer and staff?  Why did she

20   write that?

21            MS. JOHNSTON:  Objection, form.

22            MR. CECALA:  I'll withdraw it.

23   BY MR. CECALA:

24       Q.  So is there -- it says "Patient was

LISA A. KOTRBA & ASSOCIATES, LTD.  (312) 855-1834

```
 1      exhibiting agitated behavior, yelling and cursing at

 2      a peer" in the box that says Reasons for the

 3      Identified Restrictions.

 4                   Is it your understanding that the

 5      reason for the restriction was this patient's kind of

 6      psychotic behavior?

 7           A.  Well, it doesn't say psychotic behavior.  It

 8      just --

 9           Q.  Okay.  Agitated behavior?

10           A.  Yes.

11           Q.  I mean, he's yelling and cursing at staff.

12      He's -- he's behaving badly, right?

13           A.  It's not nice.

14           Q.  No.  The question is it's bad behavior for

15      which a security guard had to be called and he just

16      wouldn't calm down when he was told to calm down, so

17      they had to give him medication by mouth in the

18      security's presence?  So on the safe side, it was a

19      restriction of rights because security had to be

20      there when he got his medications; he wouldn't do it

21      because the nurse asked him, right?

22           A.  Yes.

23           Q.  So then there's another restriction of rights

24      here that was issued to Ben Hurt.  It looks like the
```

1      date isn't at the top and box 1 is not filled out

2      because this is not physical hold.  It's an other

3      restriction, right, part 2?

4          A.  Correct.

5          Q.  So this one was issued on August 29, 2015 at

6      13:30 and it was till 14:30, correct?

7          A.  Correct.

8          Q.  And then could you read the reasons for that

9      restriction in this one?

10         A.  Could you -- oh, no, no, I can see it now.

11     "Patient is on frequent observation for increased

12     psychosis and unpredictable behavior.  He is

13     undergoing medication change."

14         Q.  Right.  So looking at the document, not

15     exactly like the previous one, but there's some

16     reason the patient is behaving in some way that

17     causes and gives a reason to restrict his rights,

18     correct?

19         A.  Well, just being the frequent observation --

20     yes.

21         Q.  Okay.  Thank you.  And then this is another

22     one that was signed on August 29th.  It says RN, so

23     this is another nursing restriction of rights,

24     correct?

LISA A. KOTRBA & ASSOCIATES, LTD.  (312) 855-1834

1      A.  Yes.

2      Q.  Could have been on the nurse's own

3   origination or do you think this is one -- and how

4   could we tell the difference -- whether someone told

5   her to issue this restriction of rights?

6      A.  Well, this is just part of our procedure.

7   The patient's on frequent observation for a

8   behavioral issue, so they aren't allowed to leave the

9   unit.

10      Q.  I know.  That's not my -- that's not my

11   question.  My question is the authority to issue

12   this -- obviously the nurse signs it.  Did someone

13   instruct her to issue the restriction of rights or

14   did she do that by herself?

15      A.  I don't know.  I wasn't there.  I would

16   assume -- I can't -- actually, I can't assume.  I

17   don't know if someone told her.

18      Q.  Yeah, you wouldn't be able to know from this

19   document, right?  It doesn't say --

20      A.  No.

21      Q.  So this is another restriction of rights to

22   Ben.  In part 2, Other Restrictions, June 30th at

23   1:15 p.m., and it lasts until July 3rd at 16:00.

24   We've talked about this restriction of rights.  Could

LISA A. KOTRBA & ASSOCIATES, LTD.  (312) 855-1834

1    you read what it says under reasons for the

2    restriction?

3        A.  "Patient is under investigation

4    (administrative directive)."

5        Q.  And it was signed by -- on 6-30 at 3:15 by,

6    it looks like, social worker II, correct?

7        A.  I honestly can't -- it looks like it says

8    CADC, which would be a social worker.

9        Q.  Well, under the title it looks like SWII.

10       A.  Oh, I'm sorry.  I was looking at the

11   signature.  Yes, social worker II.

12       Q.  Good.  Now, this one looks like it was not

13   the social worker himself, but he's issuing it; it

14   says dash administrative directive, correct?

15       A.  Correct.

16       Q.  So this would have been the administration

17   directing the restriction of rights on June 30th, as

18   we talked about earlier, correct?

19       A.  Brian Dawson.

20       Q.  Well, it doesn't say Brian Dawson, does it?

21       A.  It doesn't say administration.  It says

22   administrative directive.

23       Q.  Right.  So this document itself doesn't tell

24   you whether it was Brian Dawson or the FTP director

1    or Chief Epperson.  We don't exactly know who in

2    administration gave --

3        A.  Or present -- the document doesn't even say

4    per administration.  It says administrative

5    directive, which...

6        Q.  Okay.  Fine.  What does that mean to you?

7        A.  There's a whole DHS administrative directive

8    catalog, so I -- I don't know what it means.

9        Q.  Does it --

10        A.  But I'm using the context of the previous

11    note in Ben's chart that said per administration,

12    Brian Dawson.

13        Q.  Well, it also said per -- per nursing, too,

14    right?

15        A.  What?  Per nursing, too?

16        Q.  The chart also said that the social worker

17    received the communication from nursing and security.

18        A.  Correct.

19        Q.  So it did definitely say Brian Dawson in the

20    very first note, correct?  Do you recall that?

21        A.  Yes.

22        Q.  But later it also gives two departments,

23    nursing and security, in the notes somewhere else,

24    correct?  Do you recall?

1      A.  Yeah.

2      Q.  So this one just says administrative.  And

3  the hospital administrator, the DON and the ADON and

4  security are all part of administrative, correct --

5  or part of administration?

6      A.  I'm not sure if security -- the chief of

7  security is part of administration.

8      Q.  Okay.  Can the chief of security

9  independently order restrictions of rights?

10      A.  Procedurally, no.

11      Q.  It has to come from some other either

12  administrator, the hospital administrator, or the

13  treatment team, right?

14      A.  Correct.

15      Q.  How is the hospital administrator in the

16  context of this different than the chief of security

17  because he's not a part of treatment either, why

18  would he be able to issue RORs?

19      A.  Why would he be able to issue RORs?  Well, he

20  wouldn't issue the ROR.  He would guide the treatment

21  team to issue the ROR.

22      Q.  Well, he would order it, right?

23      A.  He would guide the treatment team to issue

24  the ROR.

```
 1          Q.  What does guide the treatment team mean?
 2          A.  Guide -- tell them that, you know, they
 3     want -- they should look at issuing an ROR based on
 4     whatever the circumstance is.
 5          Q.  So he can't actually direct them to do it,
 6     can he?
 7          A.  Yeah, yeah, I guess he can.
 8          Q.  So if he gave them an order to issue an ROR,
 9     they would have to follow it, right?
10          A.  I mean, yeah, or -- I mean, like anything,
11     everyone has a choice.  I mean, if an administrative
12     directive per this, you know, wording here, I mean, I
13     don't know if the social worker was contacted, you
14     know, directly or -- or how this came to play.  I
15     mean, the social worker could say, no, I'm not doing
16     that, and then, you know, I guess that could be
17     viewed as insubordination, but, I mean, generally you
18     would -- if the hospital administrator calls you and
19     says do something, you know, unless it jeopardizes
20     the safety of somebody, you would just probably do
21     it.
22          Q.  Right.  So this is a social worker who issued
23     the restriction over the phone pursuant to some
24     administrative directive, correct?
```

1    A.  I'm sorry.  Did you say issued it over the

2    phone?

3    Q.  Issued -- issued a restriction over Ben using

4    the phone.  It says telephone --

5    A.  Oh, yeah, yes.

6    Q.  And at -- at -- pursuant to some

7    administrative directive, correct?

8    A.  Yes.

9    Q.  Okay.  So this is, looks like, the fourth ROR

10   for Ben, same box, part 2, from July 3, 2017 at 16:00

11   to July 22nd, 2017 at 06:00.  And could you read --

12   again, restricting his right to use the telephone.

13   Can you read the reason for the ROR?

14   A.  "Patient is under investigation (security) -

15   administrative directive."

16   Q.  So, again, we went over the administrative

17   directive and what that might mean prior to this, but

18   here it puts parentheses security, right?

19   A.  Yeah.

20   Q.  What in your view does that mean?

21   A.  Well, the way it's written, it looks like

22   it's a security investigation.

23   Q.  Right.  So were you part of the

24   administration that created this ROR from July 3rd to

1    July 22nd?

2         A.  No.

3         Q.  And it also indicates that patient is under

4    investigation, correct?

5         A.  Correct.

6         Q.  It doesn't say that the social worker or

7    someone else is under investigation.  It seems to

8    imply that he did something for which he's being

9    investigated, correct?

10        A.  Correct.

11        Q.  Now, this is another social worker II, again,

12   where the -- this is not something that would appear

13   to be the social worker taking it upon himself to

14   issue this ROR, correct?

15        A.  No.

16        Q.  Now, here's another ROR -- I'm not going

17   through all the Bates stamps on these for the record,

18   but we're now up to page 16254, and this is a Ben

19   Hurt restriction of rights, that part 2, Other

20   Restrictions, from July 11, 2017 12:00 to July 22nd,

21   correct?

22        A.  Correct.

23        Q.  And here it says, "Reasons:  Confiscated and

24   held by security:  Four flash drives, one journal,

1        one iPod (as appeared) Nano, blue in color," correct?

2            A.   Correct.

3            Q.   And then at the bottom it's signed by a

4        social worker.  It says social work -- under title it

5        says -- correct me if I'm wrong -- social worker

6        directed to issue ROR for property on July 11, 2017,

7        correct?

8            A.   Yes.

9            Q.   Now, I don't know if you recall, but we did

10       read the June 30th report issued by Chief Epperson,

11       where they recovered these flash drives, his journal,

12       and his iPod on June 30th, correct?

13           A.   Correct.

14           Q.   Yet, this restriction of rights indicates

15       that they confiscated his property on July 11th,

16       right?

17           A.   No, it doesn't indicate that that's when it

18       was confiscated.

19           Q.   Right, it doesn't.  It says to retain

20       personal property, right?

21           A.   Correct.

22           Q.   Because it had already been confiscated on

23       June 30th, correct?

24           A.   I -- sorry.  I don't recall.  In the security

1    report did it say they -- they kept it?  I assume

2    they did, so I would assume that they -- they

3    retained it.

4       Q.  Right.  It's a fair assumption they didn't

5    get an audio recording of Ben having sex with Christy

6    and then give it back to him, right?

7       A.  Correct.

8       Q.  So this one doesn't actually say who directed

9    the social worker to issue the ROR, does it?

10       A.  No.

11       Q.  Was nursing part of this ROR on July 11th, to

12    retain the confiscated property that Ben had taken

13    from him?

14       A.  I -- I can't -- what do you mean part of it?

15       Q.  Well, you were the associate director of

16    nursing.  Do you have any knowledge that your duties

17    as administrator or Diana Hogan's duties as

18    administrator were part of the direction to issue

19    this ROR on July 11th?

20       A.  Oh, no.  Just to clarify.  When you say

21    nursing, it -- it -- we're a very large department,

22    so on the unit when you say nursing, it means RNs and

23    STAs.

24       Q.  Okay.  Well, RNs and STAs directly report to

1    the associate director of nursing through the nurse

2    manager, correct?

3        A.  Correct.

4        Q.  So when I say nursing, I mean, the chain of

5    command of nursing at administration, meaning you and

6    Diana.

7        A.  Okay.

8        Q.  Fair enough?

9        A.  So clarify.  Going forward, when you say

10   nursing, you mean me and Diana?

11       Q.  Yeah, I'll do that for you.

12       A.  Okay.

13           MS. JOHNSTON:  And any time you're unsure,

14   Colleen, just go ahead and ask, so you know what

15   we're talking about.  Right, Joe?

16           MR. CECALA:  Yeah.  I have no -- you know,

17   we're just trying to -- it's a discovery deposition.

18   We're trying to discover, so your clarifications are

19   important.

20   BY MR. CECALA:

21       Q.  So there's another ROR on the same day, which

22   is Bates 16256.  This is on July 11th, again, at

23   13:00, a little bit later in the day, and it appears

24   to add in part 2 another iPod Shuffle, green in

1       color, as appeared, added to ROR at 15:00 is the last

2       line.  It's the same one, but just added a line here,

3       correct?

4          A.  Yeah, it appears that way.  I don't know what

5       as appeared means.

6          Q.  Yeah, I'm not -- I'm not sure what that means

7       either because it says it after blue in color and

8       then green in color.  So I'm -- I'm assuming it means

9       it appeared blue in color and it appeared green in

10      color, but it could be something other than that.  I

11      don't think it's an important distinction.

12         A.  Okay.

13         Q.  But that's what it does say, correct?

14         A.  Yes.

15         Q.  And then it provides the exact same title,

16      social worker directed to issue ROR for property on

17      July 11, 2017, correct?

18         A.  Yes.

19         Q.  And, again, it fails to indicate who was the

20      person who directed him to issue the ROR, correct?

21         A.  Yes.

22         Q.  Can you explain why the social worker would

23      have failed to indicate who told him to issue the

24      ROR?

1      A.  No.

2      Q.  And there's also no explanation in either of

3   these for why his property was confiscated, is there?

4      A.  Reason, no.

5      Q.  Can you explain why there would be no reason

6   in the ROR to explain why his property was

7   confiscated?

8      A.  No.

9      Q.  If you recall, there was a new policy issued

10  on confiscation of computer materials on -- issued on

11  July 11, 2017.  Do you recall seeing that policy

12  issued and reviewed on July 11, 2017?

13     A.  Yes.

14     Q.  Did you review that policy when it was

15  issued?

16     A.  I -- I may have.  The process changed several

17  times because we had a turnover of FTP directors, so

18  at one point it was just kind of unilateral, the FTP

19  director was just reviewing them, and then it was

20  we'd do it as a group, and then sometimes they would

21  just finalize and then present it so that we were all

22  notified of the policy.  So in some way or another,

23  I'm sure I saw it, but I don't recall at what point I

24  saw the policy.

1     Q.  Can you explain why on June 30th, when all of

2     this property was taken from Ben, there wasn't a

3     restriction of rights to confiscate his computer

4     equipment issued on that day?

5     A.  I -- no, I can't.

6     Q.  Are you aware of whether the confiscation of

7     his property on that day was a violation of policy,

8     causing the need to provide a new policy on July 11th

9     so that they could grandfather in having seized the

10    property 11 days earlier?

11    A.  I'm sorry.  What am I answering to?

12    Q.  Well -- I'll -- fine.  I'll give you the

13    question again.  So on June 30, 2017, all this

14    property was taken from Ben, correct?

15    A.  Correct.

16    Q.  And then on July 11th, the policy concerning

17    inappropriate use of computers was reissued, correct?

18    A.  Correct.

19    Q.  And as part of that, the right to confiscate

20    a computer and flash drives or things stored on

21    computers, as we went through in the statute, was

22    created anew on July 11, 2017 in that policy, right?

23    A.  I don't want to say yes to that just because

24    I'd have to see the previous version of the policy,

1    so I don't know what the revisions were.

2        Q.  Okay.  So you were -- during this window,

3    July 11th, you were still part of the administrative

4    team at Elgin, right?

5        A.  2017?  Yes, associate director of nursing.

6        Q.  So did you or any member of the

7    administrative team express any concerns that the

8    recorded files in Ben's possession might leak out,

9    exposing the sexual abuse of Ben by Christy?

10       A.  No.  Leak out?

11       Q.  Be put all over social media perhaps.

12       A.  No.

13       Q.  Did anyone ever express concern to you that

14   this abuse instance could be talked about widely in

15   the public at that time?

16       A.  And that's what I mean, I -- I don't recall

17   what conversations occurred after the -- the news

18   story and -- you know, because then a lot of staff

19   were discussing it.

20       Q.  Well, by the time of the news story, it was

21   all over the news, so no one was actually concerned

22   at that point because it was out there, right?

23       A.  Concerned about the flash drives?

24       Q.  Concerned about whether the recorded facts

1    and evidence of Christy performing oral sex on Ben

2    could be somehow given to the general public so that

3    it would be revealed what was on those recordings.

4    Was the --

5                MS. JOHNSTON:  Objection, form.  Sorry, Joe.

6                MR. CECALA:  No, I understand.

7    BY MR. CECALA:

8        Q.  Was the administration concerned on July 11,

9    2017 that the information on the seized and

10   confiscated property could be leaked out of the hands

11   of Elgin Mental Health Center?

12       A.  I can't speak for administration.  I can

13   speak for myself, that I didn't know what was on the

14   flash drives; so for myself, I had no concern about

15   anything getting -- getting out or leaked.

16       Q.  Well, you knew they -- you knew the flash

17   drives existed, right?

18       A.  Yeah.

19       Q.  Did anyone ever tell you that they were

20   concerned about the contents of the flash drives

21   being widely distributed anywhere?

22       A.  I don't know.  I -- I don't recall any

23   conversations regarding distribution of the contents

24   of the flash drives.

LISA A. KOTRBA & ASSOCIATES, LTD.  (312) 855-1834

```
 1            Q.  Were you ever told not to talk about the

 2       investigation of the Christy/Ben incident by anyone?

 3            A.  Yes.

 4            Q.  Who told you that?

 5            A.  I don't recall.  I don't know if it was ISP.

 6            Q.  Was it anyone employed by Elgin?

 7            A.  I don't recall specifically, but just as a

 8       matter of procedure, if we have an open investigation

 9       on -- on anything, like even an OIG, you know, we're

10       not supposed to discuss it until the conclusion of

11       the investigation.

12            Q.  Right, but that's not my question.  My

13       question was did anyone ever tell you not to discuss

14       it?

15            A.  Anyone from administration, I don't recall

16       specifically.

17            Q.  Anyone other than administration?

18            A.  Again, I -- I don't recall if -- if it was

19       ISP or...

20            Q.  Did you ever tell anyone not to talk about

21       it?

22            A.  Probably.

23            Q.  Who did you tell?

24            A.  I don't recall specifically, but, again, you
```

1     know, as staff started kind of stirring the pot on

2     this situation and -- and kind of -- you know, the

3     rumors start going around and -- and I -- I would

4     imagine I spoke to the nurse manager group that they

5     shouldn't be engaging in -- in conversations about

6     this situation.

7        Q.  So who would that have been?

8        A.  The nurse managers.

9        Q.  And who are they?

10        A.  Oh, God.  2017?  Again, it was -- I don't

11     know if Danette Jungles was still over there, but Jay

12     Cower (phonetic), Jeff Palarrio (phonetic), Lori

13     Campbell, Jenna Weber.

14        Q.  What did you say to them?

15        A.  I don't -- I have no idea specifically what I

16     said, but I just -- knowing -- I would have told them

17     not to engage in conversations about this situation

18     with the staff.

19        Q.  So what situation would you have been

20     referring to when you said that?

21        A.  Christy Lenhardt.

22        Q.  And so were you more precise than that or was

23     it just --

24        A.  I don't know.  I don't recall.

```
 1          Q.  Okay.  You have to let me finish my
 2     questions.  I know you're -- I know you're frustrated
 3     trying to remember, but we want to keep a nice
 4     record.
 5                    So you weren't more specific than
 6     just generally saying don't talk about Christy
 7     Lenhardt?
 8          A.  I don't recall.
 9          Q.  Do you think that the computer recordings
10     that were confiscated were kept to prevent anyone
11     from finding out what was on them?
12          A.  No.
13          Q.  Why?
14          A.  Why?
15          Q.  Do you believe that.
16          A.  Because I -- you really want a statement on
17     why I believe we weren't trying to withhold
18     information from the law?
19          Q.  I didn't ask you about the law.  I'm
20     asking -- the question is do you think the recordings
21     were kept to prevent anyone from finding out what was
22     on them?
23          A.  No.
24          Q.  Now, you know now that Ben was being sexually
```

1    abused and there's an audio recorded evidence of that

2    sexual abuse, correct?

3        A.  Yes.

4        Q.  Do you think that that was important for his

5    treatment team to know?

6        A.  At that -- at that time?

7        Q.  Well, it was evidence of Ben being sexually

8    abused on an audio recording, which is evidence of a

9    crime, and it was given to the State Police because

10   the social worker was going to be charged with

11   sexually abusing him.

12               Do you think at that time it was

13   important for Ben's treatment team to know that he

14   was being sexually abused by Christy Lenhardt?

15       A.  No, not until the facts of the situation were

16   determined.  And the reason I say that is because

17   Christy was removed from the unit, so he wasn't being

18   exposed to the alleged abuser any longer.  And it's

19   the same situation as when we have an OIG allegation,

20   we remove the person that the -- the allegation is

21   against until OIG completes their investigation and

22   then when we know, you know, what the actual facts

23   were or are, then we proceed with the -- with the

24   follow-up because how were we to know who was on

```
 1        that -- whoever listened to it, how do they know who

 2        they were on the audio?

 3            Q.  So --

 4            A.  I can make a recording and say, hi, I'm

 5        Christy Lenhardt.

 6            Q.  So have you ever heard the audio recording?

 7            A.  No, nor do I want to.

 8                MR. KRETCHMAR:  You might.

 9                THE WITNESS:  I'd prefer not to.

10                MR. CECALA:  Give me a second.

11            (Pause.)

12    BY MR. CECALA:

13            Q.  Remarkably, Randy will spare you the audio

14        recording because I'm willing to play it.

15            A.  I'd appreciate not to.  You know...

16                MR. KRETCHMAR:  My only -- my only

17        suggestion, Colleen, is that someday soon you may

18        have to hear it, not only one, but two; and you may

19        have to see a bunch of pictures that Christy sent to

20        Ben as well.

21                MS. JOHNSTON:  Can we move on?

22                MR. CECALA:  It's part of the examination.

23        We're in the examination area, which is this.

24
```

```
 1    BY MR. CECALA:

 2        Q.  You said you wouldn't want to hear the audio

 3    recording.  Why?

 4        A.  And, you know, I think I need to seek my

 5    counsel's advice on this.  I mean, is this an

 6    appropriate venue to share, you know, my personal

 7    feelings towards this situation or is this strictly,

 8    you know, facts?

 9            MR. CECALA:  I think she can answer the

10    question.

11            MS. JOHNSTON:  Yeah, you can answer the

12    question.  I'll generally object to the relevance of

13    why her personal feelings here matter at this time,

14    but go ahead and you can answer.

15    BY MR. CECALA:

16        Q.  I mean, just to clarify the question.  I

17    mean, if you want to read back the question, but

18    it's -- I asked her why she doesn't want to hear the

19    audio recording.  She can give any reason she wants.

20    It's a valid question.

21        A.  Because it's personally very upsetting to me,

22    this whole situation.  I think what occurred is a

23    travesty.  I find it repulsive, not, you know, the

24    sex act or not two people engaging because -- but
```

1    because of what -- like I worked closely with Ben.  I

2    knew Ben when he was admitted.  And I've been very

3    committed to what I do here for 28 years, and it's

4    upsetting to me to know that the actions of one

5    person calls into question everything that we do.

6    And it's just -- yeah.

7                     You know, I have my personal feelings

8    about Christy, but it's just upsetting.  That's all I

9    can say, is that it's upsetting.

10       Q.   Okay.  I think you answered the question.  We

11   would agree with you.

12                     We're back to the question, which is

13   you would rather not confront the audio recording at

14   this time, which is fine.

15                     My question is with that evidence,

16   that you would rather not even hear, as you sit here

17   today, do you think it was important for the

18   information about Christy sexually abusing Ben Hurt

19   to be made available to Ben's treatment team so that

20   he could be treated for what had occurred?

21       A.   I guess my answer would be if it were clear

22   that the two individuals on the recording were the --

23   were Ben and a treatment team member, then yes.  And

24   I'm not privy to the information as to who heard the

```
1     recordings either.  Yeah, so, I guess, if there was
2     clear indications that these were -- this was a staff
3     member and a patient and that, you know, this was an
4     obvious abuse situation, then, yes, it would -- it
5     should have been relayed to the treatment team.
6          Q.  Thank you.
7               MS. JOHNSTON:  Joe, Randy, when would be an
8     appropriate time?  Again, we've been going for about
9     another two hours again.
10                   I don't know, Colleen, if you need to
11    like grab a quick bite to eat, anything like that.
12    It is 1:40.
13              THE WITNESS:  I do have to take some
14    medication, so if I could have even 15 minutes -- 10,
15    15 minutes.
16              MR. CECALA:  Why don't we -- why don't we
17    take 15 minutes?  Or you want to resume at 2:00 p.m.?
18              MS. JOHNSTON:  Yeah, can we just do 2:00
19    p.m.?  Thanks.
20              MR. CECALA:  Yeah, just one last time on the
21    record.  Just we would ask that -- Colleen, I'm
22    talking to Mary, that she not consult anyone else,
23    other than you, or be in communication during the
24    breaks regarding the deposition.
```

```
 1                    THE WITNESS:  Okay.

 2                    MR. CECALA:  Okay.

 3                    MS. JOHNSTON:  Okay.  So we'll see you guys

 4          at 2:00.

 5                    MR. CECALA:  Okay.  Off the record.

 6                 (A brief recess was had.)

 7                    MR. CECALA:  It's 2:01.

 8                    MS. JOHNSTON:  And, sorry, Joe, real quick,

 9          just before we get back into the questioning.  I do

10          want to remind you that Colleen does have a hard 5:00

11          p.m. stop time.  I don't think it's an issue.  I'm

12          just putting it out here.

13                    MR. CECALA:  Yeah.  No, no, we have some

14          more, but I think we're -- we're ahead of schedule.

15                    MR. KRETCHMAR:  Well within the hard stop.

16                    MR. CECALA:  And our schedule was to kind of

17          be able to make sure that we make 5:00.

18                    MS. JOHNSTON:  Cool.  Thank you.

19                    MR. CECALA:  No worries.

20                 (Deposition Exhibit Number 7 was marked for

21                  identification.)

22          BY MR. CECALA:

23             Q.  Okay.  So, Colleen, I called up Exhibit 7,

24          which is Bates stamp document 27981, 27982 and 27617.
```

1      Do you see this document?

2           A.  I can, but it's a little small.

3           Q.  All right.  I'll make it a little bigger for

4      you.  No worries.  How's that?

5           A.  Good.

6           Q.  So what do you see here?

7           A.  E-mail from Epperson, Bill Epperson, to

8      Dr. Ingram, who was the, I assume, FTP director,

9      interim, at the time.

10          Q.  Yeah, I mean, the top is a forward of it from

11     Bill to Diana Hogan, right?

12          A.  Oh, yeah, sorry.

13          Q.  Yeah, that's okay.  It's on June 1, 2017 at

14     8:45 a.m.  Do you see that?

15          A.  Yes.

16          Q.  So Bill was sending it to Diana and there's

17     two attachments there, right?

18          A.  Yes.

19          Q.  Or, I mean, one attachment.  I mean, one is

20     probably like a signature document, but there's

21     definitely an attachment, .doc attachment, right?  Do

22     you see that?

23          A.  Yes.

24          Q.  Okay.  So -- and then the message he

1      forwarded is what you were talking about, it's from

2      Bill Epperson to -- to Vicky, and she carbon copies

3      Brian Dawson, you, Ryma Jacobson, Salvatore Verdone,

4      Dr. Malis and Dr. Patel.  Do you see that?

5          A.  Yes.

6          Q.  And the subject is incident on K-Unit.  Do

7      you -- do you ever remember seeing this e-mail from

8      Bill?

9          A.  I don't specifically recall this, but...

10         Q.  Do you want to take a look at it?  It's only

11     two -- it's only one sentence or two sentences.

12         A.  Yeah, yeah, I read it.

13         Q.  So -- just for our records, so the e-mail

14     says, "Dr. Ingram, Here is the report of the incident

15     on K-Unit last night.  Very concerned that a SW,"

16     that means social worker, "would ask for assistance

17     from a patient, for an office not on her unit.

18     William Epperson, chief of security."

19                  So you did receive the e-mail, right?

20         A.  Yes.

21         Q.  So when you -- you know, did -- did you read

22     it?  Did you -- did you have a chance to look at the

23     e-mail when you got it?

24         A.  I -- I can't recall.

LISA A. KOTRBA & ASSOCIATES, LTD.  (312) 855-1834

1       Q.  So -- well, what do you think the words very

2    concerned that a social worker would ask for

3    assistance from a patient -- or, actually, I'll

4    withdraw that question.  Let's look at the whole

5    thing, right.

6             So the attachment has got a name,

7    17-9021-R3 5-31-17.  Do you see that?

8       A.  Yes.

9       Q.  Okay.  So -- the -- the next page is actually

10   the original e-mail that was sent from Bill to the

11   people we mentioned at 7:58 a.m., right?  That's when

12   he sent it?

13      A.  Yes.

14      Q.  The attachment is the same there.  Do you see

15   that?

16      A.  Yes.

17      Q.  Okay.  So then on this Bates stamp, which is

18   document 27617, it's a Security Department Report.

19   It looks a lot like the report we looked at earlier,

20   right?

21      A.  Correct.

22      Q.  And you're familiar with these reports?

23   You've seen them before, haven't you?

24      A.  Yes.

1      Q.  So this looks like a report that was prepared

2    by Sergeant Tony Jackson, No. 83?

3      A.  Yes.

4      Q.  At the bottom there.  And it was prepared on

5    May 31st, time of the occurrence says 15:57 to 17:00,

6    and he wrote the report around 19:00.  Do you see

7    that?

8      A.  Yes.

9      Q.  Okay.  Do you want a chance to read what the

10   report says?

11     A.  Oh, sorry.  Yes.

12     Q.  Thanks.

13     A.  Okay.

14     Q.  So are you familiar with this incident?

15     A.  Yes.

16     Q.  And how did you find out about this incident

17   the first time?

18     A.  I -- I'm sorry.  I want to look at the time.

19   The time of the report is 19:00.  Does this -- oh, it

20   happened at shift change, right?  Yeah, 15:30.  I

21   believe, if I'm not mistaken, that Chief Epperson was

22   actually in the FTP administration office -- or,

23   excuse me, area where my office is located, and I

24   think he got a radio call about this incident because

```
 1      I believe it says -- yeah, he had -- he went down

 2      there to try and -- and open the door.

 3          Q.  So when you say he had a radio call, how

 4      would you have found out about the incident?

 5          A.  He was -- his radio's here.

 6          Q.  Yeah.

 7          A.  (Indicating.)  So, you know, the -- his

 8      officer probably spoke to him and said, you know, we

 9      have a -- there's a staff member locked in an office

10      with a patient.

11          Q.  So were you -- were you with Chief Epperson

12      when the call came in?

13          A.  I think -- I believe he was -- yeah, I think

14      we -- it was the end of the shift and he was up in

15      the -- in -- by my office area.

16          Q.  So where was your office area?

17          A.  The FTP administration area.

18          Q.  So in the front of -- in front of the

19      building there?

20          A.  Yeah.

21          Q.  Where the metal detectors are?

22          A.  Correct.  Well, you go -- you turn left as

23      opposed to going through the...

24          Q.  Right, right.  To the left?
```

```
 1          A.  Yeah.

 2          Q.  So --

 3          A.  That's what I -- that's what I recall because

 4    I remember this sort of in realtime.

 5          Q.  Okay.  So did you have a similar radio of any

 6    type to receive --

 7          A.  No.

 8          Q.  -- radio calls?

 9          A.  No.

10          Q.  Did you ever use a mobile phone as a radio?

11          A.  Yeah, we have PTT on our -- on our work

12    cells, push to talk.

13          Q.  Okay.  So you weren't -- you didn't receive

14    it on your radio; you heard it when Chief Epperson

15    got the call from his staff?

16          A.  That's what I'm recollecting, yeah.

17          Q.  And if you recall, what -- what did you hear?

18          A.  I don't recall specifics.  Just -- I just

19    remember that there was a staff member locked in --

20    in the office and then after the fact found out that

21    it was Christy Lenhardt and -- and Ben Hurt.

22          Q.  So, you know, as you read this report, there

23    isn't any mention about Christy getting incentives or

24    going to Bob Hamlin's office for incentives for
```

1          patients in this report, is there?

2              A.  No.

3              Q.  Did you ever hear anything about that?

4              A.  No, it's not ringing a bell.

5              Q.  So going back to the e-mail.  It's the same

6          e-mail on both pages.  I went to the prior page.

7                          What do you think there was to be

8          concerned about, as expressed by Chief Epperson here,

9          that a social worker asking for assistance from a

10         patient for an office not in her unit?

11             A.  From my point of view in reading the report

12         and finding out after, that there's a -- I mean, you

13         never go into a locked area with a patient for a

14         number of reasons.  It's just -- it's just a safety

15         issue, so the --

16             Q.  So -- go ahead.

17             A.  Sorry.  Just that -- that she brought a

18         patient into a room that had a broken lock.  I mean,

19         that -- you know, I'm obviously dumber than I look,

20         but I'm completely naive to what -- you know, I just

21         thought, well, that was kind of dumb on her part.

22         Why would she go into a room with a lock -- a broken

23         lock?  You know, I just thought of the safety aspect

24         of it.

1    Q.  Sure.  He added for an office not on her

2    unit.  Does that have any special significance to

3    you?

4    A.  I -- in the report I see it was Bob Hamlin's

5    office, and he was like the social worker -- like the

6    lead over there, and -- I don't know.  I just -- no,

7    I -- and, again, like looking back, now when I read

8    this, you know, knowing what I know after the fact,

9    it looks, you know, like, oh, for an office not on

10   her unit, like why is she going over to another unit?

11   Q.  Well, isn't that what it kind of means?  Like

12   he's making a statement, but is he sort of implying

13   there's a -- kind of a suspicious question in that?

14   A.  Yeah, yeah.  Now, like -- yeah.

15   Q.  So there was an incident, which is involving

16   Christy, seems a little suspicious, right?

17   A.  Yes.

18   Q.  Did you ever share any concerns back to Chief

19   Epperson about this incident?

20   A.  You know, I know I'm on the record, so I'm

21   trying to watch my -- my mouth, but I probably said

22   what the hell is she thinking?  Why is she -- what

23   the hell is she doing, you know, going in a locked

24   room?  I -- I can't recall a specific conversation,

1     but that's something I would have said.

2          Q.   Right.   I mean, did you bring it up to

3     anybody else, like, hey, what the hell is she doing?

4          A.   I may have.   I really -- I mean, nothing

5     is -- it's not -- like specific conversations aren't

6     standing out about it.

7          Q.   Okay.   Do you have any independent

8     understanding, other than the report, of reasons why

9     Christy and Ben would have been locked in that office

10    that day?

11         A.   You mean at that time?   I mean, because we

12    know now why.   But at that time are you saying?

13         Q.   Yeah.   At that time did you have any other

14    independent recollection of like why they would have

15    been locked in the office together?

16         A.   No, but I think -- I believe she -- obviously

17    she was her -- his social worker on L, so it didn't

18    strike me as like particularly odd that -- you know,

19    it's -- it's not unusual to have a social worker on

20    the sister module, you know, finish up a report with

21    somebody or, you know, bring the patient mail or --

22    you know, they don't just sever the relationship and

23    never to be seen again, so I -- I didn't

24    really -- I thought maybe she was covering for

1    somebody or -- I don't know.

2         Q.  Did you ever talk to anyone about it?

3         A.  I don't recall.

4         Q.  Do you recall if anyone talked to you about

5    it?

6         A.  I believe -- I think Bill did tell me after

7    the fact that he had, you know, to go down there and

8    unlock it and, you know -- yeah, that's -- I mean,

9    that's about it that I recall.

10        Q.  So, you know, when he was telling you he had

11   to go unlock it and obviously he sent this e-mail,

12   did he indicate to you any suspicion of it not really

13   being appropriate for Christy and Ben to be locked in

14   the office?

15        A.  I don't recall specifically.  I think the --

16   the overall thought was that she just wasn't very

17   smart in her decision-making.

18        Q.  One second.

19          (Pause.)

20   BY MR. CECALA:

21        Q.  So, Colleen, has there ever been an incident

22   like this, where a patient and a staff member were

23   locked in an office, in your 28 years' experience at

24   Elgin other than this incident?

1     A.  Oh, boy.  Not that I recall.

2     Q.  So would it be fair to characterize this as

3  unusual because it's the only incident you can think

4  of?

5     A.  Yes.  I mean, even if -- even if it weren't,

6  it's unusual.

7     Q.  Are you aware of what transpired between

8  Christy and Ben in the office before they called for

9  security?

10    A.  No.

11    Q.  You've never heard anyone speak about it or

12  there's been no rumors about it?

13    A.  Well, I mean, I'm sure there's rumors after

14  the fact, but, no, not -- not...

15    Q.  Well, have you heard any rumors about it?

16    A.  Honestly, no, I haven't.

17    Q.  So as you sit here today, you don't know what

18  happened between Christy and Ben in the office

19  immediately before they were let out by the

20  locksmith?

21    A.  No.  I -- and I, for some reason, even in my

22  mind right now, I -- I thought it was like a few

23  minutes.  Like I -- I'm not even aware of the time

24  frame, like how long, because the -- the patients are

1    checked every 15 to 30 minutes.  I don't recall if we

2    were at 15 minutes then.  It may have been 30

3    minutes, but...

4         Q.  So as you sit here today, you're not aware

5    that Christy Lenhardt and Ben Hurt both admitted to

6    having sex in the office before they were let out?

7         A.  No.

8         Q.  And you've never had a hint of a rumor that

9    that's what happened in the office before they were

10   let out from anyone?

11        A.  I don't recall hearing it from someone.  I

12   mean, I guess I've speculated, you know, with

13   hindsight that obviously she wasn't there with, you

14   know, social work intentions, so -- but I don't know

15   if I, you know, put that in my head or if I heard it

16   or I don't -- I don't recall.  I don't know.

17        Q.  Well, I mean, did you draw a reasonable

18   conclusion about the possibility that they engaged in

19   some type of sex locked in the office after you now

20   know that Christy's been accused of all this?

21        A.  Yeah.

22        Q.  Okay.  So did you -- so back to Christy.  Did

23   you work closely with Christy Lenhardt?

24        A.  Yeah, for a period when I was the nurse

1       manager for K and L and she was a caseworker, social

2       worker on the unit.

3            Q.  About how long was that?

4            A.  I would say at least three years.

5            Q.  Covering what span of time?

6            A.  2011 to about 2014.

7            Q.  So that would have been when you were nurse

8       manager and she was a social worker, so your

9       interaction with her would have been more frequent,

10      right?

11           A.  I'm sorry.  More frequent?

12           Q.  Yes.

13           A.  Yes.

14           Q.  And then roundabout that time you became --

15      you were TA'd to associate director of nursing,

16      right?

17           A.  Correct.

18           Q.  So what was your interaction with Christy

19      during the 2015 to 2017 window?

20           A.  Minimal.  I mean, I don't recall.  I'm sure I

21      saw her, but it was -- it would have been in passing

22      or...

23           Q.  Now, I'm curious.  When you became associate

24      director of nursing, where was your office?

1              A.  In the FTP administration area.

2              Q.  Okay.  And when you were nurse manager, where

3       was your office located?

4              A.  It was between Modules K and L.  I don't know

5       if you've been to the unit.

6              Q.  Yes, we've been there.

7                 MR. KRETCHMAR:  In the stem.

8       BY MR. CECALA:

9              Q.  In the stem?

10             A.  Yeah, in the stem.

11             Q.  Okay.  You know, did Christy cause much

12      trouble?

13             A.  I mean, I guess that's relative, you know,

14      much trouble.  She -- she wasn't easy to work with at

15      times.

16             Q.  Right.  So in what ways did you find her to

17      not be easy to work with?

18             A.  My -- my -- she wasn't -- you know, she

19      wasn't under my purview, like I didn't directly

20      supervise her, so a lot of her work performance

21      issues weren't -- it wasn't a direct -- you know, it

22      didn't impact me directly, but I know she made it

23      difficult for the treatment team because of like her

24      late court reports and, you know, dragging her feet

1      on this or that.

2                       But for -- for me specifically, what

3      she made difficult is that the STAs would -- STAs,

4      security therapy aides, who I supervise directly,

5      would have issue with her because they would set a

6      boundary, you know, with a patient, whatever, and it

7      was usually just like things that -- that were just

8      so minimal; but, for instance, we had a -- we had a

9      patient who in his illness he liked to just copy,

10     copy papers, copy papers, copy papers.  And he would

11     ask numerous staff frequently and then -- so they

12     made a decision, the treatment team, that he would

13     get X amount of copies per day, whatever that was.

14     And I can't recall the number, five or ten or

15     whatever.  And he would, you know, meet that boundary

16     or whatever was prescribed and then the STAs would

17     say, you know, no, Mr. So and So, we can make more

18     copies tomorrow morning, and then he would go to

19     Christy and she would do it.  So it would -- you

20     know, it would cause splitting in the -- in the

21     treatment team.  There were just things like that,

22     just little -- just run-ins, bumping heads with the

23     STAs, direct care staff.

24          Q.  Did you ever bump heads with Christy?

1        A.  Oh, yeah.  There was --

2        Q.  Go ahead.  You were going to give me an

3    instance.  Can you provide me an instance?

4        A.  This just stands out in my head.  There was a

5    specific incident where she had -- excuse me,

6    instance, she had students, social work students, and

7    I don't recall what I said to her, but something I

8    said to her in a morning meeting, the treatment

9    meeting, rubbed her the wrong way, so she came to my

10   office with the student and began like crying and

11   being overly emotional in front of the student.  And

12   I just found that pretty inappropriate.  And I asked

13   the student to leave and then I -- I just, you know,

14   told Christy, I said, I don't do this.  I said, I'm

15   not -- this is not comfortable for me.  I said, I

16   don't know what's happening right now, but, yeah,

17   so...

18       Q.  Okay.  So that's one incident.  Did you ever

19   address Christy's like boundary issues with her at

20   morning meetings, where you were overseeing the

21   morning meeting?

22       A.  I -- you know, I don't know.  I may have.

23   Again, I don't recall.

24       Q.  So let's go to page 5 of Exhibit 1, which

1     is -- I think it's the incident that you had

2     described.  Starting on, I guess, line 6 -- I'm

3     sorry.  Page 5, line 22.  The police ask you, "How

4     was your interaction with Christy?  How was she as a

5     social worker, her work ethics, her character?  Did

6     you have any issues with Christy Lenhardt?"

7                       And then from -- all the way till

8     line 23, if you want to take a look at this, do you

9     remember being asked these questions and giving these

10    answers to the State Police?

11        A.  I don't recall specifically, but, I mean, I

12    know I've had to relay that instance before, so...

13        Q.  I mean, it's basically what -- what you just

14    indicated to us about the one incident with Christy

15    and the intern, right?

16        A.  Yeah.

17        Q.  On line -- I think it's line 18, you said,

18    "So I asked her to stop."  And you -- then you say

19    you apologized to the intern, asked her to wait in

20    the hall, and then you told Christy on lines 22 and

21    23 "Don't ever do that again."

22                       Do you recall telling Christy that?

23        A.  I don't recall that now, but I -- I --

24    sounds -- yeah, I didn't have a lot of tolerance with

1    her, so I -- I probably said that.

2         Q.  Yeah.  Would you say she was a person who

3    openly showed her emotions at work?

4         A.  Yeah, but it always struck me as -- as

5    almost -- oh, sorry, you just -- yes.

6         Q.  So how did it strike you?

7         A.  Just -- instead of -- you know, when you try

8    and hold someone accountable, instead of, you know,

9    owning the behavior and changing it or -- I'll just

10   cry a lot, so then people will feel bad and stop

11   expecting me --

12        Q.  So you -- so you think she was using her

13   emotions to avoid taking responsibility for things

14   she did wrong?

15        A.  Sometimes.

16        Q.  So the incident you described here, when did

17   that incident take place?  You said it was after a

18   morning meeting, right?

19        A.  Yeah.

20        Q.  Do you remember the approximate year that

21   this would have taken place?

22        A.  I don't.  I'm sorry.  I really don't recall,

23   but...

24        Q.  Well, on the next page here it says -- let me

1      make sure I got the right lines.  Actually, it's over

2      here.  Hang on.  I think I have the wrong references.

3      Oh, yeah, here.  Sorry.  It's on page 7.  I did have

4      the right records.  It's just a different page.

5                      Actually, at the top of the page when

6      you -- you were asked about, you know, what was being

7      said to Christy, you also said -- you answered that

8      you told her that that's completely inappropriate,

9      correct?

10         A.  Yeah.

11         Q.  And then there's another part of your answer.

12     Could you read lines 2 through 6?

13         A.  "So following that, I did speak to her -- I

14     guess it's a -- he's probably in a supervisory role,

15     he's a social worker III, which is Bob Hanlon."  They

16     wrote Hanlon, but his name is actually Hamlin.

17         Q.  Yeah.

18         A.  "And told him -- I shared my concerns about

19     her sort of having students."

20         Q.  So you both addressed this directly with

21     Christy and you took it to her supervisor, right?

22         A.  Correct.

23         Q.  And then the next question is do you remember

24     was it between 2000 and 2015?  You say I don't

```
 1      remember what year it was -- or do you remember what

 2      year it was?  And your answer was, "No.  It was early

 3      when I got there."

 4                      What did you mean by early when you

 5      got there; like, you obviously had been working at

 6      Elgin for a long time?

 7          A.  Earlier -- early when I got there, I assume I

 8      meant to K and L.

 9          Q.  Okay.  So when did you get to K and L?

10          A.  2011.

11          Q.  So this incident could have been as early as

12      2011?

13          A.  Probably.  If -- this is such an aside and

14      such a weird thing to remember, but initially I had

15      sort of a friendly rapport with Christy because she

16      was interested in Alpaca farming.  Sorry.  It's just

17      striking.  And I thought how cute is that.  And she

18      was on Facebook with Alpaca things, so I remember

19      we -- we were Facebook friends and -- and all that,

20      like -- so it had -- I mean, it may have been early

21      2012.

22          Q.  So -- right.  So -- good.  That's good

23      information.  So when you started, you had more of a

24      cordial relationship, you were Facebook friends?
```

```
 1        A.  Yeah.

 2        Q.  And then there's an incident here, you know,

 3   2012 perhaps, when, you know, Christy is

 4   inappropriately emotional in your -- I don't want to

 5   put words in your mouth, but you're sort of

 6   correcting her about her behavior, right?

 7        A.  Yeah, because it was in my office.

 8        Q.  Sure.  And did -- did at some point or

 9   another your relationship with her change a bit like

10   in that 2012 time?

11        A.  I don't -- again, I don't know the time

12   frame, but, yes, it did.

13        Q.  So this incident -- let's -- can we call it

14   the 2012 incident?  Is that fair?

15        A.  Sure.

16        Q.  Or the 2012 intern incident.  You said you

17   talked to Hamlin.  Did you talk to anyone other than

18   Bob Hamlin?

19        A.  I know that I did talk to, at one point, Drew

20   Beck about concerns, you know, with her and how she

21   was splitting with the STAs.

22        Q.  Well, I'm looking at the -- the 2012 intern

23   incident.  Was it around that time that you would

24   have talked to Drew?
```

1      A.  I -- I can't recall because he was just -- he

2    was on the unit, too, so, I mean, I don't know.

3      Q.  Well, when you say he was on the unit, so

4    Drew was on K-Unit, right?

5      A.  He was on Module K, but we all -- we all did

6    the same morning meeting, every -- yeah.  And he, I

7    guess, had sort of been her mentor previously or

8    had -- you know, because social workers like do this

9    supervision thing with each other, so I -- I had

10   shared with him something -- my, you know, concerns

11   about with the splitting of the staff and whatnot.

12     Q.  So did you specifically share the 2012 intern

13   incident with him?

14     A.  I may have.  I don't recall specifically.

15     Q.  So you said that you talked about the staff

16   splitting and whatnot.  The staff splitting, was it

17   always the case that Christy was perhaps being more

18   lenient or having an easier crossing of the boundary

19   than the other staff were comfortable with?

20     A.  I don't know if it was -- the perception was

21   that she just didn't want, you know, to have any,

22   like, confrontation or conflict, that she just, you

23   know, would give in to -- to avoid, you know, having

24   to be the bad guy sort of.  So the STA's perception

1    was that they always had to be the bad guy or they

2    had to, you know, enforce the treatment team

3    recommendation.

4        Q.  Right.  Now, in this answer about the 2012

5    intern incident, you both told her never do it again

6    and that's completely inappropriate.  Were you

7    meaning that it was inappropriate to lose her

8    emotions and that's -- that's what she shouldn't do

9    again?

10       A.  No, that she brought -- and I believe if --

11   what I'm recalling is the student was pretty new and

12   obviously they're there to learn about the

13   profession, and -- and to have your just preceptor

14   just have an emotional, you know, breakdown in front

15   of you and the nurse manager, I just thought that was

16   like completely inappropriate.  I mean, if she -- if

17   she had come to my office and, you know, wanted to

18   speak to me confidentially and that, you know,

19   whatever I said offended her or upset her or, you

20   know, that -- that I still would have been like I

21   don't do well with this, but okay.  But I just

22   thought doing that with a student was very strange.

23       Q.  Well, but you made the point -- I don't know

24   if you answered one way or the other, but the strange

1      part is that she's breaking down crying, having an

2      emotional outburst in your office, correct?

3          A.   It more bothered me about the student, you

4      know.

5          Q.   But when she had the emotional outburst in

6      front of the student, right?

7          A.   Correct.

8          Q.   I mean, if she had come to your office with a

9      student and said, hey, I'd like to discuss your

10     concerns from the morning meeting.  Can you help me

11     learn what you were saying?  And the student would

12     have been learning about how to interact

13     appropriately with staff, you probably wouldn't have

14     had a problem now, would you?

15         A.   Probably it would have been received

16     differently.  Yeah, I probably would have not felt --

17     but I still thought that it was odd to discuss, you

18     know, an interpersonal issue she was having with me

19     in front of a student.

20         Q.   Right.  So -- and it was an interpersonal

21     issue, right?

22         A.   I believe -- I believe it had something to do

23     with something I said to her during a morning

24     meeting.

1     Q.  And you don't recall what you said to her at

2     the morning meeting?

3     A.  No.

4     Q.  So down here on lines 22 and 23 the police

5     ask you, "Was there any red flags that you can

6     remember, if she had any red flags pop up?"

7                     And then could you read your answer?

8     It starts on line 24 and then goes on to the next

9     page, page 8.

10    A.  "The staff that I supervised would come to me

11    and express that Christy put them in positions that

12    were uncomfortable for them, because she would -- you

13    know, we call it staff splitting, team splitting.  So

14    let's say Rick sets a limit and you go back and

15    change that, you know.  She would do things like

16    that.  And that she was frequently there on the p.m.

17    shift, after 4:00, which her shift was 8:00 to 4:00."

18    Q.  Okay.  So what did you think red flags meant?

19    A.  I don't recall.

20    Q.  So if I were to ask you can you think of red

21    flags from your experience working with Christy, how

22    would you answer that today?

23    A.  Never in a million years would I have thought

24    that we would be sitting where we are sitting right

1    now discussing that Christy Lenhardt sexually abused

2    Ben Hurt.

3        Q.  I mean, we're going to get into this in a

4    minute, and I appreciate you volunteering that

5    because Christy Lenhardt didn't just abuse Ben Hurt,

6    she confessed to abusing ████████████, ████████

7    ████████████ and Ben Hurt over a ten-year period and

8    many of these were relationships that went on for

9    months at a time, if not years.

10             So I very much appreciate -- I'm not

11    trying to confine any of your answers.  You're being

12    very cooperative and civil.  And on some of these

13    next questions, just in the interest of your hard

14    stop at 5:00, I'm going to make sure that I'm

15    disciplined about asking because there's a lot of

16    information about Christy.

17             So the police asked you about red

18    flags back then.  I'm asking you today.  As you think

19    of your working time from 2012 to 2017 working with

20    Christy Lenhardt, did you have any red flags that

21    would pop up that, you know, make you wonder about

22    Christy's behavior?  Were there red flags during that

23    time?

24        A.  Again, even knowing what I know now, thinking

1   back, I honestly thought that she had to stay as much

2   as she did over because she was always behind on her

3   paperwork.  She was always getting spoken to

4   regarding court reports and things like that.

5       Q.  Okay.  Well, let's talk about that for a

6   second because you answered the police, when they

7   asked you about red flags, that she would stay late,

8   that she would split staff.

9                   And if you go down to the bottom of

10  this page, so -- where you were answering this

11  general line of questions.  On line 24, can you start

12  reading your answer there and then we'll move on to

13  the next page?

14      A.  "You know, people aren't chomping at the bit

15  to hang out here after 4:00."

16      Q.  Okay.  And then is staying late a red flag

17  because everyone wants to leave at 4:00?

18      A.  A red flag for what?  I mean, you know, I

19  mean, if someone's not happy at home, maybe they stay

20  at work late.  You know, if someone's on a corrective

21  action plan because they're not getting their stuff

22  in on time, maybe they stay late.  So, again, because

23  I didn't -- she wasn't under my direct supervision, I

24  wasn't -- you know, I didn't know if her supervisor

1    was telling her she had to do X, Y or Z.

2        Q.  Well, I mean, is -- is staying late a red

3    flag in some way for misconduct in some way?

4        A.  No, but I can say for -- for nursing, like,

5    that has to be pre-approved.

6        Q.  Well, pre-approved because you won't get

7    paid, right?

8        A.  That and just for safety reasons to know

9    who's on the unit at any given time.

10       Q.  Okay.  Now --

11       A.  You know, and I know this sounds farfetched,

12   but what if there's a disaster and we need to know

13   who was in the building and it just -- there's many

14   reasons.  We need to know who's -- who's on the unit.

15       Q.  So -- and we talked about the staff

16   splitting, but you did say that -- this is your prior

17   answer, "The staff I supervised would come to me and

18   express."  You know, they're basically complaining

19   about Christy to you, about the splitting and the

20   staying late, right?  That's -- we just read that.

21       A.  Yeah.

22       Q.  And then, again, the police were continuing

23   to press you a bit on this issue.  People don't stay

24   late because of what you just said, and, you know, at

1     4:00 there seems to be a mass exodus and a new shift,

2     right?

3          A.  Yeah.

4          Q.  So when the staff complained to you about

5     Christy, where did they present these complaints,

6     where were you?

7          A.  Probably my office.

8          Q.  And can you give me a little idea how that

9     would happen?  Did they just come in in the morning

10    and tell you about from yesterday or passing you in

11    the hallway?  Or, I guess, you just said in the

12    office.  But how -- what was the general arrangement

13    of things as to a staff bringing you a complaint?

14         A.  I met -- well, I met with the day shift

15    staff, I saw them daily, you know, because I'd be on

16    the unit either, you know, meeting with the patients

17    or doing unit stuff or, you know, in the meeting, but

18    for the PM shift, I would also -- they'd come on --

19    excuse me.  Their shift starts at 3:00 and my shift

20    ended at 4:00, so there was always that hour overlay.

21    What is that?  Overlay.  That doesn't sound right.

22         Q.  Overlap?

23         A.  Overlap.  Thank you.  Where they had an

24    opportunity -- you know, I'd either go into the

1    nurses' station and touch base with them or -- they

2    signed in right outside my office, so sometimes I

3    would just stand out by the stem area and greet them

4    as they came in.

5        Q.  Do you remember any specific STAs who

6    complained about Christy?

7        A.  I don't.

8        Q.  Did Monico Darecko (sic) ever complain to you

9    about Christy?

10       A.  He -- he may have.  Directo, Monico Directo.

11       Q.  Sorry.  Monico Directo.  If you recall, what,

12   if anything, did he say?

13       A.  I don't recall.  Honestly, I don't recall a

14   specific conversation with him.

15       Q.  Do you recall who reported that Christy would

16   stay late?

17       A.  It had to have been the PM shift's STAs, but

18   I'm not recalling specifics, names.

19       Q.  So how did you respond to these complaints?

20       A.  I would -- I want to say I discussed it with

21   Peggy Gibble.

22       Q.  And who is Peggy?

23       A.  She -- she is currently the director of

24   social work, and I think she may have been like in an

1    interim position at that time, but if -- if it wasn't

2    Peggy, I -- or maybe it was Jeff Pharis.  I don't --

3    it could have been Jeff Pharis, but, again, not being

4    her direct supervisor, I had no authority to question

5    her or direct her regarding staying or -- like I

6    said, I didn't know if she was being paid overtime,

7    if this was -- so I -- I brought it to her supervisor

8    who -- I -- again, it was either Peggy Gibble or Jeff

9    Pharis.

10    Q.  So on page 9 here, lines 8 and 9, the police

11    ask you, "It was being brought to your attention that

12    she was staying," and then could you read your answer

13    from lines 10 to 14?

14    A.  "It was brought to my attention.  So it was

15    frequent enough that people were bothered because

16    those were -- and those were the times, for instance,

17    the staff would set a limit with a patient, and then

18    she would do something to undermine that."

19    Q.  So I'm wondering how her staying late has

20    anything to do with her setting limits?  How do those

21    two things relate?

22    A.  So if -- you know, if the STA staff, you

23    know, said no to a request or, you know, set a limit

24    and then if she was on the unit at that time and then

1     the patient would go to Christy and then she would

2     either do what the request was or -- you know, like

3     something's coming to my mind.  Like, for instance,

4     the laundry room, there's times, certain times

5     patients -- especially on the NGRI units, where the

6     patients are there longer, they have assigned laundry

7     days and -- and that's just to make sure that

8     everybody has, you know, appropriate and sufficient

9     time to wash their clothes.  And so if a patient

10    said, hey, can I throw some clothes in and the staff

11    would say, no, it's so and so's time, and then they'd

12    ask Christy and she'd open the door to the laundry

13    room.  Excuse me.

14        Q.  And is that because she was staying late?

15        A.  No, she did it on day shift, too.  It's just

16    during the day, I think there were other things

17    occurring that -- that, you know, kept her more -- or

18    busier, so maybe she didn't have as many

19    opportunities to do other things like that, like open

20    doors or make copies and all that stuff.  But on the

21    evening shift, most of the clinical staff, not most,

22    all of the clinical staff leave around 4:00 --

23    between 3:00 and 4:00, so the -- the shift is pretty

24    much comprised of STAs and RNs.

1      Q.  So because the police never asked you about

2    limits here, they were asking about staying late, and

3    I'm not sure it's clear to me yet, but I'll keep

4    asking how staying late involves splitting staff and

5    how that involves limits with patients.

6              So is it possible that she was

7    staying late to spend time with patients?  Did you

8    ever hear that?

9      A.  No.

10     Q.  Did you ever hear a staff complaint that

11   Christy spent too much time with patients?

12     A.  I do recall a staff saying she was feeding

13   certain patients.

14     Q.  Feeding?

15     A.  And, I'm sorry, that sounds so -- feeding --

16   bringing food.

17     Q.  Bringing -- like bringing a home-cooked meal

18   to certain patients?

19     A.  Right, yeah.

20     Q.  So --

21     A.  But it wasn't one patient specific, that I

22   recall.

23     Q.  But a home-cooked meal brought in to give to

24   a particular patient was one of the complaints you

1    received?

2         A.  Yeah, that she had brought food in.

3         Q.  Do you remember who told you that?

4         A.  No, I don't.

5         Q.  So on page 9 you're -- you were saying that

6    it bothered the staff because those were times, for

7    instance, that she was doing things that would

8    undermine the limits.

9              Does that merely mean that the staff

10   had set one limit, Christy violated that limit, and

11   then it undermined the other staff's authority to

12   control the environment?

13        A.  Yeah, I mean, I hate to -- to use the word

14   control, but -- but, yeah, I mean, the staff then --

15   yeah.  I'll just say yes.  Yes.

16        Q.  So on the next page the police are asking you

17   about -- lines 10 through 13 they asked -- page 10.

18   "Or was it just that, 'Hey, there's somebody -- just

19   letting you know, by the way, you know, she's

20   staying -- you know, last week, you know, last week

21   she was here three days until 7:00'."

22              I think the police are trying to

23   describe a complaint about Christy staying late.

24              And then could you read your answer

1    14 -- lines 14 through 16?

2    A. I said, "No, no, no. It was that it was

3    interfering with the direct care staff's ability to

4    do their job because."

5    Q. So if Christy stayed late, how did that

6    interfere with the other staff's ability to do their

7    job?

8    A. Because they would set a limit or say no to a

9    request and then Christy would do it.

10    Q. Right, but she was doing that during her

11    shift and after her shift, right?

12    A. I didn't hear about it from -- from -- I

13    don't recall hearing about it or not as much on the

14    day shift.

15    Q. So this is mostly the evening shift STAs that

16    complained about Christy?

17    A. Correct.

18    Q. It's been suggested by other witnesses that

19    Christy had a -- just had a different style of doing

20    social work and that her style differed from the

21    other staff.

22    Is it possible that Christy just had

23    a different style of delivering care?

24    A. Yeah. I mean, I guess. I've worked with

1    very strict social workers, and I've worked with

2    very -- you know, some are therapy-based, some are

3    case management-based, so I...

4        Q.  So that's possible?

5        A.  Well, I mean, her style of -- of -- that

6    wasn't the problem.  It was when one staff -- one

7    part of your team says no and then she'd come and say

8    yes.

9        Q.  Well, how did you know that Christy's limits

10   were wrong and that the other staff limits were

11   correct?

12       A.  Because it would be something like, you know,

13   an agreed upon by the treatment team -- you know, for

14   instance, like I said, the -- the number of copies.

15   So the treatment team is comprised of the

16   psychiatrist, the social worker, the AT, the nurse;

17   so if they all agree to something and then that's --

18   and then you have one member of the team who -- who

19   goes against it, it just...

20       Q.  Fair enough.  So these are not things --

21   complaints you were receiving that could easily be

22   dismissed as just, oh, that's Christy just being

23   Christy, correct?

24       A.  Well, but -- these were things.  They were

LISA A. KOTRBA & ASSOCIATES, LTD.  (312) 855-1834

1     never -- like I said, it's almost something you would

2     call nuisance behavior.  She wasn't doing anything

3     like overtly dangerous or, you know, overtly

4     indicative of something, you know, sinister, but it

5     was just disruptive.  It was disruptive for the other

6     staff.

7          Q.  Right.  But my question is it's a pattern of

8     behavior by Christy that wasn't easily dismissed

9     based upon some social worker style or like I used

10    the expression, oh, that's just Christy being

11    Christy?  It wasn't dismissible like that, was it?

12         A.  Well, that's -- but that's what I heard,

13    well, that's just how Christy is or that's just

14    Christy.

15         Q.  Who did you hear that from?

16         A.  Like, you know, other social workers or other

17    people in her discipline, you know, that, yeah,

18    that's just how she is and...

19         Q.  So were those types of statements being made

20    by the other social workers, other staff something

21    which made this type of behavior more or less

22    dismissible by you as a senior person at Elgin?

23         A.  For me, no, because I thought, you know, the

24    expectation is the expectation.  It should be across

1    the board.  Like my staff can't stay past their shift

2    without getting prior approval, you know.  Neither

3    should other disciplines; but, again, my -- my

4    authority only goes so far as to report it to that

5    discipline supervisor.

6        Q.  Did you ever speak to Christy directly about

7    it?

8        A.  I'm pretty direct, so I think I probably did,

9    but it's not standing out.

10       Q.  Okay.  Let's take these, perhaps, in the

11   instances you noted.  So there are complaints about

12   Christy staying late.  There's complaints about

13   Christy making copies.  There's complaints about

14   Christy bringing home-cooked meals to people.

15   There's complaints about Christy letting patients use

16   the laundry.

17              Outside of those four complaints,

18   what other complaints were there about Christy?

19       A.  Just the late court reports I remember -- you

20   know, that was a frequent issue.

21       Q.  Anything else?

22       A.  I mean, nothing -- nothing's standing out.

23       Q.  And I just -- I'm not sure if I asked this

24   before or not, but no one ever came and told you

1    Christy is spending too much time with one individual

2    patient in particular?

3        A.  I don't recall.  You know, I feel like I'm --

4    I don't know if I'm making this up or, you know, if

5    it's because it's -- this is about Ben and I don't

6    know if I'm making -- you know, tieing it together,

7    did somebody say she's bringing food to Ben.

8        Q.  Well, did you ever hear that someone told you

9    Christy is bringing home-cooked meals to Ben?

10        A.  It -- I -- maybe.  It may have been Ben or

11    Mark Owens.  There's another gentleman who I -- and I

12    don't know, because of HIPAA, if I'm -- should say

13    his name.

14           MS. JOHNSTON:  No.  Let me just jump in

15    there.  Let's not start saying other names.

16    BY MR. CECALA:

17        Q.  Well, I mean, I can ask you.  Was it ████

18    ███?

19        A.  No.

20        Q.  ███████?

21        A.  Maybe it was ██████.

22           MR. CECALA:  Give me one second.

23           MS. JOHNSTON:  Joe, while you're doing that,

24    can we actually just take a quick five?

1              MR. CECALA:  Sure.  You want to take a

2      five-minute break?  It's 3:10.

3              MS. JOHNSTON:  Yeah, sounds good.

4          (A brief recess was taken.)

5      BY MR. CECALA:

6          Q.  So I was asking you about these different

7      conflicts with staff over Christy's limits, and we

8      kind of have that she was making copies, she stayed

9      late, there were meals, the splitting on the laundry

10     uses, she was late with her court reports, she gave

11     meals to Ben Hurt, perhaps Mark Owens, perhaps ███

12     ███  Is there any other patient that you can think

13     of?

14         A.  No.  And -- and as far as giving meals to

15     those three, I -- I don't know if that's for sure or

16     not.  I don't have a clear recollection of who they

17     indicated.

18         Q.  Okay.  What about ███ ███

19         A.  Not sure.

20         Q.  So -- okay.  Outside of the specific --

21     potential for specific meals, home-cooked meals, to

22     Ben, Mark, ███ would ███ be included in that

23     or you're not sure if any of them or...

24         A.  I don't recall specifically who --

1      Q.  Okay.

2      A.  -- she was bringing food to.

3      Q.  Okay.  So -- but outside of making copies,

4   being late -- or staying late, meals generally, the

5   laundry, the court reports, what were any other

6   specific staff splitting conflicts that were reported

7   to you?

8      A.  That's all I can really recall.

9      Q.  So how often did these complaints occur?

10      A.  It was sporadic.  It wasn't, you know, daily

11   or weekly.

12      Q.  Well, over the course of a month, was it more

13   than ten times?

14      A.  No.

15      Q.  So more than five times?

16      A.  No.

17      Q.  So fewer than five complaints per month?

18      A.  Yeah, for -- I mean, from what I recall.

19      Q.  So --

20      A.  And it wasn't every month.  It would -- you

21   know, it wasn't like ongoing all the time.

22      Q.  All right.  So maybe a whole month could go

23   by with no complaints and then the next month there'd

24   be five?

1          A.  Yeah, I mean...

2          Q.  So on page 12, down at the bottom the police

3     asked you, "So she would -- but, again, there was no

4     one that she would particularly pick out.  She was

5     just -- in general, that was something she would just

6     do on a consistent basis?"

7                    Can you read your answer there

8     starting on line 21?

9          A.  I'm sorry.  Starting on line what?

10         Q.  21.

11         A.  "No, it was specific patients.  I'm going to

12    be completely honest right now.  I don't know if all

13    the hoopla and media and all this stuff is clouding

14    my -- you know, and making me think of Ben, because

15    of everything that's going on.  So I don't even -- I

16    don't want to say that it was Ben, you know."

17         Q.  Is there some particular reason you don't

18    want to say it was Ben?

19         A.  No.  I mean, I'm saying the same thing that I

20    said then and I haven't read this.  It's hard to

21    determine what I've -- from what I know post, you

22    know, the conviction and post the media stuff, if

23    that's merged in my brain as if it's just all

24    together now.

1      Q.   Sure.  But on page 14 the police ask you

2   again, "But if we were to ask you, did she do that

3   for Ben, would the answer be yes or no?"

4              Could you read your answer?

5      A.   "I would have to say yes."

6      Q.   So you knew she was doing special favors for

7   Ben, right?

8      A.   Well, what was I referring to?

9      Q.   So we can go back.  I mean, most of what

10   we're going to see here is the -- is Officer Sandavol

11   testifying on page 13.  Sorry.  There was your answer

12   to the last question.  So then he asks another

13   question on page 13, line 4, he says, very much the

14   officer, "Okay.  And the reality is this:  Obviously,

15   if in the event there's an allegation, the Illinois

16   State Police is -- you know, 'Hey, Mr. ISP, or, hey,

17   Mr. State Policeman, can you come and look at this?

18   We'd like for you to look into it.'  Because, again,

19   it's not -- you know, an allegation is -- what?  --

20   it's either true or false.  And our job is to be very

21   diligent into applying reliable, admissible

22   information that's going to prove either-or.  So

23   there's this burden of proof, if you will, but a huge

24   responsibility on our part, you know.  Just because

1    you allege something, doesn't necessarily mean it

2    happens.  And, you know, if it did, though, then we

3    want to make sure that we're doing what we need to do

4    to prove it; but at the same time, if we're able to

5    exonerate the state employee, that's our job as well.

6    But, again, yes, you mentioned the hoopla.  Now

7    there's this thing on the news, WGN and -- okay.

8    Obviously, that's a civil matter.  This is more of a

9    criminal matter as relates to the allegation."

10                   And then your answer is, "Yeah, I

11   know."

12                   So they're asking you, same line of

13   questioning, about giving special treatment to

14   patients.  And the question here is, "If we were to

15   ask you, did she do that for Ben, would the answer be

16   yes or no?"  Your answer is, "I would have to say

17   yes."  Right?

18        A.  Correct.

19        Q.  So at least at that time you felt comfortable

20   saying that you knew Christy was doing this for Ben,

21   right?

22        A.  Yes.  I don't know what doing this is,

23   though, specifically.

24        Q.  Well, let's go into that a little bit.  I

1      mean, let me ask you this.  Strike that.

2                      So on page 14 here, line 24 to

3      line -- to the next page, the police ask, but was she

4      so inclined as to do that for several patients --

5      maybe I'll start with the full question.

6                      Line 22, but at that time did she, in

7      fact, do those particular, let's say, favors.  I

8      don't want to use the word favor, but was she so

9      inclined as to do that for several patients and maybe

10     not others?  So she was selective?

11                     Could you read your answer there?

12     A.  "Oh, yeah."

13     Q.  Then he asks again, "She was selective in the

14     process?"  And your answer?

15     A.  "Uh-huh."

16     Q.  Okay.  So you knew Christy was singling out

17     patients to provide special favors for, right?

18     A.  Yes.  It says I said it was her patients.

19     Q.  Okay.  So was Ben Hurt her patient?

20     A.  I believe he was.

21     Q.  And so going back to this earlier answer.  On

22     page 14, "But if I were to ask you, did she do that

23     for Ben, would the answer be yes or no?"  And you

24     said, "I would have to say yes," in the context of

```
 1        giving Ben favors.

 2                      Now, we've talked about making

 3        copies.  So did she make copies for Ben?

 4        A.  I don't recall.  She may have.

 5        Q.  Did she stay late to stay with Ben and just

 6        hang out with him?

 7        A.  Not that I'm aware of.

 8        Q.  You said she might -- you may have heard that

 9        someone told you that she made home-cooked meals for

10        Ben?

11        A.  Not just Ben.  I just know that it was

12        reported she had brought food for certain patients.

13        Q.  I'm not asking you about certain patients

14        now.  I'm asking about Ben.

15                      You said earlier that someone may

16        have told you that she brought home-cooked meals for

17        Ben, correct?

18        A.  No, I can't say it was Ben specifically.

19        Q.  Okay.  Was she late with Ben's court reports?

20        A.  I don't recall.

21        Q.  Did she let Ben into the laundry when other

22        staff had not allowed Ben to do his laundry?

23        A.  I mean -- I don't recall specifically.  She

24        may have.
```

1    Q.  So you don't recall whether any of the six

2    different specific complaints that you heard from

3    staff about Christy were directly related to Ben

4    Hurt?

5    A.  I don't recall if it was just specific to

6    Ben.  He may have been one of several patients

7    that -- yeah, I'm not -- I don't -- I can't think of

8    a specific conversation where...

9    Q.  Do you know how old Ben Hurt was when he was

10   confined to Elgin?

11   A.  I believe 20.

12   Q.  And he was there for three years, so

13   somewhere between 20 and 24 years old, correct?

14   A.  Is that accurate?  He was 20 on admission?

15   Q.  I think that he was about 21 when he arrived.

16   A.  21, okay.

17   Q.  Do you know how old ███████████████ was

18   when he was Christy's patient?

19   A.  I don't.

20   Q.  Did he at least appear to you to be about in

21   his early 20s?

22   A.  Probably -- yeah, he was probably late --

23   mid, late 20s.

24   Q.  How about Mark Owens, do you know how old

1      Mark Owens was when he was Christy's patient?

2           A.  I don't, but I -- 20s.

3           Q.  And how about ████████ ██████

4           A.  Same, 20s.

5           Q.  And ██████████ ████████

6           A.  ████████  I want to say, was near 40.

7           Q.  He was a little older, right?

8           A.  Yeah.

9           Q.  But Ben, ██████████ Mark and ██████████ were all

10     young black men in their early 20s, right?

11          A.  Correct.

12          Q.  So I think earlier you mentioned that it's a

13     violation of policy for a social worker to lock the

14     door when meeting with a patient; is that correct?

15          A.  Yeah.  Well, it's a...

16          Q.  I'm sorry.  I didn't hear that.

17          A.  It's -- it's a practice.  We don't -- you

18     shouldn't have your door locked with a patient in

19     there.

20          Q.  Is there any reason to have the door locked?

21          A.  No.

22          Q.  Now, at Elgin, the office doors, they lock

23     from the inside out, correct?

24          A.  I'm just looking at my office -- my office

LISA A. KOTRBA & ASSOCIATES, LTD.  (312) 855-1834

1      door locks from the outside, so I don't know.

2           Q.  Okay.  What about the social worker offices

3      on the units?

4           A.  No, I think -- I think it's a key lock from

5      the outside.  They have to activate or, you know,

6      turn it or -- when you open the door, you -- you

7      disengage the lock from the outside.

8           Q.  You'd need -- you'd need an outside key -- to

9      come in from the outside, you have to have a key,

10     right?

11          A.  Yes, an H1 key.

12          Q.  Right.  But if you're inside the office, you

13     can open the door to get out without using a key,

14     right?

15          A.  Correct.

16          Q.  So that's what I meant by the door locks from

17     the -- from the inside, not from the outside, because

18     you can exit the office, unlocking it without a key

19     from the inside, but you can't do that from the

20     outside, correct?

21          A.  Correct.

22          Q.  So if you went into the office with your key

23     and you closed the door behind you, there's some

24     inside mechanism that perhaps you can't reach unless

1    the door is opened to trigger that the door would

2    just stay unlocked, right?

3    A.  Okay.  The door is not locked.  If you're in

4    the office, you can get out without a key.

5    Q.  Right.  That's my point.  In other words,

6    once you're in the office, for the door to remain

7    locked from the outside, the social worker would have

8    to make a decision to unlock the door to make it

9    available for anyone coming in from the outside to

10    get in, right?

11    A.  Correct.

12    Q.  Have you ever locked a door when you've met

13    with a patient in an office?

14    A.  Not that I'm aware of.

15    Q.  It's dangerous -- so is it dangerous for the

16    staff to be locked in the office with a patient?

17    A.  It -- yes, it can be.

18    Q.  So were you ever told that Christy would lock

19    her office door when meeting with patients?

20    A.  I don't recall.

21    Q.  You don't recall any STA ever reporting to

22    you that Christy was in an office with a patient and

23    the door was locked?

24    A.  No, I don't recall a specific conversation

1    like that.

2        Q.  Are you aware of whether Christy ever did

3    this?

4        A.  No, but if -- I mean, if it was reported to

5    me, I would have reported it, I would assume, to her

6    supervisor and I think that I would have addressed it

7    directly with her.

8        Q.  Directly -- I'm sorry.  To who?

9        A.  With her.

10       Q.  With her?

11       A.  Because that's a, you know, safety issue.

12       Q.  Right.  So if someone told you Christy's

13   locked in the office with a patient, in addition to

14   reporting it to her supervisor, it's kind of your

15   style, you would have gone and directly discussed

16   this with Christy.  Is that what you're saying?

17       A.  Well, yeah, and I probably would have, you

18   know, checked on her.

19       Q.  Do you recall any activity therapists

20   asked -- reporting to you that Christy was in the

21   office with a patient with the door locked?

22       A.  No.

23       Q.  So on page 17 the police asked you, line 2,

24   "Okay.  And then have you ever approached Christy

1      Lenhardt?  So when a nurse would talk to you, would

2      you directly go to Christy Lenhardt, or would you go

3      directly to someone else to speak about -- like

4      either it's a boundary issue or if she's -- say she's

5      going against the plans set in place by your nurses

6      and she's going against that, would you go and talk

7      to her supervisor and say, 'Hey, this is what I'm

8      hearing.  This is what she's doing.  Can you talk to

9      her about that,' or would you go directly to her and

10     ask her?"

11             Could you read your answer lines 12

12     through 16?

13     A.  Oh.  "I probably did both because I'm not

14     shy.  So my guess is that I did probably ask her to

15     stop doing that.  But I do know that I did bring her

16     staying late to her supervisor, who I think at the

17     time was Jeff Pharis."

18     Q.  Okay.  So that's consistent with what you

19     just said, which is you've got a complaint and you

20     would go directly to Christy and to the supervisor,

21     right?

22     A.  Uh-huh.  Sorry.  Yes.  I was reading.

23     Q.  No worries.  So when you approached

24     Christy -- now, on any of these different complaints

1      from staff, you were trying to get her to stop doing

2      these things, weren't you?

3          A.  Yes.

4          Q.  Why were you trying to stop her from doing

5      those things?

6          A.  Because it was causing issues with the other

7      staff members, who were my direct reports.

8          Q.  Now, you said here, you told the police "I'm

9      not shy" when you were explaining how you approached

10     Christy.  What do you -- what do you mean by that?

11         A.  Meaning, I -- I will address an issue head-on

12     as opposed to not addressing it or -- I mean, again,

13     as long as it's within my -- you know, my scope, my

14     job scope.

15         Q.  Good.  That's a good segway.

16              Is observing behavior that might lead

17     you to believe someone's behaving inappropriately

18     with a patient, like getting too close or giving them

19     special favors or even becoming somewhat intimate or

20     emotional with the patient, is that within your scope

21     as nurse manager and then associate director of

22     nursing?

23         A.  If at any time that I thought her actions

24     were abuse or neglect, I would have called OIG, in

LISA A. KOTRBA & ASSOCIATES, LTD.  (312) 855-1834

1        addition to reporting it to her supervisor.  You

2        know, as I've stated previously, I never in a million

3        years considered that there was an inappropriate

4        relationship or an inappropriate anything that she

5        was doing.  If -- if anything, I just thought she was

6        the kind of person who, again, I found that maybe she

7        was insecure about her, you know, job abilities or

8        something and that she just wanted to make everyone

9        like her.

10       Q.  So --

11       A.  You know...

12       Q.  Right.  You said you -- you never considered

13       that she was abusive.  Is that what you just said?

14       A.  If I had any indication that I thought that

15       there was abuse or neglect, I would have reported

16       that to OIG.

17       Q.  Well, that's slightly different than that you

18       didn't consider it.  So was it that you just

19       didn't -- it just didn't occur for you and you didn't

20       consider that she was doing anything inappropriate?

21       A.  I -- there's -- I had -- I had no indication

22       that there was something inappropriate going on.  I

23       mean -- and I just want to clarify something with the

24       food issue.  We used to -- the reason food has been

LISA A. KOTRBA & ASSOCIATES, LTD.  (312) 855-1834

1    kind of become -- well, it doesn't matter.  Food

2    allergies became a big, big deal, so we had to stop

3    bringing in home-cooked meals, but we used to -- that

4    used to be a frequent thing, is that staff would

5    do -- bring food in for the patients.  So, I mean, it

6    didn't even -- I don't know.  I just -- I don't know.

7        Q.  Well, my question was you didn't consider

8    it -- you said you didn't have any indication of

9    abuse.  What does it mean that you didn't have an

10   indication of it?

11       A.  I mean, there was -- none of the reported

12   behaviors, you know, making copies, opening the

13   laundry room, you know, bringing the food to

14   patients, none of that -- like -- I just -- nothing

15   says to me, well, she's sexually abusing them.  You

16   know, and, again, the only -- the -- it's not

17   abnormal for a social worker to meet with their

18   patients in their office.  They're supposed to, so

19   they can make, you know, phone calls or if they're

20   providing therapy.  I mean, that's -- that's not

21   abnormal.

22       Q.  Is it abnormal to be locked in an office with

23   a patient?

24       A.  Yes, that instance was abnormal.

1       Q.  Is it abnormal to voluntarily lock yourself

2   as a social worker in an office with a patient even

3   if it's one time during a social work meeting?

4       A.  If they purposely did it, then, yes, it's

5   abnormal because, again, you have to -- you have to

6   disengage the lock when you put your key in.  You

7   know, so I know that there's been instances where,

8   you know, staff have forgotten to disengage the lock

9   and, you know, someone will walk by and -- a lot of

10   the STAs when they do their face checks, will check

11   the handles of office doors.  And if they find it

12   locked, they just knock and say, you know, unlock

13   your door.

14       Q.  So the STAs would know if the door was locked

15   based upon the procedure you just outlined, right?

16       A.  Yeah, or security.  Sometimes security will

17   walk through the unit and look in the offices, check

18   the doors.

19       Q.  And I just want to ask this one more time.

20   So it's your testimony today that neither any STA nor

21   any activity therapist ever reported to you that

22   Christy Lenhardt was locked alone in her office with

23   Ben Hurt?

24       A.  They could have.  I just do not recall that.

1     Q.  So it's possible that they did?

2     A.  Yeah.

3     Q.  So on page 18, the state police asked you --

4  I'm starting on line 3, "Do you remember -- if you

5  did approach Christy, do you remember how her

6  reaction was?  Was she welcoming to the construction

7  criticism as relates to two professionals?"

8              Could you read your answer on lines 7

9  through 10?

10     A.  "No.  No.  Whenever anything was brought --

11  that I -- of my opinion, whenever anything was

12  brought to Christy, she -- there was -- there wasn't

13  a lot of ownership of her."  It should have been by

14  her.

15     Q.  So what exactly did Christy say when you

16  brought complaints to her attention?

17     A.  I have no recollection.

18     Q.  Well, you characterized it here.  There

19  wasn't a lot of ownership.  What was your perception

20  of Christy's reaction?

21     A.  I -- I honestly don't recall.

22     Q.  What does there wasn't a lot of ownership

23  mean?

24     A.  I can only -- I can only speculate what I

1    meant at the time.  Ownership would be owning your

2    behavior and then, you know, either changing it or

3    explaining it.

4        Q.  So she was unwilling to recognize that she

5    was doing something wrong when you talked to her?

6        A.  I don't recall.  I don't recall.

7        Q.  Okay.  So other than the direct complaints

8    that we've already discussed, was it ever brought to

9    your attention or did you ever hear rumors about

10   Christy Lenhardt having boundary issues with patients

11   that you were aware of or that you heard?

12       A.  There was an incident, and, again, I'm trying

13   to think when this was, and I'm not even going to

14   pretend to remember.  So Drew Beck relayed to me that

15   ███████ -- and I apologize.  I forgot ███████'s last

16   name.

17       Q.  ██████ --

18       A.  ████l -- I'm sorry?

19       Q.  ███████████.

20       A.  ██████████.  So ████████ had reported to

21   his treatment team -- and, apparently, this occurred

22   prior to me coming to Modules K and L -- that he --

23   ████████ had developed feelings for Christy Lenhardt.

24   And when they approached or when they -- I don't want

1    to say confronted or whatever, spoke with Christy

2    about it, she said that she also started to have

3    feelings for ██████ and that it would be better if

4    he was moved off the unit.  So they moved him from

5    Module L at the time to Module K.

6        Q.  If Christy had admitted that she was having

7    feelings for a patient, is that a sufficient amount

8    of suspicion for her committing some form of abuse?

9        A.  I don't recall when -- when Drew told me

10   that.

11       Q.  I didn't ask you when.  I'm just asking

12   whether Christy -- a social worker like Christy,

13   admitting she had feelings for a patient, mainly

14   ██████  is that a reportable suspicion of potential

15   abuse?

16       A.  No.

17       Q.  So just merely having feelings for the

18   patient is not enough?

19       A.  No.

20       Q.  What would she have to do before someone

21   would report a suspicion of abuse in relation to

22   feelings for a patient?

23       A.  Well, what would she have to do?  I mean, I

24   guess if she told the patient she was having feelings

1     for him, that would, you know, cross -- cross a

2     boundary.

3          Q.  Other than the information you provided about

4     █████████  are there any other patients that you've

5     heard rumors about Christy having boundary issues or

6     violating boundary patient -- patient/social worker

7     boundary lines?

8          A.  No.

9          Q.  So midway through page 27 the police asked

10    you about this on line 16.  The officer said, "In

11    regards to Christy, I mean, was there ever a time

12    where there was any other allegations that have

13    been -- that were ever brought forward or made in

14    regards to her and her involvement with other

15    patients that are similar that you can think of or

16    that you can recall?"

17                    Could you read your answer starting

18    on line 22?

19         A.  "This was revealed after the fact.  This

20    occurred prior to me becoming a manager on this unit.

21    But, apparently, and I can't verify whether she had

22    feelings for this patient or this patient had

23    feelings for her or it was a mutual or -- there was

24    something that was identified, and this patient was

1      moved from Module L to Module K to separate them."

2          Q.  So how was the involvement with Ben Hurt

3      similar to the involvement with ████████

4          A.  I don't know.  I wasn't there when ████████

5      was on L.

6          Q.  I understand.  You -- you answered that when

7      he asked you if it was similar, you brought up

8      ████████ as being a similar patient/social worker

9      boundary problem.  I'm just wondering what you

10     thought was similar about ████████ and Ben Hurt?

11         A.  No, you asked me if there were any other

12     boundary --

13         Q.  Well, you answered about -- you answered

14     about ████████  I mean, maybe I should ask you.

15     You're talking about the mutual feelings for each

16     other and the patient was moved to L to K.  You're

17     talking about ████████ here, right?

18         A.  Yes.

19         Q.  I mean, is there another patient besides

20     ████████ that was moved from L to K that was

21     romantically involved with Christy that you haven't

22     told us about yet?

23         A.  Not that I'm aware of, no.

24         Q.  Okay.  So, then, this is ████████ right?

LISA A. KOTRBA & ASSOCIATES, LTD.  (312) 855-1834

1     A.  Again, yes.

2     Q.  Okay.  So how was it that these mutual -- I'm

3  calling it romantic feelings between Christy and

4  ████████ are similar in your mind to that between

5  Christy and Ben?

6     A.  I don't know.  I wasn't there when ████████

7  was on Module L.

8     Q.  No, I understand that.  But I'm just

9  wondering what the similarities in your mind are

10  between what you're aware of that happened with

11  ████████ and Christy and Ben?

12     A.  I am not sure what the similarities are.

13     Q.  Are you aware of the details of Christy's

14  involvement sexually with ████████

15     A.  No.

16     Q.  Did you hear any rumors about the fact that

17  ████████ was fondling Christy's breasts during their

18  social worker meetings in her office?

19     A.  Nope.

20     Q.  Did you ever hear any rumors about the fact

21  that ████████ had penetrated Christy's vagina with his

22  fingers while they were in social work meetings while

23  in her office?

24     A.  No.

1     Q.  Are you aware or did you hear rumors that

2     Christy had masturbated ███████ using her feet while

3     they were in social worker meetings in her office?

4     A.  Nope.

5     Q.  No rumors whatsoever about the intimate

6     sexual contact between ███████ and Christy were ever

7     shared with you by anyone?

8     A.  Never.

9     Q.  And you were aware that ███████ was moved to

10    separate Christy and he from one another, so he had

11    to be moved to K-Unit to stop the potential for this

12    feelings, romance to continue, right?

13    A.  That's not the way it was presented to me.

14    It was presented that -- almost like ███████ had --

15    had reported having feelings and that Christy

16    acknowledged her feelings and that, you know, in

17    order to -- it wasn't obviously therapeutic for him

18    to stay on the unit.  That's how -- not -- not that

19    it had progressed to any type of romantic

20    relationship or...

21    Q.  Well, what wasn't therapeutic about it?

22    A.  If a patient is having feelings for their

23    therapist, which is -- you know, that's not

24    usually -- what's the word I'm looking for?  It's not

1      uncommon, but if it's reciprocated and the therapist

2      starts having feelings for the patient, then they --

3      you can't be -- I don't know what the words are, but

4      you can't be -- what's -- I don't know.  In CPI we

5      use the word rationally detached.  You have to have,

6      you know, a buffer of -- you have to be able to look

7      at what you're offering objectively.

8          Q.  I mean, is becoming intimate and romantic

9      with a patient ever therapeutic?

10         A.  No.

11         Q.  So are you aware of the allegations that

12     Christy was involved with the escaped patient, ████

13     █████?

14         A.  No.

15         Q.  You don't know anything about that?

16         A.  No.

17         Q.  Have you ever heard a rumor about that?

18         A.  Not until this.

19         Q.  So when is the first time you found out about

20     it?

21         A.  I don't know if I'm supposed to say -- well,

22     I don't know what I'm supposed to say right now.

23         Q.  Just the truth.

24         A.  The first time I really heard about it is

```
1         when I spoke with Mary Johnston.

2              Q.  Okay.  Sorry.

3                   MS. JOHNSTON:  Objection.  Do not discuss --

4                   MR. CECALA:  Do not discuss what you tell

5         your lawyer.

6                   THE WITNESS:  Sorry.  I didn't know.  I

7         don't know.

8         BY MR. CECALA:

9              Q.  That's okay.  We don't want to know what you

10        told Mary Johnston.

11             A.  Well, I didn't tell her anything because I

12        didn't know about it.

13             Q.  Okay.  Other than your lawyer --

14                  MS. JOHNSTON:  Objection.

15        BY MR. CECALA:

16             Q.  Other than your lawyer --

17                  MS. JOHNSTON:  Any conversation that we have

18        ever had doesn't need to be discussed.

19        BY MR. CECALA:

20             Q.  Other than your lawyer, when is the first

21        time you found out about Christy having any

22        relationship with ███████████, who escaped from

23        Elgin?

24             A.  I -- I knew nothing -- nothing about that.
```

LISA A. KOTRBA & ASSOCIATES, LTD.  (312) 855-1834

```
 1          Q.  So you didn't find out when you read the
 2     complaint in 2017?
 3          A.  If it's in -- if it's in the complaint, then
 4     that's -- that's where I would have read it.
 5          Q.  Did you have any information about Christy
 6     and ███████ before you read the complaint?
 7          A.  No.
 8          Q.  Bill Epperson didn't come into the
 9     administrative meeting on June 30th and say that he'd
10     recovered a journal from Ben Hurt detailing how
11     Christy helped ██████ escape from Elgin in 2006?
12          A.  Not that I recall.  If he did, I was
13     unconscious.
14          Q.  Are you aware that Christy admitted to having
15     a sexual relationship with ██████████████ while he
16     was a patient in Elgin Mental Health Center?
17          A.  Well, I believe you stated that earlier, so,
18     yes, I am.
19          Q.  You're aware now.  Were you ever aware before
20     today?
21          A.  No.
22               MR. CECALA:  One second.
23            (Pause.)
24               MS. JOHNSTON:  Joe, I'm not trying to beat a
```

1    dead horse here, just to let you know we're at 4:05.

2    I know how easy it is to lose track of time when

3    you're taking a deposition.

4        MR. CECALA:  We're going to be done in

5    plenty of time.

6        MS. JOHNSTON:  Like I said, not trying to

7    beat a dead horse, just didn't want it to sneak up on

8    you.

9        MR. CECALA:  Understood.

10   BY MR. CECALA:

11       Q.  So, Colleen, this is another -- this is page

12   21, where the State Police begin talking to you on

13   lines 6 through 8 that Christy was escorted out of

14   the facility and we have information to suggest that.

15   And then he asked -- I have to read it all in just so

16   you're clear with where he was going.

17            "But, again, she's a social worker,

18   she has patients, all of a sudden she's no longer

19   here.  In regards to the nurses that you oversee or

20   supervise, the STAs and patients within the units,

21   all of a sudden someone's here and they disappear,

22   you know, has there been anyone that's come forward

23   and said, 'Hey, by the way, like, where's she at',

24   been asking, let alone inquired or was made aware of

1    the allegation and perhaps providing information,

2    even if it seems like, oh, it's silly now, looking

3    back, it's like, oh, wait a minute, because this

4    guy's saying he knows something or this guy is

5    saying -- has any of that happened?"

6                    So could you read your answer, lines

7    22 and 23?

8        A.  "Just the rumor.  People are all talking.

9    Rumor, rumor, rumor."

10       Q.  Then he asks you, "So what's the rumor?"

11                   So can you read your answers lines 1

12   through 5?

13       A.  "That Ben Hurt's -- the latest one I heard

14   was that Ben Hurt's mother was in correspondence with

15   Christy and this was all orchestrated and Christy's

16   aware of the civil lawsuit.  I mean, it just, you

17   know, people just roll and add."

18       Q.  So who did you hear that from?

19       A.  I have no idea.  It could have been anybody

20   who works here.

21       Q.  Was it one of the administration?

22       A.  No.

23       Q.  Was it an STA?

24       A.  It could have been.

1    Q.  Was it another social worker perhaps?

2    A.  We can guess every discipline that works

3    here, I have no -- I just -- there were so many

4    rumors going around.

5    Q.  Were there other rumors going around other

6    than Ben's mother and Christy orchestrating the civil

7    lawsuit?

8    A.  I'm sure there was.  I don't recall.  I mean,

9    if you -- if you want to read it from here, whatever

10   I said then, I don't recall right now.

11   Q.  I mean, this one outlines somewhat detail --

12   I mean, on lines 20 through 22, the officer says, "So

13   there was some sort of communication between them,"

14   meaning Christy and Ben's mom, "that there was some

15   sort of orchestration of sorts in regards to this

16   happening."  And you mentioned "This civil lawsuit."

17   And he asks, "Coming to," answer "Yeah."  Then he

18   asks "And for what purpose, though?"

19                  Could you read your answer, lines 3

20   and 4?

21   A.  "Financial, that, you know, they would sue

22   the state and get money, you know."

23   Q.  So the rumor you heard was that the civil

24   lawsuit that you're taking your deposition in today

1      was just a bogus orchestration between Christy and

2      Ben's mom to get money from the state?

3          A.  I don't recall.  Whatever -- I don't --

4      whatever I said at that time.  I don't even recall

5      that -- that rumor now.

6          Q.  At least at that time this was the only rumor

7      you seem to remember.  There were no other rumors

8      going around Elgin Mental Health Center about Christy

9      or this lawsuit?

10         A.  Could you scroll up again, I'm sorry, to page

11     22?

12         Q.  Sure.  Well, I'd like you to answer my

13     question.

14         A.  Were there other rumors?  I'm sure there

15     were, but I don't recall what they were right now.

16         Q.  Did you recall them in November of 2017 when

17     you were talking to the State Police?

18         A.  I don't know.  If you -- if we go to the next

19     page, we can find out.

20         Q.  There aren't any other rumors that you

21     mention here.  I can save us the time.

22                   This was the only rumor you recalled

23     in November of 2017 about Christy Lenhardt and Ben

24     Hurt?

```
 1          A.  Yeah, if that's what I -- unless I reported

 2     another one then, I'm not -- I mean, I don't recall

 3     any.

 4          Q.  So the rumor about the bogus lawsuit being

 5     orchestrated, did Dr. Corcoran tell you about that

 6     rumor?

 7          A.  No.  I don't -- I don't even know if

 8     Dr. Corcoran was here at that time.

 9          Q.  Okay.

10          (Deposition Exhibit Number 8 was marked for

11           identification.)

12     BY MR. CECALA:

13          Q.  I'm showing you Exhibit 8.  It's titled

14     Defendant Colleen Delaney's Answers to Plaintiff's

15     First Set of Interrogatories.  Do you see this page?

16          A.  Yes.

17          Q.  And it's eight pages long.  I'm going to go

18     to the last page.  This is a verification page.  Can

19     you read the verification?

20          A.  "I, Colleen Delaney, a Defendant in this

21     matter, hereby verify that the above responses are

22     true and correct to the best of my knowledge and

23     recollection."

24          Q.  And is that your signature?
```

```
 1        A.  Yes.

 2        Q.  And it's -- the date is September 21, 2020,

 3   right?

 4        A.  Yes.

 5        Q.  So the first question asks you to identify

 6   all persons with knowledge of the facts underlying

 7   the complaint and all documents that relate to such

 8   knowledge or facts.

 9                    And here you say you believe the

10   following individuals may have knowledge.  Pat

11   Larson, who is Pat Larson?

12        A.  She was a -- the unit psychologist, Module L.

13        Q.  And what knowledge may Pat Larson have of the

14   complaint?

15        A.  I don't know, other than she worked closely

16   with the treatment team on Module L.

17        Q.  Well, when you were answering here, what were

18   you thinking about the knowledge that Pat Larson may

19   have?

20        A.  You know, I think I'd like to speak to Mary

21   about this.

22        Q.  This is something that in the middle of the

23   deposition, if I've put a proper question and, Mary,

24   there's no objection --
```

1          MS. JOHNSTON:  I wasn't trying to.  I mean,

2     Colleen, it's just what do you remember, why did --

3          MR. CECALA:  Well, maybe we should read the

4     question back.

5          MS. JOHNSTON:  I'll clarify.  It's people

6     who may have knowledge.

7          MR. CECALA:  You know, Mary, honestly, I

8     don't want you to coach the witness.  Can we read

9     back the question?  It's improper for her to -- to

10    not answer the question.

11         THE WITNESS:  To be honest, I don't remember

12    putting these names, so that's what I wanted to talk

13    to my attorney about.  I don't remember -- I think we

14    all filled these out and sent them to our counsel.

15    BY MR. CECALA:

16    Q.  Ah, okay.  So who's we?

17    A.  Whoever the people were on the

18    interrogatories, whoever got -- you know, I know

19    we -- we all get -- James Corcoran, et al.

20    Q.  Right.  So did you coordinate on answering

21    these interrogatories with the people that you

22    mentioned as we?

23    A.  No.

24    Q.  Okay.  So these are your answers?

```
1          A.  I'm saying -- I -- I believe we fill them out

2     and send them to our counsel.

3          Q.  Yeah.  So this would be -- I mean, my

4     question is did you -- did you -- did you speak to

5     someone else about answering these questions other

6     than your counsel?

7          A.  No.

8          Q.  Okay.  So did you write the name Pat Larson

9     down?

10         A.  Well, I signed that I did, so I guess I did.

11    So my answer is Pat Larson worked closely with

12    Christy Lenhardt, that's all I -- that's it.

13         Q.  So what -- what knowledge may Pat Larson

14    have?

15         A.  She may have no knowledge, but she worked

16    closely with Christy and all the patients on

17    Module L.

18         Q.  When was the last time you spoke with Pat

19    Larson about the complaint?

20         A.  I've never spoke to Pat Larson about the

21    complaint.

22         Q.  What about Antoinette Kelly --

23         A.  She was the charge nurse on day shift --

24         Q.  I actually have to put a question to you
```

```
 1        first.

 2            A.  Oh, sorry, sorry.

 3            Q.  Yeah.  So -- what -- because we kind of know

 4        their titles from this, so I'm trying to save time.

 5                        So what -- what knowledge may

 6        Antoinette Kelly have about the complaint?

 7            A.  Same, same response as Pat Larson.  She was

 8        the charge nurse on -- on Module L and worked closely

 9        with the treatment team.

10            Q.  And have you spoken to her?

11            A.  No.

12            Q.  Did you work with Pat Larson when you were on

13        L-Unit?

14            A.  Yeah.

15            Q.  And did -- you worked with Antoinette Kelly

16        on L-Unit?

17            A.  Yes.

18            Q.  And what about Daniel Hardy, what knowledge

19        may Daniel Hardy have about the complaint?

20            A.  I don't know.  I don't know what he would

21        know; just that he was the medical director.

22            Q.  And Jeff Pharis, what -- what knowledge may

23        Jeff Pharis have?

24            A.  Jeff is -- was Christy's supervisor.
```

1    Q.  So what -- what knowledge may he have?

2    A.  He may have more knowledge about the --

3    moving Christy from -- I'm sorry, moving ████ from

4    L to K, why that decision was made and -- yeah.

5    Q.  And Audrey Boston, what knowledge may Audrey

6    Boston have?

7    A.  She worked closely with Christy.  She was the

8    activity therapist on Module L.

9    Q.  Did you work closely with Audrey as well?

10   A.  Yeah.

11   Q.  And how about Cara Wueste, what knowledge may

12   she have about the complaint?

13   A.  Same.  She was -- she worked closely with

14   Christy on Module L.

15   Q.  And did you work closely with Cara?

16   A.  Yes.

17   Q.  And did you speak to any of these people

18   about their knowledge of the complaint?

19   A.  No.

20   Q.  And what about Drew Beck, have you spoken to

21   Drew Beck about the complaint?

22   A.  No.

23   Q.  What knowledge might Drew have about this

24   complaint?

```
 1          A.  Drew would know more about the ████████

 2     situation, as he was working there when that

 3     occurred, working on Modules K and L.

 4          Q.  And what about Dr. Javed, what knowledge may

 5     she have?

 6          A.  Well, she worked with Christy.  She was the

 7     psychiatrist on Module L.

 8          Q.  All right.  What -- just so you know, in the

 9     interest of saving -- because we have about 40

10     minutes left, I'm asking what knowledge they had.  We

11     know their titles.  We know who they were.

12                    What do they know that you answered

13     here that they may have knowledge that -- that you

14     have knowledge of what their knowledge is?

15          A.  I don't see their names listed on here.

16          Q.  So what it says is:  "Defendant further

17     states that all named defendants in this matter may

18     have knowledge."

19          A.  Oh, I see.  I see.  No knowledge that I'm

20     aware of.

21          Q.  No other knowledge that you're aware of?

22          A.  No.

23          Q.  And how about Dr. Kareemi, what knowledge may

24     she have about the complaint?
```

1          A.   She may have -- well, actually, I take that

2     back.   Dr. Javed, I'm not sure, and same with

3     Dr. Kareemi, if -- if they were there -- yeah, they

4     probably were, when the ███████ move occurred.

5          Q.   And no other knowledge about Christy and Ben

6     that you're aware?

7          A.   No, no.

8          Q.   How about Diana Hogan, what knowledge may she

9     have about the complaint?

10         A.   None that I'm aware.

11         Q.   When is the last time you spoke about the

12    complaint to any of the co-defendants, Drew Beck,

13    Dr. Javed, Dr. Kareemi, or Diana Hogan?

14         A.   I -- you know, I haven't discussed it with --

15    I haven't discussed it with any of them.   I just

16    recall a time -- and I can't remember, I'm sorry,

17    but -- who the lawyer was that came to the facility

18    and met with us.

19              MS. JOHNSTON:   Objection to the extent that

20    this would be calling for attorney/client privileged

21    communications.

22    BY MR. CECALA:

23         Q.   Okay.   I mean, we don't need to know the

24    contents of what was said.

1      A.   No, I wasn't going to share the contents, but

2  we met with, and I forget who it was, and I

3  apologize, but we met with the lawyer individually in

4  the conference room in FTP and we would cross each

5  other, like if one -- when one was going into the

6  room, someone would be leaving the area.

7      Q.   Okay.  That's good to know.  So you didn't

8  meet as a group with the lawyer?

9      A.   No, no, no, no.

10      Q.   What is your relationship with Dr. Kareemi?

11  Are you friends or just co-workers?

12      A.   Co-workers.

13      Q.   How is your working relationship with her?

14      A.   It's always been professional, good.

15      Q.   And how about Drew Beck, do you have a

16  personal relationship or just a professional

17  relationship with Drew?

18      A.   Professional.  We -- we tend to -- we used to

19  butt heads.

20      Q.   At work?

21      A.   Yeah.

22      Q.   And what about Dr. Javed, do you have a

23  personal or professional relationship only with her?

24      A.   Professional.  We always got along well.

1      Q.  What about Diana Hogan, do you have a

2  personal, professional or both relationship with her?

3      A.  Both.

4      Q.  Is she a good friend?

5      A.  I hate -- she's a great friend, but we don't

6  see each other because she retired in January of

7  2020.

8      Q.  So did you socialize with her as a friend

9  during 2017?

10     A.  We did stuff as a nurse manager group, like

11  we'd go out to lunch, but we never --

12     Q.  Let me ask you this.  More professionally.

13  Did you socialize outside of work, go, you know --

14     A.  No.

15     Q.  -- somewhere with your kids or some other

16  personal relationship like that?

17     A.  No.

18     Q.  So just going out to lunch with her?

19     A.  Yeah, yeah.  She was my boss for a long time,

20  so...

21     Q.  Okay.

22     A.  Yeah.

23     Q.  Did you have a -- both a personal and

24  professional relationship with her until she retired?

1      A.  Yeah, yeah.  I'd say yeah.

2      Q.  So it was like going to lunch, that type of

3  social relationship?

4      A.  Yeah.

5      Q.  And over lunch you never talked about this

6  complaint?

7      A.  No.

8      Q.  Never talked about this --

9      A.  I mean, we were always -- we always went in a

10  group.

11      Q.  Ah.  So you never went to lunch just you and

12  Diana?

13      A.  No.

14      Q.  So question 2 asks you to identify persons

15  with knowledge of the facts underlying your defenses

16  set forth in your answer to the complaint and

17  identify documents that relate to the knowledge of

18  such facts.

19          Part of your answer you say you acted

20  reasonably and in good faith at all times relevant to

21  the claims in the complaint.

22          How exactly do you consider you acted

23  reasonably and in good faith?

24      A.  Okay.  I'm sorry.  Identify all persons with

1    knowledge of the facts underlying -- just so I'm

2    clear.  So this is asking based on the plaintiff's

3    complaint -- I guess I'm not understanding the

4    question.

5         Q.  So do you know what the complaint is?

6         A.  That all the people named were aware that the

7    abuse occurred?

8         Q.  Well, it lays out in many pages exactly what

9    occurred between Christy and Ben.  That's -- what

10   you're discussing might have something to do with a

11   legal theory as to why the things that occurred are

12   against the Constitution or -- or the law.

13                    I'm asking you about the facts of the

14   complaint, all the allegations about Christy and Ben

15   and how you acted reasonably and in good faith at all

16   times relevant to those events happening.

17        A.  I'm -- I apologize.  I don't understand this.

18   The answer was provided by counsel, so I don't know.

19        Q.  Okay.  Fair enough.  In question 4 we ask you

20   to provide information with respect to all persons

21   whom the defendants, and each of them, have

22   communicated with concerning the complaint or any of

23   the events relating to the complaint, both during the

24   time period covered by the facts of the complaint and

1      at any time after, up to the date of your answer,

2      which was in September of 2020.

3                     Do you want to take a look at your

4      answer?  I'm going to ask you a couple of questions.

5      A.  Okay.

6      Q.  So who were among the many staff that were

7      discussing Christy's absence that you answered here?

8      A.  I don't recall.

9      Q.  Can you tell me how Christy's absence relates

10     to the facts of the complaint?

11     A.  Well, I mean, her office was taped off and

12     everyone was aware that ISP had come onto the

13     premises, you know, because they -- we didn't -- you

14     can't hide it.  It's a locked facility.  And then

15     Christy was no longer coming to work.

16     Q.  Okay.  What exactly were the conversations

17     you had with Bill Epperson concerning the complaint

18     or the events related to it?

19     A.  I don't recall.  I don't recall what we

20     specifically discussed.

21     Q.  But you did discuss it with him?

22     A.  Well, it would -- I mean, it may have been in

23     leadership meetings.  You know, like it could have

24     been updates on, you know, it's still with ISP or

1      this is going on or this is going on.

2           Q.  What would be this or this that he was

3      updating you on?

4           A.  You know, like the office is still taped off,

5      when are they going to, you know, release the office

6      or things like that.

7           Q.  Was there anything else that he would have

8      mentioned in the leadership meetings after Christy

9      left?

10          A.  Not that I recall.

11          Q.  What were your conversations with Diana Hogan

12     relating to the complaint or the events related to

13     the complaint?

14          A.  Related to this complaint?

15          Q.  Yes.

16          A.  I'm trying to think, you know, what we

17     discussed in -- I know a lot of our discussion was we

18     hope it's not true, because I know Diana knew Christy

19     from working on the civil side even years prior, and

20     that just how disappointed we would be if this were

21     to be true.

22          Q.  Yeah.  So did she tell you I hope this isn't

23     true?

24          A.  I don't know if she said I hope this isn't

1    true, but I just -- sort of like my -- you know,

2    discussed earlier, just -- I just, you know...

3        Q.  Well, discussed is a little different from

4    hoping it isn't true.  Did you tell her you hope it

5    isn't true?

6        A.  I don't know.  I don't know who said it.  The

7    tenor of the meeting was, you know, what the hell is

8    wrong with her?  If this is true, why would she do

9    this?  It's a reflection on all of us.  You know, we

10    talked about the public's perception of state

11    hospitals and how this taints, you know, pretty much

12    all the good work we do.  I mean, those were the

13    discussions.  They were -- they were emotional.  They

14    were, you know, angry.  They were -- those -- that's

15    the things we talked about.  We didn't -- we didn't

16    have specifics, or at least I didn't.

17        Q.  I understand.  I'm just asking you what the

18    discussions were.  It seems like there's a

19    significant amount more information about the

20    discussion, so I'm -- what was that information?

21    Part of it was you were hoping it wasn't true.

22               Was that a consensus between the two

23    of you, that you hoped it wasn't true?

24        A.  Of course.

LISA A. KOTRBA & ASSOCIATES, LTD.  (312) 855-1834

1      Q.  And then you mentioned other things about you

2      were discussing the perception of state hospitals.

3      How would the perception of state hospitals be

4      affected by Christy Lenhardt sexually abusing a

5      patient?

6      A.  Well, it was on the news.  You know, so if --

7      if -- you know, your family members who live in

8      different parts of the state, they see -- don't you

9      work there?  What's going on?  You know, and stuff

10     like that, and -- it's just -- yeah.

11     Q.  So it was the consensus between the two of

12     you that it would be embarrassing for the place that

13     you work if this were true?

14     A.  I -- embarrassing, no, that -- that's not --

15     it's not embarrassing.  It's -- it deflects from what

16     we do.  It deflects from -- you know, and I get it,

17     you're on the other side of the -- you know, you're

18     suing us, but -- and this is going to sound like

19     hyperbole and it's going to sound like, you know --

20     we do really great work here and situations like this

21     deflect from all the good we do.  And the fact that

22     she would take a position where you're meant to help

23     people, it just -- yeah, it -- it's sad.

24     Q.  What else -- what else did you discuss with

1      Colleen?

2           A.  I am Colleen.

3           Q.  I'm sorry.

4                MR. KRETCHMAR:  We're all tired.

5      BY MR. CECALA:

6           Q.  It's getting late for all of us.

7                     What else did you discuss with Diana?

8           A.  That -- that's it.  I mean, that -- that's

9      really it, just...

10                         EXAMINATION

11     BY MR. KRETCHMAR:

12          Q.  Colleen, when you say it deflects from all

13     the good work you do, you mean the public might get

14     the perception that state hospitals are not good

15     places, right?

16          A.  Potentially.

17          Q.  You mean they might even get the perception

18     that state mental hospitals are where social workers

19     use patients for sexual gratification, right?

20          A.  No, I wouldn't go that far.

21          Q.  You don't think the public would ever get

22     that perception from the details of the story of

23     Christy and Ben?

24          A.  No, I would hope that a majority of the

```
1     public uses their frontal lobe and realizes that this

2     was the poor behavior of one individual, not a

3     system.

4               MR. CECALA:  We're going to get to that.

5                         EXAMINATION

6     BY MR. CECALA:

7         Q.  So what -- look at question 11 real quick.

8     This asks you to set forth your past relationship or

9     interactions with the plaintiff, Ben Hurt, or other

10    dealings or encounters that have had to do with the

11    plaintiff.

12                    You can look at your answer and then

13    I'll have a question for you.

14        A.  I'm sorry.  Question 11?

15        Q.  Yes.

16        A.  Do you mind enlarging just a little?

17        Q.  I sure don't mind.

18        A.  Thank you.  Okay.

19        Q.  So in your answer you say that your

20    responsibilities were for maintaining hospital

21    policies and procedures, you were responsible for

22    enforcing to ensure Ben Hurt's safety.

23                    Can you give an example of a policy

24    that you were responsible for enforcing with Ben Hurt
```

```
1        that would have been an example of your

2        responsibility for enforcement of policy and

3        procedure?

4            A.  Sure.  So on the unit there is an automated

5        external defibrillator, so it's my responsibility to

6        check the -- the log on a monthly basis, but I -- I

7        did it more frequently, to make sure that each nurse

8        is making sure that the AED is working and that the

9        pads are not expired and that the battery is

10       functional.  So that's one of the hospital policies

11       and procedures in a nursing department that I make

12       sure.

13                    I reviewed the narcotic count on a

14       daily basis and then monthly I submit those -- those

15       forms as part of a state law to the pharmacy

16       department to ensure our narcotics are not missing

17       or -- yeah, we'll just leave it like that, missing,

18       that they're being tracked appropriately.  Keep

19       going?

20                       EXAMINATION

21       BY MR. KRETCHMAR:

22           Q.  Those are some good examples.  I'm just

23       wondering in my own mind was there any policies or

24       procedures that you were responsible for enforcing in
```

 1    order to protect Ben Hurt from being sexually abused

 2    by a social worker for two and a half years?

 3         A.  Was there a policy that I was responsible

 4    for?  I would say no, that under my purview, that

 5    I follow my chain of command.  I reported to the

 6    appropriate parties anything that deviated and that I

 7    tried to, to the best of my ability, make sure that

 8    the nursing department is following the policies.

 9                        EXAMINATION

10    BY MR. CECALA:

11         Q.  So you recently answered that you and

12    Defendant Hogan had conversations where you seem

13    somewhat incredulous about how this two and a half

14    years of sexual abuse with Ben is an inaccurate

15    reflection of Elgin Mental Health Center for the

16    public.  And obviously there are policies and

17    procedures in place, in the question you were just

18    asked, about preventing sexual abuse, correct?

19         A.  I mean, I guess it would be more in the --

20    the ethics of each -- of each profession.

21         Q.  Well, fine.  Let's include professional

22    ethics, policies of the institution, as well as the

23    law.  There's these areas where you have an

24    incredulous feeling about this being -- this

1      situation between Ben and Christy of sexual abuse is

2      an inadequate reflection of all the good work you do,

3      right?

4          A.  Yes.

5          Q.  And, generally, everything is designed at the

6      hospital in the codes of ethics, that the people who

7      you're saying are more an appropriate reflection

8      follow -- after all, it's a hospital filled with

9      behavioral health and mental health experts, right?

10         A.  Yes.

11         Q.  Trained in many ways to have a -- both an

12     objective and subjective, somewhat untrammeled, view

13     of human behavior or and on behalf of their patients,

14     right?

15         A.  I'm sorry.  What was the last part?

16         Q.  There's a -- there's a team of professional

17     behavorial health experts overseeing the entire

18     facility, including the ethics, the policies, and the

19     law, related to how patients should be treated,

20     right?

21         A.  Yes.

22         Q.  And we'll add to that there's securities --

23     there's even a title in the people you supervise, the

24     security therapy aide, right, that -- to keep a

225

```
 1        secure safe environment is the goal to make the

 2        patients have a therapeutic experience, right?

 3             A.  Yes.

 4             Q.  Are you aware that Ben Hurt and Christy

 5        Lenhardt have admitted to very frequent engaging in

 6        oral sex, at least five times sexual intercourse, but

 7        as many as three to four times per week Ben Hurt

 8        receiving oral sex from Christy in her social worker

 9        office?  Are you aware of that?

10             A.  No.

11             Q.  And you've already said you -- you're only

12        slightly aware of this relationship between ██████

13        and Christy, that they were separated, but didn't

14        raise anyone's suspicion of sexual abuse, right?

15             A.  I can't answer that.  I was not on the unit

16        at that time.  I -- I don't know.

17             Q.  Okay.  Well, you're now aware that she was

18        engaged in sexual acts with him by her own admission,

19        right?

20             A.  Yes.

21             Q.  You're also aware that she was engaged in

22        sexual acts with ████████████  by her own admission

23        and she actually helped him, a pedophile, escape from

24        Elgin in 2006, right?
```

```
 1        A.  I know now, yes.

 2        Q.  Okay.  So over a ten-year period, many, many

 3   days Christy Lenhardt was engaging in sex with her

 4   patients in her social worker's office with all the

 5   trained behavorial health experts who are vigilantly

 6   applying security and policy and ethics and the law.

 7   Can you explain how that happened for ten years?

 8        A.  I can't.  I can't.  I also cannot --

 9   there's -- there is nobody that I work with who would

10   know these things and not report it.

11        Q.  Okay.  Good.

12        A.  I just -- I don't -- I don't understand.

13        Q.  Is it possible for this to have happened

14   without at least some member of the staff looking the

15   other way when some red flag may have been raised

16   over this ten-year period?

17        A.  Yes, it's possible.

18        Q.  So what you're saying is that over ten years

19   with repeated sexual abuse with three confessed

20   patients at a minimum, that not a single person

21   observed a red flag or ever suspected something to

22   which they turned a blind eye?

23        A.  I don't know her discipline history.  I don't

24   know her supervision history, so I -- I can't respond
```

1    to that.  I don't know if things were reported to her

2    supervisors over the ten years and what their

3    follow-up was.  I don't know.

4                          EXAMINATION

5    BY MR. KRETCHMAR:

6        Q.  When you and Diana Hogan are sitting together

7    and saying, oh, my God, the public will get the wrong

8    impression of all the great work we do at Elgin

9    Mental Health Center, are the two of you basically

10   agreeing that the public could hear the story as we

11   just have been telling it to you; namely, three

12   patients at least over ten years being frequently

13   sexually abused, and for that matter, the

14   aftereffects of that, which maybe Joe wants to bring

15   up in a minute, and you think the public should --

16   should understand all of that and know what happened

17   and still say, oh, yeah, they do great work.  I love

18   state institutions.

19       A.  Well, the alternative is to take 370 patients

20   and put them in community agencies where they'll get

21   half the treatment.

22              MR. CECALA:  I'm not sure she answered your

23   question.  I'm not sure that we need one.

24              MR. KRETCHMAR:  I'm not sure I need an

1    answer to my question.

2              MS. JOHNSTON:  We have ten minutes left,

3    guys.

4              MR. CECALA:  Four more questions.

5              THE WITNESS:  At 5:00 I really -- I've got

6    to go.  I have kids.

7              MS. JOHNSTON:  Four more questions, so let's

8    move on forward.

9                        EXAMINATION

10   BY MR. CECALA:

11        Q.  So quickly.  In question 12 -- or, actually,

12   skip down to question 14.  So in question 14 we

13   asked -- this is a two-part question.  In it we're

14   asking you to identify about the incident in Bob

15   Hamlin's office, and you're answering that you found

16   out when you were in a meeting when the announcement

17   that Lenhardt was locked in the office with a patient

18   was announced over the radio, you didn't prepare any

19   reports or documents related to the incident; but we

20   also asked to identify all persons with whom you

21   discussed or shared any information or speculation

22   about that incident of Ben and Christy.

23              Can you answer who you may have

24   discussed or shared any information about that with,

1      just to make sure we get all your interrogatories

2      fully complete?

3          A.  I don't recall having specific conversations

4      about the incident, and I didn't prepare any

5      documents.

6          Q.  Now, just as a follow-up to my question about

7      whether reporting information and providing the

8      information from the staff that would comply with

9      ethics, policy and the law, so as to prevent sexual

10     abuse.

11             Do you feel that being honest and

12     somewhat critical where suspicions may be is an

13     important aspect of following the policies, the

14     ethics and the law?

15         A.  Do I feel that being honest is critical?

16     Yes.  Do I feel that -- what was the second part?

17         Q.  No, that was the answer.  Do you feel that

18     being honest about that -- reporting that information

19     is important?

20         A.  Yes.

21         Q.  And I asked you whether anyone would have

22     turned a blind eye to information or not provided,

23     perhaps, the full details so as to allow this abuse

24     to have continued for so long as an explanation for

1      why it, in fact, occurred?  Do you recall that?

2          A.  I'm -- I'm so sorry.  I totally zoned out.

3      I'm sorry.  What was the question again?

4              MR. CECALA:  So -- could you read back the

5      question, Court Reporter?

6          (Record read back as requested.)

7              THE WITNESS:  Do I recall you asking me

8      that?

9      BY MR. CECALA:

10         Q.  Yes.

11         A.  Yes.

12         Q.  And do you recall saying, well, no, no one

13     turned a blind eye?

14         A.  I said I can't imagine anybody would.

15         Q.  Okay.  So that's a little different.  So you

16     can't imagine it.  But is it possible that that is

17     one of the explanations for why it occurred?

18         A.  I can say that nobody -- you know what, I

19     don't know.

20         Q.  Okay.  Fine.  So -- and providing full and

21     complete details of the truth, not a half truth and

22     not a quarter truth could actually help detect

23     suspicions about sexual abuse, couldn't it?

24         A.  Providing the truth, not a half truth or a

1    quarter truth?

2         Q.  Yes.  Wouldn't that help?

3         A.  In preventing sexual abuse?

4         Q.  Yes.

5         A.  In regards to what?

6         Q.  In regards to the observations or -- I hate

7    to use the word suspicions, but or suspicions that

8    maybe something is going on.

9         A.  I don't know if it would prevent sexual

10   abuse, but it would -- I mean, honesty's -- full --

11   full disclosure, full truth is better than half

12   truth.

13        Q.  Right.  Two more and we're done.

14             So if you look at question 16, we ask

15   you to describe in detail how and when you first knew

16   or heard that Christy Lenhardt had been discovered,

17   through evidence found in a room search of Ben Hurt's

18   room at EMHC, to have been in a sexual or illegal or

19   unauthorized relationship with Ben Hurt, and identify

20   all persons with whom you discussed or shared any and

21   all information, or from whom you received

22   information about this.

23             Can you read your answer?

24        A.  "Defendant Delaney has no knowledge of any

1    such evidence."

2        Q.  For about the first half of this deposition,

3    we discussed the administrative meeting in which you

4    were informed about computer paraphernalia and other

5    evidence that you characterized as an inappropriate

6    relationship between Ben and Christy.  Do you

7    remember testifying about that?

8        A.  I testified that I was aware that flash

9    drives and computer paraphernalia were confiscated.

10   I was not aware of the contents.

11       Q.  Right.  Can you explain why you failed to

12   provide that as part of your answer to interrogatory

13   16?

14       A.  I don't -- I mean, I don't think I was

15   ever -- unless it's in the complaint that -- the

16   details of the audio recordings or pictures.

17       Q.  It's in the complaint.

18       A.  Then, I guess, interrogatory 16 was answered

19   in error.

20       Q.  Oh, it's an error?

21       A.  Or I didn't read the complaint.

22       Q.  Well, this doesn't really discuss the

23   complaint.  It's asking you to describe when you

24   first knew or heard about it.

```
 1          A.  I have one minute, sir.

 2          Q.  I asked you to describe when you first heard

 3     about it.  I'm not sure I've received the answer.

 4          A.  I don't recall.

 5          Q.  You don't recall.  Hold on.

 6               THE WITNESS:  Mary, it's 5:00.

 7               MS. JOHNSTON:  Yeah, and they're just coming

 8     back.  Let's let them come back.

 9               MR. CECALA:  Okay.  We don't have anything

10     further, and we're ordering.

11               MS. JOHNSTON:  Okay.  Colleen, do you want

12     to review the transcript for accuracy, or do you want

13     to just trust that Stacey has taken everything down

14     accurately?  You wouldn't be able to actually change

15     answers, but if there was a mistake, like somebody

16     put J instead of K, you're able to fix things like

17     that, more typographical.

18               THE WITNESS:  I'd like to review it, yes.

19               MS. JOHNSTON:  Okay.  We'll reserve

20     signature.  You're all set then, Colleen.

21                         And I'm ordering as well, Stacey.

22     Randy and Joe said they're ordering.

23               (Proceedings concluded at 5:00 p.m.)

24
```

```
 1              IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                      EASTERN DIVISION

 3      BENAHDAM HURT,                      )
                                           )
 4                   Plaintiff,            )
                                           )
 5              -vs-                        )  No. 17-cv-7909
                                           )
 6      HASINA JAVED, FAIZA                )
        KAREEMI, COLLEEN DELANEY,          )
 7      DIANA HOGAN & DREW BECK,           )
                                           )
 8                   Defendants.           )
        _____    )
 9      MARK OWENS,                        )
                                           )
10                   Plaintiff,            )
                                           )
11              -vs-                        )  No. 18-cv-0334
                                           )
12      HASINA JAVED,                      )
                                           )
13                   Defendant.            )
```

14          I, COLLEEN McBEAN-DELANEY, being first

15     duly sworn, on oath say that I am the deponent in the

16     aforesaid deposition taken on June 29, 2022, that I

17     have read the foregoing transcript of my deposition,

18     consisting of pages 1 through 233 inclusive, and

19     affix my signature to same.

20                         _____

21                         COLLEEN McBEAN-DELANEY

22     Subscribed and sworn to before me this _____ day
       of _____, 2022.

23

       _____
24     Notary Public

LISA A. KOTRBA & ASSOCIATES, LTD.  (312) 855-1834

```
 1      STATE OF ILLINOIS  )
                          ) ss:
 2        COUNTY OF COOK  )

 3

 4              STACEY L. PARR, being first duly sworn,

 5      deposes and says that she is a Certified Shorthand

 6      Reporter in Cook County, Illinois, and reporting

 7      proceedings in the Courts in said County;

 8              That she reported in shorthand and

 9      thereafter transcribed the foregoing proceedings to

10      the best of her ability;

11              That the within and foregoing transcript

12      is true, accurate and complete and contains all the

13      evidence which was received in the proceedings upon

14      the above-entitled cause.

15              I do hereunto set my hand this 12th day of

16      July, 2022.

17

18

19                       Stacey L. Parr, C.S.R.

20                       _____
                         STACEY L. PARR, C.S.R.
21                       License No. 084-004502

22

23

24
```

LISA A. KOTRBA & ASSOCIATES, LTD.  (312) 855-1834

## '

**'17** [2] - 74:1, 94:13
**'89** [2] - 94:13, 94:20
**'Hey** [4] - 167:18, 176:16, 185:7, 200:23
**'inappropriate** [1] - 95:14
**'no** [1] - 80:4
**'Notice** [1] - 101:7
**'Supplemental** [1] - 102:4

## 0

**06:00** [1] - 115:11
**0730** [1] - 34:20
**084-004502** [2] - 2:24, 235:21
**090** [1] - 89:14

## 1

**1** [16] - 3:12, 9:1, 9:2, 11:6, 11:9, 19:9, 37:5, 51:21, 52:19, 62:3, 104:20, 109:1, 134:13, 149:24, 201:11, 234:18
**10** [7] - 38:14, 51:21, 132:14, 164:13, 167:17, 190:9
**100** [1] - 2:13
**103** [1] - 3:19
**105** [1] - 89:15
**109** [2] - 93:9, 95:6
**109.1** [1] - 95:9
**109.3** [1] - 100:19
**10:02** [1] - 1:22
**11** [20] - 3:12, 12:22, 13:14, 18:8, 25:14, 38:14, 92:14, 94:7, 94:10, 116:20, 117:6, 120:17, 121:11, 121:12, 122:10, 122:22, 124:8, 221:7, 221:14
**1100** [1] - 35:2
**111** [1] - 32:16
**113** [1] - 33:4
**114** [2] - 32:17, 33:15
**1170** [1] - 2:8
**11:00** [7] - 35:6, 35:11, 35:17, 35:19, 67:17, 74:1, 74:5
**11:44** [1] - 65:5
**11:50** [1] - 65:6
**11th** [9] - 94:10, 94:24, 117:15, 118:11,

118:19, 119:22, 122:8, 122:16, 123:3
**12** [4] - 28:14, 175:2, 185:11, 228:11
**12:00** [1] - 116:20
**12th** [1] - 235:15
**13** [4] - 28:16, 167:17, 176:11, 176:13
**133** [1] - 3:21
**13:00** [1] - 119:23
**13:30** [1] - 109:6
**13th** [1] - 2:14
**14** [8] - 164:13, 168:1, 176:1, 178:2, 178:22, 228:12
**14508** [1] - 66:1
**14509** [1] - 70:20
**14510** [1] - 71:20
**14512** [1] - 79:2
**14529** [1] - 66:2
**14:30** [1] - 109:6
**14:50** [1] - 104:16
**15** [7] - 71:19, 92:12, 132:14, 132:15, 132:17, 145:1, 145:2
**15-page** [1] - 44:5
**15:00** [1] - 120:1
**15:15** [5] - 70:22, 71:5, 72:20, 73:22, 74:3
**15:30** [1] - 137:20
**15:57** [1] - 137:5
**16** [7] - 20:15, 168:1, 185:12, 193:10, 231:14, 232:13, 232:18
**16-page** [1] - 89:13
**16246** [2] - 103:5, 104:14
**16254** [1] - 116:18
**16256** [1] - 119:22
**16257** [1] - 103:6
**16:00** [6] - 71:5, 71:21, 72:21, 74:13, 110:23, 115:10
**17** [2] - 20:15, 184:23
**17-9021-R3** [1] - 136:7
**17-cv-7909** [3] - 1:6, 2:17, 234:5
**17:00** [1] - 137:5
**18** [4] - 2:3, 93:19, 150:17, 190:3
**18-cv-0334** [1] - 1:12, 2:18, 234:11
**1870** [1] - 47:16
**19** [2] - 44:6, 45:1
**1989** [1] - 92:12
**1994** [3] - 7:8, 7:13, 7:16
**1999** [1] - 7:19

## 2

**19:00** [2] - 137:6, 137:19
**1:13** [1] - 45:1
**1:15** [1] - 110:23
**1:40** [1] - 132:12

**2** [15] - 3:13, 32:10, 32:14, 33:13, 48:9, 52:21, 93:9, 109:3, 110:22, 115:10, 116:19, 119:24, 152:12, 184:23, 214:14
**20** [7] - 3:17, 15:12, 19:9, 180:11, 180:13, 180:14, 202:12
**200** [1] - 2:4
**2000** [4] - 7:19, 9:2, 152:24
**2002** [1] - 90:16
**2003** [3] - 7:6, 9:1, 9:2
**2006** [3] - 90:20, 199:11, 225:24
**2011** [4] - 9:10, 146:6, 153:10, 153:12
**2011-ish** [1] - 9:2
**2012** [10] - 10:2, 153:21, 154:3, 154:10, 154:14, 154:16, 154:22, 155:12, 156:4, 159:19
**2014** [4] - 9:13, 9:21, 10:21, 146:6
**2015** [9] - 9:3, 9:4, 9:21, 10:23, 13:18, 104:16, 109:5, 146:19, 152:24
**2017** [47] - 11:17, 11:24, 21:18, 22:17, 22:24, 26:11, 27:16, 29:8, 29:9, 31:8, 34:16, 34:24, 39:8, 39:10, 39:15, 39:22, 44:6, 45:1, 53:10, 54:23, 70:22, 92:14, 93:18, 94:7, 94:10, 94:20, 115:10, 115:11, 116:20, 117:6, 120:17, 121:11, 121:12, 122:13, 122:22, 123:5, 124:9, 126:10, 134:13, 146:19, 159:19, 199:2, 203:16, 203:23, 213:9

## 2 (cont)

**2019** [4] - 9:6, 17:2, 17:4, 22:7
**2020** [4] - 17:4, 205:2, 213:7, 216:2
**2022** [4] - 1:23, 234:16, 234:22, 235:16
**204** [1] - 3:22
**20s** [5] - 180:21, 180:23, 181:2, 181:4, 181:10
**21** [8] - 3:5, 14:24, 175:8, 175:10, 180:15, 180:16, 200:12, 205:2
**22** [10] - 3:7, 104:16, 150:3, 150:20, 158:4, 178:6, 193:18, 201:7, 202:12, 203:11
**220** [1] - 3:5
**221** [1] - 3:7
**222** [1] - 3:5
**223** [1] - 3:7
**227** [1] - 3:5
**228** [1] - 3:7
**22nd** [7] - 54:23, 55:4, 55:6, 55:17, 115:11, 116:1, 116:20
**23** [5] - 3:5, 150:8, 150:21, 158:4, 201:7
**233** [1] - 234:18
**235-6752** [1] - 2:5
**24** [4] - 158:8, 160:11, 178:2, 180:13
**25** [1] - 3:7
**25th** [1] - 90:19
**27** [1] - 193:9
**27404** [1] - 44:5
**27412** [2] - 47:16, 49:11
**27413** [1] - 49:12
**27414** [1] - 49:12
**27415** [1] - 51:11
**27617** [2] - 133:24, 136:18
**27981** [1] - 133:24
**27982** [1] - 133:24
**28** [8] - 7:1, 7:7, 55:23, 56:1, 68:5, 90:16, 131:3, 143:23
**29** [2] - 109:5, 234:16
**29th** [3] - 1:23, 66:4, 109:22
**2:00** [3] - 132:17, 132:18, 133:4
**2:01** [1] - 133:7

## 3

**3** [16] - 3:15, 12:21, 29:9, 32:21, 40:22, 44:1, 44:4, 49:12, 71:8, 90:22, 92:17, 93:9, 101:23, 115:10, 190:4, 202:19
**30** [8] - 27:16, 29:8, 34:16, 34:24, 70:22, 122:13, 145:1, 145:2
**30th** [23] - 30:3, 34:4, 54:1, 55:4, 55:6, 55:17, 67:13, 68:9, 70:12, 71:9, 71:12, 73:21, 75:24, 76:6, 86:13, 88:5, 110:22, 111:17, 117:10, 117:12, 117:23, 122:1, 199:9
**312** [2] - 2:5, 2:15
**319** [1] - 4:3
**31st** [1] - 137:5
**32** [1] - 3:13
**370** [1] - 227:19
**370-5410** [1] - 2:9
**3:00** [2] - 162:19, 165:23
**3:10** [1] - 173:2
**3:15** [6] - 70:23, 71:9, 71:12, 74:6, 75:24, 111:5
**3rd** [7] - 74:5, 76:8, 80:14, 80:16, 86:13, 110:23, 115:24

## 4

**4** [12] - 3:16, 18:6, 19:8, 37:4, 40:18, 41:21, 65:15, 65:18, 92:17, 176:13, 202:20, 215:19
**40** [2] - 181:6, 210:9
**44** [1] - 3:15
**462-2004M** [1] - 101:9
**4:00** [8] - 158:17, 160:15, 160:17, 162:1, 162:20, 165:22, 165:23
**4:05** [1] - 200:1

## 5

**5** [12] - 3:5, 3:18, 18:6, 18:17, 37:5, 40:19, 40:22, 88:9, 89:12, 149:24, 150:3, 201:12

**5-31-17** [1] - 136:7
**57** [1] - 34:1
**5:00** [6] - 133:10, 133:17, 159:14, 228:5, 233:6, 233:23

## 6

**6** [7] - 3:19, 92:23, 95:3, 103:1, 150:2, 152:12, 200:13
**6-29-2022** [1] - 3:2
**6-30** [2] - 73:2, 111:5
**6-30-17** [4] - 66:9, 71:4, 71:21, 74:3
**60068** [1] - 2:4
**60091** [1] - 2:9
**60601** [1] - 2:14
**65** [1] - 3:16

## 7

**7** [9] - 3:21, 18:8, 19:17, 25:14, 133:20, 133:23, 152:3, 190:8
**7-3** [5] - 72:24, 73:18, 74:1, 74:13, 79:22
**7-3-17** [2] - 71:5, 72:21
**7-3-2017** [1] - 80:1
**7:00'** [1] - 167:21
**7:58** [1] - 136:11

## 8

**8** [9] - 3:22, 13:16, 18:6, 41:20, 158:9, 164:10, 200:13, 204:10, 204:13
**81** [1] - 34:2
**814-3739** [1] - 2:15
**83** [1] - 137:2
**847** [1] - 2:9
**89** [1] - 3:18
**8:00** [1] - 158:17
**8:45** [4] - 27:7, 27:9, 68:9, 134:14

## 9

**9** [5] - 11:24, 13:16, 164:10, 167:5
**92** [1] - 90:7
**94** [2] - 91:7, 91:21
**97** [1] - 95:10
**9:30** [5] - 66:11, 67:13, 67:20, 67:22, 69:6
**9th** [1] - 11:16

## A

**a..** [1] - 181:15
**a.m** [9] - 1:23, 35:6, 35:11, 35:17, 35:19, 67:17, 74:1, 134:14, 136:11
██████████ [7] - 159:7, 172:18, 180:17, 191:17, 191:18, 191:19, 191:20
██████████ [4] - 159:7, 180:17, 191:19, 191:20
**abilities** [1] - 187:7
**ability** [7] - 5:10, 86:15, 88:4, 168:3, 168:6, 223:7, 235:10
**able** [9] - 34:11, 110:18, 113:18, 113:19, 133:17, 177:4, 197:6, 233:14, 233:16
**abnormal** [6] - 188:17, 188:21, 188:22, 188:24, 189:1, 189:5
**above-entitled** [1] - 235:14
**absence** [2] - 216:7, 216:9
**absolutely** [1] - 47:14
**abuse** [37] - 51:19, 53:6, 53:16, 54:7, 54:10, 55:14, 60:6, 60:11, 60:14, 60:16, 61:6, 61:10, 61:13, 63:6, 81:19, 123:9, 123:14, 128:2, 132:4, 159:5, 186:24, 187:15, 188:9, 192:8, 192:15, 192:21, 215:7, 223:14, 223:18, 224:1, 225:14, 226:19, 229:10, 229:23, 230:23, 231:3, 231:10
**abused** [9] - 53:11, 55:7, 60:23, 128:1, 128:8, 128:14, 159:1, 223:1, 227:13
**abuser** [1] - 128:18
**abusing** [6] - 53:7, 128:11, 131:18, 159:6, 188:15, 219:4
**abusive** [1] - 187:13
**access** [1] - 54:20
**accompanying** [1] - 101:3

**accord** [3] - 70:9, 105:13, 105:15
**accordance** [1] - 102:7
**according** [4] - 48:17, 67:19, 87:16, 101:9
**accountable** [1] - 151:8
**accuracy** [1] - 233:12
**accurate** [4] - 5:10, 35:22, 180:14, 235:12
**accurately** [2] - 6:10, 233:14
**accused** [1] - 145:20
**acknowledged** [1] - 196:16
**Act** [1] - 4:4
**act** [3] - 36:14, 50:21, 130:24
**acted** [3] - 214:19, 214:22, 215:15
**acting** [1] - 17:9
**action** [2] - 101:24, 160:21
**actions** [3] - 59:1, 131:4, 186:23
**activate** [1] - 182:5
**activities** [1] - 67:1
**activity** [13] - 15:4, 15:6, 15:18, 45:23, 50:22, 51:4, 58:20, 63:22, 64:11, 86:7, 184:19, 189:21, 209:8
**acts** [3] - 62:16, 225:18, 225:22
**actual** [1] - 128:22
**add** [3] - 119:24, 201:17, 224:22
**added** [3] - 120:1, 120:2, 141:1
**addition** [3] - 88:7, 184:13, 187:1
**address** [6] - 46:2, 63:13, 63:20, 64:5, 149:19, 186:11
**addressed** [3] - 63:24, 152:20, 184:6
**addresses** [1] - 64:14
**addressing** [2] - 62:24, 186:12
**administering** [1] - 4:5
**administration** [40] - 17:13, 22:3, 22:6, 22:7, 28:2, 28:6, 30:7, 42:8, 68:22, 69:11, 70:2, 71:17, 72:8, 76:7, 77:12,

77:18, 78:12, 81:20, 86:20, 87:2, 87:17, 88:13, 103:17, 111:16, 111:21, 112:2, 112:4, 112:11, 113:5, 113:7, 115:24, 119:5, 124:8, 124:12, 125:15, 125:17, 137:22, 138:17, 147:1, 201:21
**Administrative** [4] - 93:10, 93:12, 95:6, 100:17
**administrative** [51] - 19:6, 19:16, 20:4, 20:5, 20:18, 21:4, 22:18, 23:1, 23:10, 23:23, 25:20, 25:22, 26:6, 26:21, 27:3, 27:12, 27:18, 29:5, 29:11, 30:5, 30:12, 41:11, 42:7, 68:8, 68:16, 69:14, 70:13, 74:16, 74:19, 77:13, 79:18, 87:10, 87:24, 88:8, 111:4, 111:14, 111:22, 112:4, 112:7, 113:2, 113:4, 114:11, 114:24, 115:7, 115:15, 115:16, 123:3, 123:7, 199:9, 232:3
**administrator** [21] - 23:14, 23:16, 24:1, 24:9, 24:15, 26:24, 35:11, 35:14, 52:6, 52:20, 71:4, 71:7, 77:24, 78:13, 113:3, 113:12, 113:15, 114:18, 118:17, 118:18
**administrators** [1] - 21:6
**admissible** [1] - 176:21
**admission** [3] - 180:14, 225:18, 225:22
**admitted** [5] - 131:2, 145:5, 192:6, 199:14, 225:5
**admitting** [1] - 192:13
**ADON** [3] - 10:19, 11:1, 113:3
**advice** [1] - 130:5
**advised** [2] - 80:2, 80:13
**advocate** [1] - 80:4

**AED** [1] - 222:8
**affected** [1] - 219:4
**affix** [1] - 234:19
**aforesaid** [1] - 234:16
**aftereffects** [1] - 227:14
**afternoon** [1] - 27:5
**agencies** [1] - 227:20
**agitated** [4] - 104:23, 107:18, 108:1, 108:9
**ago** [1] - 13:21
**agree** [6] - 4:2, 4:11, 80:10, 97:5, 131:11, 169:17
**agreed** [3] - 67:4, 75:12, 169:13
**agreeing** [1] - 227:10
**agreement** [3] - 4:7, 83:4, 94:23
**ahead** [9] - 23:6, 50:9, 56:6, 73:23, 119:14, 130:14, 133:14, 140:16, 149:2
**aide** [3] - 7:20, 8:20, 224:24
**aides** [1] - 148:4
**al** [1] - 206:19
**aligning** [1] - 26:17
**Allan** [1] - 15:13
**allegation** [6] - 128:19, 128:20, 176:15, 176:19, 177:9, 201:1
**Allegations** [1] - 51:14
**allegations** [4] - 6:17, 193:12, 197:11, 215:14
**allege** [1] - 177:1
**alleged** [2] - 63:1, 128:18
**alleges** [1] - 45:19
**allergies** [1] - 188:2
**allow** [3] - 67:1, 83:23, 229:23
**allowed** [2] - 110:8, 179:22
**allowing** [1] - 83:2
**almost** [5] - 17:5, 65:3, 151:5, 170:1, 196:14
**alone** [3] - 97:8, 189:22, 200:24
**Alpaca** [2] - 153:16, 153:18
**alternative** [1] - 227:19
**amount** [3] - 148:13, 192:7, 218:19
**and..** [1] - 170:18
**anew** [1] - 122:22

███████ [8] - 36:23, 159:6, 197:12, 198:22, 199:6, 199:11, 199:15, 225:22

**angry** [1] - 218:14

**ankle** [2] - 67:3, 68:11

**Ann** [1] - 44:13

**announced** [1] - 228:18

**announcement** [1] - 228:16

**answer** [69] - 6:9, 17:20, 18:8, 18:9, 18:21, 25:15, 37:3, 37:8, 38:13, 40:22, 41:20, 49:9, 50:19, 56:6, 57:1, 60:10, 61:1, 81:8, 82:16, 98:4, 98:5, 104:8, 130:9, 130:11, 130:14, 131:21, 152:11, 153:2, 156:4, 158:7, 158:22, 160:12, 161:17, 164:12, 167:24, 175:7, 176:3, 176:4, 176:11, 177:10, 177:15, 177:16, 178:11, 178:14, 178:21, 178:23, 185:11, 190:8, 193:17, 201:6, 202:17, 202:19, 203:12, 206:10, 207:11, 214:16, 214:19, 215:18, 216:1, 216:4, 221:12, 221:19, 225:15, 228:1, 228:23, 229:17, 231:23, 232:12, 233:3

**answered** [16] - 12:10, 13:16, 28:16, 96:22, 131:10, 152:7, 156:24, 160:6, 194:6, 194:13, 210:12, 216:7, 223:11, 227:22, 232:18

**answering** [7] - 22:11, 122:11, 160:10, 205:17, 206:20, 207:5, 228:15

**Answers** [1] - 204:14

**answers** [7] - 51:8, 79:17, 150:10, 159:11, 201:11,

206:24, 233:15

**anti** [1] - 99:18

**Antoinette** [3] - 207:22, 208:6, 208:15

**anyway** [2] - 47:9, 91:13

**AOD** [4] - 52:3, 52:6, 52:9, 52:21

**apologize** [9] - 9:12, 17:19, 17:20, 58:11, 69:20, 76:16, 191:15, 212:3, 215:17

**apologized** [1] - 150:19

**appeal** [4] - 74:22, 74:24, 75:3, 75:4

**appear** [4] - 31:13, 81:21, 116:12, 180:20

**appeared** [5] - 117:1, 120:1, 120:5, 120:9

**applied** [1] - 55:8

**applies** [1] - 53:1

**apply** [1] - 92:7

**applying** [2] - 176:21, 226:6

**appointment** [2] - 68:15, 68:24

**appreciate** [4] - 31:13, 129:15, 159:4, 159:10

**approach** [1] - 190:5

**approached** [5] - 73:13, 184:24, 185:23, 186:9, 191:24

**appropriate** [8] - 96:14, 98:17, 130:6, 132:8, 143:13, 165:8, 223:6, 224:7

**appropriately** [2] - 157:13, 222:18

**approval** [3] - 103:17, 105:14, 171:2

**approved** [3] - 87:2, 161:5, 161:6

**approximate** [1] - 151:20

**April** [1] - 92:12

**area** [10] - 30:21, 129:23, 137:23, 138:15, 138:16, 138:17, 140:13, 147:1, 163:3, 212:6

**areas** [3] - 14:7, 14:15, 223:23

**arrangement** [1] - 162:12

**arrived** [2] - 44:21, 180:15

**aside** [1] - 153:13

**aspect** [2] - 140:23, 229:13

**assault** [2] - 101:2, 102:21

**assigned** [10] - 8:20, 10:16, 10:18, 10:23, 13:19, 14:7, 14:15, 17:1, 17:9, 165:6

**assignment** [2] - 9:9, 13:22

**assigns** [1] - 70:5

**assist** [1] - 96:1

**assistance** [2] - 135:16, 136:3, 140:9

**assisted** [1] - 36:16

**associate** [24] - 9:4, 9:15, 10:4, 10:9, 10:17, 13:15, 14:5, 15:24, 16:10, 17:7, 17:11, 22:5, 24:10, 53:14, 55:6, 77:10, 78:21, 103:22, 118:15, 119:1, 123:5, 146:15, 146:23, 186:21

**associated** [1] - 101:1

**assume** [14] - 31:8, 37:15, 39:2, 46:16, 53:17, 76:18, 96:3, 110:16, 118:1, 118:2, 134:8, 153:7, 184:5

**assuming** [2] - 12:7, 120:8

**assumption** [2] - 28:22, 118:4

**AT** [1] - 169:16

**at'** [1] - 200:23

**ATs** [1] - 15:9

**Attached** [1] - 3:10

**attachment** [5] - 134:19, 134:21, 136:6, 136:14

**attachments** [3] - 45:4, 45:8, 134:17

**attack** [2] - 101:1, 102:21

**attempt** [1] - 101:20

**attend** [1] - 24:17

**attending** [3] - 19:6, 19:16, 24:13

**attention** [5] - 50:4, 164:11, 164:14, 190:16, 191:9

**attest** [1] - 35:24

**attorney** [2] - 6:2, 206:13

**ATTORNEY** [1] - 2:12

**attorney/client** [1] - 211:20

**audio** [24] - 17:21, 35:6, 35:8, 36:15, 36:20, 37:12, 37:17, 37:20, 38:18, 40:20, 41:12, 41:15, 43:8, 55:14, 118:5, 128:1, 128:8, 129:2, 129:6, 129:13, 130:2, 130:19, 131:13, 232:16

**Audrey** [3] - 209:5, 209:9

**August** [6] - 7:1, 22:17, 22:24, 104:16, 109:5, 109:22

**authority** [6] - 78:22, 107:15, 110:11, 164:4, 167:11, 171:4

**authorized** [2] - 103:21, 103:24

**automated** [1] - 222:4

**available** [2] - 131:19, 183:9

**Avenue** [1] - 2:8

**avoid** [2] - 151:13, 155:23

**aware** [31] - 6:13, 18:9, 25:15, 37:9, 37:20, 39:15, 39:17, 41:15, 42:22, 46:10, 53:9, 54:15, 54:18, 63:9, 63:11, 63:13, 63:15, 63:18, 63:21, 76:6, 81:10, 81:13, 98:15, 122:6, 144:7, 144:23, 145:4, 179:7, 183:14, 184:2, 191:11, 194:23, 195:10, 195:13, 196:1, 196:9, 197:11, 199:14, 199:19, 200:24, 201:16, 210:20, 210:21, 211:6, 211:10, 215:6, 216:12, 225:4, 225:9, 225:12, 225:17, 225:21, 232:8, 232:10

**B**

**B(4** [2] - 100:22

**bachelor's** [1] - 6:24

**background** [2] -

6:23, 58:9

**bad** [4] - 108:14, 151:10, 155:24, 156:1

**badly** [1] - 108:12

**bank** [1] - 92:20

**base** [1] - 163:1

**based** [10] - 58:19, 78:6, 82:4, 82:22, 114:3, 169:2, 169:3, 170:9, 189:15, 215:2

**basis** [3] - 175:6, 222:6, 222:14

**Bates** [12] - 32:16, 44:5, 47:16, 51:11, 66:1, 70:20, 71:20, 103:5, 116:17, 119:22, 133:24, 136:17

**battery** [1] - 222:9

**beat** [2] - 199:24, 200:7

**became** [13] - 8:19, 9:1, 9:3, 9:4, 9:6, 9:15, 13:19, 16:12, 25:15, 28:21, 146:14, 146:23, 188:2

**BECK** [2] - 1:8, 234:7

**Beck** [6] - 154:20, 191:14, 209:20, 209:21, 211:12, 212:15

**become** [1] - 188:1

**becoming** [3] - 186:19, 193:20, 197:8

**began** [1] - 149:10

**begin** [2] - 86:13, 200:12

**beginning** [2] - 10:2, 79:22

**begins** [1] - 36:5

**behalf** [5] - 2:6, 2:11, 2:16, 4:14, 224:13

**behaving** [3] - 108:12, 109:16, 186:17

**behavior** [21] - 50:23, 57:9, 57:13, 104:23, 107:18, 108:1, 108:6, 108:7, 108:9, 108:14, 109:12, 151:9, 154:6, 159:22, 170:2, 170:8, 170:21, 186:16, 191:21, 221:2, 224:13

**Behavior** [1] - 102:5

**behaviors** [1] - 188:12

**behavioral** [4] - 110:8,

224:9, 224:17, 226:5
**behind** [2] - 160:2,
182:23
**bell** [3] - 33:15, 33:16,
140:4
**belonged** [1] - 31:24
**belt** [2] - 67:2, 68:11
**Ben** [113] - 4:10, 18:4,
18:20, 31:24, 35:6,
36:22, 40:15, 41:3,
42:4, 53:10, 53:15,
53:22, 54:18, 55:4,
55:7, 65:22, 67:22,
68:11, 68:14, 70:16,
71:8, 80:22, 81:5,
81:16, 81:18, 86:12,
87:11, 88:3, 103:9,
104:15, 106:11,
108:24, 110:22,
115:3, 115:10,
116:18, 118:5,
118:12, 122:2,
122:14, 123:9,
124:1, 127:24,
128:7, 129:20,
131:1, 131:2,
131:18, 131:23,
139:21, 142:9,
143:13, 144:8,
144:18, 145:5,
159:2, 159:5, 159:7,
172:5, 172:7, 172:9,
172:10, 173:11,
173:22, 175:14,
175:16, 175:18,
176:3, 176:7,
177:15, 177:20,
178:19, 178:23,
179:1, 179:3, 179:5,
179:10, 179:11,
179:14, 179:17,
179:18, 179:21,
179:22, 180:3,
180:6, 180:9, 181:9,
189:23, 194:2,
194:10, 195:5,
195:11, 199:10,
201:13, 201:14,
203:23, 211:5,
215:9, 215:14,
220:23, 221:9,
221:22, 221:24,
223:1, 223:14,
224:1, 225:4, 225:7,
228:22, 231:17,
231:19, 232:6
**Ben's** [13] - 32:1, 34:5,
54:22, 76:7, 81:20,
112:11, 123:8,
128:13, 131:19,

179:19, 202:6,
202:14, 203:2
**BENAHDAM** [2] - 1:4,
234:3
**beneath** [1] - 52:3
**benefit** [2] - 85:17,
85:20
**best** [5] - 7:14, 11:12,
204:22, 223:7,
235:10
**better** [3] - 31:9,
192:3, 231:11
**between** [34] - 10:4,
36:22, 37:17, 38:4,
41:3, 45:14, 46:11,
46:19, 47:3, 47:21,
48:13, 53:2, 55:6,
55:17, 62:13, 94:18,
144:7, 144:18,
147:4, 152:24,
165:23, 180:13,
195:3, 195:4,
195:10, 196:6,
202:13, 203:1,
215:9, 218:22,
219:11, 224:1,
225:12, 232:6
**big** [2] - 188:2
**bigger** [1] - 134:3
**Bill** [15] - 21:16, 30:14,
31:22, 34:2, 35:15,
67:16, 134:7,
134:11, 134:16,
135:2, 135:8,
136:10, 143:6,
199:8, 216:17
**binding** [1] - 4:5
**bit** [9] - 11:20, 13:2,
32:23, 37:21,
119:23, 154:9,
160:14, 161:23,
177:24
**bite** [1] - 132:11
**black** [1] - 181:10
**blind** [3] - 226:22,
229:22, 230:13
**blue** [3] - 117:1, 120:7,
120:9
**board** [1] - 171:1
**Bob** [5] - 139:24,
141:4, 152:15,
154:18, 228:14
**bogus** [2] - 203:1,
204:4
**boss** [2] - 80:20,
213:19
**Boston** [2] - 209:5,
209:6
**bothered** [3] - 157:3,
164:15, 167:6

**bottom** [6] - 33:24,
35:10, 117:3, 137:4,
160:9, 175:2
**boundary** [12] - 148:6,
148:15, 149:19,
155:18, 185:4,
191:10, 193:2,
193:5, 193:6, 193:7,
194:9, 194:12
**box** [5] - 44:21,
104:20, 108:2,
109:1, 115:10
**boxes** [1] - 34:20
**boy** [3] - 25:5, 30:8,
144:1
**brain** [1] - 175:23
**break** [5] - 5:23, 5:24,
47:8, 65:6, 173:2
**breakdown** [1] -
156:14
**breaking** [1] - 157:1
**breaks** [2] - 5:24,
132:24
**breasts** [1] - 195:17
**Brian** [16] - 26:19,
26:23, 71:3, 77:15,
77:17, 77:19, 78:6,
78:13, 87:18, 87:19,
111:19, 111:20,
111:24, 112:12,
112:19, 135:3
**brief** [3] - 65:14,
133:6, 173:4
**bring** [6] - 11:10,
142:2, 142:21,
185:15, 188:5,
227:14
**bringing** [11] - 100:14,
162:13, 166:16,
166:17, 171:14,
172:7, 172:9, 174:2,
188:3, 188:13
**broken** [2] - 140:18,
140:22
**brought** [5] - 58:6,
68:10, 140:17,
156:10, 164:7,
164:11, 164:14,
166:23, 167:2,
179:12, 179:16,
190:10, 190:12,
190:16, 191:8,
193:13, 194:7
**buffer** [1] - 197:6
**building** [6] - 8:21,
12:5, 58:4, 58:18,
138:19, 161:13
**bump** [1] - 148:24
**bumping** [1] - 148:22
**bunch** [1] - 129:19

**burden** [1] - 176:23
**busier** [1] - 165:18
**business** [2] - 24:14
**but..** [5] - 19:2, 21:2,
135:9, 145:3, 151:23
**butt** [1] - 212:19
**BY** [69] - 2:3, 2:8, 2:13,
3:3, 5:2, 8:22, 11:8,
11:14, 11:21, 13:13,
14:3, 17:23, 18:22,
19:14, 20:2, 20:11,
21:5, 21:12, 22:1,
22:10, 23:8, 25:2,
25:9, 29:4, 32:12,
41:8, 44:3, 51:9,
55:3, 56:9, 58:23,
59:21, 60:13, 65:17,
82:17, 84:15, 86:19,
89:4, 89:11, 96:12,
97:19, 98:6, 103:3,
107:23, 119:20,
124:7, 129:12,
130:1, 130:15,
133:22, 143:20,
147:8, 172:16,
173:5, 198:8,
198:15, 198:19,
200:10, 204:12,
206:15, 211:22,
220:5, 220:11,
221:6, 222:21,
223:10, 227:5,
228:10, 230:9
**bypassed** [1] - 77:6

## C

**C.S.R** [2] - 1:18,
235:20
**CADC** [1] - 111:8
**calm** [4] - 75:19,
105:1, 108:16
**Campbell** [1] - 126:13
**candy** [1] - 40:15
**CANNON** [1] - 4:17
**Cannon** [1] - 2:20
**cannot** [2] - 72:11,
226:8
**Cara** [2] - 209:11,
209:15
**carbon** [1] - 135:2
**care** [4] - 71:3, 148:23,
168:3, 168:23
**case** [4] - 96:23,
107:1, 155:17, 169:3
**Case** [2] - 2:17, 2:18
**caseworker** [1] -
146:1
**catalog** [1] - 112:8
**catch** [1] - 5:16

**caught** [1] - 56:14
**caused** [1] - 88:4
**causes** [2] - 83:18,
109:17
**causing** [3] - 83:15,
122:8, 186:6
**CD** [1] - 90:12
**CD-ROM** [1] - 90:12
**CDs** [1] - 90:12
**Cecala** [2] - 2:22, 3:7,
4:12
**CECALA** [108] - 2:2,
2:3, 2:7, 4:12, 8:13,
11:12, 11:18, 12:23,
13:2, 13:5, 13:7,
13:10, 13:12, 14:1,
17:16, 18:16, 19:12,
19:22, 20:2, 20:11,
21:5, 21:10, 21:12,
22:10, 23:6, 24:23,
25:9, 29:2, 29:4,
32:12, 41:6, 41:8,
44:3, 50:9, 51:8,
51:9, 54:24, 55:3,
56:9, 58:10, 58:23,
59:21, 60:13, 64:24,
65:5, 65:11, 65:17,
82:5, 82:17, 84:15,
86:19, 89:4, 89:11,
96:12, 97:19, 98:4,
98:6, 103:3, 107:22,
107:23, 119:16,
119:20, 124:6,
124:7, 129:10,
129:12, 129:22,
130:1, 130:9,
130:15, 132:16,
132:20, 133:2,
133:5, 133:7,
133:13, 133:16,
133:19, 133:22,
143:20, 147:8,
172:16, 172:22,
173:1, 173:5, 198:4,
198:8, 198:15,
198:19, 199:22,
200:4, 200:9,
200:10, 204:12,
206:3, 206:7,
206:15, 211:22,
220:5, 221:4, 221:6,
223:10, 227:22,
228:4, 228:10,
230:4, 230:9, 233:9
**cells** [1] - 139:12
**Center** [10] - 17:13,
49:7, 50:13, 54:19,
59:6, 124:11,
199:16, 203:8,
223:15, 227:9

**certain** [9] - 39:18, 52:1, 83:23, 90:4, 165:4, 166:13, 166:18, 179:12, 179:13
**Certified** [1] - 235:5
**certified** [2] - 52:9, 52:11
**chain** [3] - 81:24, 119:4, 223:5
**chance** [2] - 135:22, 137:9
**change** [9] - 7:23, 8:2, 79:17, 109:13, 137:20, 154:9, 158:15, 233:14
**changed** [4] - 7:15, 7:20, 8:6, 121:16
**changing** [3] - 8:15, 151:9, 191:2
**character** [1] - 150:5
**characterize** [1] - 144:2
**characterized** [2] - 190:18, 232:5
**charge** [4] - 51:22, 51:24, 207:23, 208:8
**Charge** [1] - 34:1
**charged** [2] - 81:11, 128:10
**chart** [13] - 61:11, 65:23, 66:3, 67:12, 68:1, 71:20, 79:1, 80:6, 87:14, 87:16, 112:11, 112:16
**charted** [2] - 56:13, 88:19
**charts** [1] - 68:4
**check** [4] - 55:8, 189:10, 189:17, 222:6
**checked** [2] - 145:1, 184:18
**Checklist** [1] - 51:15
**checklist** [5] - 51:18, 51:21, 54:6, 61:11, 61:18
**checks** [1] - 189:10
**Chester** [1] - 59:6
**Chicago** [1] - 2:14
**Chief** [13] - 34:15, 35:9, 36:20, 37:13, 40:1, 78:14, 112:1, 117:10, 137:21, 138:11, 139:14, 140:8, 141:18
**chief** [13] - 21:17, 23:9, 24:11, 24:13, 24:14, 30:18, 30:22, 78:2, 78:14, 113:6,

113:8, 113:16, 135:18
**choice** [1] - 114:11
**chomping** [1] - 160:14
**Christy** [154] - 18:4, 28:11, 28:16, 35:7, 36:22, 36:23, 37:18, 40:15, 41:4, 42:23, 53:12, 53:16, 81:4, 81:10, 90:4, 118:5, 123:9, 124:1, 126:21, 127:6, 128:14, 128:17, 129:5, 129:19, 131:8, 131:18, 139:21, 139:23, 141:16, 142:9, 143:13, 144:8, 144:18, 144:5, 145:22, 145:23, 146:18, 147:11, 148:19, 148:24, 149:14, 150:4, 150:6, 150:14, 150:20, 150:22, 152:7, 152:21, 153:15, 154:3, 155:17, 158:11, 158:21, 159:1, 159:5, 159:16, 159:20, 161:19, 162:5, 163:6, 163:9, 163:15, 165:1, 165:12, 166:11, 167:10, 167:23, 168:5, 168:9, 168:16, 168:19, 168:22, 169:22, 169:23, 170:8, 170:10, 170:11, 170:13, 170:14, 171:6, 171:12, 171:13, 171:14, 171:15, 171:18, 172:1, 172:9, 177:20, 178:16, 180:3, 183:18, 183:22, 184:2, 184:16, 184:20, 184:24, 185:2, 185:20, 185:24, 186:10, 189:22, 190:5, 190:12, 190:15, 191:10, 191:23, 192:1, 192:6, 192:12, 193:5, 193:11, 194:21, 195:3, 195:5, 195:11, 196:2, 196:6, 196:10, 196:15,

197:12, 198:21, 199:5, 199:11, 199:14, 200:13, 201:15, 202:6, 202:14, 203:1, 203:8, 203:23, 207:12, 207:16, 209:3, 209:7, 209:14, 210:6, 211:5, 215:9, 215:14, 216:15, 217:8, 217:18, 219:4, 220:23, 224:1, 225:4, 225:8, 225:13, 226:3, 228:22, 231:16, 232:6
**Christy's** [18] - 18:20, 28:20, 145:20, 149:19, 159:22, 169:9, 173:7, 180:18, 181:1, 184:12, 190:20, 195:13, 195:17, 195:21, 201:15, 208:24, 216:7, 216:9
**Christy/Ben** [1] - 125:2
**circumstance** [2] - 61:7, 114:4
**citation** [1] - 100:18
**civil** [8] - 92:1, 159:12, 177:8, 201:16, 202:6, 202:16, 202:23, 217:19
**Civil** [1] - 1:20
**claims** [1] - 214:21
**clarification** [3] - 5:19, 50:8, 50:10
**clarifications** [1] - 119:18
**clarify** [8] - 19:22, 41:19, 49:3, 118:20, 119:9, 130:16, 187:23, 206:5
**clear** [13] - 8:13, 18:17, 22:23, 26:5, 55:11, 55:13, 55:18, 131:21, 132:2, 166:3, 173:16, 200:16, 215:2
**clearly** [2] - 22:6, 75:20
**clinical** [6] - 24:19, 87:6, 87:7, 165:21, 165:22
**clinicians** [1] - 59:22
**close** [2] - 50:4, 186:18
**closed** [3] - 75:13,

75:18, 182:23
**closely** [10] - 131:1, 145:23, 205:15, 207:11, 207:16, 208:8, 209:7, 209:9, 209:13, 209:15
**clothes** [2] - 165:9, 165:10
**clouding** [1] - 175:13
**clue** [2] - 29:15, 67:4
**CNM** [4] - 52:4, 52:9, 52:15, 52:17
**co** [3] - 211:12, 212:11, 212:12
**co-defendants** [1] - 211:12
**co-workers** [2] - 212:11, 212:12
**coach** [1] - 206:8
**Code** [4] - 93:10, 93:12, 95:7, 100:17
**code** [2] - 93:15, 95:13
**codes** [1] - 224:6
**coerced** [1] - 51:1
**coercion** [2] - 106:15, 107:10
**coercive** [1] - 106:21
**collaborating** [1] - 105:24
**Colleen** [30] - 2:17, 6:6, 11:15, 12:24, 14:4, 25:11, 44:16, 50:19, 55:4, 56:6, 58:16, 60:10, 65:12, 65:20, 119:14, 129:17, 132:10, 132:21, 133:10, 133:23, 143:21, 200:11, 204:14, 204:20, 206:2, 220:1, 220:2, 220:12, 233:11, 233:20
**COLLEEN** [8] - 1:7, 1:17, 3:1, 4:19, 6:6, 234:6, 234:14, 234:21
**color** [6] - 117:1, 120:1, 120:7, 120:8, 120:9, 120:10
**Comford** [2] - 77:1, 77:20
**comfortable** [3] - 149:15, 155:19, 177:19
**Coming** [1] - 202:17
**coming** [8] - 31:3, 31:5, 41:18, 165:3, 183:9, 191:22, 216:15, 233:7

75:18, 182:23
**command** [3] - 20:17, 119:5, 223:5
**comment** [1] - 59:19
**committed** [5] - 49:5, 62:14, 62:16, 62:23, 131:3
**committing** [1] - 192:8
**common** [2] - 101:11, 101:15
**communicate** [2] - 86:15, 88:5
**communicated** [1] - 215:22
**communication** [3] - 112:17, 132:23, 202:13
**communications** [1] - 211:21
**community** [1] - 227:20
**complain** [1] - 163:8
**complained** [3] - 162:4, 163:6, 168:16
**complaining** [1] - 161:18
**complaint** [38] - 162:13, 166:10, 167:23, 185:19, 199:2, 199:3, 199:6, 205:7, 205:14, 207:19, 207:21, 208:6, 208:19, 209:12, 209:18, 209:21, 209:24, 210:24, 211:9, 211:12, 214:6, 214:16, 214:21, 215:3, 215:5, 215:14, 215:22, 215:23, 215:24, 216:10, 216:17, 217:12, 217:13, 217:14, 232:15, 232:17, 232:21, 232:23
**complaints** [17] - 162:5, 163:19, 166:24, 169:21, 171:11, 171:12, 171:13, 171:15, 171:17, 171:18, 174:9, 174:17, 174:23, 180:2, 185:24, 190:16, 191:7
**complete** [3] - 229:2, 230:21, 235:12
**completed** [4] - 67:20, 73:3, 101:9, 102:6
**completely** [5] -

140:20, 152:8, 156:6, 156:16, 175:12
**completes** [1] - 128:21
**complex** [2] - 48:24, 50:15
**complications** [2] - 59:16, 60:22
**comply** [1] - 229:8
**comprised** [2] - 165:24, 169:15
**computer** [55] - 11:19, 18:12, 29:6, 30:4, 30:13, 37:23, 38:11, 40:6, 41:12, 41:16, 42:2, 42:4, 42:10, 42:16, 43:5, 43:9, 43:12, 51:10, 95:15, 95:18, 95:21, 95:24, 96:6, 96:7, 96:21, 97:11, 97:16, 97:18, 98:2, 98:8, 98:10, 98:12, 98:13, 98:17, 98:18, 98:19, 98:21, 98:22, 99:1, 99:7, 99:11, 99:15, 100:24, 101:3, 101:19, 101:21, 102:6, 102:17, 102:20, 121:10, 122:3, 122:20, 127:9, 232:4, 232:9
**computers** [10] - 90:11, 91:8, 92:11, 92:18, 92:24, 93:13, 95:3, 100:21, 122:17, 122:21
**concept** [1] - 12:18
**concern** [2] - 123:13, 124:14
**concerned** [9] - 45:8, 123:21, 123:23, 123:24, 124:8, 124:20, 135:15, 136:2, 140:8
**concerning** [4] - 81:3, 122:16, 215:22, 216:17
**concerns** [6] - 123:7, 141:18, 152:18, 154:20, 155:10, 157:10
**conclude** [1] - 43:13
**concluded** [1] - 233:23
**conclusion** [2] - 125:10, 145:18
**condone** [2] - 62:12
**conduct** [1] - 62:4

**conference** [3] - 75:14, 75:18, 212:4
**conferencing** [1] - 1:19
**confessed** [2] - 159:6, 226:19
**confidentially** [1] - 156:18
**confine** [1] - 159:11
**confined** [1] - 180:10
**confiscate** [2] - 122:3, 122:19
**confiscated** [14] - 32:1, 93:2, 101:4, 102:23, 116:23, 117:15, 117:18, 117:22, 118:12, 121:3, 121:7, 124:10, 127:10, 232:9
**confiscation** [5] - 93:1, 102:17, 121:10, 122:6
**conflict** [1] - 155:22
**conflicts** [2] - 173:7, 174:6
**confront** [1] - 131:13
**confrontation** [1] - 155:22
**confronted** [1] - 192:1
**confusing** [1] - 13:23
**consensual** [3] - 48:14, 49:6, 50:13
**consensus** [2] - 218:22, 219:11
**consider** [5] - 22:5, 187:18, 187:20, 188:7, 214:22
**considerable** [1] - 49:11
**considered** [3] - 42:14, 187:3, 187:12
**consistent** [5] - 13:20, 18:23, 41:1, 175:6, 185:18
**consisting** [1] - 234:18
**Constitution** [1] - 215:12
**construction** [1] - 190:6
**consult** [1] - 132:22
**contact** [10] - 46:17, 48:19, 53:2, 62:6, 62:8, 62:13, 63:3, 82:14, 83:23, 196:6
**Contact** [2] - 47:17, 51:15
**contacted** [1] - 114:13
**contacting** [1] - 84:2,

84:3
**contagious** [3] - 82:22, 83:1, 86:3
**contains** [1] - 235:12
**content** [2] - 90:14, 106:9
**contents** [12] - 37:16, 38:18, 41:3, 41:14, 54:11, 94:4, 94:15, 124:20, 124:23, 211:24, 212:1, 232:10
**context** [7] - 19:19, 37:14, 39:14, 56:11, 112:10, 113:16, 178:24
**continuation** [1] - 100:16
**continue** [3] - 8:23, 73:15, 196:12
**continued** [2] - 26:23, 229:24
**continuing** [1] - 161:22
**continuous** [1] - 91:1
**continuously** [1] - 66:2
**contraband** [2] - 33:17, 42:14
**contractual** [1] - 8:2
**control** [2] - 167:12, 167:14
**conversation** [7] - 36:6, 36:11, 141:24, 163:14, 180:8, 183:24, 198:17
**conversations** [10] - 37:12, 123:17, 124:23, 126:5, 126:17, 142:5, 216:16, 217:11, 223:12, 229:3
**conviction** [1] - 175:22
**COOK** [1] - 235:2
**Cook** [1] - 235:6
**cooked** [8] - 166:17, 166:23, 171:14, 172:9, 173:21, 179:9, 179:16, 188:3
**cool** [1] - 133:18
**cooperate** [1] - 67:5
**cooperative** [1] - 159:12
**coordinate** [1] - 206:20
**copies** [11] - 135:2, 148:13, 148:18, 165:20, 169:14, 171:13, 173:8,

174:3, 179:3, 188:12
**copy** [9] - 73:11, 75:13, 75:17, 80:3, 80:5, 148:9, 148:10
**Corcoran** [3] - 204:5, 204:8, 206:19
**cord** [1] - 101:1
**cordial** [1] - 153:24
**correct** [184] - 6:12, 7:9, 7:11, 11:2, 13:23, 15:3, 16:1, 16:8, 16:13, 19:5, 19:15, 19:17, 20:13, 20:14, 21:8, 21:9, 22:14, 23:2, 27:1, 28:4, 28:5, 35:3, 35:16, 35:20, 37:1, 38:2, 38:17, 40:13, 41:4, 41:5, 41:14, 42:13, 43:1, 43:2, 43:9, 44:22, 45:2, 45:3, 45:5, 46:5, 46:9, 47:14, 50:6, 50:16, 51:16, 52:2, 52:15, 52:22, 59:4, 60:20, 62:7, 62:9, 63:9, 64:17, 64:21, 64:22, 65:23, 65:24, 66:6, 67:22, 68:2, 69:19, 70:24, 71:10, 74:7, 74:17, 76:1, 76:4, 76:5, 76:15, 76:21, 76:22, 79:4, 79:15, 79:16, 79:18, 82:20, 83:11, 84:8, 85:2, 85:4, 85:18, 85:21, 86:4, 86:10, 86:11, 86:22, 87:8, 87:9, 87:17, 87:21, 87:24, 88:14, 88:23, 91:4, 91:5, 92:5, 92:9, 92:12, 92:13, 92:15, 92:22, 93:5, 94:24, 95:1, 95:3, 96:15, 96:19, 97:4, 97:13, 98:13, 98:19, 99:1, 102:9, 102:13, 102:14, 102:18, 102:23, 102:24, 105:7, 109:4, 109:6, 109:7, 109:18, 109:24, 111:6, 111:14, 111:15, 111:18, 112:18, 112:20, 112:24, 113:4, 113:14, 114:24, 115:7, 116:4, 116:5, 116:9, 116:10, 116:14, 116:21, 116:22,

117:1, 117:2, 117:5, 117:7, 117:12, 117:13, 117:21, 117:23, 118:7, 119:2, 119:3, 120:3, 120:13, 120:17, 120:20, 122:14, 122:15, 122:17, 122:18, 128:2, 136:21, 138:22, 146:17, 152:9, 152:22, 157:2, 168:17, 169:11, 169:23, 177:18, 179:17, 180:13, 181:11, 181:14, 181:23, 182:15, 182:20, 182:21, 183:11, 204:22, 223:18
**Correct** [1] - 157:7
**correcting** [1] - 154:6
**corrective** [1] - 160:20
**correspondence** [1] - 201:14
**counsel** [8] - 4:2, 27:14, 54:22, 67:22, 206:14, 207:2, 207:6, 215:18
**counsel's** [1] - 130:5
**counseling** [3] - 67:5, 67:9, 67:10
**count** [1] - 222:13
**County** [2] - 235:6, 235:7
**COUNTY** [1] - 235:2
**couple** [3] - 16:7, 88:21, 216:4
**course** [4] - 57:7, 57:11, 174:12, 218:24
**court** [13] - 5:10, 24:16, 83:21, 83:22, 85:14, 95:17, 104:8, 147:24, 160:4, 171:19, 173:10, 174:5, 179:19
**COURT** [2] - 1:1, 234:1
**Court** [1] - 230:5
**Courts** [2] - 1:21, 235:7
**covered** [1] - 215:24
**covering** [2] - 142:24, 146:5
**Cower** [1] - 126:12
**CPI** [1] - 197:4
**create** [2] - 98:9, 98:13
**created** [3] - 49:24, 115:24, 122:22

**creates** [1] - 96:15
**credible** [1] - 55:18
**crime** [6] - 40:17, 47:4, 81:11, 81:16, 81:18, 128:9
**criminal** [1] - 96:23, 177:9
**critical** [2] - 229:12, 229:15
**criticism** [1] - 190:7
**cross** [3] - 193:1, 212:4
**crossing** [1] - 155:18
**cry** [1] - 151:10
**crying** [2] - 149:10, 157:1
**CSR** [1] - 2:23
**cuffs** [2] - 67:3, 68:12
**curiosity** [2] - 7:21, 27:2
**curious** [1] - 146:23
**current** [2] - 4:2, 22:8
**cursing** [4] - 104:24, 107:19, 108:1, 108:11
**cute** [1] - 153:17

**D**

**D-a-n** [1] - 79:13
**D-e-l-a-n-e-y** [1] - 6:7
**daily** [3] - 162:15, 174:10, 222:14
**Dan** [2] - 24:4, 24:6
**Danette** [1] - 79:7, 79:13, 79:14, 126:11
**dangerous** [3] - 170:3, 183:15
**Daniel** [2] - 208:18, 208:19
**Darecko** [1] - 163:8
**Darrell** [1] - 25:3
**dash** [1] - 111:14
**date** [13] - 23:12, 27:17, 34:16, 34:18, 34:23, 45:1, 54:18, 54:23, 66:4, 94:15, 109:1, 205:2, 216:1
**dated** [2] - 44:6, 70:22
**dates** [2] - 7:14, 93:21
**Dawson** [18] - 23:16, 23:18, 23:21, 26:19, 26:23, 71:3, 77:15, 77:18, 77:19, 78:6, 87:18, 87:19, 111:19, 111:20, 111:24, 112:12, 112:19, 135:3
**days** [5] - 101:23, 122:10, 165:7,

167:21, 226:3
**dead** [2] - 200:1, 200:7
**deal** [4] - 46:14, 60:2, 61:13, 188:2
**dealing** [2] - 49:17, 68:5
**dealings** [1] - 221:10
**decided** [1] - 69:5
**decision** [8] - 80:16, 81:1, 81:24, 87:6, 143:17, 148:12, 183:8, 209:4
**decision-making** [3] - 81:1, 81:24, 143:17
**declined** [1] - 75:17
**deep** [2] - 36:13, 38:19
**defendant** [4] - 4:16, 6:15, 210:16, 231:24
**Defendant** [6] - 1:14, 2:18, 204:14, 204:20, 223:12, 234:13
**defendants** [5] - 4:15, 6:18, 210:17, 211:12, 215:21
**Defendants** [3] - 1:9, 2:16, 234:8
**defending** [1] - 96:22
**defense** [1] - 96:1
**defenses** [1] - 214:15
**defibrillator** [1] - 222:5
**definitely** [2] - 112:19, 134:21
**definition** [7] - 48:7, 48:8, 48:18, 48:20, 48:21, 95:10, 95:12
**definitions** [1] - 95:9
**deflect** [1] - 219:21
**deflects** [3] - 219:15, 219:16, 220:12
**Delaney** [8] - 2:17, 4:15, 5:3, 6:6, 11:16, 44:16, 204:20, 231:24
**DELANEY** [7] - 1:7, 1:17, 3:1, 4:19, 234:6, 234:14, 234:21
**Delaney's** [1] - 204:14
**delay** [1] - 69:20
**delete** [1] - 97:21
**deliver** [1] - 31:4
**delivered** [1] - 32:15
**delivering** [1] - 168:23
**denied** [1] - 75:12
**department** [8] - 14:9, 20:6, 93:3, 105:10, 118:21, 222:11, 222:16, 223:8

**Department** [17] - 2:20, 89:16, 95:19, 95:22, 96:3, 96:4, 96:7, 97:10, 98:24, 99:9, 99:17, 99:18, 99:20, 99:22, 100:15, 136:18
**Department's** [2] - 99:1, 99:2
**departments** [2] - 21:15, 112:22
**deponent** [1] - 234:15
**deposed** [1] - 31:12
**deposes** [1] - 235:5
**Deposition** [8] - 11:6, 32:10, 44:1, 65:15, 89:9, 103:1, 133:20, 204:10
**deposition** [11] - 1:17, 5:4, 6:10, 119:17, 132:24, 200:3, 202:24, 205:23, 232:2, 234:16, 234:17
**DEPOSITION** [1] - 3:1
**depositions** [1] - 1:22
**Derek** [1] - 25:5
**derogatory** [1] - 56:2
**describe** [4] - 167:23, 231:15, 232:23, 233:2
**described** [2] - 150:2, 151:16
**designation** [1] - 8:15
**designed** [1] - 224:5
**designee** [3] - 69:23, 69:24, 70:1
**detached** [1] - 197:5
**detail** [3] - 39:1, 202:11, 231:15
**detailed** [3] - 49:13, 49:21, 51:17
**detailing** [1] - 199:10
**details** [7] - 38:22, 39:19, 195:13, 220:22, 229:23, 230:21, 232:16
**detect** [1] - 230:22
**detectors** [1] - 138:21
**determine** [2] - 101:24, 175:21
**determined** [1] - 128:16
**developed** [1] - 191:23
**development** [1] - 8:24
**developmental** [3] - 101:19, 102:8, 102:11

**deviated** [1] - 223:6
**devices** [2] - 68:18, 101:3
**DHS** [5] - 93:9, 93:10, 97:12, 103:5, 112:7
**DIANA** [2] - 1:8, 234:7
**Diana** [18] - 2:17, 16:11, 16:16, 78:17, 80:19, 118:17, 119:6, 119:10, 134:11, 134:16, 211:8, 211:13, 213:1, 214:12, 217:11, 217:18, 220:7, 227:6
**differed** [1] - 168:20
**difference** [1] - 110:4
**different** [20] - 9:14, 16:6, 20:24, 45:21, 51:5, 54:5, 91:15, 91:16, 91:23, 113:16, 152:4, 168:19, 168:23, 173:6, 180:2, 185:24, 187:17, 218:3, 219:8, 230:15
**differentiate** [1] - 20:21
**differently** [1] - 157:16
**difficult** [4] - 6:9, 72:22, 147:23, 148:3
**diligent** [1] - 176:21
**direct** [11] - 78:10, 114:5, 147:21, 148:23, 160:23, 164:4, 164:5, 168:3, 171:8, 186:7, 191:7
**directed** [4] - 117:6, 118:8, 120:16, 120:20
**directing** [1] - 111:17
**direction** [1] - 118:18
**directive** [14] - 74:16, 74:19, 77:13, 77:15, 88:8, 111:14, 111:22, 112:5, 112:7, 114:12, 114:24, 115:7, 115:15, 115:17
**directive)** [1] - 111:4
**directives** [1] - 77:9
**directly** [20] - 10:8, 15:23, 16:2, 16:4, 92:20, 114:14, 118:24, 147:19, 147:22, 148:4, 152:20, 171:6, 180:3, 184:7, 184:8, 184:15, 185:2, 185:3, 185:9, 185:20

**deviated** ...

**Directo** [3] - 163:10, 163:11
**director** [60] - 9:4, 9:6, 9:15, 10:5, 10:9, 10:17, 13:15, 14:5, 15:15, 15:18, 15:24, 16:10, 16:11, 16:12, 16:22, 17:2, 17:7, 17:10, 17:11, 17:12, 24:2, 24:4, 24:10, 24:12, 24:18, 24:19, 24:22, 24:24, 52:12, 52:19, 52:20, 53:14, 55:7, 69:3, 69:11, 69:17, 69:22, 69:23, 70:5, 77:10, 78:15, 78:16, 78:17, 78:21, 103:22, 104:1, 111:24, 118:15, 119:1, 121:19, 123:5, 134:8, 146:15, 146:24, 163:23, 186:21, 208:21
**directors** [4] - 20:16, 22:5, 24:11, 121:17
**disabilities** [3] - 101:19, 102:8, 102:12
**disagreement** [1] - 100:12
**disappear** [1] - 200:21
**disappointed** [1] - 217:20
**disaster** [1] - 161:12
**discharge** [1] - 93:4
**discipline** [4] - 170:17, 171:5, 202:2, 226:23
**disciplined** [1] - 159:15
**disciplines** [1] - 171:3
**disclosure** [1] - 231:11
**discover** [1] - 119:18
**discovered** [4] - 27:16, 53:11, 59:7, 231:16
**discovering** [1] - 34:4
**discovery** [3] - 1:22, 27:20, 119:17
**discuss** [10] - 125:10, 125:13, 157:9, 157:17, 198:3, 198:4, 216:21, 219:24, 220:7, 232:22
**discussed** [24] - 28:2, 29:7, 29:11, 29:17, 30:13, 39:23, 42:1,

42:18, 71:16, 71:18, 163:20, 184:15, 191:8, 198:18, 211:14, 211:15, 216:20, 217:17, 218:2, 218:3, 228:21, 228:24, 231:20, 232:3

**discussing** [7] - 36:16, 100:23, 123:19, 159:1, 215:10, 216:7, 219:2

**discussion** [5] - 27:13, 28:7, 29:21, 217:17, 218:20

**discussions** [19] - 18:10, 36:22, 37:10, 37:12, 37:17, 37:19, 38:4, 38:7, 38:8, 38:9, 38:12, 41:3, 41:21, 41:23, 41:24, 55:21, 75:20, 218:13, 218:18

**disease** [1] - 86:3

**disengage** [3] - 182:7, 189:6, 189:8

**dismissed** [2] - 169:22, 170:8

**dismissible** [2] - 170:11, 170:22

**dispute** [2] - 89:6, 89:8

**disruptive** [2] - 170:5

**dissuade** [1] - 57:12

**distinction** [2] - 48:13, 120:11

**distributed** [1] - 124:21

**distribution** [1] - 124:23

**DISTRICT** [4] - 1:1, 1:1, 234:1, 234:1

**District** [1] - 1:21

**DIVISION** [2] - 1:2, 234:2

**doc** [1] - 134:21

**doctor** [5] - 106:1, 106:3, 106:5, 106:7, 107:2

**doctor's** [2] - 68:15, 68:23

**document** [35] - 33:4, 33:9, 33:11, 33:23, 35:21, 35:24, 43:19, 45:5, 47:15, 52:21, 89:13, 89:18, 90:7, 90:8, 91:7, 94:14, 97:20, 98:2, 100:5, 103:5, 103:6, 103:10, 103:12,

104:19, 105:18, 106:9, 109:14, 110:19, 111:23, 112:3, 133:24, 134:1, 134:20, 136:18

**documentation** [2] - 85:1, 88:1

**documenting** [1] - 34:3

**documents** [24] - 32:14, 88:7, 88:16, 88:18, 88:22, 88:23, 89:6, 89:23, 90:2, 97:18, 97:23, 97:24, 99:8, 99:12, 99:14, 102:9, 103:7, 103:14, 103:19, 104:6, 205:7, 214:17, 228:19, 229:5

**DON** [1] - 113:3

**done** [10] - 5:12, 66:17, 69:1, 82:18, 83:7, 83:14, 86:6, 86:9, 200:4, 231:13

**door** [21] - 138:2, 165:12, 181:14, 181:18, 181:20, 182:1, 182:6, 182:13, 182:16, 182:23, 183:1, 183:3, 183:6, 183:8, 183:12, 183:19, 183:23, 184:21, 189:13, 189:14

**doors** [4] - 165:20, 181:22, 189:11, 189:18

**doubt** [1] - 94:7

**down** [18] - 36:8, 45:12, 49:12, 79:1, 100:17, 105:1, 107:18, 108:16, 138:1, 143:7, 157:1, 158:4, 160:9, 175:2, 207:9, 228:12, 233:13

**download** [3] - 36:5, 36:7, 36:11

**Dr** [18] - 2:18, 67:6, 67:21, 69:9, 134:8, 135:4, 135:14, 204:5, 204:8, 210:4, 210:23, 211:2, 211:3, 211:13, 212:10, 212:22

**dragging** [1] - 147:24

**draw** [1] - 145:17

**DREW** [2] - 1:8, 234:7

**Drew** [11] - 154:19, 154:24, 155:4, 191:14, 192:9, 209:20, 209:21, 209:23, 211:12, 212:15, 212:17

**drew** [1] - 210:1

**drives** [33] - 18:11, 25:17, 27:13, 27:15, 29:6, 30:4, 30:12, 33:16, 37:23, 38:10, 39:2, 40:6, 40:9, 41:16, 42:2, 42:4, 42:10, 42:13, 42:16, 43:4, 43:8, 43:11, 54:11, 97:17, 116:24, 117:11, 122:20, 123:23, 124:14, 124:17, 124:20, 124:24, 232:9

**due** [8] - 59:13, 74:15, 74:16, 74:18, 74:19, 83:3, 83:4, 88:9

**duly** [3] - 4:20, 234:15, 235:4

**dumb** [1] - 140:21

**dumber** [1] - 140:19

**during** [18] - 18:2, 22:2, 22:16, 26:22, 30:11, 69:14, 103:9, 123:2, 132:23, 146:19, 157:23, 159:22, 165:16, 168:10, 189:3, 195:17, 213:9, 215:23

**duties** [2] - 118:16, 118:17

**duty** [1] - 52:6

**E**

**e-mail** [14] - 44:6, 44:7, 44:11, 44:18, 44:21, 134:7, 135:7, 135:13, 135:19, 135:23, 136:10, 140:5, 140:6, 143:11

**early** [8] - 71:9, 153:2, 153:4, 153:7, 153:11, 153:20, 180:21, 181:10

**easier** [2] - 43:19, 155:18

**easily** [2] - 169:21, 170:8

**EASTERN** [2] - 1:2, 234:2

**easy** [5] - 5:9, 31:12,

147:14, 147:17, 200:2

**eat** [1] - 132:11

**education** [1] - 6:20

**educational** [1] - 6:23

**effect** [1] - 85:12

**effective** [1] - 71:4

**effects** [1] - 60:3

**eight** [1] - 204:17

**either** [20] - 7:19, 17:9, 43:18, 51:1, 56:15, 72:20, 83:13, 113:11, 113:17, 120:7, 121:2, 132:1, 162:16, 162:24, 164:8, 165:2, 176:20, 176:22, 185:4, 191:2

**either-or** [1] - 176:22

**electronic** [2] - 91:9, 92:11

**Elgin** [39] - 17:13, 32:22, 45:13, 46:7, 46:20, 49:6, 50:12, 54:19, 55:5, 55:24, 57:5, 60:4, 60:19, 61:14, 68:1, 82:1, 82:8, 90:5, 91:16, 92:8, 95:7, 102:13, 103:9, 123:4, 124:11, 125:6, 143:24, 153:6, 170:22, 180:10, 181:22, 198:23, 199:11, 199:16, 203:8, 223:15, 225:24, 227:8

**elicit** [1] - 82:19

**embarrassing** [3] - 219:12, 219:14, 219:15

**Emergency** [2] - 4:3, 102:5

**EMHC** [7] - 59:22, 62:12, 62:23, 91:18, 91:21, 91:23, 231:18

**emotional** [7] - 149:11, 154:4, 156:14, 157:2, 157:5, 186:20, 218:13

**emotions** [3] - 151:3, 151:13, 156:8

**employed** [2] - 7:1, 125:6

**employee** [4] - 33:24, 101:2, 102:22, 177:5

**enact** [1] - 63:17

**encounters** [3] - 54:17, 59:17, 221:10

**end** [3] - 58:9, 58:15, 138:14

**ended** [1] - 162:20

**ending** [1] - 36:9

**ends** [2] - 17:5, 49:12

**enforce** [1] - 156:2

**enforcement** [1] - 222:2

**enforcing** [3] - 221:22, 221:24, 222:24

**engage** [2] - 45:23, 126:17

**engaged** [5] - 50:22, 51:4, 145:18, 225:18, 225:21

**engaging** [7] - 57:20, 58:19, 64:10, 126:5, 130:24, 225:5, 226:3

**engineer** [1] - 24:14

**engineering** [1] - 24:14

**enlarging** [1] - 221:16

**ensure** [5] - 48:1, 48:3, 62:15, 221:22, 222:16

**entire** [2] - 103:9, 224:17

**entitled** [2] - 11:15, 235:14

**entry** [1] - 74:3

**environment** [2] - 167:12, 225:1

**Epperson** [24] - 21:16, 30:14, 33:24, 34:2, 34:15, 35:9, 36:21, 37:13, 40:1, 67:16, 78:14, 112:1, 117:10, 134:7, 135:2, 135:18, 137:21, 138:11, 139:14, 140:8, 141:19, 199:8, 216:17

**equipment** [7] - 91:9, 92:11, 92:18, 92:24, 93:2, 101:4, 122:4

**error** [2] - 232:19, 232:20

**escalating** [1] - 106:11

**escape** [4] - 36:16, 36:24, 199:11, 225:23

**escaped** [2] - 197:12, 198:22

**escorted** [1] - 200:13

**especially** [1] - 165:5

**essentially** [2] - 8:6, 14:21

**et** [1] - 206:19

**ethics** [8] - 150:5, 223:20, 223:22, 224:6, 224:18, 226:6, 229:9, 229:14
**evening** [3] - 52:8, 165:21, 168:15
**event** [5] - 15:23, 51:19, 52:21, 176:15
**events** [4] - 215:16, 215:23, 216:18, 217:12
**eventually** [1] - 16:19
**everyday** [1] - 26:21
**evidence** [20] - 18:13, 25:17, 37:24, 38:15, 42:23, 43:12, 54:16, 55:11, 55:13, 55:18, 96:6, 124:1, 128:1, 128:7, 128:8, 131:15, 231:17, 232:1, 232:5, 235:13
**exact** [4] - 9:19, 21:1, 91:8, 120:15
**exactly** [6] - 109:15, 112:1, 190:15, 214:22, 215:8, 216:16
**examination** [2] - 129:22, 129:23
**EXAMINATION** [13] - 3:3, 5:1, 20:1, 21:11, 22:9, 23:7, 25:8, 220:10, 221:5, 222:20, 223:9, 227:4, 228:9
**examine** [1] - 54:7
**examined** [1] - 4:21
**example** [5] - 21:15, 85:15, 86:3, 221:23, 222:1
**examples** [3] - 21:14, 86:5, 222:22
**exception** [2] - 96:15, 96:16
**exceptions** [2] - 96:18, 96:20
**excuse** [6] - 10:22, 71:4, 137:23, 149:5, 162:19, 165:13
**exhibit** [6] - 44:6, 46:4, 61:12, 65:2, 89:13, 89:21
**Exhibit** [26] - 3:12, 3:13, 3:15, 3:16, 3:18, 3:19, 3:21, 3:22, 11:6, 11:9, 32:10, 32:14, 37:5, 44:1, 44:4, 45:9, 65:15, 65:18, 89:9, 89:12, 103:1,

133:20, 133:23, 149:24, 204:10, 204:13
**exhibited** [1] - 57:8
**exhibiting** [4] - 104:21, 104:23, 107:18, 108:1
**EXHIBITS** [1] - 3:9
**exist** [1] - 55:15
**existed** [1] - 124:17
**exists** [1] - 49:21
**exit** [1] - 182:18
**exodus** [1] - 162:1
**exonerate** [1] - 177:5
**expectation** [2] - 170:24
**expecting** [2] - 35:23, 151:11
**experience** [17] - 5:6, 55:22, 55:24, 56:19, 56:20, 57:3, 57:6, 57:13, 59:5, 59:16, 60:7, 60:21, 61:2, 63:2, 143:23, 158:21, 225:2
**experienced** [2] - 60:2, 62:24
**experiences** [1] - 63:6
**experts** [3] - 224:9, 224:17, 226:5
**expired** [1] - 222:9
**explain** [9] - 5:20, 50:16, 80:22, 120:22, 121:5, 121:6, 122:1, 226:7, 232:11
**explained** [3] - 73:6, 73:7, 73:14
**explaining** [2] - 186:9, 191:3
**explanation** [3] - 83:12, 121:2, 229:24
**explanations** [1] - 230:17
**exposed** [3] - 48:2, 61:23, 128:18
**exposing** [1] - 123:9
**exposure** [1] - 49:24
**express** [4] - 123:7, 123:13, 158:11, 161:18
**expressed** [1] - 140:8
**expression** [1] - 170:10
**extend** [2] - 80:2, 80:16
**extensive** [1] - 49:15
**extent** [1] - 211:19
**external** [2] - 84:5, 222:5

**eye** [3] - 226:22, 229:22, 230:13
**eyes** [1] - 43:18

**F**

**face** [1] - 189:10
**Facebook** [3] - 153:18, 153:19, 153:24
**facility** [11] - 93:4, 95:15, 100:24, 101:10, 101:19, 102:17, 107:9, 200:14, 211:17, 216:14, 224:18
**facility's** [2] - 102:8, 102:12
**fact** [18] - 28:23, 42:9, 46:18, 54:15, 68:14, 81:6, 106:23, 107:8, 139:20, 141:8, 143:7, 144:14, 178:7, 193:19, 195:16, 195:20, 219:21, 230:1
**facts** [12] - 123:24, 128:15, 128:22, 130:8, 205:6, 205:8, 214:15, 214:18, 215:1, 215:13, 215:24, 216:10
**factual** [1] - 78:8
**failed** [2] - 120:23, 232:11
**fails** [1] - 120:19
**fair** [17] - 5:7, 8:10, 12:8, 23:19, 23:22, 24:21, 47:11, 48:21, 63:5, 83:8, 94:21, 118:4, 119:8, 144:2, 154:14, 169:20, 215:19
**fairly** [2] - 49:14, 69:22
**faith** [3] - 214:20, 214:23, 215:15
**FAIZA** [2] - 1:7, 234:6
**Faiza** [2] - 2:17
**fall** [1] - 96:8
**false** [1] - 176:20
**familiar** [10] - 6:14, 12:17, 45:13, 70:22, 90:10, 90:14, 101:12, 104:6, 136:22, 137:14
**family** [1] - 219:7
**far** [5] - 14:8, 59:12, 171:4, 173:14, 220:20
**farfetched** [1] - 161:11

**farming** [1] - 153:16
**favor** [1] - 178:8
**favors** [5] - 176:6, 178:7, 178:17, 179:1, 186:19
**fear** [1] - 56:12
**Federal** [1] - 1:20
**feeding** [3] - 166:12, 166:14, 166:19
**feelings** [19] - 130:7, 130:13, 131:7, 191:23, 192:3, 192:7, 192:13, 192:17, 192:22, 192:24, 193:22, 193:23, 194:15, 195:3, 196:12, 196:15, 196:16, 196:22, 197:2
**feet** [2] - 147:24, 196:2
**felt** [2] - 157:16, 177:19
**female** [1] - 61:5
**fence** [1] - 99:14
**fenced** [1] - 99:13
**few** [2] - 21:14, 144:22
**fewer** [1] - 174:17
**figure** [1] - 107:15
**file** [2] - 36:15, 38:18
**filed** [1] - 80:5
**files** [7] - 37:12, 37:17, 37:20, 39:20, 41:12, 41:15, 123:8
**filing** [1] - 96:3
**fill** [1] - 207:1
**filled** [7] - 16:17, 16:18, 16:19, 16:20, 109:1, 206:14, 224:8
**final** [1] - 41:9
**finalize** [1] - 121:21
**financial** [1] - 202:21
**fine** [7] - 34:12, 55:2, 112:6, 122:12, 131:14, 223:21, 230:20
**fingers** [1] - 195:22
**finish** [2] - 127:1, 142:20
**finished** [1] - 34:6
**First** [3] - 36:5, 36:7, 204:15
**first** [31] - 4:20, 5:5, 9:9, 27:4, 32:16, 33:18, 36:11, 38:24, 62:5, 66:3, 66:14, 71:22, 71:24, 72:5, 72:11, 89:22, 91:17, 112:20, 137:17, 197:19, 197:24, 198:20, 205:5,

208:1, 231:15, 232:2, 232:24, 233:2, 234:14, 235:4
**five** [10] - 39:16, 65:3, 65:6, 148:14, 172:24, 173:2, 174:15, 174:17, 174:24, 225:6
**five-minute** [2] - 65:6, 173:2
**fix** [1] - 233:16
**flag** [5] - 160:16, 160:18, 161:3, 226:15, 226:21
**flags** [8] - 158:5, 158:6, 158:18, 158:21, 159:18, 159:20, 159:22, 160:7
**flash** [32] - 18:11, 25:17, 27:13, 27:15, 29:6, 30:3, 30:12, 33:16, 37:23, 38:10, 39:2, 40:5, 41:16, 42:1, 42:4, 42:10, 42:13, 42:16, 43:4, 43:8, 43:11, 54:11, 97:17, 116:24, 117:11, 122:20, 123:23, 124:14, 124:16, 124:20, 124:24, 232:8
**Floor** [1] - 2:14
**foggy** [1] - 10:11
**follow** [6] - 114:9, 128:24, 223:5, 224:8, 227:3, 229:6
**follow-up** [3] - 128:24, 227:3, 229:6
**followed** [1] - 53:10
**following** [6] - 29:14, 82:7, 152:13, 205:10, 223:8, 229:13
**follows** [1] - 4:22
**fondling** [1] - 195:17
**food** [10] - 166:16, 167:2, 172:7, 174:2, 179:12, 187:24, 188:1, 188:5, 188:13
**FOR** [2] - 1:1, 234:1
**foray** [1] - 89:23
**forced** [2] - 51:1, 51:6
**forcibly** [1] - 45:20
**foregoing** [3] - 234:17, 235:9, 235:11
**forensic** [11] - 6:22, 8:18, 8:20, 9:5, 10:10, 14:6, 14:10,

14:11, 17:8, 92:1, 92:3
**forensics** [3] - 91:19, 92:7, 93:18
**forget** [2] - 13:17, 212:2
**forgot** [2] - 67:24, 191:15
**forgotten** [1] - 189:8
**Form** [1] - 101:9
**form** [18] - 57:24, 58:3, 59:2, 59:18, 60:9, 69:4, 69:10, 69:13, 69:18, 84:14, 86:16, 96:9, 97:14, 98:3, 102:3, 107:21, 124:5, 192:8
**format** [1] - 73:24
**forms** [4] - 101:12, 101:13, 102:7, 222:15
**forth** [2] - 214:16, 221:8
**forward** [5] - 119:9, 134:10, 193:13, 200:22, 228:8
**forwarded** [1] - 135:1
**foundation** [2] - 57:2, 88:12
**four** [9] - 29:22, 29:24, 30:2, 36:8, 116:24, 171:17, 225:7, 228:4
**Four** [1] - 228:7
**fourth** [1] - 115:9
**frame** [4] - 23:3, 26:11, 144:24, 154:12
**free** [1] - 19:10
**frequent** [9] - 109:11, 109:19, 110:7, 146:9, 146:11, 164:15, 171:20, 188:4, 225:5
**frequently** [4] - 148:11, 158:16, 222:7, 227:12
**Friday** [4] - 29:9, 29:12, 68:8, 74:6
**Fridays** [2] - 26:9, 26:10
**friend** [3] - 213:4, 213:5, 213:8
**friendly** [1] - 153:15
**friends** [3] - 153:19, 153:24, 212:11
**front** [6] - 138:18, 149:11, 156:14, 157:6, 157:19
**frontal** [1] - 221:1
**frustrated** [1] - 127:2

**FTP** [17] - 12:5, 24:18, 69:3, 69:11, 69:17, 69:22, 78:15, 78:16, 92:2, 111:24, 121:17, 121:18, 134:8, 137:22, 138:17, 147:1, 212:4
**full** [8] - 5:13, 10:19, 178:5, 229:23, 230:20, 231:10, 231:11
**full-time** [1] - 10:19
**fully** [1] - 229:2
**functional** [1] - 222:10
**functions** [1] - 52:1

# G

**General** [1] - 100:20
**GENERAL** [1] - 2:12
**general** [5] - 91:21, 124:2, 160:11, 162:12, 175:5
**generally** [9] - 12:17, 23:22, 54:3, 106:1, 114:17, 127:6, 130:12, 174:4, 224:5
**gentleman** [1] - 172:11
**Gibble** [2] - 163:21, 164:8
**given** [11] - 73:10, 73:11, 74:12, 89:14, 90:2, 95:7, 106:7, 107:4, 124:2, 128:9, 161:9
**goal** [1] - 225:1
**God** [3] - 25:5, 126:10, 227:7
**gotcha** [2] - 48:22, 99:23
**grab** [1] - 132:11
**grandfather** [1] - 122:9
**gratification** [1] - 220:19
**gray** [2] - 49:9, 50:15
**great** [10] - 8:23, 25:13, 33:3, 43:16, 44:4, 67:10, 213:5, 219:20, 227:8, 227:17
**Great** [1] - 13:12
**green** [3] - 119:24, 120:8, 120:9
**greet** [1] - 163:3
**ground** [1] - 5:7
**grounds** [1] - 30:20
**group** [6] - 31:1, 121:20, 126:4,

212:8, 213:10, 214:10
**guard** [1] - 108:15
**guardian** [1] - 80:4
**guess** [21] - 33:24, 49:9, 51:4, 114:7, 114:16, 131:21, 132:1, 145:12, 147:13, 150:2, 152:14, 155:7, 162:11, 168:24, 185:14, 192:24, 202:2, 207:10, 215:3, 223:19, 232:18
**guessing** [1] - 27:8
**guidance** [1] - 102:15
**guide** [4] - 113:20, 113:23, 114:1, 114:2
**Gunderson** [1] - 2:21
**guy** [3] - 155:24, 156:1, 201:4
**guys** [2] - 133:3, 228:3

# H

**H1** [1] - 182:11
**HA** [7] - 23:13, 26:18, 26:19, 26:22, 26:23, 77:10, 77:16
**half** [7] - 223:2, 223:13, 227:21, 230:21, 230:24, 231:11, 232:2
**hall** [1] - 150:20
**hallway** [2] - 58:15, 162:11
**Hamlin** [3] - 152:16, 154:17, 154:18
**Hamlin's** [3] - 139:24, 141:4, 228:15
**Hammeed** [4] - 159:7, 180:17, 191:19, 191:20
**hand** [3] - 67:2, 68:11, 235:15
**handles** [1] - 189:11
**hands** [1] - 124:10
**hang** [5] - 8:12, 17:17, 152:2, 160:15, 179:6
**Hang** [1] - 17:17
**Hanlon** [2] - 152:15, 152:16
**happy** [5] - 5:19, 160:19
**harass** [1] - 95:16
**hard** [5] - 61:7, 133:10, 133:15, 159:13, 175:20
**Hardy** [4] - 24:5, 24:6,

208:18, 208:19
**harm** [3] - 95:16, 101:20
**harmful** [2] - 85:12, 85:14
**Hartman** [2] - 9:18, 10:12
**HASINA** [4] - 1:7, 1:13, 234:6, 234:12
**Hasina** [2] - 2:16, 2:18
**hate** [3] - 167:13, 213:5, 231:6
**head** [6] - 5:16, 21:14, 21:15, 145:15, 149:4, 186:11
**head-on** [1] - 186:11
**heads** [4] - 20:6, 148:22, 148:24, 212:19
**health** [13] - 7:17, 7:18, 7:24, 8:7, 8:15, 8:19, 56:14, 62:15, 100:24, 224:9, 224:17, 226:5
**Health** [11] - 4:4, 17:13, 49:7, 50:13, 54:19, 59:6, 124:11, 199:16, 203:8, 223:15, 227:9
**hear** [20] - 18:18, 37:6, 129:18, 130:2, 130:18, 131:16, 139:17, 140:3, 166:8, 166:10, 168:12, 170:15, 172:8, 181:16, 191:9, 195:16, 195:20, 196:1, 201:18, 227:10
**heard** [20] - 39:20, 40:20, 129:6, 131:24, 139:14, 144:11, 144:15, 145:15, 170:12, 179:8, 180:2, 191:11, 193:5, 197:17, 197:24, 201:13, 202:23, 231:16, 232:24, 233:2
**hearing** [3] - 145:11, 168:13, 185:8
**Heidi** [1] - 15:22
**held** [3] - 7:13, 26:8, 116:24
**hell** [4] - 141:22, 141:23, 142:3, 218:7
**help** [7] - 19:22, 31:19, 44:10, 157:10, 219:22, 230:22,

231:2
**helped** [3] - 36:23, 199:11, 225:23
**helpful** [2] - 99:19, 99:20
**helping** [1] - 97:23
**hereby** [1] - 204:21
**herein** [1] - 4:20
**hereunto** [1] - 235:15
**herself** [1] - 110:14
**hesitant** [1] - 12:3
**hesitate** [3] - 5:22, 65:11, 65:13
**hi** [1] - 129:4
**hide** [1] - 216:14
**high** [1] - 61:5
**Highway** [1] - 2:3
**himself** [2] - 111:13, 116:13
**hindsight** [1] - 145:13
**hint** [1] - 145:8
**HIPAA** [1] - 172:12
**hired** [1] - 7:16
**histories** [1] - 61:6
**history** [3] - 61:8, 226:23, 226:24
**Hogan** [13] - 2:17, 4:15, 16:11, 16:16, 78:17, 80:19, 134:11, 211:8, 211:13, 213:1, 217:11, 223:12, 227:6
**HOGAN** [2] - 1:8, 234:7
**Hogan's** [1] - 118:17
**hold** [6] - 19:12, 58:13, 66:24, 109:2, 151:8, 233:5
**home** [10] - 93:3, 160:19, 166:17, 166:23, 171:14, 172:9, 173:21, 179:9, 179:16, 188:3
**home-cooked** [8] - 166:17, 166:23, 171:14, 172:9, 173:21, 179:9, 179:16, 188:3
**honest** [5] - 175:12, 206:11, 229:11, 229:15, 229:18
**honestly** [7] - 9:24, 111:7, 144:16, 160:1, 163:13, 190:21, 206:7
**honesty's** [1] - 231:10
**hoopla** [2] - 175:13, 177:6
**hope** [6] - 12:11,

217:18, 217:22, 217:24, 218:4, 220:24
**hoped** [1] - 218:23
**hoping** [2] - 218:4, 218:21
**horse** [2] - 200:1, 200:7
**hospital** [23] - 6:22, 23:13, 23:15, 24:1, 24:9, 35:10, 35:14, 50:3, 52:19, 53:23, 71:4, 71:7, 77:24, 78:13, 91:24, 113:3, 113:12, 113:15, 114:18, 221:20, 222:10, 224:6, 224:8
**hospitals** [5] - 218:11, 219:2, 219:3, 220:14, 220:18
**hour** [1] - 162:20
**hours** [4] - 34:20, 35:2, 65:4, 132:9
**housekeeping** [1] - 14:21
**HR** [3] - 24:12, 24:22, 24:23
**huge** [1] - 176:23
**human** [1] - 224:13
**Human** [1] - 2:20
**HURT** [2] - 1:4, 234:3
**Hurt** [59] - 4:10, 4:13, 4:15, 18:4, 18:11, 31:24, 36:12, 36:15, 37:10, 37:17, 38:4, 38:7, 38:10, 38:12, 41:3, 41:22, 42:1, 42:5, 42:11, 42:12, 42:17, 53:10, 53:15, 53:22, 54:18, 66:22, 67:3, 71:8, 81:5, 81:16, 81:18, 86:12, 88:3, 103:9, 104:15, 108:24, 116:19, 131:18, 139:21, 145:5, 159:2, 159:5, 159:7, 173:11, 178:19, 180:4, 180:9, 189:23, 194:2, 194:10, 199:10, 203:24, 221:9, 221:24, 223:1, 225:4, 225:7, 231:19
**Hurt's** [5] - 65:23, 201:13, 201:14, 221:22, 231:17
**hyperbole** [1] - 219:19
**hypersexual** [2] - 57:4, 57:8

**hypersexuality** [1] - 57:19
**hyphen** [1] - 6:7

**I**

**I..** [1] - 169:3
**idea** [6] - 43:15, 72:13, 96:11, 126:15, 162:8, 201:19
**identification** [8] - 11:7, 32:11, 44:2, 65:16, 89:10, 103:2, 133:21, 204:11
**Identified** [1] - 108:3
**identified** [1] - 193:24
**identify** [7] - 205:5, 214:14, 214:17, 214:24, 228:14, 228:20, 231:19
**ignored** [1] - 74:23
**II** [5] - 73:22, 79:4, 111:6, 111:11, 116:11
**III** [1] - 152:15
**IL** [1] - 101:9
**ill** [3] - 60:7, 60:15, 60:18
**illegal** [2] - 97:7, 231:18
**ILLINOIS** [4] - 1:1, 2:12, 234:1, 235:1
**Illinois** [12] - 2:4, 2:9, 2:14, 2:20, 7:4, 11:24, 18:2, 32:15, 93:10, 100:17, 176:15, 235:6
**illness** [9] - 57:8, 57:11, 57:14, 57:17, 59:12, 61:8, 82:23, 83:2, 148:9
**imagine** [3] - 126:4, 230:14, 230:16
**immediate** [3] - 62:14, 62:20, 77:7
**immediately** [7] - 62:20, 63:7, 64:6, 64:19, 64:20, 106:14, 144:19
**impact** [1] - 147:22
**imply** [1] - 116:8
**implying** [5] - 88:23, 88:24, 97:21, 97:22, 141:12
**important** [8] - 49:2, 119:19, 120:11, 128:4, 128:13, 131:17, 229:13, 229:19
**impose** [3] - 69:18,

86:14, 88:13
**imposed** [3] - 82:1, 82:8, 103:8
**imposing** [1] - 102:16
**impression** [1] - 227:8
**improper** [1] - 206:9
**improvement** [1] - 91:1
**IN** [2] - 1:1, 234:1
**inaccurate** [1] - 223:14
**inadequate** [1] - 224:2
**inapplicable** [1] - 102:13
**inappropriate** [36] - 18:14, 25:18, 28:15, 38:1, 38:16, 39:4, 39:7, 39:11, 39:21, 39:24, 40:5, 41:13, 42:24, 43:13, 92:23, 95:2, 95:5, 95:10, 95:13, 96:8, 96:13, 96:16, 96:18, 97:1, 98:22, 122:17, 149:12, 152:8, 156:6, 156:7, 156:16, 187:3, 187:4, 187:20, 187:22, 232:5
**inappropriately** [2] - 154:4, 186:17
**incentives** [2] - 139:23, 139:24
**incident** [32] - 34:4, 125:2, 135:6, 135:14, 137:14, 137:16, 137:24, 138:4, 141:15, 141:19, 143:21, 143:24, 144:3, 149:5, 149:18, 150:1, 150:14, 151:16, 151:17, 153:11, 154:2, 154:13, 154:14, 154:16, 154:23, 155:13, 156:5, 191:12, 228:14, 228:19, 228:22, 229:4
**inclined** [2] - 178:4, 178:9
**include** [7] - 60:18, 95:18, 95:24, 96:5, 97:4, 98:12, 223:21
**included** [2] - 36:21, 173:22
**includes** [1] - 96:14
**including** [3] - 60:19, 80:4, 224:18

**inclusive** [1] - 234:18
**inconsistent** [1] - 19:3
**increased** [1] - 109:11
**incredulous** [2] - 223:13, 223:24
**independent** [2] - 142:7, 142:14
**independently** [1] - 113:9
**indicate** [7] - 30:19, 35:22, 94:3, 117:17, 120:19, 120:23, 143:12
**indicated** [3] - 78:7, 150:14, 173:17
**indicates** [5] - 35:5, 104:14, 106:9, 116:3, 117:14
**indicating** [3] - 61:24, 104:19, 138:7
**indication** [5] - 64:8, 187:14, 187:21, 188:8, 188:10
**indications** [1] - 132:2
**indicative** [1] - 170:4
**indirectly** [1] - 16:5
**Individual** [1] - 102:2
**individual** [11] - 83:15, 83:23, 100:21, 100:23, 101:2, 101:18, 101:22, 102:21, 172:1, 221:2
**individual's** [1] - 102:6
**individually** [1] - 212:3
**individuals** [4] - 50:20, 62:15, 131:22, 205:10
**Individuals'** [1] - 101:8
**infection** [1] - 83:5
**infectious** [2] - 83:5, 85:24
**influence** [1] - 84:6
**inform** [1] - 67:21
**information** [35] - 31:5, 31:23, 32:2, 34:4, 38:22, 39:24, 54:21, 92:19, 96:7, 97:11, 98:9, 98:13, 98:18, 124:9, 127:18, 131:18, 131:24, 153:23, 159:16, 176:22, 193:3, 199:5, 200:14, 201:1, 215:20, 218:19, 218:20, 228:21, 228:24, 229:7,

229:8, 229:18, 229:22, 231:21, 231:22
**informed** [6] - 74:15, 74:18, 75:1, 75:6, 75:10, 232:4
**infraction** [1] - 82:4
**Ingram** [2] - 134:8, 135:14
**initials** [3] - 10:23, 11:3, 52:5
**initiate** [1] - 54:13
**initiated** [1] - 54:10
**injury** [1] - 73:19
**inquired** [1] - 200:24
**insecure** [1] - 187:7
**inside** [5] - 181:23, 182:12, 182:17, 182:19, 182:24
**instance** [19] - 12:7, 64:9, 78:24, 80:12, 82:12, 85:8, 85:23, 106:10, 123:14, 148:8, 149:3, 149:6, 150:12, 164:16, 165:3, 167:7, 169:14, 188:24
**instances** [4] - 57:9, 105:22, 171:11, 189:7
**instead** [3] - 151:7, 151:8, 233:16
**institution** [1] - 223:22
**institutions** [1] - 227:18
**instruct** [2] - 107:2, 110:13
**instructed** [2] - 95:17, 106:3
**insubordination** [1] - 114:17
**intended** [1] - 61:13
**intent** [1] - 61:22
**intentions** [1] - 145:14
**interact** [1] - 157:12
**interaction** [3] - 146:9, 146:18, 150:4
**interactions** [1] - 221:9
**interchangeable** [1] - 52:16
**intercourse** [1] - 225:6
**interdisciplinary** [1] - 101:23
**interest** [2] - 159:13, 210:9
**interested** [1] - 153:16
**interests** [3] - 97:12, 99:1, 99:2
**interfere** [1] - 168:6

**interfering** [1] - 168:3
**interim** [7] - 9:6, 10:17, 16:14, 17:1, 17:5, 134:9, 164:1
**intern** [6] - 150:15, 150:19, 154:16, 154:22, 155:12, 156:5
**Internal** [1] - 89:16
**internal** [1] - 33:21
**internally** [1] - 46:15
**interpersonal** [2] - 157:18, 157:20
**interpret** [2] - 97:18, 97:23
**interrogatories** [4] - 4:21, 206:18, 206:21, 229:1
**Interrogatories** [1] - 204:15
**interrogatory** [2] - 232:12, 232:18
**interrupt** [1] - 7:22
**Intervention** [1] - 102:5
**interview** [4] - 11:16, 18:3, 18:24, 19:1
**interviewed** [1] - 41:1
**intimate** [3] - 186:19, 196:5, 197:8
**investigate** [1] - 28:4
**investigated** [1] - 116:9
**investigation** [25] - 26:4, 28:21, 30:20, 31:6, 53:18, 54:6, 66:23, 67:5, 74:16, 74:19, 81:2, 81:3, 81:22, 88:9, 88:14, 90:3, 111:3, 115:14, 115:22, 116:4, 116:7, 125:2, 125:8, 125:11, 128:21
**Investigation** [1] - 89:16
**investigations** [2] - 54:4, 54:14
**involuntarily** [1] - 49:5
**involuntary** [1] - 50:12
**involved** [3] - 40:17, 194:21, 197:12
**involvement** [4] - 193:14, 194:2, 194:3, 195:14
**involves** [2] - 164:4, 166:5
**involving** [3] - 74:17, 74:20, 141:15
**iPod** [3] - 117:1, 117:12, 119:24

**ISP** [25] - 26:4, 30:19, 31:5, 31:9, 32:16, 33:4, 33:14, 41:17, 41:18, 46:17, 53:17, 54:4, 54:5, 54:13, 78:3, 89:14, 89:15, 90:7, 91:6, 95:10, 125:5, 125:19, 176:16, 216:12, 216:24
**ISP's** [1] - 40:17
**issue** [45] - 60:7, 60:15, 60:17, 76:21, 77:3, 77:7, 77:12, 77:20, 83:3, 85:15, 85:24, 87:7, 87:21, 105:13, 106:2, 106:4, 107:7, 110:5, 110:8, 110:11, 110:13, 113:18, 113:19, 113:20, 113:21, 113:23, 114:8, 116:14, 117:6, 118:9, 118:18, 120:16, 120:20, 120:23, 133:11, 140:15, 148:5, 157:18, 157:21, 161:23, 171:20, 184:11, 185:4, 186:11, 187:24
**issued** [23] - 77:15, 79:15, 82:4, 82:14, 87:17, 90:16, 92:12, 94:20, 104:16, 105:15, 105:23, 108:24, 109:5, 114:22, 115:1, 115:3, 117:10, 121:9, 121:10, 121:12, 121:15, 122:4
**issues** [7] - 86:21, 147:21, 149:19, 150:6, 186:6, 191:10, 193:5
**issuing** [4] - 71:8, 78:12, 111:13, 114:3
**item** [4] - 92:17, 92:23, 95:3, 101:20
**Item** [1] - 93:9
**items** [2] - 51:20, 52:18
**itself** [2] - 107:10, 111:23

**J**

**Jackson** [2] - 34:1,
137:2
**Jacobson** [1] - 135:3
**James** [1] - 206:19
**Janet** [1] - 79:11
**January** [6] - 17:4, 22:17, 22:24, 44:6, 45:1, 213:6
**JAVED** [4] - 1:7, 1:13, 234:6, 234:12
**Javed** [8] - 2:16, 2:18, 4:15, 4:16, 210:4, 211:2, 211:13, 212:22
**Jay** [1] - 126:11
**Jeff** [8] - 126:12, 164:2, 164:3, 164:8, 185:17, 208:22, 208:23, 208:24
**Jenna** [1] - 126:13
**jeopardizes** [1] - 114:19
**■■■■■** [4] - 173:18, 173:22, 181:5, 181:6
**job** [10] - 7:19, 8:1, 8:6, 8:8, 168:4, 168:7, 176:20, 177:5, 186:14, 187:7
**jobs** [1] - 7:12
**Joe** [12] - 11:10, 11:22, 50:11, 64:23, 119:15, 124:5, 132:7, 133:8, 172:23, 199:24, 227:14, 233:22
**joe@kretchmarcecalalaw.com** [1] - 2:5
**JOHN** [1] - 2:3
**Johnston** [3] - 4:14, 198:1, 198:10
**JOHNSTON** [46] - 2:13, 4:14, 17:18, 50:18, 55:2, 56:5, 58:8, 58:11, 58:14, 59:18, 60:9, 64:23, 65:1, 65:7, 84:14, 86:16, 96:9, 97:14, 98:3, 98:5, 107:21, 119:13, 124:5, 129:21, 130:11, 132:7, 132:18, 133:3, 133:8, 133:18, 172:14, 172:23, 173:3, 198:3, 198:14, 198:17, 199:24, 200:6, 206:1, 206:5, 211:19, 228:2, 228:7, 233:7, 233:11, 233:19

**Joseph** [1] - 4:12
**JOSEPH** [1] - 2:3
**journal** [9] - 31:24, 32:2, 32:4, 32:5, 32:6, 32:8, 116:24, 117:11, 199:10
**■■■** [6] - 172:20, 172:21, 173:11, 173:22, 181:3, 181:9
**July** [38] - 29:9, 53:10, 54:23, 55:4, 55:6, 55:17, 74:5, 76:8, 80:14, 80:16, 86:13, 92:14, 94:7, 94:9, 94:10, 94:18, 94:24, 110:23, 115:10, 115:11, 115:24, 116:1, 116:20, 117:6, 117:15, 118:11, 118:19, 119:22, 120:17, 121:11, 121:12, 122:8, 122:16, 122:22, 123:3, 124:8, 235:16
**jump** [1] - 172:14
**June** [34] - 1:23, 27:16, 29:8, 30:3, 34:4, 34:16, 34:24, 54:1, 55:4, 55:6, 55:17, 66:4, 67:13, 68:9, 70:12, 70:22, 71:9, 71:12, 73:21, 75:24, 76:6, 86:13, 88:5, 90:16, 110:22, 111:17, 117:10, 117:12, 117:23, 122:1, 122:13, 134:13, 199:9, 234:16
**Jungles** [1] - 79:8, 126:11
**just..** [3] - 79:19, 169:19, 220:9

**K**

**K-Unit** [4] - 135:6, 135:15, 155:4, 196:11
**KAREEMI** [2] - 1:7, 234:6
**Kareemi** [9] - 2:17, 4:15, 67:6, 67:21, 69:9, 210:23, 211:3, 211:13, 212:10
**keep** [9] - 49:22, 57:12, 97:11, 100:9, 100:13, 127:3, 166:3, 222:18,

224:24
**keeping** [2] - 93:3, 98:12
**Kelly** [3] - 207:22, 208:6, 208:15
**kept** [4] - 118:1, 127:10, 127:21, 165:17
**key** [9] - 182:4, 182:8, 182:9, 182:11, 182:13, 182:18, 182:22, 183:4, 189:6
**kids** [2] - 213:15, 228:6
**kind** [18] - 10:11, 27:16, 28:21, 30:8, 96:24, 108:5, 121:18, 126:1, 126:2, 133:16, 140:21, 141:11, 141:13, 173:8, 184:14, 187:6, 188:1, 208:3
**kiss** [1] - 26:16
**Kiss** [1] - 23:18
**kissing** [2] - 36:13, 38:20
**knock** [1] - 189:12
**know..** [3] - 129:15, 187:11, 218:2
**knowing** [4] - 64:2, 126:16, 141:8, 159:24
**knowledge** [37] - 41:10, 78:10, 81:7, 118:16, 204:22, 205:6, 205:8, 205:10, 205:13, 205:18, 206:6, 207:13, 207:15, 208:5, 208:18, 208:22, 209:1, 209:2, 209:5, 209:11, 209:18, 209:23, 210:4, 210:10, 210:13, 210:14, 210:18, 210:19, 210:21, 210:23, 211:5, 211:8, 214:15, 214:17, 215:1, 231:24
**known** [3] - 27:17, 54:12, 81:9
**knows** [1] - 201:4
**Kretchmar** [3] - 2:22, 3:5, 4:9
**KRETCHMAR** [35] - 2:2, 2:7, 2:8, 4:9, 5:2, 8:22, 11:8,

11:13, 11:14, 11:21, 13:13, 14:3, 17:17, 17:23, 18:22, 19:14, 20:10, 21:3, 21:12, 22:1, 23:8, 25:2, 50:7, 50:11, 65:13, 88:21, 129:8, 129:16, 133:15, 147:7, 220:4, 220:11, 222:21, 227:5, 227:24

**KWAME** [1] - 2:12

## L

**L-Unit** [5] - 9:8, 10:4, 10:8, 208:13, 208:16
**language** [3] - 96:17, 97:2, 99:24
**laptop** [1] - 90:24
**laptops** [1] - 90:24
**large** [1] - 118:21
**Larson** [11] - 205:11, 205:13, 205:18, 207:8, 207:11, 207:13, 207:19, 207:20, 208:7, 208:12
**last** [21] - 5:5, 6:6, 17:20, 35:9, 38:14, 40:18, 67:8, 73:15, 79:21, 105:16, 120:1, 132:20, 135:15, 167:20, 176:12, 191:15, 204:18, 207:18, 211:11, 224:15
**lastly** [1] - 5:23
**lasts** [1] - 110:23
**late** [30] - 7:19, 74:2, 147:24, 160:7, 160:16, 160:20, 160:22, 161:2, 161:20, 161:24, 163:16, 164:19, 165:14, 166:2, 166:4, 166:7, 167:23, 168:5, 171:12, 171:19, 173:9, 173:10, 174:4, 179:5, 179:19, 180:22, 180:23, 185:16, 220:6
**latest** [1] - 201:13
**laundry** [9] - 165:4, 165:6, 165:12, 171:16, 173:9, 174:5, 179:21, 179:22, 188:13

**law** [13] - 46:22, 47:8, 47:9, 97:1, 127:18, 127:19, 215:12, 222:15, 223:23, 224:19, 226:6, 229:9, 229:14
**lawsuit** [9] - 6:14, 96:4, 96:23, 201:16, 202:7, 202:16, 202:24, 203:9, 204:4
**lawyer** [7] - 198:5, 198:13, 198:16, 198:20, 211:17, 212:3, 212:8
**lays** [1] - 215:8
**lead** [2] - 141:6, 186:16
**leadership** [14] - 18:5, 18:10, 19:18, 19:19, 19:20, 20:3, 20:4, 20:5, 21:3, 22:13, 37:9, 38:9, 216:23, 217:8
**leads** [1] - 61:9
**leak** [2] - 123:8, 123:10
**leaked** [2] - 124:10, 124:15
**learn** [2] - 156:12, 157:11
**learned** [1] - 18:3
**learning** [1] - 157:12
**least** [11] - 6:13, 67:20, 69:8, 146:4, 177:19, 180:20, 203:6, 218:16, 225:6, 226:14, 227:12
**leave** [7] - 83:2, 97:8, 110:8, 149:13, 160:17, 165:22, 222:17
**leaving** [1] - 212:6
**Lee** [2] - 79:4, 80:13
**Lee's** [1] - 79:6
**left** [9] - 10:13, 66:5, 75:13, 75:18, 138:22, 138:24, 210:10, 217:9, 228:2
**legal** [3] - 96:2, 97:9, 215:11
**Lenhardt** [35] - 18:4, 28:17, 36:12, 36:14, 36:16, 37:18, 38:4, 41:4, 42:23, 53:12, 53:16, 81:4, 126:21, 127:7, 128:14, 129:5, 139:21, 145:5, 145:23, 150:6, 159:1, 159:5,

159:20, 185:1, 185:2, 189:22, 191:10, 191:23, 203:23, 207:12, 219:4, 225:5, 226:3, 228:17, 231:16
**Lenhardt's** [1] - 28:11
**lenient** [1] - 155:18
**less** [2] - 8:8, 170:21
**letter** [5] - 90:23, 90:24, 91:1, 93:9, 100:20
**letting** [2] - 167:19, 171:15
**level** [4] - 54:12, 68:20, 69:2, 70:16
**library** [2] - 58:20, 58:21
**license** [2] - 7:4, 7:5
**License** [2] - 2:24, 235:21
**lieu** [1] - 52:8
**light** [1] - 25:24
**likely** [2] - 60:21, 75:11
**limit** [6] - 158:14, 164:17, 164:23, 167:10, 168:8
**limiting** [1] - 59:1
**limits** [7] - 164:20, 166:2, 166:5, 167:8, 169:9, 169:10, 173:7
**line** [44] - 12:22, 13:14, 13:16, 14:23, 18:17, 19:9, 28:14, 28:16, 35:9, 37:5, 38:14, 40:18, 40:22, 41:20, 62:5, 66:15, 72:5, 72:9, 73:2, 73:15, 120:2, 150:2, 150:3, 150:8, 150:17, 158:8, 160:11, 175:8, 175:9, 176:13, 177:12, 178:2, 178:3, 178:6, 184:23, 190:4, 193:10, 193:18
**lines** [22] - 18:6, 18:8, 20:15, 25:14, 36:8, 79:21, 150:20, 152:1, 152:12, 158:4, 164:10, 164:13, 167:17, 168:1, 185:11, 190:8, 193:7, 200:13, 201:6, 201:11, 202:12, 202:19
**list** [1] - 45:4

**listed** [1] - 210:15
**listened** [2] - 36:21, 129:1
**litigation** [5] - 95:18, 95:21, 96:21, 96:24, 98:23
**live** [1] - 219:7
**lobe** [1] - 221:1
**located** [2] - 137:23, 147:3
**location** [1] - 8:4
**lock** [11] - 140:18, 140:22, 140:23, 181:13, 181:22, 182:4, 182:7, 183:18, 189:1, 189:6, 189:8
**locked** [24] - 138:9, 139:19, 140:13, 141:23, 142:9, 142:15, 143:13, 143:23, 145:19, 181:18, 181:20, 183:3, 183:7, 183:12, 183:16, 183:23, 184:13, 184:21, 188:22, 189:12, 189:14, 189:22, 216:14, 228:17
**locks** [2] - 182:1, 182:16
**locksmith** [1] - 144:20
**log** [1] - 222:6
▮ [4] - 172:20, 172:21, 173:12, 181:3
**look** [32] - 9:23, 11:9, 18:1, 30:8, 32:13, 33:3, 33:6, 36:1, 43:17, 52:24, 62:3, 66:8, 68:4, 72:14, 91:14, 92:17, 100:5, 114:3, 135:10, 135:22, 136:4, 137:18, 140:19, 150:8, 176:17, 176:18, 189:17, 197:6, 216:3, 221:7, 221:12, 231:14
**looked** [2] - 87:14, 136:19
**looking** [22] - 17:18, 18:6, 19:8, 19:18, 25:13, 39:14, 47:15, 66:7, 73:24, 89:23, 95:9, 97:6, 97:8, 106:8, 109:14, 111:10, 141:7, 154:22, 181:24,

196:24, 201:2, 226:14
**looks** [25] - 36:8, 38:5, 51:17, 51:20, 65:1, 68:1, 72:17, 73:2, 73:11, 73:19, 79:3, 79:20, 90:15, 93:7, 104:15, 108:24, 111:6, 111:7, 111:9, 111:12, 115:9, 115:21, 136:19, 137:1, 141:9
**Lori** [1] - 126:12
**lose** [2] - 156:7, 200:2
**loss** [2] - 57:24, 58:24
**loud** [1] - 18:8
**love** [1] - 227:17
**lunch** [5] - 213:11, 213:18, 214:2, 214:5, 214:11

## M

**ma'am** [1] - 64:24
**mail** [15] - 44:6, 44:7, 44:11, 44:18, 44:21, 134:7, 135:7, 135:13, 135:19, 135:23, 136:10, 140:5, 140:6, 142:21, 143:11
**maintaining** [1] - 221:20
**majority** [1] - 220:24
**Malini** [1] - 24:6
**Malis** [1] - 135:4
**managed** [1] - 9:18
**management** [1] - 169:3
**management-based** [1] - 169:3
**manager** [34] - 9:3, 9:7, 9:11, 9:14, 10:1, 10:4, 10:8, 16:3, 16:6, 51:18, 51:23, 52:9, 52:10, 52:11, 52:14, 52:16, 55:23, 74:9, 76:4, 76:10, 76:17, 76:19, 76:23, 77:9, 79:7, 119:2, 126:4, 146:1, 146:8, 147:2, 156:15, 186:21, 193:20, 213:10
**managers** [2] - 16:3, 126:8
**mandated** [1] - 46:23
**manifestation** [1] - 57:11
**manner** [1] - 45:22

**[32]** - 159:6, 172:17, 180:17, 181:9, 191:15, 191:20, 191:23, 192:3, 192:14, 193:4, 194:3, 194:4, 194:8, 194:10, 194:14, 194:17, 194:20, 194:24, 195:4, 195:6, 195:11, 195:14, 195:17, 195:21, 196:2, 196:6, 196:9, 196:14, 209:3, 210:1, 211:4, 225:12

**[1]** - 191:15

**manual** [8] - 46:5, 91:16, 91:18, 92:2, 92:4, 93:22, 93:23, 93:24

**manuals** [2] - 91:15, 91:23

**March** [2] - 17:2, 22:7

**MARK** [2] - 1:10, 234:9

**Mark** [7] - 4:10, 172:11, 173:11, 173:22, 180:24, 181:1, 181:9

**marked** [8] - 11:6, 32:10, 44:1, 65:15, 89:9, 103:1, 133:20, 204:10

**MARY** [1] - 2:13

**Mary** [11] - 4:14, 11:10, 55:1, 98:4, 132:22, 198:1, 198:10, 205:20, 205:23, 206:7, 233:6

**mary.johnston@ilag.gov** [1] - 2:15

**mass** [1] - 162:1

**masturbated** [1] - 196:2

**materials** [1] - 121:10

**matter** [9] - 94:22, 125:8, 130:13, 177:8, 177:9, 188:1, 204:21, 210:17, 227:13

**McBain** [1] - 11:16

**McBain-Delaney** [1] - 11:16

**MCBEAN** [1] - 6:7

**McBean** [6] - 1:17, 3:1, 4:19, 6:6, 234:14, 234:21

**McBean-Delaney** [6] - 1:17, 3:1, 4:19, 6:6,

234:14, 234:21

**MD** [1] - 67:6

**meal** [2] - 166:17, 166:23

**meals** [11] - 171:14, 172:9, 173:9, 173:11, 173:14, 173:21, 174:4, 179:9, 179:16, 188:3

**mean** [127] - 20:3, 23:11, 24:7, 24:12, 24:13, 28:22, 31:8, 33:19, 39:4, 39:8, 44:13, 47:14, 48:6, 48:8, 49:1, 54:20, 55:14, 59:10, 61:4, 61:22, 62:2, 63:12, 64:4, 69:1, 77:8, 77:14, 81:6, 81:10, 89:5, 90:13, 94:22, 97:23, 99:6, 99:10, 99:17, 105:16, 105:23, 108:11, 112:6, 114:1, 114:10, 114:11, 114:12, 114:15, 114:17, 115:17, 115:20, 118:14, 119:4, 119:10, 123:16, 130:5, 130:16, 130:17, 134:10, 134:19, 140:12, 140:18, 142:2, 142:4, 142:11, 143:8, 144:5, 144:13, 145:12, 145:17, 146:20, 147:13, 150:11, 150:13, 153:4, 153:20, 155:2, 156:16, 157:8, 159:3, 160:18, 160:19, 161:2, 167:9, 167:13, 167:14, 168:24, 169:5, 171:22, 172:17, 174:18, 175:19, 176:9, 177:1, 178:1, 179:23, 184:4, 186:10, 186:12, 187:23, 188:5, 188:9, 188:11, 188:20, 190:23, 192:23, 193:11, 194:14, 194:19, 197:8, 201:16, 202:8, 202:11, 202:12, 204:2, 206:1, 207:3, 211:23, 214:9,

216:11, 216:22, 218:12, 220:8, 220:13, 220:17, 223:19, 231:10, 232:14

**mean..** [1] - 175:1

**meaning** [7] - 56:1, 97:10, 98:24, 119:5, 156:7, 186:11, 202:14

**means** [15] - 14:21, 95:14, 95:23, 97:9, 98:1, 99:5, 99:7, 106:17, 112:8, 118:22, 120:5, 120:6, 120:8, 135:16, 141:11

**meant** [6] - 19:19, 153:8, 158:18, 182:16, 191:1, 219:22

**mechanism** [1] - 182:24

**media** [4] - 39:16, 123:11, 175:13, 175:22

**medical** [11] - 23:14, 24:2, 24:4, 24:9, 52:19, 69:3, 69:23, 70:5, 73:19, 85:23, 208:21

**medication** [7] - 105:2, 105:23, 106:8, 107:5, 108:17, 109:13, 132:14

**medications** [2] - 6:8, 108:20

**meet** [5] - 27:7, 58:21, 148:15, 188:17, 212:8

**meeting** [55] - 12:4, 19:20, 20:3, 20:6, 20:7, 20:17, 20:19, 20:20, 20:21, 20:24, 21:7, 25:20, 25:22, 29:5, 29:11, 30:5, 30:8, 30:12, 30:14, 30:16, 30:17, 31:1, 31:4, 39:23, 40:2, 41:11, 42:8, 42:18, 44:12, 44:24, 68:8, 68:16, 69:14, 70:13, 71:17, 149:8, 149:9, 149:21, 151:18, 155:6, 157:10, 157:24, 158:2, 162:16, 162:17, 181:14, 183:19,

189:3, 199:9, 218:7, 228:16, 232:3

**meetings** [20] - 19:7, 19:16, 19:20, 20:9, 21:7, 21:14, 22:13, 22:18, 23:1, 23:10, 23:23, 26:6, 26:22, 27:3, 149:20, 195:18, 195:22, 196:3, 216:23, 217:8

**meets** [1] - 101:23

**member** [18] - 17:12, 18:13, 25:18, 28:15, 37:24, 38:15, 53:7, 56:16, 57:16, 70:2, 123:6, 131:23, 132:3, 138:9, 139:19, 143:22, 169:18, 226:14

**members** [3] - 87:2, 186:7, 219:7

**memory** [5] - 13:23, 31:18, 31:20, 44:10, 92:20

**men** [1] - 181:10

**mental** [12] - 7:16, 7:18, 7:24, 8:7, 8:15, 8:19, 56:14, 57:16, 61:8, 100:23, 220:18, 224:9

**Mental** [10] - 17:13, 49:7, 50:13, 54:19, 59:6, 124:11, 199:16, 203:8, 223:15, 227:9

**mentally** [3] - 60:7, 60:15, 60:18

**mention** [3] - 24:23, 139:23, 203:21

**mentioned** [7] - 136:11, 177:6, 181:12, 202:16, 206:22, 217:8, 219:1

**mentor** [1] - 155:7

**Meredith** [1] - 23:18

**merely** [2] - 167:9, 192:17

**merged** [1] - 175:23

**message** [1] - 134:24

**met** [13] - 12:7, 12:8, 12:18, 20:7, 67:3, 74:8, 76:3, 162:14, 183:12, 211:18, 212:2, 212:3

**metal** [1] - 138:21

**Michigan** [1] - 2:8

**mid** [1] - 180:23

**middle** [2] - 36:4, 205:22

**midway** [2] - 62:5,

193:9

**might** [16] - 6:8, 56:12, 69:23, 85:11, 85:14, 85:24, 97:6, 115:17, 123:8, 129:8, 179:8, 186:16, 209:23, 215:10, 220:13, 220:17

**might..** [1] - 65:4

**military** [1] - 70:23

**million** [2] - 158:23, 187:2

**mind** [8] - 75:13, 144:22, 165:3, 195:4, 195:9, 221:16, 221:17, 222:23

**minimal** [2] - 146:20, 148:8

**minimize** [2] - 63:8, 64:20

**minimizing** [1] - 62:24

**minimum** [1] - 226:20

**minute** [10] - 13:21, 17:21, 47:2, 65:6, 93:14, 159:4, 173:2, 201:3, 227:15, 233:1

**minutes** [9] - 132:14, 132:15, 132:17, 144:23, 145:1, 145:2, 145:3, 210:10, 228:2

**misconduct** [1] - 161:3

**missing** [2] - 222:16, 222:17

**mistake** [1] - 233:15

**mistaken** [1] - 137:21

**mistaking** [1] - 66:19

**mobile** [1] - 139:10

**MOD** [4] - 72:12, 72:13, 72:15, 72:19

**modems** [2] - 91:9, 92:11

**modified** [1] - 82:15

**module** [1] - 142:20

**Module** [13] - 155:5, 192:5, 194:1, 195:7, 205:12, 205:16, 207:17, 208:8, 209:8, 209:14, 210:7

**modules** [1] - 10:14

**Modules** [3] - 147:4, 191:22, 210:3

**mom** [2] - 202:14, 203:2

**Monday** [5] - 29:9, 29:14, 74:5, 74:13, 80:14

**Monday/Friday** [1] -

26:15
**Monday/Fridays** [1] - 27:10
**Mondays** [2] - 26:8, 26:10
**money** [2] - 202:22, 203:2
**Monico** [3] - 163:8, 163:10, 163:11
**monitor** [1] - 73:15
**month** [5] - 174:12, 174:17, 174:20, 174:22, 174:23
**monthly** [2] - 222:6, 222:14
**months** [6] - 29:22, 29:24, 30:6, 54:14, 159:9
**morning** [22] - 19:20, 20:7, 20:9, 27:4, 27:6, 27:11, 44:12, 44:24, 52:22, 66:11, 67:13, 68:10, 148:18, 149:8, 149:20, 149:21, 151:18, 155:6, 157:10, 157:23, 158:2, 162:9
**most** [3] - 165:21, 176:9
**mostly** [1] - 168:15
**mother** [2] - 201:14, 202:6
**mouse** [1] - 79:21
**mouth** [8] - 105:2, 106:17, 106:18, 107:13, 108:17, 141:21, 154:5
**move** [8] - 8:5, 43:19, 79:21, 129:21, 160:12, 211:4, 228:8
**moved** [7] - 192:4, 194:1, 194:16, 194:20, 196:9, 196:11
**moving** [3] - 65:1, 209:3
**MR** [140] - 2:3, 2:8, 4:9, 4:12, 4:17, 5:2, 8:13, 8:22, 11:8, 11:12, 11:13, 11:14, 11:18, 11:21, 12:23, 13:2, 13:5, 13:7, 13:10, 13:12, 13:13, 14:1, 14:3, 17:16, 17:17, 17:23, 18:16, 18:22, 19:12, 19:14, 19:22, 20:2, 20:10, 20:11, 21:3, 21:5, 21:10, 21:12, 21:22,

22:1, 22:10, 23:6, 23:8, 24:23, 25:2, 25:9, 29:2, 29:4, 32:12, 41:6, 41:8, 44:3, 50:7, 50:9, 50:11, 51:8, 51:9, 54:24, 55:3, 56:9, 58:10, 58:23, 59:21, 60:13, 64:24, 65:5, 65:11, 65:13, 65:17, 82:5, 82:17, 84:15, 86:19, 88:21, 89:4, 89:11, 96:12, 97:19, 98:4, 98:6, 103:3, 107:22, 107:23, 119:16, 119:20, 124:6, 124:7, 129:8, 129:10, 129:12, 129:16, 129:22, 130:1, 130:9, 130:15, 132:16, 132:20, 133:2, 133:5, 133:7, 133:13, 133:15, 133:16, 133:19, 133:22, 143:20, 147:7, 147:8, 172:16, 172:22, 173:1, 173:5, 198:4, 198:8, 198:15, 198:19, 199:22, 200:4, 200:9, 200:10, 204:12, 206:3, 206:7, 206:15, 211:22, 220:4, 220:5, 220:11, 221:4, 221:6, 222:21, 223:10, 227:5, 227:22, 227:24, 228:4, 228:10, 230:4, 230:9, 233:9
**MS** [46] - 2:13, 4:14, 17:18, 50:18, 55:2, 56:5, 58:8, 58:11, 58:14, 59:18, 60:9, 64:23, 65:1, 65:7, 84:14, 86:16, 96:9, 97:14, 98:3, 98:5, 107:21, 119:13, 124:5, 129:21, 130:11, 132:7, 132:18, 133:3, 133:8, 133:18, 172:14, 172:23, 173:3, 198:3, 198:14, 198:17, 199:24, 200:6, 206:1, 206:5, 211:19, 228:2, 228:7, 233:7,

233:11, 233:19
**must** [2] - 41:24, 102:20
**mutual** [3] - 193:23, 194:15, 195:2

## N

**naive** [1] - 140:20
**name** [10] - 6:4, 6:7, 25:6, 65:22, 79:6, 136:6, 152:16, 172:13, 191:16, 207:8
**named** [2] - 210:17, 215:6
**namely** [1] - 227:11
**names** [6] - 21:20, 24:2, 163:18, 172:15, 206:12, 210:15
**Nano** [1] - 117:1
**narcotic** [1] - 222:13
**narcotics** [1] - 222:16
**National** [1] - 4:3
**near** [3] - 86:14, 106:22, 181:6
**nearly** [1] - 93:19
**necessarily** [7] - 5:16, 52:12, 64:4, 82:16, 83:17, 177:1
**need** [21] - 5:23, 41:19, 46:19, 46:21, 47:7, 72:7, 83:15, 86:6, 107:2, 122:8, 130:4, 132:10, 161:12, 161:14, 177:3, 182:8, 198:18, 211:23, 227:23, 227:24
**needed** [2] - 5:19, 75:8
**needing** [1] - 28:11
**negative** [2] - 56:2, 56:21
**negatively** [1] - 56:13
**neglect** [2] - 186:24, 187:15
**negotiated** [1] - 8:3
**never** [23] - 38:23, 39:19, 55:18, 58:3, 89:23, 103:21, 103:24, 140:13, 142:23, 144:11, 145:8, 156:5, 158:23, 166:1, 170:1, 187:2, 187:12, 196:8, 207:20, 213:11, 214:5, 214:8, 214:11

**new** [6] - 65:2, 93:19, 121:9, 122:8, 156:11, 162:1
**news** [8] - 18:19, 25:16, 37:7, 123:17, 123:20, 123:21, 177:7, 219:6
**next** [25] - 8:24, 17:24, 34:19, 36:2, 66:8, 66:9, 70:20, 71:19, 72:9, 72:23, 72:24, 73:1, 73:2, 73:21, 75:6, 136:9, 151:24, 152:23, 158:8, 159:13, 160:13, 167:16, 174:23, 178:3, 203:18
**NGRI** [2] - 14:12, 165:5
**nice** [2] - 108:13, 127:3
**nicer** [1] - 80:7
**night** [2] - 52:8, 135:15
**nobody** [2] - 226:9, 230:18
**noise** [1] - 58:9
**nomenclature** [1] - 101:15
**noncoercive** [1] - 107:5
**Nonconsensual** [2] - 47:17, 51:15
**nonconsensual** [18] - 45:13, 45:24, 47:21, 48:6, 48:11, 48:14, 48:19, 49:18, 50:3, 53:2, 56:3, 62:4, 62:6, 62:8, 62:13, 63:2, 63:6, 63:22
**None** [1] - 211:10
**none** [2] - 188:11, 188:14
**normal** [1] - 98:8
**NORTHERN** [2] - 1:1, 234:1
**Northwest** [1] - 2:3
**not..** [1] - 144:14
**Notary** [1] - 234:24
**note** [31] - 65:21, 66:3, 66:4, 66:8, 66:9, 66:14, 66:20, 67:12, 67:19, 70:21, 71:1, 71:2, 71:20, 71:21, 71:22, 71:24, 72:2, 72:23, 72:24, 73:2, 73:18, 73:19, 73:21, 73:23, 77:15, 77:17, 78:7, 79:3, 79:23, 112:11, 112:20

**noted** [1] - 171:11
**notes** [1] - 112:23
**Nothing** [1] - 40:23
**nothing** [6] - 41:2, 142:4, 171:22, 188:14, 198:24
**nothing's** [1] - 171:22
**Notice** [1] - 102:1
**notification** [1] - 53:20
**notified** [6] - 35:11, 35:14, 53:15, 53:23, 55:6, 121:22
**notify** [1] - 52:19
**November** [4] - 11:16, 11:24, 203:16, 203:23
**NSG** [1] - 72:2
**nuisance** [1] - 170:2
**Number** [18] - 3:12, 3:13, 3:15, 3:16, 3:18, 3:19, 3:21, 3:22, 11:6, 32:10, 44:1, 44:4, 65:15, 65:18, 89:9, 103:1, 133:20, 204:10
**number** [5] - 34:1, 102:3, 140:14, 148:14, 169:14
**numeral** [4] - 48:9, 62:3, 90:22, 92:17
**numerous** [6] - 18:11, 37:23, 42:1, 42:9, 64:15, 148:11
**nurse** [48] - 7:2, 9:2, 9:3, 9:7, 9:11, 9:14, 10:1, 10:4, 10:8, 16:3, 16:5, 51:18, 51:22, 51:24, 52:8, 52:10, 52:11, 52:13, 52:16, 55:22, 74:9, 76:4, 76:10, 76:17, 76:19, 76:23, 77:9, 79:7, 86:23, 105:8, 108:21, 110:12, 119:1, 126:4, 126:8, 145:24, 146:7, 147:2, 156:15, 169:16, 185:1, 186:21, 207:23, 208:8, 213:10, 222:7
**nurse's** [1] - 110:2
**nurses** [4] - 14:16, 14:19, 185:5, 200:19
**nurses'** [1] - 163:1
**nursing** [63] - 6:24, 7:4, 9:5, 9:6, 9:16, 10:5, 10:9, 13:15, 14:5, 14:8, 14:9, 15:24, 16:10, 16:11, 16:12, 16:23, 17:2,

17:7, 17:10, 17:11, 17:12, 22:6, 24:10, 24:11, 52:13, 52:20, 53:14, 55:7, 72:3, 78:18, 78:21, 80:2, 80:13, 80:17, 87:20, 87:22, 93:22, 93:24, 103:22, 104:1, 105:7, 105:9, 109:23, 112:13, 112:15, 112:17, 112:23, 118:11, 118:16, 118:21, 118:22, 119:1, 119:4, 119:5, 119:10, 123:5, 146:15, 146:24, 161:4, 186:22, 222:11, 223:8

## O

**oath** [2] - 4:5, 234:15
**obey** [1] - 47:8
**object** [2] - 4:18, 130:12
**objecting** [1] - 5:11
**Objection** [2] - 59:18, 198:3
**objection** [16] - 4:4, 4:13, 4:16, 50:18, 56:5, 60:9, 84:14, 86:16, 96:9, 97:14, 98:3, 107:21, 124:5, 198:14, 205:24, 211:19
**objective** [1] - 224:12
**objectively** [1] - 197:7
**observation** [3] - 109:11, 109:19, 110:7
**observations** [1] - 231:6
**observed** [2] - 57:7, 226:21
**observing** [2] - 4:17, 186:16
**obtained** [1] - 35:8
**obtaining** [1] - 90:24
**obvious** [1] - 132:4
**obviously** [14] - 39:15, 47:12, 53:1, 110:12, 140:19, 142:16, 143:11, 145:13, 153:5, 156:12, 176:14, 177:8, 196:17, 223:16
**occupied** [1] - 28:24
**occur** [2] - 174:9, 187:19

**occurred** [16] - 55:12, 55:19, 63:23, 85:24, 123:17, 130:22, 131:20, 191:21, 193:20, 210:3, 211:4, 215:7, 215:9, 215:11, 230:1, 230:17
**occurrence** [5] - 34:16, 34:18, 34:20, 34:24, 137:5
**occurring** [3] - 63:23, 64:8, 165:17
**October** [2] - 17:3, 30:6
**odd** [2] - 142:18, 157:17
**OF** [7] - 1:1, 2:12, 3:1, 234:1, 235:1, 235:2
**off-unit** [1] - 67:1
**offended** [2] - 31:18, 156:19
**offering** [2] - 63:1, 197:7
**offhand** [1] - 54:21
**office** [67] - 26:2, 26:3, 28:11, 28:20, 28:24, 29:18, 41:18, 135:17, 137:22, 137:23, 138:9, 138:15, 138:16, 139:20, 139:24, 140:10, 141:1, 141:5, 141:9, 142:9, 142:15, 143:14, 143:23, 144:8, 144:18, 145:6, 145:9, 145:19, 146:24, 147:3, 149:10, 154:7, 156:17, 157:2, 157:8, 162:7, 162:12, 163:2, 181:22, 181:24, 182:12, 182:18, 182:22, 183:4, 183:6, 183:13, 183:16, 183:19, 183:22, 184:13, 184:21, 188:18, 188:22, 189:2, 189:11, 189:22, 195:18, 195:23, 196:3, 216:11, 217:4, 217:5, 225:9, 226:4, 228:15, 228:17
**officer** [9] - 4:5, 33:23, 34:2, 106:21, 107:8, 138:8, 176:14,

193:10, 202:12
**Officer** [1] - 176:10
**offices** [2] - 182:2, 189:17
**officially** [1] - 17:9
**often** [1] - 174:9
**OIG** [7] - 46:15, 47:1, 125:9, 128:19, 128:21, 186:24, 187:16
**old** [5] - 93:19, 180:9, 180:13, 180:17, 180:24
**older** [1] - 181:7
**once** [6] - 29:21, 33:8, 64:14, 64:19, 97:20, 183:6
**One** [1] - 17:16
**one** [85] - 11:18, 11:20, 14:1, 16:7, 19:12, 21:22, 23:20, 28:20, 29:2, 30:19, 31:6, 33:12, 41:6, 43:22, 64:15, 66:7, 85:8, 86:20, 87:2, 89:20, 90:15, 91:17, 91:18, 91:21, 93:8, 93:11, 94:1, 94:6, 96:20, 98:23, 105:18, 105:19, 106:5, 107:6, 109:5, 109:9, 109:15, 109:22, 110:3, 111:12, 113:2, 116:24, 117:1, 118:8, 120:2, 121:18, 123:21, 129:18, 131:4, 132:20, 134:19, 135:11, 143:18, 149:18, 150:14, 154:19, 156:24, 166:21, 166:24, 167:10, 169:6, 169:18, 171:24, 172:1, 172:22, 175:4, 180:6, 189:3, 189:19, 196:10, 199:22, 201:13, 201:21, 202:11, 204:2, 212:5, 221:2, 222:10, 227:23, 230:12, 230:17, 233:1
**one's** [1] - 72:22
**ones** [1] - 45:7
**ongoing** [4] - 29:16, 29:20, 88:9, 174:21
**open** [6] - 125:8, 138:2, 165:12,

165:19, 182:6, 182:13
**opened** [1] - 183:1
**opening** [1] - 188:12
**openly** [1] - 151:3
**Operations** [1] - 102:3
**opinion** [2] - 97:9, 190:11
**opportunities** [1] - 165:19
**opportunity** [1] - 162:24
**opposed** [4] - 5:15, 51:5, 138:23, 186:12
**opposite** [1] - 99:20
**or..** [4] - 125:19, 146:22, 173:23, 196:20
**oral** [8] - 4:21, 36:12, 36:15, 36:22, 38:19, 124:1, 225:6, 225:8
**orchestrated** [2] - 201:15, 204:5
**orchestrating** [1] - 202:6
**orchestration** [2] - 202:15, 203:1
**order** [13] - 79:15, 79:18, 82:13, 82:14, 83:21, 83:22, 85:14, 106:8, 113:9, 113:22, 114:8, 196:17, 223:1
**ordering** [3] - 233:10, 233:21, 233:22
**ordinarily** [1] - 85:13
**original** [3] - 77:17, 80:5, 136:10
**origination** [1] - 110:3
**otherwise** [3] - 95:16, 95:17, 105:17
**outburst** [2] - 157:2, 157:5
**outline** [3] - 7:12, 90:4, 90:22
**outlined** [1] - 189:15
**outlines** [1] - 202:11
**outlining** [1] - 102:20
**outside** [14] - 163:2, 171:17, 173:20, 174:3, 182:1, 182:5, 182:7, 182:8, 182:9, 182:17, 182:20, 183:7, 183:9, 213:13
**overall** [1] - 143:16
**overlap** [2] - 162:22, 162:23
**overlay** [2] - 162:20, 162:21
**overly** [1] - 149:11

165:19, 182:6, 182:13
**oversee** [2] - 14:9, 200:19
**overseeing** [2] - 149:20, 224:17
**overtime** [1] - 164:6
**overtly** [2] - 170:3
**Owens** [7] - 4:10, 4:13, 4:16, 172:11, 173:11, 180:24, 181:1
**OWENS** [2] - 1:10, 234:9
**own** [7] - 70:9, 105:13, 105:15, 110:2, 222:23, 225:18, 225:22
**ownership** [4] - 190:13, 190:19, 190:22, 191:1
**owning** [2] - 151:9, 191:1

## P

**p.m** [10] - 45:2, 70:23, 73:22, 75:24, 110:23, 132:17, 132:19, 133:11, 158:16, 233:23
**pads** [1] - 222:9
**page** [57] - 12:21, 17:15, 18:6, 19:8, 32:16, 32:21, 33:13, 33:14, 34:10, 37:4, 40:18, 40:19, 40:22, 41:21, 51:10, 51:12, 70:20, 71:19, 79:2, 91:3, 91:21, 95:9, 104:14, 116:18, 136:9, 140:6, 149:24, 150:3, 151:24, 152:3, 152:4, 152:5, 158:9, 160:10, 160:13, 164:10, 167:5, 167:16, 167:17, 175:2, 176:1, 176:11, 176:13, 178:2, 178:3, 178:22, 184:23, 190:3, 193:9, 200:11, 203:10, 203:19, 204:15, 204:18
**PAGE** [2] - 3:3, 3:11
**pages** [4] - 140:6, 204:17, 215:8, 234:18
**paid** [2] - 161:7, 164:6
**Palarrio** [1] - 126:12

papers [3] - 148:10
paperwork [2] - 106:1,
160:3
paraphernalia [19] -
18:12, 25:17, 27:13,
29:6, 30:4, 30:13,
37:24, 38:11, 40:6,
41:12, 42:2, 42:4,
42:10, 42:17, 43:5,
43:9, 43:12, 232:4,
232:9
parentheses [1] -
115:18
Park [1] - 2:4
Parr [1] - 2:23
PARR [3] - 1:18,
235:4, 235:20
parsing [1] - 41:10
part [54] - 22:7, 23:4,
23:9, 28:6, 28:18,
31:22, 39:12, 57:14,
57:16, 59:10, 59:11,
61:12, 69:11, 76:6,
80:15, 80:16, 80:24,
81:19, 81:23, 90:3,
95:15, 99:15, 101:1,
102:11, 103:16,
109:3, 110:6,
110:22, 113:4,
113:5, 113:7,
113:17, 115:10,
115:23, 116:19,
118:11, 118:14,
118:18, 119:24,
122:19, 123:3,
129:22, 140:21,
152:11, 157:1,
169:7, 176:24,
214:19, 218:21,
222:15, 224:15,
228:13, 229:16,
232:12
partaking [1] - 40:21
participant [3] - 22:12,
87:12, 87:15
particular [9] - 22:11,
47:8, 69:17, 84:20,
86:8, 166:24, 172:2,
175:17, 178:7
particularly [2] -
142:18, 175:4
parties [1] - 223:6
parts [1] - 219:8
pass [3] - 58:4, 58:18,
67:1
passing [2] - 146:21,
162:10
past [3] - 58:5, 171:1,
221:8
pat [1] - 205:10

Pat [10] - 205:11,
205:13, 205:18,
207:8, 207:11,
207:13, 207:18,
207:20, 208:7,
208:12
Patel [2] - 24:6, 135:4
Patient [2] - 36:9,
107:24
patient [147] - 36:12,
36:15, 36:17, 45:19,
45:21, 45:22, 45:23,
47:4, 53:22, 55:5,
56:3, 56:4, 56:11,
56:15, 57:16, 57:23,
58:7, 58:17, 59:5,
59:11, 59:13, 63:21,
64:1, 64:4, 67:6,
68:1, 69:19, 73:6,
73:7, 73:8, 73:11,
73:12, 73:16, 74:9,
74:12, 74:15, 74:17,
74:18, 74:21, 74:22,
75:1, 75:2, 75:5,
75:9, 75:10, 75:12,
75:17, 75:19, 76:3,
82:2, 82:9, 82:12,
82:18, 83:1, 83:8,
83:13, 83:14, 83:19,
83:20, 84:2, 84:3,
84:17, 84:18, 84:20,
85:2, 85:6, 85:7,
85:12, 85:17, 85:20,
85:22, 85:23, 86:2,
86:6, 86:8, 86:9,
86:10, 87:21, 90:10,
93:4, 96:6, 104:21,
104:23, 105:1,
105:2, 106:16,
107:5, 107:11,
107:13, 107:18,
109:11, 109:16,
111:3, 115:14,
116:3, 132:3,
135:17, 136:3,
138:10, 140:10,
140:13, 140:18,
142:21, 143:22,
148:6, 148:9,
164:17, 165:1,
165:9, 166:21,
166:24, 172:2,
173:12, 178:19,
180:18, 181:1,
181:14, 181:18,
183:13, 183:16,
183:22, 184:13,
184:21, 186:18,
186:20, 188:23,
189:2, 192:7,
192:13, 192:18,

192:22, 192:24,
193:6, 193:22,
193:24, 194:16,
194:19, 196:22,
197:2, 197:9,
197:12, 199:16,
219:5, 228:17
patient's [7] - 59:1,
84:6, 85:16, 85:19,
86:1, 108:5, 110:7
patient/social [2] -
193:6, 194:8
Patients [2] - 47:17,
92:18
patients [68] - 20:23,
45:14, 46:11, 46:19,
47:21, 49:6, 49:17,
50:12, 50:22, 53:2,
56:12, 56:20, 57:3,
57:5, 57:7, 57:20,
57:21, 57:22, 58:2,
59:3, 59:8, 59:15,
59:17, 60:19, 61:4,
61:6, 62:13, 64:10,
92:20, 140:1,
144:24, 162:16,
165:5, 165:6, 166:5,
166:7, 166:11,
166:13, 166:18,
171:15, 175:11,
177:14, 178:4,
178:9, 178:17,
178:18, 179:12,
179:13, 180:6,
183:19, 188:5,
188:14, 188:18,
191:10, 193:4,
193:15, 200:18,
200:20, 207:16,
220:19, 224:13,
224:19, 225:2,
226:4, 226:20,
227:12, 227:19
pattern [1] - 170:7
Pause [8] - 14:2,
19:13, 21:23, 29:3,
41:7, 129:11,
143:19, 199:23
pay [1] - 50:4
PC [2] - 2:2, 2:7
PCP [1] - 71:2
Pedan [2] - 25:6, 25:7
pedophile [1] - 225:23
peer [3] - 104:24,
107:19, 108:2
Peggy [4] - 163:21,
163:22, 164:2, 164:8
penetrated [1] -
195:21
people [27] - 5:8,

23:12, 57:12, 60:2,
60:8, 60:15, 60:17,
83:24, 103:18,
130:24, 136:11,
151:10, 160:14,
161:23, 164:15,
170:17, 171:14,
201:8, 201:17,
206:5, 206:17,
206:21, 209:17,
215:6, 219:23,
224:6, 224:23
per [14] - 53:1, 71:3,
72:8, 77:18, 88:1,
112:4, 112:11,
112:13, 112:15,
114:12, 148:13,
174:17, 225:7
perceived [3] -
106:15, 106:21,
107:10
percentage [1] - 61:5
perception [9] -
155:20, 155:24,
190:19, 218:10,
219:2, 219:3,
220:14, 220:17,
220:22
performance [1] -
147:20
performing [2] -
36:14, 124:1
perhaps [14] - 40:15,
85:5, 86:5, 92:6,
123:11, 154:3,
155:17, 171:10,
173:11, 182:24,
201:1, 202:1, 229:23
period [12] - 9:17,
9:19, 10:18, 22:15,
22:22, 22:24, 26:7,
145:24, 159:7,
215:24, 226:2,
226:16
periodically [1] -
24:13
periods [1] - 22:2
peripheral [1] - 100:24
permanent [1] - 13:19
permanently [1] -
10:24
permission [2] -
84:19, 84:22
permitted [1] - 92:19
person [29] - 16:6,
47:4, 49:24, 57:9,
57:15, 59:8, 60:22,
61:23, 61:24, 63:8,
83:15, 84:1, 84:4,
84:17, 85:6, 85:8,

85:11, 85:16, 95:16,
98:14, 101:21,
107:1, 120:20,
128:20, 131:5,
151:2, 170:22,
187:6, 226:20
personal [15] - 38:19,
39:12, 90:11, 93:2,
93:13, 101:5,
117:20, 130:6,
130:13, 131:7,
212:16, 212:23,
213:2, 213:16,
213:23
personally [1] -
130:21
persons [6] - 205:6,
214:14, 214:24,
215:20, 228:20,
231:20
pertaining [4] - 1:21,
28:15, 46:11, 90:23
Pharis [6] - 164:2,
164:3, 164:9,
185:17, 208:22,
208:23
pharmacy [1] - 222:15
phone [14] - 6:1,
16:16, 72:8, 72:18,
72:20, 73:3, 75:10,
77:18, 86:15,
114:23, 115:2,
115:4, 139:10,
188:19
phonetic [4] - 25:7,
77:1, 126:12
phonetic) [1] - 79:8
photographs [1] -
43:4
physical [1] - 109:2
physician [3] - 71:3,
86:24, 105:24
pick [1] - 175:4
pictures [2] - 129:19,
232:16
piece [1] - 10:12
place [5] - 151:17,
151:21, 185:5,
219:12, 223:17
placed [3] - 82:13,
93:2, 101:4
places [1] - 220:15
plain [3] - 96:17, 97:2,
99:24
Plaintiff [4] - 1:5, 1:11,
234:4, 234:10
plaintiff [2] - 221:9,
221:11
plaintiff's [1] - 215:2
Plaintiff's [1] - 204:14

**plaintiffs** [2] - 4:10, 4:13
**Plaintiffs** [2] - 2:6, 2:11
**plan** [1] - 160:21
**plans** [1] - 185:5
**play** [2] - 114:14, 129:14
**playing** [1] - 11:22
**pleased** [1] - 75:20
**plenty** [1] - 200:5
**PM** [2] - 162:18, 163:17
**point** [18] - 16:7, 16:23, 42:15, 47:20, 47:22, 53:17, 64:13, 87:23, 89:7, 94:12, 121:18, 121:23, 123:22, 140:11, 154:8, 154:19, 156:23, 183:5
**points** [1] - 36:2
**Police** [25] - 11:24, 12:5, 18:2, 27:23, 28:3, 32:15, 32:19, 32:21, 33:19, 37:3, 39:10, 40:11, 40:19, 40:24, 42:22, 81:4, 89:14, 89:19, 90:3, 95:8, 128:9, 150:10, 176:16, 200:12, 203:17
**police** [26] - 12:9, 12:13, 18:17, 18:21, 20:15, 22:20, 28:14, 37:4, 39:22, 89:23, 150:3, 158:4, 159:17, 160:6, 161:22, 164:10, 166:1, 167:16, 167:22, 175:2, 176:1, 178:3, 184:23, 186:8, 190:3, 193:9
**Policeman** [1] - 176:17
**policies** [11] - 90:4, 93:8, 94:3, 221:21, 222:10, 222:23, 223:8, 223:16, 223:22, 224:18, 229:13
**policy** [72] - 44:12, 45:13, 45:16, 46:3, 46:5, 46:7, 46:10, 46:19, 46:21, 47:7, 47:16, 47:20, 47:24, 48:17, 48:24, 53:1, 53:3, 61:12, 61:16, 61:17, 61:19, 61:23,

62:3, 62:4, 62:11, 63:7, 63:11, 63:14, 64:14, 64:18, 82:2, 82:4, 82:9, 82:11, 90:10, 90:14, 91:4, 91:7, 91:8, 91:12, 91:20, 91:21, 91:23, 91:24, 92:7, 92:10, 92:16, 93:9, 93:18, 93:19, 93:22, 94:4, 94:18, 95:2, 95:5, 95:15, 121:9, 121:11, 121:14, 121:22, 121:24, 122:7, 122:8, 122:16, 122:22, 122:24, 181:13, 221:23, 222:2, 223:3, 226:6, 229:9
**Policy** [1] - 44:24
**poor** [1] - 221:2
**pop** [2] - 158:6, 159:21
**position** [8] - 10:19, 10:24, 15:14, 16:17, 23:21, 69:21, 164:1, 219:22
**positions** [4] - 7:13, 8:5, 17:10, 158:11
**possession** [6] - 42:12, 42:17, 90:11, 91:8, 92:10, 123:8
**possibility** [1] - 145:18
**possible** [10] - 49:5, 50:12, 84:5, 166:6, 168:22, 169:4, 190:1, 226:13, 226:17, 230:16
**possibly** [1] - 64:15
**post** [4] - 52:13, 52:14, 175:21, 175:22
**pot** [1] - 126:1
**potential** [4] - 55:20, 173:21, 192:14, 196:11
**potentially** [2] - 18:13, 220:16
**power** [1] - 101:1
**PPM** [1] - 46:4
**PPM1870** [1] - 45:9
**PPM1870.doc** [1] - 45:9
**practice** [5] - 11:3, 26:23, 98:8, 106:10, 181:17
**pre** [2] - 161:5, 161:6
**pre-approved** [2] - 161:5, 161:6

**preceding** [1] - 45:10
**preceptor** [1] - 156:13
**precise** [1] - 126:22
**prefer** [1] - 129:9
**premises** [1] - 216:13
**prepare** [11] - 95:18, 95:21, 96:1, 96:21, 96:24, 97:23, 98:22, 99:8, 99:11, 228:18, 229:4
**prepared** [8] - 33:23, 34:15, 35:17, 103:12, 103:18, 104:4, 137:1, 137:4
**prescribed** [1] - 148:16
**presence** [3] - 106:20, 107:16, 108:18
**present** [9] - 2:20, 15:17, 23:13, 85:11, 105:3, 106:2, 112:3, 121:21, 162:5
**PRESENT** [1] - 2:1
**presentation** [1] - 59:10
**presented** [2] - 196:13, 196:14
**press** [1] - 161:23
**presume** [2] - 6:12, 13:23
**pretend** [1] - 191:14
**pretty** [5] - 149:12, 156:11, 165:23, 171:8, 218:11
**prevent** [4] - 127:10, 127:21, 229:9, 231:9
**preventing** [2] - 223:18, 231:3
**previous** [6] - 77:14, 89:20, 91:12, 109:15, 112:10, 122:24
**previously** [3] - 61:22, 155:7, 187:2
**primary** [2] - 71:2, 107:1
**printers** [1] - 90:11
**privilege** [1] - 59:1
**privileged** [1] - 211:20
**privileges** [2] - 57:24, 59:1
**privy** [2] - 38:21, 131:24
**PRN** [3] - 105:2, 106:6, 106:7
**pro** [1] - 99:22
**problem** [4] - 4:11, 157:14, 169:6, 194:9
**problems** [1] - 60:22
**procedurally** [1] -

113:10
**Procedure** [1] - 1:20
**procedure** [14] - 46:5, 46:11, 47:16, 49:11, 49:17, 49:19, 49:21, 53:6, 78:11, 101:10, 110:6, 125:8, 189:15, 222:3
**procedure-wise** [1] - 78:11
**procedures** [9] - 52:24, 53:10, 90:23, 100:19, 102:8, 221:21, 222:11, 222:24, 223:17
**Procedures'** [1] - 102:5
**proceed** [2] - 4:1, 128:23
**proceeding** [1] - 96:2
**proceedings** [3] - 235:7, 235:9, 235:13
**Proceedings** [1] - 233:23
**process** [5] - 68:17, 83:5, 106:13, 121:16, 178:14
**processed** [1] - 102:7
**processing** [1] - 102:9
**profession** [2] - 156:13, 223:20
**professional** [10] - 6:21, 212:14, 212:16, 212:18, 212:23, 212:24, 213:2, 213:24, 223:21, 224:16
**professionally** [1] - 213:12
**professionals** [1] - 190:7
**program** [8] - 8:18, 9:5, 10:10, 14:6, 14:10, 14:11, 17:8, 92:4
**programmatic** [1] - 101:24
**programs** [1] - 92:1
**progress** [1] - 65:21
**progressed** [1] - 196:19
**prompt** [1] - 105:1
**proof** [1] - 176:23
**proper** [1] - 205:23
**properly** [3] - 50:5, 54:8, 86:9
**property** [14] - 93:3, 101:5, 117:6, 117:15, 117:20, 118:12, 120:16,

121:3, 121:6, 122:2, 122:7, 122:10, 122:14, 124:10
**protect** [3] - 86:2, 86:9, 223:1
**prove** [2] - 176:22, 177:4
**provide** [6] - 107:4, 122:8, 149:3, 178:17, 215:20, 232:12
**provided** [7] - 32:22, 67:9, 67:10, 80:5, 193:3, 215:18, 229:22
**provides** [1] - 120:15
**providing** [8] - 31:22, 84:24, 102:15, 188:20, 201:1, 229:7, 230:20, 230:24
**Provisions** [1] - 100:20
**psychiatric** [4] - 6:22, 50:3, 57:4, 66:14
**psychiatrist** [2] - 169:16, 210:7
**psychiatrists** [2] - 20:23, 60:1
**psychological** [2] - 59:15, 60:3
**psychologist** [1] - 205:12
**psychologists** [2] - 20:23, 60:1
**psychosis** [1] - 109:12
**psychotic** [2] - 108:6, 108:7
**PTT** [1] - 139:11
**Public** [2] - 4:4, 234:24
**public** [9] - 123:15, 124:2, 220:13, 220:21, 221:1, 223:16, 227:7, 227:10, 227:15
**public's** [1] - 218:10
**pull** [1] - 62:2
**punish** [2] - 57:22, 58:2
**punished** [2] - 57:20, 81:14
**punishment** [3] - 58:1, 58:3, 59:2
**purchasing** [1] - 90:23
**purpose** [5] - 1:22, 47:24, 62:10, 107:6, 202:18
**purposely** [1] - 189:4
**pursuant** [4] - 1:19,

4:3, 114:23, 115:6
**purview** [2] - 147:19, 223:4
**push** [1] - 139:12
**put** [12] - 89:20, 106:17, 106:18, 123:11, 145:15, 154:5, 158:11, 189:6, 205:23, 207:24, 227:20, 233:16
**puts** [1] - 115:18
**putting** [3] - 103:4, 133:12, 206:12

**Q**

**qualifications** [2] - 6:21, 61:1
**qualified** [1] - 17:11
**quality** [1] - 91:1
**quarantine** [1] - 83:3
**quarter** [2] - 230:22, 231:1
**questioned** [3] - 11:23, 12:9, 31:9
**questioning** [2] - 133:9, 177:13
**questions** [17] - 5:18, 5:20, 12:10, 12:14, 22:12, 22:15, 31:19, 33:8, 36:2, 127:2, 150:9, 159:13, 160:11, 207:5, 216:4, 228:4, 228:7
**quick** [6] - 50:7, 65:3, 132:11, 133:8, 172:24, 221:7
**quickly** [6] - 62:16, 62:21, 63:7, 64:19, 64:20, 228:11
**quite** [1] - 50:14
**quote** [1] - 71:3

**R**

**radio** [7] - 137:24, 138:3, 139:5, 139:8, 139:10, 139:14, 228:18
**radio's** [1] - 138:5
**raise** [1] - 225:14
**raised** [1] - 226:15
**ramifications** [1] - 56:2
**RANDOLPH** [1] - 2:8
**Randolph** [2] - 2:13, 4:9
**Randy** [7] - 17:18, 23:6, 50:9, 64:23,

129:13, 132:7, 233:22
**Randy's** [1] - 89:7
**RAOUL** [1] - 2:12
**rapport** [1] - 153:15
**rather** [3] - 15:2, 131:13, 131:16
**rationally** [1] - 197:5
**reach** [1] - 182:24
**reaction** [2] - 190:6, 190:20
**read** [73] - 17:20, 17:22, 18:8, 18:21, 25:14, 32:24, 33:5, 33:18, 34:5, 34:8, 34:11, 36:7, 36:10, 37:3, 43:20, 43:23, 48:7, 48:9, 66:18, 66:20, 71:1, 72:5, 72:11, 72:22, 75:6, 82:5, 82:6, 89:1, 89:3, 95:12, 100:7, 104:11, 104:12, 104:20, 109:8, 111:1, 115:11, 115:13, 117:10, 130:17, 135:12, 135:21, 137:9, 139:22, 141:7, 152:12, 158:7, 161:20, 164:12, 167:24, 175:7, 175:20, 176:4, 178:11, 185:11, 190:8, 193:17, 199:1, 199:4, 199:6, 200:15, 201:6, 201:11, 202:9, 202:19, 204:19, 206:3, 206:8, 230:4, 230:6, 231:23, 232:21, 234:17
**reading** [5] - 19:17, 35:13, 140:11, 160:12, 185:22
**real** [2] - 133:8, 221:7
**reality** [1] - 176:14
**realizes** [1] - 221:1
**really** [15] - 25:23, 46:18, 50:4, 107:11, 127:16, 142:4, 142:24, 143:12, 151:22, 174:8, 197:24, 219:20, 220:9, 228:5, 232:22
**realtime** [1] - 139:4
**reason** [23] - 12:12, 44:20, 84:21, 85:1, 85:5, 88:14, 89:5, 89:8, 94:7, 100:13,

107:17, 108:5, 109:16, 109:17, 115:13, 121:4, 121:5, 128:16, 130:19, 144:21, 175:17, 181:20, 187:24
**reasonable** [1] - 145:17
**reasonably** [3] - 214:20, 214:23, 215:15
**reasons** [6] - 109:8, 111:1, 140:14, 142:8, 161:8, 161:14
**Reasons** [2] - 108:2, 116:23
**recalled** [1] - 203:22
**recalling** [1] - 156:11, 163:18
**receive** [5] - 83:19, 88:4, 135:19, 139:6, 139:13
**received** [9] - 44:18, 44:19, 80:22, 112:17, 157:15, 167:1, 231:21, 233:3, 235:13
**receiving** [2] - 169:21, 225:8
**recently** [1] - 223:11
**recess** [3] - 65:14, 133:6, 173:4
**recipient** [1] - 65:22
**reciprocated** [1] - 197:1
**recognize** [2] - 65:19, 191:4
**recollecting** [1] - 139:16
**recollection** [9] - 12:4, 18:24, 19:4, 32:3, 71:18, 142:14, 173:16, 190:17, 204:23
**recommendation** [1] - 156:3
**recommended** [2] - 66:24, 67:2
**record** [14] - 4:2, 4:8, 6:5, 18:17, 32:14, 33:22, 56:14, 66:21, 82:6, 116:17, 127:4, 132:21, 133:5, 141:20
**Record** [2] - 17:22, 230:6
**recorded** [5] - 98:14, 98:15, 123:8, 123:24, 128:1

**recording** [12] - 36:20, 75:23, 98:16, 118:5, 128:8, 129:4, 129:6, 129:14, 130:3, 130:19, 131:13, 131:22
**recordings** [9] - 35:6, 35:8, 43:8, 55:15, 124:3, 127:9, 127:20, 132:1, 232:16
**records** [3] - 27:17, 135:13, 152:4
**recovered** [2] - 117:11, 199:10
**red** [13] - 158:5, 158:6, 158:18, 158:20, 159:17, 159:20, 159:22, 160:7, 160:16, 160:18, 161:2, 226:15, 226:21
**refer** [1] - 19:10
**reference** [4] - 36:2, 93:12, 102:1, 105:20
**references** [1] - 152:2
**referencing** [2] - 38:11, 89:2
**referring** [7] - 18:19, 27:19, 37:11, 37:16, 37:18, 126:20, 176:8
**refers** [3] - 93:7, 93:8, 95:6
**refinement** [2] - 91:20, 91:22
**reflect** [1] - 56:13
**reflected** [1] - 94:14
**reflection** [4] - 218:9, 223:15, 224:2, 224:7
**refresh** [2] - 31:19, 44:10
**regarding** [6] - 68:17, 93:13, 124:23, 132:24, 160:4, 164:5
**Regarding** [2] - 101:8, 102:2
**regards** [6] - 193:11, 193:14, 200:19, 202:15, 231:5, 231:6
**registered** [2] - 7:2, 9:1
**regular** [1] - 98:8
**rehab** [2] - 15:15, 15:18
**reissued** [2] - 93:18, 122:17
**relate** [3] - 164:21, 205:7, 214:17
**related** [10] - 92:18, 92:20, 92:24,

101:20, 180:3, 216:18, 217:12, 217:14, 224:19, 228:19
**relates** [3] - 177:9, 190:7, 216:9
**relating** [2] - 215:23, 217:12
**relation** [2] - 99:9, 192:21
**relationship** [38] - 18:14, 25:19, 28:16, 36:13, 38:1, 38:16, 38:20, 39:5, 39:7, 39:11, 39:12, 39:13, 39:22, 40:1, 40:5, 41:13, 42:24, 43:13, 142:22, 153:24, 154:9, 187:4, 196:20, 198:22, 199:15, 212:10, 212:13, 212:16, 212:17, 212:23, 213:2, 213:16, 213:24, 214:3, 221:8, 225:12, 231:19, 232:6
**relationships** [1] - 159:8
**relative** [1] - 147:13
**relay** [1] - 150:12
**relayed** [2] - 132:5, 191:14
**release** [1] - 217:5
**released** [1] - 54:19
**relevance** [3] - 50:18, 56:5, 130:12
**relevant** [3] - 19:10, 214:20, 215:16
**reliable** [1] - 176:21
**relief** [7] - 95:19, 95:21, 96:2, 97:5, 97:7, 97:9
**remain** [1] - 183:6
**remarkably** [1] - 129:13
**remember** [32] - 17:3, 26:2, 31:13, 31:14, 31:23, 32:7, 44:19, 70:11, 127:3, 135:7, 139:4, 139:19, 150:9, 151:20, 152:23, 153:1, 153:14, 153:18, 158:6, 163:5, 167:3, 171:19, 190:4, 190:5, 191:14, 203:7, 206:2, 206:11, 206:13, 211:16, 232:7

**remind** [1] - 133:10
**reminded** [1] - 79:6
**remotely** [1] - 4:6
**remove** [1] - 128:20
**removed** [2] - 101:21, 128:17
**repeat** [1] - 85:10
**repeated** [2] - 49:24, 226:19
**repeating** [1] - 100:9
**repercussions** [1] - 56:1
**replied** [1] - 80:4
**Report** [2] - 102:4, 136:18
**report** [38] - 16:9, 32:18, 32:22, 33:18, 34:3, 34:14, 34:23, 35:2, 35:5, 35:10, 35:13, 35:17, 35:19, 36:4, 37:13, 51:3, 52:22, 64:1, 64:5, 67:16, 117:10, 118:1, 118:24, 135:14, 136:19, 137:1, 137:6, 137:10, 137:19, 139:22, 140:1, 140:11, 141:4, 142:8, 142:20, 171:4, 192:21, 226:10
**reportable** [1] - 192:14
**reported** [20] - 15:23, 16:2, 16:3, 51:19, 63:21, 76:10, 163:15, 174:6, 179:12, 184:4, 184:5, 187:15, 188:11, 189:21, 191:20, 196:15, 204:1, 223:5, 227:1, 235:8
**Reported** [1] - 2:23
**reporter** [2] - 82:6, 104:9
**REPORTER** [1] - 4:1
**Reporter** [2] - 230:5, 235:6
**reporter's** [1] - 5:10
**reporters** [1] - 46:23
**reporting** [10] - 33:23, 34:2, 47:2, 183:21, 184:14, 184:20, 187:1, 229:7, 229:18, 235:6
**reports** [12] - 33:11, 46:24, 89:17, 136:22, 147:24, 160:4, 171:19,

173:10, 174:5, 179:19, 186:7, 228:19
**repulsive** [1] - 130:23
**request** [5] - 74:9, 76:3, 164:23, 165:2, 168:9
**requested** [3] - 17:22, 87:20, 230:6
**required** [1] - 70:16
**reserve** [1] - 233:19
**respect** [1] - 215:20
**respond** [3] - 97:16, 163:19, 226:24
**responding** [2] - 62:16, 94:2
**response** [2] - 51:5, 208:7
**Response** [1] - 51:14
**responses** [1] - 204:21
**responsibilities** [3] - 14:5, 103:16, 221:20
**responsibility** [4] - 151:13, 176:24, 222:2, 222:5
**responsible** [4] - 221:21, 221:24, 222:24, 223:3
**restate** [1] - 5:20
**restrained** [1] - 68:23
**restraining** [1] - 82:13
**restraint** [1] - 70:17
**Restraints** [1] - 102:4
**restraints** [2] - 69:6, 69:18
**restrict** [9] - 58:4, 82:21, 83:6, 83:9, 83:15, 84:3, 84:6, 86:1, 109:17
**restricted** [8] - 58:19, 76:8, 81:21, 84:18, 85:2, 85:7, 86:7, 102:6
**restricting** [7] - 68:11, 82:19, 84:1, 84:12, 84:13, 84:23, 115:12
**Restriction** [2] - 101:8, 102:2
**restriction** [51] - 57:24, 71:8, 71:11, 71:14, 75:12, 83:3, 83:19, 84:9, 85:3, 85:15, 85:19, 86:15, 86:24, 87:1, 87:7, 87:10, 87:16, 87:21, 87:23, 87:24, 88:4, 88:13, 101:11, 101:13, 101:16, 102:16, 103:8,

103:21, 103:24, 104:15, 105:6, 106:4, 106:24, 107:14, 108:5, 108:19, 108:23, 109:3, 109:9, 109:23, 110:5, 110:13, 110:21, 110:24, 111:2, 111:17, 114:23, 115:3, 116:19, 117:14, 122:3
**Restrictions** [1] - 108:3, 110:22, 116:20
**restrictions** [4] - 58:24, 86:21, 103:18, 113:9
**result** [3] - 57:18, 61:10, 92:24
**results** [1] - 62:7
**resume** [1] - 132:17
**retain** [2] - 117:19, 118:12
**retained** [1] - 118:3
**retired** [3] - 16:16, 213:6, 213:24
**retract** [1] - 30:15
**reveal** [1] - 38:18
**revealed** [6] - 30:4, 38:23, 39:23, 40:1, 124:3, 193:19
**revelation** [1] - 30:5
**review** [8] - 44:12, 44:24, 94:2, 94:5, 94:15, 121:14, 233:12, 233:18
**reviewed** [7] - 35:9, 44:14, 94:4, 94:6, 94:10, 94:24, 103:14, 121:12, 222:13
**reviewing** [1] - 121:19
**reviews** [2] - 94:12, 94:18
**revise** [1] - 94:2
**revised** [5] - 90:19, 92:14, 94:6, 94:9, 94:24
**revisions** [2] - 94:18, 123:1
**Rick** [1] - 158:14
**Ridge** [1] - 2:4
**rights** [54] - 57:24, 58:24, 59:2, 71:8, 76:7, 81:20, 82:19, 82:21, 83:4, 83:9, 83:19, 84:6, 84:9, 84:10, 84:11, 84:12, 84:13, 84:18, 84:20,

85:3, 85:20, 86:1, 86:22, 86:24, 87:8, 87:11, 87:16, 87:21, 87:23, 101:12, 101:13, 101:16, 102:16, 103:8, 103:18, 103:22, 104:1, 104:15, 106:4, 106:24, 107:14, 108:19, 108:23, 109:17, 109:23, 110:5, 110:13, 110:21, 110:24, 111:17, 113:9, 116:19, 117:14, 122:3
**Rights** [2] - 101:8, 102:2
**ring** [1] - 33:15
**ringing** [1] - 140:4
**rings** [1] - 33:16
**RN** [6] - 9:1, 105:4, 105:24, 106:24, 109:22
**RNs** [3] - 118:22, 118:24, 165:24
**Robert** [3] - 79:3, 79:6, 80:13
**Roger** [2] - 25:6, 25:7
**role** [1] - 152:14
**roll** [1] - 201:17
**ROM** [1] - 90:12
**Roman** [5] - 48:8, 49:12, 62:3, 90:22, 92:17
**romance** [1] - 196:12
**romantic** [3] - 195:3, 196:19, 197:8
**romantically** [1] - 194:21
**room** [21] - 27:23, 28:1, 28:3, 28:10, 32:1, 33:17, 34:5, 35:7, 66:22, 67:19, 67:22, 140:18, 140:22, 141:24, 165:4, 165:13, 188:13, 212:4, 212:6, 231:17, 231:18
**ROR** [47] - 71:5, 72:7, 72:17, 72:20, 73:3, 73:10, 73:11, 73:12, 74:12, 75:13, 75:17, 76:4, 76:21, 77:4, 77:7, 77:12, 77:20, 78:12, 80:2, 80:16, 80:20, 82:14, 87:12, 105:13, 106:20, 107:3, 107:4,

113:20, 113:21, 113:24, 114:3, 114:8, 115:9, 115:13, 115:24, 116:14, 116:16, 117:6, 118:9, 118:11, 118:19, 119:21, 120:1, 120:16, 120:20, 120:24, 121:6
**RORs** [6] - 80:23, 82:1, 82:3, 82:8, 113:18, 113:19
**Rory** [1] - 2:20
████████ [8] - 36:9, 36:17, 36:23, 159:6, 197:13, 198:22, 199:15, 225:22
**roundabout** [1] - 146:14
**route** [1] - 46:16
**rubbed** [1] - 149:9
**Rules** [1] - 1:20
**rules** [2] - 5:8, 48:24
**rumor** [13] - 145:8, 197:17, 201:8, 201:9, 201:10, 202:23, 203:5, 203:6, 203:22, 204:4, 204:6
**rumors** [15] - 126:3, 144:12, 144:13, 144:15, 191:9, 193:5, 195:16, 195:20, 196:1, 196:5, 202:4, 202:5, 203:7, 203:14, 203:20
**run** [1] - 148:22
**run-ins** [1] - 148:22
**Ryma** [1] - 135:3

**S**

**sad** [1] - 219:23
**safe** [5] - 19:4, 57:12, 93:3, 108:18, 225:1
**safety** [10] - 48:1, 62:15, 83:10, 114:20, 140:14, 140:23, 161:8, 184:11, 221:22
**Salvatore** [1] - 135:3
**Sandavol** [1] - 176:10
**save** [3] - 98:9, 203:21, 208:4
**saving** [1] - 210:9
**saw** [6] - 32:5, 89:23, 121:23, 121:24, 146:21, 162:15

**schedule** [2] - 133:14, 133:16
**science** [1] - 6:24
**scope** [3] - 186:13, 186:14, 186:20
**screen** [1] - 103:4
**screws** [1] - 5:9
**scroll** [3] - 61:15, 91:11, 203:10
**seal** [6] - 26:1, 26:3, 27:22, 27:24, 28:12, 28:19
**sealed** [4] - 28:23, 29:18, 30:21, 41:18
**sealing** [1] - 28:3
**Sean** [1] - 2:21
**search** [5] - 34:3, 66:22, 67:19, 67:22, 231:17
**searched** [1] - 35:7
**second** [20] - 11:18, 11:20, 14:1, 17:16, 19:12, 21:22, 29:2, 33:14, 34:10, 36:15, 41:6, 91:18, 91:21, 102:11, 129:10, 143:18, 160:6, 172:22, 199:22, 229:16
**section** [5] - 44:15, 79:23, 95:8, 100:18, 100:22
**Section** [3] - 4:3, 95:6, 100:22
**secure** [1] - 225:1
**securities** [1] - 224:22
**security** [46] - 7:20, 8:19, 21:16, 23:9, 24:12, 31:24, 32:22, 33:11, 34:3, 46:16, 66:23, 66:24, 67:15, 75:11, 78:2, 78:14, 80:2, 105:2, 106:12, 106:14, 106:20, 106:21, 107:8, 107:12, 108:15, 108:19, 112:17, 112:23, 113:4, 113:6, 113:7, 113:8, 113:16, 115:14, 115:18, 115:22, 116:24, 117:24, 135:18, 144:9, 148:4, 189:16, 224:24, 226:6
**Security** [2] - 34:1, 136:18
**security's** [1] - 108:18
**see** [56] - 12:24, 13:3, 14:19, 14:22, 18:7,

32:24, 33:7, 34:10, 34:14, 34:16, 34:21, 34:24, 42:3, 45:10, 47:18, 51:11, 51:20, 61:15, 61:17, 61:19, 66:8, 67:7, 71:21, 72:1, 74:9, 79:2, 79:23, 85:6, 85:16, 90:6, 90:16, 91:9, 94:17, 103:10, 104:16, 109:10, 122:24, 129:19, 133:3, 134:1, 134:6, 134:14, 134:22, 135:4, 136:7, 136:14, 137:6, 141:4, 176:10, 204:15, 210:15, 210:19, 213:6, 219:8
**seeing** [5] - 44:7, 79:5, 85:8, 121:11, 135:7
**seek** [5] - 95:19, 95:21, 96:2, 97:5, 130:4
**seem** [2] - 203:7, 223:12
**segway** [1] - 186:15
**seized** [2] - 122:9, 124:9
**selected** [1] - 16:17
**selective** [2] - 178:10, 178:13
**send** [2] - 44:13, 207:2
**sending** [1] - 134:16
**senior** [1] - 170:22
**sent** [7] - 80:3, 93:3, 129:19, 136:10, 136:12, 143:11, 206:14
**sentence** [4] - 36:5, 36:9, 62:5, 135:11
**sentences** [1] - 135:11
**separate** [4] - 21:7, 50:24, 194:1, 196:10
**separated** [1] - 225:13
**September** [3] - 90:19, 205:2, 216:2
**sequence** [1] - 7:12
**sequentially** [2] - 89:15, 103:5
**Sergeant** [1] - 137:2
**series** [3] - 7:18, 8:19, 8:20
**served** [1] - 62:15
**Service** [1] - 4:4
**service** [2] - 14:19, 14:20
**Services** [1] - 2:20
**services** [4] - 15:16, 15:18, 24:16, 63:1

**Set** [1] - 204:15
**set** [11] - 34:19, 148:5, 164:17, 164:23, 167:10, 168:8, 185:5, 214:16, 221:8, 233:20, 235:15
**sets** [1] - 158:14
**setting** [2] - 62:17, 164:20
**sever** [1] - 142:22
**several** [4] - 121:16, 178:4, 178:9, 180:6
**sex** [29] - 36:12, 36:15, 36:22, 38:19, 45:14, 46:11, 46:19, 47:3, 47:21, 48:14, 49:6, 49:18, 50:4, 50:13, 56:3, 56:15, 56:22, 57:15, 57:21, 59:7, 59:13, 118:5, 124:1, 130:24, 145:6, 145:19, 225:6, 225:8, 226:3
**sexual** [48] - 45:22, 45:23, 48:19, 50:22, 51:19, 53:2, 53:6, 53:16, 54:16, 55:14, 56:11, 58:19, 59:16, 59:23, 60:3, 60:6, 60:11, 60:14, 60:16, 61:6, 61:10, 61:13, 62:4, 62:6, 62:8, 63:3, 63:6, 63:22, 64:11, 81:19, 123:9, 128:2, 196:6, 199:15, 220:19, 223:14, 223:18, 224:1, 225:6, 225:14, 225:18, 225:22, 226:19, 229:9, 230:23, 231:3, 231:9, 231:18
**Sexual** [2] - 47:17, 51:15
**sexually** [13] - 55:7, 60:23, 127:24, 128:7, 128:14, 128:14, 131:18, 159:1, 188:15, 195:14, 219:4, 223:1, 227:13
**shaking** [1] - 5:15
**shall** [1] - 101:4
**share** [5] - 32:1, 130:6, 141:18, 155:12, 212:1
**shared** [6] - 152:18, 155:10, 196:7, 228:21, 228:24,

231:20
**sharing** [1] - 31:23
**sheet** [1] - 55:8
**Shift** [1] - 34:1
**shift** [21] - 26:21, 52:8, 137:20, 138:14, 158:17, 162:1, 162:14, 162:18, 162:19, 165:15, 165:21, 165:23, 168:11, 168:14, 168:15, 171:1, 207:23
**shift's** [1] - 163:17
**shifted** [1] - 26:14
**shifts** [2] - 8:5, 52:7
**Shorthand** [1] - 235:5
**shorthand** [1] - 235:8
**show** [7] - 79:22, 89:12, 91:6, 93:11, 93:15, 93:20, 100:18
**showed** [1] - 151:3
**showing** [1] - 204:13
**shrink** [4] - 13:2, 32:23, 43:17, 43:22
**Shuffle** [1] - 119:24
**shy** [2] - 185:14, 186:9
**sic** [3] - 62:4, 74:22, 163:8
**sick** [3] - 83:8, 83:14, 85:22
**side** [3] - 108:18, 217:19, 219:17
**sign** [4] - 69:3, 69:10, 69:18, 94:16
**signature** [5] - 111:11, 134:20, 204:24, 233:20, 234:19
**signed** [9] - 67:6, 69:2, 69:13, 105:4, 109:22, 111:5, 117:3, 163:2, 207:10
**significance** [1] - 141:2
**significant** [4] - 60:7, 60:14, 60:17, 218:19
**signing** [1] - 105:19
**signs** [3] - 69:22, 86:21, 110:12
**silly** [1] - 201:2
**similar** [11] - 46:3, 46:10, 52:14, 53:5, 139:5, 193:15, 194:3, 194:7, 194:8, 194:10, 195:4
**similarities** [2] - 195:9, 195:12
**simple** [1] - 49:22
**sincerely** [1] - 31:14
**single** [3] - 23:23,

48:20, 226:20
**singling** [1] - 178:16
**sinister** [1] - 170:4
**sister** [1] - 142:20
**sit** [3] - 131:16, 144:17, 145:4
**sitting** [3] - 158:24, 227:6
**situation** [20] - 12:6, 16:15, 18:4, 18:20, 29:16, 30:9, 49:17, 63:20, 106:11, 126:2, 126:6, 126:17, 126:19, 128:15, 128:19, 130:7, 130:22, 132:4, 210:2, 224:1
**situations** [2] - 46:2, 219:20
**six** [1] - 180:1
**skip** [1] - 228:12
**slightly** [2] - 187:17, 225:12
**slow** [1] - 11:20, 51:11
**small** [4] - 13:5, 13:7, 13:8, 134:2
**smaller** [2] - 43:20, 104:12
**smart** [1] - 143:17
**sneak** [1] - 200:7
**Snyder** [1] - 15:13
**so's** [1] - 165:11
**so..** [7] - 5:6, 26:9, 57:22, 100:3, 149:17, 150:12, 213:20
**social** [68] - 14:17, 20:22, 73:3, 73:13, 73:22, 74:4, 76:20, 79:4, 79:15, 80:1, 86:23, 87:20, 111:6, 111:8, 111:11, 111:13, 112:16, 114:13, 114:15, 114:22, 116:6, 116:11, 116:13, 117:4, 117:5, 118:9, 120:16, 120:22, 123:11, 128:10, 135:16, 136:2, 140:9, 141:5, 142:17, 142:19, 145:14, 146:1, 146:8, 149:6, 150:5, 152:15, 155:8, 163:24, 168:20, 169:1, 169:16, 170:9, 170:16, 170:20, 181:13, 182:2, 183:7,

188:17, 189:2,
189:3, 192:12,
195:18, 195:22,
196:3, 200:17,
202:1, 214:3,
220:18, 223:2,
225:8, 226:4
**socialize** [2] - 213:8,
213:13
**SODC** [1] - 102:3
**someday** [1] - 129:17
**someone** [31] - 16:18,
16:21, 38:12, 50:2,
51:6, 58:12, 58:15,
63:6, 69:17, 70:2,
76:10, 76:13, 77:6,
83:18, 85:14,
105:14, 110:4,
110:12, 110:17,
116:7, 145:11,
151:8, 172:8, 179:9,
179:15, 184:12,
185:3, 189:9,
192:20, 207:5, 212:6
**something's** [1] -
165:3
**sometime** [1] - 69:6
**sometimes** [7] -
52:15, 82:12, 94:14,
121:20, 151:15,
163:2, 189:16
**somewhat** [6] - 6:13,
186:19, 202:11,
223:13, 224:12,
229:12
**somewhere** [3] -
112:23, 180:13,
213:15
**soon** [2] - 54:1,
129:17
**sorry** [76] - 7:3, 7:21,
10:13, 10:22, 13:1,
13:9, 16:15, 21:17,
22:21, 27:24, 29:24,
31:7, 33:5, 34:18,
43:18, 47:22, 51:10,
56:24, 58:7, 60:10,
60:11, 65:3, 65:9,
70:22, 71:20, 71:22,
72:24, 73:1, 73:24,
75:7, 79:5, 82:3,
85:10, 86:13, 91:11,
92:22, 95:3, 96:10,
104:18, 105:22,
111:10, 115:1,
117:24, 122:11,
133:8, 134:12,
137:11, 137:18,
140:17, 146:11,
150:3, 151:5,

151:22, 152:3,
153:16, 163:11,
166:15, 175:9,
176:11, 181:16,
184:8, 185:22,
191:18, 198:2,
198:6, 203:10,
208:2, 209:3,
211:16, 214:24,
220:3, 221:14,
224:15, 230:2, 230:3
**Sorry** [5] - 8:13, 58:8,
58:13, 58:15, 124:5
**sort** [13] - 25:24, 64:8,
96:4, 139:4, 141:12,
152:19, 153:15,
154:5, 155:7,
155:24, 202:13,
202:15, 218:1
**sorts** [1] - 202:15
**sound** [5] - 18:23,
19:3, 162:21,
219:18, 219:19
**sounded** [1] - 12:2
**sounds** [4] - 150:24,
161:11, 166:15,
173:3
**South** [1] - 2:3
**span** [1] - 146:5
**spare** [1] - 129:13
**special** [5] - 141:2,
176:6, 177:13,
178:17, 186:19
**specialize** [2] - 59:23,
59:24
**specific** [26] - 14:8,
17:3, 23:12, 30:16,
30:17, 30:24, 33:10,
61:3, 87:12, 91:18,
127:5, 141:24,
142:5, 149:5, 163:5,
163:14, 166:21,
173:20, 173:21,
174:6, 175:11,
180:2, 180:5, 180:8,
183:24, 229:3
**specifically** [19] -
40:21, 59:9, 59:12,
61:9, 125:7, 125:16,
125:24, 126:15,
135:9, 143:15,
148:2, 150:11,
155:12, 155:14,
173:24, 177:23,
179:18, 179:23,
216:20
**specifications** [1] -
92:6
**specifics** [5] - 19:1,
25:23, 139:18,

163:18, 218:16
**speculate** [2] - 56:17,
190:24
**speculated** [1] -
145:12
**speculating** [1] - 78:4
**speculation** [2] -
56:18, 228:21
**spell** [1] - 6:4
**spend** [1] - 166:7
**spending** [1] - 172:1
**spent** [1] - 166:11
**split** [1] - 160:8
**splitting** [12] - 148:20,
154:21, 155:11,
155:16, 158:13,
161:16, 161:19,
166:4, 173:9, 174:6
**spoken** [3] - 160:3,
208:10, 209:20
**sporadic** [1] - 174:10
**sport** [2] - 14:20, 15:2
**spreading** [1] - 86:2
**srandolphk@gmail.
com** [1] - 2:10
**ss** [1] - 235:1
**ST** [1] - 7:23
**STA** [8] - 7:20, 7:24,
8:7, 8:16, 164:22,
183:21, 189:20,
201:23
**STA's** [1] - 155:24
**Stacey** [4] - 2:23,
17:19, 233:13,
233:21
**STACEY** [3] - 1:18,
235:4, 235:20
**staff** [72] - 18:13,
25:18, 28:15, 37:24,
38:15, 46:12, 46:20,
47:4, 53:7, 56:15,
57:16, 59:8, 59:17,
60:2, 91:2, 92:21,
104:24, 107:19,
108:11, 123:18,
126:1, 126:18,
132:2, 138:9,
139:15, 139:19,
143:22, 148:11,
148:23, 155:11,
155:15, 155:16,
155:19, 157:13,
158:10, 158:13,
160:8, 161:15,
161:17, 162:4,
162:13, 162:15,
164:17, 164:22,
165:10, 165:21,
165:22, 166:4,
166:10, 166:12,

167:6, 167:9,
167:14, 168:21,
169:6, 169:10,
170:6, 170:20,
171:1, 173:7, 174:6,
179:22, 180:3,
183:16, 186:1,
186:7, 188:4, 189:8,
216:6, 226:14, 229:8
**staff's** [3] - 167:11,
168:3, 168:6
**stamp** [7] - 44:5,
51:11, 66:1, 70:20,
71:20, 133:24,
136:17
**stamped** [3] - 32:16,
47:16, 103:5
**stamps** [1] - 116:17
**stand** [3] - 52:5, 72:3,
163:3
**standard** [1] - 68:1
**standing** [7] - 106:22,
107:8, 107:12,
107:15, 142:6,
171:9, 171:22
**stands** [5] - 46:5,
52:6, 70:6, 72:6,
149:4
**start** [6] - 5:3, 24:7,
126:3, 160:11,
172:15, 178:5
**started** [5] - 7:8,
26:17, 126:1,
153:23, 192:2
**starting** [6] - 49:11,
150:2, 175:8, 175:9,
190:4, 193:17
**starts** [4] - 68:9,
158:8, 162:19, 197:2
**STAs** [18] - 14:17,
14:19, 15:23, 16:2,
118:23, 118:24,
148:3, 148:16,
148:23, 154:21,
163:5, 163:17,
165:24, 168:15,
189:10, 189:14,
200:20
**STATE** [2] - 2:12,
235:1
**state** [19] - 4:7, 6:4,
6:21, 7:4, 8:14, 22:6,
176:17, 177:5,
190:3, 202:22,
203:2, 218:10,
219:2, 219:3, 219:8,
220:14, 220:18,
222:15, 227:18
**State** [25] - 11:24,
12:5, 18:2, 27:23,

28:3, 32:15, 32:19,
32:21, 33:19, 37:3,
39:10, 40:11, 40:19,
40:24, 42:22, 81:4,
89:14, 89:19, 90:3,
95:7, 128:9, 150:10,
176:16, 200:12,
203:17
**statement** [4] - 39:9,
46:4, 127:16, 141:12
**statements** [1] -
170:19
**states** [1] - 210:17
**STATES** [2] - 1:1,
234:1
**States** [1] - 1:20
**station** [1] - 163:1
**statute** [4] - 96:17,
100:1, 102:16,
122:21
**stay** [12] - 103:9,
160:1, 160:7,
160:19, 160:22,
161:23, 163:16,
171:1, 179:5, 183:2,
196:18
**stayed** [2] - 168:5,
173:8
**staying** [15] - 160:16,
161:2, 161:20,
164:5, 164:12,
164:19, 165:14,
166:2, 166:4, 166:7,
167:20, 167:23,
171:12, 174:4,
185:16
**stem** [4] - 147:7,
147:9, 147:10, 163:3
**steps** [4] - 51:18,
62:14, 62:21, 64:20
**still** [16] - 26:16,
32:24, 43:22, 53:22,
83:3, 104:12, 107:9,
107:11, 107:13,
123:3, 126:11,
156:20, 157:17,
216:24, 217:4,
227:17
**stipulate** [3] - 27:15,
54:22, 54:24
**stirring** [1] - 126:1
**stop** [12] - 36:18,
50:23, 133:11,
133:15, 150:18,
151:10, 159:14,
185:15, 186:1,
186:4, 188:2, 196:11
**storage** [2] - 97:17,
101:5
**store** [3] - 92:19,

98:17, 99:14
**stored** [1] - 122:20
**story** [4] - 123:18, 123:20, 220:22, 227:10
**strange** [2] - 156:22, 156:24
**Street** [1] - 2:13
**strict** [1] - 169:1
**strictly** [1] - 130:7
**strike** [3] - 142:18, 151:6, 178:1
**striking** [1] - 153:17
**struck** [1] - 151:4
**student** [10] - 149:10, 149:11, 149:13, 156:11, 156:22, 157:3, 157:6, 157:9, 157:11, 157:19
**students** [3] - 149:6, 152:19
**stuff** [8] - 41:17, 160:21, 162:17, 165:20, 175:13, 175:22, 213:10, 219:9
**style** [6] - 168:19, 168:20, 168:23, 169:5, 170:9, 184:15
**subject** [3] - 44:23, 81:21, 135:6
**subjective** [1] - 224:12
**submit** [1] - 222:14
**Subscribed** [1] - 234:22
**subsequent** [1] - 63:2
**sudden** [2] - 200:18, 200:21
**sue** [1] - 202:21
**suffer** [1] - 59:15
**suffice** [1] - 93:15
**sufficient** [2] - 165:8, 192:7
**suggest** [1] - 200:14
**suggested** [1] - 168:18
**suggesting** [1] - 47:3
**suggestion** [1] - 129:17
**suing** [1] - 219:18
**Suite** [1] - 2:4
**summarize** [1] - 6:20
**summary** [2] - 33:20, 63:5
**supervise** [7] - 14:7, 14:16, 147:20, 148:4, 200:20, 224:23
**supervised** [3] - 15:9, 158:10, 161:17

**supervises** [1] - 15:18
**supervision** [5] - 14:18, 15:7, 155:9, 160:23, 226:24
**supervisor** [13] - 77:7, 152:21, 160:24, 164:4, 164:7, 171:5, 184:6, 184:14, 185:7, 185:16, 185:20, 187:1, 208:24
**supervisors** [1] - 227:2
**supervisory** [1] - 152:14
**support** [3] - 14:19, 14:21, 15:1
**suppose** [1] - 24:8
**supposed** [4] - 125:10, 188:18, 197:21, 197:22
**suspect** [2] - 40:4, 40:16
**suspected** [1] - 226:21
**suspecting** [1] - 40:8
**suspicion** [6] - 40:17, 143:12, 192:8, 192:14, 192:21, 225:14
**suspicions** [5] - 47:1, 229:12, 230:23, 231:7
**suspicious** [2] - 141:13, 141:16
**SW** [1] - 135:15
**SWII** [1] - 111:9
**sworn** [4] - 4:21, 234:15, 234:22, 235:4
**symptomatic** [1] - 57:10
**synopsis** [1] - 44:14
**system** [1] - 221:3

## T

**TA** [3] - 16:15, 16:24, 17:1
**TA'd** [3] - 10:22, 104:2, 146:15
**table** [2] - 94:3, 94:15
**taints** [1] - 218:11
**talks** [1] - 100:19
**taped** [2] - 216:11, 217:4
**target** [1] - 28:21
**team** [33] - 20:22, 42:8, 58:6, 67:3, 70:9, 86:18, 87:3,

87:7, 101:23, 113:13, 113:21, 113:23, 114:1, 123:4, 123:7, 128:5, 128:13, 131:19, 131:23, 132:5, 147:23, 148:12, 148:21, 156:2, 158:13, 169:7, 169:13, 169:15, 169:18, 191:21, 205:16, 208:9, 224:16
**teams** [1] - 20:12
**tech** [6] - 7:17, 7:18, 7:24, 8:7, 8:15, 8:19
**telephone** [7] - 71:5, 71:12, 71:15, 74:12, 76:7, 115:4, 115:12
**temporarily** [5] - 10:18, 10:23, 13:19, 17:1, 17:9
**temporary** [1] - 13:22
**ten** [10] - 148:14, 159:7, 174:13, 226:2, 226:7, 226:16, 226:18, 227:2, 227:12, 228:2
**ten-year** [3] - 159:7, 226:2, 226:16
**tend** [1] - 212:18
**tenor** [1] - 218:7
**tenure** [2] - 26:22, 55:23
**term** [7] - 21:1, 57:4, 95:5, 96:8, 96:13, 97:7, 97:9
**terrible** [1] - 13:17
**testified** [4] - 4:22, 28:7, 87:5, 232:8
**testifying** [2] - 176:11, 232:7
**testimony** [1] - 189:20
**THE** [34] - 1:1, 1:1, 2:12, 4:1, 8:17, 13:1, 13:4, 13:6, 13:8, 13:11, 25:1, 50:20, 56:7, 58:12, 58:17, 59:19, 60:11, 65:9, 82:11, 86:17, 88:24, 96:10, 97:15, 129:9, 132:13, 133:1, 198:6, 206:11, 228:5, 230:7, 233:6, 233:18, 234:1, 234:1
**the..** [1] - 138:23
**themselves** [2] - 85:24, 96:22
**theory** [1] - 215:11
**therapeutic** [5] -

39:13, 196:17, 196:21, 197:9, 225:2
**therapist** [4] - 189:21, 196:23, 197:1, 209:8
**therapists** [4] - 15:4, 15:6, 15:19, 184:19
**therapy** [6] - 7:20, 8:19, 148:4, 169:2, 188:20, 224:24
**therapy-based** [1] - 169:2
**there'd** [1] - 174:23
**thereafter** [1] - 235:9
**they've** [1] - 83:7
**Thiem** [1] - 54:23
**thinking** [5] - 12:2, 93:22, 141:22, 159:24, 205:18
**third** [1] - 71:23
**threatened** [1] - 51:2
**three** [9] - 9:13, 17:6, 94:5, 146:4, 167:21, 173:15, 180:12, 225:7, 226:19, 227:11
**throughout** [2] - 75:20, 94:13
**throw** [1] - 165:10
**Thursday** [2] - 17:5, 45:1
**tieing** [1] - 172:6
**tired** [1] - 220:4
**title** [9] - 7:20, 8:4, 8:6, 15:16, 91:13, 111:9, 117:4, 120:15, 224:23
**titled** [2] - 51:14, 204:13
**titles** [5] - 21:20, 24:3, 24:8, 208:4, 210:11
**today** [12] - 7:13, 41:2, 44:12, 44:24, 131:17, 144:17, 145:4, 158:22, 159:18, 189:20, 199:20, 202:24
**together** [5] - 36:14, 142:15, 172:6, 175:24, 227:6
**tolerance** [1] - 150:24
**tolerate** [2] - 62:11, 62:12
**Tom** [5] - 77:1, 77:3, 77:20, 79:11, 79:14
**Tom's** [1] - 77:6
**tomorrow** [1] - 148:18
**Tony** [1] - 137:2
**took** [5] - 23:21, 105:2, 106:17, 106:19, 152:21

**top** [7] - 70:21, 71:23, 71:24, 93:20, 109:1, 134:10, 152:5
**total** [2] - 86:14, 103:8
**totally** [1] - 230:2
**touch** [1] - 163:1
**touches** [1] - 45:22
**touching** [1] - 57:4
**towards** [1] - 130:7
**track** [1] - 200:2
**tracked** [1] - 222:18
**trained** [2] - 224:11, 226:5
**trainee** [1] - 7:17
**training** [1] - 91:2
**transcribed** [1] - 235:9
**transcript** [8] - 5:11, 11:15, 14:20, 18:1, 25:14, 233:12, 234:17, 235:11
**transferred** [2] - 59:6, 59:13
**transpired** [1] - 144:7
**transport** [4] - 67:2, 68:18, 69:6, 69:10
**trauma** [16] - 49:23, 50:1, 50:3, 59:15, 59:23, 60:3, 60:6, 60:12, 60:14, 60:16, 61:8, 61:14, 62:7, 62:24, 63:8, 64:21
**traumatization** [1] - 62:6
**traumatized** [2] - 48:3, 61:24
**travesty** [1] - 130:23
**treat** [1] - 63:7
**treated** [4] - 50:5, 54:8, 131:20, 224:19
**treatment** [36] - 8:18, 9:5, 10:10, 14:6, 17:8, 20:12, 20:22, 58:6, 62:17, 63:1, 70:9, 86:10, 86:18, 92:3, 113:13, 113:17, 113:20, 113:23, 114:1, 128:5, 128:13, 131:19, 131:23, 132:5, 147:23, 148:12, 148:21, 149:8, 156:2, 169:13, 169:15, 177:13, 191:21, 205:16, 208:9, 227:21
**tried** [1] - 223:7
**tries** [1] - 45:22
**trigger** [1] - 183:1
**trouble** [2] - 147:12,

147:14
**true** [13] - 176:20, 204:22, 217:18, 217:21, 217:23, 218:1, 218:4, 218:5, 218:8, 218:21, 218:23, 219:13, 235:12
**trust** [1] - 233:13
**truth** [12] - 12:14, 35:24, 89:6, 197:23, 230:21, 230:22, 230:24, 231:1, 231:11, 231:12
**truthful** [1] - 12:9
**truthfully** [1] - 6:10
**try** [6] - 11:12, 11:19, 43:22, 79:21, 138:2, 151:7
**trying** [23] - 31:14, 31:18, 48:23, 49:2, 61:3, 66:17, 69:20, 99:14, 119:17, 119:18, 127:3, 127:17, 141:21, 159:11, 167:22, 186:1, 186:4, 191:12, 199:24, 200:6, 206:1, 208:4, 217:16
**turn** [2] - 138:22, 182:6
**turned** [3] - 226:22, 229:22, 230:13
**turnover** [1] - 121:17
**two** [31] - 9:18, 13:17, 17:10, 49:5, 50:12, 50:20, 50:22, 52:18, 64:10, 65:3, 72:16, 79:21, 91:3, 91:22, 112:22, 129:18, 130:24, 131:22, 132:9, 134:17, 135:11, 164:21, 190:7, 218:22, 219:11, 223:2, 223:13, 227:9, 228:13, 231:13
**two-page** [1] - 91:3
**two-part** [1] - 228:13
**type** [11] - 39:11, 41:12, 49:6, 54:16, 57:13, 68:18, 139:6, 145:19, 170:21, 196:19, 214:2
**types** [2] - 46:2, 170:19
**typewritten** [2] - 79:3, 80:8
**typographical** [1] -

233:17

# U

**UA** [1] - 36:16
**umbrella** [2] - 91:24, 92:7
**unable** [1] - 105:1
**unauthorized** [1] - 231:19
**uncertain** [1] - 75:16
**uncomfortable** [1] - 158:12
**uncommon** [1] - 197:1
**unconscious** [1] - 199:13
**under** [16] - 4:2, 14:17, 15:6, 96:8, 97:1, 100:22, 111:1, 111:3, 111:9, 115:14, 116:3, 116:7, 117:4, 147:19, 160:23, 223:4
**undergoing** [1] - 109:13
**underlying** [3] - 205:6, 214:15, 215:1
**undermine** [2] - 164:18, 167:8
**undermined** [1] - 167:11
**understood** [2] - 63:14, 200:9
**unfolding** [1] - 30:8
**unfortunately** [1] - 61:5
**unilateral** [1] - 121:18
**union** [1] - 8:3
**Unit** [9] - 9:8, 10:4, 10:8, 135:6, 135:15, 155:4, 196:11, 208:13, 208:16
**unit** [38] - 9:14, 16:6, 20:10, 20:12, 21:7, 54:12, 67:1, 68:19, 69:2, 69:5, 77:9, 83:2, 87:22, 106:14, 110:9, 118:22, 128:17, 135:17, 140:10, 141:2, 141:10, 146:2, 147:5, 155:2, 155:3, 161:9, 161:14, 162:16, 162:17, 164:24, 189:17, 192:4, 193:20, 196:18, 205:12, 222:4, 225:15
**UNITED** [2] - 1:1,

234:1
**United** [1] - 1:20
**units** [9] - 8:5, 9:18, 9:20, 14:8, 14:13, 16:7, 165:5, 182:3, 200:20
**unless** [9] - 63:21, 95:17, 96:15, 98:14, 98:22, 114:19, 182:24, 204:1, 232:15
**unlock** [4] - 143:8, 143:11, 183:8, 189:12
**unlocked** [1] - 183:2
**unlocking** [1] - 182:18
**unpredictable** [1] - 109:12
**unquote** [1] - 71:3
**unsafe** [2] - 51:2, 51:7
**unsure** [1] - 119:13
**untrammeled** [1] - 224:12
**untruthful** [1] - 100:12
**unusual** [3] - 142:19, 144:3, 144:6
**unwanted** [3] - 48:12, 48:13, 48:21
**unwilling** [1] - 191:4
**up** [25] - 5:9, 11:11, 22:23, 61:15, 68:10, 89:20, 91:12, 100:6, 100:14, 116:18, 128:24, 133:23, 138:14, 142:2, 142:20, 158:6, 159:21, 172:4, 194:7, 200:7, 203:10, 216:1, 227:3, 227:15, 229:6
**updates** [1] - 216:24
**updating** [1] - 217:3
**upset** [2] - 106:12, 156:19
**upsetting** [4] - 130:21, 131:4, 131:8, 131:9
**use'** [1] - 95:14
**uses** [6] - 62:20, 98:17, 100:24, 101:19, 173:10, 221:1
**UST** [1] - 14:12

# V

**vagina** [1] - 195:21
**vague** [2] - 32:3, 97:6
**valid** [1] - 130:20
**venue** [1] - 130:6
**verbal** [1] - 5:17

**verbally** [1] - 105:1
**Verdone** [1] - 135:3
**verification** [2] - 204:18, 204:19
**verify** [2] - 193:21, 204:21
**versed** [1] - 90:13
**version** [1] - 122:24
**versus** [1] - 26:15
**via** [1] - 2:1
**Vicky** [1] - 135:2
**victim** [14] - 49:23, 50:2, 50:5, 53:1, 53:6, 53:7, 53:15, 54:7, 54:9, 55:9, 55:20, 61:14, 81:16, 81:18
**victims** [1] - 63:1
**video** [1] - 1:19
**videotapes** [1] - 43:4
**view** [6] - 48:14, 48:15, 57:23, 115:20, 140:11, 224:12
**viewed** [2] - 57:14, 114:17
**viewpoint** [3] - 49:20, 56:19, 68:22
**vigilantly** [1] - 226:5
**violated** [2] - 83:7, 167:10
**violating** [1] - 193:6
**violation** [4] - 82:11, 95:15, 122:7, 181:13
**violations** [2] - 82:1, 82:9
**visit** [1] - 85:13
**visitation** [2] - 82:22, 83:6
**visitor** [2] - 101:3, 102:22
**voiced** [2] - 68:22, 73:12
**voluntarily** [1] - 189:1
**volunteering** [1] - 159:4
**vs** [4] - 1:6, 1:12, 234:5, 234:11

# W

[blank] [2] - 173:18, 181:5
**waist** [1] - 67:2, 68:11
**wait** [6] - 5:11, 5:13, 21:22, 150:19, 201:3
**Wait** [1] - 21:22
**walk** [2] - 106:13, 106:14, 189:9, 189:17

**walk-through** [1] - 106:13
**wants** [4] - 85:6, 130:19, 160:17, 227:14
**warranted** [1] - 101:24
**wash** [1] - 165:9
**washroom** [1] - 65:10
**watch** [1] - 141:21
**ways** [3] - 64:15, 147:16, 224:11
**Weber** [1] - 126:13
**week** [5] - 5:5, 54:2, 167:20, 225:7
**weekend** [1] - 29:13
**weekly** [1] - 174:11
**weird** [2] - 16:14, 153:14
**Weisman** [1] - 15:22
**welcome** [1] - 34:5
**welcoming** [1] - 190:6
**well-known** [1] - 27:17
**West** [1] - 2:13
**WGN** [1] - 177:7
**whatnot** [2] - 155:11, 155:16
**whatsoever** [1] - 196:5
**where..** [1] - 180:8
**which..** [1] - 112:5
**whole** [8] - 14:11, 33:9, 55:24, 91:24, 112:7, 130:22, 136:4, 174:22
**widely** [2] - 123:14, 124:21
**William** [1] - 135:18
**Williamson** [1] - 25:3
**willing** [1] - 129:14
**willingly** [4] - 51:4, 106:16, 106:19, 107:13
**Wilmette** [1] - 2:9
**window** [3] - 22:16, 123:2, 146:19
**wise** [1] - 78:11
**withdraw** [4] - 49:1, 98:7, 107:22, 136:4
**withhold** [1] - 127:17
**WITNESS** [28] - 8:17, 13:1, 13:4, 13:6, 13:8, 13:11, 25:1, 50:20, 56:7, 58:12, 58:17, 59:19, 60:11, 65:9, 82:11, 86:17, 88:24, 96:10, 97:15, 129:9, 132:13, 133:1, 198:6, 206:11, 228:5, 230:7, 233:6, 233:18

**witness** [3] - 4:6, 4:20, 206:8
**witnesses** [2] - 64:6, 168:18
**wonder** [1] - 159:21
**wondering** [5] - 48:10, 164:19, 194:9, 195:9, 222:23
**word** [12] - 48:20, 62:20, 66:18, 67:8, 72:11, 75:6, 75:16, 167:13, 178:8, 196:24, 197:5, 231:7
**wording** [1] - 114:12
**words** [9] - 10:7, 14:12, 72:16, 97:3, 99:17, 136:1, 154:5, 183:5, 197:3
**worker** [53] - 73:4, 73:13, 73:22, 74:4, 76:20, 79:4, 79:15, 80:1, 86:23, 87:20, 111:6, 111:8, 111:11, 111:13, 112:16, 114:13, 114:15, 114:22, 116:6, 116:11, 116:13, 117:4, 117:5, 118:9, 120:16, 120:22, 128:10, 135:16, 136:2, 140:9, 141:5, 142:17, 142:19, 146:2, 146:8, 150:5, 152:15, 169:16, 170:9, 181:13, 182:2, 183:7, 188:17, 189:2, 192:12, 193:6, 194:8, 195:18, 196:3, 200:17, 202:1, 223:2, 225:8
**worker's** [1] - 226:4
**workers** [11] - 14:17, 14:19, 14:20, 20:22, 155:8, 169:1, 170:16, 170:20, 212:11, 212:12, 220:18
**works** [2] - 201:20, 202:2
**worries** [7] - 31:11, 34:13, 58:10, 65:11, 133:19, 134:4, 185:23
**write** [5] - 86:24, 97:20, 98:2, 107:20, 207:8
**writer** [3] - 74:8, 76:2, 76:3

**writing** [3] - 74:4, 97:18, 97:24
**written** [6] - 32:8, 66:11, 67:16, 74:1, 74:2, 115:21
**wrote** [3] - 107:18, 137:6, 152:16
**Wueste** [1] - 209:11

## Y

**year** [6] - 151:20, 153:1, 153:2, 159:7, 226:2, 226:16
**years** [25] - 7:1, 7:7, 9:13, 13:18, 17:6, 39:16, 55:24, 56:1, 68:5, 93:19, 94:5, 131:3, 146:4, 158:23, 159:9, 180:12, 180:13, 187:3, 217:19, 223:2, 223:14, 226:7, 226:18, 227:2, 227:12
**years'** [1] - 143:23
**yelling** [4] - 104:24, 107:19, 108:1, 108:11
**yesterday** [1] - 162:10
**young** [1] - 181:10
**yourself** [1] - 189:1

## Z

**zoned** [1] - 230:2
**Zoom** [3] - 1:19, 2:1, 4:22