# **<u>EXHIBIT F</u>**

1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION


BENAHDAM HURT,                          )
                                        )
                Plaintiff,              )
                                        )
        -vs-                            )  No. 17-cv-7909
                                        )
HASINA JAVED, FAIZA KAREEMI,            )
COLLEEN DELANEY, DIANA HOGAN and        )
DREW BECK,                              )
                                        )
                Defendants.             )
_____)
MARK OWENS,                             )
                                        )
                Plaintiff,              )
                                        )
        -vs-                            )  No. 18-cv-0334
                                        )
HASINA JAVED,                           )
                                        )
                Defendant.              )


        The deposition of DIANA HOGAN, taken pursuant

to the Federal Rules of Civil Procedure of the United

States District Courts pertaining to the taking

of depositions, taken before LISA A. KOTRBA, Certified

Shorthand Reporter of the State of Illinois, taken

remotely via Zoom in Illinois, on Wednesday, May 25,

2022, at 2:00 p.m.

2

1    APPEARANCES:

2

3        KRETCHMAR & CECALA, PC
         BY:  MR. JOSEPH JOHN CECALA
4        18 South Northwest Highway
         Suite 200
5        Park Ridge, Illinois  60068
         (312) 235-6752
6        joe@kretchmarcecalalaw.com

7         on behalf of the Plaintiffs;

8        KRETCHMAR & CECALA, PC
         BY:  MR. S. RANDOLPH KRETCHMAR
9        1170 Michigan Avenue
         Wilmette, Illinois  60091
10       (847) 370-5410
         srandolphk@gmail.com
11
         on behalf of the Plaintiffs;
12

13       KWAME RAOUL, ATTORNEY GENERAL
         OF THE STATE OF ILLINOIS
14       BY:  MS. MARY JOHNSTON
         100 West Randolph Street
15       13th Floor
         Chicago, Illinois  60601
16       (312) 814-3739
         mary.johnston@ilag.gov
17
         on behalf of the Defendants Hasina Javed, Faiza
18       Kareemi, Colleen Delaney and Diana Hogan in
         Case No. 17-cv-7909 and Defendant, Dr. Hasina Javed
19       in Case No. 18-cv-0334;

20

21

22

23

24

3

1    APPEARANCES (Continued):

2

3        KWAME RAOUL, ATTORNEY GENERAL
         OF THE STATE OF ILLINOIS
         BY:  MS. AMANDA L. KOZAR
4        100 West Randolph Street
         13th Floor
5        Chicago, Illinois  60601
         (312) 814-6534
6        amanda.kozar@ilag.gov

7
         on behalf of Defendant Drew Beck in
8        Case No. 17-cv-7909;

9

10   ALSO PRESENT:

11
         MR. RORY CANNON
12       Illinois Department of Human Services

13       Mr. Sean Gunderson
         Kretchmar & Cecala, PC
14

15

16

17

18
     REPORTED BY:  LISA A. KOTRBA, CSR.
19

20

21

22

23

24

4

1                    I N D E X

2   WITNESS                                    PAGE

3   DIANA HOGAN

4       Direct By Mr. Kretchmar ......................6

5       Direct By Mr. Cecala .......................26

6       Cross By Ms. Johnston .....................127

7

8                  E X H I B I T S

    NUMBER                          FIRST REFERENCED
9
    Deposition Exhibit
10

11      No. 1 ......................................26

12      No. 3 ......................................55

13      No. 4 ......................................89

14
    (Exhibits retained by Mr. Cecala.)
15

16

17

18

19

20

21

22

23

24

5

1       THE COURT REPORTER:  Before we proceed, I will ask

2  counsel to agree on the record that there is no

3  objection to this notary public administering a binding

4  oath to the witness by videoconference.

5           Please state your agreement on the record,

6  starting with counsel for the plaintiff, and at the

7  same time identify yourself and the party you

8  represent.

9       MR. KRETCHMAR:  Randolph Kretchmar representing

10  the plaintiffs, Ben Hurt and Mark Owens.  I have no

11  objection.

12       MR. CECALA:  Joseph Cecala, also representing

13  plaintiffs.  No objection.

14       MS. JOHNSTON:  Mary Johnston representing

15  Defendants Javed, Kareemi, Delaney and Hogan in the

16  Hurt case and Defendant Javed in the Owens case.  No

17  objection.

18       MS. KOZAR:  And Amanda Kozar representing

19  Defendant Beck in the Hurt matter.  No objection.

20       MR. CANNON:  Assistant General Counsel Rory

21  Cannon.  I'm just observing, so no objection.

22                    (Witness duly sworn.)

23

24

6

1              DIANA HOGAN,

2    called as a witness herein, having been first duly sworn,

3    was examined and testified as follows:

4              DIRECT EXAMINATION

5    BY MR. KRETCHMAR:

6         Q    Ms. Hogan -- or let me know if it's okay,

7    I'll call you Diana, you can call me Randy.

8         A    That's fine.  That's fine.

9         Q    Okay.  I just want to mention a couple of

10   rules of the road in a deposition.  I don't know

11   whether you have been in a deposition before or not.

12   Have you?

13        A    No.

14        Q    Okay.  Well, we've got a court reporter who

15   is taking a word-for-word transcript, and she needs to

16   hear one voice at a time in order to make it accurate.

17   So if somebody is asking a question, wait until you're

18   sure they are done asking the question, and, likewise,

19   I'll certainly try to wait until you're done answering,

20   but the point is we shouldn't talk over each other.

21             And we need to stay verbal.  So when you

22   answer, say yes or no as opposed to nodding or shaking

23   your head.

24             Also, if we ask any questions that aren't

7

1    really clear to you or that seem confusing, just say so

2    we can rephrase them or clarify.

3            And if at any point you want a break, just

4    say so.  It should be after a question has been

5    answered is the only thing.

6        A    Okay.

7        Q    Can you please, for the record, state and

8    spell your name?

9        A    Diana Hogan.  D-i-a-n-a, Hogan is H-o-g-a-n.

10       Q    Thank you.

11           Let me ask, are you aware of and, at least,

12   initially or somewhat familiar with this lawsuit in

13   which you are a defendant?

14       A    Somewhat.  I've read the paperwork.

15       Q    And when you say, "the paperwork," do you

16   mean the current complaint?

17       A    Yeah, the complaint and the interrogatories,

18   obviously.

19       Q    Okay.  Do you understand the allegations

20   against you and the other defendants?

21       A    Yes.

22       Q    Okay.  Now, let's go straight into it then.

23           Please summarize your education and your

24   professional qualifications.

8

1     A    Okay.  My education, I got my RN degree from

2  Rockford Memorial School of Nursing in 1987.  I went in

3  to finish my Bachelor's in healthcare leadership from

4  the University of St. Francis.  I finished that in

5  2012.  And then I went on to get my Master's in

6  healthcare administration.  I finished that in December

7  of 2013.

8     Q    Okay.  And how about any other qualifications

9  as a clinician or as an administrator in a state

10  forensic hospital?

11     A    I completed the annual requirements as

12  required by the hospital to continue my employment

13  there.

14     Q    That would be regular continuing education,

15  or is that an agency --

16     A    That's a state of Illinois requirement.

17  I also for my license -- my RN licensure, which I have

18  to renew every two years, I have to complete 20 CEUs to

19  maintain that licensure, and I complete that every two

20  years.

21     Q    Okay.  Thank you.

22          Tell us when you started as an employee at

23  Elgin Mental Health Center.

24     A    I started as an employee on August 27th of

9

1   1990.

2       Q    And you were 24 years old, right?

3       A    Yeah, I think.  You do the math.  I'm not a

4   math whiz.

5       Q    You started young, almost like straight out

6   of school?

7       A    I did.

8       Q    Yeah.  Okay.  And what was the sequence of

9   jobs or positions that you've held until you retired

10  which, correct me if I'm wrong, was the end of 2019?

11      A    Correct.  Correct.

12      Q    You know, as best you can recall what the

13  dates of your different positions at Elgin were.

14      A    Sure.  Sure.  From 1990, when I started,

15  until 1998 I worked as an RN 2 on the FTP 2 North Unit,

16  which was an all-female UST/NGRI unit.  From there, in

17  1998 to 2002, I transferred over to the CPS Program,

18  and there I worked as a clinical nurse supervisor on

19  the drugs unit.  Then in 2002, I was laid off there in

20  the middle for three months.  In October of 2002 to

21  2008 I worked as a clinical nurse supervisor on the

22  FTP F and G Unit, which was a UST 50-bed all-male unit.

23  From 2008 to July of 2015 I worked as the FTP associate

24  director of nursing.  And then from -- actually, from

10

1   7/1 of 2015 until December of 2015, I was temporarily

2   assigned as the director of nursing, then I applied for

3   that position, and as of January of 2016 until my

4   retirement my title was the director of nursing;

5   however, I was T.A. to the hospital administrator

6   position in January of 2020 to mid October of 2020 in

7   the interim when we had no H.A.

8       Q     H.A. is hospital administrator?

9       A     I'm sorry.  Hospital administrator.

10      Q     Were you also a temporary hospital

11  administrator in 2017?

12      A     2017, no, I was not.

13      Q     Only in 2019; is that correct?

14      A     2020, actually.

15      Q     2020?

16      A     No, I'm sorry.  You're right.  It was 2019.

17  I retired the first part of 2020.  I get my dates

18  confused.  January of 2020 is when I retired, so, yes,

19  January of 2019 to October of 2019 when I was -- that's

20  when I was H.A.

21      Q     Okay.  Can I ask you something?  Were you

22  reading those dates from a resume?

23      A     Yes, I was.  I wrote them down because

24  there's so many to remember and everything.

LISA A. KOTRBA & ASSOCIATES, LTD. (312) 855-1834

11

1       Q     Yeah, okay.  Okay.  Fair enough.

2             What were the circumstances in which you

3   became hospital administrator?

4       A     Our current hospital administrator left at

5   the end of the previous year, so the first part of 2019

6   I was asked if I would step up and T.A. since I was the

7   most senior and had been in administration, I guess.

8       Q     And who was that hospital administrator who

9   left?

10      A     Brian Dawson.

11      Q     Did he leave suddenly?

12      A     Yes.  I don't know all of the details of what

13  happened or how, but, yes, it wasn't something that we

14  knew about.

15      Q     When you say, "it wasn't something that we

16  knew about," who does that include, we?

17      A     The we includes the administrative team.

18      Q     And who was on that team?

19      A     The administrators of the hospital, which

20  would be me; the director of quality strategies, which

21  would be Ann Boisclair; director of FTP, which was Jeff

22  Pharis; director of security, which would be at that

23  time Bill Epperson; director of HR, which at that

24  time -- I can't remember his name -- Peter something,

12

1    but, yeah, people there in the administration area.

2         Q    How about the director of court services,

3    Vicky Ingram, was she part of that?

4         A    No.

5         Q    Okay.

6         A    No.

7         Q    You said it wasn't something we knew or it

8    wasn't something that we were told.

9              I believe you were referring to the

10   circumstances or the reason that the hospital

11   administrator retired suddenly --

12        A    Correct.

13        Q    -- is that correct?

14        A    Correct.

15        Q    And was there any rumor about that or

16   anything you heard since?

17        A    Not to my knowledge.

18        MS. JOHNSTON:  Objection.  Form.  Sorry.

19   Objection.  Form.

20              And, Diana, if you want to restate your

21   answer, that got garbled.

22        THE WITNESS:  I'm sorry.  Did you want to repeat

23   the question, please?

24

13

1    BY MR. KRETCHMAR:

2        Q    I'll ask it in a different form.

3            Have you ever known why the hospital

4    administrator at that time retired so quickly?

5        MS. JOHNSTON:  Objection.

6    BY THE WITNESS:

7        A    No.

8        MR. CECALA:  What's your objection?

9        MS. JOHNSTON:  Relevance.

10           She can answer.  I'm just putting it on the

11   record.

12   BY MR. KRETCHMAR:

13       Q    Yeah, I believe your answer was no; is that

14   correct?

15       A    Correct.

16       Q    Okay.  Can you tell us what your

17   responsibilities as assistant director or associate

18   director of nursing were?

19       A    I oversaw the units in FTP, the nursing staff

20   of FTP, and made sure that the units had proper

21   staffing, made sure that the annual required training

22   were available and completed, monitored overtime and

23   the financial of that, monitored -- what else did I do?

24   I also oversaw central scheduling to make sure, again,

14

1    that the units were properly scheduled and had adequate

2    staff.  I looked at quality assurance measures,

3    different measures that we looked at, made sure that

4    there were updates to any policies were disseminated to

5    the nurse managers.  I was also a resource for staff or

6    for when we had patients who had difficult medical

7    issues, I would discuss that with the nursing staff and

8    how we could do things better for the patient to reach

9    the proper outcome.

10       Q    When you say difficult medical issues, you

11   mean non-psychiatric?

12       A    Yes.

13       Q    You actually were always a nurse, right?  You

14   had a solid medical training?

15       A    Yes.

16       Q    You would be able to put in an IV, for

17   example, or dress a wound, right?

18       A    Elgin didn't do IVs, but I did them prior to

19   coming to Elgin, so, yes, I probably could.  But, yeah,

20   but also, you know, along the way I was also a

21   psychiatric nurse.  So I was able to assist in certain

22   issues with patients who had -- it gets kind of

23   convoluted, but when you have patients who have

24   specific medical needs but their psychiatric illness or

15

1    paranoia or different things, perhaps, get in the way

2    of that, I would try to consult with the teams to see

3    how we could get the medical interventions taken care

4    of yet also deal with the patients', perhaps, paranoia

5    or different psychiatric issues.

6         Q    What would be an example of a situation like

7    that?  Do you mean a patient who believes that his

8    psychiatric medication is poison or --

9         A    No.

10        Q    Not that -- not that --

11        A    Nothing to do with the medications.

12             I had a -- for example, I had a patient one

13   time who had a horrible foot wound, and his answer to

14   helping the foot wound was to soak it in his dirty

15   trash can.  This just created more issues, as you can

16   imagine.  So we actually went and -- and we couldn't

17   get him to understand that this was not helping his

18   illness.  We needed him to go to a specific wound

19   clinic and really get it looked at; otherwise, he was

20   looking at some different osteo issues with the bones,

21   and he could potentially lose part of the foot because

22   of this.  So we actually got together with him and

23   said, "Look, how is it that we can help you?  We need

24   to soak this the proper way, in soap and water."  And I

16

1   can't remember how it all came out, but somehow it came

2   out that he really wanted to golf.  So we brought in a

3   putter and some golf balls, and he was able to go out

4   in the courtyard and do some putting that made him

5   happy, and he soaked it, and, you know, we made

6   progress that way.

7            So that's what I'm talking about is kind of

8   meeting with the patient to see how we can -- we can

9   fix both issues at the same time and really look at it

10  with fresh eyes, I guess.

11       Q    So would you attribute -- I mean, you were

12  very successful as an administrator at Elgin, according

13  to your personnel file anyway.

14           Would you attribute that success to some

15  extent to your actual medical knowledge and training?

16       A    Some of it.  Some of it was actually -- I had

17  very good mentors in my career and going up.  I had

18  great supervisors.  I worked with phenomenal people,

19  and some of the physicians are just -- they are so

20  smart, and they were able to, you know, show me new

21  things and teach me things.

22           And it's not just about the medical or with

23  the knowledge, but it's also about getting -- having a

24  relationship with your patient, an appropriate

17

1    relationship with your patient, and being able to

2    educate them and talk with them one-on-one to make --

3    you know, help them understand things, and there's a

4    way to do.

5        MS. JOHNSTON:  Real quick, Randy, Joe, is there

6    somebody else in there with you?

7        MR. CECALA:  Yeah.  I mean, he's coming in and out

8    right now, but he is going to sit in in a second.  He

9    is not in here right now, but our paralegal, Sean

10   Gunderson, when he gets back will be observing the dep.

11       MS. JOHNSTON:  That's fine.  I just wanted to make

12   sure if it was somebody that was going to be in here

13   for a while that he could be listed on -- you know,

14   that Lisa can take it down.

15       MR. CECALA:  For the record, he is not in here

16   right now, but as soon as he comes back, he'll be

17   observing the dep.

18       MS. JOHNSTON:  And sorry about that.  I just

19   noticed that.

20       MR. CECALA:  No, I saw him come in and out, too,

21   but --

22       MR. KRETCHMAR:  We should have mentioned it.

23       MR. CECALA:  -- he'll be back in a minute.

24       MS. JOHNSTON:  Yep.  No harm.  Sorry about that.

18

1          Go ahead, Randy.

2     BY MR. KRETCHMAR:

3          Q    Anyway, based on your last answer or

4     comments, I get the feeling -- correct me if I'm

5     wrong -- it's important to actually know who a patient

6     is as a person; is that right?

7          A    Yes.

8          Q    And you believe you were particularly good at

9     that?

10         A    I believe so, yes.

11         Q    You mentioned mentors, great mentors.

12         A    Uh-huh.

13         Q    Can you tell us who one or two of them were?

14         A    My first year supervisor when I started at

15    Elgin in 1990 was Cheryl Galla and now Cheryl Hofmann.

16    She was phenomenal, as well as John Hofmann, who is our

17    unit director; very smart, very good in their field.

18    I also had Donna Laveck (phonetic) as a director of

19    nursing.  She was very good.  I had Mary Litt as a

20    director of nursing.  She was also very good.  I worked

21    with Jeff Pharis.  I worked with Dennis Headley.  He

22    was also very good.  Those are the ones that come off

23    the top of my head.

24         Q    I knew Dennis Headley, by the way.  I thought

19

1    he was a really bright man.

2         A    Very good.  He is very good.

3         Q    Now, at a certain point, I believe -- let's

4    see if I'm right.  2015, I believe, you became director

5    of nursing as opposed to associate director of nursing;

6    is that right?

7         A    Correct.

8         Q    And what new responsibilities did you take on

9    at that appointment?

10        A    Director of nursing also not only continues

11   to encompass the forensic program, as I had done

12   earlier, but it also then encompasses the community

13   psychiatric program, which was the other program on the

14   other side.  I also oversaw the clinics, which were --

15   provided different services for the patients, all of

16   the different clinics you can think of, GYNE, podiatry

17   optometry, I oversaw all of those.

18        Q    At one point I heard you use the acronym CPS.

19   Is that community psychiatric services?

20        A    Services, correct.  I'm sorry.

21             And let's see.  As a director of nursing, you

22   work more closely with governing agencies, IDPH, OIG.

23   Who else did I work with?  Joint Commission.  These are

24   all -- they come, essentially, to the director of

20

1   nursing office for different data and things of that

2   nature.

3       Q    You were actually the Joint Commission

4   liaison or administrator for EMHC; is that right?

5       A    No.  Actually, Ann Boisclair was.  It's

6   usually the quality manager, but when it came to

7   questions specific to nursing, they would come to me

8   and ask me different things.  And when they came to the

9   facility for surveys, it always involved the director

10  of nursing.

11      Q    Diana, in, I believe, 2017 you received a

12  citation for outstanding performance as director of

13  nursing, correct?

14      A    Correct.

15      Q    That was -- it stated, I believe -- we've got

16  a copy of it here somewhere, but it was particularly

17  for your outstanding performance between January and

18  July of 2017; is that right?

19      A    Yes.

20      Q    Can you tell us what you most recall from

21  that period of time in the way of challenges or

22  achievements, either one?

23      A    That period of time we had a Joint Commission

24  survey, and the preparation that -- I went about the

1    preparation for the Joint Commission survey in a little

2    bit different way than my predecessors, and I actually

3    did education facility-wide for the different standards

4    of care under the Joint Commission's psychiatric

5    hospital standards, and because previous -- I don't

6    want to diss our previous administrators, but in order

7    for us to do a great survey, the people that are being

8    surveyed need to know what are the standards and what

9    is it you're looking for.  Our policies always mirrored

10   the standards, and they knew the policies, but I really

11   wanted them to know what the standard was, what our

12   policy was, and what does that mean for us as a

13   facility; how are we doing in making sure that we're

14   following those policies and doing all of that.  So I

15   did all kinds of education.

16           I did a lot of -- we went through -- to every

17   unit and went through charts, looking to make sure that

18   treatment plans and everything were thorough and

19   completed.  We really did a lot of education and

20   oversight with the staff.  And because of that, I think

21   because of all of the extra stuff that we did and I did

22   and actually went out of our way, we got such a great

23   survey outcome.  We had zero nursing findings, and for

24   a Joint Commission survey, that -- it had never

22

1    happened at Elgin Mental Health Center.  That was the

2    first of its kind, and so for me, that was a particular

3    proud moment that we really -- we did very, very well,

4    and I was so proud of everyone.

5         Q    And challenges during that period of time,

6    was it just the fact that your predecessors had not

7    gone to the trouble that you went to, or was there

8    anything else?

9         A    I can't think of any other particular

10   challenges that I had had.  We did at one point -- and

11   I don't know the dates.  We had some staffing

12   challenges.  We had a lot of people retiring, and

13   hiring in was a difficult time, so overtime was very

14   challenging, but, again, I don't know -- I can't think

15   of anything else that was very challenging at that

16   time.

17        Q    You worked fairly closely with Jeffrey Pharis

18   during that time, correct?

19        A    Yes.

20        Q    Do you recall when he retired?

21        A    No, I don't.  I know it was while I was

22   director of nursing, but I don't know exactly when he

23   did retire.

24        Q    What do you recall about your association or

23

1    your relationship with Mr. Pharis?

2        A    Jeff and I worked as kind of -- it was a

3    professional relationship.  If he had questions

4    related to nursing things, he always came to me.  If I

5    had questions about procedural things, I would talk to

6    him.  We worked together, and we had quarterly town

7    hall meetings with the forensic staff where we set up

8    meetings on every unit and met with them every shift to

9    see how things were going and, you know, what were any

10   challenges or problems and how could we address them.

11   So we tried to work together as much as possible to

12   make sure that the program ran very smoothly.

13       Q    It sounds as though you were pretty much

14   right in the middle of everything.  Is that a fair --

15       A    For nursing stuff, I was.  When it was

16   something that was with my discipline, my nursing

17   discipline, I was involved.  I had to be.  I was the

18   administrator responsible, so I had to be.

19       Q    Have you spoken with Jeffrey Pharis at all

20   since he retired?

21       A    No, I have not.

22       Q    Have you heard anything about him since you

23   retired?

24       A    Occasionally I see him on Facebook doing some

24

1    traveling.  That's all I see.

2        MR. KRETCHMAR:  Okay.  Okay.  Hang on just one

3    second, guys.  I think I'm going to turn it over to Joe

4    for a question or two.

5    BY MR. KRETCHMAR:

6        Q    I'm curious.  When you limit your oversight

7    history or responsibility or job to your profession

8    only, nursing, you actually had a much wider oversight

9    and responsibility, at least when you were hospital

10   administrator, right?

11       A    Yes.  Yes, I did as hospital administrator.

12       Q    And does director of nursing -- well, let me

13   put it this way.  Who actually reports to the director

14   of nursing?

15       A    The associate directors of nursing, the

16   nursing supervisors, the nurses, STAs, housekeepers and

17   office people.

18       Q    I'm sorry.  What was that last?

19       A    Office people, secretaries, that kind of

20   stuff, central schedulers.  They were all under the

21   office coordinator kind of job description.

22       Q    Okay.  So the STAs are a fairly large crowd,

23   right?

24       A    Yes.

25

1    Q    Now, how about when you were associate

2  director of nursing, who reported to you at that point?

3    A    The associate directors -- still the nursing

4  supervisors, the people on down from that.  So the

5  nursing supervisors, the RNs, the STAs and the

6  housekeepers and office people also reported to --

7  everybody had -- it was a linear kind of leadership

8  hierarchy.

9         So the office people -- the office people,

10  STAs, housekeepers reported to their specific

11  directors -- I'm sorry -- specific nursing supervisors.

12  Those supervisors and everyone below them reported to

13  the associate directors of nursing, and then when you

14  were the director of nursing, you were responsible for

15  all of them.

16    Q    Now, for an associate director of nursing, on

17  any given day how many people would be reporting to the

18  associate director of nursing?

19    A    On any given day, there's -- in the forensic

20  program, the associate director of nursing -- I'm

21  guessing.  I am.  I wish I could give you a better

22  answer.  There are about 250 nursing staff within the

23  forensic program.  As a nursing supervisor you're

24  responsible for a 50-bed unit, which was about

26

1  fifty-ish staff.  So as a -- as an associate director

2  of nursing, you're probably looking at 200 staff that

3  you're responsible for.

4     Q    And I presume the director of nursing reports

5  to the hospital administrator?

6     A    Correct.

7     MR. KRETCHMAR:  Okay, Joe.

8                    DIRECT EXAMINATION

9  BY MR. CECALA:

10    Q    So if you could -- there is another exhibit.

11 I think it was called Exhibit No. 1.  It's the answers

12 to the interrogatories we sent to you.

13    A    Yes, sir.

14    Q    I didn't number the pages.  It looks like

15 it's six pages.  Do you have six pages?

16    A    I do.

17    Q    So if you look at the last page, number six,

18 where it says verification, could you read the

19 sentence, what it says?

20    A    "I, Diana Hogan, a defendant in this matter,

21 hereby verify that the above responses are true and

22 correct to the best of my knowledge and recollection."

23 It has my signature and dated 10/1 of 2020.

24    Q    Thank you.

27

1          That is your signature, right?

2     A    Yes, it is.

3     Q    Could you take a minute to just look at the

4    previous five pages to make sure that these are the

5    answers that you provided?

6     A    Yes, they are.

7     Q    On the first page where it has interrogatory

8    number one, it asks you to identify all persons with

9    knowledge of the facts underlying plaintiff's complaint

10   and identify all documents that relate to such

11   knowledge of facts.

12          So before I ask you about that, you said

13   earlier that you were able to read the complaint of Ben

14   Hurt versus James Corcoran and the other defendants.

15   You read through that, right?

16    A    Yes.

17    Q    Do you recall the first time you read through

18   it?

19    A    No, I do not.

20    Q    Was it before you answered these

21   interrogatories?

22    A    I don't recall.

23    Q    So is it possible that you answered the

24   interrogatories without reading the complaint?

28

1      A     I don't know.

2      Q     Did you write these interrogatories yourself,

3    the answers?

4      A     Yes.

5      Q     You did.

6            But you don't recall if you were looking at

7    the complaint before you answered the questions?

8      A     No, I don't recall.

9      Q     So in your answer to question number one, it

10   asks about knowledge of persons pertaining to the facts

11   underlying the complaint, right?

12     A     Yes.

13     Q     If you -- I'm just wondering if you hadn't

14   looked at the complaint how you were able to answer

15   this question.

16     A     I may have.  Again, I don't recall.

17     Q     Okay.  Well, your answer gives several names,

18   that the following individuals may have knowledge

19   relevant to the claims in the complaint, and the first

20   name is Pat Larson, former L Unit psychologist at Elgin

21   Mental Health Center.

22           Have you -- did you talk to Pat Larson about

23   the allegations in the complaint?

24     A     No.

29

1    Q    So how did you come to know that he may have

2  facts relevant to the complaint?

3    A    That person is a she.

4    Q    She.  Thank you.

5    A    And I can tell you this list of people

6  were -- these are people that were involved in the

7  treatment on the unit of the plaintiff.

8    Q    And I'm just asking about Pat Larson.

9        Thank you for correcting me.

10   A    Yeah, Pat is a psychologist on the unit, so

11 being part of the treatment team, it was my assumption

12 that she had knowledge.

13   Q    You know, just -- I'm having a bit of a

14 difficult time hearing you.  I don't know if there's a

15 way to adjust the microphone or something.

16   A    I think I already turned it up.  I guess --

17 okay.  I'm up all the way.  Is that any better?

18   Q    We'll give it a shot.

19        Okay.  So going back to Pat Larson, you're

20 just -- you're assuming they would know.  You don't

21 have any direct knowledge as to whether Pat Larson

22 knows or not?

23   A    Correct.

24   Q    So then you also listed Joanne Langley,

30

1   allied health director and social work supervisor at

2   Elgin.  Had you spoken to Joanne Langley about the

3   allegations in the complaint?

4       A    No.

5       Q    And how would you know if she had relevant

6   knowledge about the facts of the complaint?

7       A    Joanne Langley was the supervisor of Christy

8   Lenhardt, so, again, it was my assumption that being

9   the supervisor of this person that she would have

10  knowledge.

11      Q    And then the next person is Antoinette Kelly,

12  former nurse at Elgin.  Did you speak with her about

13  the allegations in the complaint?

14      A    No, I did not.

15      Q    And is it also that same situation where you

16  were just assuming she would know about the allegations

17  in the complaint, or do you have information that you

18  have about what she may or may not know?

19      A    No.  It was an assumption again.

20      Q    And what was her position that made you make

21  that assumption?

22      A    She was -- Nenette was a nurse on the unit,

23  and then for a while she was the temporarily assigned

24  nurse manager, I believe, when I went to the director

31

1    of nursing role.  The supervisor -- the previous

2    supervisor from that unit, Colleen Delaney, became the

3    associate director, and Nenette moved up to temporarily

4    assigned nurse manager of the unit.

5        Q    So did Nenette work for you directly at some

6    point, or did she always work one person away through

7    Colleen Delaney?

8        A    One person away, I believe.

9        Q    Then you also listed James Corcoran, former

10   medical director at Elgin.  Did you speak with him

11   about the allegations in the complaint?

12       A    No, I did not.

13       Q    And how did you come -- again, same

14   question -- to know that he may have information about

15   the allegations in the complaint?

16       A    He was working in the program as one of

17   the -- the hospital -- the psychiatrists' supervisor,

18   so I just assumed he would know something.

19       Q    So you say he was working in the program.

20   What program are you --

21       A    I'm sorry.  Forensic treatment program.

22       Q    So forensic treatment program having

23   oversight of all forensic patients, right?

24       A    He had oversight over all forensic

32

1    psychiatrists.

2        Q    Okay.  And then same question:  Daniel Hardy,

3    medical director at Elgin, you listed him.  What was

4    his position?

5        A    He was the medical director at Elgin, and he

6    also covered -- his area of coverage was also the

7    forensic treatment program, so again, I assumed he had

8    knowledge being the medical director.

9        Q    Now, did you ever speak to Daniel Hardy about

10   the allegations in the complaint?

11       A    No, I did not.

12       Q    And perhaps I should have asked this from the

13   beginning.  When I say the allegations in the

14   complaint, what does that mean to you?

15       A    That means that staff -- administrative staff

16   at Elgin had knowledge that there was something going

17   on between Christy and a patient.

18       Q    Is there anything other than that in the

19   complaint or any other facts, or did you only think it

20   meant that whether the forensic staff or the staff at

21   Elgin had knowledge of the --

22       A    Had knowledge --

23       Q    You have to wait until I finish.

24       A    I'm sorry.

33

1       Q    She can't take us both down talking.

2            So there's more allegations in the complaint

3    than merely whether the staff had knowledge of what was

4    going on between Christy and Ben.

5            So I'm asking whether you are limiting your

6    answer in this instance to just whether staff had

7    knowledge or the other facts that are listed in the

8    complaint?

9       A    I haven't read the complaint recently, but my

10   recollection is that the staff had knowledge, didn't

11   report it and that I allegedly had some sort of meeting

12   with Drew and Colleen to discuss it and sweep it under

13   the carpet.  That's what I recall.

14      Q    So that's when you -- when you're answering

15   the question "knowledge of the facts underlying the

16   complaint," that's what it means to you?

17      A    Yes.

18      Q    So the next person you listed was Jeffrey

19   Pharis, former forensic director at Elgin, which looks

20   like -- I just want to clarify their jobs.  That's why

21   we're doing this.

22           So is one of the other people that you've

23   listed a replacement for Jeffrey Pharis as forensic

24   director?

34

1       A    No.

2       Q    So Jeffrey was the former forensic director,

3 and I'm wondering when you view the former dates to be.

4 Is it during the allegations of the complaint or before

5 the allegations of the complaint?  What does former

6 mean?

7       A    Former means that at the time of this -- my

8 signing this, 10/1/20, Mr. Pharis had already retired.

9 So at the time of this allegation, he was the

10 current -- he was the director, but at the time of the

11 signing, he was former.

12       Q    Understood.  Okay.  And I'm not sure if Randy

13 already asked this, but have you spoken to Jeffrey

14 Pharis about the complaint or the facts alleged in the

15 complaint?

16       A    No.

17       Q    And what would be the reason that you listed

18 him as someone who may have knowledge?

19       A    Jeff was the program director at the time, so

20 he often oversaw some of the -- or had knowledge of

21 incidents that were occurring on units that, perhaps,

22 I would not that didn't involve nursing staff.

23       Q    And then the last person is Victoria Ingram,

24 court services administrator.  Have you spoken to

35

1    Victoria Ingram about the allegations in the complaint?

2        A    No, sir.

3        Q    And same question:  What would be the reason

4    you listed her as someone with knowledge?

5        A    I don't recall why I would list her.

6    I honestly don't.  She wasn't involved in day-to-day

7    treatment, so I don't know why I would list her.

8        Q    Then your final statement is that all of the

9    named defendants may have knowledge relevant to the

10   claims in the complaint.

11            So start with Colleen Delaney, who is one of

12   the defendants.  Have you spoken to Colleen Delaney

13   about the allegations in the complaint ever?

14       A    No.

15       Q    And how would you know she would have

16   knowledge about the allegations in the complaint?

17       A    I didn't list her on there, so I don't know

18   that she has knowledge of the complaint except that

19   she's listed as one of the defendants.

20       Q    So only because she's listed as a defendant,

21   not because you were assuming she would have knowledge

22   of the facts?

23       A    Yeah, I didn't list her on this, so I don't

24   know how her name is coming up.

36

1      Q    I'll just read your answer.

2      A    Okay.

3      Q    "Defendant further states that all named

4   defendants in this matter may have knowledge relevant

5   to the claims in plaintiff's complaint."

6           So even though she is not named individually,

7   it's the group of defendants may have, so I'm just

8   picking them one at a time.

9      A    Oh, okay.  Okay.

10     Q    Does that -- does it change your answer from

11  before?

12     A    The only reason I would say that she perhaps

13  could have knowledge would be that she was at a time

14  the nursing supervisor on the K and L Unit.

15     Q    And is that, again, your assumption, or do

16  you have knowledge -- any knowledge about what Colleen

17  Delaney might know?

18     A    I have no idea what Colleen Delaney knows.

19     Q    What about Drew Beck, what was his position,

20  if you recall?

21     A    Drew Beck was a social worker on either K or

22  L.  I don't know which unit he was on.

23     Q    And did you speak with Drew Beck about the

24  allegations in the complaint?

37

1    A    No.

2    Q    And how would you know that he, too, would

3 have information about the complaint?

4    A    I don't know that he has information.

5    Q    And Dr. Javed is another named defendant, and

6 she was a L Unit psychiatrist, I think, was her post.

7         Have you spoken to her about the allegations

8 in the complaint?

9    A    No, sir.

10   Q    And how is it that you would know if she had

11 knowledge about the allegations in the complaint?

12   A    I don't know that she has knowledge except

13 that she was a psychiatrist on one of the units.

14   Q    Are you aware of whether she was the treating

15 psychiatrist for any of the plaintiffs in the

16 complaint?

17   A    I have no idea.

18   Q    And Dr. Kareemi was another treating

19 psychiatrist.  Have you spoken to Dr. Kareemi?

20   A    No, I have not.

21   Q    And same question:  How would you know

22 whether she has knowledge?  Are you aware, or were you

23 again assuming?

24   A    I'm assuming, assuming as a psychiatrist on

38

1    the unit.

2         MR. KRETCHMAR:  You told Joe that the reason you

3    might expect Dr. Corcoran to have some familiarity or

4    some knowledge was that he had oversight of all of the

5    forensic psychiatrists; is that correct?

6         THE WITNESS:  No, that was Dr. Hardy had oversight

7    over all of the psychiatrists.

8              I know Dr. -- Dr. Corcoran came to work in

9    the forensic program.  I wasn't part of the discussion

10   on what he covered and what he did.  I knew he worked

11   with some of the forensic staff, but to what degree, I

12   don't know.

13        MR. KRETCHMAR:  I thought you stated, actually,

14   when Joe said why would he -- why would you expect that

15   he would have some knowledge, I believe your answer was

16   that he had oversight of all forensic psychiatrists,

17   and I was just wondering why that would imply any

18   knowledge.

19        THE WITNESS:  I don't have an answer for that.  I

20   don't know.

21        MR. KRETCHMAR:  Okay.  That's the only thing

22   I have.

23   BY MR. CECALA:

24        Q    So looking at the second question, it says,

39

1    "Identify all persons with knowledge of facts

2    underlying the affirmative defenses set forth in your

3    answer to the complaint and identify all documents that

4    relate to such knowledge or facts."  And as part of

5    your answer you said, "based upon the fact that she

6    acted reasonably and in good faith at all times

7    relevant to the claims in the plaintiff's complaint."

8            Did you personally write that?

9        A    No, I did not.

10       Q    What does it mean that you acted reasonably

11   and in good faith?

12       A    I don't understand the question.  Related to

13   what?

14       Q    Well, it's your answer.

15       A    I know.

16       Q    I'm just asking what you meant by what you

17   wrote.

18       A    I honestly don't know.

19       Q    Well, do you have knowledge of your acting

20   reasonably and in good faith?

21       A    I do.  I'm not sure it's related to this.  My

22   entire career I've acted reasonably and in good faith.

23   I don't act unethically.  I don't do any of that stuff,

24   so I don't know.

40

1    Q    I understand, and actually, I'll acknowledge

2    you.  You seem to have had an auspicious career at

3    Elgin.

4    A    Thank you.

5    Q    That's not the question.

6         The question is identifying the persons with

7    knowledge of facts underlying affirmative defenses in

8    your answer to the complaint and the documents that

9    relate to the knowledge of the facts.  And your answer

10   is that you acted reasonably and in good faith.  This

11   is not encompassing your 30-year career.  This is about

12   a very short window of time from 2014 to 2017 about a

13   specific set of information that's in the complaint.

14        I'm just asking what you mean by you acted

15   reasonably and in good faith.

16   A    Relating to the allegations, what I can say

17   to you is that I in acting -- reasonably and in good

18   faith in that had I known anything, had I heard

19   anything, I would have done what was necessary.  I did

20   not know anything, I didn't hear anything; therefore,

21   I acted in good faith according to the knowledge that

22   I had.

23   Q    So on the next page at the top it asks to

24   identify all persons you have relayed -- you have

41

1   retained to testify on your behalf.

2          I guess I could -- we can ask the lawyers,

3   but have you hired anyone other than your lawyers that

4   are not lawyers to help you with the case?

5      A    No, sir.

6      Q    So in question four, it asks you to provide

7   information with respect to all persons who the

8   defendants, and each individual one, have communicated

9   with concerning the complaint or any of the events

10  relating to the complaint both during the time period

11  covered by the facts of the complaint and at any time

12  after, up to the date of your answer.

13         Here -- and I don't want you to talk about

14  things you discussed with your attorney; however, you

15  did say, "Defendant Hogan has not communicated with

16  anyone other than her counsel concerning plaintiff's

17  complaint or the events related to the complaint."

18         So the question asks during the time period

19  of the complaint, which is from 2014 to 2017.  Is it

20  your answer that you spoke to no other person about

21  what happened between Christy and Ben during that

22  period of time?

23     A    No, sir, I did not.

24     Q    And since that time have you spoken to any

42

1   person about what has happened in the complaint?

2       A    No.

3       Q    Question five asks you to provide information

4   with respect to all persons who have knowledge of the

5   basis for any denial of the specific facts in the

6   complaint and the knowledge of the person you're

7   talking about, how they came to know the information

8   and the identification of documents that relate to it,

9   and you say:  "See response to question one."  This is

10  the same group of people we went through earlier.

11      A    Uh-huh.

12      Q    Do you have any specific information

13  regarding any of those people having knowledge about

14  the complaint?

15      A    No.

16      Q    So you don't know whether they could affirm

17  or deny anything in the complaint?

18      A    Correct.

19      Q    So if you could now look at question number

20  seven, interrogatory number seven.

21      A    Okay.

22      Q    And maybe just read that to yourself, the

23  question.

24      A    Okay.

43

1    Q    Let me know when you're done.

2    A    Okay.

3    Q    So your answer is to see the same answer to

4    question number one, again, with the list of people?

5    A    Correct.

6    Q    So it's your testimony that, again, this is

7    the complete list of treatment professionals that

8    you're aware of that would be related to the

9    allegations in the complaint?

10   A    The list in interrogatory question one, as

11   well as the people that are defendants, Drew Beck,

12   Colleen Delaney, they were also part of the treatment

13   team, the doctors, they were part of the treatment team

14   at the time.

15   Q    And you have no knowledge of any other person

16   as part of the treatment -- forensic treatment team

17   that would have information about the complaint?

18   A    No, I do not.

19   Q    Okay.  If you can go to the next page?

20   A    Yes, sir.

21   Q    So interrogatory eleven asks whether you had

22   any interaction with Ben Hurt.

23   A    No, I did not.  I never even met Ben.

24   I couldn't tell you what he looks like.

44

1      Q    Okay.  And the prior question, when it

2  asks -- sorry.  I forgot to ask you this.

3           The questions about the conversations you may

4  have had between 2014 and 2017, which would be the

5  period in which the sexual abuse took place, you're

6  saying you had no conversations with anyone during that

7  time, correct?

8      A    Correct, or after.

9      Q    Or after.

10          So up to -- and your answers here were dated

11  October 1st.  So updating your answers up to today, you

12  had no conversations with anyone all of the way up to

13  today, inclusive of today, with any person about the

14  complaint?

15     A    No.  No.

16     Q    So the next question is question twelve.  Did

17  you want to read that one to yourself and let me know

18  when you're finished?

19     A    Okay.

20     Q    So in that question it's asking when you

21  first came to know about or had any suspicion of the

22  allegations that are in the complaint.  Maybe I'm

23  miswording the question, but when was the first time

24  you were aware of what was happening is essentially the

45

1   question, would you agree?

2       A    Yes.  The first time I was aware of the

3   situation was from the news.  I saw it on the --

4   actually, my mom saw it on the newscast and called me

5   and told me Elgin is on the news; I might want to turn

6   on the TV.  My mom was also a previous Elgin employee

7   for 29 years.

8       Q    Now, weren't you, at least, I think, the

9   acting hospital administrator from January of 2017 to

10  the end of July 2017?

11      A    No.

12      Q    When were you hospital administrator?

13      A    2019.

14      Q    So during 2017 when this -- when the abuse

15  ended -- because Ben Hurt was discharged on July 22nd,

16  2017 --

17      A    Uh-huh.

18      Q    -- you weren't aware of how the information

19  about Ben Hurt having sex with Christy Lenhardt was

20  released at Elgin or found out at that time?

21      A    No, I was not.

22      Q    You knew nothing about the information that

23  was obtained at Elgin in July of 2017 about their

24  sexual relationship?

46

1    A    No, I knew nothing.

2    Q    So in July of 2017, what was your position?

3    A    July of 2017 -- July 1st of 2017, I -- sorry.

4    Wait.  Let me look at my timeline.  2017 --

5    Q    Actually, just so you know, I don't -- I

6    don't mind if you're consulting a document, but during

7    a deposition, if you're going to consult a document,

8    your lawyer and we have to know what documents you're

9    consulting.

10   A    Okay.

11   Q    So if you're not testifying from your own

12   memory and you have some notes --

13   MR. CECALA:  You know, I don't want to make an

14   issue of it, Mary, but if she has got notes, I'm going

15   to want to either see the notes or have her testify

16   from her memory rather than some summary she has.

17   MS. JOHNSTON:  I'm fine with that.  My

18   understanding is that, I think, it looks like she

19   basically went through her CV and kind of made a little

20   chart of it.  So I don't think it's different than what

21   we would have, but if you -- if you want the specifics

22   of where she was in July '17, I think that we can agree

23   to look back at her CV later.  I know she has these

24   notes, but I understand what you're saying, but if you

47

1    want her to be going from memory, then, Diana, put the

2    notes away.

3         THE WITNESS:  That's fine.  I'll put it away.

4         MS. JOHNSTON:  I guess I'll just say on behalf of

5    her then if she is a little bit off by something, you

6    know, she's going by memory.

7         MR. CECALA:  Yeah, you know --

8         MS. JOHNSTON:  That's fine.

9         MR. CECALA:  -- it's kind of the point of what you

10   remember.

11        THE WITNESS:  Okay.

12        MS. JOHNSTON:  But I get you, Joe.  I would have

13   asked the same thing.

14        MR. CECALA:  Yeah.

15        THE WITNESS:  Okay.  No, that's fair.  That's

16   fair.

17   BY MR. CECALA:

18        Q    Yeah, so my question is, you know, what was

19   your position during July -- well, maybe June and July

20   of 2017, what was your job at Elgin?

21        A    2017 I became director of nursing.

22        Q    So as the director of nursing -- was the

23   director of nursing position facility-wide, over all

24   clinical units and forensic units?

48

1      A    Yes.

2      Q    So then L Unit would have been one of the

3  units under your supervisory responsibilities?

4      A    Yes, L Unit nursing staff.  I did not oversee

5  social workers, psychologists, psychiatrists.

6      Q    What about the STAs?

7      A    Yes, I did oversee them.

8      Q    So I guess my question is:  You're also

9  overseeing the care of the patients on those units,

10  correct?

11      A    Yes.

12      Q    Whether it's from your specific job

13  responsibilities as director of nursing is -- I'm not

14  suggesting that you had responsibility for other

15  clinical professionals or the security department or

16  any of those people, right?

17      A    Yes.

18      Q    Just -- okay.

19          So what I'm wondering is, so in the month of

20  July 2017 when you were director of nursing, you had no

21  information or you weren't -- you had no conversations

22  or no one talked to you about the revelation that Ben

23  Hurt and Christy Lenhardt were engaging in sexual

24  relations?

49

1      A     No.

2      Q     Did you ever hear that there's an audio

3   recording that was discovered of Christy Lenhardt

4   giving oral sex to Ben Hurt while he was a patient at

5   Elgin?

6      A     After the news report that I had heard,

7   later -- and I can't tell you when -- I heard that

8   there was evidence found and that there was an audio,

9   but I never heard it, but -- and this was well after

10  everything came out in the news reports and everything,

11  but I did not hear about it prior.

12     Q     Who did you hear it from?

13     A     I don't recall.

14     MR. CECALA:  Hold on one second.

15     MR. KRETCHMAR:  Diana, the news reports came out

16  when this complaint was filed.  I believe your counsel

17  will stipulate that was November of 2017.

18     THE WITNESS:  Okay.

19     MR. KRETCHMAR:  You're saying that you had heard

20  nothing about this, no rumors, no clue until November

21  of 2017; is that correct?

22     THE WITNESS:  Correct.

23     MR. KRETCHMAR:  Do you recall during your time as

24  director of nursing that there was an Illinois State

50

1    Police investigation in which they interviewed,

2    I think, close to three dozen staff at Elgin Mental

3    Health Center?

4         THE WITNESS:  I knew there were -- we have ISP out

5    for different -- different situations, dietary,

6    whatever, things come up, so I knew that ISP was on

7    grounds, but I didn't know the basis of what they were

8    interviewing or, you know, any of the cases per se.

9    BY MR. CECALA:

10        Q    So you said you first heard about the audio

11   recording after of the news stories were released,

12   correct?

13        A    Correct.

14        Q    Did you hear about any of the other evidence

15   in the case once the news stories broke?

16        A    No, I did not.

17        Q    So do you know anything about any of the

18   other evidence in the case?

19        A    No, I don't.

20        Q    For example, whether Christy Lenhardt was

21   providing nude photos to Ben Hurt while he was a

22   patient at Elgin?

23        A    No, I did not know that.

24        Q    Is this the first time you're finding that

51

1  out, right now?

2       A    Yeah.  Actually, yeah.

3       Q    Did you know whether the Elgin security was

4  involved in any investigation of what was happening

5  between Christy and Ben?

6       A    As prior, what I said, that there was a

7  search and evidence was found.  I knew security was the

8  one who did that search, but that was all I knew.

9       Q    And when did you find that information out?

10      A    That was the same, what I said, after the

11 news report came out and I found out that there was

12 evidence found and that security was the one that did

13 the search.

14      Q    So between July and the news stories, which

15 we'll say sometime in November, was your position still

16 director of nursing?

17      A    Yes.

18      Q    Did you, while you were director of nursing,

19 ever talk to any of the nursing staff about whether

20 they were being interviewed by the State Police

21 concerning any investigation?

22      A    No.

23      MR. CECALA:  Give me one second.

24      MS. JOHNSTON:  Joe?

52

1        MR. CECALA:  Yes.

2        MS. JOHNSTON:  Would this be actually a good time

3    we could do five minutes?

4        MR. CECALA:  That's good.  We'll take a

5    five-minute break.

6                        (Short break.)

7        MR. CECALA:  Just to clarify, we're back on the

8    record.

9    BY MR. CECALA:

10       Q    So we were looking at the question twelve.

11   Actually, let me just ask this question right now.

12            Again, just going back to your answer twelve

13   and the first you're finding out.  So are you aware

14   now, today, as to what happened with Ben Hurt after he

15   left Elgin?

16       A    No, I am not.

17       Q    Did you ever make any inquiries about that?

18       A    No, I did not.

19       Q    Have you talked to anyone about that?

20       A    No, I did not.

21       Q    So as you sit here today, you have no

22   knowledge that he had three suicide attempts in six

23   months after leaving Elgin?

24       A    Wow.  No, I did not know that.

53

1          Q    Okay.  So the next question, if you want to

2     take a quick look at question number 13 and maybe read

3     through that.  When you're done, let me know.

4          A    Okay.

5          Q    And then so as you're here today, is your

6     answer the same, that you weren't involved in any

7     decisions of the transfer of Ben between the L and

8     K units at the time?

9          A    No, I was not.

10         Q    Are you aware of his transfer?

11         A    I am because I'm reading it, but I was not

12    aware at the time.

13         Q    When a patient is transferred from one unit

14    to the next, would you ordinarily have received the

15    information as director of nursing?

16         A    Not necessarily, no.

17              Unless it had something to do with one of my

18    staff, I would not have been told.

19         Q    And your staff was confined to nursing and

20    the STAs, not social workers, right?

21         A    Correct.

22         Q    So if you could take a look at the next

23    question, which is interrogatory number 14?

24         A    Okay.

54

1      Q    So this is describing an incident where

2  Christy Lenhardt was locked in an office with Ben Hurt

3  on the K Unit, and you say that you heard about the

4  incident the following day.

5           What information did you hear about it?

6      A    I recall a conversation that I had with

7  Program Director Jeff Pharis outside of my office first

8  thing in the morning that the event had happened; that

9  the door had -- something had gone wrong with the door,

10 and Christy and a patient were locked in the office,

11 and we had to call out engineering to have the door

12 opened.

13     Q    And what was -- what was it that Jeff

14 Pharis -- other than the mere fact that it happened,

15 did he communicate anything else to you?

16     A    My question to Jeff was of a safety nature

17 regarding was there something else -- was there

18 something wrong with the doors?  Is this something that

19 could have happened to my staff?  If they assisted a

20 patient in the laundry room, could they have been

21 locked in there, housekeeping closet, washer, could any

22 of this have happened -- you know, continued to happen

23 with other doors, and was there something that we

24 needed to do from an engineering standpoint to ensure

55

1   this didn't happen again.  That was the conversation

2   I had with him.  And he said they were taking a look at

3   it, and they were going to handle it, and that was all

4   I recall.

5        Q    And you said that -- was that conversation

6   the day after the incident?

7        A    Yes.

8        Q    Did either of you express any concern about

9   why a social worker would be locked in an office with a

10  patient?

11       A    No.

12       Q    So if you could, there's another exhibit.

13  It's Exhibit 3.  We're going to come back to the

14  interrogatories in a moment.

15       A    Okay.

16       Q    Do you see Exhibit 3?

17       A    Yes, I do.

18       Q    So at the top, it's a from/to subject.  It's

19  an email, correct?

20       A    Yes.

21       Q    Can you say who it's from?

22       A    From Bill Epperson.

23       Q    And who is Bill Epperson?

24       A    Bill Epperson was the chief of security.

56

1     Q    Did you work with Bill Epperson?

2     A    Yes.

3     Q    Was he part of the administrative team?

4     A    Yes.

5     Q    And you were also part of the administrative

6  team, right?

7     A    Yes.

8     Q    And he sent it -- obviously, the "To "says

9  Diana Hogan.  Is this your email?

10    A    Yes.

11    Q    Do you remember receiving this email?

12    A    No, I do not.

13    Q    The date on it is Thursday, June 1st, 2017,

14 at 8:45 a.m., correct?

15    A    Okay.  Yes.  Correct.

16    Q    Do you remember whether you talked to Jeff

17 Pharis before this email or after it, if you could

18 recall?

19    A    I don't recall.

20    Q    When you had your conversation with Jeff

21 Pharis, do you know whether it was later in the day or

22 earlier in the morning?

23    A    It was at some point in the morning.

24    Q    Some point in the morning?

57

1          So it could have been before this email --

2     A    It could have been.

3     Q    -- was sent?

4          So when you look down, Bill Epperson

5    forwarded the email to you, right?  Is that what it

6    looks like?

7     A    Yes, he did.  Yes.

8     Q    And the subject of the email is "Incident on

9    K Unit" on the middle of the page, correct?

10    A    Correct.

11    Q    Just for the record, this is Bates stamped

12   27981.  That's the page you're looking at.

13         Can you just read the text of the email

14   that -- it looks like Bill Epperson sent it to a lot of

15   people.  We'll go through that in a moment, but can you

16   read the text of what Bill wrote?

17    A    Yes.  He said, "Dr. Ingram, here is a report

18   from the incident on K Unit last night.  Very concerned

19   that a social work would ask for assistance from a

20   patient for an office not on her unit.  Bill Epperson,

21   chief of security."

22    Q    Okay.  Looking at the document now, do you

23   remember receiving this email?

24    A    No, I don't.

58

1      Q    Okay.  The subsequent two pages -- the page

2  27982 is the original email sent from Bill to Vicky,

3  copying Brian Dawson -- and, again, at that time who

4  was Brian Dawson?

5      A    Brian Dawson was the facility director, the

6  hospital administrator.

7      Q    In July of 20 -- I'm sorry.  On June 1st,

8  2017 he was the hospital administrator?

9      A    Yes.

10     Q    And then Colleen Delaney, what was her

11  position?

12     A    Her position would have been associate

13  director of nursing of forensics.

14     Q    And as the associate director of nursing, she

15  worked for you, right?

16     A    Yes.

17     Q    Did she have specific units that she was

18  responsible for or a specific area of the hospital?

19     A    As the associate director of nursing, she

20  would have had specific responsibility in the forensic

21  program.  I don't remember the exact -- I think at that

22  point she had the entire forensic program, which would

23  have been F, G, H, I, K, L, M, N, Hartman, Pinel and

24  William White Cottage.

59

1      Q    So this was an incident on K Unit.  That

2  would have been a unit that would have covered her area

3  of responsibility, right?

4      A    Correct.

5      Q    So would it be correct to assume that because

6  it was K Unit and it was sent to Colleen that the

7  reason it was sent to her was because it was her area

8  of responsibility?  Is that a correct assumption in

9  your view?

10     A    Yes.

11     Q    And then it says Ryma Jacobson.  Who is Ryma

12 Jacobson?

13     A    Ryma Jacobson was the associate director of

14 nursing for the community psychiatric services program,

15 and she oversaw clinic.

16     Q    Okay.  And if you know, why do you think Ryma

17 would have been copied on this email?

18     A    Often if Colleen is off, Ryma will cover, and

19 vice versa.  So many times they would send emails about

20 the different programs to each of the ADONs to make

21 sure they were informed of what was going on, that

22 potentially would need to be addressed.

23     Q    Salvatore Verdone, who was that?

24     A    That was a social work -- social worker in

60

1   the program, and I don't know what his particular title

2   at that point was.  I know at one point he took a

3   temporary supervisory role, and I can guess that's why

4   they sent it to him, but I honestly don't know.

5       Q    Okay.  So not knowing that, would you know

6   why he would have been copied on the email?

7       A    No, I do not.

8       Q    Okay.  And who is Richard Malis?

9       A    Dr. -- he is a psychiatrist in the forensic

10  program, and he would often back up Dr. Hardy when

11  Dr. Hardy was not there.  So that would be my only

12  guess on why they would send it to him.

13      Q    But Dr. Hardy isn't copied on it.

14           Was Dr. Hardy employed at that time?

15      A    I don't know.  I don't know when he left.

16      Q    And neither is Jeff Pharis copied on it.  Do

17  you recall if he was working there at the time?

18      A    I don't recall.

19      Q    And then the last person is Malini Patel.

20  Who was that?

21      A    Dr. Malini Patel, she is the other

22  director -- medical director.  She shared

23  responsibilities with Dr. Hardy.

24      Q    So in this email from Bill Epperson to Vicky

61

1    Ingram, there isn't -- doesn't appear to be any direct

2    treatment patient care staff member.  Is that a correct

3    assessment of the list of people?

4        A    Can you repeat the question?

5        Q    So maybe I'll say it a different way so it's

6    more understandable.

7        A    Okay.

8        Q    Are any of the people that are on this email

9    directly responsible for patient care, like a social

10   worker or a treating psychiatrist?

11       A    No.

12       Q    So this email is more towards the, I would

13   call it, administrative group, giving them the

14   information, correct?

15       A    Correct.

16       Q    Now, where it says attachments, it says the

17   letters 17-9021-R35-31-17.doc.  Do you see that?

18       A    Yes, I do.

19       Q    Okay.  So that would have been the -- an

20   attachment to the email, correct?

21       A    Yes.

22       Q    So if you look at page 27617 is the next

23   page --

24       A    Yes.

62

1      Q     -- can you tell me what that document is?

2      A     This is a security department report from

3  5/31 of '17 indicating -- at 7 p.m., indicating that

4  social worker Christy Lenhardt and patient Ben Hurt

5  were locked in the office.

6      Q     Okay.  So where it says report number --

7      A     Yes.

8      Q     -- do you see that number?

9      A     Yes.

10     Q     And does that number appear to match the

11  attachment, right?

12     A     Yes.

13     Q     So because it doesn't -- there was no

14  attachment to these emails, I just want to confirm that

15  the numbers are the same.

16           I guess I'm making an assumption, but this

17  would have been the same number of the attachment to

18  the email because it's describing in the security

19  department report exactly what Mr. Epperson was

20  referring to, correct?

21     A     Correct.

22     Q     Do you ever recall seeing this incident

23  report?

24     A     I don't recall it, but it was attached to my

63

1    email.

2         Q    So it's a fair assumption that you would have

3    read the attachment --

4         A    Yes.

5         Q    -- since you got the email?

6              I'm sorry.  I don't know if I -- I

7    interrupted you, and I didn't hear your answer.

8         A    I'm sorry.  It's a fair assumption that I saw

9    this report, is that what you asked?

10        Q    Yes.

11        A    Yes, it is.

12        Q    Okay.  Great.

13             Now, as you read the report -- maybe take a

14   minute to read the report.  Let me know when you're

15   done.

16        A    Okay.

17        Q    So in the very -- it describes in detail

18   everything security found, but the last sentence says:

19   Mark -- I think that is the security officer -- also

20   stated that Lenhardt's office is located on FTP L and

21   that they were locked in Social Worker Hamlin's office,

22   period, end of report.  Right?

23        A    Correct.

24        Q    Now, then if you look at the two copies of

64

1    the same email, it refers -- Chief Epperson is

2    referring to the fact that he's very concerned that a

3    social worker would ask for assistance from a patient,

4    comma, for an office not on her unit.

5            What does that mean to you?

6    A    That means that Bill Epperson was concerned

7    that Christy would be on another unit asking a patient

8    for assistance in an office that she was in that was

9    not of her own.

10   Q    Right.  So that's a fair interpretation.

11           My question is:  What does that mean, that

12   comment?  What does that mean to you?  What information

13   does --

14   A    That means that Bill has a concern --

15   Q    Let me finish my question.

16           What information, with you sitting here

17   today, do you think is conveyed to you by that extra

18   comment?

19   A    That Bill thought it was inappropriate that

20   Christy was in an office on the other side.

21   Q    So is that something that appears to create

22   some degree of suspicion in your mind as to why that

23   would have happened?

24   A    No.

65

1    Q    So it would have -- it's not -- Bill is just

2    wrong?

3        A    Bill is a security guard and not aware

4    sometimes of the inner workings of the unit and patient

5    coverage.  There are -- when I was a nurse manager on F

6    and G, when you have a social worker who goes on

7    vacation or is gone, his or her patients still require

8    treatment and care, so they are often divvied up, or

9    this one will take care of that one, this one will take

10   care of that one so that there is coverage for them.

11   So -- and that may occur from social workers on the

12   other side depending on what staffing is.

13        So for me, when I saw this, I thought, okay,

14   Christy is over on the other side.  Again, I didn't

15   know it was not her side at the time.  Until I read

16   this, I had no idea because I don't know what side she

17   was on.  But she -- so she went over to assist a

18   patient on the other side.  I honestly breezed through

19   the report, and I didn't see that he was in to assist

20   her with the broken lock.  I thought she was assisting

21   him to make a phone call, which is not out of the

22   ordinary as a covering social worker for another

23   patient.

24        Q    Does it say any of that in the report?

66

1      A    No, it does not.

2      Q    So that's an interpretation of the report

3  that you're making today, or was that your

4  interpretation of the report when you got it on

5  June 1st, if you recall?

6      A    That was my interpretation of the report and

7  the -- the report that I had -- not the written

8  report -- the verbal report that I had gotten from Jeff

9  that this had happened, that she was helping him make a

10  phone call.  I honestly didn't think more about it than

11  that.

12      Q    And you're saying you didn't think about it

13  at the time you received it?

14      A    Correct.

15      Q    Give me one second.

16          So did you have any occasion to talk to

17  anyone other than Jeff Pharis about this report?

18      A    No, I did not.

19      Q    Did you ever ask Chief Epperson what he meant

20  by his remark?

21      A    No, I did not.

22      Q    Did you do anything to follow up on what the

23  remark or the -- perhaps whatever suspicion appears to

24  be kind of couched in his remark, did --

67

1       A     No, I did not.

2       Q     Give me one second.

3             So earlier you testified about some of your

4    answers to the interrogatories, saying as an employee,

5    you acted reasonably and in good faith.  Do you recall

6    that?

7       A     Yes, I do.

8       Q     So would this be one of the circumstances

9    where you felt as though, based upon your testimony,

10   coverage -- we don't really know the details of why

11   Christy Lenhardt would have left her unit and gotten

12   locked in an office with a patient on another unit, is

13   that because coverage and all those other things that

14   you mentioned, is that a fair interpretation of what

15   you meant by acting reasonably and in good faith?

16      A     I don't supervise Christy, so anything -- any

17   further questions that may have come up about what was

18   going on with her were to be directed to her supervisor

19   and Jeff Pharis and the program.  I didn't have any --

20   my concern was for my staff and the safety of those

21   doors, to make sure my staff wouldn't be caught in that

22   situation, but as far as any of the other questions,

23   those were not for me to ask.  Those were for her

24   supervisor, for the facility director and for Jeff

68

1    Pharis and those people to follow up on if they thought

2    it was inappropriate, and I don't know their thoughts

3    on it.  I didn't ask.

4         Q    What about any concern you may have had for

5    Ben Hurt?

6         A    I didn't have any concern for Ben Hurt.

7         Q    And I appreciate your answer, but I actually

8    asked a different question.

9              May question was --

10        A    Oh, sorry.

11        Q    That's okay.  It's not easy being deposed.

12             My question was:  Earlier you testified about

13   acting reasonably and in good faith, and then you

14   answered this question by saying when you saw this --

15   I mean, I don't want to testify for you, but if you

16   don't think what I'm saying is correct, correct me.

17             So you testified acting reasonably and in

18   good faith, and then you said, well, Bill really

19   doesn't know all of the coverage issues, and from your

20   interpretation of what he is saying, sort of like this

21   is not that big of a deal, Bill.  Social workers have

22   to cover in other places.  You're not pointing

23   something out that is to be suspicious of.

24             Is that a fair interpretation of what your

69

1    testimony was, and is that what it means to be acting

2    reasonably and in good faith?

3        A    I acted reasonably and in good faith

4    according to my staff.

5        Q    Right.  I'm going back to is there any part

6    of acting reasonably and in good faith regardless of

7    your staff or anyone's staff that would call your

8    attention to something that might be abusive to a

9    patient like Ben Hurt?

10       A    I don't understand the question.

11       Q    So your attention was on inappropriate

12   behavior of a staff member, correct?

13       A    No.

14       Q    Well, you were saying that if he was calling

15   attention to this and it was Christy Lenhardt who may

16   have been doing something that was out of bounds and

17   she is not your staff, it's not really your concern,

18   correct?

19       A    Correct.

20       Q    And my question is:  Regardless of whether it

21   was your staff or not, don't you have an equal

22   responsibility to be concerned with all of the patients

23   at Elgin from your position as director of nursing?

24       A    I do, and there are limits.  I can't know

70

1    everything about 200 to 350 patients.  So when

2    something like this comes up, I rely on the very

3    professional and good people that are supervisors to

4    those people to do their job and follow up on what they

5    should do.

6        Q    And -- good.  And is that what you mean when

7    acting reasonably and in good faith, is that the

8    meaning of you kind of staying in your lane, doing your

9    job, acting reasonably and in good faith, is that what

10   that remark means?

11       A    Yes.

12       Q    And you're relying on the -- to do that,

13   you're all relying on each other, right?

14       MR. CECALA:  Sorry.  I think we have a weather

15   alarm or something.

16       MR. KRETCHMAR:  Yes, that's exactly what it is.

17       MR. CECALA:  Sorry about that.

18                    (Record read as requested.)

19       MR. CECALA:  Maybe, Lisa, could you read that

20   back?

21   BY THE WITNESS:

22       A    Correct.

23   BY MR. CECALA:

24       Q    So security has to do its job, forensic

71

1    psychiatry and social work, they have to do their jobs,

2    nursing has to do their job, and you rely on each

3    other, correct?

4        A    Correct.

5        Q    And there's kind of a vigilant team in each

6    of those areas at Elgin to assure staff and patient

7    safety, correct?

8        A    Correct.

9        Q    So in this instance, acting reasonably and in

10   good faith, this isn't something that in your lane you

11   felt needed to be followed up on?

12       A    Not by me.

13       Q    And in your experience, those other teams,

14   and, perhaps, the teams you manage, they tended to be

15   vigilant and do a fairly good job overseeing patient

16   care and safety and staff safety, correct?

17       A    Yes.  Yes.

18       Q    I just want to go back to the

19   interrogatories.  We were on -- I kind of got them all

20   over.  Well, I'll go by question.  So the last question

21   I covered was question 14.

22            Could you take a look at question 15 and read

23   that?  When you're done, let me know.

24       A    Okay.

72

1      Q    So in this instance, this was one of the ways

2   that security found out that Christy and Ben were

3   carrying on this relationship was through a social

4   media post.

5           Did you ever hear that?

6      A    No, I did not.

7      Q    And do you have any direct knowledge as to

8   how the relationship between Ben and Christy was

9   discovered?

10     A    No, I don't.

11     Q    And just -- maybe I should have asked this

12  earlier, but do you have any knowledge of the extent of

13  the sexual relationship between Christy Lenhardt and

14  Ben Hurt?

15     A    No, I don't.

16     Q    And now -- I just want to make sure.

17          Colleen Delaney was your immediate junior.

18  You were her supervisor, correct?

19     A    Correct.

20     Q    And when this happened, that they discovered

21  social media pictures taken of Ben in Christy's office

22  on the internet, did Colleen Delaney ever have any

23  discussion with you about that?

24     A    No.

73

1      Q    And as the ensuing security searches took

2  place, did anyone inform you about that at all?

3      A    No.  I didn't know anything about anything on

4  social media regarding Christy.

5      Q    Okay.  So if you could take a look at

6  interrogatory number 16 and let me know when you're

7  finished reading that.

8      A    Okay.

9      Q    So you have, as you sit here today, no

10 knowledge of any of the evidence that was discovered in

11 Ben Hurt's room after the ensuing security search?

12     A    Aside from what I said earlier about being

13 told that there was an audio report, I have no other

14 knowledge.

15     Q    Do you know as you sit here today what the

16 contents of the audio recording were?

17     A    No.  I believe at the time I was told that it

18 was of an oral sexual situation, but I -- again, that's

19 from my memory of what I was told.  I never heard any

20 of it.

21     Q    Do you remember who told you that?

22     A    No, I sure don't.

23     Q    Did anyone ever relate to you or did you ever

24 find out that Christy Lenhardt admitted on an audio

74

1   recording to helping ██████████ escape from Elgin?

2       A   No, I did not know that.

3       Q   Is that the first time you're finding that

4   out today?

5       A   You know what?  I didn't know that it was on

6   a recording.  I do remember it coming out way after the

7   case, that perhaps she had something to do with the

8   escape, but that was all I had heard.  I didn't want to

9   hear any more.

10      Q   So which -- after which case?

11      A   After Christy's picture came out and then

12   they had -- I had the discussion with Bill or whoever

13   it was that had said that, you know, there were

14   recordings, and then I think somebody told me that it

15   was -- it was assumed that she also had something to do

16   with ████████ but that was all I had heard.  I don't

17   know.

18      Q   Do you remember who told you that?

19      A   No, I don't.

20      Q   You said you had a discussion with Bill.

21   What was that discussion about?

22      A   I assumed it was Bill, but -- that said

23   something, but I honestly don't remember.  He said

24   something about the recording.

75

1    Q    So someone was relating to you that Christy

2  helped ███████ become a fugitive, and you don't remember

3  who you spoke to about that?

4    A    No, I don't.

5    Q    Do you remember approximately when the

6  conversation took place?

7    A    No, I honestly don't.  It was way after the

8  news about Christy came out.  I don't know.

9    Q    Give me one second.

10       If you could take a look at interrogatory

11 number 18 --

12   A    Okay.

13   Q    -- and when you're done reading, let me know.

14   A    Okay.

15   Q    So this is about the policy related to

16 reporting incidents of sexual abuse, correct?

17   A    Correct.

18   Q    And your answer is you've been trained on and

19 are aware of the duty to report allegations for

20 suspicions of sexual abuse to the OIG, and you don't

21 have information as to dates, times, people involved in

22 such training but has completed the annual training

23 every year.

24       So could you tell me a little bit about what

76

1    is the annual training as it would relate to reporting

2    incidents of sexual abuse to OIG?

3        A    Yes.  We do a training that's called OIG

4    Rule 50.  It is an annual training done by all

5    employees that specifically goes through abuse and

6    neglect of patients and what constitutes abuse and

7    neglect.

8        Q    So does a staff member having sex with a

9    patient constitute abuse and neglect?

10       A    Yes, it does.

11       Q    And actually, I should have asked this

12   earlier.

13            You're aware that Christy Lenhardt pled

14   guilty to sexual abuse, felony charges, and went to

15   prison for what happened between her and Ben?  Are you

16   aware of that?

17       A    Yes.

18       Q    So you're aware that -- at least if you

19   believe her guilty plea, that there were sexual

20   encounters between her and Ben Hurt, correct?

21       A    Correct.

22       Q    So -- okay.  If you could read question

23   number 19.  I'm going to come back to the policy in a

24   minute.

77

1        A    Okay.

2        Q    I just want to see if we can get through

3    these questions --

4        A    Okay.

5        Q    -- really fast.

6             So question 19, would you let me know when

7    you're done reading that?

8        A    Sure.  Okay.

9        Q    So you never heard a rumor or even gossip

10   about Christy Lenhardt being involved with any patients

11   ever at Elgin?

12       A    No, I did not.

13       Q    So let's look at question 20.  Could you read

14   that and let me know when you're finished?

15       A    Sure.  Okay.

16       Q    So your answer to this question was that you

17   couldn't answer it based upon the HIPAA laws?

18       A    Right.

19       Q    Right.  So I mean, I'll ask you questions.

20   If your lawyer has objections, give her a chance,

21   but -- because you didn't answer the question.  You

22   said, "I object on the basis of I can't reveal anything

23   because of HIPAA."

24             So my question is:  Do you know anything

78

1    about Christy Lenhardt having a relationship with

2    ████████ Rotunno?

3        A    No, I do not.

4        Q    Did you ever hear a rumor about that?

5        A    No, I did not.

6        Q    And if you look at interrogatory number 21,

7    it's a similar question, just about Christy helping

8    ████████ to escape.  Do you see that?

9        A    Yes, I do.

10       Q    So you've read that.

11            And you have a similar answer, but did you --

12   do you have any knowledge about Christy helping ████████

13   to escape?

14       A    No, I do not.

15       Q    And do you -- did you ever hear a rumor of

16   that in any way?

17       A    No, I did not.

18       Q    And then questions 22 and 23 are similar, but

19   question -- could you read question 22?

20       A    Sure.  Okay.

21       Q    So this is about a patient named ████████

22   ████████████████  Have you ever heard of that patient?

23       A    Yes.

24       Q    Did you have any reason to interact with that

79

1    patient?

2         A    No.

3         Q    But you know who he is?

4         A    Yes, I do.

5         Q    Are you aware whether Christy Lenhardt had a

6    relationship with ██████████

7         A    No.

8         Q    Did you ever hear a rumor or anything about

9    Christy having a sexual relationship with ██████████

10        A    No.

11        Q    While you were -- I think you said you were

12   hospital administrator in 2019; is that correct?

13        A    Correct.

14        Q    Are you aware of any OIG investigation

15   related to ██████████

16        A    No.

17        Q    Is the hospital administrator regularly made

18   aware of OIG reports and findings?

19        A    Not always, but honestly, I don't remember.

20        Q    So -- and just out of curiosity, as part of

21   the -- there was a wonderful commendation you received

22   as hospital administrator and setting out between the

23   dates of January through July of 2017 -- well, it says

24   director of nursing.  The hospital administrator gave

80

1      you the commendation.  Sorry.

2          A     Correct.  Correct.

3          Q     You were working on the Joint Commission

4      survey at that time, correct?

5          A     Correct.

6          Q     And did you also liaise at all with OIG as

7      part of the Joint Commission responsibilities?

8          A     I got specific OIG -- as a nursing -- as a

9      director of nursing, I got specific OIG reports if they

10     pertained to my nursing staff, things that I had -- if

11     I had to follow up with discipline of staff, and so

12     there are different OIG reports.  You can get -- there

13     are different letters, and I cannot remember them.

14     There's M cases and S cases and the ones that they are

15     taking the case.

16          So I would actually get all of the reports

17     that dealt with my staff, and then I would kind of

18     review them, because sometimes you get a name that you

19     might see a little bit, and maybe they need some

20     reeducation or something, and those are in the reports

21     that I followed up on.

22          Q     Right.  Actually, that was going to be my

23     next question, which is, as hospital administrator,

24     isn't it part of the responsibilities to assure that

81

1   there's staff training to prevent incidents of abuse?

2       A    Yes.  Yes -- well, it's not necessarily the

3   hospital administrator's duty.  That comes from the

4   State of Illinois directly to our education department,

5   and they make sure that it's loaded on every staff

6   computer and that they complete it annually.

7       Q    So is there internal training that's done by

8   the Elgin staff related to particular areas of concern

9   that's developed internally?

10      A    No.

11      Q    So there has never been an instance where

12  there has been training developed for the purpose of

13  making sure staff understand policy and can act

14  accordingly within Elgin?

15      A    Yes, we're -- for Elgin policies.  When

16  policies are changed, we develop a different system on

17  how to make sure that that is disseminated to all

18  staff.  We put it in the monthly bulletins that go out,

19  the information bulletin, actually, that describes what

20  the changes in each policy are.  And then for some of

21  the policies we do what we call a read and sign, which

22  is we put it on every unit.  Every staff is expected to

23  read it and then sign off on it that they have read and

24  understand the policy.

82

1     Q    And -- good.  So it's internal Elgin policy

2   that this more, I guess, internal tailor-made training

3   is designed to assure they know the policy and can

4   apply it, correct?

5     A    Correct.

6     Q    Okay.  So could you read question --

7   interrogatory 23?

8     A    Okay.

9     Q    So you never filed an OIG report regarding

10  any sexual or romantic relationships between staff and

11  patients in the entire time you worked at Elgin?

12    A    No.

13    Q    And you said because you had never known or

14  suspected any such relationship, correct?

15    A    Correct.

16    Q    For you to suspect a relationship, say, when

17  you were hospital administrator, wouldn't you have to

18  have received some information through your subordinate

19  lines?

20    A    For me to write a report to OIG or call it

21  in, nowadays, to orient you regarding a sexual or

22  romantic relation, I would have had to be the one that

23  would have had to seen it or suspected it.

24         As reporters to OIG, we are obligated to

83

1    report what we see.  So if one of my staff comes to me

2    and says, "I think this is going on," my response to

3    them would be, "Call it into OIG," and then I would

4    follow up to make sure they did call it into the OIG.

5    It should be the person who actually witnessed it

6    instead of just hearsay.

7        Q    Right.  So as a hospital administrator, if a

8    staff person tells you, "I saw this," the report of who

9    actually directly witnessed it must go to OIG, correct?

10       A    Correct.

11       Q    But the person who receives the report, is it

12   your understanding that that person does not have the

13   responsibility to make the report, as well?

14       A    That is my -- as long as someone makes the

15   report, it doesn't have to be me.  It can -- it should

16   be the person, again, who witnessed it.

17       Q    So how would you know if the person who

18   reported it to you made the report to OIG?

19       A    Because I call them and bug them to make sure

20   that they get it done and that they have done it within

21   the four-hour window.  I will not just assume that they

22   do it.  I will follow up with them.

23       Q    Have you ever done that?

24       A    Yes.

84

1    Q    So you've called and bugged subordinate staff

2  to make sure they reported within the four-hour window

3  to OIG on --

4    A    Absolutely.

5    MS. JOHNSTON:  One second.  Joe, I'm not sure if

6  you actually finished your question there before she

7  answered.  You said -- you got to called subordinate to

8  call in a report to OIG about. . .

9    MR. CECALA:  Sexual misconduct.

10 BY MR. CECALA:

11   Q    I think you got it.  Did you understand that,

12 that was the --

13   A    No.  I'm sorry.  I didn't.

14        I had never had anyone report to me anything

15 about sexual misconduct, nor have I directed anyone to

16 call OIG on that sexual misconduct.  It has been other

17 subjects, not sexual misconduct.

18        Thank you, Mary.

19   Q    So other abuse that needs to be reported in

20 the four-hour window other than sexual abuse is what

21 you --

22   A    Yes.

23   Q    -- were answering to?

24   A    Yes.

85

1      Q    And maybe I'll -- Mary will ask these

2  questions later, but -- so did you ever directly see

3  Christy Lenhardt and Ben Hurt having sex?

4      A    Absolutely not.

5      Q    And do you know if any of the other

6  defendants saw Christy Lenhardt and Ben Hurt having

7  sex?

8      A    I don't know that.  I could only -- no, I

9  don't -- I don't know.

10     Q    Which means you don't know if they did see

11 it; it just never got reported to you, either, correct?

12     A    Correct.

13     Q    And just to make sure I ask it, interrogatory

14 number 24 asks whether you ever had a relationship or

15 interaction with Christy Lenhardt or encounters with

16 her of any kind.  Do you see that question?

17     A    I do.

18     Q    So did you have any encounters with Christy

19 Lenhardt?

20     A    No.  I knew who Christy was.  I saw Christy

21 in the hallways if I was out and about visiting units,

22 but I never had a relationship with her, nor did I ever

23 have conversations with her.

24     Q    So you never spoke to Christy Lenhardt in the

86

1    entire time that you worked there or she worked there?

2         A    I may have had a fleeting conversation of

3    "Hi, how are you," that's all.

4         Q    So question 25 asks about -- the same

5    question about each defendant.  I'm going to go through

6    each of them one at a time.

7         A    Okay.

8         Q    So what relationship did you have while you

9    worked at Elgin with Drew Beck?

10        A    Professional.  I saw Drew once in a while,

11   worked with him at one point on some educational stuff

12   he was doing with the staff, which involved my staff.

13   So we talked about scheduling and that kind of stuff,

14   but otherwise, that was all.

15        Q    So when was it that you worked with Drew Beck

16   on educational materials for the staff at Elgin?

17        A    I believe it was after all of this stuff with

18   Christy.  I think we did a program -- he did a program

19   on boundaries.

20        Q    And you're aware that he created that

21   training program on boundaries?

22        A    Yes.

23        Q    And that would have been not only delivered

24   to the social work staff but the nursing staff, as

87

1    well?

2         A    Correct.

3         Q    Did you meet with him about creating those

4    materials?

5         A    No.

6         Q    Did you have any other interactions with Drew

7    Beck?

8         A    No.

9         Q    Did you ever work with him on anything else

10   other than the after-the-Christy-incident boundary

11   training materials?

12        A    No, I did not.

13        Q    Did you have a relationship with Dr. Javed?

14        A    No.

15        Q    Did you ever speak to her?

16        A    I did.  Occasionally Jeff and I or just

17   myself would go to some of the morning team meetings if

18   we had something to share with them or some sort of

19   education thing we wanted to share with them.  So I

20   knew who Dr. Javed was and have no professional

21   relationship with her, didn't have conversations with

22   her, nothing like that.

23        Q    So you never talked to her about work topics?

24        A    No.

88

1    Q    You said you participated in morning meetings

2  with the staffing units?

3    A    Correct.

4    Q    Did you ever participate in morning meetings

5  on L Unit?

6    A    Once in a while I would go down there.  This

7  wasn't a thing that happened every day.  It was just

8  once in a very great while we would go down if they

9  needed us or if we needed to provide some sort of

10  information or whatever.  So yes, I did go down to

11  L Unit.

12    Q    Do you recall any meetings on L Unit in 2017?

13    A    No.

14    Q    Did you have a working relationship with

15  Dr. Kareemi?

16    A    Same as Dr. Javed; I would see her on

17  occasion in a professional meeting or whatever, but no

18  conversations, no real relationship.

19    Q    And then Colleen Delaney was your immediate

20  subordinate, correct?

21    A    Correct.

22    Q    So could you tell me about your working

23  relationship with Colleen?

24    A    I supervised Colleen.  I helped her -- when

89

1    she got into these different roles, I would help mentor

2    her, you know, and reeducating on how to enroll and

3    things that worked for me, you know, just regular

4    mentor stuff.  We were friendly, we were professional,

5    but I don't do anything with her personally or anything

6    like that.  It was just work stuff.

7        Q    So were you Colleen's supervisor during the

8    time period between 2014 and July of 2017?

9        A    Yes.

10        Q    Did Colleen ever mention Christy Lenhardt and

11    boundary issues to you during those three years?

12        A    No.

13        Q    Did she ever mention any information or offer

14    any information about Christy Lenhardt's behavior with

15    Ben Hurt?

16        A    No.

17        Q    Did she ever relate to you that other staff

18    had reported breaking of boundary issues between Ben

19    Hurt and Christy Lenhardt to her?

20        A    No.

21        Q    Give me one second.

22        If you could look at what has been marked

23    Exhibit 4, I think the pages are all numbered in

24    perfect sequence from 27404 through 27418.

90

1        Do you have all of those pages?

2    A    Yes, I do.

3    Q    Could you take a look at the first page,

4    which is 27404?

5    A    Okay.

6    Q    So what is this document?

7    A    This is an email from Ann Boisclair to, it

8    looks like, much of the administrative team about

9    policy reviews at morning meeting today.  That was the

10   subject of it.

11   Q    And the date is January 19th, 2017, correct?

12   A    Correct.

13   Q    Who is Ann Boisclair?

14   A    Ann Boisclair was the director of quality

15   strategy.

16   Q    And do you know who Linda Nidelkoff is?

17   A    Yes.

18   Q    Who is Linda Nidelkoff?

19   A    She was the girl over in staff development,

20   the instructor.

21   Q    Did Linda Nidelkoff work for Ann Boisclair?

22   A    Yes, she did.

23   Q    And the subject -- it looks like it's an

24   email from Ann to a bunch of people, which I would,

91

1   perhaps, call this -- is this the administrative team?

2       A    Yes.

3       Q    And it's cc'd to Meredith Kiss.  Who is

4   Meredith?

5       A    Meredith Kiss is the deputy director of

6   hospital operations for the State of Illinois.

7       Q    And does she work at Elgin?

8       A    Yes, she does.  She has an office there.

9       Q    But she's not -- her oversight is more than

10  merely Elgin, correct?

11      A    Correct.

12      Q    And then there's attachments and the names of

13  the attachments to the email there.  I'm mostly looking

14  at the ones that say PPM1870 and then 1870 Exhibit A, B

15  and C.

16           Do you see those attachments?

17      A    Yes, I do.

18      Q    I'm going to kind of skip because -- Ann is

19  describing in paragraph one on that page the necessity

20  for implementation of policies through the leadership

21  group and that there would be revisions, and she is

22  just describing the purposes behind delivering all of

23  this information.

24           Is that a fair assessment of paragraph one?

92

1       A    Correct.

2       Q    If you could look at paragraph six, do you

3  see where -- that paragraph?

4       A    Yes.  The one about PPM1870?

5       Q    Correct.

6            Now, what does PPM stand for?

7       A    Policy and Procedure Manual 1870.  It's just

8  a filing reference.

9       Q    Right.  And the Policy and Procedure Manual

10  is the -- what we were talking about earlier, the

11  internal governance policies of Elgin, correct?

12      A    Correct.

13      Q    And actually, you testified earlier when

14  Randy was asking you about your background that --

15  emphasizing the importance of policy for the Joint

16  Commission and making sure that policy gets followed at

17  Elgin was a primary part of your responsibilities when

18  you got the commendation, correct?

19      A    Correct.

20      Q    And that education and oversight of the

21  patient -- of the staff to assure policy is created and

22  followed was -- that's why the Joint Commission looks

23  favorably at hospitals, isn't it?

24      A    Yes.

93

1    Q    So this is kind of squarely within the

2  management, the responsibilities of management, to

3  oversee the training of the staff as it pertains to

4  policy, correct?

5    A    Correct.

6    Q    Give me a sec.

7         Okay.  So Policy and Procedure Manual 1870 is

8  a policy entitled Nonconsensual Sexual Contact Among

9  Patients, correct?

10   A    Correct.

11   Q    And then there's -- it says, "Implementation

12  plan."  QM, is that quality management?

13   A    Quality manager, yes.

14   Q    "Quality manager will send approved version

15  to all."

16        That would be Ann Boisclair, correct?

17   A    Correct.

18   Q    And then it says DON.  Is that director of

19  nursing?

20   A    Correct.

21   Q    Was that you?

22   A    Yes.

23   Q    "To present it to CNMs."  What is CNMs?

24   A    Clinical nurse managers.

94

1    Q    Was Colleen Delaney considered a clinical

2  nurse manager as a subordinate of yours?

3    A    At this time when I was DON, she was

4  associate director of nursing.

5    Q    Okay.  So there would have been another

6  clinical nurse manager, perhaps, on each clinical unit,

7  correct?

8    A    Correct.

9    Q    Do you recall who that was in 2017?

10    A    No, I do not.  I don't know if that was

11  Nenette Kelly -- Antoinette Kelly.  She was there for a

12  while, but I don't know who took the position after

13  that.

14    Q    Okay.

15    A    I don't remember.  I should say it like that.

16  Somebody did.  I just don't remember.

17    Q    Fair enough.

18        So the clinical nurse managers who will train

19  and do read and sign with RNs, the registered nurses,

20  staff at the facility, correct?

21    A    Correct.

22    Q    It says to begin today, which this email is

23  dated January 19, 2017, correct?

24    A    Correct.

95

1      Q    And M.D.'s, the doctors?

2      A    Yes.

3      Q    "Will present at MSO."  What does MSO stand

4  for?

5      A    MSO is medical staff organization meeting.

6  That's when the doctors, essentially, have a

7  get-together.

8      Q    So the doctors were going to discuss it on

9  January 19th, will present these materials that day,

10  correct?

11      A    Correct.

12      Q    So if you could, then there's the policies

13  that are behind it, and they are kind of numbered

14  according to what the email was, but I'd ask you --

15  well, the next page, which is 27406, that looks like

16  it's an Elgin policy on Policy 1320, reporting patients

17  with MR diagnosis.

18      A    Correct.

19      Q    So what is MR diagnosis?

20      A    MR is mentally retarded.

21      Q    So that's that page.

22           And then there's another policy after that,

23  1530, Patients with Mental Illness and Intellectual

24  Disabilities.  This is a new policy draft, correct?

96

1      A    Yes.

2      Q    The page after that, 27408, similar policy.

3  It's page two of that, correct?

4      A    Correct.

5      Q    And then the one after that, it just says

6  page three.  Same policy, correct?

7      A    Correct.

8      Q    And then there's page four, correct?

9      A    Correct.

10      Q    So that would have been attachment PPM1550,

11  I think?  I'm not sure because I can't tell what -- we

12  have the printouts, but I'm just asking you.

13          This would have been an attachment to the

14  email, correct?

15      A    Correct.

16      Q    Oh, and actually I forgot to ask you.

17          So you were on the list.  You received this

18  email, correct?

19      A    Yes, I did.

20      Q    Do you actually remember receiving this

21  email?

22      A    No, I don't.

23      Q    But this would have been sent in the ordinary

24  course of Ann's job responsibilities to you as director

97

1   of nursing, right?

2      A   Yes.

3      Q   And a big part of responsibility is making

4   sure that policy is trained and implemented as --

5      A   Correct.

6      Q   Okay.  So then the next page, which is

7   document 27412, that's the policy -- it's page one of

8   Policy 1870, Nonconsensual Sexual Contact Among

9   Patients, right?

10      A   I think mine are -- what number did you say?

11   I'm sorry.

12      Q   So at the bottom of the page, it's page

13   27412.

14      A   Oh, yes.  Yes.

15      Q   And at the top it's the Policy and Procedure

16   Manual Number 1870, Nonconsensual Sexual Contact Among

17   Patients, correct?

18      A   Correct.

19      Q   So what exactly does nonconsensual sexual

20   contact mean?

21      A   That -- I was trying to see if it was in

22   the -- a behavior of any sexual nature that occurs

23   between patients that is unwanted and makes the alleged

24   victim feel uncomfortable and feel fearful.  This

98

1    may --

2         Q    You're reading from the document, right?

3         A    Yes.  It's right there in the definition.

4         Q    That's okay.  I'm asking you what it means.

5    We're going to read from the document in a moment.

6              What does it mean to you?

7         A    To me, it's sexual contact that's not asked

8    for or wanted.

9         Q    Do you know why there's a distinction made,

10   nonconsensual sexual contact in this document?

11        A    No, I don't.

12        Q    Is it possible for a patient and another

13   patient or a patient and a staff member to ever have

14   consensual sexual contact while confined to an

15   involuntary mental health facility?

16        A    It is never appropriate for a staff member to

17   have any sexual relationship with a patient.  However,

18   we have had -- and to the other part of your question,

19   we have had patients in the CPS program, not forensic,

20   that have had sex before, and both were consenting

21   parties, and that was a little bit different, but that

22   was years ago.  I don't know if that has changed since.

23   I honestly don't know.

24        Q    Okay.  I actually asked you a different

99

1   question.

2        A    I'm sorry.

3        Q    That's okay.  My question is:  Is it ever

4   possible for a patient confined to an involuntary

5   facility to have consensual sex with anyone?

6        A    I don't know.

7        Q    Were you ever trained on that?

8        A    I don't recall.

9             It's never appropriate to have sexual

10  relations with a staff ever, but patient to patient, I

11  don't know.

12       Q    Okay.  So this happens to be a policy on

13  patient-to-patient nonconsensual sex, correct?

14       A    Correct.

15       Q    And you started to read it.  It's on

16  page 27412, nonconsensual sexual contact, and it gives

17  a lot of very detailed forms, kissing, touching, you

18  know, basically any genital contact of any kind which

19  are deliberate exposure of genitals for sexual

20  gratification.

21            So there's all this fairly detailed graphic

22  behavior of sexual acts that are in the policy,

23  correct?

24       A    Correct.

100

1    Q    And then it outlines who the alleged victim

2    is, correct?

3    A    Correct.

4    Q    So that would be anyone alleging a

5    nonconsensual sexual act, correct?

6    A    Correct.

7    Q    So at that point it's an allegation, correct?

8    A    Correct.

9    Q    So it doesn't say here who the witnesses to

10   the sexual act are, correct?

11   A    Correct.

12   Q    It's merely that it happened, and somebody is

13   now talking about it after the fact in this policy?

14   A    Correct.

15   Q    Because, obviously, if a staff person saw two

16   patients having sex, there would be a witness to that

17   act directly observing it, and the patient as the

18   alleged victim might not necessarily even be needed to

19   make anyone aware because the staff would have seen it,

20   right?

21   A    Right.

22   Q    So there's a policy here because a victim is

23   someone who has to allege that to someone else, right?

24   A    I don't know.

101

1      Q    Well, let's read the definition.  It says
2  alleged victim, right?
3      A    Uh-huh.
4      Q    What does that say?
5      A    One who alleges that a nonconsensual sexual
6  act with another patient has occurred.
7      Q    Right.  So someone has to allege it.
8      A    Right.
9      Q    And it goes and it defines the victim, the
10 perpetrator, and then it says advocate.  Here it says:
11 The staff person assigned by the charge nurse to
12 immediately remove an alleged victim from the milieu
13 after an allegation or incident of nonconsensual sexual
14 contact and provide support and advocacy as outlined in
15 policy part III B. 2 below.
16     A    Right.
17     Q    So if this happens, where someone alleges
18 that they have had sex with another patient,
19 immediately -- that's the word, immediately -- there's
20 a staff member assigned to take care of the patient who
21 is the victim, correct?
22     A    Correct.
23     Q    And then there's a procedure, and the
24 procedure starts with part three. "Any EMHC staff who

102

1   receives an allegation" -- and it says, "or observes

2   interpatient nonconsensual sexual contact will, after

3   ensuring immediate safety of the alleged victim, report

4   the allegation to the unit charge nurse," correct?

5       A    Correct.

6       Q    Okay.  Now, I'm going to ask you, looking

7   at -- so we've kind of discussed that.  That's up in

8   the -- it's kind of almost implicit in the definitions,

9   right?  We're going to immediately take care of the

10  patient, correct?

11      A    Correct.

12      Q    And then there is a list of things in

13  Section B.  Once it's reported, the charge nurse or

14  designee -- now, you were a director of nursing.  Would

15  the charge nurse have been someone that we talked about

16  was in your lane of supervisory responsibility?

17      A    Yes.

18      Q    So charge nurses are the ones in the policy

19  required to handle an abuse situation pertaining to

20  sex, correct?

21      A    Right.

22      MS. JOHNSTON:  Objection.  This is the policy that

23  specifically relates to nonconsensual sexual

24  relationships between patients, not just sex in

103

1    general.

2         MR. CECALA:  Objection noted.

3    BY MR. CECALA:

4         Q    Can you read number one and the list of

5    things that need to be done, what the charge nurse, who

6    would have been someone that would have been a

7    subordinate to you, would have to do once this is

8    discovered?

9         A    Sure.  "Assign a staff person as an advocate

10   to immediately remove the alleged victim from the

11   milieu and take him or her to a safe area, e.g., the

12   nursing station, conference room, staff area" -- or

13   "staff office, et cetera.  The choice of location will

14   be determined by the clinical safety needs of the

15   alleged victim and, to the extent possible, by the

16   person's preference;

17             "B.  Contact the primary care physician/MOD,"

18   which is medical doctor on duty, "for immediate

19   examination of the alleged victim;

20             "C.  Assist the psychiatrist/MOD to evaluate

21   the alleged perpetrator or increase observation and

22   ensure separation from other patients;

23             "D.  Contact security to come to the unit to

24   complete their incident reporting process per the

104

1   Serious Incident Management (SIM) Program Directive

2   02.02.06.040, and, if indicated, ensure the

3   preservation of evidence.;

4           "E.  Notify the clinical nurse manager or the

5   administrator on duty based on shift of incident;

6           "F.  Notify the alleged victim's guardian, if

7   possible, and any other individuals whom the alleged

8   victim wishes to be notified with a completed

9   Authorization to Disclose/Obtain Information,

10  Illinois 462-0146;"

11          And "G.  Initiate/complete required

12  paperwork, including:  One, injury report for the

13  alleged victim; two, the comprehensive progress note in

14  the medical record of both the alleged victim and the

15  alleged perpetrators that describe the assessments,

16  consultations, decisions, interventions, patient

17  conditions/responses and actions taken to ensure the

18  safety of the alleged victim and alleged perpetrator or

19  perpetrators; three, the response to allegations of

20  nonconsensual sexual consent" -- or "contact

21  checklist."

22      Q    Great.  Okay.  I'm asking you to stop right

23  there.

24          So this is the policy of what will happen

1    once an allegation is reported of nonconsensual sexual

2    contact among patients that the nursing area is

3    required to do, correct?

4         A    Correct.

5         Q    Now, there are other areas there.  There is

6    an advocate assigned which may or may not be from

7    nursing, correct?  That's the next section?

8         A    Yes.  Correct.

9         Q    So -- because it says -- it refers back to

10   the paragraph where the definition is.  The advocate is

11   on the page prior.  It says, the staff person assigned

12   by the charge nurse.  Well, that could be a nursing

13   staff, it could be anybody that -- it doesn't say who,

14   correct?

15        A    Correct.

16        Q    Okay.  So that's the advocate section on page

17   27413.

18             Then it says, "Clinical nurse manager or

19   administrator on duty will notify the medical director,

20   hospital administrator and the director of nursing

21   about the incident, and the AOD," which is the

22   administrator an duty, "will document the incident on

23   the AOD report," correct?

24        A    Correct.

106

1      Q    So there's at least some involvement with

2  nursing as to step three, correct?

3      A    Yes.

4      Q    And then there's requirements for the

5  physician, which may or may not involve delivering

6  information to the charge nurse.  It looks like part C

7  in section four says, "Consult with the medical

8  director or designee, the charge nurse and the clinical

9  nurse manager."

10          So there's at least a consultive receiving

11  data from -- from the physicians in section four,

12  correct?

13     A    Correct.

14     Q    And then section five now goes to the

15  perpetrators, who have been placed on heightened

16  observation, will remain so until -- and it goes on to

17  page 27414 -- until the next administrative morning

18  meeting following the incident, at which time the

19  administrative leadership team will -- and it looks

20  like there's these checklists that start to become part

21  of the routine policy to handle patient-to-patient

22  nonconsensual sex, correct?

23     A    Correct.

24     Q    Now -- and just going back to Mary's

107

1  objection, I mean, you said you don't know whether two

2  patients can have consensual sex or not.  Is that

3  because there is an instance where someone could be

4  forcing, physically, violently having sex with someone,

5  or perhaps there's two patients that want to have sex,

6  and that is the distinction -- I'm not drawing a legal

7  distinction.  I'm just using the ordinary meaning of

8  the word consent.  Would that be a distinction between

9  consensual and nonconsensual sex, correct?

10      A    Correct.

11      Q    And that would only be applied to

12  patient-to-patient sex, correct?  Because you said it's

13  never appropriate for a staff person to have sex with a

14  patient, period.  It can never be consented to,

15  correct?

16      A    Correct.

17      Q    And then the Roman numeral IV, it says

18  attachment, Exhibit A, B and C, and they follow this.

19  Do you see that?

20      A    Yes.

21      Q    Okay.  So Attachment A is on page 27415.  Do

22  you see that?

23      A    Yes.

24      Q    And it is a checklist, it appears, called

108

1  Response to Allegations of Nonconsensual Sexual Contact

2  Checklist, correct?

3      A    Correct.

4      Q    So there's -- it appears to be that the

5  charge nurse has at least ten things that the charge

6  nurse has to do.

7      A    Correct.

8      Q    And at least as part of those, like number

9  four under the charge nurse it says, "Initiate

10 paperwork to increase observation level for the

11 perpetrator."

12          So there's paperwork going to be initiated,

13 correct?

14     A    Correct.

15     Q    And then it says, "Initiate injury report,"

16 correct?

17     A    Correct.

18     Q    So another written report?

19     A    Correct.

20     Q    And then underneath that is another nursing

21 lane which says "AOD/CNM," which are both nursing

22 poses, correct?

23     A    Correct.

24     Q    Number two says, "Document the event in AOD

109

1    or the morning report," correct?

2         A    Correct.

3         Q    I just want to ask you quickly.  A morning

4    report, would that be the -- like, let's say the

5    incident happens today.  Each unit has -- or module has

6    a morning meeting amongst the clinical staff, correct?

7         A    Correct.

8         Q    And that's the morning report that comes out

9    of those morning meetings where they document these

10   things, correct?

11        A    Correct.

12        Q    And then it gives the responsibilities of the

13   advocate in the position, which also include writing

14   reports.  The advocate is supposed to write progress

15   notes.  The physician is supposed to complete an injury

16   report, as well.  There's a lot of information out of

17   this checklist, isn't there?

18        A    Correct.

19        Q    So if we look at Exhibit B, which is on

20   page 27416, do you see that page?

21        A    No.  Mine went right to C.  Let me see if I

22   can pull it up on my phone.

23        Q    Okay.  Sorry about that.

24        A    No, I don't know if it was my printer.

110

1    MS. JOHNSTON:  I'll screen share so we can keep

2  this going.

3    THE WITNESS:  What are you going to do, Mary?

4    MS. JOHNSTON:  Oh, put it up on my screen for you,

5  Diana.

6    THE WITNESS:  Oh, okay.

7    MS. JOHNSTON:  Can everybody see it?

8    MR. CECALA:  We can.

9    THE WITNESS:  Yes.

10    MR. CECALA:  Great.  I'm sorry that you don't have

11  it.

12    MS. JOHNSTON:  It was probably just an error.

13  Let's just move on with the questioning so she can

14  finish up here.

15  BY MR. CECALA:

16    Q    So this Exhibit B says, "Helpful Strategies

17  for EMHC Victim Advocate in Cases of Nonconsensual

18  Sexual Contact."

19    A    Okay.

20    Q    And it's talking about what the advocate's

21  role is, right?

22    A    Yes.

23    Q    And the third paragraph down starts out,

24  "Consult with your charge nurse," correct?

111

1      A    Yes.

2      Q    And again, that's the nursing lane?

3      A    Yes.

4      Q    And then I'll move to page 27417.

5      A    Okay.

6      Q    And this is the Exhibit C, Individualized

7 Plan of Care, and at the top it identifies certain

8 problems, which is pertaining to false allegations,

9 right?

10     A    Yes.

11     Q    Because it's possible that someone dreamed

12 the entire thing up, right?

13     A    Yes.

14     Q    Okay.  But suffice it to say that the

15 allegation alone would trigger this, and then there

16 would be a lot of paperwork, and then documenting here

17 maladaptive behavior through false allegations,

18 psychiatric symptoms resulting in false allegations,

19 and then it says, "As evidenced by three or more

20 previous false allegations within six months."

21        So this is directed at what if someone is

22 falsely reporting this sexual incident, and if they do

23 that three times in six months, there's a plan of care

24 for that, as well, right?

112

1          A      Correct.

2          Q      And there's -- obviously there's only one,

3    "Check patient after one hour," is the RN for

4    interventions.  That's at the lower half of the page?

5          A      Uh-huh.

6          Q      Okay.  So this is a fairly extensive policy

7    pertaining to nonconsensual sexual contact among

8    patients, and I think the common understanding of

9    nonconsensual is what I'm aware of for needing to do

10   this, because if it was consensual, perhaps this

11   wouldn't apply.  Is that your understanding?

12         A      Yes.

13         Q      But that's not a legal definition of

14   consensual; that's just the situation that would be

15   whether or not there was violence or kind of a rape,

16   correct?

17         A      Correct.

18         Q      My question is:  Are you aware of similar

19   documents and reports that would be generated for an

20   allegation of sexual misconduct between a staff member

21   and a patient?

22         A      I'm not aware of any additional paperwork

23   other than the OIG that would be done.  They report to

24   the State Police.  Of course, the treatment team would

113

1  meet with the patient, find out where they are at and

2  what their needs -- current needs are, how to adjust

3  their treatment plan to adjust that.  Is there trauma

4  related to that?  Does that then need to be addressed?

5  You know, so you need to treat the patient, obviously,

6  in a situation like that, as well.  But as far as

7  anything else, I don't know.  I was trying to remember.

8         The State has an employee conduct code, and

9  they have parts of that in that book, but I don't --

10  quite honestly, I don't remember the correct, you know,

11  verbiage any more.

12     Q    Right.  And thank you for that.

13         My question is:  Are you aware of a similar

14  policy for generating the reports that are voluminous

15  reports that are required when an allegation of sexual

16  misconduct is made between a staff person and a

17  patient?

18     A    No, I am not aware of anything.

19     Q    And it would seem as a clinician that this 16

20  pages is directed at assuring policy and training are

21  implemented for this patient-to-patient situation to

22  take care of both the patients, correct?

23     A    Yes.

24     Q    Even though one is a victim and one may be

LISA A. KOTRBA & ASSOCIATES, LTD. (312) 855-1834

114

1    viewed as a perpetrator, right?

2        A    Correct.

3        Q    Wouldn't an identical situation as a

4    clinician occur for a patient who may have an

5    allegation of sexual misconduct with a staff member?

6        A    Can you repeat the question, please?  I'm

7    sorry.

8        Q    I can say it another way.

9             Wouldn't you be equally concerned clinically

10   with the patient if there was an allegation of sexual

11   conduct between a patient and a staff member?

12       A    Yes.

13       Q    And you mentioned reporting to OIG as part of

14   a -- it's -- it's the law.  You have to report it

15   within four hours, right?  I'm not even sure a policy

16   is needed.  Everyone is aware of that.  You are,

17   correct?

18       A    Correct.

19       Q    Is there anything more, both by way of

20   documents or clinical treatment, that needs to be done

21   if the patient and a staff member, if there's an

22   allegation of that sexual misconduct, wouldn't there --

23   is there more that would need to be done than paperwork

24   and reports and checklists on behalf of the patient if

115

1   that happened?

2                       (Frozen Zoom connection.)

3                       (Record read as requested.)

4   BY THE WITNESS:

5        A    Although I don't think there's a specific

6   policy to cover that, any clinician knows that any time

7   any of our patients has a traumatic event on the unit,

8   a fight, a whatever, we follow up with the patient to

9   find out how they are.  Do they need an injury report?

10  Do we need to review their treatment plan?  Do we need

11  to put them on special precautions?  Do they need to be

12  on 15-minute checks?  That's just clinical -- good

13  clinical sense, and that's a good clinical practice,

14  but that's what we're here for.

15  BY MR. CECALA:

16       Q    My question -- and maybe I didn't make this

17  clear.

18            Clearly, if someone has a black eye or has

19  been physically abused or raped, you're going to see

20  the injuries, correct?

21       A    Correct.

22       Q    That's not really what this policy was

23  addressing, though.  It's talking about allegations,

24  correct?

116

1     A     And a trauma response.

2     Q     Well, it actually talks about in an entire

3     exhibit about false reports, too, correct?

4     A     Correct.

5     Q     So you might not actually see the evidence of

6     two people that just had sex; there's just merely the

7     report of the allegation that they did, for which

8     there's concern for the patient's clinical care, right?

9     A     Correct.

10    Q     So my question is:  Wouldn't there be an

11    equal response pertaining to an allegation of sexual

12    misconduct between a patient and a staff that would

13    generate a whole bunch of paperwork about those

14    allegations to make sure that the clinical treatment to

15    the patient is being correctly delivered?

16    A     Yes, I would think so.

17    Q     Are you aware -- so you were director of

18    nursing in July of 2017, correct?

19    A     Yes.

20    Q     Are you aware of or did you receive any

21    written reports about the sexual abuse that was

22    reported on an audio tape between Christy Lenhardt and

23    Ben Hurt?

24    A     No, I did not.

117

1    Q    After this all transpired and the news media

2    got the story and everyone seems to have known either

3    from the internet or news stories that Christy and Ben

4    were having sex, were you aware of -- you said you

5    talked earlier with Drew Beck, but were you aware of

6    any administrative response to correcting or getting

7    policy and training delivered to the staff to ensure

8    that this didn't ever happen again?

9    A    No, aside from the -- like you mentioned, the

10   training from Drew Beck on boundaries.

11   Q    Good.  So you talked to Drew Beck about that

12   training, right?

13   A    Not the specifics of the training.  I talked

14   to him about how to schedule it with the nursing unit,

15   because he had so many people to train and how did we

16   logistically do that.

17   Q    Right.  So is it an understanding --

18   I completely understand that you were not part of the

19   development of the materials.  I think you testified to

20   that earlier.

21        So you were having conversations with Drew

22   Beck about what he was going to do, scheduling to

23   deliver training about boundary issues to the entire

24   Elgin team after -- long after the Christy incident

118

1    news broke, correct?

2        A    Correct.

3        Q    Do you recall a conversation where you and

4    Linda Nidelkoff and Drew Beck were in the same

5    conversation about, you know, the need for the training

6    and the scheduling of the training or something of that

7    substance?

8        A    No, I don't, because the training -- Drew was

9    doing it on the units that didn't require Linda

10   Nidelkoff's participation.

11       Q    So Ann Boisclair and Linda Nidelkoff weren't

12   involved in helping develop the quality of the

13   training?

14       A    That I don't know.  I don't know.

15       Q    Did anyone ever ask you to recuse yourself or

16   remove yourself as part of the process of developing

17   the training about Christy so you wouldn't be put in a

18   position where the training -- you were involved in

19   training after the fact, after you were sued?

20       A    No.

21       Q    So that never happened?

22       A    No.

23       Q    Hang on one second.

24            Okay.  So are you aware of whether Drew

119

1    delivered the training that was scheduled to the

2    nursing staff and the rest of the folks at Elgin?

3        A    To my knowledge, yes, he did.

4        Q    And we talked about this before.  There's a

5    lot of very well-intentioned, highly educated

6    behavioral expert people that work at Elgin, including

7    yourself, right?

8        A    Correct.

9        Q    And the vigilance and the training and the

10   policies that are in place are intended to prevent the

11   very things that happened between Christy Lenhardt and

12   Ben, right?

13       A    Correct.

14       Q    And this would have been only something that

15   Drew developed to enhance the possibility that this

16   would never happen again, right?

17       A    Yes, and to -- when you work with a patient

18   for -- some of our patients are there for a long time,

19   and you're kind of complacent.  This is -- a part of

20   his training was to remind them that you can't get

21   complacent with stuff.  We have to stay vigilant all of

22   the time.

23       Q    Exactly.  In other words, what ordinarily

24   through complacency one might -- if you're not -- if

120

1  you're new or if you're, you know, not a regular part

2  of the routine observing what's happening, you might be

3  a bit more on high alert, so you add training, you make

4  people more aware to accomplish raising the level of

5  awareness, right?

6       A    Correct.

7       Q    And, you know, perhaps maybe this is a fair

8  characterization that it gets routine, so everybody

9  starts to turn a bit of a blind eye to something that

10  could be wrong and not report it out of the reason of

11  complacency, correct?

12       A    No.

13       MS. KOZAR:  Object to form.

14  BY MR. CECALA:

15       Q    Did you say no?

16       A    I said no.

17       Q    I'm not sure I understand.

18       A    You know what?  They get complacent about

19  different things.  You may think, oh, I don't think

20  this patient is dangerous.  I don't think -- you know

21  what?  I'll tell them what I did last night and what

22  I had for dinner, that kind of complacency.  The kind

23  of complacency in which a staff is having sex with a

24  patient would never happen.  If that happens, they will

121

1    report that, and they will do what they need to do.

2         Q    Right.  Okay.

3         MR. KRETCHMAR:  Diana, I mean, there are people

4    who specialize in sexual trauma at Elgin, correct?

5         THE WITNESS:  I am not sure, actually, Randy.  I

6    don't know.  I know we have people that specialize in

7    drug therapy, but I don't know about sexual stuff.

8    Honestly, I don't.

9         MR. KRETCHMAR:  There are people who have some

10   expertise in sexual trauma?

11        THE WITNESS:  I don't know.

12        MR. KRETCHMAR:  Okay.  Or any training?

13        THE WITNESS:  I don't know.  Those people would be

14   social workers and psychologists, and I don't know what

15   their qualifications are.  If it was one of my nurses

16   or my nursing staff, I would certainly know, but I

17   don't know the other disciplines' specificities.

18   I really don't.

19        MR. KRETCHMAR:  Do you know if sexual abuse or

20   trauma can be a significant issue for mentally ill

21   people?

22        THE WITNESS:  Yes, it can.

23        MS. KOZAR:  Objection.  Form.

24        MR. KRETCHMAR:  It can be, right?

1      THE WITNESS:  Yes.

2      MR. KRETCHMAR:  Yes.  Okay.  What kind of problems

3  can that cause?

4      MS. KOZAR:  Object to form.

5      MS. JOHNSTON:  Form.

6      MS. KOZAR:  Speculation.

7      MR. CECALA:  Hold on one second.

8      MR. KRETCHMAR:  Diana, let me ask you this.  You

9  reacted earlier in this deposition with apparent shock

10  that Ben Hurt had attempted suicide three times within

11  six months after he was released from Elgin.

12          Don't you think someone should have taken

13  some interest in helping him once it was known or

14  suspected that Christy Lenhardt, his social worker at a

15  state institution where he was involuntarily committed,

16  was having sex with him several times a week?

17      MS. KOZAR:  Object to form, foundation.

18      MS. JOHNSTON:  Join.

19      MS. KOZAR:  Assumes facts not in this evidence.

20      MR. KRETCHMAR:  Don't you think that would have

21  been a critical clinical situation?

22      MS. KOZAR:  Same objection.

23      MR. KRETCHMAR:  You can answer.  Do you have any

24  opinion on that?

123

1          THE WITNESS:  I would -- see, I just don't know.

2     Of course, somebody should have taken a look at Ben and

3     what is his -- what was his response to all of this,

4     and perhaps his treatment plan needs to be updated, and

5     we need to look at different therapies.  Was that done?

6     I have no idea.  I've never seen his chart, so I don't

7     know what was done or what could have done

8     differently -- been done differently.  I don't know.

9          MR. KRETCHMAR:  You were a highly commended or

10    highly admired administrator in this hospital, right?

11         THE WITNESS:  Yes.

12         MR. KRETCHMAR:  But you have no idea whether that

13    occurred?

14         THE WITNESS:  No, I don't.

15    BY MR. CECALA:

16         Q    Okay.  Just one -- one, maybe two, but

17    certainly one last question.

18              You said earlier -- and I don't want to

19    mischaracterize your testimony -- that never would it

20    be the case that the complacency would go so far down

21    as to not report sexual relations between a staff and a

22    patient, right?

23         A    Right.

24         Q    So how do you think this happened for two and

124

1   a half years?

2        MS. KOZAR:  Object to form, foundation.  Calls for

3   speculation.

4        MR. CECALA:  Would you like me to build the

5   foundation, Amanda, or can she answer?

6        MS. JOHNSTON:  She never instructed her not to

7   answer.

8        MR. CECALA:  I understand.  I'm only asking

9   because we're trying to save time, and I could --

10       MS. JOHNSTON:  Go ahead and answer the question,

11  Diana.

12  BY MR. CECALA:

13       Q    How do you think it happened?

14       A    When you have worked at a facility for

15  however long -- many years Christy was there, I would

16  think that if there was a will, there was a way.  So if

17  you knew where to have the sex and when to have the sex

18  in between face checks and how to sneakily do this,

19  I would think that it would be possible if you were

20  that devious and you were that -- that -- you know, so

21  desperate to get this done, I think that there --

22  there -- you know -- you can -- in the offices there

23  are hiding places.  There are checks every half an

24  hour.  You could certainly, you know, plan it on how to

125

1    do it.  You really could.  Is it right?  Absolutely

2    not.

3            MR. CECALA:  One second, and then we can wrap up.

4               We have no further questions.

5            MS. JOHNSTON:  Diana, I just have three questions

6    for you, and then we'll get you out of here.

7            THE WITNESS:  I want to do a clarification, Mary,

8    once you're done on one of the questions.

9            MS. JOHNSTON:  Go ahead and do that.

10           THE WITNESS:  Okay.  It was the question that

11   Randy reacted to me not -- not doing, I think, what --

12   in reviewing the treatment plan and making sure that

13   that was done.

14              Let me say that, of course, my patient care

15   has always been my most important thing in my entire

16   career.  I didn't follow up on it because treatment

17   like that, therapies, different groups, different

18   things don't involve my nursing staff or me.  That is

19   through psychology.  That is through social work.

20   I assumed that my administrators, the ethical people

21   that I work with, those supervisors followed up on that

22   and made sure that Ben got the care and the follow-up

23   that he needed.

24           MS. JOHNSTON:  Thank you, Diane.

126

1        MR. CECALA:  Can I just ask in light of her

2    expanding?

3        MS. JOHNSTON:  Yes.

4                    DIRECT EXAMINATION

5    BY MR. CECALA:

6        Q     So, on June 30th, the security swept Ben's

7    room, found an audio recording of him having sex with

8    Christy, found a journal where he wrote down that

9    Christy helped ███████ ███████ escape and was having a

10   sexual affair with him, and had an audio recording of

11   Christy admitting that she had a sexual affair with

12   ███████ ███████ as well.

13           And the very next day, which is July 1st,

14   after the incident broke, wouldn't it have then been in

15   much the same policy way it is when there's

16   patient-to-patient nonconsensual sex, wouldn't it have

17   been the responsibility of all of the staff members in

18   the other policy to do something similar, if not

19   identical, to clinically care for the patient on

20   July 1st, the day afterwards?

21       MS. KOZAR:  Object to form.

22   BY THE WITNESS:

23       A     I think that the care of Ben should have

24   reflected very similar to that, yes.

127

BY MR. CECALA:

Q    Okay.  That's all I'm looking for is what should have been done.

A    Yeah.  Yes.

MR. CECALA:  Okay.  Thanks.

MS. JOHNSTON:  Okay.  So I just have three questions for you.

CROSS-EXAMINATION

BY MS. JOHNSTON:

Q    Earlier you testified that the general kind of chain of command for the nursing staff at Elgin was very linear.  So it would start with -- and if I get something out of order, please correct me, but starting with the director of nursing, then associate director, then going down through all of the STAs and the kind of more general office staff; is that correct?

A    Correct.

Q    So does that mean that when you were working on the administrative side either as the director of nursing or the associate director, all of the approximately 250 people that fell under the umbrella of nursing did not report directly to you on every topic, correct?

A    Correct.  Correct.  They reported to their

128

1    supervisors.  If their supervisors had needed guidance

2    or assistance, they brought it to me, but there were

3    many things that weren't brought to me.  I can't -- I

4    can't do all of -- you know, the whole facility.

5    That's too much.

6         Q    Okay.  And then going back to the incident

7    with Christy being locked in Bob Hamlin's office with

8    Ben Hurt, if you remember we talked about that earlier?

9         A    Yes.

10        Q    So based on the email that you saw and

11   anything that you were told about that day when they

12   were locked in the office, did you believe at any point

13   in time that Ben Hurt was in -- that he was being

14   abused in that office?

15        A    No, I did not.

16        Q    Did you believe that he was in danger in any

17   way?

18        A    No, I did not.  I mean, except for the fact,

19   you know, both of them were in the locked office for

20   several hours, that couldn't have been comfortable, but

21   as far as in any kind of grave danger, no.

22        Q    If you had believed that Ben Hurt had been

23   being abused, would you have done more to look into

24   that?

129

1     A    Absolutely.  I would have reported it
2  immediately without question.
3     MS. JOHNSTON:  Okay.  And I think that's all
4  I have.
5          Anything else, Randy or Joe?
6     MR. KRETCHMAR:  No.
7     MR. CECALA:  We're ordering.
8     MS. JOHNSTON:  We're ordering, as well.
9          Diana, I'll get you out of here in one
10  second.
11          So the court reporter, Lisa, has been taking
12  everything down this whole time.  You can either
13  reserve signature, which means that I'll end up sending
14  you a copy of the transcript after she has prepared it
15  but before it's finalized where you would be able to
16  read things.  You can't make substantive changes to
17  your answers or say, hey, you know, that's not what
18  I meant.  You would just be able to make fixes if it
19  was, you know, something spelled differently or, you
20  know, the acronym actually means this thing, or you can
21  trust that Lisa has taken everything down accurately
22  and waive signature, and that means that you don't have
23  to worry about reviewing it later.  It's your decision.
24     THE WITNESS:  I would like to review it, please.

130

1      MS. JOHNSTON:  Okay.  We'll reserve signature.

2   Otherwise, I think we're all set then.

3            AND FURTHER DEPONENT SAITH NOT

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

131

                IN THE UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DISTRICT OF ILLINOIS
                        EASTERN DIVISION

BENAHDAM HURT,                        )
                                      )
                Plaintiff,            )
                                      )
              -vs-                    )    No. 17-cv-7909
                                      )
HASINA JAVED, FAIZA KAREEMI,          )
COLLEEN DELANEY, DIANA HOGAN and      )
DREW BECK,                            )
                Defendants.           )
_____)
MARK OWENS,                           )
                Plaintiff,            )
              -vs-                    )    No. 18-cv-0334
                                      )
HASINA JAVED,                         )
                Defendant.            )


        I hereby certify that I have read the

foregoing transcript of my deposition given at the time

and place aforesaid, consisting of pages 1 to 130,

inclusive, and I do again subscribe and make oath that

the same is a true, correct, and complete transcript of

my deposition so given as aforesaid and includes

changes, if any, so made by me.


                         _____
                                  DIANA HOGAN

SUBSCRIBED AND SWORN TO
before me this _____ day
of _____, A.D. 2022.

_____

                      Notary Public
LISA A. KOTRBA & ASSOCIATES, LTD. (312) 855-1834

132

1         I, LISA A. KOTRBA, a Certified Shorthand Reporter within and for the State of Illinois, do
2  hereby certify:

3         That previous to the commencement of the examination of the witness, the witness was duly sworn
4  to testify the whole truth concerning the matters herein;

5

6         That the foregoing deposition was reported stenographically by me, was thereafter reduced to a printed transcript by me, and constitutes a true record
7  of the testimony given and the proceedings had;

8         That the said deposition was taken before me at the time and place specified;

9

10        That the reading and signing by the witness of the deposition transcript was agreed upon as stated herein;

11

12        That I am not a relative or employee or attorney or counsel, nor a relative or employee of such attorney or counsel for any of the parties hereto, nor
13  interested directly or indirectly in the outcome of this action.

14

15        IN WITNESS WHEREOF, I do hereunto set my hand at Chicago, Illinois, this 23rd day of June, 2022.

16

17

18                                                          Certified Shorthand Reporter
19                                                         State of Illinois

20

21  CSR License No. 084-002777.

22

23

24

**A**

**A.D** 131:23

**a.m** 56:14

████████

78:22

**able** 14:16,21
16:3,20 17:1
27:13 28:14
129:15,18

**Absolutely** 84:4
85:4 125:1
129:1

**abuse** 44:5 45:14
75:16,20 76:2,5
76:6,9,14 81:1
84:19,20
102:19 116:21
121:19

**abused** 115:19
128:14,23

**abusive** 69:8

**accomplish** 120:4

**accurate** 6:16

**accurately**
129:21

**achievements**
20:22

**acknowledge**
40:1

**acronym** 19:18
129:20

**act** 39:23 81:13
100:5,10,17
101:6

**acted** 39:6,10,22
40:10,14,21
67:5 69:3

**acting** 39:19
40:17 45:9
67:15 68:13,17
69:1,6 70:7,9
71:9

**action** 132:13

**actions** 104:17

**acts** 99:22

**actual** 16:15

**add** 120:3

**additional**
112:22

**address** 23:10

**addressed** 59:22
113:4

**addressing**
115:23

**adequate** 14:1

**adjust** 29:15
113:2,3

**administering**
5:3

**administration**
8:6 11:7 12:1

**administrative**
11:17 32:15
56:3,5 61:13
90:8 91:1
106:17,19
117:6 127:19

**administrator**
8:9 10:5,8,9,11
11:3,4,8 12:11
13:4 16:12 20:4
23:18 24:10,11
26:5 34:24 45:9
45:12 58:6,8
79:12,17,22,24
80:23 82:17
83:7 104:5
105:19,20,22
123:10

**administrator's**
81:3

**administrators**
11:19 21:6
125:20

**admired** 123:10

**admitted** 73:24

**admitting** 126:11

**ADONs** 59:20

**advocacy** 101:14

**advocate** 101:10
103:9 105:6,10
105:16 109:13
109:14 110:17

**advocate's**
110:20

**affair** 126:10,11

**affirm** 42:16

**affirmative** 39:2

40:7

**aforesaid** 131:15
131:18

**after-the-Chris...**
87:10

**agencies** 19:22

**agency** 8:15

**ago** 98:22

**agree** 5:2 45:1
46:22

**agreed** 132:10

**agreement** 5:5

**ahead** 18:1
124:10 125:9

**alarm** 70:15

**alert** 120:3

**all-female** 9:16

**all-male** 9:22

**allegation** 34:9
100:7 101:13
102:1,4 105:1
111:15 112:20
113:15 114:5
114:10,22
116:7,11

**allegations** 7:19
28:23 30:3,13
30:16 31:11,15
32:10,13 33:2
34:4,5 35:1,13
35:16 36:24
37:7,11 40:16
43:9 44:22
75:19 104:19
108:1 111:8,17
111:18,20
115:23 116:14

**allege** 100:23
101:7

**alleged** 34:14
97:23 100:1,18
101:2,12 102:3
103:10,15,19
103:21 104:6,7
104:13,14,15
104:18,18

**allegedly** 33:11

**alleges** 101:5,17

**alleging** 100:4

**allied** 30:1

**Amanda** 3:3 5:18
124:5

**amanda.kozar...**
3:6

████████ 74:1,16
75:2 78:2,8,12
126:9,12

**Ann** 11:21 20:5
90:7,13,14,21
90:24 91:18
93:16 118:11

**Ann's** 96:24

**annual** 8:11
13:21 75:22
76:1,4

**annually** 81:6

**answer** 6:22
12:21 13:10,13
15:13 18:3
25:22 28:9,14
28:17 33:6 36:1
36:10 38:15,19
39:3,5,14 40:8
40:9 41:12,20
43:3,3 52:12
53:6 63:7 68:7
75:18 77:16,17
77:21 78:11
122:23 124:5,7
124:10

**answered** 7:5
27:20,23 28:7
68:14 84:7

**answering** 6:19
33:14 84:23

**answers** 26:11
27:5 28:3 44:10
44:11 67:4
129:17

**Antoinette** 30:11
94:11

**anybody** 105:13

**anyone's** 69:7

**anyway** 16:13
18:3

**AOD** 105:21,23
108:24

**AOD/CNM**

108:21

**apparent** 122:9

**appear** 61:1
62:10

**APPEARANC...**
2:1 3:1

**appears** 64:21
66:23 107:24
108:4

**applied** 10:2
107:11

**apply** 82:4
112:11

**appointment**
19:9

**appreciate** 68:7

**appropriate**
16:24 98:16
99:9 107:13

**approved** 93:14

**approximately**
75:5 127:21

**area** 12:1 32:6
58:18 59:2,7
103:11,12
105:2

**areas** 71:6 81:8
105:5

**aside** 73:12 117:9

**asked** 11:6 32:12
34:13 47:13
63:9 68:8 72:11
76:11 98:7,24

**asking** 6:17,18
29:8 33:5 39:16
40:14 44:20
64:7 92:14
96:12 98:4
104:22 124:8

**asks** 27:8 28:10
40:23 41:6,18
42:3 43:21 44:2
85:14 86:4

**assessment** 61:3
91:24

**assessments**
104:15

**Assign** 103:9

**assigned** 10:2

30:23 31:4
101:11,20
105:6,11
**assist** 14:21
65:17,19
103:20
**assistance** 57:19
64:3,8 128:2
**assistant** 5:20
13:17
**assisted** 54:19
**assisting** 65:20
**associate** 9:23
13:17 19:5
24:15 25:1,3,13
25:16,18,20
26:1 31:3 58:12
58:14,19 59:13
94:4 127:14,20
**association** 22:24
**assume** 59:5
83:21
**assumed** 31:18
32:7 74:15,22
125:20
**Assumes** 122:19
**assuming** 29:20
30:16 35:21
37:23,24,24
**assumption**
29:11 30:8,19
30:21 36:15
59:8 62:16 63:2
63:8
**assurance** 14:2
**assure** 71:6 80:24
82:3 92:21
**assuring** 113:20
**attached** 62:24
**attachment**
61:20 62:11,14
62:17 63:3
96:10,13
107:18,21
**attachments**
61:16 91:12,13
91:16
**attempted**
122:10

**attempts** 52:22
**attention** 69:8,11
69:15
**attorney** 2:13 3:2
41:14 132:12
132:12
**attribute** 16:11
16:14
**audio** 49:2,8
50:10 73:13,16
73:24 116:22
126:7,10
**August** 8:24
**auspicious** 40:2
**Authorization**
104:9
**available** 13:22
**Avenue** 2:9
**aware** 7:11 37:14
37:22 43:8
44:24 45:2,18
52:13 53:10,12
65:3 75:19
76:13,16,18
79:5,14,18
86:20 100:19
112:9,18,22
113:13,18
114:16 116:17
116:20 117:4,5
118:24 120:4
**awareness** 120:5

### B

**B** 4:8 91:14
101:15 102:13
103:17 107:18
109:19 110:16
**Bachelor's** 8:3
**back** 17:10,16,23
29:19 46:23
52:7,12 55:13
60:10 69:5
70:20 71:18
76:23 105:9
106:24 128:6
**background**
92:14
**balls** 16:3
**based** 18:3 39:5

67:9 77:17
104:5 128:10
**basically** 46:19
99:18
**basis** 42:5 50:7
77:22
**Bates** 57:11
**Beck** 1:8 3:7 5:19
36:19,21,23
43:11 86:9,15
87:7 117:5,10
117:11,22
118:4 131:7
**beginning** 32:13
**behalf** 2:6,11,17
3:7 41:1 47:4
114:24
**behavior** 69:12
89:14 97:22
99:22 111:17
**behavioral** 119:6
**believe** 12:9
13:13 18:8,10
19:3,4 20:11,15
30:24 31:8
38:15 49:16
73:17 76:19
86:17 128:12
128:16
**believed** 128:22
**believes** 15:7
**Ben** 5:10 27:13
33:4 41:21
43:22,23 45:15
45:19 48:22
49:4 50:21 51:5
52:14 53:7 54:2
62:4 68:5,6
69:9 72:2,8,14
72:21 73:11
76:15,20 85:3,6
89:15,18
116:23 117:3
119:12 122:10
123:2 125:22
126:23 128:8
128:13,22
**Ben's** 126:6
**BENAHDAM**

1:4 131:3
**best** 9:12 26:22
**better** 14:8 25:21
29:17
**big** 68:21 97:3
**Bill** 11:23 55:22
55:23,24 56:1
57:4,14,16,20
58:2 60:24 64:6
64:14,19 65:1,3
68:18,21 74:12
74:20,22
**binding** 5:3
**bit** 21:2 29:13
47:5 75:24
80:19 98:21
120:3,9
**black** 115:18
**blind** 120:9
**Bob** 128:7
**Boisclair** 11:21
20:5 90:7,13,14
90:21 93:16
118:11
**bones** 15:20
**book** 113:9
**bottom** 97:12
**boundaries** 86:19
86:21 117:10
**boundary** 87:10
89:11,18
117:23
**bounds** 69:16
**break** 7:3 52:5,6
**breaking** 89:18
**breezed** 65:18
**Brian** 11:10 58:3
58:4,5
**bright** 19:1
**broke** 50:15
118:1 126:14
**broken** 65:20
**brought** 16:2
128:2,3
**bug** 83:19
**bugged** 84:1
**build** 124:4
**bulletin** 81:19
**bulletins** 81:18

**bunch** 90:24
116:13

### C

**C** 91:15 103:20
106:6 107:18
109:21 111:6
**call** 6:7,7 54:11
61:13 65:21
66:10 69:7
81:21 82:20
83:3,4,19 84:8
84:16 91:1
**called** 6:2 26:11
45:4 76:3 84:1
84:7 107:24
**calling** 69:14
**Calls** 124:2
**Cannon** 3:11
5:20,21
**care** 15:3 21:4
48:9 61:2,9
65:8,9,10 71:16
101:20 102:9
103:17 111:7
111:23 113:22
116:8 125:14
125:22 126:19
126:23
**career** 16:17
39:22 40:2,11
125:16
**carpet** 33:13
**carrying** 72:3
**case** 2:18,19 3:8
5:16,16 41:4
50:15,18 74:7
74:10 80:15
123:20
**cases** 50:8 80:14
80:14 110:17
**caught** 67:21
**cause** 122:3
**cc'd** 91:3
**Cecala** 2:2,3,8
3:13 4:5,14
5:12,12 13:8
17:7,15,20,23
26:9 38:23
46:13 47:7,9,14

47:17 49:14
50:9 51:23 52:1
52:4,7,9 70:14
70:17,19,23
84:9,10 103:2,3
110:8,10,15
115:15 120:14
122:7 123:15
124:4,8,12
125:3 126:1,5
127:1,5 129:7
**Center** 8:23 22:1
28:21 50:3
**central** 13:24
24:20
**certain** 14:21
19:3 111:7
**certainly** 6:19
121:16 123:17
124:24
**Certified** 1:19
132:1,18
**certify** 131:13
132:2
**cetera** 103:13
**CEUs** 8:18
**chain** 127:11
**challenges** 20:21
22:5,10,12
23:10
**challenging**
22:14,15
**chance** 77:20
**change** 36:10
**changed** 81:16
98:22
**changes** 81:20
129:16 131:19
**characterization**
120:8
**charge** 101:11
102:4,13,15,18
103:5 105:12
106:6,8 108:5,5
108:9 110:24
**charges** 76:14
**chart** 46:20 123:6
**charts** 21:17
**Check** 112:3

**checklist** 104:21
107:24 108:2
109:17
**checklists** 106:20
114:24
**checks** 115:12
124:18,23
**Cheryl** 18:15,15
**Chicago** 2:15 3:5
132:15
**chief** 55:24 57:21
64:1 66:19
**choice** 103:13
**Christy** 30:7
32:17 33:4
41:21 45:19
48:23 49:3
50:20 51:5 54:2
54:10 62:4 64:7
64:20 65:14
67:11,16 69:15
72:2,8,13 73:4
73:24 75:1,8
76:13 77:10
78:1,7,12 79:5
79:9 85:3,6,15
85:18,20,20,24
86:18 89:10,14
89:19 116:22
117:3,24
118:17 119:11
122:14 124:15
126:8,9,11
128:7
**Christy's** 72:21
74:11
**circumstances**
11:2 12:10 67:8
**citation** 20:12
**Civil** 1:17
**claims** 28:19
35:10 36:5 39:7
**clarification**
125:7
**clarify** 7:2 33:20
52:7
**clear** 7:1 115:17
**Clearly** 115:18
**clinic** 15:19

59:15
**clinical** 9:18,21
47:24 48:15
93:24 94:1,6,6
94:18 103:14
104:4 105:18
106:8 109:6
114:20 115:12
115:13,13
116:8,14
122:21
**clinically** 114:9
126:19
**clinician** 8:9
113:19 114:4
115:6
**clinics** 19:14,16
**close** 50:2
**closely** 19:22
22:17
**closet** 54:21
**clue** 49:20
**CNMs** 93:23,23
**code** 113:8
**Colleen** 1:7 2:18
31:2,7 33:12
35:11,12 36:16
36:18 43:12
58:10 59:6,18
72:17,22 88:19
88:23,24 89:10
94:1 131:6
**Colleen's** 89:7
**come** 17:20 18:22
19:24 20:7 29:1
31:13 50:6
55:13 67:17
76:23 103:23
**comes** 17:16 70:2
81:3 83:1 109:8
**comfortable**
128:20
**coming** 14:19
17:7 35:24 74:6
**comma** 64:4
**command** 127:11
**commencement**
132:3
**commendation**

79:21 80:1
92:18
**commended**
123:9
**comment** 64:12
64:18
**comments** 18:4
**Commission**
19:23 20:3,23
21:1,24 80:3,7
92:16,22
**Commission's**
21:4
**committed**
122:15
**common** 112:8
**communicate**
54:15
**communicated**
41:8,15
**community**
19:12,19 59:14
**complacency**
119:24 120:11
120:22,23
123:20
**complacent**
119:19,21
120:18
**complaint** 7:16
7:17 27:9,13,24
28:7,11,14,19
28:23 29:2 30:3
30:6,13,17
31:11,15 32:10
32:14,19 33:2,8
33:9,16 34:4,5
34:14,15 35:1
35:10,13,16,18
36:5,24 37:3,8
37:11,16 39:3,7
40:8,13 41:9,10
41:11,17,17,19
42:1,6,14,17
43:9,17 44:14
44:22 49:16
**complete** 8:18,19
43:7 81:6
103:24 109:15

131:17
**completed** 8:11
13:22 21:19
75:22 104:8
**completely**
117:18
**comprehensive**
104:13
**computer** 81:6
**concern** 55:8
64:14 67:20
68:4,6 69:17
81:8 116:8
**concerned** 57:18
64:2,6 69:22
114:9
**concerning** 41:9
41:16 51:21
132:4
**conditions/resp...**
104:17
**conduct** 113:8
114:11
**conference**
103:12
**confined** 53:19
98:14 99:4
**confirm** 62:14
**confused** 10:18
**confusing** 7:1
**connection** 115:2
**consensual** 98:14
99:5 107:2,9
112:10,14
**consent** 104:20
107:8
**consented** 107:14
**consenting** 98:20
**considered** 94:1
**consisting** 131:15
**constitute** 76:9
**constitutes** 76:6
132:6
**consult** 15:2 46:7
106:7 110:24
**consultations**
104:16
**consulting** 46:6,9
**consultive** 106:10

**contact** 93:8 97:8
97:16,20 98:7
98:10,14 99:16
99:18 101:14
102:2 103:17
103:23 104:20
105:2 108:1
110:18 112:7
**contents** 73:16
**continue** 8:12
**continued** 3:1
54:22
**continues** 19:10
**continuing** 8:14
**conversation**
54:6 55:1,5
56:20 75:6 86:2
118:3,5
**conversations**
44:3,6,12 48:21
85:23 87:21
88:18 117:21
**conveyed** 64:17
**convoluted** 14:23
**coordinator**
24:21
**copied** 59:17
60:6,13,16
**copies** 63:24
**copy** 20:16
129:14
**copying** 58:3
**Corcoran** 27:14
31:9 38:3,8
**correct** 9:10,11
9:11 10:13
12:12,13,14
13:14,15 18:4
19:7,20 20:13
20:14 22:18
26:6,22 29:23
38:5 42:18 43:5
44:7,8 48:10
49:21,22 50:12
50:13 53:21
55:19 56:14,15
57:9,10 59:4,5
59:8 61:2,14,15
61:20 62:20,21

63:23 66:14
68:16,16 69:12
69:18,19 70:22
71:3,4,7,8,16
72:18,19 75:16
75:17 76:20,21
79:12,13 80:2,2
80:4,5 82:4,5
82:14,15 83:9
83:10 85:11,12
87:2 88:3,20,21
90:11,12 91:10
91:11 92:1,5,11
92:12,18,19
93:4,5,9,10,16
93:17,20 94:7,8
94:20,21,23,24
95:10,11,18,24
96:3,4,6,7,8,9
96:14,15,18
97:5,17,18
99:13,14,23,24
100:2,3,5,6,7,8
100:10,11,14
101:21,22
102:4,5,10,11
102:20 105:3,4
105:7,8,14,15
105:23,24
106:2,12,13,22
106:23 107:9
107:10,12,15
107:16 108:2,3
108:7,13,14,16
108:17,19,22
108:23 109:1,2
109:6,7,10,11
109:18 110:24
112:1,16,17
113:10,22
114:2,17,18
115:20,21,24
116:3,4,9,18
118:1,2 119:8
119:13 120:6
120:11 121:4
127:13,16,17
127:23,24,24
131:17

**correcting** 29:9
117:6
**correctly** 116:15
**Cottage** 58:24
**couched** 66:24
**counsel** 5:2,6,20
41:16 49:16
132:12,12
**couple** 6:9
**course** 96:24
112:24 123:2
125:14
**court** 1:1 5:1
6:14 12:2 34:24
129:11 131:1
**Courts** 1:18
**courtyard** 16:4
**cover** 59:18
68:22 115:6
**coverage** 32:6
65:5,10 67:10
67:13 68:19
**covered** 32:6
38:10 41:11
59:2 71:21
**covering** 65:22
**CPS** 9:17 19:18
98:19
**create** 64:21
**created** 15:15
86:20 92:21
**creating** 87:3
**critical** 122:21
**Cross** 4:6
**CROSS-EXA...**
127:8
**crowd** 24:22
**CSR** 3:18 132:21
**curiosity** 79:20
**curious** 24:6
**current** 7:16 11:4
34:10 113:2
**CV** 46:19,23

————————
**D**
**D** 4:1 103:23
**D-i-a-n-a** 7:9
**danger** 128:16,21
**dangerous**
120:20

**Daniel** 32:2,9
**data** 20:1 106:11
**date** 41:12 56:13
90:11
**dated** 26:23
44:10 94:23
**dates** 9:13 10:17
10:22 22:11
34:3 75:21
79:23
**Dawson** 11:10
58:3,4,5
**day** 25:17,19
54:4 55:6 56:21
88:7 95:9
126:13,20
128:11 131:22
132:15
**day-to-day** 35:6
**deal** 15:4 68:21
**dealt** 80:17
**December** 8:6
10:1
**decision** 129:23
**decisions** 53:7
104:16
**defendant** 1:14
2:18 3:7 5:16
5:19 7:13 26:20
35:20 36:3 37:5
41:15 86:5
131:11
**defendants** 1:9
2:17 5:15 7:20
27:14 35:9,12
35:19 36:4,7
41:8 43:11 85:6
131:7
**defenses** 39:2
40:7
**defines** 101:9
**definition** 98:3
101:1 105:10
112:13
**definitions** 102:8
**degree** 8:1 38:11
64:22
**Delaney** 1:7 2:18
5:15 31:2,7

35:11,12 36:17
36:18 43:12
58:10 72:17,22
88:19 94:1
131:6
**deliberate** 99:19
**deliver** 117:23
**delivered** 86:23
116:15 117:7
119:1
**delivering** 91:22
106:5
**denial** 42:5
**Dennis** 18:21,24
**deny** 42:17
**dep** 17:10,17
**department** 3:12
48:15 62:2,19
81:4
**depending** 65:12
**DEPONENT**
130:3
**deposed** 68:11
**deposition** 1:16
4:9 6:10,11
46:7 122:9
131:14,18
132:5,8,10
**depositions** 1:19
**deputy** 91:5
**describe** 104:15
**describes** 63:17
81:19
**describing** 54:1
62:18 91:19,22
**description** 24:21
**designed** 82:3
**designee** 102:14
106:8
**desperate** 124:21
**detail** 63:17
**detailed** 99:17,21
**details** 11:12
67:10
**determined**
103:14
**develop** 81:16
118:12
**developed** 81:9

81:12 119:15
**developing**
118:16
**development**
90:19 117:19
**devious** 124:20
**diagnosis** 95:17
95:19
**Diana** 1:7,16
2:18 4:3 6:1,7
7:9 12:20 20:11
26:20 47:1
49:15 56:9
110:5 121:3
122:8 124:11
125:5 129:9
131:6,21
**Diane** 125:24
**dietary** 50:5
**different** 9:13
13:2 14:3 15:1
15:5,20 19:15
19:16 20:1,8
21:2,3 46:20
50:5,5 59:20
61:5 68:8 80:12
80:13 81:16
89:1 98:21,24
120:19 123:5
125:17,17
**differently** 123:8
123:8 129:19
**difficult** 14:6,10
22:13 29:14
**dinner** 120:22
**direct** 4:4,5 6:4
26:8 29:21 61:1
72:7 126:4
**directed** 67:18
84:15 111:21
113:20
**Directive** 104:1
**directly** 31:5 61:9
81:4 83:9 85:2
100:17 127:22
132:13
**director** 9:24
10:2,4 11:20,21
11:22,23 12:2

13:17,18 18:17
18:18,20 19:4,5
19:10,21,24
20:9,12 22:22
24:12,13 25:2
25:14,16,18,20
26:1,4 30:1,24
31:3,10 32:3,5
32:8 33:19,24
34:2,10,19
47:21,22,23
48:13,20 49:24
51:16,18 53:15
54:7 58:5,13,14
58:19 59:13
60:22,22 67:24
69:23 79:24
80:9 90:14 91:5
93:18 94:4
96:24 102:14
105:19,20
106:8 116:17
127:14,14,19
127:20
**directors** 24:15
25:3,11,13
**dirty** 15:14
**Disabilities** 95:24
**discharged** 45:15
**discipline** 23:16
23:17 80:11
**disciplines'**
121:17
**Disclose/Obtain**
104:9
**discovered** 49:3
72:9,20 73:10
103:8
**discuss** 14:7
33:12 95:8
**discussed** 41:14
102:7
**discussion** 38:9
72:23 74:12,20
74:21
**diss** 21:6
**disseminated**
14:4 81:17
**distinction** 98:9

107:6,7,8
**District** 1:1,2,18
131:1,1
**DIVISION** 1:2
131:2
**divvied** 65:8
**doctor** 103:18
**doctors** 43:13
95:1,6,8
**document** 46:6,7
57:22 62:1 90:6
97:7 98:2,5,10
105:22 108:24
109:9
**documenting**
111:16
**documents** 27:10
39:3 40:8 42:8
46:8 112:19
114:20
**doing** 21:13,14
23:24 33:21
69:16 70:8
86:12 118:9
125:11
**DON** 93:18 94:3
**Donna** 18:18
**door** 54:9,9,11
**doors** 54:18,23
67:21
**dozen** 50:2
**Dr** 2:18 37:5,18
37:19 38:3,6,8
38:8 57:17 60:9
60:10,11,13,14
60:21,23 87:13
87:20 88:15,16
**draft** 95:24
**drawing** 107:6
**dreamed** 111:11
**dress** 14:17
**Drew** 1:8 3:7
33:12 36:19,21
36:23 43:11
86:9,10,15 87:6
117:5,10,11,21
118:4,8,24
119:15 131:7
**drug** 121:7

**drugs** 9:19
**duly** 5:22 6:2
132:3
**duty** 75:19 81:3
103:18 104:5
105:19,22

**E**

**E** 4:1,8 104:4
**e.g** 103:11
**earlier** 19:12
27:13 42:10
56:22 67:3
68:12 72:12
73:12 76:12
92:10,13 117:5
117:20 122:9
123:18 127:10
128:8
**EASTERN** 1:2
131:2
**easy** 68:11
**educate** 17:2
**educated** 119:5
**education** 7:23
8:1,14 21:3,15
21:19 81:4
87:19 92:20
**educational**
86:11,16
**either** 20:22
36:21 46:15
55:8 85:11
117:2 127:19
129:12
**eleven** 43:21
**Elgin** 8:23 9:13
14:18,19 16:12
18:15 22:1
28:20 30:2,12
31:10 32:3,5,16
32:21 33:19
40:3 45:5,6,20
45:23 47:20
49:5 50:2,22
51:3 52:15,23
69:23 71:6 74:1
77:11 81:8,14
81:15 82:1,11
86:9,16 91:7,10

92:11,17 95:16
117:24 119:2,6
121:4 122:11
127:11
**email** 55:19 56:9
56:11,17 57:1,5
57:8,13,23 58:2
59:17 60:6,24
61:8,12,20
62:18 63:1,5
64:1 90:7,24
91:13 94:22
95:14 96:14,18
96:21 128:10
**emails** 59:19
62:14
**EMHC** 20:4
101:24 110:17
**emphasizing**
92:15
**employed** 60:14
**employee** 8:22,24
45:6 67:4 113:8
132:11,12
**employees** 76:5
**employment** 8:12
**encompass** 19:11
**encompasses**
19:12
**encompassing**
40:11
**encounters** 76:20
85:15,18
**ended** 45:15
**engaging** 48:23
**engineering**
54:11,24
**enhance** 119:15
**enroll** 89:2
**ensuing** 73:1,11
**ensure** 54:24
103:22 104:2
104:17 117:7
**ensuring** 102:3
**entire** 39:22
58:22 82:11
86:1 111:12
116:2 117:23
125:15

entitled 93:8
Epperson 11:23
  55:22,23,24
  56:1 57:4,14,20
  60:24 62:19
  64:1,6 66:19
equal 69:21
  116:11
equally 114:9
error 110:12
escape 74:1,8
  78:8,13 126:19
essentially 19:24
  44:24 95:6
et 103:13
ethical 125:20
evaluate 103:20
event 54:8 108:24
  115:7
events 41:9,17
everybody 25:7
  110:7 120:8
evidence 49:8
  50:14,18 51:7
  51:12 73:10
  104:3 116:5
  122:19
evidenced 111:19
exact 58:21
exactly 22:22
  62:19 70:16
  97:19 119:23
examination 6:4
  26:8 103:19
  126:4 132:3
examined 6:3
example 14:17
  15:6,12 50:20
exhibit 4:9 26:10
  26:11 55:12,13
  55:16 89:23
  91:14 107:18
  109:19 110:16
  111:6 116:3
Exhibits 4:14
expanding 126:2
expect 38:3,14
expected 81:22
experience 71:13

expert 119:6
expertise 121:10
exposure 99:19
express 55:8
extensive 112:6
extent 16:15
  72:12 103:15
extra 21:21 64:17
eye 115:18 120:9
eyes 16:10

———————
**F**
F 9:22 58:23 65:5
  104:6
face 124:18
Facebook 23:24
facility 20:9
  21:13 58:5
  67:24 94:20
  98:15 99:5
  124:14 128:4
facility-wide 21:3
  47:23
fact 22:6 39:5
  54:14 64:2
  100:13 118:19
  128:18
facts 27:9,11
  28:10 29:2 30:6
  32:19 33:7,15
  34:14 35:22
  39:1,4 40:7,9
  41:11 42:5
  122:19
fair 11:1 23:14
  47:15,16 63:2,8
  64:10 67:14
  68:24 91:24
  94:17 120:7
fairly 22:17
  24:22 71:15
  99:21 112:6
faith 39:6,11,20
  39:22 40:10,15
  40:18,21 67:5
  67:15 68:13,18
  69:2,3,6 70:7,9
  71:10
Faiza 1:7 2:17
  131:6

false 111:8,17,18
  111:20 116:3
falsely 111:22
familiar 7:12
familiarity 38:3
far 67:22 113:6
  123:20 128:21
fast 77:5
favorably 92:23
fearful 97:24
Federal 1:17
feel 97:24,24
feeling 18:4
fell 127:21
felony 76:14
felt 67:9 71:11
field 18:17
fifty-ish 26:1
fight 115:8
file 16:13
filed 49:16 82:9
filing 92:8
final 35:8
finalized 129:15
financial 13:23
find 51:9 73:24
  113:1 115:9
finding 50:24
  52:13 74:3
findings 21:23
  79:18
fine 6:8,8 17:11
  46:17 47:3,8
finish 8:3 32:23
  64:15 110:14
finished 8:4,6
  44:18 73:7
  77:14 84:6
first 4:8 6:2
  10:17 11:5
  18:14 22:2 27:7
  27:17 28:19
  44:21,23 45:2
  50:10,24 52:13
  54:7 74:3 90:3
five 27:4 42:3
  52:3 106:14
five-minute 52:5
fix 16:9

fixes 129:18
fleeting 86:2
Floor 2:15 3:4
folks 119:2
follow 66:22 68:1
  70:4 80:11 83:4
  83:22 107:18
  115:8 125:16
follow-up 125:22
followed 71:11
  80:21 92:16,22
  125:21
following 21:14
  28:18 54:4
  106:18
follows 6:3
foot 15:13,14,21
forcing 107:4
foregoing 131:14
  132:5
forensic 8:10
  19:11 23:7
  25:19,23 31:21
  31:22,23,24
  32:7,20 33:19
  33:23 34:2 38:5
  38:9,11,16
  43:16 47:24
  58:20,22 60:9
  70:24 98:19
forensics 58:13
forgot 44:2 96:16
form 12:18,19
  13:2 120:13
  121:23 122:4,5
  122:17 124:2
  126:21
former 28:20
  30:12 31:9
  33:19 34:2,3,5
  34:7,11
forms 99:17
forth 39:2
forwarded 57:5
found 45:20 49:8
  51:7,11,12
  63:18 72:2
  126:7,8
foundation

122:17 124:2,5
four 41:6 96:8
  106:7,11 108:9
  114:15
four-hour 83:21
  84:2,20
Francis 8:4
fresh 16:10
friendly 89:4
from/to 55:18
Frozen 115:2
FTP 9:15,22,23
  11:21 13:19,20
  63:20
fugitive 75:2
further 36:3
  67:17 125:4
  130:3

———————
**G**
G 9:22 58:23
  65:6 104:11
Galla 18:15
garbled 12:21
general 2:13 3:2
  5:20 103:1
  127:10,16
generate 116:13
generated 112:19
generating
  113:14
genital 99:18
genitals 99:19
get-together 95:7
getting 16:23
  117:6
girl 90:19
give 25:21 29:18
  51:23 66:15
  67:2 75:9 77:20
  89:21 93:6
given 25:17,19
  131:14,18
  132:7
gives 28:17 99:16
  109:12
giving 49:4 61:13
go 7:22 15:18
  16:3 18:1 43:19
  57:15 71:18,20

81:18 83:9 86:5
87:17 88:6,8,10
123:20 124:10
125:9
**goes** 65:6 76:5
101:9 106:14
106:16
**going** 16:17 17:8
17:12 23:9 24:3
29:19 32:16
33:4 46:7,14
47:1,6 52:12
55:3,13 59:21
67:18 69:5
76:23 80:22
83:2 86:5 91:18
95:8 98:5 102:6
102:9 106:24
108:12 110:2,3
115:19 117:22
127:15 128:6
**golf** 16:2,3
**good** 16:17 18:8
18:17,19,20,22
19:2,2 39:6,11
39:20,22 40:10
40:15,17,21
52:2,4 67:5,15
68:13,18 69:2,3
69:6 70:3,6,7,9
71:10,15 82:1
115:12,13
117:11
**gossip** 77:9
**gotten** 66:8 67:11
**governance**
92:11
**governing** 19:22
**graphic** 99:21
**gratification**
99:20
**grave** 128:21
**great** 16:18 18:11
21:7,22 63:12
88:8 104:22
110:10
**grounds** 50:7
**group** 36:7 42:10
61:13 91:21

**groups** 125:17
**guard** 65:3
**guardian** 104:6
**guess** 11:7 16:10
29:16 41:2 47:4
48:8 60:3,12
62:16 82:2
**guessing** 25:21
**guidance** 128:1
**guilty** 76:14,19
**Gunderson** 3:13
17:10
**guys** 24:3
**GYNE** 19:16

## H

**H** 4:8 58:23
**H-o-g-a-n** 7:9
**H.A** 10:7,8,20
**half** 112:4 124:1
124:23
**hall** 23:7
**hallways** 85:21
**Hamlin's** 63:21
128:7
**hand** 132:14
**handle** 55:3
102:19 106:21
**Hang** 24:2
118:23
**happen** 54:22
55:1 104:24
117:8 119:16
120:24
**happened** 11:13
22:1 41:21 42:1
52:14 54:8,14
54:19,22 64:23
66:9 72:20
76:15 88:7
100:12 115:1
118:21 119:11
123:24 124:13
**happening** 44:24
51:4 120:2
**happens** 99:12
101:17 109:5
120:24
**happy** 16:5
**Hardy** 32:2,9

38:6 60:10,11
60:13,14,23
**harm** 17:24
**Hartman** 58:23
**Hasina** 1:7,13
2:17,18 131:6
131:10
**he'll** 17:16,23
**head** 6:23 18:23
**Headley** 18:21,24
**health** 8:23 22:1
28:21 30:1 50:3
98:15
**healthcare** 8:3,6
**hear** 6:16 40:20
49:2,11,12
50:14 54:5 63:7
72:5 74:9 78:4
78:15 79:8
**heard** 12:16
19:18 23:22
40:18 49:6,7,9
49:19 50:10
54:3 73:19 74:8
74:16 77:9
78:22
**hearing** 29:14
**hearsay** 83:6
**heightened**
106:15
**held** 9:9
**help** 15:23 17:3
41:4 89:1
**helped** 75:2
88:24 126:9
**Helpful** 110:16
**helping** 15:14,17
66:9 74:1 78:7
78:12 118:12
122:13
**hereto** 132:12
**hereunto** 132:14
**hey** 129:17
**Hi** 86:3
**hiding** 124:23
**hierarchy** 25:8
**high** 120:3
**highly** 119:5
123:9,10

**Highway** 2:3
**HIPAA** 77:17,23
**hired** 41:3
**hiring** 22:13
**history** 24:7
**Hofmann** 18:15
18:16
**Hogan** 1:7,16
2:18 4:3 5:15
6:1,6 7:9,9
26:20 41:15
56:9 131:6,21
**Hold** 49:14 122:7
**honestly** 35:6
39:18 60:4
65:18 66:10
74:23 75:7
79:19 98:23
113:10 121:8
**horrible** 15:13
**hospital** 8:10,12
10:5,8,9,10
11:3,4,8,19
12:10 13:3 21:5
24:9,11 26:5
31:17 45:9,12
58:6,8,18 79:12
79:17,22,24
80:23 81:3
82:17 83:7 91:6
105:20 123:10
**hospitals** 92:23
**hour** 112:3
124:24
**hours** 114:15
128:20
**housekeepers**
24:16 25:6,10
**housekeeping**
54:21
**HR** 11:23
**Human** 3:12
**Hurt** 1:4 5:10,16
5:19 27:14
43:22 45:15,19
48:23 49:4
50:21 52:14
54:2 62:4 68:5
68:6 69:9 72:14

76:20 85:3,6
89:15,19
116:23 122:10
128:8,13,22
131:3
**Hurt's** 73:11

## I

**idea** 36:18 37:17
65:16 123:6,12
**identical** 114:3
**identification**
42:8
**identifies** 111:7
**identify** 5:7 27:8
27:10 39:1,3
40:24
**identifying** 40:6
**IDPH** 19:22
**III** 101:15
**ill** 121:20
**Illinois** 1:2,20,21
2:4,9,13,15 3:3
3:5,12 8:16
49:24 81:4 91:6
104:10 131:1
132:1,15,19
**illness** 14:24
15:18 95:23
**imagine** 15:16
**immediate** 72:17
88:19 102:3
103:18
**immediately**
101:12,19,19
102:9 103:10
129:2
**implementation**
91:20 93:11
**implemented**
97:4 113:21
**implicit** 102:8
**imply** 38:17
**importance**
92:15
**important** 18:5
125:15
**inappropriate**
64:19 68:2

69:11
**incident** 54:1,4
  55:6 57:8,18
  59:1 62:22
  101:13 103:24
  104:1,5 105:21
  105:22 106:18
  109:5 111:22
  117:24 126:14
  128:6
**incidents** 34:21
  75:16 76:2 81:1
**include** 11:16
  109:13
**includes** 11:17
  131:18
**including** 104:12
  119:6
**inclusive** 44:13
  131:16
**increase** 103:21
  108:10
**indicated** 104:2
**indicating** 62:3,3
**indirectly** 132:13
**individual** 41:8
**Individualized**
  111:6
**individually** 36:6
**individuals** 28:18
  104:7
**inform** 73:2
**information**
  30:17 31:14
  37:3,4 40:13
  41:7 42:3,7,12
  43:17 45:18,22
  48:21 51:9
  53:15 54:5
  61:14 64:12,16
  75:21 81:19
  82:18 88:10
  89:13,14 91:23
  104:9 106:6
  109:16
**informed** 59:21
**Ingram** 12:3
  34:23 35:1
  57:17 61:1

**initially** 7:12
**Initiate** 108:9,15
**Initiate/complete**
  104:11
**initiated** 108:12
**injuries** 115:20
**injury** 104:12
  108:15 109:15
  115:9
**inner** 65:4
**inquiries** 52:17
**instance** 33:6
  71:9 72:1 81:11
  107:3
**institution**
  122:15
**instructed** 124:6
**instructor** 90:20
**Intellectual**
  95:23
**intended** 119:10
**interact** 78:24
**interaction** 43:22
  85:15
**interactions** 87:6
**interest** 122:13
**interested** 132:13
**interim** 10:7
**internal** 81:7
  82:1,2 92:11
**internally** 81:9
**internet** 72:22
  117:3
**interpatient**
  102:2
**interpretation**
  64:10 66:2,4,6
  67:14 68:20,24
**interrogatories**
  7:17 26:12
  27:21,24 28:2
  55:14 67:4
  71:19
**interrogatory**
  27:7 42:20
  43:10,21 53:23
  73:6 75:10 78:6
  82:7 85:13
**interrupted** 63:7

**interventions**
  15:3 104:16
  112:4
**interviewed** 50:1
  51:20
**interviewing**
  50:8
**investigation**
  50:1 51:4,21
  79:14
**involuntarily**
  122:15
**involuntary**
  98:15 99:4
**involve** 34:22
  106:5 125:18
**involved** 20:9
  23:17 29:6 35:6
  51:4 53:6 75:21
  77:10 86:12
  118:12,18
**involvement**
  106:1
**ISP** 50:4,6
**issue** 46:14
  121:20
**issues** 14:7,10,22
  15:5,15,20 16:9
  68:19 89:11,18
  117:23
**IV** 14:16 107:17
**IVs** 14:18

_____

**J**

**Jacobson** 59:11
  59:12,13
**James** 27:14 31:9
**January** 10:3,6
  10:18,19 20:17
  45:9 79:23
  90:11 94:23
  95:9
**Javed** 1:7,13 2:17
  2:18 5:15,16
  37:5 87:13,20
  88:16 131:6,10
**Jeff** 11:21 18:21
  23:2 34:19 54:7
  54:13,16 56:16
  56:20 60:16

**66:8,17 67:19**
  67:24 87:16
**Jeffrey** 22:17
  23:19 33:18,23
  34:2,13
**Joanne** 29:24
  30:2,7
**job** 24:7,21 47:20
  48:12 70:4,9,24
  71:2,15 96:24
**jobs** 9:9 33:20
  71:1
**Joe** 17:5 24:3
  26:7 38:2,14
  47:12 51:24
  84:5 129:5
**joe@kretchma...**
  2:5
**John** 2:3 18:16
**Johnston** 2:14
  4:6 5:14,14
  12:18 13:5,9
  17:5,11,18,24
  46:17 47:4,8,12
  51:24 52:2 84:5
  102:22 110:1,4
  110:7,12 122:5
  122:18 124:6
  124:10 125:5,9
  125:24 126:3
  127:6,9 129:3,8
  130:1
**Join** 122:18
**Joint** 19:23 20:3
  20:23 21:1,4,24
  80:3,7 92:15,22
**Joseph** 2:3 5:12
**journal** 126:8
**July** 9:23 20:18
  45:10,15,23
  46:2,3,3,22
  47:19,19 48:20
  51:14 58:7
  79:23 89:8
  116:18 126:13
  126:20
**June** 47:19 56:13
  58:7 66:5 126:6
  132:15

**junior** 72:17

_____

**K**

**K** 36:14,21 53:8
  54:3 57:9,18
  58:23 59:1,6
**Kareemi** 1:7 2:18
  5:15 37:18,19
  88:15 131:6
**keep** 110:1
**Kelly** 30:11 94:11
  94:11
**kind** 14:22 16:7
  22:2 23:2 24:19
  24:21 25:7
  46:19 47:9
  66:24 70:8 71:5
  71:19 80:17
  85:16 86:13
  91:18 93:1
  95:13 99:18
  102:7,8 112:15
  119:19 120:22
  120:22 122:2
  127:10,15
  128:21
**kinds** 21:15
**Kiss** 91:3,5
**kissing** 99:17
**knew** 11:14,16
  12:7 18:24
  21:10 38:10
  45:22 46:1 50:4
  50:6 51:7,8
  85:20 87:20
  124:17
**know** 6:6,10 9:12
  11:12 14:20
  16:5,20 17:3,13
  18:5 21:8,11
  22:11,14,21,22
  23:9 28:1 29:1
  29:13,14,20
  30:5,16,18
  31:14,18 35:7
  35:15,17,24
  36:17,22 37:2,4
  37:10,12,21
  38:8,12,20
  39:15,18,24

40:20 42:7,16
43:1 44:17,21
46:5,8,13,23
47:6,7,18 50:7
50:8,17,23 51:3
52:24 53:3
54:22 56:21
59:16 60:1,2,4
60:5,15,15 63:6
63:14 65:15,16
67:10 68:2,19
69:24 71:23
73:3,6,15 74:2
74:5,5,13,17
75:8,13 77:6,14
77:24 79:3 82:3
83:17 85:5,8,9
85:10 89:2,3
90:16 94:10,12
98:9,22,23 99:6
99:11,18
100:24 107:1
109:24 113:5,7
113:10 118:5
118:14,14
120:1,7,18,20
121:6,6,7,11,13
121:14,16,17
121:19 123:1,7
123:8 124:20
124:22,24
128:4,19
129:17,19,20
**knowing** 60:5
**knowledge** 12:17
16:15,23 26:22
27:9,11 28:10
28:18 29:12,21
30:6,10 32:8,16
32:21,22 33:3,7
33:10,15 34:18
34:20 35:4,9,16
35:18,21 36:4
36:13,16,16
37:11,12,22
38:4,15,18 39:1
39:4,19 40:7,9
40:21 42:4,6,13
43:15 52:22

72:7,12 73:10
73:14 78:12
119:3
**known** 13:3
40:18 82:13
117:2 122:13
**knows** 29:22
36:18 115:6
**KOTRBA** 1:19
3:18 132:1
**Kozar** 3:3 5:18
5:18 120:13
121:23 122:4,6
122:17,19,22
124:2 126:21
**Kretchmar** 2:2,8
2:8 3:13 4:4 5:9
5:9 6:5 13:1,12
17:22 18:2 24:2
24:5 26:7 38:2
38:13,21 49:15
49:19,23 70:16
121:3,9,12,19
121:24 122:2,8
122:20,23
123:9,12 129:6
**KWAME** 2:13
3:2

**L**
**L** 3:3 28:20 36:14
36:22 37:6 48:2
48:4 53:7 58:23
63:20 88:5,11
88:12
**laid** 9:19
**lane** 70:8 71:10
102:16 108:21
111:2
**Langley** 29:24
30:2,7
**large** 24:22
**Larson** 28:20,22
29:8,19,21
**laundry** 54:20
**Laveck** 18:18
**law** 114:14
**laws** 77:17
**lawsuit** 7:12
**lawyer** 46:8

77:20
**lawyers** 41:2,3,4
**leadership** 8:3
25:7 91:20
106:19
**leave** 11:11
**leaving** 52:23
**left** 11:4,9 52:15
60:15 67:11
**legal** 107:6
112:13
**Lenhardt** 30:8
45:19 48:23
49:3 50:20 54:2
62:4 67:11
69:15 72:13
73:24 76:13
77:10 78:1 79:5
85:3,6,15,19,24
89:10,19
116:22 119:11
122:14
**Lenhardt's** 63:20
89:14
**let's** 7:22 19:3,21
77:13 101:1
109:4 110:13
**letters** 61:17
80:13
**level** 108:10
120:4
**liaise** 80:6
**liaison** 20:4
**license** 8:17
132:21
**licensure** 8:17,19
**light** 126:1
**likewise** 6:18
**limit** 24:6
**limiting** 33:5
**limits** 69:24
**Linda** 90:16,18
90:21 118:4,9
118:11
**linear** 25:7
127:12
**lines** 82:19
**Lisa** 1:19 3:18
17:14 70:19

129:11,21
132:1
**list** 29:5 35:5,7
35:17,23 43:4,7
43:10 61:3
96:17 102:12
103:4
**listed** 17:13
29:24 31:9 32:3
33:7,18,23
34:17 35:4,19
35:20
**Litt** 18:19
**little** 21:1 46:19
47:5 75:24
80:19 98:21
**loaded** 81:5
**located** 63:20
**location** 103:13
**lock** 65:20
**locked** 54:2,10,21
55:9 62:5 63:21
67:12 128:7,12
128:19
**logistically**
117:16
**long** 83:14
117:24 119:18
124:15
**look** 15:23 16:9
26:17 27:3
42:19 46:4,23
53:2,22 55:2
57:4 61:22
63:24 71:22
73:5 75:10
77:13 78:6
89:22 90:3 92:2
109:19 123:2,5
128:23
**looked** 14:2,3
15:19 28:14
**looking** 15:20
21:9,17 26:2
28:6 38:24
52:10 57:12,22
91:13 102:6
127:2
**looks** 26:14 33:19

43:24 46:18
57:6,14 90:8,23
92:22 95:15
106:6,19
**lose** 15:21
**lot** 21:16,19
22:12 57:14
99:17 109:16
111:16 119:5
**lower** 112:4

**M**
**M** 58:23 80:14
**M.D.'s** 95:1
**maintain** 8:19
**making** 21:13
62:16 66:3
81:13 92:16
97:3 125:12
**maladaptive**
111:17
**Malini** 60:19,21
**Malis** 60:8
**man** 19:1
**manage** 71:14
**management**
93:2,2,12 104:1
**manager** 20:6
30:24 31:4 65:5
93:13,14 94:2,6
104:4 105:18
106:9
**managers** 14:5
93:24 94:18
▮▮▮▮ 78:21
79:6,9,15
**Manual** 92:7,9
93:7 97:16
**Mark** 1:10 5:10
63:19 131:8
**marked** 89:22
**Mary** 2:14 5:14
18:19 46:14
84:18 85:1
110:3 125:7
**Mary's** 106:24
**mary.johnston...**
2:16
**Master's** 8:5
**match** 62:10

**materials** 86:16 87:4,11 95:9 117:19
**math** 9:3,4
**matter** 5:19 26:20 36:4
**matters** 132:4
**mean** 7:16 14:11 15:7 16:11 17:7 21:12 32:14 34:6 39:10 40:14 64:5,11 64:12 68:15 70:6 77:19 97:20 98:6 107:1 121:3 127:18 128:18
**meaning** 70:8 107:7
**means** 32:15 33:16 34:7 64:6 64:14 69:1 70:10 85:10 98:4 129:13,20 129:22
**meant** 32:20 39:16 66:19 67:15 129:18
**measures** 14:2,3
**media** 72:4,21 73:4 117:1
**medical** 14:6,10 14:14,24 15:3 16:15,22 31:10 32:3,5,8 60:22 95:5 103:18 104:14 105:19 106:7
**medication** 15:8
**medications** 15:11
**meet** 87:3 113:1
**meeting** 16:8 33:11 88:17 90:9 95:5 106:18 109:6
**meetings** 23:7,8 87:17 88:1,4,12 109:9

**member** 61:2 69:12 76:8 98:13,16 101:20 112:20 114:5,11,21
**members** 126:17
**Memorial** 8:2
**memory** 46:12,16 47:1,6 73:19
**mental** 8:23 22:1 28:21 50:2 95:23 98:15
**mentally** 95:20 121:20
**mention** 6:9 89:10,13
**mentioned** 17:22 18:11 67:14 114:13 117:9
**mentor** 89:1,4
**mentors** 16:17 18:11,11
**mere** 54:14
**Meredith** 91:3,4 91:5
**merely** 33:3 91:10 100:12 116:6
**met** 23:8 43:23
**Michigan** 2:9
**microphone** 29:15
**mid** 10:6
**middle** 9:20 23:14 57:9
**milieu** 101:12 103:11
**mind** 46:6 64:22
**mine** 97:10 109:21
**minute** 17:23 27:3 63:14 76:24
**minutes** 52:3
**mirrored** 21:9
**mischaracterize** 123:19
**misconduct** 84:9 84:15,16,17

112:20 113:16 114:5,22 116:12
**miswording** 44:23
**module** 109:5
**mom** 45:4,6
**moment** 22:3 55:14 57:15 98:5
**monitored** 13:22 13:23
**month** 48:19
**monthly** 81:18
**months** 9:20 52:23 111:20 111:23 122:11
**morning** 54:8 56:22,23,24 87:17 88:1,4 90:9 106:17 109:1,3,6,8,9
**move** 110:13 111:4
**moved** 31:3
**MSO** 95:3,3,5

—————
**N**
**N** 4:1 58:23
**name** 7:8 11:24 28:20 35:24 80:18
**named** 35:9 36:3 36:6 37:5 78:21
**names** 28:17 91:12
**nature** 20:2 54:16 97:22
**necessarily** 53:16 81:2 100:18
**necessary** 40:19
**necessity** 91:19
**need** 6:21 15:23 21:8 59:22 80:19 103:5 113:4,5 114:23 115:9,10,10,11 118:5 121:1 123:5
**needed** 15:18

54:24 71:11 88:9,9 100:18 114:16 125:23 128:1
**needing** 112:9
**needs** 6:15 14:24 84:19 103:14 113:2,2 114:20 123:4
**neglect** 76:6,7,9
**neither** 60:16
**Nenette** 30:22 31:3,5 94:11
**never** 21:24 43:23 49:9 73:19 77:9 81:11 82:9,13 84:14 85:11,22 85:24 87:23 98:16 99:9 107:13,14 118:21 119:16 120:24 123:6 123:19 124:6
**new** 16:20 19:8 95:24 120:1
**news** 45:3,5 49:6 49:10,15 50:11 50:15 51:11,14 75:8 117:1,3 118:1
**newscast** 45:4
**Nidelkoff** 90:16 90:18,21 118:4 118:11
**Nidelkoff's** 118:10
**night** 57:18 120:21
**nodding** 6:22
**non-psychiatric** 14:11
**nonconsensual** 93:8 97:8,16,19 98:10 99:13,16 100:5 101:5,13 102:2,23 104:20 105:1 106:22 107:9

108:1 110:17 112:7,9 126:16
**North** 9:15
**NORTHERN** 1:2 131:1
**Northwest** 2:3
**notary** 5:3
**note** 104:13
**noted** 103:2
**notes** 46:12,14,15 46:24 47:2 109:15
**noticed** 17:19
**notified** 104:8
**notify** 104:4,6 105:19
**November** 49:17 49:20 51:15
**nowadays** 82:21
**nude** 50:21
**number** 4:8 26:14,17 27:8 28:9 42:19,20 43:4 53:2,23 62:6,8,10,17 73:6 75:11 76:23 78:6 85:14 97:10,16 103:4 108:8,24
**numbered** 89:23 95:13
**numbers** 62:15
**numeral** 107:17
**nurse** 9:18,21 14:5,13,21 30:12,22,24 31:4 65:5 93:24 94:2,6,18 101:11 102:4 102:13,15 103:5 104:4 105:12,18 106:6,8,9 108:5 108:6,9 110:24
**nurses** 24:16 94:19 102:18 121:15
**nursing** 8:2 9:24 10:2,4 13:18,19

14:7 18:19,20
19:5,5,10,21
20:1,7,10,13
21:23 22:22
23:4,15,16 24:8
24:12,14,15,16
25:2,3,5,11,13
25:14,16,18,20
25:22,23 26:2,4
31:1 34:22
36:14 47:21,22
47:23 48:4,13
48:20 49:24
51:16,18,19
53:15,19 58:13
58:14,19 59:14
69:23 71:2
79:24 80:8,9,10
86:24 93:19
94:4 97:1
102:14 103:12
105:2,7,12,20
106:2 108:20
108:21 111:2
116:18 117:14
119:2 121:16
125:18 127:11
127:14,20,22

**O**

**oath** 5:4 131:16
**object** 77:22
120:13 122:4
122:17 124:2
126:21
**objection** 5:3,11
5:13,17,19,21
12:18,19 13:5,8
102:22 103:2
107:1 121:23
122:22
**objections** 77:20
**obligated** 82:24
**observation**
103:21 106:16
108:10
**observes** 102:1
**observing** 5:21
17:10,17
100:17 120:2

**obtained** 45:23
**obviously** 7:18
56:8 100:15
112:2 113:5
**occasion** 66:16
88:17
**Occasionally**
23:24 87:16
**occur** 65:11
114:4
**occurred** 101:6
123:13
**occurring** 34:21
**occurs** 97:22
**October** 9:20
10:6,19 44:11
**offer** 89:13
**office** 20:1 24:17
24:19,21 25:6,9
25:9 54:2,7,10
55:9 57:20 62:5
63:20,21 64:4,8
64:20 67:12
72:21 91:8
103:13 127:16
128:7,12,14,19
**officer** 63:19
**offices** 124:22
**oh** 36:9 68:10
96:16 97:14
110:4,6 120:19
**OIG** 19:22 75:20
76:2,3 79:14,18
80:6,8,9,12
82:9,20,24 83:3
83:4,9,18 84:3
84:8,16 112:23
114:13
**okay** 6:6,9,14 7:6
7:19,22 8:1,8
8:21 9:8 10:21
11:1,1 12:5
13:16 24:2,2,22
26:7 28:17
29:17,19 32:2
34:12 36:2,9,9
38:21 42:21,24
43:2,19 44:1,19
46:10 47:11,15

48:18 49:18
53:1,4,24 55:15
56:15 57:22
58:1 59:16 60:5
60:8 61:7,19
62:6 63:12,16
65:13 68:11
71:24 73:5,8
75:12,14 76:22
77:1,4,8,15
78:20 82:6,8
86:7 90:5 93:7
94:5,14 97:6
98:4,24 99:3,12
102:6 104:22
105:16 107:21
109:23 110:6
110:19 111:5
111:14 112:6
118:24 121:2
121:12 122:2
123:16 125:10
127:2,5,6 128:6
129:3 130:1
**old** 9:2
**once** 50:15 86:10
88:6,8 102:13
103:7 105:1
122:13 125:8
**one-on-one** 17:2
**ones** 18:22 80:14
91:14 102:18
**opened** 54:12
**operations** 91:6
**opinion** 122:24
**opposed** 6:22
19:5
**optometry** 19:17
**oral** 49:4 73:18
**order** 6:16 21:6
127:13
**ordering** 129:7,8
**ordinarily** 53:14
119:23
**ordinary** 65:22
96:23 107:7
**organization**
95:5
**orient** 82:21

**original** 58:2
**osteo** 15:20
**outcome** 14:9
21:23 132:13
**outlined** 101:14
**outlines** 100:1
**outside** 54:7
**outstanding**
20:12,17
**oversaw** 13:19,24
19:14,17 34:20
59:15
**oversee** 48:4,7
93:3
**overseeing** 48:9
71:15
**oversight** 21:20
24:6,8 31:23,24
38:4,6,16 91:9
92:20
**overtime** 13:22
22:13
**Owens** 1:10 5:10
5:16 131:8

**P**

**p.m** 1:22 62:3
**page** 4:2 26:17
27:7 40:23
43:19 57:9,12
58:1 61:22,23
90:3 91:19
95:15,21 96:2,3
96:6,8 97:6,7
97:12,12 99:16
105:11,16
106:17 107:21
109:20,20
111:4 112:4
**pages** 26:14,15
26:15 27:4 58:1
89:23 90:1
113:20 131:15
**paperwork** 7:14
7:15 104:12
108:10,12
111:16 112:22
114:23 116:13
**paragraph** 91:19
91:24 92:2,3

105:10 110:23
**paralegal** 17:9
**paranoia** 15:1,4
**Park** 2:4
**part** 10:17 11:5
12:3 15:21
29:11 38:9 39:4
43:12,13,16
56:3,5 69:5
79:20 80:7,24
92:17 97:3
98:18 101:15
101:24 106:6
106:20 108:8
114:13 117:18
118:16 119:19
120:1
**participate** 88:4
**participated** 88:1
**participation**
118:10
**particular** 22:2,9
60:1 81:8
**particularly** 18:8
20:16
**parties** 98:21
132:12
**parts** 113:9
**party** 5:7
**Pat** 28:20,22 29:8
29:10,19,21
**Patel** 60:19,21
**patient** 14:8 15:7
15:12 16:8,24
17:1 18:5 32:17
49:4 50:22
53:13 54:10,20
55:10 57:20
61:2,9 62:4
64:3,7 65:4,18
65:23 67:12
69:9 71:6,15
76:9 78:21,22
79:1 92:21
98:12,13,13,17
99:4,10,10
100:17 101:6
101:18,20
102:10 104:16

107:14 112:3
112:21 113:1,5
113:17 114:4
114:10,11,21
114:24 115:8
116:12,15
119:17 120:20
120:24 123:22
125:14 126:19
**patient's** 116:8
**patient-to-pati...**
99:13 106:21
107:12 113:21
126:16
**patients** 14:6,22
14:23 19:15
31:23 48:9 65:7
69:22 70:1 76:6
77:10 82:11
93:9 95:16,23
97:9,17,23
98:19 100:16
102:24 103:22
105:2 107:2,5
112:8 113:22
115:7 119:18
**patients'** 15:4
**PC** 2:2,8 3:13
**people** 12:1
16:18 21:7
22:12 24:17,19
25:4,6,9,9,17
29:5,6 33:22
42:10,13 43:4
43:11 48:16
57:15 61:3,8
68:1 70:3,4
75:21 90:24
116:6 117:15
119:6 120:4
121:3,6,9,13,21
125:20 127:21
**perfect** 89:24
**performance**
20:12,17
**period** 20:21,23
22:5 41:10,18
41:22 44:5
63:22 89:8

107:14
**perpetrator**
101:10 103:21
104:18 108:11
114:1
**perpetrators**
104:15,19
106:15
**person** 18:6 29:3
30:9,11 31:6,8
33:18 34:23
41:20 42:1,6
43:15 44:13
60:19 83:5,8,11
83:12,16,17
100:15 101:11
103:9 105:11
107:13 113:16
**person's** 103:16
**personally** 39:8
89:5
**personnel** 16:13
**persons** 27:8
28:10 39:1 40:6
40:24 41:7 42:4
**pertained** 80:10
**pertaining** 1:18
28:10 102:19
111:8 112:7
116:11
**pertains** 93:3
**Peter** 11:24
**Pharis** 11:22
18:21 22:17
23:1,19 33:19
33:23 34:8,14
54:7,14 56:17
56:21 60:16
66:17 67:19
68:1
**phenomenal**
16:18 18:16
**phone** 65:21
66:10 109:22
**phonetic** 18:18
**photos** 50:21
**physically** 107:4
115:19
**physician** 106:5

109:15
**physician/MOD**
103:17
**physicians** 16:19
106:11
**picking** 36:8
**picture** 74:11
**pictures** 72:21
**Pinel** 58:23
**place** 44:5 73:2
75:6 119:10
131:15 132:8
**placed** 106:15
**places** 68:22
124:23
**plaintiff** 1:5,11
5:6 29:7 131:4
131:9
**plaintiff's** 27:9
36:5 39:7 41:16
**plaintiffs** 2:6,11
5:10,13 37:15
**plan** 93:12 111:7
111:23 113:3
115:10 123:4
124:24 125:12
**plans** 21:18
**plea** 76:19
**please** 5:5 7:7,23
12:23 114:6
127:13 129:24
**pled** 76:13
**podiatry** 19:16
**point** 6:20 7:3
19:3,18 22:10
25:2 31:6 47:9
56:23,24 58:22
60:2,2 86:11
100:7 128:12
**pointing** 68:22
**poison** 15:8
**Police** 50:1 51:20
112:24
**policies** 14:4 21:9
21:10,14 81:15
81:16,21 91:20
92:11 95:12
119:10
**policy** 21:12

75:15 76:23
81:13,20,24
82:1,3 90:9
92:7,9,15,16,21
93:4,7,8 95:16
95:16,22,24
96:2,6 97:4,7,8
97:15 99:12,22
100:13,22
101:15 102:18
102:22 104:24
106:21 112:6
113:14,20
114:15 115:6
115:22 117:7
126:15,18
**poses** 108:22
**position** 10:3,6
30:20 32:4
36:19 46:2
47:19,23 51:15
58:11,12 69:23
94:12 109:13
118:18
**positions** 9:9,13
**possibility**
119:15
**possible** 23:11
27:23 98:12
99:4 103:15
104:7 111:11
124:19
**post** 37:6 72:4
**potentially** 15:21
59:22
**PPM** 92:6
**PPM1550** 96:10
**PPM1870** 91:14
92:4
**practice** 115:13
**precautions**
115:11
**predecessors**
21:2 22:6
**preference**
103:16
**preparation**
20:24 21:1
**prepared** 129:14

**present** 3:10
93:23 95:3,9
**preservation**
104:3
**presume** 26:4
**pretty** 23:13
**prevent** 81:1
119:10
**previous** 11:5
21:5,6 27:4
31:1 45:6
111:20 132:3
**primary** 92:17
103:17
**printed** 132:6
**printer** 109:24
**printouts** 96:12
**prior** 14:18 44:1
49:11 51:6
105:11
**prison** 76:15
**probably** 14:19
26:2 110:12
**problems** 23:10
111:8 122:2
**procedural** 23:5
**procedure** 1:17
92:7,9 93:7
97:15 101:23
101:24
**proceed** 5:1
**proceedings**
132:7
**process** 103:24
118:16
**profession** 24:7
**professional** 7:24
23:3 70:3 86:10
87:20 88:17
89:4
**professionals**
43:7 48:15
**program** 9:17
19:11,13,13
23:12 25:20,23
31:16,19,20,21
31:22 32:7
34:19 38:9 54:7
58:21,22 59:14

60:1,10 67:19
86:18,18,21
98:19 104:1
**programs** 59:20
**progress** 16:6
  104:13 109:14
**proper** 13:20
  14:9 15:24
**properly** 14:1
**proud** 22:3,4
**provide** 41:6
  42:3 88:9
  101:14
**provided** 19:15
  27:5
**providing** 50:21
**psychiatric** 14:21
  14:24 15:5,8
  19:13,19 21:4
  59:14 111:18
**psychiatrist** 37:6
  37:13,15,19,24
  60:9 61:10
**psychiatrist/M...**
  103:20
**psychiatrists**
  32:1 38:5,7,16
  48:5
**psychiatrists'**
  31:17
**psychiatry** 71:1
**psychologist**
  28:20 29:10
**psychologists**
  48:5 121:14
**psychology**
  125:19
**public** 5:3
**pull** 109:22
**purpose** 81:12
**purposes** 91:22
**pursuant** 1:16
**put** 14:16 24:13
  47:1,3 81:18,22
  110:4 115:11
  118:17
**putter** 16:3
**putting** 13:10
  16:4

## Q

**QM** 93:12
**qualifications**
  7:24 8:8 121:15
**quality** 11:20
  14:2 20:6 90:14
  93:12,13,14
  118:12
**quarterly** 23:6
**question** 6:17,18
  7:4 12:23 24:4
  28:9,15 31:14
  32:2 33:15 35:3
  37:21 38:24
  39:12 40:5,6
  41:6,18 42:3,9
  42:19,23 43:4
  43:10 44:1,16
  44:16,20,23
  45:1 47:18 48:8
  52:10,11 53:1,2
  53:23 54:16
  61:4 64:11,15
  68:8,9,12,14
  69:10,20 71:20
  71:20,21,22
  76:22 77:6,13
  77:16,21,24
  78:7,19,19
  80:23 82:6 84:6
  85:16 86:4,5
  98:18 99:1,3
  112:18 113:13
  114:6 115:16
  116:10 123:17
  124:10 125:10
  129:2
**questioning**
  110:13
**questions** 6:24
  20:7 23:3,5
  28:7 44:3 67:17
  67:22 77:3,19
  78:18 85:2
  125:4,5,8 127:7
**quick** 17:5 53:2
**quickly** 13:4
  109:3
**quite** 113:10

## R

**raising** 120:4
**ran** 23:12
**Randolph** 2:8,14
  3:4 5:9
**Randy** 6:7 17:5
  18:1 34:12
  92:14 121:5
  125:11 129:5
**RAOUL** 2:13 3:2
**rape** 112:15
**raped** 115:19
**reach** 14:8
**reacted** 122:9
  125:11
**read** 7:14 26:18
  27:13,15,17
  33:9 36:1 42:22
  44:17 53:2
  57:13,16 63:3
  63:13,14 65:15
  70:18,19 71:22
  76:22 77:13
  78:10,19 81:21
  81:23,23 82:6
  94:19 98:5
  99:15 101:1
  103:4 115:3
  129:16 131:13
**reading** 10:22
  27:24 53:11
  73:7 75:13 77:7
  98:2 132:9
**real** 17:5 88:18
**really** 7:1 15:19
  16:2,9 19:1
  21:10,19 22:3
  67:10 68:18
  69:17 77:5
  115:22 121:18
  125:1
**reason** 12:10
  34:17 35:3
  36:12 38:2 59:7
  78:24 120:10
**reasonably** 39:6
  39:10,20,22
  40:10,15,17
  67:5,15 68:13

68:17 69:2,3,6
  70:7,9 71:9
**recall** 9:12 20:20
  22:20,24 27:17
  27:22 28:6,8,16
  33:13 35:5
  36:20 49:13,23
  54:6 55:4 56:18
  56:19 60:17,18
  62:22,24 66:5
  67:5 88:12 94:9
  99:8 118:3
**receive** 116:20
**received** 20:11
  53:14 66:13
  79:21 82:18
  96:17
**receives** 83:11
  102:1
**receiving** 56:11
  57:23 96:20
  106:10
**recollection**
  26:22 33:10
**record** 5:2,5 7:7
  13:11 17:15
  52:8 57:11
  70:18 104:14
  115:3 132:6
**recording** 49:3
  50:11 73:16
  74:1,6,24 126:7
  126:10
**recordings** 74:14
**recuse** 118:15
**reduced** 132:6
**reeducating** 89:2
**reeducation**
  80:20
**reference** 92:8
**REFERENCED**
  4:8
**referring** 12:9
  62:20 64:2
**refers** 64:1 105:9
**reflected** 126:24
**regarding** 42:13
  54:17 73:4 82:9
  82:21

**regardless** 69:6
  69:20
**registered** 94:19
**regular** 8:14 89:3
  120:1
**regularly** 79:17
**relate** 27:10 39:4
  40:9 42:8 73:23
  76:1 89:17
**related** 23:4
  39:12,21 41:17
  43:8 75:15
  79:15 81:8
  113:4
**relates** 102:23
**relating** 40:16
  41:10 75:1
**relation** 82:22
**relations** 48:24
  99:10 123:21
**relationship**
  16:24 17:1 23:1
  23:3 45:24 72:3
  72:8,13 78:1
  79:6,9 82:14,16
  85:14,22 86:8
  87:13,21 88:14
  88:18,23 98:17
**relationships**
  82:10 102:24
**relative** 132:11
  132:12
**relayed** 40:24
**released** 45:20
  50:11 122:11
**Relevance** 13:9
**relevant** 28:19
  29:2 30:5 35:9
  36:4 39:7
**rely** 70:2 71:2
**relying** 70:12,13
**remain** 106:16
**remark** 66:20,23
  66:24 70:10
**remember** 10:24
  11:24 16:1
  47:10 56:11,16
  57:23 58:21
  73:21 74:6,18

74:23 75:2,5
79:19 80:13
94:15,16 96:20
113:7,10 128:8
**remind** 119:20
**remotely** 1:21
**remove** 101:12
103:10 118:16
**renew** 8:18
**repeat** 12:22 61:4
114:6
**rephrase** 7:2
**replacement**
33:23
**report** 33:11 49:6
51:11 57:17
62:2,6,19,23
63:9,13,14,22
65:19,24 66:2,4
66:6,7,8,8,17
73:13 75:19
82:9,20 83:1,8
83:11,13,15,18
84:8,14 102:3
104:12 105:23
108:15,18
109:1,4,8,16
112:23 114:14
115:9 116:7
120:10 121:1
123:21 127:22
**reported** 3:18
25:2,6,10,12
83:18 84:2,19
85:11 89:18
102:13 105:1
116:22 127:24
129:1 132:5
**reporter** 1:20 5:1
6:14 129:11
132:1,18
**reporters** 82:24
**reporting** 25:17
75:16 76:1
95:16 103:24
111:22 114:13
**reports** 24:13
26:4 49:10,15
79:18 80:9,12

80:16,20
109:14 112:19
113:14,15
114:24 116:3
116:21
**represent** 5:8
**representing** 5:9
5:12,14,18
**requested** 70:18
115:3
**require** 65:7
118:9
**required** 8:12
13:21 102:19
104:11 105:3
113:15
**requirement**
8:16
**requirements**
8:11 106:4
**reserve** 129:13
130:1
**resource** 14:5
**respect** 41:7 42:4
**response** 42:9
83:2 104:19
108:1 116:1,11
117:6 123:3
**responses** 26:21
**responsibilities**
13:17 19:8 48:3
48:13 60:23
80:7,24 92:17
93:2 96:24
109:12
**responsibility**
24:7,9 48:14
58:20 59:3,8
69:22 83:13
97:3 102:16
126:17
**responsible**
23:18 25:14,24
26:3 58:18 61:9
**rest** 119:2
**restate** 12:20
**resulting** 111:18
**resume** 10:22
**retained** 4:14

41:1
**retarded** 95:20
**retire** 22:23
**retired** 9:9 10:17
10:18 12:11
13:4 22:20
23:20,23 34:8
**retirement** 10:4
**retiring** 22:12
**reveal** 77:22
**revelation** 48:22
**review** 80:18
115:10 129:24
**reviewing** 125:12
129:23
**reviews** 90:9
**revisions** 91:21
**Richard** 60:8
**Ridge** 2:4
**right** 9:2 10:16
14:13,17 17:8,9
17:16 18:6 19:4
19:6 20:4,18
23:14 24:10,23
27:1,15 28:11
31:23 48:16
51:1 52:11
53:20 56:6 57:5
58:15 59:3
62:11 63:22
64:10 69:5
70:13 77:18,19
80:22 83:7 92:9
97:1,9 98:2,3
100:20,21,23
101:2,7,8,16
102:9,21
104:22 109:21
110:21 111:9
111:12,24
113:12 114:1
114:15 116:8
117:12,17
119:7,12,16
120:5 121:2,24
123:10,22,23
125:1
**RN** 8:1,17 9:15
112:3

**RNs** 25:5 94:19
**road** 6:10
**Rockford** 8:2
**role** 31:1 60:3
110:21
**roles** 89:1
**Roman** 107:17
**romantic** 82:10
82:22
**room** 54:20 73:11
103:12 126:7
**Rory** 3:11 5:20
████████ 74:1
78:2 126:9,12
**routine** 106:21
120:2,8
**Rule** 76:4
**rules** 1:17 6:10
**rumor** 12:15 77:9
78:4,15 79:8
**rumors** 49:20
**Ryma** 59:11,11
59:13,16,18

─────────

**S**

**S** 2:8 4:8 80:14
**safe** 103:11
**safety** 54:16
67:20 71:7,16
71:16 102:3
103:14 104:18
**SAITH** 130:3
**Salvatore** 59:23
**save** 124:9
**saw** 17:20 45:3,4
63:8 65:13
68:14 83:8 85:6
85:20 86:10
100:15 128:10
**saying** 44:6 46:24
49:19 66:12
67:4 68:14,16
68:20 69:14
**says** 26:18,19
38:24 56:8
59:11 61:16,16
62:6 63:18
79:23 83:2
93:11,18 94:22
96:5 101:1,10

101:10 102:1
105:9,11,18
106:7 107:17
108:9,15,21,24
110:16 111:19
**schedule** 117:14
**scheduled** 14:1
119:1
**schedulers** 24:20
**scheduling** 13:24
86:13 117:22
118:6
**school** 8:2 9:6
**screen** 110:1,4
**se** 50:8
**Sean** 3:13 17:9
**search** 51:7,8,13
73:11
**searches** 73:1
**sec** 93:6
**second** 17:8 24:3
38:24 49:14
51:23 66:15
67:2 75:9 84:5
89:21 118:23
122:7 125:3
129:10
**secretaries** 24:19
**section** 102:13
105:7,16 106:7
106:11,14
**security** 11:22
48:15 51:3,7,12
55:24 57:21
62:2,18 63:18
63:19 65:3
70:24 72:2 73:1
73:11 103:23
126:6
**see** 15:2 16:8
19:4,21 23:9,24
24:1 42:9 43:3
46:15 55:16
61:17 62:8
65:19 77:2 78:8
80:19 83:1 85:2
85:10,16 88:16
91:16 92:3
97:21 107:19

107:22 109:20
109:21 110:7
115:19 116:5
123:1
**seeing** 62:22
**seen** 82:23
100:19 123:6
**send** 59:19 60:12
93:14
**sending** 129:13
**senior** 11:7
**sense** 115:13
**sent** 26:12 56:8
57:3,14 58:2
59:6,7 60:4
96:23
**sentence** 26:19
63:18
**separation**
103:22
**sequence** 9:8
89:24
**Serious** 104:1
**services** 3:12
12:2 19:15,19
19:20 34:24
59:14
**set** 23:7 39:2
40:13 130:2
132:14
**setting** 79:22
**seven** 42:20,20
**sex** 45:19 49:4
76:8 85:3,7
98:20 99:5,13
100:16 101:18
102:20,24
106:22 107:2,4
107:5,9,12,13
116:6 117:4
120:23 122:16
124:17,17
126:7,16
**sexual** 44:5 45:24
48:23 72:13
73:18 75:16,20
76:2,14,19 79:9
82:10,21 84:9
84:15,16,17,20

93:8 97:8,16,19
97:22 98:7,10
98:14,17 99:9
99:16,19,22
100:5,10 101:5
101:13 102:2
102:23 104:20
105:1 108:1
110:18 111:22
112:7,20
113:15 114:5
114:10,22
116:11,21
121:4,7,10,19
123:21 126:10
126:11
**shaking** 6:22
**share** 87:18,19
110:1
**shared** 60:22
**shift** 23:8 104:5
**shock** 122:9
**short** 40:12 52:6
**Shorthand** 1:20
132:1,18
**shot** 29:18
**show** 16:20
**side** 19:14 64:20
65:12,14,15,16
65:18 127:19
**sign** 81:21,23
94:19
**signature** 26:23
27:1 129:13,22
130:1
**significant**
121:20
**signing** 34:8,11
132:9
**SIM** 104:1
**similar** 78:7,11
78:18 96:2
112:18 113:13
126:18,24
**sir** 26:13 35:2
37:9 41:5,23
43:20
**sit** 17:8 52:21
73:9,15

**sitting** 64:16
**situation** 15:6
30:15 45:3
67:22 73:18
102:19 112:14
113:6,21 114:3
122:21
**situations** 50:5
**six** 26:15,15,17
52:22 92:2
111:20,23
122:11
**skip** 91:18
**smart** 16:20
18:17
**smoothly** 23:12
**sneakily** 124:18
**soak** 15:14,24
**soaked** 16:5
**soap** 15:24
**social** 30:1 36:21
48:5 53:20 55:9
57:19 59:24,24
61:9 62:4 63:21
64:3 65:6,11,22
68:21 71:1 72:3
72:21 73:4
86:24 121:14
122:14 125:19
**solid** 14:14
**somebody** 6:17
17:6,12 74:14
94:16 100:12
123:2
**somewhat** 7:12
7:14
**soon** 17:16
**sorry** 10:9,16
12:18,22 17:18
17:24 19:20
24:18 25:11
31:21 32:24
44:2 46:3 58:7
63:6,8 68:10
70:14,17 80:1
84:13 97:11
99:2 109:23
110:10 114:7
**sort** 33:11 68:20

87:18 88:9
**sounds** 23:13
**South** 2:3
**speak** 30:12
31:10 32:9
36:23 87:15
**special** 115:11
**specialize** 121:4,6
**specific** 14:24
15:18 20:7
25:10,11 40:13
42:5,12 48:12
58:17,18,20
80:8,9 115:5
**specifically** 76:5
102:23
**specificities**
121:17
**specifics** 46:21
117:13
**specified** 132:8
**speculation**
122:6 124:3
**spell** 7:8
**spelled** 129:19
**spoke** 41:20 75:3
85:24
**spoken** 23:19
30:2 34:13,24
35:12 37:7,19
41:24
**squarely** 93:1
**srandolphk@g...**
2:10
**St** 8:4
**staff** 13:19 14:2,5
14:7 21:20 23:7
25:22 26:1,2
32:15,15,20,20
33:3,6,10 34:22
38:11 48:4 50:2
51:19 53:18,19
54:19 61:2
67:20,21 69:4,7
69:7,12,17,21
71:6,16 76:8
80:10,11,17
81:1,5,8,13,18
81:22 82:10

83:1,8 84:1
86:12,12,16,24
86:24 89:17
90:19 92:21
93:3 94:20 95:5
98:13,16 99:10
100:15,19
101:11,20,24
103:9,12,13
105:11,13
107:13 109:6
112:20 113:16
114:5,11,21
116:12 117:7
119:2 120:23
121:16 123:21
125:18 126:17
127:11,16
**staffing** 13:21
22:11 65:12
88:2
**stamped** 57:11
**stand** 92:6 95:3
**standard** 21:11
**standards** 21:3,5
21:8,10
**standpoint** 54:24
**start** 35:11
106:20 127:12
**started** 8:22,24
9:5,14 18:14
99:15
**starting** 5:6
127:13
**starts** 101:24
110:23 120:9
**STAs** 24:16,22
25:5,10 48:6
53:20 127:15
**state** 1:20 2:13
3:3 5:5 7:7 8:9
8:16 49:24
51:20 81:4 91:6
112:24 113:8
122:15 132:1
132:19
**stated** 20:15
38:13 63:20
132:10

**statement** 35:8
**states** 1:1,18 36:3
  131:1
**station** 103:12
**stay** 6:21 119:21
**staying** 70:8
**stenographically**
  132:6
**step** 11:6 106:2
**stipulate** 49:17
**stop** 104:22
**stories** 50:11,15
  51:14 117:3
**story** 117:2
**straight** 7:22 9:5
**strategies** 11:20
  110:16
**strategy** 90:15
**Street** 2:14 3:4
**stuff** 21:21 23:15
  24:20 39:23
  86:11,13,17
  89:4,6 119:21
  121:7
**subject** 55:18
  57:8 90:10,23
**subjects** 84:17
**subordinate**
  82:18 84:1,7
  88:20 94:2
  103:7
**subscribe** 131:16
**SUBSCRIBED**
  131:22
**subsequent** 58:1
**substance** 118:7
**substantive**
  129:16
**success** 16:14
**successful** 16:12
**suddenly** 11:11
  12:11
**sued** 118:19
**suffice** 111:14
**suggesting** 48:14
**suicide** 52:22
  122:10
**Suite** 2:4
**summarize** 7:23

**summary** 46:16
**supervise** 67:16
**supervised** 88:24
**supervisor** 9:18
  9:21 18:14
  25:23 30:1,7,9
  31:1,2,17 36:14
  67:18,24 72:18
  89:7
**supervisors**
  16:18 24:16
  25:4,5,11,12
  70:3 125:21
  128:1,1
**supervisory** 48:3
  60:3 102:16
**support** 101:14
**supposed** 109:14
  109:15
**sure** 6:18 9:14,14
  13:20,21,24
  14:3 17:12
  21:13,17 23:12
  27:4 34:12
  39:21 59:21
  67:21 72:16
  73:22 77:8,15
  78:20 81:5,13
  81:17 83:4,19
  84:2,5 85:13
  92:16 96:11
  97:4 103:9
  114:15 116:14
  120:17 121:5
  125:12,22
**survey** 20:24
  21:1,7,23,24
  80:4
**surveyed** 21:8
**surveys** 20:9
**suspect** 82:16
**suspected** 82:14
  82:23 122:14
**suspicion** 44:21
  64:22 66:23
**suspicions** 75:20
**suspicious** 68:23
**sweep** 33:12
**swept** 126:6

**sworn** 5:22 6:2
  131:22 132:3
**symptoms**
  111:18
**system** 81:16

**T**

**T** 4:8
**T.A** 10:5 11:6
**tailor-made** 82:2
**take** 17:14 19:8
  27:3 33:1 52:4
  53:2,22 63:13
  65:9,9 71:22
  73:5 75:10 90:3
  101:20 102:9
  103:11 113:22
**taken** 1:16,19,20
  15:3 72:21
  104:17 122:12
  123:2 129:21
  132:8
**talk** 6:20 17:2
  23:5 28:22
  41:13 51:19
  66:16
**talked** 48:22
  52:19 56:16
  86:13 87:23
  102:15 117:5
  117:11,13
  119:4 128:8
**talking** 16:7 33:1
  42:7 92:10
  100:13 110:20
  115:23
**talks** 116:2
**tape** 116:22
**teach** 16:21
**team** 11:17,18
  29:11 43:13,13
  43:16 56:3,6
  71:5 87:17 90:8
  91:1 106:19
  112:24 117:24
**teams** 15:2 71:13
  71:14
**tell** 8:22 13:16
  18:13 20:20
  29:5 43:24 49:7

  62:1 75:24
  88:22 96:11
  120:21
**tells** 83:8
**temporarily** 10:1
  30:23 31:3
**temporary** 10:10
  60:3
**ten** 108:5
**tended** 71:14
**testified** 6:3 67:3
  68:12,17 92:13
  117:19 127:10
**testify** 41:1 46:15
  68:15 132:4
**testifying** 46:11
**testimony** 43:6
  67:9 69:1
  123:19 132:7
**text** 57:13,16
**thank** 7:10 8:21
  26:24 29:4,9
  40:4 84:18
  113:12 125:24
**Thanks** 127:5
**therapies** 123:5
  125:17
**therapy** 121:7
**thing** 7:5 38:21
  47:13 54:8
  87:19 88:7
  111:12 125:15
  129:20
**things** 14:8 15:1
  16:21,21 17:3
  20:1,8 23:4,5,9
  41:14 50:6
  67:13 80:10
  89:3 102:12
  103:5 108:5
  109:10 119:11
  120:19 125:18
  128:3 129:16
**think** 9:3 19:16
  21:20 22:9,14
  24:3 26:11
  29:16 32:19
  37:6 45:8 46:18
  46:20,22 50:2

  58:21 59:16
  63:19 64:17
  66:10,12 68:16
  70:14 74:14
  79:11 83:2
  84:11 86:18
  89:23 96:11
  97:10 112:8
  115:5 116:16
  117:19 120:19
  120:19,20
  122:12,20
  123:24 124:13
  124:16,19,21
  125:11 126:23
  129:3 130:2
**third** 110:23
**thorough** 21:18
**thought** 18:24
  38:13 64:19
  65:13,20 68:1
**thoughts** 68:2
**three** 9:20 50:2
  52:22 89:11
  96:6 101:24
  104:19 106:2
  111:19,23
  122:10 125:5
  127:6
**Thursday** 56:13
**time** 5:7 6:16
  11:23,24 13:4
  15:13 16:9
  20:21,23 22:5
  22:13,16,18
  27:17 29:14
  34:7,9,10,19
  36:8,13 40:12
  41:10,11,18,22
  41:24 43:14
  44:7,23 45:2,20
  49:23 50:24
  52:2 53:8,12
  58:3 60:14,17
  65:15 66:13
  73:17 74:3 80:4
  82:11 86:1,6
  89:8 94:3
  106:18 115:6

119:18,22
124:9 128:13
129:12 131:14
132:8
**timeline** 46:4
**times** 39:6 59:19
75:21 111:23
122:10,16
**title** 10:4 60:1
**today** 44:11,13
44:13 52:14,21
53:5 64:17 66:3
73:9,15 74:4
90:9 94:22
109:5
**told** 12:8 38:2
45:5 53:18
73:13,17,19,21
74:14,18
128:11
**top** 18:23 40:23
55:18 97:15
111:7
**topic** 127:23
**topics** 87:23
**touching** 99:17
**town** 23:6
**train** 94:18
117:15
**trained** 75:18
97:4 99:7
**training** 13:21
14:14 16:15
75:22,22 76:1,3
76:4 81:1,7,12
82:2 86:21
87:11 93:3
113:20 117:7
117:10,12,13
117:23 118:5,6
118:8,13,17,18
118:19 119:1,9
119:20 120:3
121:12
**transcript** 6:15
129:14 131:14
131:17 132:6
132:10
**transfer** 53:7,10

**transferred** 9:17
53:13
**transpired** 117:1
**trash** 15:15
**trauma** 113:3
116:1 121:4,10
121:20
**traumatic** 115:7
**traveling** 24:1
**treat** 113:5
**treating** 37:14,18
61:10
**treatment** 21:18
29:7,11 31:21
31:22 32:7 35:7
43:7,12,13,16
43:16 61:2 65:8
112:24 113:3
114:20 115:10
116:14 123:4
125:12,16
**tried** 23:11
**trigger** 111:15
**trouble** 22:7
**true** 26:21 131:17
132:6
**trust** 129:21
**truth** 132:4
**try** 6:19 15:2
**trying** 97:21
113:7 124:9
**turn** 24:3 45:5
120:9
**turned** 29:16
**TV** 45:6
**twelve** 44:16
52:10,12
**two** 8:18,19
18:13 24:4 58:1
63:24 96:3
100:15 104:13
107:1,5 108:24
116:6 123:16
123:24

**U**

**Uh-huh** 18:12
42:11 45:17
101:3 112:5
**umbrella** 127:21

**uncomfortable**
97:24
**underlying** 27:9
28:11 33:15
39:2 40:7
**underneath**
108:20
**understand** 7:19
15:17 17:3
39:12 40:1
46:24 69:10
81:13,24 84:11
117:18 120:17
124:8
**understandable**
61:6
**understanding**
46:18 83:12
112:8,11
117:17
**Understood**
34:12
**unethically** 39:23
**unit** 9:15,16,19
9:22,22 18:17
21:17 23:8
25:24 28:20
29:7,10 30:22
31:2,4 36:14,22
37:6 38:1 48:2
48:4 53:13 54:3
57:9,18,20 59:1
59:2,6 64:4,7
65:4 67:11,12
81:22 88:5,11
88:12 94:6
102:4 103:23
109:5 115:7
117:14
**United** 1:1,17
131:1
**units** 13:19,20
14:1 34:21
37:13 47:24,24
48:3,9 53:8
58:17 85:21
88:2 118:9
**University** 8:4
**unwanted** 97:23

**updated** 123:4
**updates** 14:4
**updating** 44:11
**use** 19:18
**UST** 9:22
**UST/NGRI** 9:16
**usually** 20:6

**V**

**vacation** 65:7
**verbal** 6:21 66:8
**verbiage** 113:11
**Verdone** 59:23
**verification**
26:18
**verify** 26:21
**versa** 59:19
**version** 93:14
**versus** 27:14
**vice** 59:19
**Vicky** 12:3 58:2
60:24
**victim** 97:24
100:1,18,22
101:2,9,12,21
102:3 103:10
103:15,19
104:8,13,14,18
110:17 113:24
**victim's** 104:6
**Victoria** 34:23
35:1
**videoconference**
5:4
**view** 34:3 59:9
**viewed** 114:1
**vigilance** 119:9
**vigilant** 71:5,15
119:21
**violence** 112:15
**violently** 107:4
**visiting** 85:21
**voice** 6:16
**voluminous**
113:14
**vs-** 1:6,12 131:5,9

**W**

**wait** 6:17,19
32:23 46:4

**waive** 129:22
**want** 6:9 7:3
12:20,22 21:6
33:20 41:13
44:17 45:5
46:13,15,21
47:1 53:1 62:14
68:15 71:18
72:16 74:8 77:2
107:5 109:3
123:18 125:7
**wanted** 16:2
17:11 21:11
87:19 98:8
**washer** 54:21
**wasn't** 11:13,15
12:7,8 35:6
38:9 88:7
**water** 15:24
**way** 14:20 15:1
15:24 16:6 17:4
18:24 20:21
21:2,22 24:13
29:15,17 44:12
61:5 74:6 75:7
78:16 114:8,19
124:16 126:15
128:17
**ways** 72:1
**we'll** 29:18 51:15
52:4 57:15
125:6 130:1
**we're** 21:13
33:21 52:7
55:13 81:15
98:5 102:9
115:14 124:9
129:7,8 130:2
**we've** 6:14 20:15
102:7
**weather** 70:14
**Wednesday** 1:21
**week** 122:16
**well-intentioned**
119:5
**went** 8:2,5 15:16
20:24 21:16,17
21:22 22:7
30:24 42:10

46:19 65:17
76:14 109:21
**weren't** 45:8,18
48:21 53:6
118:11 128:3
**West** 2:14 3:4
**WHEREOF**
132:14
**White** 58:24
**whiz** 9:4
**wider** 24:8
**William** 58:24
**Wilmette** 2:9
**window** 40:12
83:21 84:2,20
**wish** 25:21
**wishes** 104:8
**witness** 4:2 5:4
5:22 6:2 12:22
13:6 38:6,19
47:3,11,15
49:18,22 50:4
70:21 100:16
110:3,6,9 115:4
121:5,11,13,22
122:1 123:1,11
123:14 125:7
125:10 126:22
129:24 132:3,3
132:9,14
**witnessed** 83:5,9
83:16
**witnesses** 100:9
**wonderful** 79:21
**wondering** 28:13
34:3 38:17
48:19
**word** 101:19
107:8
**word-for-word**
6:15
**words** 119:23
**work** 19:22,23
23:11 30:1 31:5
31:6 38:8 56:1
57:19 59:24
71:1 86:24 87:9
87:23 89:6
90:21 91:7

119:6,17
125:19,21
**worked** 9:15,18
9:21,23 16:18
18:20,21 22:17
23:2,6 38:10
58:15 82:11
86:1,1,9,11,15
89:3 124:14
**worker** 36:21
55:9 59:24
61:10 62:4
63:21 64:3 65:6
65:22 122:14
**workers** 48:5
53:20 65:11
68:21 121:14
**working** 31:16
31:19 60:17
80:3 88:14,22
127:18
**workings** 65:4
**worry** 129:23
**wouldn't** 67:21
82:17 112:11
114:3,9,22
116:10 118:17
126:14,16
**wound** 14:17
15:13,14,18
**Wow** 52:24
**wrap** 125:3
**write** 28:2 39:8
82:20 109:14
**writing** 109:13
**written** 66:7
108:18 116:21
**wrong** 9:10 18:5
54:9,18 65:2
120:10
**wrote** 10:23
39:17 57:16
126:8

**X**

**X** 4:1,8

**Y**

**yeah** 7:17 9:3,8
11:1 12:1 13:13

14:19 17:7
29:10 35:23
47:7,14,18 51:2
51:2 127:4
**year** 11:5 18:14
75:23
**years** 8:18,20 9:2
45:7 89:11
98:22 124:1,15
**Yep** 17:24
**young** 9:5

**Z**

**zero** 21:23
**Zoom** 1:21 115:2

**0**

**02.02.06.040**
104:2
**084-002777**
132:21

**1**

**1** 4:11 26:11
131:15
**10/1** 26:23
**10/1/20** 34:8
**100** 2:14 3:4
**1170** 2:9
**127** 4:6
**13** 53:2
**130** 131:15
**1320** 95:16
**13th** 2:15 3:4
**14** 53:23 71:21
**15** 71:22
**15-minute**
115:12
**1530** 95:23
**16** 73:6 113:19
**17** 46:22 62:3
**17-9021-R35-3...**
61:17
**17-cv-7909** 1:6
2:18 3:8 131:5
**18** 2:3 75:11
**18-cv-0334** 1:12
2:19 131:9
**1870** 91:14 92:7
93:7 97:8,16

**19** 76:23 77:6
94:23
**1987** 8:2
**1990** 9:1,14 18:15
**1998** 9:15,17
**19th** 90:11 95:9
**1st** 44:11 46:3
56:13 58:7 66:5
126:13,20

**2**

**2** 9:15,15 101:15
**2:00** 1:22
**20** 8:18 58:7
77:13
**200** 2:4 26:2 70:1
**2002** 9:17,19,20
**2008** 9:21,23
**2012** 8:5
**2013** 8:7
**2014** 40:12 41:19
44:4 89:8
**2015** 9:23 10:1,1
19:4
**2016** 10:3
**2017** 10:11,12
20:11,18 40:12
41:19 44:4 45:9
45:10,14,16,23
46:2,3,3,4
47:20,21 48:20
49:17,21 56:13
58:8 79:23
88:12 89:8
90:11 94:9,23
116:18
**2019** 9:10 10:13
10:16,19,19
11:5 45:13
79:12
**2020** 10:6,6,14,15
10:17,18 26:23
**2022** 1:22 131:23
132:15
**21** 78:6
**22** 78:18,19
**22nd** 45:15
**23** 78:18 82:7
**235-6752** 2:5
**23rd** 132:15

**24** 9:2 85:14
**25** 1:21 86:4
**250** 25:22 127:21
**26** 4:5,11
**27404** 89:24 90:4
**27406** 95:15
**27408** 96:2
**27412** 97:7,13
99:16
**27413** 105:17
**27414** 106:17
**27415** 107:21
**27416** 109:20
**27417** 111:4
**27418** 89:24
**27617** 61:22
**27981** 57:12
**27982** 58:2
**27th** 8:24
**29** 45:7

**3**

**3** 4:12 55:13,16
**30-year** 40:11
**30th** 126:6
**312** 2:5,16 3:5
**350** 70:1
**370-5410** 2:10

**4**

**4** 4:13 89:23
**462-0146** 104:10

**5**

**5/31** 62:3
**50** 76:4
**50-bed** 9:22
25:24
**55** 4:12

**6**

**6** 4:4
**60068** 2:4
**60091** 2:9
**60601** 2:15 3:5

**7**

**7** 62:3
**7/1** 10:1

**8**