# **<u>EXHIBIT H</u>**

Page 1

```
 1                  IN THE UNITED STATES DISTRICT COURT
 2              FOR THE NORTHERN DISTRICT OF ILLINOIS
                           EASTERN DIVISION
 3

 4   BENAHDAM HURT,                        )
                                           )
 5                    Plaintiff,           )
                                           )
 6            -vs-                          )  No. 17-cv-7909
                                           )
 7   HASINA JAVED, FAIZA KAREEMI,          )
     COLLEEN DELANEY, DIANA HOGAN and      )
 8   DREW BECK,                            )
                                           )
 9                    Defendants.          )
     _____)
10   MARK OWENS,                           )
                                           )
11                    Plaintiff,           )
                                           )
12            -vs-                          )  No. 18-cv-0334
                                           )
13   HASINA JAVED,                         )
                                           )
14                    Defendant.           )

15

16            The deposition of FAIZA KAREEMI, M.D., taken

17   pursuant to the Federal Rules of Civil Procedure of the

18   United States District Courts pertaining to the taking

19   of depositions, taken before LISA A. KOTRBA, Certified

20   Shorthand Reporter of the State of Illinois, taken

21   remotely via Zoom in Illinois, on Thursday, June 9, 2022,

22   at 1:00 p.m.

23

24
```

```
 1   APPEARANCES:

 2        KRETCHMAR & CECALA, PC
          BY:  MR. JOSEPH JOHN CECALA
 3        18 South Northwest Highway
          Suite 200
 4        Park Ridge, Illinois  60068
          (312) 235-6752
 5        joe@kretchmarcecalalaw.com

 6         on behalf of the Plaintiffs;

 7
          KRETCHMAR & CECALA, PC
 8        BY:  MR. S. RANDOLPH KRETCHMAR
          1170 Michigan Avenue
 9        Wilmette, Illinois  60091
          (847) 370-5410
10        srandolphk@gmail.com

11        on behalf of the Plaintiffs;

12
          KWAME RAOUL, ATTORNEY GENERAL
13        OF THE STATE OF ILLINOIS
          BY:  MS. MARY JOHNSTON
14        100 West Randolph Street
          13th Floor
15        Chicago, Illinois  60601
          (312) 814-3739
16        mary.johnston@ilag.gov

17        on behalf of the Defendants Hasina Javed, Faiza
          Kareemi, Colleen Delaney and Diana Hogan in
18        Case No. 17-cv-7909 and Defendant, Dr. Hasina Javed
          in Case No. 18-cv-0334;

19
20   ALSO PRESENT:

21        MR. RORY CANNON
          Illinois Department of Human Services
22
          Mr. Sean Gunderson
23        Kretchmar & Cecala, PC

24
```

REPORTED BY:  LISA A. KOTRBA, CSR.

1                    I N D E X

2   WITNESS                                    PAGE

3   FAIZA KAREEMI, M.D.

4        Direct By Mr. Kretchmar ....................4

5        DirectBy Mr. Cecala ......................20

6                  E X H I B I T S

7                                        MARKED
    NUMBER                               FOR ID
8
    Plaintiff's Deposition Exhibit
9

10       No. 1  ...................................20

11       No. 2  ...................................57

12       No. 3  ...................................140

13       No. 4  ...................................144

14       No. 5  ...................................154

15       No. 6  ...................................194

16       No. 7  ...................................217

17       No. 8  ...................................159

18       No. 10 ...................................173

19       No. 12 ...................................218

20

21

22

23

24

Page 4

1      THE COURT REPORTER:  Before we proceed, I'll ask

2  counsel to agree on the record that there is no

3  objection to this notary public administering a binding

4  oath to the witness by videoconference.

5          Please state your agreement on the record,

6  and identify yourself and the party you represent

7  starting with counsel for the plaintiff.

8      MR. KRETCHMAR:  Yes.  Randolph Kretchmar

9  representing plaintiffs, Ben Hurt and Mark Owens.  No

10  objection.

11      MR. CECALA:  Joseph Cecala, C-e-c-a-l-a, counsel

12  for plaintiffs.  No objection.

13      MS. JOHNSTON:  Mary Johnston representing

14  defendants Javed, Kareemi, Delaney and Hogan in the

15  Hurt case, and Defendant Javed in the Owens case.  No

16  objection.

17                  FAIZA KAREEMI, M.D.

18  called as a witness herein, having been first duly sworn,

19  was examined and testified as follows:

20                  DIRECT EXAMINATION

21  BY MR. KRETCHMAR:

22      Q    Doctor, I just want to start off mentioning a

23  couple of rules that will help this go more smoothly.

24  The first one is don't talk over anybody.  If there is

Page 5

1  a question being asked, make sure it has been fully

2  voiced before you answer.  You'll also have to be

3  verbal because the court reporter can't really take

4  down a nod or a head shake; and not talking over people

5  is for the same reason; she has to make a record of

6  everybody's words, and when they get mushed together,

7  it's difficult.

8        If there is any question that you don't

9  understand or -- you know, just ask; we can repeat it

10 or clarify it or rephrase it.  And if you want a break

11 at any point, say so; we can take a break.

12    A   **Okay.  Thank you.**

13    Q   Would you please state and spell your name

14 for the record?

15    A   **Faiza Kareemi, F-a-i-z-a K-a-r-e-e-m-i.**

16    Q   Thank you.  Can I -- could I call you Faiza,

17 or would you prefer Dr. Kareemi?

18    A   **Dr. Kareemi.**

19    Q   Okay.  And you can call me Randy.  That's

20 okay; I'm used to it, for that matter, right?  I have

21 three grandchildren visiting for the summer, and they

22 call me dude.  You can use that if you would like, too.

23    A   **They are nice.**

24    Q   Are you taking -- this is a form question.

Page 6

1   Are you taking any -- any kind of medication that might

2   make it difficult for you to answer fully or truthfully

3   or remember things?

4        **A    No.**

5        Q    Okay.  Are you aware of or, at least,

6   initially or somewhat familiar with this lawsuit in

7   which you are a defendant?

8        **A    Yes.**

9        Q    Do you understand the allegations against you

10  and against the other defendants?

11       **A    Yes, I do.**

12       Q    I'm sorry.  I didn't get that.

13       **A    Yes, I do.**

14            **Can you hear me okay?**

15       Q    Yeah, you're okay.  It's just a little bit

16  echoey, so --

17       **A    Yeah, I know; same thing about your voice,**

18  **too.  Yes.  Okay.**

19       Q    It's hard to have perfect acoustics on these

20  things.

21       **A    I understand.**

22       Q    I would prefer to do this in person, to tell

23  you the truth.

24            Could you please summarize your education and

1  your professional qualifications as a doctor in a state

2  forensic hospital?

3  **A     Do you have a copy of my CV?**

4  MR. KRETCHMAR:  Do we have a copy?

5  MR. CECALA:  We do, but, you know, the question

6  is -- and throughout the day there may be other

7  documents, but this is something from your memory that

8  we're going to ask, and it's kind of how depositions

9  go.  We're going to ask you questions, and you're going

10  to give us answers.

11  BY THE WITNESS:

12  **A     Okay.  So I am board certified in psychiatry.**

13  **I completed my residency from Loyola Medical Center in**

14  **1997.  For about a year I was in private practice.  And**

15  **from August of 1998, I have been working at Elgin**

16  **Mental Health Center as a staff psychiatrist.**

17  BY MR. KRETCHMAR:

18  Q     So you have been at Elgin for, let's see, I

19  guess that would be 34 years?

20  **A     No.  23 years.**

21  Q     23.

22  **A     Yes, 1998.**

23  Q     Oh, yeah.  Okay.  Sorry.  Quick math

24  sometimes fails me.

```
 1          And the sequence of jobs, you've been a staff
 2   psychiatrist the whole time, just one job, right?
 3       A    Yes.  I also did work for a period of time,
 4   like I work at Edward Medical Center for about a year.
 5   I believe it was in 2017.  I also worked at another
 6   private facility called Seven Hills for about a few
 7   months, but the main work that I've been doing is at
 8   Elgin Mental Health Center.
 9       Q    Okay.  So the other jobs you're mentioning
10   were in addition to -- simultaneous employment at
11   Elgin?
12       A    Correct.
13       Q    Good enough.
14          Tell me what your responsibilities are as a
15   psychiatrist.
16       A    I work on a 25-bed inpatient forensic unit.
17   My responsibilities are to evaluate patients, allow me
18   in collaboration with other treatment team members to
19   formulate a treatment plan, and prescribe medications
20   and make sure that the patients are on their way to
21   recovery.  And for us, since we're working in forensic,
22   our goal for every patient is to do well, go into
23   recovery and eventually be placed in a less restrictive
24   environment.
```

1    Q    And you're full time at Elgin, correct?

2    **A    No.  I work point seven at this time.**

3    Q    I -- I --

4    **A    It's 28 hours a week.**

5    Q    Oh, I see.

6         Have you always been 28 hours a week, or has

7    that changed at some point?

8    **A    It changed in 2020.  Before 2020, I was**

9    **working full time, and I think -- I believe in 2012 I**

10   **was still part time.  So it has varied, but from 2012**

11   **to 2020 I was full time.**

12   Q    Well, let me clarify this.

13        From 2014 until 2017, you were full time?

14   **A    Yes.**

15   Q    And prior to that, back to 2012, correct?

16   **A    Correct.**

17   Q    Who do you report to?

18   **A    My supervisor is the medical director of**

19   **Elgin Mental Health Center.  It was Dr. Daniel Hardy**

20   **before, but since 2017 it has been Dr. Patel.**

21   Q    And who reports to you?

22   **A    As of then, no one reports to me.  All of the**

23   **disciplines of the treatment team are -- they have**

24   **their own supervisors, so I am not in charge of**

1  **anybody's evaluations or disciplining process.  I'm**

2  **just working in collaboration with my treatment team.**

3     Q    In the particular case of any patient, are

4  you ultimately in charge of the treatment plan?

5     **A    I work in collaboration with my treatment**

6  **team to formulate a treatment plan.  So all disciplines**

7  **are responsible for their own part of the treatment**

8  **plan.**

9     Q    All right.  Now, what about the clinical unit

10  where you work?  I believe that's K Unit; is that

11  right?

12     **A    Correct.**

13     Q    Are you in charge of the unit?

14     **A    I'm the psychiatrist on the unit.  I would**

15  **not say I'm in charge of the unit.  We also have a**

16  **nurse manager who oversees all of the administrative**

17  **duties.  So I am a psychiatrist.  So like I said,**

18  **everybody has different roles on the unit, and my role**

19  **is to be the psychiatrist, and I mentioned what my**

20  **duties are on the unit.**

21     Q    Okay.  Let me ask it -- let me ask it this

22  way.  Do you have any administrative or clerical

23  responsibilities as well as those responsibilities as a

24  psychiatrist, as a doctor?

1      **A     On this unit I do not have any administrative**
2   **responsibilities.  There were times when -- but that**
3   **hasn't happened after Dr. Hardy left in 2017.**
4   **Sometimes Dr. Patel asked me to cover for her, and**
5   **I would just work on signing off on the travel**
6   **documents or if there is an issue, but I am not working**
7   **as an administrator.**
8      Q     Between 2014 and 2017 did you have any of
9   those -- any of those other more administrative
10  responsibilities?
11     **A     No.**
12     Q     Well, back to something maybe related to what
13  I asked.
14         When it comes to a treatment plan, is your
15  opinion about what's needed for a patient or your input
16  more important, or does it have a different
17  significance than the opinions or the inputs of the
18  other team members, like the social worker or the
19  psychologist or the activity therapist?
20     **A     In our facility everybody's opinion matters,**
21  **including social worker, activity therapy, nurses,**
22  **STAs, psychologists and psychiatrists.  So everybody's**
23  **opinion matters because they work in different areas of**
24  **patients' treatment.  So we work as a team, and**

1    **everybody is working on matters.**

2         Q    But you're the only M.D.; isn't that right?

3         **A    Correct.**

4         Q    So as the only medical doctor, doesn't that

5    give you some kind of seniority or some special

6    significance to your opinion?

7         **A    Like I said, in our facility on our unit,**

8    **everybody's opinion matters.  We take into account**

9    **everybody's opinion.  And like I said, everybody has**

10   **different areas of expertise, and we value their**

11   **opinions.**

12        Q    Part of your work in any individual patient's

13   case is explaining the patient's progress or lack of

14   progress in treatment to a court and maybe even a

15   prosecutor; isn't that true?

16        **A    Can you rephrase your question?**

17        Q    Yeah.  I'm sorry.

18             You occasionally are in the role of

19   explaining a patient's progress or their lack of

20   progress in treatment to a court; isn't that right?

21        **A    Every 90 days we have to submit a court**

22   **report to the court, and that is signed off by the**

23   **social worker and the psychiatrist.  Sometimes we are**

24   **asked to testify in any proceedings regarding their**

Page 13

1    **privileges or conditional release.**

2         Q     So that does entail explaining the progress

3    or lack of progress of a patient to a court; isn't that

4    right?

5         **A     Correct.**

6         Q     Okay.  Now, when a patient wants on-grounds

7    or off-grounds passes or, for that matter, conditional

8    release, do you usually tell the court whether it

9    should grant that request?

10        **A     It depends on who the court wants to testify.**

11   **Sometimes social workers are asked to testify,**

12   **sometimes psychiatrists.  So if the psychiatrist is**

13   **subpoenaed, then, yes, I would go to the court and**

14   **explain to the court, correct.**

15        Q     In any event, your opinion about that request

16   would be in a court report, wouldn't it?

17        **A     Yes.**

18        Q     Now, how do you know -- as a psychiatrist,

19   how do you know when a patient is no longer mentally

20   ill?

21        **A     I don't understand your question.**

22        Q     You know if a patient is mentally ill, right?

23        **A     Yes.  Okay.  Go ahead.**

24        Q     And if a patient gets over their mental

Page 14

1    illness, if they are successfully treated, how do you

2    know when they are no longer mentally ill?

3       **A    So for mental illness, patients have symptoms**

4    **of mental illness, and when they no longer have**

5    **symptoms, the symptoms are in remission and they are in**

6    **the process of recovery.  We never say that they are**

7    **cured of mental illness because it's an ongoing**

8    **process, and, you know, once they have a diagnosis,**

9    **they would need some kind of treatment or supervision**

10   **and evaluation to make sure they are not having**

11   **symptoms.  So it really depends on the diagnosis.**

12        **So for the diagnosis that we treat at Elgin**

13   **Mental Health Center, most of the time in the forensic**

14   **those diagnoses are usually long-term mental illnesses**

15   **that require long-term treatment, and the symptoms can**

16   **be in remission but not full cure because this is an**

17   **ongoing process.**

18       Q    So does that mean -- tell me if I'm wrong.

19   Does that mean as a medical issue when somebody is

20   mentally ill, they are always mentally ill?

21       **A    Correct.**

22       MS. JOHNSTON:  Objection.  Form.

23       MR. KRETCHMAR:  Sorry.  What was that, Mary?

24       MS. JOHNSTON:  Just objection, form or

Page 15

```
 1    hypothetical, but she can answer, and her answer was
 2    yes, I believe, so . . .
 3         MR. KRETCHMAR:  Okay.  Thank you.
 4    BY MR. KRETCHMAR:
 5         Q    Is there any difference -- just another way
 6    to ask the same question, perhaps.  I hate to be too
 7    meticulous, but is there any difference between not
 8    mentally ill and not symptomatic?
 9         MS. JOHNSTON:  Objection.  Form.
10         MR. KRETCHMAR:  Well, let's see.
11         MR. CECALA:  Can she answer?  Did she understand
12    the question?
13         MS. JOHNSTON:  If she understands the question.
14         THE WITNESS:  No, I don't actually.
15    BY MR. KRETCHMAR:
16         Q    Okay.  You know when a patient is mentally
17    ill, right?
18         A    They are having symptoms of mental illness,
19    correct.
20         Q    Okay.  And you know when a patient is
21    symptomatic.  Are those two things the same?
22         A    There could be times when patients who have a
23    history of mental illness are no longer having
24    symptoms, but that does not mean they are fully cured.
```

Page 16

1    I will just give you an example.  Just like people have

2    hypertension and they take their medication and their

3    blood pressure is normal, that does not mean that it's

4    cured.  They will -- they will be normal if they are

5    taking the medication.  So it's the same way.  There

6    are neurotransmitters in the brain that go in balance

7    when patients are taking medication.  That does not

8    mean they are fully cured.

9         Q    I see.  Okay.  All right.  Well, let me go to

10   something else.

11             How much time do you spend with any given

12   patient in any given month?

13        A    If patients are not having significant

14   issues -- it really depends on what is going on.  If a

15   patient is having significant issues, and they are

16   having symptoms, they are usually monitored more

17   closely, their treatment observation, and I see them

18   every day.  So -- and some patients who are relatively

19   doing better and they are no longer having symptoms, I

20   sometimes see them once a week, sometimes once at their

21   staffing and once in individual session.  So it really

22   depends on the level of care a patient needs.

23        Q    So you never see a patient less than twice a

24   month; is that correct?

1     **A     Correct.**

2         Q     You mentioned that different members of the

3     treatment team have their own different inputs into the

4     process of evaluation and treatment and the plan and so

5     on.  Is it ever the case that two members of the

6     treatment team have different opinions about an issue

7     that's critical, for example, whether a patient should

8     receive privileges from the court?

9         **A     This is a very major thing, having**

10    **privileges.  So most of the time it does not happen**

11    **that people disagree over this, because they have to**

12    **meet a certain criteria before they are ready for this**

13    **level of privileges, and it's a huge responsibility.**

14    **So in my career, I never had issues with treatment team**

15    **members disagreeing over privileges.**

16        Q     Have you ever had issues of treatment team

17    members differing over other issues than a specific

18    court request?

19        **A     Can you explain your question?**

20        Q     Well, for example, suppose a patient had just

21    been transferred to your caseload from a different

22    unit, is there a possibility that the activity

23    therapist or the social worker on your unit might say,

24    "Gee, I think that patient is just depressed," whereas

1    you might say, "I think that patient is schizophrenic"?

2        **A     The diagnosis is basically by a psychologist**

3    **or psychiatrist.  So social workers usually do not have**

4    **input in their diagnosis.  They work with -- the**

5    **psychotherapy, the placement, the substance abuse**

6    **issues, the diagnosis is mainly done by the**

7    **psychologist and the psychiatrist on the unit.**

8        Q     Does the psychiatrist ever disagree with the

9    psychologist?

10       **A     In terms of diagnosis?**

11       Q     Yes.

12       **A     It can happen, but I don't recall any such**

13   **incident myself.**

14       Q     It has never happened in your career?

15       **A     It might have.  I don't recall it.**

16       Q     Okay.  Now, if, for example, a psychiatrist

17   and a psychologist were to disagree about a diagnosis,

18   would that cause problems?

19       MS. JOHNSTON:  Objection.  Relevance.

20            She can answer.

21   BY THE WITNESS:

22       **A     Can you rephrase your question, please?**

23   BY MR. KRETCHMAR:

24       Q     Yes.  If a psychiatrist and a psychologist

Page 19

1    were to disagree about the diagnosis of a patient,

2    would that cause problems?

3          **A     What kind of problems?**

4          Q     Well, would it cause a hesitation in putting

5    together a treatment plan, for example?

6          **A     So if the diagnosis is basically for their**

7    **mental illness, like, for example, schizophrenia,**

8    **bipolar, if we disagree over that, it would be the**

9    **psychiatrist who will be more responsible for that, but**

10   **if it's for cognitive impairment, since psychologists**

11   **usually do psychological testing and this is more of**

12   **their area of expertise, we would take into account a**

13   **psychologist's opinion more so because they are the**

14   **ones who did the psychological testing, and they have**

15   **more validation on those diagnoses rather than**

16   **diagnosis like schizophrenia or bipolar disorder or**

17   **depression.  So it really depends on what kind of**

18   **diagnosis we have a disagreement on.**

19         Q     So would it be true that the treatment plan

20   would be the same regardless of any disagreement?

21         **A     Eventually we will come to an agreement, and**

22   **the treatment plan will have a diagnosis that**

23   **everybody -- you know, both the psychologist and**

24   **psychiatrist agrees on.**

Page 20

```
 1          MR. CECALA:  I'm going to try to share a screen.

 2          MS. JOHNSTON:  Is this one of the exhibits, Joe?

 3          MR. CECALA:  This is Exhibit No. 1 I'm pulling up.

 4                          (Whereupon, Plaintiff's Exhibit

 5                          No. 1 was marked for

 6                          identification.)

 7          MS. JOHNSTON:  And sorry.  I'll just ask, because

 8  I have them all on my computer, too, so for my ease,

 9  I'll probably pull them up with you as you are.

10          MR. CECALA:  Okay.  I'm going to share and see if

11  this works.  Can everyone see that?

12          MS. JOHNSTON:  Uh-huh.

13          MR. CECALA:  Maybe I can make it full screen.

14          MR. KRETCHMAR:  I'll see it better, that's for

15  sure.

16          MR. CECALA:  There you go.

17                          DIRECT EXAMINATION

18  BY MR. CECALA:

19      Q    Dr. Kareemi, do you see what's on the screen

20  right now?

21      A    Yes, I do.

22      Q    Okay.  So what it says on this first page is

23  Defendant Faizina -- am I saying this correctly,

24  Faizina?
```

LISA A. KOTRBA & ASSOCIATES, LTD. (312) 855-1834

Page 21

```
 1       A     Faiza.

 2       Q     Faiza.  Okay.  I'm sorry.

 3             Faiza Kareemi's Answers To Plaintiff's First

 4  Set of Interrogatories.

 5             Do you remember preparing this document?

 6       A     Yes, I do.

 7       Q     And then I'm just going to jump to the final

 8  page.  I don't have these pages numbered.  Sorry for my

 9  slow screen.  What is the number on the bottom?  Yeah,

10  there's seven pages, and this is the last page.

11             Do you see that, Doctor?

12       A     Yes, I do.

13       Q     And is that your signature?

14       A     It is.

15       Q     And it's dated September 23rd of 2020?

16       A     Correct.

17       Q     Okay.  I'm going to jump back up to the top.

18  Let me see if I can do this faster in another way.

19  Sorry about the slow computers, but -- it has to stop

20  at some point because there's a beginning of the

21  document.  Okay.  Great.

22             So where it asks -- it says, Interrogatory

23  Number 1, and it asks you to identify all persons with

24  knowledge of facts underlying the plaintiff's complaint
```

Page 22

1    and identify all documents that relate to such

2    knowledge or facts.

3         **A    I can't hear you.  Can you please try to**

4    **speak into the mic, please?**

5         Q    I'm going to move the microphone over.  Is

6    this better?

7         **A    Much better.**

8         Q    Okay.  Great.

9              So what I did was I read what it says after

10   interrogatory one, identify all persons with knowledge

11   of facts underlying plaintiff's complaint and identify

12   all documents that relate to such knowledge.

13             Do you see that?

14        **A    Yes, I do.**

15        Q    And then afterwards there's an answer.  Now,

16   my question is:  Did you prepare this answer on your

17   own?

18        **A    I did with my attorney.**

19        Q    Other than your attorney, did anyone else

20   help you prepare this answer?

21        **A    No.**

22        Q    So it identifies Pat Larson, former L Unit

23   psychologist, as someone who may have knowledge

24   relevant to the case.

Page 23

1          Who is Pat Larson?

2     **A     She was a psychologist on L Unit at that**

3  **time.  She is retired now.**

4     Q     Okay.  How did you know she would have

5  knowledge about the complaint?

6     **A     What complaint?**

7     Q     Oh, so do you know what the plaintiff's

8  complaint means?

9     **A     You're referring to that.  Okay.**

10    Q     Okay.  Do you know what that is?

11    **A     Yes.**

12    Q     So -- and you're familiar with the contents

13 of it?  You know what the allegations and statements in

14 the complaint are?

15    **A     Not fully.**

16    Q     Well, before you prepared this document, had

17 you read the complaint?

18    **A     Yes.**

19    Q     So were you familiar with it when you

20 prepared this document?

21    **A     Yes.**

22    Q     So as you sit here today, I'm asking you to

23 recall when you prepared this document what you were

24 providing to us is information about people that had

Page 24

```
 1   knowledge of the contents of that document.  Do you
 2   understand that?
 3        MS. JOHNSTON:  Objection.  Just to clarify that it
 4   says individuals that may have knowledge relevant to
 5   the claims.
 6        MR. CECALA:  That's fine.  I don't think it
 7   changes my question.
 8   BY MR. CECALA:
 9        Q    We're talking first about the contents of the
10   document with the allegations and the statements about
11   what happened at Elgin.  You're familiar with that,
12   right?
13        A    I am, and these are the people who were
14   actually working with Christy at that time and Ben,
15   so --
16        Q    Yeah, thank you for that.  That's not my
17   question.
18        A    Okay.
19        Q    My question -- and we -- and I apologize.
20   I really don't want to appear short, but I know that we
21   may have to take a break, and we have a limited amount
22   of time.  So if I'm -- if you're just -- and this may
23   even help your own lawyer, because sometimes witnesses
24   volunteer information, and I really just want you to be
```

Page 25

1    able to answer my questions, and volunteering

2    information is fine, but if I'm -- I'm not being short

3    with you on a personal level.  I just want to make sure

4    we get our questions answered.  Is that okay?

5         **A    Correct.  Okay.  Thank you.**

6         Q    Okay.  So I'm asking you about the knowledge

7    of the information in a complaint.  A complaint is all

8    the facts and information that was written down in the

9    lawsuit in which you've been sued.  Do you understand

10   that?

11        **A    Yes.**

12        Q    Okay.  So this question is asking for

13   individuals that may have knowledge about the

14   information in the document called plaintiff's

15   complaint, correct?

16        **A    Correct.**

17        Q    Okay.  So you identified Pat Larson.

18        **A    I did.**

19        Q    Okay.  So Pat was a unit psychologist, and my

20   question is:  How do you know that Pat Larson had

21   information about the information in the complaint?

22        **A    Because she was working on L Unit with the**

23   **patient and the social worker, so she was a part of the**

24   **treatment team at that time.**

Page 26

1    Q    Okay.  Did you talk to her?

2    **A    About this incident?  No, I did not.**

3    Q    So you're just merely -- she may have

4  knowledge merely because she was part of the treatment

5  team, is that what that means?

6    **A    Exactly.  This is what -- because she was a**

7  **part of the treatment team at that time and working**

8  **with both the social worker and the patient, she may**

9  **have.  Like I said, she may have.  I don't know if she**

10  **does.**

11    Q    Okay.  What about -- I have the same question

12  for Joanne Langley.  Did you ever talk to Joanne

13  Langley?

14    **A    About this incident?  No, I did not.**

15    Q    So, yeah, about anything that's in the

16  complaint, you've never spoken to Joanne?

17    **A    No.**

18    Q    Well, why would she be someone who has

19  knowledge about the information in the complaint?

20    **A    Because she was the supervisor for Christy.**

21    Q    Okay.  And then same question:  Have you

22  spoken to Antoinette Kelly?

23    **A    No.**

24    Q    And why would you assume she may have

Page 27

1   knowledge relevant to the claims?  Why did you answer

2   Antoinette Kelly?

3       **A     Because she was working as a nurse on that**

4   **unit at that time.**

5       Q    Okay.  What about Daniel Hardy, have you

6   spoken to him about this?

7       **A     No.  He was -- he was the medical director at**

8   **Elgin Mental Health Center at the time.**

9       Q    So why would you assume that the medical

10  director has knowledge about the complaint?

11      **A     Because he was the medical director at that**

12  **time.  That's the reason.**

13      Q    But he wasn't a part of the treatment team on

14  that unit, right?

15      **A     No, he was not, but as a medical director, he**

16  **was made aware of what was going on, so he may have.  I**

17  **don't know if he did.  I never talked to him about this**

18  **thing.**

19      Q    Well, you said he was aware of what was going

20  on.  How do you know he was aware?

21      MS. JOHNSTON:  Objection.  Misstates her

22  testimony.

23      MR. CECALA:  Could we read back her testimony?

24              (Record read as requested.)

Page 28

1   BY MR. CECALA:

2       Q    So when you just said he was made aware, how

3   do you know he was made aware.

4       **A    I said he was made aware of the facts that**

5   **were going on on a unit hypothetically.  I did not know**

6   **he was made aware of those facts.  As a medical**

7   **director, they are made aware of what is going on on a**

8   **unit if there is an issue.  So this may have been.  I**

9   **do not know if he did or not.**

10      Q    Well, how would the medical -- how would the

11  medical director have been made aware?

12      **A    I don't know what you're asking.  I already**

13  **answered that question.**

14      Q    Well, you said he may have been, but that

15  leaves open that he may have not been.  I'm asking

16  if -- you put him down.  It's your answer.  I'm only

17  asking because you listed him, and I'm trying to find

18  out how you know he may have been made aware.  How do

19  you know that?

20      **A    I don't know.  I listed him because he was**

21  **the medical director at that time, and as a medical**

22  **director, they are made aware of incidents that are**

23  **happening, so he may have, and he may not have.  I**

24  **don't know that.**

Page 29

1     Q   So how -- how, when an incident is happening,

2  if you know, is the medical director made aware of the

3  incident?  How does that happen?

4     **A   I don't understand your question.**

5     Q   Well, somehow Daniel Hardy, former medical

6  director, may have been made aware of what's happening,

7  correct?

8     **A   Like I said, the medical directors are made**

9  **aware of incidents on the unit because they are the**

10  **medical director.  This is the reason I named him,**

11  **because he was the medical director at that time.  I do**

12  **not know if he knew or not, and I never had any**

13  **discussion about this incident with him.**

14     Q   Yeah, that's not my question.

15       My question is, obviously, either some --

16  some way, either a written or a verbal communication

17  would make him aware unless he saw the incident for

18  himself.  I'm trying to understand the ways that Daniel

19  Hardy may have become aware of claims in our complaint.

20     MS. JOHNSTON:  Objection.  Speculation.

21     MR. CECALA:  I didn't ask a question yet.

22  I didn't ask a question yet.

23     MS. JOHNSTON:  You've been asking how he would

24  have been made aware.  I'm sorry.  Go ahead.

Page 30

```
 1        MR. CECALA:  Incidents in general.  We're not even
 2   at this.  So she's -- look, it's an answer in an
 3   interrogatory.  We're not speculating about anything.
 4   Daniel Hardy is a person she says may have knowledge
 5   relevant to the claims.  I have to ask how she knows
 6   that.  That's not speculation.  She wrote it down.
 7   BY MR. CECALA:
 8        Q    So my question to you, Doctor, is if he was
 9   made aware -- because we're fencing with whether he may
10   not have been made aware.  I understand that question.
11   But if he was made aware of knowledge relevant to the
12   claims, how do you know that that happened or didn't
13   happen?
14        A    Are you asking me the ways a medical director
15   is notified of incidents on the unit?
16        Q    You can -- that's a fair interpretation.
17   Fine.  If you want to answer that, that's fine.  How
18   would he be -- right, how would he be notified?
19        A    Sometimes there are calls, sometimes there is
20   an email, sometimes in person.  It really depends.  I
21   don't know.  In this incident, if he was made aware, I
22   don't know.  I put his name because he was the medical
23   director.  That is the only reason.
24        Q    Could it have been -- you're giving me
```

Page 31

1  different forms.  It could have been a call.  It could

2  have been an email.  It could have been -- it could

3  have been just someone telling him as he walks by in

4  the hallway.  Is that another way?

5      **A    I've already answered your question.  I don't**

6  **know what to answer.**

7      Q    No, my question is, is it possible that

8  Daniel Hardy was just in the hallway and someone said,

9  "Hey, did you hear what happened?  There was an

10 incident."  Is that a possibility?

11     **A    I don't know.  It can -- I don't know if it**

12 **can -- usually we don't talk about patients in the**

13 **hallway.  I didn't say in the hallway.  I said in**

14 **person.  It could be in a meeting.  It could be -- it**

15 **could be anything.  I don't know.**

16     Q    Well, in-person communication is one way,

17 right?

18     **A    Yes.**

19     Q    Would it have to be a formal meeting?

20     **A    I think you're asking all of these**

21 **hypothetical questions, and I don't know how to answer**

22 **them.**

23     Q    That's not a hypothetical question.  I'm not

24 trying to argue with you, Doctor.  I don't know if you

Page 32

1    understand the magnitude because, you know, we can go

2    to the judge and certify questions and have you

3    compelled to answer them.  That's a very clear

4    question.

5         MS. JOHNSTON:  Joe, I don't think she understands

6    the question.  I don't think she is trying not to

7    answer.

8         MR. CECALA:  Well, I asked, does it have to be in

9    a formal meeting.  Mary, I'm not fencing with her.  I'm

10   asking very clear, very precise, very slow-pitched

11   questions.  And this is going to be a really long

12   deposition if this is how we're going to conduct it.

13   I'll end it and go to the court.  I'll file a motion to

14   have her in contempt.  We're not going to fence with

15   her for four hours.  That's a very clear question --

16        MR. JOHNSTON:  I don't think she is.

17        MR. CECALA:  It's a very clear unobjectionable

18   question.  If we're going to do this for four hours,

19   I'm going to end the deposition, and I'm going to file

20   a motion for contempt.

21        MS. JOHNSTON:  Maybe we're getting confused here,

22   because -- if I can --

23        MR. CECALA:  Does it have to be in a formal

24   meeting is not in any way --

Page 33

1        MR. JOHNSTON:  No, can we backtrack --

2        MR. CECALA:  It's not even a gotcha question.  And

3   I'm just telling you we're burning time right now on

4   this.

5        MS. JOHNSTON:  I'm asking if we can backtrack for

6   a moment because I feel like maybe I've gotten confused

7   here, because you were asking about how she stated that

8   Daniel Hardy may or may not know about the allegations

9   in the complaint, right?

10       MR. CECALA:  Well, here is the thing.  I'm willing

11  to concede that what she wrote and what she is

12  answering are different.  That's not what the answer to

13  the interrogatory under oath is.  The answer to the

14  interrogatory under oath is that they may have

15  knowledge.  It implies that they may not have it.

16  That's fine.  But we are now fencing, and I'm not going

17  to fence for four hours.  I'm willing to go that far,

18  but I'm even going towards may or may not.  So what are

19  the different forms in which a communication is

20  delivered are my questions now.

21       MS. JOHNSTON:  Just theoretically, not about this

22  specific incident, theoretically how might information

23  be conveyed to Daniel Hardy?

24       MR. CECALA:  Well, they are her answers, so I'm

Page 34

1   allowed to ask the question about the form in which

2   these people, according to her knowledge because she

3   put them on the page, may have received the

4   information.  I'm only probing that side.

5       MS. JOHNSTON:  And, Joe, I'm not trying to argue

6   with you.  I'm just trying to make sure we understood

7   what you were asking.

8       MR. CECALA:  No, Mary, we have been very gracious

9   with one another for two years, but we're now deposing

10  defendants, and the degree of evasiveness isn't going

11  to be something we're going to put up with.  I will

12  go -- I will go very fast, right to motions to compel.

13      MS. JOHNSTON:  I do not believe she is trying to

14  be evasive, but let's just go ahead.

15      MR. CECALA:  Well, we have -- as lawyers, we have

16  different opinions about what's actually occurring, so

17  I'm going to try again, Doctor.  Okay?

18  BY MR. CECALA:

19      Q    You wrote down that Daniel Hardy may have

20  knowledge relevant to the claims that are in the

21  complaint, correct?

22      **A    Correct.**

23      Q    Okay.  Now I'm asking you how you know that

24  he may have knowledge.  How did you find that out?  He

Page 35

```
 1    is the medical director, not the treatment team.  How

 2    do you know?

 3         A    Because medical directors get notified about

 4    incidents on the unit.

 5         Q    Very good.  How do medical directors get

 6    notified about incidents on the unit?

 7         A    It could be an email.  It could be in-person

 8    meeting.  It could be a telephone call.

 9         Q    Does it have to be a formal in-person

10    meeting?

11         A    It really depends.  I don't know.  It doesn't

12    have to be a formal meeting, but we do not talk about

13    these things in hallways.  It has to be in a place

14    where a patient's confidentiality can be taken care of.

15         Q    Okay.  Great.

16              And so now I have a similar question.  So the

17    answer is it could be any one of a number of different

18    ways, but in your view, it would be something that's

19    formal in a closed office setting where someone is

20    delivering the communication, not a casual

21    communication in a hallway, correct?

22         A    Correct.

23         Q    So I'm going to go through the next two, and

24    then I'll ask you something about that.
```

Page 36

1          And you wrote down, as well, Jeffrey Pharis.

2     So why did you write down that Jeffrey Pharis may have

3     knowledge?

4          **A    For the same reason, because he is forensic**

5     **medical director, and incidents were reported to him if**

6     **something happened.**

7          Q    And how would he have received the

8     notification that something happened?

9          **A    In some communication when a director is**

10    **notified for any incident, it's the same way, phone**

11    **call, personal meeting or email.**

12         Q    And have you spoken to Jeffrey Pharis about

13    this?

14         **A    No.**

15         Q    And then you also wrote down Victoria Ingram.

16    Same question.  So why did you write down Vicky?

17         **A    She is the director of court services, and**

18    **for the same reason, that she is also made aware of**

19    **incidents like that in the same form, by phone call, by**

20    **personal meeting or by email.**

21         Q    And Dr. Hardy, Jeff Pharis and Vicky Ingram,

22    none of those people are part of the treatment team,

23    correct?

24         **A    They are not.**

Page 37

```
 1        Q    So based upon your knowledge from your
 2   position as a psychiatrist, what would be the purpose
 3   of these people having that information?
 4        A    Can you explain the question?  What would be
 5   the purpose?
 6        Q    Why are they notified?
 7        A    Because they are supervisors.  One is medical
 8   director, other one is forensic medical director, one
 9   is director of court services.  So when anything of
10   significant importance happens, these people are
11   notified.  Like Dr. Ingram is director of court
12   services.  She gets all of the court reports, 90-day
13   court reports.  She reviews them.  So if there is
14   anything of any significance in those court reports,
15   then she would know, but I personally never talked to
16   any one of them about this incident.
17        Q    Okay.  Well, have you talked to anyone else
18   other than these five people about this incident -- six
19   people.  I'm sorry.
20        A    So your question is that if I've talked to
21   anyone else about these -- this incident?
22        Q    Other than your lawyer.
23        A    Yes.  When this investigation was initiated,
24   there were times that I have -- you know, people were
```

Page 38

1    telling different things after the investigation was

2    initiated.

3            Initially we did not even know what was going

4    on.  We only knew that Christy was escorted off the

5    unit.  For a while we did not know what was going on,

6    but started seeing the news, and so people were talking

7    about what was in the news.  I do not rememberer any

8    specific conversations, but, yes, with the treatment

9    team members, with the staff, there were different

10   rumors about different things.  So, yes, we have heard

11   and talked about the news, talked about what was

12   happening after that evaluation -- after this

13   investigation was initiated.

14       Q    Okay.  So who did you talk about --

15   I appreciate that answer.

16            My question was:  Who did you talk about this

17   with?

18       A    I remember -- if you asked me specifically,

19   I have a social worker on the unit by the name of Bob

20   Hamlin.  I recall him telling me about the news.  We

21   discussed this was in the news, because the

22   administration was not made aware what was happening,

23   so we discussed the news, what was in the news, so

24   I . . .

Page 39

1    Q    Other than Bob Hamlin, who else did you talk

2  about the claims in the complaint?

3    **A    I don't recall.  It would have been other**

4  **staff members.  Let me recall who else have I talked**

5  **with at times.  Andrew Beck, he is another social**

6  **worker on the unit.  So we talked about what was in the**

7  **news, and this was all after the investigation started**

8  **and, you know, we were hearing things on the news.**

9  **So -- and let me recall.  Dr. Javed, I may have**

10  **discussed it with her.  I don't recall anybody else.**

11    Q    So Bob Hamlin, Drew Beck and Dr. Javed are

12  the only people you've ever discussed anything about

13  the claims in the complaint with?

14    **A    I don't recall if I did with anybody else,**

15  **because everybody was -- at that time everybody was**

16  **talking about it.**

17    Q    Now, you said at that time.  You're referring

18  to the news reports that came out after the complaint

19  was filed, correct?

20    **A    Correct.**

21    Q    So you never talked to anyone about what was

22  happening because this is -- what's in the complaint

23  happened before the news reports, correct?

24    **A    Before the news reports?**

Page 40

1    Q    Well, sure.  In the complaint, it outlines

2  all kinds of events that happened before November of

3  2017.  Are you aware of that?

4    **A    In the news?  Yes, I'm aware of what was in**

5  **the news.**

6    Q    Not the news.  The events in the complaint

7  all occur before the news story, correct?

8    **A    Correct.**

9    Q    My question is:  Before the news story, did

10 you talk to anyone about the information that's

11 contained in the complaint?

12   **A    No.**

13   Q    So you never spoke to Dr. Javed about

14 anything related to what was going on before the news

15 stories?

16   **A    No.**

17   Q    And you never spoke to Drew Beck about that?

18   **A    No.**

19   Q    And you never talked to Bob Hamlin?

20   **A    No, because we were not aware of anything**

21 **that was happening until there was investigation that**

22 **started.  Even after the investigation started, we were**

23 **not getting any information from anyone, but when we**

24 **started hearing those news, then people started to get**

Page 41

1    to know what was going on.

2        Q    Okay.  So that's -- that gives us another

3    period of time.  So you just mentioned an

4    investigation.  What investigation are you referring

5    to?

6        A    What happened was that we were -- at that

7    time Ben was on my unit, so we were told by

8    administration to hold his passes, because he had

9    on-grounds and off-ground pass, and we restricted his

10   phone calls.  And that is the only information we were

11   given, and we did not know what was going on.  We also

12   find out -- found out from different resources that

13   Christy was escorted off the premises by security.

14       Q    We're going to get into all of that.

15           My question was:  What investigation are you

16   referring to?

17       MS. JOHNSTON:  Joe, can you rephrase that?  You

18   echoed for a minute.  I couldn't hear the start of your

19   question.

20   BY MR. CECALA:

21       Q    My question is:  What investigation are you

22   referring to?

23       A    Investigation about what was going on when

24   they asked us to pull his passes, Ben's passes, and

Page 42

1    **pull -- and restrict his phone calls.  I'm calling this**

2    **that investigation; that we were told that it was**

3    **because of an investigation.**

4        Q    Right.  So between the time you found out

5    about the investigation and the news reports, you

6    didn't talk to Bob Hamlin about any of the information

7    that now is revealed in the complaint?

8        A    **No, because we did not have that information**

9    **at that time.**

10       Q    But you didn't talk about anything pertaining

11   to the investigation or why there was an investigation?

12       A    **Yes, we --**

13       Q    You made no comments at all?

14       A    **We -- we did not know what was going on, so**

15   **we were talking.  We were wondering and we were talking**

16   **about what is going on, why are we asked to do that?**

17   **At that time we did not know.**

18       Q    See, I'm not asking what you knew.  My

19   question is:  You're now saying you did talk about

20   something, right?

21       A    **We talked about the investigation that Ben is**

22   **restricted to the unit and he was not allowed phone**

23   **calls and the fact that Christy was escorted off the**

24   **unit, about that investigation.**

Page 43

1      Q    Right.  So what was said at that time about

2    Ben being restricted and Christy being escorted between

3    you and anyone?  Just we'll start with Bob Hamlin, Drew

4    Beck, Dr. Javed, what was said between you and them?

5      **A    We were told that he -- there -- no**

6    **information was given, so we were wondering what was**

7    **going on.  We were just saying that "What is going on?**

8    **Why is this happening?"  That is the conversation we**

9    **were having with each other; that why is this thing**

10   **happening and why the administration is not telling us**

11   **what has happened.**

12     Q    So you talked about -- you had that

13   conversation of we don't know what's going on with Bob

14   Hamlin?

15     **A    I may have.  I do not recall specific**

16   **conversations.  I may have because he was working on my**

17   **unit, and we worked very closely.**

18     Q    What about -- what about Drew Beck, did you

19   have a conversation like that with Drew Beck?

20     **A    I do not -- as I said, I do not recall that**

21   **conversation because it happened five years ago.  I**

22   **know that we worked very closely, and since we were all**

23   **wondering, I may have talked about it, but I do not**

24   **recall any specific conversation.**

Page 44

1   Q What about Colleen Delaney, had you ever

2 spoken to her about any of the information in the

3 complaint?

4   **A** **No.**

5   Q Diana Hogan, have you ever spoken to her

6 about any information in the complaint?

7   **A** **No.**

8   MR. CECALA: One second. Sorry about that.

9 BY MR. CECALA:

10   Q So this question goes right to the

11 information about what's in the complaint, which you

12 correctly identified is this investigation that Christy

13 left the facility, Ben was restricted, and there was at

14 least some conversations with some people, perhaps Bob,

15 Drew or Dr. Javed, but you don't remember which one or

16 when after the investigation started. Is that a fair

17 way to say it?

18   **A** **Correct.**

19   Q What I'm wondering is how -- so would Bob

20 Hamlin have had knowledge about the complaint in the

21 conversations that you did have?

22   **A** **I don't understand your question.**

23   Q When you talked to Bob Hamlin and you were

24 wondering about the investigation, what were you saying

1   to one another?

2       **A      I think I answered that question earlier;**

3   **that we were wondering what was going on.  We were**

4   **surprised at why these passes all of a sudden are put**

5   **on hold.  He was very close to being discharged.  You**

6   **know, we do not do this for patients who are being so**

7   **close to discharge and doing overall okay, no**

8   **incidents.  So we were all wondering what was going on.**

9   **And same thing with Bob Hamlin, same thing with Drew**

10  **Beck, and same thing with Dr. Javed.**

11      Q    And is there anyone other than Bob Hamlin,

12  Drew Beck and Dr. Javed that you would have done this

13  wondering what was going on with?

14      **A    I don't recall.**

15      Q    Okay.  Is there a reason you didn't list Bob

16  Hamlin in addition to the other six people that may

17  have knowledge relevant to the claims?

18      MS. JOHNSTON:  Sorry.  Joe, I think you froze.

19      MR. CECALA:  Sorry.

20      MR. JOHNSTON:  No, you're back.  I think you cut

21  off at other -- is there a reason you didn't -- yeah.

22  BY MR. CECALA:

23      Q    Is there a reason you didn't list Bob Hamlin

24  with the other six people in your answer to question

Page 46

1  number one?

2      A    The reason I did not list him is because he

3  was also wondering.  So I do not -- I know that after

4  talking to him, he did not know anything, and he was

5  wondering just like me.  So I knew that he didn't know

6  anything.

7      Q    Okay.  If you look at this interrogatory

8  number two, "Identify all persons with knowledge of the

9  facts underlying the affirmative defenses set forth in

10  defendants' answer to the complaint and identify all

11  documents that relate to such knowledge or facts," as

12  part of your answer, it says that you're relying upon

13  the fact that you acted reasonably and in good faith at

14  all times relevant to the claims.

15         So the complaint has a time window from 2014

16  to 2017, correct?

17      A    Correct.

18      Q    Can you help me understand how you acted

19  reasonably and in good faith regarding the claims that

20  are made in the complaint?

21      A    Nothing was reported to me about Ben or

22  other -- or anybody else, so since I was not aware of

23  any of these complaints, there was nothing else I could

24  have done differently.

Page 47

1    Q    Just on a different question, not actually

2    related to this interrogatory, but do you know who Mark

3    Owens is?

4    **A    Yes, I knew.**

5    Q    Are you aware that Mark Owens also filed a

6    lawsuit against Elgin Mental Health Center staff?

7    **A    I'm aware.**

8    Q    And do you have any information -- like you

9    just said, no one reported anything to me.  Do you have

10   any information about the allegations in the Owens

11   complaint?

12   **A    No one reported anything to me in that case,**

13   **either.  He was a patient on another unit.  He was on**

14   **my unit.  I don't even remember at what time, but I**

15   **believe he was at one point on my unit.  He never**

16   **reported any of that to me, neither did anybody else.**

17   Q    Okay.  And I'm not trying -- none of these

18   are gotcha questions.  I'm not trying to trick you, but

19   there's a difference between my question and your

20   answer.

21        My question is:  Do you have knowledge?  My

22   question is not did anyone report something to you.  Do

23   you see the difference?

24   **A    Okay.  So let me try to understand.  So what**

LISA A. KOTRBA & ASSOCIATES, LTD. (312) 855-1834

Page 48

1    **you're asking is if I had any knowledge of any -- if**

2    **any of those complaints were happening at that time,**

3    **any of that was happening; is that correct?**

4        Q    I'm asking what your knowledge is, whatever

5    your knowledge is, not did someone report something to

6    you.  Do you understand the difference?

7        **A    I understand.  So I can --**

8        Q    I haven't asked the question yet.  I just

9    want to clarify that when I'm asking a question that

10   you're understanding the question and answering the

11   question I've asked rather than something that I didn't

12   ask.

13       **A    Okay.**

14       Q    That's all we're doing right now.

15       **A    Okay.  Thank you.**

16       Q    So now I'm going to ask the question again.

17           Do you have any knowledge about the

18   information related to Mark Owens' complaint?

19       **A    No.**

20       Q    So you know nothing about anything that

21   happened to Mark Owens as it relates to the complaint

22   and his stay at Elgin Mental Health Center?

23       **A    Not before those allegations were made.  Not**

24   **before that investigation was initiated.  Now I am**

Page 49

1   aware, but not at that time.

2        Q    Okay.  Well, you have knowledge now, right?

3        A    Correct.

4        Q    That's my question.

5             What do you know?

6        A    Well, I know that Mark Owens allegedly said

7   that he was also sexually abused by the same staff

8   member.

9        Q    And who is that?

10       A    Christy Lenhardt.

11       Q    And what other -- what other knowledge do you

12  have about that?

13       A    I don't have any other knowledge.  That's all

14  I know.

15       Q    So I'm going to ask you the same question

16  again about the assertion that you acted reasonably and

17  in good faith.

18            What knowledge do you have about the

19  complaint that would lead you to the conclusion that

20  you acted reasonably and in good fifth?

21       A    Since nothing was reported to me, I don't

22  know what would I have done to prevent that.  I was not

23  aware of what was going on at that time.  I was made

24  aware after the investigation was initiated.  I acted

1   **in good faith because I was not aware of what was going**

2   **on at that time.**

3       Q    Go down to interrogatory number 12.  Doctor,

4   do you see where it says interrogatory 12 on the page?

5       **A    Yes, I do.**

6       Q    So it asks you to describe in detail events

7   that led up to your first knowledge or suspicion that

8   plaintiff was engaged in a sexual relationship with

9   Christy, including how you came by the knowledge, all

10  persons with whom you shared any information or

11  suspicions about a sexual relationship with Christy and

12  the specific location of documents, recordings or other

13  written information relevant to the events that led to

14  your knowledge or suspicion, and describe all

15  information and identify all documents you prepared to

16  help report and document the incident.

17          You see all of that, right?

18      **A    Yes, I do.**

19      Q    And you can take your time to read your

20  answer.  Do you want to take a look at your answer?

21      **A    Yes.**

22      Q    Have you read it?

23      **A    Yes.**

24      Q    Is this answer still true today?

Page 51

1      **A     Absolutely.  Yes.**

2      Q     So all of the information that you had that

3   led to any knowledge or suspicion about Ben and Christy

4   came after the investigation was initiated?  And when

5   I say the investigation, I mean -- I guess I wouldn't

6   ask Counsel to stipulate.  We're going to get to this

7   in a minute.  But the investigation started on

8   June 30th, 2017.

9      MS. JOHNSTON:  Joe, I was just going to jump in

10  and say for ease moving forward, I'm happy to

11  stipulate, and I apologize if -- what if we call --

12  just because I know at some point you might talk about

13  the ISP.

14     MR. CECALA:  Yeah, that's going to be the next

15  exhibit.

16     MS. JOHNSTON:  Do we want to talk and maybe we can

17  refer to the Elgin investigation and then the ISP

18  investigation to have the two different --

19     MR. CECALA:  Sure.  Sure.

20     MS. JOHNSTON:  I didn't know if that just might

21  make it easier for identifying time periods moving

22  forward.

23     MR. CECALA:  Yeah.  That's fine.  I'll clarify

24  that.  So on -- and stipulated.

LISA A. KOTRBA & ASSOCIATES, LTD. (312) 855-1834

Page 52

1  BY MR. CECALA:

2    Q    So on June 30th of 2017, there was an Elgin

3  search of Ben Hurt's room.  Are you aware of that?

4    **A    Yes, I am.**

5    Q    And when we say the Elgin investigation,

6  we're talking about what the Elgin security and

7  administration did, looking at what was found in Ben's

8  room that day, correct?

9    **A    Correct.**

10    Q    Then there's another investigation which was

11  conducted by the Illinois State Police.  You're aware

12  of that one, too, correct?

13    **A    Correct.**

14    Q    Coincidentally, that investigation started on

15  the same day, June 30th.  Did you know that?

16    **A    I did not know when that investigation**

17  **started.**

18    Q    Okay.  So maybe we can just call it the State

19  Police investigation --

20    **A    Okay.**

21    Q    -- okay, for clarity?

22        So I'm asking about this question on

23  interrogatory number twelve.  You're saying that what

24  you've written here is -- you don't want to make any

LISA A. KOTRBA & ASSOCIATES, LTD. (312) 855-1834

Page 53

1    changes to anything you've written down here today

2    based upon what you wrote on, I think it was,

3    September 23rd, 2020?

4         **A    Yes.  Correct.**

5         Q    There's nothing you want to add to this?

6         **A    The first time I learned about this incident**

7    **was through the news and when everybody started**

8    **discussing what was in the news.  This is the first**

9    **time I learned about this incident.**

10        Q    Well, what it asks is your first knowledge or

11   suspicion that plaintiff was engaged in a sexual

12   relationship with Christy.  So your first suspicion

13   that Christy and Ben were in a sexual relationship

14   wasn't until the news stories, which are in November of

15   2017.  Is that your answer?

16        **A    Can you repeat the date?**

17        Q    The news stories that you were referring to,

18   I believe -- and I don't know if counsel wants to

19   stipulate, but they all occurred after the filing of

20   the lawsuit.  The lawsuit was filed on November 4th,

21   2017.  There were no news stories before November 4th.

22   And I'm just trying to get the time frame for when you

23   first had any knowledge or suspicion that there was a

24   sexual relationship between Christy Lenhardt and Ben

1   Hurt, and your answer is all of your suspicion and

2   knowledge happened after November 4th of 2017.

3          Is that your answer?

4      **A    To the best of my knowledge and recollection,**

5   **that's my answer.  I don't recall having any suspicion**

6   **before that.  When the investigation was started, we**

7   **were not made aware of what was going on, why she was**

8   **escorted off the unit, why Ben was restricted to the**

9   **unit.  We were not made aware.**

10     Q    Did you have any other knowledge besides what

11  you weren't made aware of by investigative people.

12     **A    I don't recall.**

13     Q    Well, you were Ben's psychiatrist, correct?

14     **A    Correct.**

15     Q    There are no incidents, as you sit here

16  today, that would have led you to an earlier knowledge

17  than November 4th of 2017 that you had a suspicion that

18  there was something going on between Christy and Ben.

19  Is that your answer?

20     **A    That's correct.  There was no incident that**

21  **would lead me to believe that.  There was one incident,**

22  **I don't remember when exactly it happened, when Christy**

23  **and Ben were locked in a room, but at that point Ben**

24  **never said anything to me.  We were just concerned**

Page 55

1    about everybody's safety.  That lock was a faulty lock,

2    and we knew that we were having issue.  At that point

3    we did not suspect anything.

4        Q    Well, when did you first suspect something?

5    Did you suspect it on -- that incident happened on

6    May 31st, 2017.  When did you first suspect that there

7    was something more going on between Christy and Ben?

8    Was it -- was it not until November of 2017?

9        A    When Christy was escorted off the unit, Ben

10   was restricted.  At that point there may be what was

11   going on, but that this would be going on, I do not

12   recall even thinking that this would happen.

13            There is OIG investigation for different

14   reasons, and it would be for people being abusive to

15   staff -- to patients.  So I -- we suspected there was

16   something going on, but something of this magnitude I

17   did not suspect.

18       Q    Well, the question that's written here -- and

19   I'm trying to give you an opportunity to change your

20   answer today, and now you're indicating that there was

21   a suspicion of something, correct?  And now you're

22   qualifying it to this magnitude.

23            What was the magnitude of your suspicion

24   related to the -- any relationship between Ben being

1    restricted and Christy being asked to leave?

2         A    Since those incidents happened together, it

3    could be any verbal abuse by staff to patient.  It

4    could be any exploitation.  It could be anything.

5    These are just speculation.  It was just wondering is

6    there a connection between the two, you know?  So I do

7    not -- I did not suspect anything that this was going

8    on even at that time when Ben was restricted and

9    Christy was escorted.

10        Q    Even at that time, which time?

11        A    When Christy was escorted off the unit, I

12   believe it was June 30th of 2017?

13        Q    Yes.

14        A    Yes.  So at that time I did not suspect that

15   this was going on.  I just suspected it might have a

16   connection between the two, and it's possible maybe she

17   was not really abusive or she exploited, it could be

18   anything, but I did not suspect that there was some

19   kind of sexual activity going on between the two.

20        Q    What made you think she was being verbally

21   abusive to him?

22        A    Just speculation.  I'm just giving you

23   examples why at different times investigations were

24   initiated, why at different times OIG is called.  I'm

Page 57

1    just giving you some examples.

2         Q    But I'm asking what you thought.

3         A    I did not think of anything.  I just suspect

4    that it could be verbal abuse, it could be just

5    exploitation, it could be anything, so I did not

6    suspect any kind of sexual relationship.

7         Q    Well, it could be anything.  Could it have

8    been a sexual relationship?

9         A    It could have been.  Again, speculation.  It

10   could be anything, but I did not at that time think

11   about it.  That's all I recall.

12        Q    But that -- so a suspicion of something, you

13   had no -- you're saying you had no other knowledge to

14   lead you to a suspicion that there was a romantic,

15   sexual relationship between Ben and Christy -- same

16   question about this interrogatory 12 -- until the news

17   stories, correct?

18        A    That's what I recall; that when I started

19   hearing it in the news and we started talking about it,

20   that's when I remember that that's when I became aware

21   of it.

22                       (Whereupon, Plaintiff's Exhibit

23                        No. 2 was marked for

24                        identification.)

Page 58

1    BY MR. CECALA:

2        Q    Okay.  I'm going to go to Exhibit 2.  I'm

3    going to try this quickly to go to the next exhibit.

4    Hopefully I don't fail.  Hey, look at that.

5            So do you see -- Doctor, do you see the

6    transcript on the screen right now?

7        **A    I do.**

8        Q    So this has been marked as Exhibit No. 2.  Do

9    you remember testifying -- giving a witness statement

10   to the Illinois State Police?

11       **A    I remember.**

12       Q    And was that on November 8th, 2017?

13       **A    I don't exactly recall, but I see the date**

14   **November 8th, 2017, yes.**

15       Q    Then sorry for the slow computer.  On page

16   five -- yeah, page five.

17       MR. KRETCHMAR:  There is an upside down page.

18       MR. CECALA:  Oh, no.  That's four.  Let's go to

19   five.  Maybe it will be right side up.  Yes.  Great.

20   BY MR. CECALA:

21       Q    So on page five -- jeez, some of these are

22   upside down.  We're good.

23           Doctor, do you see the screen right now?  It

24   has lines one through 13?

Page 59

1      **A     Yes, I do see that.**

2      Q    And the police, at the top of the page, are

3  asking you what you've heard about these allegations,

4  and the A's are your answers.  The Q's are the State

5  Police questions.

6      **A     Okay.**

7      Q    They ask you what have you heard, and your

8  answer is, "There are some allegations against an

9  employee here, former employee."

10          And then he asks you:  What is her name?

11          Christy Lenhardt.

12          What have you heard?

13          And you answer:  I heard there are

14  allegations of some sexual abuse towards a patient.

15          Then he asks what type of sexual abuse?  And

16  you say -- do you know what type?  And you say no.

17          Do you remember being asked those questions

18  and giving those answers?

19      **A     Yes.  I can see that.  I don't remember my**

20  **exact words, but I see them, looking at it.**

21      Q    Okay.  So on November 8th you didn't know any

22  information about what type of sexual interactions that

23  were occurring between Ben and Christy?

24      **A     Since I answered that question, yes.**

Page 60

1      Q    Yeah, it's fine.  None of these are trick

2   questions.  I'm asking to verify your answers from

3   before.

4      **A    Yes.**

5          **Again, I would just like to say that this**

6   **happened five years ago, so I do not recall exactly my**

7   **answers, and I did not get a chance to review it**

8   **either, so . . .**

9      Q    No worries.  That's why I'm asking you these

10  questions, because if your memory is changed or

11  different or if you want to change your answers, that's

12  why we do what we're doing, to make sure we get all of

13  the evidence, truthful evidence, in the case, okay?

14          I'll just move this over so I can see what

15  page we're on.  Okay.  So we're now on page seven, and

16  the State Police are asking you about Christy and your

17  interactions with her just prior to this, and they ask

18  you did you have any interaction with Christy on the

19  L Unit side.  Do you see that?

20     **A    Yes, I see that.**

21     Q    And then your answer is:  Yeah, I mean, we

22  shared morning reports, so we are -- every morning the

23  whole team is there.  So Christy is there, too.  She

24  was there, too, during that time.

Page 61

```
 1          Do you remember giving that answer to the
 2   State Police?
 3      A    Yes, I can read it, and I remember.
 4      Q    Okay.  What you're referring to there is the
 5   fact that K and L are sister units, correct?
 6      A    Correct.
 7      Q    So when you have your morning meetings, the
 8   treatment teams, the psychiatrists, psychologists and
 9   the social workers, I think the activity therapists,
10   they all attend a meeting every morning to start the
11   day, correct?
12      A    Correct.
13      Q    So is that the morning report or morning
14   meeting that you're referring to?
15      A    Correct.
16      Q    And from 2014 till Christy left on June 30th,
17   2017, whenever you were at work attending a morning
18   meeting, was Christy at that morning meeting, as well?
19      A    Most meetings, yes.
20      Q    Okay.  So it was a full-time interaction
21   between the K and L Unit personnel, correct?
22      A    During the meeting, yes.
23      Q    So you were able to observe Christy in those
24   morning meetings during the time she worked there if
```

Page 62

1    you both were in attendance, correct?

2         **A    Correct.**

3         Q    Now it's page ten.  We're starting at,

4    actually, line -- well, the top of the page.  Well, the

5    bottle of page nine has the question.

6         MR. CECALA:  Sorry about our slow computer, guys.

7         MS. JOHNSTON:  It happens.

8    BY MR. CECALA:

9         Q    So here is another question that the State

10   Police asked.  It says, "Okay.  Have you ever seen

11   Christy on the K side when she was working from the

12   L side?"  And the answer on the next page, page ten,

13   says:  As far as I recall, no, because like I said,

14   I worked 7 to 3 shift.  I have never seen her, you

15   know, coming as far as I remember."

16            So my question is:  You would have seen

17   Christy in the morning meetings, correct?

18        **A    Yes, in the morning meetings.  They could**

19   **have -- they could be on K side, L side, it really**

20   **depends, but for any other reason, I don't recall**

21   **seeing her.**

22        Q    Okay.  Good.  That's what I want to clarify.

23            So there's not really other reasons you would

24   have interacted with Christy other than the morning

Page 63

1    meetings?

2         **A    Morning meetings.  Sometimes we cover for**

3    **each other.  So if Dr. Javed is not there, I might have**

4    **had to, you know, work with her on some patients.  So**

5    **there are times when we cover for each other and see**

6    **each other for other than morning meetings.**

7         Q    So you may have worked with Christy,

8    interacted with her during the workday, not just the

9    morning meeting?

10        **A    It may have happened, yes.**

11        Q    So what was your working relationship like

12   with Christy?

13        **A    Very professional.**

14        Q    Did you socialize with her?

15        **A    If there were, like, Christmas parties for**

16   **the unit, you know, for the whole unit, yes, we went**

17   **out with the whole team, but just one-on-one with her,**

18   **no.**

19        Q    So then the State Police go on to ask you if

20   you know who Ben Hurt is, and you answer that he was

21   discharged.

22             He was on the K Unit when he was discharged,

23   correct?

24        **A    Correct.**

Page 64

1    Q    And then you're asked, "How long was he on

2  your unit for, can you recall that?"  And you say, "A

3  few months."  Correct?

4    **A    Yes.  So now I can give you a more**

5  **approximate answer because he came to my unit on**

6  **December 18, 2016, and he was discharged on July 22nd,**

7  **2017, so around seven months.**

8    Q    Great.  And you explain here the reason he

9  was transferred.  So what was the reason that he was

10  transferred?

11    **A    Ben had a physical altercation, a fight with**

12  **another patient.  To separate both patients, he was**

13  **transferred from L Unit to the K Unit.**

14    Q    And that was literally a physical altercation

15  where they came to blows, right?

16    **A    Yes, it was a physical altercation.  Yes.**

17    Q    Is that commonplace?

18    **A    It's a psychiatric facility.  Yes, it**

19  **happens, and at that point we have to separate both**

20  **individuals to protect patients from each other.**

21    Q    And then on page eleven -- well, let me ask

22  this, as well.

23         So once that happens and they transfer a

24  patient to separate them, right, is it customary that

Page 65

1    the patients stay on the unit they have been

2    transferred to, or do they go back to the unit that

3    they were transferred from?

4         **A    It really depends on the circumstances.**

5    **Sometimes we feel that the issue has resolved, then**

6    **sometimes they go back.  Sometimes they stay on the**

7    **same unit, the unit that they are transferred to.**

8              **In Ben's case, he did have substance abuse,**

9    **and the unit that I worked on is a mental illness and**

10   **substance abuse unit, so the team decided it would be**

11   **good for Ben to complete the MISA program before he**

12   **leaves; we would just let him stay on K Unit.**

13        Q    So that was a treatment team decision,

14   correct?

15        **A    Yes.**

16        Q    Were you part of the treatment team that made

17   that decision?

18        **A    Yes.**

19        Q    Was Dr. Javed part of the treatment team that

20   made that decision?

21        **A    Yes.**

22        Q    And did you have a meeting about that to talk

23   about it with the other members of the treatment team?

24        **A    I don't recall it, but I can just tell you**

Page 66

1    **that these decisions are made by both treatment teams,**

2    **and the administration has to approve it.  Without**

3    **administration's approval, we cannot transfer the**

4    **patient from the one unit to another.**

5         Q    So without the administration's approval, you

6    said?

7         **A    Correct.  So any time you want to transfer**

8    **one patient to another unit, we have to get approval**

9    **from administration.**

10        Q    So that would be something called an

11   administrative transfer, right?

12        **A    Correct.**

13        Q    So if it's not an administrative transfer and

14   you make a transfer, is there another way to do that?

15        **A    Even for that we had to get approval from**

16   **administration, for any kind of transfer.**

17        Q    But one is just purely administrative, right,

18   and the other one might be characterized as a clinical

19   transfer?

20        **A    Clinical team recommends it, and**

21   **administration approves it.**

22        Q    Well, but the reason -- the reason being

23   clinical.  For example, here, Ben, you're saying he

24   needed MISA substance abuse treatment, so he was

Page 67

1    clinically not on the MISA unit, right?  When he was

2    on -- when he was on L Unit -- L Unit is not a MISA

3    unit, right?

4    **A   No, it is not.**

5    Q   So the transfer, was it a clinical transfer

6    so he could get different treatment, or was it for his

7    safety?

8    **A   Initially it was for his safety, but we**

9    **decided for him to stay on K because of the substance**

10    **abuse issue.**

11    **Most of the transfers are because of the**

12    **clinical reasons, but we always have to get approval**

13    **from administration.  We cannot transfer a patient**

14    **without approval from administration.**

15    Q   So when you say approval from administration,

16    who is administration?

17    **A   Jeff Pharis was the person.  Because he was**

18    **the forensic director, he was responsible for approving**

19    **transfers.**

20    Q   Was Christy Lenhardt ever discussed in regard

21    to his transfer?

22    **A   I don't recall ever discussing Christy**

23    **Lenhardt because -- the reason for his transfer, no.**

24    Q   What about the possibility of him --

Page 68

1    obviously there was a decision to keep him on the MISA

2    unit, right?

3         **A     Right.**

4         Q     So if you had not decided to keep him on the

5    MISA unit, the alternative would have been to send him

6    back to L Unit, right?

7         **A     Like I had mentioned earlier, if the issue is**

8    **resolved and we feel that it's safe, it has been done**

9    **sometimes, but I don't recall in his case if that issue**

10   **was resolved or not, but the main reason that he stayed**

11   **was the substance abuse issue.**

12        Q     So you don't know whether the patient that

13   Ben got in the fight with remained on L Unit or not?

14        **A     I don't recall how long he stayed on -- the**

15   **other patient stayed on L Unit.**

16        Q     Hang on one second.

17              So on page 14, I think it is --

18        MS. JOHNSTON:  Off the record for one second.

19                        (Whereupon, a discussion was held

20                        off the record.)

21        MS. JOHNSTON:  Back on the record.

22   BY MR. CECALA:

23        Q     So, Doctor, on the middle of this page there

24   is a question from the State Police.  He is asking,

Page 69

1    "Okay.  And if patients are spending too much time in a

2    social worker's room and if you notice that, what are

3    the procedures?  Do you talk to the social worker?  Do

4    you bring it up to somebody else, or how does that

5    work?"  And you can read your answer if you would like.

6    I like to read it into the record.  If you don't mind

7    reading it, that way it's in the record, because if you

8    read it silently, the court reporter can't take it

9    down.

10        **A     You want me to read that aloud?**

11        Q     Yeah, from line 18 on.

12        **A     Okay.  "I think it depends on the nature, you**

13   **know, if we just feel that it's just because a person**

14   **is just, you know, feeling this for this person and**

15   **being, you know, a little bit more -- paying more**

16   **attention to this person, we would just talk to this**

17   **person and say that, you know, you have to treat**

18   **everybody equally and the other person, patients are**

19   **complaining that you're spending more time."**

20        Q     So -- and the answer continues, but I'm glad

21   you stopped there.

22             So what did you mean by the other patients

23   are complaining that you're spending more time?

24        **A     Can I read it again?**

Page 70

1      Q    Sure.

2      **A    Let me read it again because I'm not clear**

3  **what I was saying at that time.**

4      MS. JOHNSTON:  While you're doing this,

5  Dr. Kareemi, if you do need to look a little before or

6  after to give context to yourself, that's okay; just

7  let Randy and Joe know.

8  BY MR. CECALA:

9      Q    Can you still read it?  I shrunk it a little

10  bit.

11     **A    Okay.  But this was a hypothetical question**

12  **that in what case we suspect that a person, there is**

13  **some issue.  Okay.  Let me read the question one more**

14  **time.  Can you go up and let me read the question?**

15          **So it says, "And if patients are spending too**

16  **much time in a social worker's room and if you notice**

17  **that, what are the procedures?"  So it is a**

18  **hypothetical question, and I answered it that if we**

19  **feel that there is something going on, if it is, you**

20  **know, more feelings, we suspect that, this is what we**

21  **do.**

22          **So it's more of a hypothetical question.**

23  **That does not mean I said that Christy was spending**

24  **more time with Ben.  I am not aware of that, so I**

Page 71

1  **don't -- it's a very hypothetical question.**

2       Q    Well, actually, that's my question.

3            So he hadn't asked you whether Christy was

4  spending more time with Ben at that moment.

5       **A    Correct.**

6       Q    He is not asking a hypothetical.  He is

7  asking you what are the procedures.

8       **A    Right.**

9       Q    So -- and then you provide your answer, and

10 as part of your answer you also say, ". . .  You have

11 to treat everybody equally and the other person,

12 patients are complaining that you're spending more

13 time."

14           My question to you before was:  What were you

15 referring to about patients complaining that a social

16 worker was spending more time?

17      **A    Again, it's hypothetical that if patient**

18 **complains, sometimes they do that.  "Oh, I would like**

19 **to go on this person's caseload because this person**

20 **spends more time with their patient, where this one**

21 **does not."  So it really depends.  And sometimes**

22 **patients complain that this social worker might have**

23 **been spending more time with this patient and not**

24 **paying attention to me.  It's just very hypothetical.**

Page 72

```
 1   I'm just giving examples of what could have happened
 2   and what can happen on a unit.
 3        Q    Were you aware that patients were complaining
 4   that Christy was spending too much time with Ben?
 5        A    No.
 6        Q    So that's not what you were referring to
 7   here?
 8        A    No.  I'm just -- I'm saying it was a
 9   hypothetical question, and I'm answering very
10   hypothetically.
11        Q    And then going back to your answer, it
12   says -- it starts with the word "but."  Can you read
13   that next paragraph down to line eight?
14        A    "But if it's anything beyond that, you know,
15   then we need to talk to the supervisor, their
16   supervisor, if it's anything beyond that and then we
17   call OIG.  I mean, we call Office of the Inspector
18   General even if there's the slightest bit of doubt
19   about anything."
20        Q    So what were you referring to when you said
21   the slightest bit of doubt about anything?
22        A    I am -- it's a hypothetical question.  I am
23   referring to anything hypothetical.  We call OIG if we
24   think we are in doubt.  So, for example, if I am not
```

Page 73

1    sure this is a reportable incident, you still call

2    sometimes supervisor and sometimes OIG, and if OIG

3    sometimes tells us this is not reportable, and they do

4    not take that report.  So when in doubt, we call OIG or

5    we call the supervisor depending on the circumstances,

6    and this is hypothetical.

7         Q    This is hypothetical related to a social

8    worker who is spending too much time with a patient,

9    correct?

10        A    I was not aware if she was spending more

11   time.

12        Q    That wasn't my question.

13             My question is:  This was a hypothetical that

14   if a social worker was spending too much time with a

15   patient, and even if there's the slightest bit of doubt

16   about anything, you call OIG.  That was your answer,

17   right?

18        A    If I know that a social worker is spending

19   too much time with a patient and there is nothing going

20   on beyond that, call the supervisor first, you know, to

21   see what the supervisor will do about it, or talk to

22   the social worker and see that what is going on, talk

23   to the patient, see what's going on.  OIG is something

24   that we call when we really suspect any kind of abuse

Page 74

1    or neglect.  So in that case, you know, it really

2    depends on the circumstances.  And it's very hard to

3    answer these questions hypothetically because we are

4    not -- we do not have all of the facts.  We do not know

5    what are the facts, what is going on.  So I'm just

6    doing -- trying my best to answer this question.

7         Q    So you said that if you know there isn't

8    anything going on beyond that, in the hypothetical, how

9    would you know whether something is going on beyond

10   appropriate or not to call OIG?

11        A    Patient report.  If a patient reports to me

12   or a contact reports to me that there is something

13   inappropriate happening, if a patient -- if a staff

14   comes and tells me that they saw something, so if you

15   find out there is something going on beyond that, then

16   I would just act within my capacity to protect that

17   patient.  And it really depends on the circumstances.

18   Like I said, it's very hard to answer these questions

19   hypothetically because we do not have all of the facts

20   and all of the circumstances.

21        Q    So but -- we're trying to understand the

22   process.  So the process -- I'm asking the same State

23   Police question.  So the process would be if a staff

24   person reported to you something that you felt was

Page 75

1    inappropriate, that would be what you would report on,

2    correct, because a staff report came to you personally,

3    right?

4         **A    A staff came to me personally about another**

5    **staff?**

6         Q    Yes.

7         **A    Yes, then I would tell the staff member if it**

8    **came that this is what's going on, they should be the**

9    **one initiating the OIG report because they are the ones**

10   **that they witnessed it, and I would make sure that they**

11   **do it if they have seen anything.**

12        Q    So okay.  So staff reports to staff can

13   initiate a report to OIG, correct?

14        **A    They can, but what I'm saying is that the**

15   **staff who has witnessed it should be the one that's**

16   **reporting it because they are the one who witnessed it.**

17        Q    What if the staff person that reported to you

18   didn't report it to OIG, then what would you do?

19        **A    Then I would report that staff member, too,**

20   **that if they have seen anything inappropriate and they**

21   **are telling me that they have seen it themselves and**

22   **it's not hearsay, then I would report it to the**

23   **supervisor and, if needed, to OIG depending on the**

24   **circumstances.**

Page 76

1    Q    Right.  And it says here, the next answer on

2  line nine, "Even if we know that the patient is

3  delusional and psychotic and this cannot be true, even

4  then we go ahead and I, myself, have reported many

5  times that I knew that this patient was complaining and

6  so and so abused me and we knew that this patient was

7  delusional.  But we still go ahead and order it."

8         You're referring to you don't really know,

9  but it seems like the patient is delusional, but it's

10 still something that needs to be reported, right?

11   **A    That's correct.  Even if a patient is**

12 **delusional and we know that the patient is paranoid or**

13 **delusional, we still report if they come and tell us**

14 **anything that could be potentially abuse or neglect,**

15 **correct.**

16   Q    Are you aware of whether any staff members

17 reported that Christy and Ben were too close to each

18 other or that Christy spent too much time with Ben?

19 Are you aware of any staff reports concerning that?

20   **A    No one reported it to me.**

21   Q    I didn't ask if they reported it to you.

22        I asked are you aware of whether staff made

23 reports like that about Christy spending too much time

24 with Ben.

Page 77

1      **A      I'm not aware.**

2      Q      You never heard anything like that?

3      **A      No.**

4      Q      You never heard a rumor of that?

5      **A      I don't recall.**

6      Q      Well, you don't recall if you heard a rumor?

7      **A      If it was something that is significant,**

8      **I would remember that.  That I don't remember at this**

9      **time.**

10      Q      So here it says -- the State Police are

11      asking you, you know, about the -- it's up to -- you

12      say, "It's up to the Office of the Inspector General

13      whether they take that report."

14              And then, since you have been here in 1998,

15      and you say uh-huh.  And then he is going to go on, and

16      I'm going to ask you about this.

17              The question is, "Have you seen anybody or

18      witnessed anybody being walked out of the facility as

19      in the Christy Lenhardt situation?"

20              And your answer was, "I did not witness it.

21      I heard about it."

22              Correct?

23      **A      Correct.**

24      Q      So when did you first hear about it?

1    **A    I heard about this incident the same day.  I**

2  **don't recall who told me, but I heard that Christy was**

3  **escorted off the unit by security.**

4    Q    So someone told you that Christy was escorted

5  out of the building, correct?

6    **A    Correct.**

7    Q    And then was that a big deal when that

8  happened?

9    **A    Yes, it is.**

10    Q    In fact, he asks you what did you feel about

11  it when you heard about it, and you answered:  I felt

12  really bad, and I think the patients felt that, too, on

13  lines eight and nine, correct?

14    **A    Correct.**

15    Q    And you said, "We were really concerned, and

16  we were like what could anybody do that, you know, that

17  led to this thing with being escorted by the security,

18  you know."

19    **A    Correct.**

20    Q    Who was we that you were referring to?

21    **A    All of the treatment team members.**

22    **Like I said, it happened five years ago.**

23  **I do not recall specific conversation.  It was the**

24  **treatment team.  I am referring to our treatment team,**

Page 79

1    whoever we were talking to about it.  I do not recall

2    who I did.  Like I said, it might have been the social

3    worker, STA, nurses on the unit who were present at

4    that time.

5         Q    Do you remember anyone in particular that you

6    spoke to?

7         A    I remember Bob Hamlin.

8         Q    Okay.

9         A    Robert Hamlin.

10        Q    So on the day that Christy was walked out,

11   you remember talking to Bob.  What did Bob say?

12        A    I do not recall the specific conversation.

13   Like I said, we were just wondering what happened,

14   what -- why is this happening.  So I do not recall it.

15   It happened five years ago.  I do not recall it.

16        Q    Okay.  It was very dramatic, though, right?

17        A    Yes.

18        Q    And then a little bit further down he is

19   asking "What is the word -- had the patients been

20   talking about it after the fact when she went --"

21             And then you said, "What I heard -- nobody

22   said anything to me but I heard from other people that

23   patients were really disturbed and they were saying

24   what happened, you know, why she was taken like this."

Page 80

1        So what I'm wondering is you said nobody said

2   anything to you, but, obviously, you heard something,

3   so someone said something.  Who were the people that

4   were talking about this in such a disturbing way?

5        **A     So when I said nobody said anything to me and**

6   **to us, I'm referring to administration, because we were**

7   **not getting any clear answers from administration, so**

8   **that's what I'm referring to.  And it was mainly the**

9   **patients on L Unit that I recall who were disturbed**

10  **that actually saw it.  So I'm referring to the patients**

11  **on L Unit who actually saw her being escorted.**

12       Q     So did you try to ask, what you're calling

13  administration, who -- did you try to ask anyone what

14  happened?

15       **A     No, I did not.**

16       Q     So on line 21 you say, "There was some staff

17  member also talking about that maybe, you know, they

18  could have just asked her to go out and then not in

19  front of the patient escorted out. . ."

20            Do you remember what staff member that was

21  that told you that?

22       **A     No, I don't recall.**

23       Q     So here it says -- because you were talking

24  about how disturbed the patients were earlier, and his

Page 81

1    question is, "Are you aware of the patients talking

2    about the allegation at all or nobody said anything

3    like that?"  And you said, "Nobody said anything to

4    me."

5              So what I'm wondering is how did you find out

6    that the patients were disturbed?

7         **A    When I say nobody said anything to me, I was**

8    **referring to administration.  Like I said in the**

9    **earlier question, that I heard it from different staff**

10   **members working between two different units that the**

11   **patients were upset.**

12        Q    So that's my question.  What staff told you

13   that?

14        **A    I do not recall honestly.  It happened five**

15   **years ago.  I do not recall at all.**

16        Q    Maybe I can ask this way.  This was a very

17   dramatic event, correct?

18        **A    Correct.**

19        Q    And I don't like generalizations, but was

20   there anyone that you can recall that didn't know this

21   happened?

22        **A    Who didn't know this happened?**

23        Q    That you spoke to and they had no idea that

24   Christy was walked out.  Anyone you spoke to that they

Page 82

```
 1    were -- that you said did you hear Christy was walked

 2    out and they said, "I had no idea"?

 3        A    I don't recall.  I don't know what to tell

 4    you, but I do not recall.  It was five --

 5        Q    Was it big enough news that, like, everybody

 6    knew?

 7        A    Yes, everybody -- I would say everybody was

 8    talking about it.

 9        Q    Okay.  And he asks the same question.  Sorry

10    about the computer screen slowness.  On line five he

11    says, "Okay.  And in regard to your fellow co-workers,

12    what is everybody saying about the situation?"

13             And I'm not exactly sure I know the time

14    frame here.  So --

15        A    Which line are you referring to?

16        Q    I'm looking at lines five through seven, he

17    asks the question.

18        A    Okay.

19        Q    He says, "What is everybody saying about the

20    situation?"  I think his question is:  What is everyone

21    saying about the situation on November 8th, 2017?

22    Because if you want to, you can read your answer.  I

23    don't want to interpret your answer for you, but could

24    you read that question and your answer?
```

Page 83

```
 1        My question is:  Were you answering in regard
 2   to what people were talking about in November, or were
 3   you answering as to what people were talking about on
 4   June 30th?
 5        A    I don't remember what I was referring to.
 6   Was it in November, or was it in --
 7        Q    Well, your answer is, "I think the
 8   allegation . . ."
 9        So do you recall what you meant by the
10   allegation?
11        A    Allegation -- what I meant by allegation is
12   the allegation of sexual abuse.
13        Q    Right.  So you say, "I think the
14   allegation -- I mean, for me it's really hard to
15   believe.  You know, first of all, you know, anybody who
16   has -- we treat our patients, you know, with respect
17   and, you know, we -- this is what we have been taught
18   through our profession, you know, as doctors and social
19   workers and psychologists."
20        Your answer goes on further, but the
21   allegation of sexual abuse was hard for you to believe
22   about the allegation between Christy and Ben, right?
23        A    Yes.
24        Q    And then your answer goes on.  "So for us,
```

Page 84

1    it's really hard to believe that anybody could do

2    that."

3            When you say "us," had you talked to anyone

4    about what you believed about the allegation at that

5    time in November of 2017?

6        **A    In November of 2017, at that time, yes, all**

7    **the staff members were discussing and talking about it**

8    **when it was in the news so, yes, staff members were**

9    **talking about it and, yes, I did talk to staff members**

10   **about it at that time.**

11       Q    On the next page, which is page 19, the

12   police ask you on line 12, "But you believe something

13   like that can happen in a facility like this or any

14   setting like a mental facility, IDOC, anything like

15   that?  Do you believe that something may have happened

16   like that that could have happened, not may have, could

17   have happened?"  And your answer begins with, "I mean,

18   anything can happen."  And you go on to say, "But what

19   I'm saying is that the way our units are set up, I

20   don't know if you have seen it or not, on all the

21   patients' rooms and offices, there are vision panels so

22   like glass on there."

23           Were you assuming that the sexual abuse had

24   to happen in an office or a patient's room?

1     **A      I am assuming that -- I don't understand.**

2   **I'm just saying that he asked me if it can happen, so**

3   **I'm just saying that, obviously, there is a dayroom, a**

4   **big dayroom, and there are offices.  So if it had to**

5   **happen, it had to be in an office where it's, you**

6   **know -- it can be closed.  So I'm not understanding**

7   **your question fully.**

8      Q      Well, he never asked you whether it happened

9   in an office, but you volunteered --

10     **A      Yes.  Yes, because, obviously --**

11     Q      I know you're anxious to answer, but I have

12   to finish my questions so the court reporter --

13     **A      Okay.**

14     Q      It's just so the court reporter can take us

15   down.

16     **A      Okay.  Thank you.**

17     Q      So my question was:  He never asked you

18   whether it happened in a patient room or an office, but

19   you volunteered that it -- the information about

20   patients' rooms and offices.

21          Were you assuming that Christy and Ben were

22   engaged in sex in a patient room or an office?

23     **A      The way the units are set up, we have a**

24   **dayroom, we have a nursing station, and we have**

Page 86

1    offices.  So if any such thing would happen, it would

2    have to be in an office.  That's why I assume that.

3         Q    So you did assume that it was in an office?

4         A    I might have assumed it.

5         Q    I'm sorry.  I couldn't hear your answer.

6         A    I might have assumed it.  I do not remember.

7    Like I said, it happened five years ago.  This -- this

8    transcript is also -- let me look at the date again.

9    It's November --

10        Q    It's November the 8th, 2017.

11        A    2017.  So what I -- I do not recall

12   everything that's in here because it was five years

13   ago.

14        Q    Are you sure you don't have any other

15   information about Christy and Ben having -- having sex

16   in Christy's office as you sit here today?

17        A    If you are referring to the time frame before

18   April 30th, 2017, no, I did not.

19        MS. JOHNSTON:  Object -- or if I may interject.

20        MR. CECALA:  I think she got the date wrong.

21        MS. JOHNSTON:  I do, and I just wanted to really

22   clarify that, because I think --

23        MR. CECALA:  It's okay.  I got it.

24        MS. JOHNSTON:  What is the -- yeah.

Page 87

```
 1   BY MR. CECALA:

 2       Q    Did you mean June 30th of --

 3       A    June 30th, 2017.

 4       MS. JOHNSTON:  Sorry.  Thanks, Joe.  I just,

 5   obviously, would not want that type of mistake.

 6       MR. CECALA:  No, that's an accident, not an

 7   untruth.  We only want the truth.

 8       MS. JOHNSTON:  Exactly.  Thank you.

 9       THE WITNESS:  Can we take a break right now?

10       MR. CECALA:  We absolutely can.  We're at

11   3:03 p.m.

12            Do you need more time, Mary, to check on our

13   case?

14       MS. JOHNSTON:  Well, you know, I'm hoping that

15   it's all going well, but if we just want to say maybe

16   3:10, give everybody a minute to stretch their legs.

17       MR. CECALA:  We'll come back on the record at

18   3:10.

19       THE WITNESS:  Thank you so much.

20                      (Short break.)

21       MR. CECALA:  We are back on the record?

22       THE COURT REPORTER:  Yes.

23   BY MR. CECALA:

24       Q    Okay.  Just on another -- on page 20, Doctor,
```

Page 88

1    the end of the question on lines four and five, he is

2    asking you, "so I mean if somebody has done it, it must

3    be really hard today do," I guess meaning have sex in a

4    social worker's office at a -- at Elgin, right?  Is

5    that what -- that's what he was asking you, right?  Oh,

6    I'm sorry.  That's your answer.  You actually answer,

7    "if somebody has done it, it must be really hard to

8    do."  That's what you were referring to, right?

9         **A     Let me read the question.**

10        Q     Sure.

11        **A     Can I see the question?  Can you read the**

12   **question, please?**

13        Q     Fine.  Let's go back a little earlier.

14        **A     Okay.**

15        Q     He asks you can something happen at a

16   facility like this.

17        **A     Okay.**

18        Q     Okay, that question.  And you can read your

19   answer.  It's lines 18 to 22.

20        **A     Okay.  Do you want me to read it?**

21        Q     No, that's okay, because I have more

22   exhibits, and we're going to go a little faster now.

23             Okay.  When you say "anything can happen -- I

24   don't know if you have seen it or not on all the

Page 89

1    patients' rooms and offices, there are vision panels,

2    so, like, glass on there."

3          And so he refers to, "So it would be like

4    this door."  And then your answer, "Yeah, just like

5    this door."

6          So do you recall the room you were in for the

7    State Police interview?  Was it a social worker office,

8    or was it the attorney room?

9    **A    No, no, that was not on the unit.  It was**

10   **where we have security offices and clinic area.  So it**

11   **was not on the unit.**

12   Q    But was the door the same as a social

13   worker's door?  Is that what you were referring to?

14   **A    Yes.**

15   Q    And the rest of your answer, it says, "So if

16   you or somebody is in the office, anyone who is

17   passing, there's a lot of traffic, you know, patients

18   are walking on the unit, staff is walking on the unit,

19   so I mean, if somebody has done it, it must be really

20   hard to do."  That's what I was asking you about.

21          What you were referring to there is if

22   someone is going to have sex in a social worker's

23   office at Elgin, you're saying that's what you were

24   referring to that was hard to do, right?

Page 90

1      A    Yes.   The question -- that was the

2    question -- can I get the question one more time,

3    please?

4      Q    Sure.   Sure.

5      A    The question.   Okay.   Do you believe that

6    something -- okay.   So the question is do you believe

7    something may have happened like that that could

8    have -- could you go a little bit up?   Can I scroll it,

9    or only you can do it, right?

10     Q    Only I can do it.

11     A    Okay.   "But do you believe something like

12   that can happen in a facility like this?"

13          So it looks like -- what is he referring to?

14   What was the question before that?   Can I look at it?

15   What is he referring to when he says, "but you believe

16   something like that can happen . . . "

17          Okay.   I don't know what he is referring to

18   when he says something like that can happen.

19     Q    Well, right before that, the whole -- we have

20   this discussion about it's hard to believe that two

21   people would be having sex, right?

22     A    Okay.  I get it.  Okay.  Yes.  Yes.  That's

23   what I was referring to in that question, yes.

24     Q    Okay.  So we're on to page 20, which you say,

Page 91

```
 1    "If somebody has done it, it must be really hard to
 2    do."  That's what you're referring to, right, having
 3    sex in a social worker's office, right?
 4         A    Yes.
 5         Q    And then you said, "It's not something that
 6    can happen right very easily"?
 7         A    Okay.  Yes.
 8         Q    Okay.  Like I said, these aren't trick
 9    questions.  I'm just -- if it --
10         A    Yes.
11         Q    It's written on the page.
12         A    I understand.  I understand.  I'm trying to
13    read it and understand what I was referring to at that
14    time.  I'm trying to understand that myself.
15         Q    Right.  Okay.  And then he goes on to ask you
16    about the door and "when the social worker meets with a
17    patient, are the doors open, closed?  Is it locked.
18    Unlocked?"  And then could you read your answer
19    starting at line twelve?  And you can go all the way
20    down to line 17, I guess, to save time.
21         A    Okay.  "Definitely they're instructed to
22    unlock, keep it unlocked because of the safety reasons.
23    I personally never see patients in my office.  I always
24    see them either in the conference room or in the
```

Page 92

1    nursing station."

2        Q    So you're talking about that when a patient

3    is in a social worker's office, they should never have

4    the door locked, correct?

5        A    Correct.

6        Q    And if they have the door locked, would you

7    consider that, like, a violation of a rule?

8        A    It's for their safety.  I'm not aware if this

9    is a rule, but they are instructed to keep it unlocked

10   for their safety, the patient's safety, everybody's

11   safety.

12       Q    So you're not sure if that's a written rule

13   or not, but it's, perhaps, a rule of thumb at Elgin

14   that the door is always to be unlocked, correct?

15       A    That's correct.  I'm not aware if it's a

16   written rule.

17       Q    I think you emphasize that later, where here

18   you say, "The door could be closed, but it has to be

19   unlocked," on page 21, lines three and four?

20       A    Yes.  Yes, it has to be closed because of the

21   confidentiality.  So we don't see patients -- social,

22   workers see patients in their offices, and they close

23   it because, obviously, if they are open, then there is

24   no confidentiality.

Page 93

1      Q    Well, do you see patients in your office with

2  the door closed?

3      **A    No, I don't.  I see -- like I said, I see**

4  **patients in the conference room or in nursing station.**

5  **The way my office is set up, it's just very small, and**

6  **I don't feel comfortable seeing patients in my office**

7  **because it's really very small.**

8      Q    So is your office much smaller than a social

9  worker's office?

10     **A    Yes.**

11     Q    And then you go on to say on lines nine

12 through twelve, "No, nothing can be covering the

13 window.  All offices have vision panels and even the

14 social workers' doors have like even bigger like -- not

15 long.  They're like spread."

16          He says, "Wider?"

17          And you say, "It's wider, bigger, yeah."

18          Are you referring to the window?

19     **A    Yes, the vision panel of the window in my**

20 **office is a long vision panel, and then the social**

21 **workers' offices are like square, much bigger vision**

22 **panel.**

23     Q    So it would be very hard to hide because of

24 the vision panel in the office because people walking

Page 94

1    could easily see in, correct?

2        **A    It would be hard, but it's possible because**

3    **there are blind spots on the side.**

4        Q    So --

5        **A    It's possible.**

6        Q    It's possible.

7            But what I'm getting to is because you're --

8    you work at the facility, you've worked there for close

9    to 20 years, right?

10       **A    Yes, 23 years, actually, yes.**

11       Q    And walking past a social worker's office is

12   something you've done many, many times, right?

13       **A    Correct.**

14       Q    And as you walk past, you can see whether a

15   social worker is in the office with a patient or not?

16       **A    Yes.**

17       Q    And that would be true for just anyone with

18   normal vision, right?

19       **A    Correct.**

20       Q    So the social worker and the patient would

21   easily be seen because of the wide vision panel-styled

22   window on the door, correct?

23       **A    Like I said, there are blind spots.  In**

24   **certain cases, if somebody is maybe sitting at the**

1    **corner, then it's possible that, you know, they have to**

2    **actually -- you know, actually see through the window**

3    **vision panel in order to clearly see the whole office.**

4    **So like I said, there are blind spots in the corner.**

5         Q    So if you walked up to the window to look, if

6    you were right up close to the window to look into the

7    office, would there still be a blind spot?

8         A    **No.**

9         Q    Now, on page -- we're all of the way down to

10   page 24 now.  Can you read this easily, Doctor, at the

11   size that it is?

12        A    **The size is perfect.  I can read it.**

13        Q    If I make it a little smaller, it seems to

14   make the scrolling faster.  Can I shrink it a little

15   bit and see if I can make it even easier to move

16   faster?

17        A    **Okay.  That's fine.  This is fine.**

18        Q    Okay.  Great.

19             Okay.  So on page 24, the officer -- starting

20   on line eight, he has questions.  "Okay.  And then for

21   Ben Hurt, how is his demeanor like how you say -- is he

22   very flirtatious with staff or flirtatious with other

23   patients or how was his daily interaction with people?

24   Was it friendly?  Is it aggressive?  Is it -- how would

Page 96

1    you say?  Is he very talkative?"

2            And then your answer from line 15 to 19,

3    could you read that?

4        A    "When he came to my unit, he stayed on my

5    unit for just a few months.  Not quite a long time.

6    And he was very stable.  So I -- he didn't come across

7    as being flirtatious or hyper or anything like that."

8        Q    So when you were characterizing Ben at that

9    time as not being flirtatious, was there any other part

10   of Ben's behavior involving sexual appropriateness

11   other than being flirtatious that was notable to you?

12       A    I'm just trying to recall.  What do you

13   consider anything other than being flirtatious?  Can

14   you just repeat your question, please?

15       Q    Was he sexually inappropriate in any way?

16       A    While he was on my unit?

17       Q    Yes, or that you're aware of.

18       A    While he was on my unit, I did not see him

19   like that, but when I was reviewing his record, I am

20   aware of an incident when he was -- I think it was in

21   2014 when he was not very stable.  He exposed himself

22   to a nurse on Unit L.  So when I was reviewing his

23   records, I came across that incident.

24       Q    So were you recently reviewing his records,

Page 97

1  or do you recall that from the last time you reviewed

2  his records in 2017?

3       **A    Recently.**

4       Q    Oh, so I should have, perhaps, asked this

5  earlier.

6            Did you do anything to prepare for today's

7  deposition by, like, reviewing Ben's chart?

8       **A    I don't have his chart.  I just have a copy**

9  **of the discharge summary when he was discharged, so**

10 **I had that, so I reviewed that, and I also had my**

11 **psychiatric evaluation.  So that's all.  I don't have**

12 **all his records.**

13      Q    So were those records that you retained

14 personally, or did you get them from somewhere else?

15      **A    Yes, they were on my computer file.**

16      Q    So you actually have records on your computer

17 files about --

18      **A    Yes, just a few things.  Yes.**

19      Q    Do you have anything else on your computer

20 files?

21      **A    Some monthly -- monthly notes that I did at**

22 **that time when he was on my unit.**

23      Q    Are your monthly notes part of the -- Ben's

24 chart?

Page 98

1      **A    Yes.  Yes.**

2      Q    I'm just asking because we sent a subpoena

3  for all of the records to the State, and they never

4  mentioned that you were holding any records on your

5  computer.

6      **A    I am not -- these are not records that I'm**

7  **holding.  They are a copy of those records that are in**

8  **the chart.**

9      Q    So you don't have any records on your

10  computer that are not in Ben's --

11      **A    No.**

12      Q    You have to let me finish because the court

13  reporter can only take one of us down at a time.

14          You don't have any records now on your work

15  computer that are not already a part of Ben's chart; is

16  that correct?

17      **A    Correct.**

18      Q    And you reviewed those records before today's

19  deposition?

20      **A    Yes.**

21      Q    And just to be clear, by those records,

22  I mean the records that are on your computer.

23      **A    Yes.**

24          **So when we do our monthly notes or**

1    **psychiatric evaluation, they are on our computer files,**

2    **and then we print a copy, and we put it in the chart.**

3    **So whatever I have, it's already in his chart.**

4         Q    So going on to line 20, you're describing

5    Ben, saying he was just very stable, correct?

6         **A    Correct.**

7         Q    And then you said, "we had to encourage him

8    to attend his groups and we always thought that, oh,

9    he's coming so close to his discharge so he doesn't

10   care because people who are working on their

11   conditional release, you know, we have to request it to

12   the court.  They are more and more willing to be

13   involved in their treatment and groups and everything

14   because they know if they don't do that, they will not

15   be discharged."

16              Correct?

17        **A    Correct.**

18        Q    So is this generally for all patients, or was

19   this just Ben?

20        **A    Most patients, if they -- they know that they**

21   **have long Thiem dates, they work on -- they are more**

22   **invested with the treatment.**

23             **I remember that Ben was missing some groups**

24   **sometimes, coming late to some groups, and we were**

1    telling him that it's a part of him to complete the

2    program.  He should be going to the groups.  So it is

3    generally true, but it is true for Ben, also, that he

4    was doing it because his Thiem date was coming very

5    close.

6         Q    Right.  But on line seven you're saying it's

7    a little different for Ben, right?  Could you read that

8    from line seven to line twelve?

9         A    Seven?  Okay.  "But in his case, he knew that

10   unless he's a threat to himself or others, we cannot

11   certify him.  In fact, the discharge plan that we

12   recommended for him like we wanted him to be in a

13   supervised structured environment after discharge which

14   we recommend for everybody."

15        Q    So here you're saying, "he knew that unless

16   he's a threat to himself or others, we can't certify

17   him."  What do you mean by certify him?

18        A    If a patient comes to their Thiem date and at

19   that point we feel that they are still a danger to

20   themselves or others, then what we do is file a

21   petition and certificate for involuntary commitment to

22   the court.

23        Q    So you didn't actually have any information

24   to prepare an involuntary petition on Ben leading up to

1   his Thiem date, correct?

2        **A    Yes.**

3        Q    You also said that he knew that unless he's a

4   threat to himself or others, we can't certify him.  How

5   did you know that he knew that?

6        **A    We knew that he was stable and he was not --**

7   **the incident that happened when he was transferred**

8   **to -- from L to K, the other patient attacked him.  He**

9   **was not doing anything that would lead to involuntary**

10  **commitment, which includes fighting with other patients**

11  **or being suicidal or anything, so we knew that.**

12       Q    How do you know he knew that?

13       **A    I don't recall if we had a discussion**

14  **regarding it, but I might have had a discussion with**

15  **him regarding that, that when he was not going to some**

16  **of these groups, and we might have talked about that if**

17  **we could keep him against his will in the facility or**

18  **what are the criteria.  I usually talk to the patients**

19  **about what could lead to involuntary commitment and how**

20  **they can work with conditional release.  So with most**

21  **patients we do talk about these things so that they**

22  **know what our expectations are, how they can be**

23  **invested in their treatment and how can they get**

24  **conditional release.**

1      Q    So he was conditionally released, you said,

2   on July 22nd, 2017, correct?

3      **A    No.  He --**

4      Q    I'm sorry.  He was -- he was discharged via

5   his Thiem date on July 22nd, correct?

6      **A    Correct.**

7      Q    Which is why you're saying this, because

8   unless you could present an involuntary commitment

9   petition, he knew he was getting released.  Unless you

10  could prove he was a danger to himself or others, he

11  was getting out, right?

12     **A    Correct.**

13     Q    But on June 30th there was an investigation

14  being conducted where he was restricted from all phone

15  calls, and he had a restriction of rights, correct?

16     **A    Correct.**

17     Q    And you didn't know anything about what that

18  investigation was regarding, right?

19     **A    No, I did not at that time.**

20     Q    Could it have been that Ben was doing some

21  thing, some activity that was a danger to himself or

22  others?

23     **A    If that was the case -- I'm sure prior to his**

24  **discharge that administration would let us know if that**

1   **was the case.  So --**

2       Q    Did you ever ask?

3       **A    No, I did not.**

4       Q    We'll come back to that.

5       MR. CECALA:  Well, that didn't work, Mary.

6   I tried to change the page up above, but it won't let

7   me get in it.

8       MS. JOHNSTON:  All right.  No luck there.  Sorry.

9   It was worth a shot.

10      MR. CECALA:  Thank you for the suggestion, but

11  sorry to make everybody wait through the scrolling

12  again.  Okay.  Sorry for the length of time.

13      MS. JOHNSTON:  Where are we headed, and I'll get

14  it on my end.

15      MR. CECALA:  We are on page 30 -- actually, the

16  end of page 29.  I kind of put a line for you to see.

17  BY MR. CECALA:

18      Q    The question starts on line 17 of 29.  The

19  police are saying, "I understand that coming now, it

20  could be that one of those things where, well, I never

21  saw anything, we never saw anything because as a

22  physician, as an M.D., let alone any employee at the

23  Department of Human Services, there's always that

24  mandated reporting.  You mentioned OIG.  Obviously, for

Page 104

1    example, if you have a patient who is constantly or

2    consistently talking about, let's say, being assaulted

3    or raped, well, we call OIG.  It could easily be that

4    it's unfounded" --

5              And your answer is on line four.  Can you

6    read the answer from four through six?

7        **A    "Absolutely.  Even one time, not constantly.**

8    **If a person even says it one time, we have to report it**

9    **within four hours."**

10       Q    So you're aware that there is a legal

11   requirement that a suspicion of abuse needs to be

12   reported to OIG within four hours?

13       **A    Yes.**

14       Q    Now, going down, he asks you again on

15   line 18, "Were you ever made aware of any other

16   incidents where there may have been some sort of

17   incident involving her," meaning Christy, "and maybe a

18   patient or anything like that that was suspicious in

19   nature?"

20             And then he has got a lengthy discussion.

21   Officer Sandoval likes to talk.  And his question is,

22   "But was there ever a time where you may have been made

23   aware of or you may have seen something that you just

24   thought was not so much suspicious but just, you know,

Page 105

1    a concern to you or anything like that?"  And that's

2    from line three through line ten.

3            And then your answer -- the court reporter

4    was having -- or the recording is broken.  So you

5    answer on line eight, "Like I said," and you continue

6    your answer on line eleven.

7            So could you read what was happening on line

8    eleven to line sixteen?

9        A    **"She was not on my unit so I mean I had very**

10   **limited interaction with her, especially just in the**

11   **morning, during the morning time.  And other than that,**

12   **I would just see her passing by.  Other than that,**

13   **I had no interaction with her and so . . ."**

14       Q    So there's this limited interaction with you

15   and Christy, which is she's on a different unit.  You

16   see her in the mornings.  There's the occasional

17   coverage of patients when Dr. Javed is out, but you're

18   not really, you know, daily interacting

19   psychiatrist/social worker with any patients

20   whatsoever, right?

21       A    **Correct.  I know that there was one time**

22   **when, you know, because of the coverage issue, the**

23   **social workers from one unit were covering both units,**

24   **so there might have been some time when Christy was**

1  carrying some patients on K.  I don't recall exactly

2  how long, so, yeah, that's correct.

3      Q    Okay.  And then he is asking -- because

4  there's -- through your interaction with her, there's

5  no suspicion, but then he asks you here at the end of

6  page 31 and starting on page 32 about your

7  suspicions -- well, line 24 of 31, "ever been a time

8  where you were informed of, even through rumors, of

9  anything else that involved Christy?"  You answer,

10  "Even through rumors?"  His question is, "Yeah, rumors.

11  Aside from this, were there other rumors that you may

12  have been exposed to pertaining to Christy at any point

13  in time?"  Correct?"

14          Could you read your answer, lines eight

15  through eleven?

16      A    "Well, I heard rumors that there was a

17  patient, ███████  ████████ who escaped from here, so

18  there were just rumors that she may be involved in

19  that, too.  I don't know."

20          And this was also at that time when everybody

21  was talking about Christy after the incident on

22  June 30th, 2017, and when we saw the news, and this was

23  also in the news, his name, ████████ ██████████ name.

24      Q    So you say, "Well, I heard rumors."

1          Who did you hear those rumors from?

2     **A     I do not recall any specific conversations.**

3  **Like I said earlier, most people, most staff were**

4  **talking about all of this.  I do not remember who**

5  **I heard it from.  I do remember seeing his name in the**

6  **newspaper.**

7     Q    So this interview was done on November 8th of

8  2017 and had -- we filed the complaint on November 4th.

9  So sometime between the filing of the complaint on

10  November 4th and this interview, you're saying that the

11  first you heard about ███████  ███████ was reading it in

12  the newspaper during those four days?

13     **A     I do not recall exactly.  Just reading in the**

14  **newspaper or I heard it from somebody, but I do recall**

15  **knowing that and hearing that, hearing his name.**

16     Q    Well, you did say you heard rumors, which is

17  different than reading it in the paper, correct?

18     **A     Yes, but then staff talked about the news,**

19  **you know, and they say, oh, they read this news, or**

20  **when they talk about it or if you have not read that**

21  **news yourself, it would still be a rumor, so I'm not**

22  **sure what I was referring to at that time.**

23     Q    Well, you're saying staff, though.  When you

24  say staff, was it an STA?  A social worker?  Another

1  psychiatrist?  Who did you hear rumors from?

2  **A    I do not recall my conversation.  I do not**

3  **recall who it was because it was five years ago, like**

4  **I said.  It's very hard to remember any specific**

5  **conversation I had with each staff.  I don't recall.**

6  Q    Did you ever talk to Rebecca Nikolov about

7  Christy and ▇▇▇▇ ▇▇▇▇▇

8  **A    I don't recall.**

9  Q    What was the rumor that you heard about

10  Christy and ▇▇▇▇ ▇▇▇▇▇

11  **A    That she might have been involved with him.**

12  **This is what I heard.**

13  Q    Involved in what way?

14  **A    Sexually involved, I heard.**

15  Q    Did you ever hear that Christy had

16  communication with ▇▇▇▇ ▇▇▇▇▇ after his elopement?

17  **A    I don't recall hearing that.**

18  **I did -- I do recall hearing that she might**

19  **have been involved in helping him escape the facility.**

20  Q    Any -- so you heard that she was involved

21  with him sexually; that she may have helped him escape,

22  but you're saying you never heard anyone allege that

23  she continued to communicate with ▇▇▇▇ after he had

24  escaped from Elgin?

1      **A      I don't recall that, hearing that.**

2      Q      Did you ever have a conversation with

3  Dr. Javed about Christy and ███████ ████████

4      **A      When we were discussing all of these rumors,**

5  **yes, we did talk about all this news, what was**

6  **happening, these allegations, so, yes, I did.**

7      Q      So let me ask you this.  Are you -- what's

8  your relationship like with Dr. Javed?

9      **A      With Dr. Javed, it's professional as well as**

10 **social.**

11     Q      So how long have you known her?

12     **A      I have known her since my residency.**

13     Q      And that's more than 23 years ago?

14     **A      Yes.  Yes.**

15     Q      And you worked together with her for -- at

16 Elgin the whole time?

17     **A      Yes.  She was -- first she was on the civil**

18 **side, and I was on the forensic side when she started**

19 **working here, but I think after a few years of being on**

20 **that side, then she moved onto the forensic side.**

21     Q      And she's -- would you consider her a good

22 friend?

23     **A      She's a friend, yes.**

24     Q      Well, do you socialize with her?

1      **A     Yes.  We attend different social gatherings**

2   **together, yes.**

3      Q    So outside of work with your families?

4      **A     Yes.**

5      Q    And how long have you been good friends with

6   Dr. Javed?

7      **A     Since residency.  I started residency in**

8   **199 -- 1993, so since 1993 I will say.**

9      Q    So 29 years?

10     **A     Yes.**

11     Q    So when you talked to Dr. Javed about this

12  situation between Christy and ███████  what did you talk

13  about?

14     **A     About the newspaper reports, about what the**

15  **staff were talking about, him being -- her being**

16  **involved -- Christy being involved in the escape of**

17  ███████ ███████    **We talked about all this stuff when**

18  **after it was in the news and after everybody was**

19  **talking about it.**

20     Q    So you never spoke to her before the news

21  story about Christy and ███████ ███████ not ever?

22     **A     I don't recall talking to her about ███████**

23     Q    So going down to the bottom of page 34, the

24  question -- now, the police are talking to you

Page 111

1    specifically about the allegation, just -- I don't know

2    if we just want to agree that the allegation means

3    Christy and Ben having sex, and he begins on line 21 of

4    page 34, "So let me -- let me -- now that you said

5    that, taking now -- I want to, if you will, take this

6    allegation," Christy and Ben having sex, "and let's put

7    that on the table, right?"  And he asks you, "Now, now

8    that we look at what's on the table, and thinking back,

9    right, hindsight is 20-20 as they say, looking back

10   now, is there anything that comes to mind on a

11   professional, personal level that again looking at it,

12   not insinuating and/or suggesting that the allegation

13   is true, but is there anything that may have -- because

14   I know you mentioned Ben, well, Ben never really talked

15   about anything and his behavior with, let's say, female

16   staff, it was never inappropriate in any way, shape or

17   form."

18          So your answer begins on line 13.  Could you

19   read your line 13 to line 16?

20   **A     "Not that I remember.  And again like if this**

21   **was happening to him, he didn't seem any -- in any**

22   **distress, either.  You know, he was fine and stable.**

23   **He never reported anything, never."**

24          Q    Is the primary way that you would gather

1    information from abuse the admissions of the patient?

2         A     It could be reported by the patient.  It

3    could be reported by staff.  Sometimes we look at what

4    is -- how a patient is interacting, if they are

5    depressed.  We ask them what is going on.  Whenever we

6    see a patient is down or depressed, we always try to

7    ask them if there is any issue going on, what's

8    bothering them, what is the cause of that they are

9    feeling that.  And Ben was seeing me at least twice a

10   month.  He was seeing his social worker.  He was seeing

11   activity therapists, nurses, so I am not aware that he

12   reported anything to anybody.

13        Q     Right.  My question was:  Is the primary way

14   that you would find out about abuse from the patient

15   reporting it to you?  Is that the primary way?

16        A     That could be primary way, but there are

17   other ways, too.  Like I mentioned earlier, that

18   interaction with the other -- a staff member can report

19   it, sometimes when they are seeing them feeling down or

20   depressed, we ask them what's bothering them, but like

21   you said, most of the time it's patient who usually

22   report it, if there is any history of abuse,

23   themselves.

24        Q     So you were speaking to the State Police here

Page 113

1    in November of 2017 after the news, after the State

2    Police investigation, after the investigation searching

3    Ben's room, and he's kind of asking you, looking back,

4    hindsight is 20-20 is his exact words.

5             So in hindsight, you're saying even as you

6    sit here today in 2022 -- I'm asking the same question.

7    In hindsight, is there any other information that would

8    lead you to believe that Ben was in distress that you

9    didn't see?

10   **A    I did not see him in distress.  He was**

11   **interacting well with other patients.  None of the**

12   **staff members came and reported to me that anything --**

13   **any abuse was happening.  Ben himself never reported**

14   **anything to me.  So if I look back, I really don't know**

15   **of anything I could have done differently to prevent it**

16   **because I was not made aware about that, any staff**

17   **member, I did not see him in distress, I did not see**

18   **him feeling depressed.**

19   Q    So on page 38, line two, the police ask, "How

20   about just questions, has anyone asked about Christy

21   and where she's at in terms of patients?"

22            Could you read your answer from line five to

23   seven?

24   **A    "No one asked me, none of my patients.  I'm**

Page 114

1    **sure they talk about it amongst themselves but nobody**

2    **particularly asked me anything."**

3        Q    How are you sure they were talking about it

4    amongst themselves?

5        **A    I wrote, I am sure patients talk amongst**

6    **themselves.  I was just hypothetically saying that.**

7    **I'm sure they talk about it amongst themselves.**

8        Q    So you don't know if they were actually

9    talking about it; it was speculation?

10       **A    Yes, and it is based on the fact that if**

11   **something is in the news.  We have TV and internet.**

12   **Patients watch the TV.  So this speculation is based on**

13   **the fact that patients were listening to the news, they**

14   **get newspapers, so it is based on these facts.**

15       Q    So what would you do -- what do you have to

16   do if a patient reports abuse to you?

17       **A    First of all, I would call OIG.  You also**

18   **have to call security.  I would make the treatment team**

19   **members aware of that so they know and definitely**

20   **reporting it to the supervisor of the person who is**

21   **involved, staff member who is involved.**

22       Q    What happens to the patient?

23       **A    The patient is provided support, if they need**

24   **any kind of psychotherapy to deal with the stress.  If**

Page 115

1    it's a very, very recent incident, the primary care

2    physician will evaluate them to see physically, and

3    sometimes, if needed, they are sent to the ER to get

4    physically examined.

5        Q    We'll come back to that, too.

6             On line 16 of page 38 the police asked you,

7    "Are you aware of her," Christy, "trying to communicate

8    with anyone here since she was walked out of the

9    building."

10            Can you read your answer from line 19 to 24?

11       A    "I don't know.  When we were -- before all

12   this happened, sometimes when somebody was not coming

13   in or calling in sick, then there was like a group text

14   that they would send everybody like on the whole unit

15   saying I'm not coming in, I'm sick, can you cover my

16   group."

17       Q    So then it continues on to page 39.  Could

18   you read the next four lines?

19       A    "So she was in that group text that everybody

20   was sending.  I don't even have her number, and I never

21   contacted her.  She never contacted me since."

22            After saying that, I would just like to

23   mention that once I went to Panera Bread, and she works

24   there, and I saw her there.  It was at least a year

Page 116

 1    ago, so I saw her there, but she didn't talk to me

 2    about anything.  She just gave me what I wanted, and

 3    I walked out.

 4        Q    But here you said on line two, "I don't even

 5    have her number, and I never contacted her," right?

 6        A    Yes, I have not -- since this incident

 7    happened, I never contacted her.

 8        Q    And you repeated on line seven and eight,

 9    "I had no communication.  I don't even have her

10    number," right?

11        A    Yes, I don't have her number at this time,

12    no.  I had her number when we were communicating with

13    each other, but then I deleted it.

14        Q    Aah.  So when the group text was going on,

15    you had her number?

16        A    Yes.  Yes.  Her number was in the group --

17    group text when it was going on, yes.

18        Q    So on page 41 now, the police ask the

19    question, "It didn't seem like he," Ben, "had any type

20    of anxiety as it relates to any type of abuse."  And

21    then he asks a hypothetical, "And again hypothetically

22    and not insinuating and/or not suggesting" -- I want to

23    get to the question because the officer has a lot.  He

24    says, "Do you think it could be that both of them knew

1   what they were doing and they were both aware of what

2   was going on?"

3           Could you read your answer starting on line

4   18, and you can go to the next page?

5       **A     Okay.  Can I read the question again?  I'm**

6   **just trying to --**

7       Q     Sure.  I just read the bottom of the question

8   where he says, you know, "Do you think it could be that

9   both of them knew what they were doing and they were

10  both aware of what was going on?"

11      **A     And he is referring to Christy and Ben?**

12      Q     Yes.

13      **A     Okay.  My answer is, "I don't know.  I can't**

14  **answer that question but the thing is that he was a**

15  **patient.  And again being a professional, if you are**

16  **having that kind of relationship with a patient, you**

17  **are the one at fault because obviously in our**

18  **profession once a patient always a patient.  A**

19  **psychiatrist, psychologist, social worker cannot have**

20  **any inappropriate relationships with a patient."**

21          **Do you want me to go on?**

22      Q     Yeah, just the next three lines.

23      **A     Okay.  "So obviously if it happened, it is**

24  **more so on the social worker's part, not on the patient**

Page 118

1    **part."**

2        Q    So it's actually not possible for a staff

3    person and a patient to have consensual sex, right?

4        **A    It's possible, but it's not allowed.  It's**

5    **not appropriate.  It's not ethical.  It's illegal.**

6    **It's not . . .**

7        Q    So can a patient that has been determined to

8    be mentally ill, confined to a state psychiatric

9    facility, can they give actual consent to having sex

10   with another person?

11       **A    No.**

12       Q    So what I said was, it's not possible for a

13   patient and a staff person to have consensual sex.

14   Right?

15       **A    Correct.**

16       Q    At the bottom of page 42 there's a lot of the

17   police testimony that I -- or testimony -- I'm calling

18   it testimony.  There's a lot of information that he

19   says, but there's an answer starting on line two.  He

20   is talking about reporting and calling the police,

21   calling 911, and he starts at the bottom of 42, he

22   says, "Are there always channels and people available

23   here for that," meaning to report or call.  So the

24   beginning of that is, "Or you call the police or you

Page 119

1    call someone to help you."

2            So is there someone to report what's

3    happening when he says here at Elgin?  Do you want to

4    read the whole question?

5        **A    Yeah.  Yes, I'm not understanding what he is**

6    **referring to.  Thank you.**

7        Q    Sure.  Okay.  I know I'm trying to save time.

8    He says -- the end of your answer, that, you know,

9    you're saying that, you know, obviously, if it

10   happened, it's more so on the social worker's part, not

11   on the patient's part.  That's those lines you just

12   read?

13       **A    Right.**

14       Q    And then you suggest, "Ben could have easily

15   been -- to me he did not strike as a person who would

16   be scared or not tell anybody.  He knew how to stand up

17   for his rights, so if that was happening to him, he

18   could have easily reported to any one of us, you know,

19   and we would have called the OIG, but he did not."

20           And the question is, "So again there --

21   I would take it that there's always channels of

22   communication?"  And your answer is "Absolutely."  And

23   then he goes into if you're at home and somebody is

24   trying to break into your house, you call 911."

Page 120

1          Your answer is "Right."

2          "Since you're young, there's always that

3    notion you call 911?"

4          You said, "Exactly."

5          "Or you call the police or you call someone

6    to help you."

7          Then he asks are there always channels and

8    people available here at Elgin for that?

9          Could you read your answer from line two to

10   line seven?

11   **A    "Absolutely.  Absolutely.  And like I said,**

12   **Ben did not to me strike like as a person who doesn't**

13   **know how to stand up for himself or doesn't know his**

14   **rights or would get scared.  He could have easily said**

15   **something to any one of us, and we would have to call**

16   **OIG."**

17   Q    So we just talked about the fact that it's

18   not possible for a patient and a staff person to have

19   consensual sex, and you just said that he could have

20   easily reported it, right?

21   **A    Correct.**

22   Q    Do you know if Ben understood the balance of

23   fault for having sex between himself and a social

24   worker?

Page 121

1    **A    I never had that conversation with him, but**

2   **knowing that he was an intelligent person and quite**

3   **assertive, too, where he came across as someone who**

4   **would know his rights, I'm assuming that he would know,**

5   **but I never had that specific conversation with him.**

6       Q    Do you know if he thought he would get in

7   trouble if he reported that he was having sex with

8   Christy?

9       **A    No, I'm not aware of that.**

10      THE WITNESS:  Can I take a short break, please?

11      MR. CECALA:  We can.

12      THE WITNESS:  Okay.  Thank you.

13      MR. CECALA:  We're off the record at 4:02.  We'll

14  come back at 4:07.

15      THE WITNESS:  Thank you so much.

16                  (Short break.)

17      MR. CECALA:  Are we back on the record, Lisa?

18      THE COURT REPORTER:  Yes.

19      MR. CECALA:  Let me get back to my flow.  Sorry,

20  guys.  We should do that after we're done with the dep.

21  BY MR. CECALA:

22      Q    At the bottom of page 45, starting on

23  line 19, the officer is asking you a question.  He

24  says, "So any type of touching that would be, let's

Page 122

```
 1    say, with a sexual undertone would be considered to be

 2    inappropriate?"  I'm sorry at the bottom of 44.

 3              And your answer is "Absolutely."

 4              And the question is:  And that would raise a

 5    red flag?

 6              And you answer on the top of 45,

 7    "Absolutely."

 8              And then he asks you, "By the way, hey, we

 9    see that so and so is maybe getting a little too close

10    to the patients" on -- midway through 45, correct?

11       A    Yes.

12       Q    And you answer yes.

13              And he is creating hypotheticals about a

14    staff member being too close, you know, if it's an

15    80-year-old patient and they need help, it may not be

16    inappropriate.

17              Then at the bottom of page 45 he asks you,

18    "Are you aware of the incident when Christy Lenhardt

19    and Ben Hurt got locked in his office?"  You answer,

20    "Yeah, I heard about it, yes."  That's at the top of

21    page 46.

22              Who did you hear about that incident from?

23       A    I remember that when this incident

24    happened -- I leave at 3 o'clock, and this happened
```

Page 123

1     after that, so the next morning when I came, I remember

2     I heard it from Bob Hamlin.

3          Q    And what did he say?

4          A    He told me that we all knew that that door

5     lock was faulty, and he reported it to security to get

6     it fixed.  And he told me that the door -- there was

7     some issue; that the door got locked, and Christy and

8     Ben were in the office, and then security had to come

9     and open the door.  That's what he told me.

10         Q    And that's all he said?

11         A    Yes.

12         Q    Did you speak about it with anyone else?

13         A    I'm trying to remember.  I must have spoken

14    to other treatment team members.  I don't actually

15    recall exactly the specific -- any specific

16    conversation I had with anybody else.

17         Q    So later in your answer on line 20 -- well,

18    19, you say, "I did hear that, you know, Christy was

19    locked in that office, and we didn't think much of it

20    other than that lock was not working, you know,

21    properly and it happened.  So at that point we didn't

22    think much of it."

23              Who is we?

24         A    When I say we, I'm actually referring to the

Page 124

1   **treatment team, you know?  If we feel there is anything**

2   **significant, we try to see what interventions are**

3   **required.**

4           **The next morning Ben didn't say anything to**

5   **me about that incident.  I don't recall him coming to**

6   **me or anything like that.  So we -- when I say we, it**

7   **refers to the treatment team.**

8      Q   So who is the treatment team?

9      **A   The treatment team is psychiatrists, social**

10  **workers, nurses, activity therapists, security therapy**

11  **aides.**

12     Q   I don't mean generally who is the treatment

13  team.

14          Who was the treatment team that didn't think

15  anything of this incident?

16     **A   You want specific names?**

17     Q   Yes.

18     **A   Okay.  So the social worker was Bob Hamlin.**

19  **I know Drew Beck was on the unit.  Nurse manager was,**

20  **I think, Colleen Delaney at that time.  I don't recall**

21  **who were the nurses and STAs.**

22     Q   So the treatment team didn't think anything

23  of it, is that what you're -- is that who you meant?

24     **A   Yes.**

Page 125

1    Q    What did the treatment team say to you, each

2  of those people, that made you believe that they didn't

3  think anything of it?

4    A    They did not tell me that anything happened.

5  They did not tell me that Ben was stressed or Ben

6  reported anything.  We assumed that since the lock was

7  already faulty, it happened.  And we knew that Christy

8  was coming to Bob's office to get snacks for another

9  patient on her unit who was transferred from K to L, so

10 that's what I assumed, that she came to get those

11 snacks.  And Ben, since he was her former patient,

12 sometimes patients do go and talk with their former

13 social workers for different reasons.  Sometimes social

14 workers are covering for each other, so it's not very

15 unusual for two sister units to take care of each

16 other's patients.

17         So what I meant by that is that we did not

18 think that there was anything that happened was

19 totally, totally unusual other than the door being

20 faulty and it being locked.  We were -- obviously would

21 have been more concerned about staff or patient safety

22 if Ben was a violent patient, but Ben was not at that

23 time because he was compliant with his treatment.  So

24 this is what I mean by that.

1    Q    So did you have -- you had all of those

2    conversations with Bob Hamlin, Drew Beck and Colleen

3    Delaney?

4    **A    I do not recall specific conversation.**

5    **I remember the people who were working on that -- on**

6    **our unit at that time, and I'm assuming that it was**

7    **these treatment team members.  It may have been other**

8    **nurses that were working or STAs.  I do not recall the**

9    **specific conversation.**

10   Q    Well, you answered we.

11   **A    Yes.**

12   Q    We didn't think much of it, and then you said

13   the treatment team, and then the treatment team

14   consisted of Bob Hamlin, Drew Beck and Colleen Delaney

15   and possibly STAs?

16   **A    Yes.**

17   Q    And then you've given me a very long

18   explanation, which we've gone over very detailed, about

19   the justification for them to be locked because the

20   lock was malfunctioning.

21       I'm just wondering how you understood that

22   we, the treatment team, didn't think much of it.  What

23   was said to you by those other people?

24   **A    I'm trying to remember.  Nothing -- what**

1    **I would say is that nothing of significance was said to**

2    **me.  So anything of significance could be Ben reported**

3    **this to me that something happened or Ben is distressed**

4    **or -- so nothing of significance was reported to me.**

5    **I would just say that.**

6         MR. CECALA:  Hold on.

7                        (Whereupon, a discussion was held

8                         off the record.)

9         MR. CECALA:  We're back.

10         MR. KRETCHMAR:  Dr. Kareemi, I noticed when Joe

11    asked you how you found out about the incident of

12    Christy and Ben being locked in Bob Hamlin's office,

13    your response was -- your answer was that Bob Hamlin

14    told you about it the next day.  And he asked, well,

15    what did he say, and you gave a sequence of what he

16    said.  First of all, he said the lock was

17    malfunctioning, secondly he said we all knew the lock

18    was malfunctioning, and only thirdly did he mention

19    Christy and Ben got locked in.

20              Does that make sense to you, that that would

21    be the order of importance of those three items?

22         THE WITNESS:  I don't remember the sequence.  I

23    knew the lock was faulty because I had tried to go into

24    his office, and it was -- I was having trouble, so

Page 128

1    I already knew that there was issues with the lock.

2    That might not have been the sequence of how he

3    reported it to me, but like I said earlier, this

4    happened such a long time ago, that's five years ago,

5    that I do not recall each and every incident or how it

6    was said to me.

7        MR. KRETCHMAR:  I understand.  Is it actually

8    possible that you don't even remember whether or not he

9    was the one that reported it to you?

10       THE WITNESS:  If Ben reported it to me, I would

11   definitely remember that.

12       MR. KRETCHMAR:  No, what I'm saying is, is it

13   possible that it's -- you don't even know really

14   whether Bob Hamlin reported it to you?

15       THE WITNESS:  I recall that Bob reported it to me.

16   I recall that part.

17       MR. KRETCHMAR:  Okay.

18   BY MR. CECALA:

19       Q    So on page 47, line six, the officer asks,

20   "So just to get a snack for a patient on L side, is

21   there a reason why Ben should have been in that office

22   with her?"  Your answer is, "Thinking of now, now that

23   we know so much, why Ben, why was he in that office you

24   know, now if you think back and knowing all that, yes,

Page 129

1    you can think it."

2           What were you thinking when you said you can

3    think it?

4       A    I was referring to the allegations that we

5    had that were -- the allegation against Christy.

6    That's what I was referring to.

7       Q    Well, what about the allegation?

8       A    That she was involved in having sexual

9    activity with a patient named Ben Hurt.

10      Q    In Bob Hamlin's office?

11      A    It could have been possible.  I don't know

12   where it happened, but what I'm saying is when I knew

13   that she had these allegations against her, then it

14   is -- it could be, if you think about it, that she was

15   in that office with him.  It's possible.

16      Q    And then you go on to say, "But at that

17   point, we never thought about it because Ben was a

18   patient who was working with her on that, on that unit,

19   on L Unit, and he was transferred there.  And I mean,

20   patient can come and -- come in the office and say

21   something to any social worker.  So we didn't think

22   much of it at that time."

23           That was your answer, right?

24      A    Right.

Page 130

1   Q    So -- but Ben wasn't working with Christy at

2   that time, was he?

3   **A    Yes, but he was a former patient, and**

4   **sometimes social workers cover for each other.**

5   **Sometimes it's not unusual for social workers to go and**

6   **talk to their former patient or say hi or if they have**

7   **any issue, take care of that if their own social worker**

8   **is not there.  So it's not uncommon.**

9   Q    But that's not the reason anyone gave for

10  Christy and Ben being alone in the office.  The reason

11  that everyone gave, including you and this testimony,

12  was that Christy was there to get a snack for another

13  patient, right?

14  **A    Yes, and it's possible that Ben had some**

15  **issue or Ben wanted to say hi to Christy and he went**

16  **into the office.**

17  Q    And you didn't find that suspicious at all?

18  **A    No, I did not.**

19  Q    Jumping down to page 52, so at the very top

20  of 52 the officer asks you, "Have you heard any rumors

21  of her," meaning Christy, "in a relationship at all

22  with ███████   Your answer starts at line three to

23  seven.  Can you read that answer?

24  **A    "What I know about ███████ is that he was --**

1    **he -- when I heard about ███████ is that he -- because**

2    **he was also transferred from L to K because he was**

3    **having some romantic feelings towards her."**

4    Q    And the question is "Towards Christy?"  And

5    you answer, "Towards Christy, and that was the reason

6    he was moved from L to K."  Correct?

7    **A    Correct.**

8    Q    Do you remember when that occurred?

9    **A    Yes, I remember.**

10    Q    When was it?

11    **A    I think it was sometime in 2010 sometime.  I**

12    **don't remember the exact date, but it was sometime in**

13    **2010.**

14    Q    How did you know that ███████ had feeling

15    toward Christy?

16    **A    Because he reported it to Dr. Javed, and**

17    **I think he reported it to me, too, that he had some**

18    **romantic feelings towards Christy.**

19    Q    Did you ever consider that Christy had

20    romantic feelings toward ███████

21    **A    No, I had no reason to believe that.**

22    Q    Well, does ███████ having romantic feelings

23    toward Christy provide any reason to suspect that

24    Christy may have reciprocated?

1      **A      No.  It is not that unusual for patients to**

2  **have romantic feelings towards providers.**

3      Q      How often does that happen?

4      **A      It doesn't happen that often, but it's not**

5  **totally unusual.  I have had incidents where there were**

6  **times when patients had romantic feelings for their**

7  **provider, but that does not mean that the provider also**

8  **has romantic feelings towards a patient.  I had -- go**

9  **ahead.**

10     Q      Did you ever ask ██████ whether Christy

11  reciprocated his romantic feelings?

12     **A      I don't recall that.**

13     Q      And you said he informed somebody, Dr. Javed.

14  Are you sure it was Dr. Javed that he reported it to?

15     **A      It may have been another treatment team**

16  **member, but eventually that was reported to Dr. Javed.**

17     Q      Do you, sitting here today, knowing that

18  Christy admitted to having sex with Ben Hurt, that her

19  relationship with ██████ as you sit here today, is

20  now more suspicious to you than it may have been at the

21  time?

22     **A      Yes, it is.**

23     Q      Now, on page 54 -- I'll go with the question.

24  I'm trying to save as much time as I can, Doctor.

LISA A. KOTRBA & ASSOCIATES, LTD. (312) 855-1834

```
1    There's a question on 53.  He says, "Simple touching

2    with some sexual innuendo, even if the patient now vice

3    versa looking at the other way, if the patient is

4    saying -- if a patient comes to you and says, Doctor,

5    I think you're looking great today and I really, really

6    find you attractive, would that lead to something?"

7             You answer, "Yes, I would report it and that

8    patient will be moved.  I will not continue to work

9    with that patient because then obviously the

10   relationship cannot be, you know, professional proof.

11   It cannot be professional and what is the patient

12   gaining from working with me, you know, if this is how

13   he's feeling."

14            And this last part I'm going to ask you to

15   read from line five to line nine.

16        A    "It's not appropriate so and that what the

17   protocol is, that, you know, if patients say anything

18   inappropriate or anything that could be potentially

19   dangerous, then they are moved."

20        Q    Sorry.  One second.

21            Sorry.  Minor -- minor emergency.  I'm

22   getting notes passed to me.

23            So the protocol that you're talking about,

24   patients say anything inappropriate or anything that
```

Page 134

1    could be potentially dangerous, they are moved, so is

2    that in addition to the reporting that must take place?

3        A    What reporting?

4        Q    Well, you're saying that if a patient reports

5    something in this nature -- well, I guess that maybe

6    I'll ask a different question.

7             If the patient reports these feelings, is

8    that a reportable event?

9        A    Reportable to who?

10       Q    To OIG, or even you suggested earlier in your

11   testimony that there's internal reports that are

12   generated before -- you know, like if there's -- going

13   to a supervisor because the social worker is too close.

14   Is there any report that's generated because a patient

15   is too close to the social worker and has to be moved?

16       **A    No OIG because this is a patient's feelings,**

17   **not the staff's.  So if we are moving a patient from**

18   **one unit to another unit, obviously administration has**

19   **to be involved.  So it really depends on what is going**

20   **on.  Sometimes patients are at a level in their**

21   **treatment where they are able to process this feeling**

22   **and move on and not act on it.  So it really depends.**

23   **         And in ██████████ case, I will just say at**

24   **that time, him reporting it to us and then cooperating**

1    with the move, that also tells us that he is where he

2    is at in his treatment, that he is able to see that,

3    not act on it and then cooperate with the move.  So it

4    really depends on the situation.  Every situation is

5    different and depending on which level a patient is at.

6         Q    Are you aware that Christy admitted to having

7    sexual contact with ██████████

8         A    I'm not aware until now.  I was just telling

9    you this is the first time I'm mentioning it.

10        Q    So the first time you're finding out Christy

11   is engaged in inappropriate sexual contact with ██████

12   is right now?

13        A    I do not know about since.  What I heard was

14   maybe there was some touching or -- from different

15   staff later on, but I am not aware he was involved in

16   having sexual activity with her.

17        Q    Well, you said touching.  What type of

18   touching are you referring to?

19        A    I don't know.  The staff reported he might

20   have been involved in some type of touching or just

21   hypothetical situations, but nobody came and told me,

22   and I never read it anywhere that there was actually

23   some sexual activity going on between the two.

24        Q    Well, if no one told you, how did you find

Page 136

1   out there was touching?

2     **A**   **The staff discussed these things. When they**

3   **discussed it, they were after the fact when that**

4   **incident was reported, that even** ▬▬▬▬ **name was**

5   **coming up, we talked about what could have happened,**

6   **but nobody just said that there was any sexual activity**

7   **going on. It might have happened, it might not have**

8   **happened. I'm just talking about all hypothetical,**

9   **nothing concrete, nothing reported in a newspaper or**

10   **nothing reported by anybody credible and talking about**

11   **this is what I heard from different people.**

12     Q   Well, how -- so you just mentioned credible.

13   Christy admitted that this happened. ▬▬▬▬ I

14   believe -- I don't want to misstate the other evidence

15   in the case, but Christy has a founded OIG report on

16   her regarding sexual contact with ▬▬▬▬ and there's

17   an audio recording of Christy admitting that she had

18   sexual contact with ▬▬▬▬ and we now know that he

19   was fondling her breasts and she was rubbing his penis.

20     That's touching, isn't it?

21     **A**   **Yes.**

22     Q   Is that sexual touching?

23     **A**   **Yes.**

24     Q   And now that it has been a founded OIG

1  report, is it credible?

2      **A      Yes.**

3      Q    What would make you conclude before this that

4  it wasn't credible?

5      **A      Can you read phrase the question?**

6      Q    Sure.  You said that you heard rumors, you

7  weren't able to identify who told you the rumors, but

8  you somehow found out.  You have alleged that you only

9  found out after the news reports and not before that,

10 and you decided the information wasn't credible.

11          What is it that made you believe that it

12 wasn't credible when you found out?

13     **A      Hearing from different staff that -- what**

14 **I heard was there might be some touching going on.  I**

15 **don't know.  I do not know what is the extent of the**

16 **touching.  I did not read newspaper report about**

17 ███████  **I was not aware of all these allegations**

18 **because I did not read all of these transcripts that**

19 **you have.  So what I'm saying is I'm hearing from the**

20 **people who don't even -- which is like hearsay and just**

21 **saying there might be some touching going on.**

22     Q    Right, but my question is -- thank you for

23 that.

24          My question is:  Why did you decide it wasn't

1  credible?

2      A    It's hearsay when I'm hearing rumors about

3  different things, saying that not -- not even the

4  person will say that I saw it myself or I heard it

5  myself.  They are just saying, oh, so and so and so and

6  so said so.  So I'm just saying that some rumors might

7  be credible and a person will say I saw it myself.

8  Some might not be credible, saying some people told

9  them, you know, it's coming from different people.  So

10  it really depends on who is saying credibility, if it's

11  credible or not.  But it was all after when it was

12  initially reported, so I'm not sure what you're trying

13  to ask me.

14      Q    Well, I'm just asking you how you came to the

15  conclusion that the hearsay wasn't credible.

16      A    I explained that.

17      Q    That it's just your judgment?

18      A    You can say that if you want to.

19      Q    Well, I'm asking you.

20      A    It's not credible because nobody came to me

21  and said they saw it or they heard it from first

22  person.  These are rumors coming from one person to

23  second to third and fourth.  That's why I'm saying I do

24  not know if they were credible or not.

1      Q    So a rumor or hearsay is automatically

2 something you just dismiss as not credible?

3      **A**    **No. We would not dismiss it if it was -- if**

4 **I had known this before the fact, before all of this**

5 **investigation started, I would have done something**

6 **about it. I would have informed at least the**

7 **supervisor or investigated it further.**

8      Q    So but you testified earlier about there just

9 being a mere suspicion, you know, is something that

10 even if the patient is delusional that you would act

11 on.

12      **A**    **Yes. And if I had known it before --**

13      Q    I need to finish my question.

14      **A**    **Okay. Sorry about that.**

15      Q    That's okay.

16      Earlier you said a mere suspicion, even if

17 the patient is delusional is something that the team

18 reports on. These are potential -- these are rumors.

19 They are not even coming from delusional patients,

20 staff, and I'm wondering why you dismissed those rumors

21 as having no reportable credibility. And I'm not sure

22 I understand the answer. Perhaps you could clarify it

23 more, and I then I can move on to the next question.

24      **A**    **Let me clarify. I did not do anything about**

```
 1   it because --

 2        Q    Thank you.

 3        A    -- Christy was already in trial, and she was

 4   already going through trial, and then she was found

 5   guilty of all of those charges, so I don't know if at

 6   that point this is even reportable.

 7        Q    Right.  But that's -- she was -- she was

 8   accused of having sex with Ben by the police.  We're

 9   talking about ████████ the rumors about ████████  She

10   wasn't on trial for ██████

11        A    Correct.  But what you are -- what you are

12   saying?  It was also at that time when all of this was

13   happening and everybody knew about it, and it was not

14   in my place to report at that time anything -- any

15   suspicion or anything like that because all of the

16   cases were already in court, and the investigation was

17   already going on.

18        Q    I see.  So you never heard anything about

19   Christy, a rumor of any kind, from staff before the

20   news reports were available on Christy and Ben?

21        A    Correct.

22                      (Whereupon, Plaintiff's Exhibit

23                      No. 3 was marked for

24                      identification.)
```

1    BY MR. CECALA:

2        Q    I'll try to get to the next exhibit so we

3    can -- I am showing you an exhibit.  It's marked

4    Exhibit 3.  At the bottom of it there's a page number

5    27981, 27982 and 27617.  I don't think this is an email

6    you've ever seen because it wasn't sent to you.  It was

7    sent from Chief Epperson to Diana Hogan.  And there's

8    an attachment number.  It says 17-9021-R3, 5-31-17.

9            Do you see that at the top of the email, the

10   from and to and the attachment?

11       **A    Yes, I do.**

12       Q    Okay.  This is an email from Chief Epperson

13   to Vicky Ingram, and he says, "Here's the report of the

14   incident on K Unit last night."  He's referring to the

15   Ben/Christy incident.  He says, "Very concerned that an

16   SW," social worker, "would ask for assistance from a

17   patient, for an office not on her unit."

18           Did you ever hear that Chief Epperson was

19   very concerned that Christy and Ben were locked in the

20   office?

21       **A    No, I did not.**

22       Q    Did you ever hear that anyone else was very

23   concerned about Christy and Ben being locked in the

24   office on May 31st?

Page 142

1      **A      No, I don't recall.**

2      Q      And you've already said you weren't very

3   concerned about it at all, either, correct?

4      **A      Yes, I was not that concerned.**

5      Q      And then on this email chain there's -- the

6   final name is Malini Patel.  Do you see that name?

7      **A      Yes.**

8      Q      And that was your immediate supervisor,

9   right?

10     **A      Correct.**

11     Q      Did Dr. Patel ever talk to you about this

12  email?

13     **A      No.**

14     Q      Then there's another name, Colleen Delaney.

15            Did Colleen ever talk to you about hearing

16  that Chief Epperson was concerned about this?

17     **A      No, she did not.**

18     Q      And then the last page of this exhibit is the

19  security report about the incident.  I'm going to try

20  to shrink it so scrolling goes faster.

21            Do you see this security department report?

22     **A      Yes, I do.**

23     Q      Have you ever seen this before?

24     **A      No.**

Page 143

1     Q    Did anyone ever relate to you that --

2    **A    I can't see the report now.**

3     Q    The report is gone.  I'm just going to ask

4 you a different question.

5         Did anyone ever relate to you that there

6 should be a concern about Christy and Ben being locked

7 in Bob Hamlin's office?

8    **A    No.**

9     Q    Are you aware that Christy admitted that

10 while Christy and Ben were in the office, they actually

11 had sex before getting out of the locked office?

12    **A    You mean that day when this incident**

13 **happened?**

14     Q    At any time have you become aware that

15 Christy Lenhardt and Ben Hurt while locked in the

16 office had sex before calling the nurse's station to

17 get out of the office?

18    **A    I don't know exactly where this was**

19 **happening, the sexual activity.  I was not aware that**

20 **that was the place.**

21     Q    Well, I'm telling you where it happened.

22 Christy Lenhardt and Ben Hurt had sex in Bob Hamlin's

23 office before they were let out of the office, and they

24 both have admitted to that.

Page 144

```
 1              Are you aware of that?
 2      A     No.
 3      Q     You've never been informed about that by
 4  anybody to this day?
 5      A     No.
 6                        (Whereupon, Plaintiff's Exhibit
 7                        No. 4 was marked for
 8                        identification.)
 9  BY MR. CECALA:
10      Q     I'm showing you now what is -- it's a bunch
11  of pages.  I only have a few questions about this.  It
12  starts on page -- at the bottom it's 27404, for the
13  record, and it ends at 27418.  This is another email
14  that went from Ann Boisclair.
15              Do you know who Ann Boisclair is?
16      A     Yes.
17      Q     And what is she -- what is your knowledge
18  about what Ann does at Elgin?
19      A     She does the quality control, so she kind of
20  reviews the records and makes sure that everything is
21  in place.
22      Q     And does she also help with training staff?
23      A     Yes.
24      Q     So this email was from Ann, and you can see
```

Page 145

1    that Dr. Hardy is there?

2        A    Yes.

3        Q    And Malini Patel, that was your supervisor,

4    right?

5        A    Yes.

6        Q    And Diana Hogan and Colleen Delaney, and you

7    know who these people are?

8        A    **Yes, I do.  I don't know who Michael Anderson**

9    **is.  I'm not sure.**

10       Q    You don't know who Michael Anderson is.

11            Do you know who Bill Epperson is?

12       A    Yes.

13       Q    And it says Andrew Beck.  Do you know who

14   that is?

15       A    Yes.

16       Q    Did you ever receive any materials on quality

17   control policy updates from Ann Boisclair?

18       A    **Yes, I received -- yes.  She sent -- go**

19   **ahead.**

20       Q    No, it's okay.  So you have received emails

21   from Ann in the past?

22       A    Yes.

23       Q    Okay.  Do you recall ever getting an email

24   like this?  There are exhibits on this email related

Page 146

1    to -- if we look at the bottom of her email on this

2    page -- oh, I just skipped pages.  The very bottom of

3    the page, item number six says PPM1870.  This is a

4    policy manual, "Non-Consensual Sexual Contact Among

5    Patients Implementation Plan, QM," which, I think, is

6    quality manual -- or quality area -- "will send

7    approval version to all.  Director of nursing to

8    present to CNM's" -- probably certified nurse managers

9    -- "who will train and do read and sign with" -- on the

10   next page -- "RNs to begin today; M.D.'s will present

11   at MSO today.  Not sure if this got done because it's

12   already after MSO.  Sorry."

13        So this policy was kind of distributed to

14   the -- to the team, and I'm just going to go quickly to

15   the policy that we're referring to.

16   **A    Can I know what date this email was sent?**

17   Q    Sure.  Sure.  You absolutely can.

18        So this was an email sent January 19th of

19   2017.

20   **A    Okay.  Thank you.**

21   Q    Okay.  And it was distributed to the team.

22   I'm just wondering -- I'll get to that policy.  I'll

23   get the page number.  So here's the first page of the

24   policy, and it goes from the bottom pages 27412 -- do

1   you see that number down there?

2       A    Yes, I do.

3       Q    It goes to the very end.  It's six pages

4   long.  It's Policy and Procedure Manual 1870

5   Non-Consensual Sexual Contact Among Patients.

6           Have you ever seen this before?

7       A    Yes, I have.

8       Q    You have.  So you're familiar with this

9   policy?

10      A    Yes.

11      Q    Okay.  As part of the policy there's a lot of

12  procedure here, that it -- it talks about in, like,

13  letter B it says, "Once the allegation is reported, the

14  following actions will occur:  Number one, The charge

15  nurse --" telling the charge nurse what to do if there

16  is a consent -- a sexual relationship between two

17  patients, and then number two, there's an advocate and

18  instructions for the advocate; the nurse managers, part

19  three, and part four is -- covers physician.

20          So in this policy, physician, does that mean

21  you as the treating psychiatrist, M.D.?

22      A    I think it's probably both because the

23  medical examination is done by the primary care

24  physician.

1    Q    Yes.  So that would be -- so if we look at

2    this, there's A, B, C, D procedurally.

3          A is, "Complete orders for increased

4    observation for the alleged perpetrator," correct?

5    **A    That would be the psychiatrist.**

6    Q    Say again?

7    **A    That would be the psychiatrist.**

8    Q    That's the psychiatrist.

9          And then the medical evaluation is probably

10   done by the M.D., right?

11   **A    Primary care physician.**

12   Q    Primary care.

13         And then there's a consultation amongst the

14   doctors taking into account the alleged victim's

15   preference of unit, because they need to be moved, the

16   linguistic accessibility, the gender composition of

17   units, other relevant factors.

18         So is this a meeting with the medical

19   director, charge nurse, clinical nurse manager, the --

20   whoever is on duty?  So there's a meeting that takes

21   place to handle this move, correct?

22   **A    Correct.**

23   Q    Is the psychiatrist ever involved in that

24   meeting?

Page 149

1       **A    It really depends on the time.  So if it's**

2  **after hours, then it's just the primary care physician**

3  **who are the medical officer of the day.  So if it's**

4  **immediate action needs to be taken, it's done just by**

5  **the primary care physician, but if it's during the day**

6  **shift, then the psychiatrist is involved.**

7       Q    Okay.  And then it goes on here on item

8  letter C, it says, "If the alleged victim's treatment

9  plan specifically identifies a problem and intervention

10  plan for falsely alleging non-consensual sex based on

11  three or more previous allegations within the past six

12  months, or another well-described pattern of behavior,

13  that were addressed in the manner described above and

14  found not credible, then the charge nurse will contact

15  the medical director to describe the incident and

16  request the treatment intervention plan be followed, in

17  lieu of this protocol."

18           So if it's all just a bunch of false

19  information, falls alarms, it's just the psychiatric

20  team -- or the treatment team that has an intervention

21  because the person is falsely accusing everyone,

22  correct?

23       **A    That's correct.  But again, it's very hard to**

24  **find out if it's false or true, so we -- there would be**

1   **definitely an OIG report made to make sure that it's**

2   **reported to OIG because it's very -- at that moment**

3   **it's really hard to determine.**

4        Q    Right.  At a minimum, even if the false

5   allegation, the team is trained -- the social workers,

6   the STAs, the nurses, the medical doctors, the

7   psychiatrists, they are all trained kind of like a

8   crackerjack team to make sure it gets reported to OIG

9   and everyone knows what's happening, right?

10       **A    Correct.**

11       Q    And then these are exhibits.  One is a

12  response checklist to allegations of non-consensual

13  sexual contact.  It says non-consensual because it's

14  two patients, right, not a patient and a staff?

15       **A    Yes, two patients.**

16       Q    Right.  So this is all what's needing to be

17  done.  And under the physician area it says:  Medically

18  evaluate and treat, as needed, the alleged victim;

19  complete an injury report; consult with the medical

20  director on how to best separate them; write a transfer

21  order; consult with the medical director on whether the

22  victim needs to be sent to a medical hospital; and

23  write comprehensive progress notes in the charts of

24  both the alleged victim and the alleged perpetrator.

Page 151

1           Would those chart notes be something that the

2   psychiatrists would be preparing because it's under the

3   physician area?

4           **A     Yes.  The psychiatrist would be doing that,**

5   **the primary care physician, nurses or whoever the staff**

6   **it was reported to, if it's an STA or social worker.**

7           Q    Yeah.  No, I understand that, and I really

8   want to get you out of here on time, so we can go

9   quickly.

10          But this is under the physician area, right?

11          **A     Right.**

12          Q    The treating psychiatrist would write

13  progress note reports on both the victim and the

14  perpetrator, correct?

15          **A     Correct.**

16          Q    Okay.  And then there's another exhibit which

17  is helpful, strategies for the victim, correct?

18          **A     Correct.**

19          Q    And there's a lot of stuff.

20          When this happens, it's kind of a big deal,

21  isn't it?

22          **A     Yes.**

23          Q    So the first thing is telling the person

24  you're with them for their safety.  This is the

1    advocate.  There's a special job.  Someone gets

2    appointed as an advocate for the victim, correct?

3         A    Correct.

4         Q    And there's a lot of language here,

5    reassuring the person, doing everything possible to

6    listen carefully; asking the person if they'd like to

7    make a phone call to family, friends or other support

8    persons and provide privacy for the phone call to take

9    place.

10             That's what the advocate would do, correct?

11        A    Correct.

12        Q    And then there's another individualized plan

13   of care with all of the interventions.  Now -- and this

14   is -- even if it's false, like, we're looking at three

15   or more previous false allegations, because if someone

16   keeps doing this falsely, accusing of abuse, it's kind

17   of a burden to everyone because even if it's false,

18   you've got to do all this paperwork, right?

19        A    Correct.

20        Q    So you want to correct the behavior of false

21   report?

22        A    Correct.

23        Q    Okay.  And here, interventions, check the

24   patient after an hour, the next day, done by the RN.

Page 153

 1          Then there's psychiatrists here.  Interview

 2  the patient and determine whether the patient's report

 3  may mask another incident.  If so, convene the clinical

 4  team to address it.

 5          So the psychiatrist would get involved in

 6  querying the patient about, hey, is this the only

 7  incident, or are there more?  Is that what that means?

 8      A    **Yes.**

 9      Q    And then the psychiatrist assesses

10  medication, and then it looks like that's the end of

11  the psychiatric notes on this.

12          So this is all something that's done for

13  non-consensual sex between two patients, correct?

14      A    **Correct.**

15      Q    Is it possible for two patients to have --

16  who have been determined to be mentally ill to be -- to

17  have consensual sex?

18      A    **Is it possible?**

19      Q    Yeah.  Can any mentally ill -- any person who

20  is confined to a secured psychiatric facility have

21  consensual sex with any person ever?

22      A    **Any patient?**

23      Q    Any patient.

24      A    **Any patient.  It's possible, yes.**

Page 154

1    Q    So two patients can have consensual sex if

2  they are confined to and have been adjudicated mentally

3  ill?

4    **A    It's not allowed, but if you're saying it's**

5  **possible, it's possible.**

6    Q    Okay.  Fair enough.  You're saying that

7  it's -- they can have -- your answer is they can have

8  consensual sex?

9    **A    It's not allowed.  It's something that's not**

10  **allowed, but it can happen.  That's what I'm saying.**

11              **(Whereupon, Plaintiff's Exhibit**

12              **No. 5 was marked for**

13              **identification.)**

14  BY MR. CECALA:

15    Q    Okay.  This next exhibit is a -- it's the

16  entire set of restriction of rights on Ben Hurt from

17  his chart.  So this first page, which is page -- at the

18  bottom it's, for the record, 16246, and it

19  consecutively goes to 16257.

20         So on this first page 16246 -- have you ever

21  seen a notice regarding a restriction of rights paper

22  like this?

23    **A    Yes, I have.**

24    Q    Have you seen this one?

Page 155

1    A    No.

2    Q    So can you tell me what this is?

3    **A    So what it says is that a patient was**

4  **yelling, cursing at a peer and staff, and staff was**

5  **unable to calm down, and so he was offered medication.**

6  **And whenever the medication are given in the presence**

7  **of security, we have to do restriction of rights.**

8    Q    Okay.  So -- and this was for Ben Hurt,

9  right?

10   **A    Yes.**

11   Q    And it was issued on August 22nd, 2015?

12   **A    Correct.**

13   Q    And then there's just a page two with some

14 notices to the patient, and then there is another one

15 here.  This is a different one, right?  And it's

16 another -- Ben Hurt is the patient's name, and it says

17 Part Two, Other Restrictions.  On August 29th,

18 patient -- it says, "Reason:  Patient is on frequent

19 ob's for increased psychosis and unpredictable

20 behavior.  He is undergoing medication change."

21        So this is another restriction of Ben's

22 rights a little bit after the one we just looked at,

23 correct?

24   **A    Correct.**

Page 156

1    Q    Okay.  And then there's the same notice to

2    the individual because his rights are being restricted?

3    A    Uh-uh.

4    Q    Here is another one now.  This is the one

5    I want to get to.

6         So this is page 16250.  This is another

7    restriction of rights, correct?

8    A    Correct.

9    Q    Relating to Ben, and the date of this is

10   June 30th, 2017, correct?

11   A    Correct.

12   Q    And it's going to be restricted from

13   June 30th to July 3rd, 2017, right?  Correct?

14   A    Right.

15   Q    Are you -- he was your patient at that time,

16   right?

17   A    Yes.

18   Q    In fact, June 30th, we talked about, is the

19   big date when the investigation from Elgin security and

20   the State Police commenced, correct?

21   A    Correct.

22   Q    So here it says, "Patient is under

23   investigation - administrative directive," correct?

24   A    Correct.

Page 157

1      Q      Were you aware of this restriction put on

2  Ben?

3      **A      Yes.**

4      Q      And it says here that he is not allowed to

5  use the telephone, right?

6      **A      Correct.**

7      Q      So he can't call anyone?

8      **A      Correct.**

9      Q      And then there's the same page two, notice of

10  his rights.  Then there's another restriction of rights

11  that ends -- begins on July 3rd when the prior

12  restriction ended, right?  Is that what you see?

13      **A      Yes.**

14      Q      And that one ends July 22nd --

15      **A      Correct.**

16      Q      -- 2017.

17              And that's -- that was Ben's Thiem date, it's

18  when he Thiemed out?

19      **A      That's correct.**

20      **And I just want to clarify that when people**

21  **have these restriction of rights for telephone, if they**

22  **need to call the family, they are allowed to do so in**

23  **the presence of the social worker.  So that restriction**

24  **is mainly for a phone that's in the day area, the**

Page 158

1    **patient phone where they are able to just talk on their**

2    **own, but we allow them to talk to their family in the**

3    **presence of the social worker, if needed.**

4        Q    Thank you for volunteering that.

5             We're going to get to that in a minute.

6        **A    Okay.**

7        Q    So part three, it says -- the box is checked,

8    "Individual wished guardian and/or designee notified as

9    indicated below."

10            So here is says, "Mother to be notified of

11   the ROR.  Patient called for social worker office, as

12   per security."  Correct?

13       **A    Correct.**

14       Q    So you're saying he can talk to his mother?

15       **A    Yes, or any family member that he wishes to.**

16       Q    Or any family member.  Yeah.  Understood.

17            But that's your understanding of this ROR,

18   right?

19       **A    Right.**

20       Q    Sorry.  ROR, restriction of rights.

21            Okay.  And then I think that's the end of

22   that.  So Ben -- Ben received a restriction of rights

23   the day that this instance of his investigation

24   commenced, right?

Page 159

1      **A     Correct.**

2      Q     And you're aware that he got the restriction

3  of rights, and what I'm wondering is whether you were

4  aware of anything -- of any -- any information about

5  the investigation that would have caused him to need a

6  restriction of rights?

7      **A     We were not given any information by**

8  **administration.  We were just told it is an**

9  **investigation.**

10     Q     Yeah, my question is a little different.

11  I just want to make sure you're understanding my

12  questions.  I'm not asking what you were told.  I'm

13  asking what you were aware of.

14          So were you aware of any information about

15  why Ben was being investigated that would cause a

16  restriction of rights to prevent Ben from making any

17  phone calls?

18     **A     No, I was not aware.**

19                        **(Whereupon, Plaintiff's Exhibit**

20                        **No. 8 was marked for**

21                        **identification.)**

22  BY MR. CECALA:

23     Q     Okay.  So the next exhibit -- I'm going to

24  skip ahead.

Page 160

1      MS. JOHNSTON:  Which exhibit are you going to,

2  Joe?

3      MR. CECALA:  Sorry.  I went ahead to Exhibit 8.

4      MS. JOHNSTON:  Okay.

5  BY MR. CECALA:

6      Q    So this one begins page 14018.  Do you

7  recognize this, Doctor?

8      **A    This is a progress note.  I don't know if I**

9  **read it or not, but this is a progress note from Ben's**

10 **chart dated 12/10/14.**

11     Q    Yeah, 12/10/14 is the first progress note,

12 right?

13     **A    Right.**

14     Q    That's in the upper left.

15          And then I'm most -- I'm interested on this

16 page with the second progress note --

17     **A    Okay.**

18     Q    -- which is on 12/11/14.  I think it says --

19 we're all going to struggle here.  I think it says,

20 "Altercation between" --

21     MS. JOHNSTON:  Can you just say patient for any

22 other patient name that --

23     MR. CECALA:  Sure.  They are always first names.

24

LISA A. KOTRBA & ASSOCIATES, LTD. (312) 855-1834

Page 161

```
 1   BY MR. CECALA:

 2        Q    But altercation with patient and Ben, banging

 3   on each other's doors.  And then the note goes on.  But

 4   clearly they put some note in here that there's --

 5   something is going on with Ben and another patient

 6   where they are banging on each other's doors.  And this

 7   is December 11, 2014.  2000 hours, military time, that

 8   would be what, 10 o'clock.

 9             Is that -- that first sentence, does that

10   read that way to you?

11        A    Yes, altercation between patient and Ben

12   banging on each other's door.  Yes.

13        Q    Okay.  So that was on December 11th.  So Ben

14   is having some trouble on December the 11th.

15             And then -- let me make sure I get the right

16   page.  Fast forward to a few days later, there's

17   another progress note, and in the progress notes they

18   either -- the signatures are very difficult to read,

19   but they sort of try to put their titles where this

20   note starts:  12/14/14.  I think it says, NS -- is it?

21        A    G.

22        Q    Say again?

23        A    NSG, which means nursing.

24        Q    Right.  So it's nursing?
```

Page 162

1      **A**    **Correct.**

2      Q    And in this progress note it says -- if you

3 look a few lines down, because it's very difficult to

4 read -- I'm going to try to get it because it's hard to

5 read it.  At 1730 hours -- right here, can you see what

6 I'm pointing to?

7      **A**    **Yes.**

8      Q    I can't read that word.  I think it's patient

9 was in the L -- L --

10     **A**    **Laundry room.**

11     Q    Laundry room.

12         Can you read that?

13     **A**    **I don't know exactly.**

14     Q    It looks like L Unit dinner room?

15     **A**    **Dining room.**

16     Q    Dining room.  Yes?

17     **A**    **Right.  When --**

18     Q    When a physical altercation --

19     **A**    **Occurred.**

20     Q    -- occurred.

21     **A**    **Right.**

22     Q    So Ben got in a fight at about 6 p.m. on the

23 14th of December 2014, is that -- that's in his

24 progress notes, right?

LISA A. KOTRBA & ASSOCIATES, LTD. (312) 855-1834

Page 163

1      **A      Correct.**

2      Q      And as we've discussed before, if you look

3   at -- it doesn't say the time, but there's -- on this

4   next page, the top of the next page, 12/14/14, "Patient

5   moved from L Unit due to altercation with peer.

6   Started on," it looks like a code for medication.

7      **A      Frequent observation for unpredictable**

8   **behavior.**

9      Q      Good.  So that's what that meant.  FO is

10  frequent ob's, right?

11     **A      Correct.**

12     Q      What does frequent ob's mean?

13     **A      So on the forensic side, patients are**

14  **monitored every half an hour, but when patients are on**

15  **frequent observations, they are monitored every 15**

16  **minutes, and if there is anything potentially dangerous**

17  **they have, then it's removed from them in order to keep**

18  **them and other people safe.**

19     Q      Now, we just looked through all of Ben's

20  restrictions of rights, and it looks like he got in a

21  fight, and he may have been the one who caused the

22  fight here.  We can go through that in detail, but it's

23  not necessary.  And he didn't receive any restrictions

24  of his rights, correct?

Page 164

```
 1        A    I don't know.  I don't have access to all of
 2   the record right now.
 3        Q    Well, I showed you all of the restrictions of
 4   rights in the last exhibit that pertained to Ben Hurt.
 5   There is no restriction of rights in December of 2014.
 6        A    When patients are on frequent observation,
 7   that means automatically that there is -- there are
 8   some restrictions.  I'm not sure if they have to fill a
 9   separate restriction or rights for that.
10        Q    Right.  But he wasn't restricted from using
11   the phone?
12        A    No, he was not, no.
13        Q    Right.
14        A    No.
15        Q    So I'm going to jump down to page 14061.
16        A    Okay.
17        Q    There it is.  That wasn't too bad.
18             So in the middle of this page, these are
19   notes from January 4th at the top, and then it starts
20   January 5th at 6:37 in the morning, and then there's
21   another one at 9:30 p.m., and then the fourth one is
22   January 5th, '15, nursing, 10 p.m. -- or I don't know
23   if it's -- it says -- maybe it's 10 a.m. because they
24   are using military time.
```

Page 165

1      **A      Yes.**

2      Q    It's 10 a.m., right?

3      **A      Yes, 10 a.m.**

4      Q    Right.  And then it says, "Patient being

5      transferred to L Module."

6           So when he was transferred off of L, it looks

7      like here the third line down says, "Patient

8      transferred from K Module to L Module."

9           That was back in December, right?

10     **A      January 5th, 2015?**

11     Q    Well, this note on January '15, it says he

12     was transferred to L Module.

13     **A      Yes.**

14     Q    But he was already on L Module and

15     transferred off, when he got in the fight, to K?

16     **A      Correct.**

17     Q    And now he is being transferred back on

18     January 5th, right?

19     **A      Correct.**

20     Q    Why would he be transferred back?

21     **A      Maybe the issue between the two patients was**

22     **resolved.**

23     Q    Had he had MISA at this time?

24     **A      No.  At that time he was not stable for MISA.**

1    Patients who are in the MISA program are the

2   ones who are stable, who are attending their groups,

3   who are able to comprehend the MISA program.  So at

4   that point he did not stay there because he was not

5   stable for the MISA program.

6    Q    Aah.  Okay.

7    A    And I also want to bring up that when he was

8   transferred from L to K at that time in 2014, he was

9   still being monitored by the same treatment team.  So L

10   treatment team was still following him up, as you see

11   the notes from Dr. Javed in the chart.

12    Q    Right.  So he didn't become your patient on

13   K Unit in 2014?

14    A    Correct.

15    Q    Okay.  So this next one is another excerpt

16   from Ben's chart.  I'm going to shrink it.  So this one

17   is a couple years later, and this is December 13th,

18   2016 is entry one, same but a little bit later, and

19   then 12/18/16, 1930, so 7:30 p.m., there is a note

20   here, and it looks like -- I can't read the first two

21   words, but "physical altercation with another peer."

22    Do you see that note?

23    A    Yes.  Patient had physical altercation with

24   another peer.

Page 167

1    Q    So a couple years later Ben got in another

2  fight?

3    A    **Yes.**

4         **And in this, the worse difference in this**

5  **fight is that he was the one that got beat up.**

6    Q    Right.

7    A    **Yes.**

8    Q    Right.  So he wasn't the perpetrator in this

9  instance?

10   A    **No.  No.  No.**

11   Q    And then on page 14477 -- so there's quite a

12  few notes on this.

13   A    **Right.**

14   Q    Getting to, I think I'm on it, 76 -- great.

15  77.  It looks here on 12/20, I think these are your

16  notes right here --

17   A    **Yes.**

18   Q    -- the second entry.

19        Can you tell us what -- is the first and the

20  second entry yours or just the second?

21   A    **Just the second.**

22   Q    And what does that say?  I'm sorry to put you

23  on the spot with your own handwriting, but can you read

24  that to us?

Page 168

    A    "Mr. Hurt needs to complete MISA program.  It
is the consensus of treatment teams from K and L that
he will stay on Unit K to work on his substance abuse
issues."

    Q    Good.  So it was the consensus of the
treatment teams on K and L?

    A    Correct.

    Q    Were you in any meetings to discuss how the
consensus was arrived at to leave him on K Unit?

    A    Yes, it was discussed in the morning
meetings.

    Q    And who was part of those meetings?

    A    Everybody from both teams is invited to these
meetings.

    Q    So who would that be?  What are the names of
the people?

    A    Psychiatrists.

    Q    Well, no, what are the names of the people?

    A    Dr. Javed, Dr. Kareemi; social worker from K,
Bob Hamlin; Drew Beck.  I'm not sure who else was a
social worker there.  Social worker on L, Christy
Lenhardt, and I do not remember who else was a social
worker.  Psychologist Pat Larson; nurse manager,
I think it was Colleen Delaney; sometimes STAs are also

Page 169

1    **in those meetings, so it was discussed in the**

2    **treatment -- in the morning meetings.**

3         Q    So you, Dr. Javed, Colleen Delaney, Drew

4    Beck, Bob Hamlin, Christy Lenhardt.  Did I miss

5    anybody?

6         A    **No.  So I --**

7         Q    Pat Larson?

8         A    **Correct.**

9              **And I do not recall specifically, you know,**

10   **this meeting, but I am generally saying that this is**

11   **how we discuss things.**

12        Q    So as part of the meeting on December 20th,

13   do you ever recall Christy Lenhardt voicing any

14   objection to go against the consensus that Ben stay on

15   K Unit?

16        A    **No, I don't recall.**

17        Q    Do you ever recall Christy becoming emotional

18   about the fact that Ben was not coming back to L Unit?

19        A    **No, I don't recall that.**

20        Q    Did you ever observe Christy crying because

21   Ben wasn't going to come back to L Unit?

22        A    **No.  No, I did not.**

23        Q    Then the next entry is on 12/2016, Mr. Hurt

24   was transferred to K Unit for his own safety due to

Page 170

1    recent physical altercation with peer who remained on

2    unit.

3            So he was actually transferred for his

4    safety, correct?

5        A    **Correct.**

6        Q    But then this consensus meeting happened, and

7    everyone that we named was in agreement that Ben should

8    stay on K Unit to complete the MISA program, correct?

9        A    **Correct.**

10       Q    And at the bottom of this note, it says he is

11   aware of permanent -- and it goes on to the next

12   page -- transfer and change in condition.  Treatment

13   plan staffing, et cetera.

14           So Ben was made aware of this is what that

15   note says, right?

16       A    **Right.**

17       Q    And did Ben ever voice any objections to you

18   about staying on K Unit?

19       A    **No, he did not.**

20       Q    Give me one second.

21           So you were on K Unit for how many years,

22   Doctor?

23       A    **Since August of 1999.**

24       Q    And actually, one quick question before I go

Page 171

1    down that road.

2            This is December of 2016 when this

3    altercation happened, and it looks like Ben was the

4    victim of -- another patient beat him up, right?

5        A    Yes.

6        Q    So I looked through all the restrictions of

7    rights.  We just looked at all of the restrictions of

8    rights in Ben's chart.  He wasn't given a restriction

9    of rights here, either, right?

10       A    No.  Since he was the victim, there was no

11   reason.

12       Q    Right.  A victim would never get a

13   restriction of rights, correct?

14       A    Correct.

15       Q    So back to the -- how many years were you on

16   K Unit?

17       A    Since 1999, so 22 years.

18       Q    23 years on K Unit, which is the MISA unit at

19   Elgin, right?

20       A    Yes.  22 years.

21       Q    22 years?

22       A    Yes.

23       Q    How long does it take a patient to finish

24   MISA?

Page 172

1      **A      It really depends on the motivation of the**

2   **patient, but most people complete it in around six to**

3   **nine months.**

4      Q      Six to nine months on average?

5      **A      Yes.**

6      Q      Is it closer to six months or closer to nine

7   months if you were picking an average?

8      **A      I would say closer to nine than six.**

9      Q      And you just mentioned if the patient is

10  motivated.  What does that mean?

11     **A      It means that they are going to their groups.**

12  **They are working on their relapse prevention plan,**

13  **their recovery plan, their conflict presentation.  So**

14  **they need to complete all of these documents before**

15  **they can graduate, and they have to pass certain**

16  **groups.  So if they are motivated only, then they will**

17  **do it.  If they are not motivated for that, not going**

18  **to their groups, not completing these documents, then**

19  **it takes longer.**

20     Q      And the motivation, you talked about this

21  earlier.  If someone is kind of trying to become

22  conditionally released, perhaps they have a long Thiem

23  date, would that make them more motivated to finish

24  MISA and to really do the work and go to the groups and

Page 173

1    participate so they could accelerate the checking off

2    one of the things they need to do to be conditionally

3    released?  Is that true for you?

4          **A    Correct.**

5          Q    So the people who would tend to complete it

6    in closer to the six-month might be people that might

7    have a conditional release hanging over their head to

8    finish things so they can demonstrate that they are

9    ready to be released, correct?

10         **A    Correct.**

11         Q    And you even said, they are there, they are

12   more stable, they are getting ready to be released on

13   K Unit.  They are going through MISA.  Their incentive

14   is to do well, show up to the groups, finish MISA in a

15   hurry to get out, correct?

16         **A    Correct.**

17         Q    Was that your experience with Ben?

18         **A    No, because he was missing his groups, coming**

19   **late to the groups.  He was not very motivated.**

20         Q    And why do you think he wasn't motivated.

21         **A    Because he knew that he would get discharged**

22   **anyway because his Thiem date was July 22nd, 2017.**

23                          **(Whereupon, Plaintiff's Exhibit**

24                              **No. 10 was marked for**

Page 174

1                     **identification.)**

2   BY MR. CECALA:

3        Q    So, Doctor, here's another chart note, and

4   this looks like it is -- this chart note starts on

5   May 25th, 2017.

6        **A    Correct.**

7        Q    And the last entry on the page is June 1st,

8   2017, right?

9        **A    Right.**

10       Q    And I think there's another page.  This, too,

11  is entered -- this is the next note after June 1st,

12  June 8th, 2017 in the chart.  So these are sequential

13  pages 1502 -- maybe I'm missing a page.  It looks like

14  there's a 1503 that I'm missing.

15       MS. JOHNSTON:  I can look into that later.  Sorry.

16  30,000 pages got scanned in --

17       MR. CECALA:  No worries.

18       MS. JOHNSTON:  -- at various times.

19       MR. CECALA:  No, no worries.

20       MS. JOHNSTON:  We can go back to that.

21       MR. CECALA:  I, actually, am completely

22  uninterested in the note on the next page.

23  BY MR. CECALA:

24       Q    This was the note between May 30th and

Page 175

```
 1    June 1st, which is the two days on either side of the
 2    day Ben and Christy were locked in Bob Hamlin's office,
 3    right?  They were locked in on May 31st; is that
 4    correct?
 5         A    I don't know what date they were locked in.
 6         Q    Well, maybe Counsel will stipulate.  It was
 7    May 31st, 2017 they were locked in the office.
 8         A    Okay.
 9         MS. JOHNSTON:  I trust that you're remembering
10    accurately the security report.  I'll stipulate to
11    whatever was on there.  That's fine.  We don't need to
12    pull it back up.
13         MR. CECALA:  Okay.  Great.  I was going to say I
14    have the exhibit.
15    BY MR. CECALA:
16         Q    But May 31st is the day Ben and Christy were
17    locked in Bob Hamlin's office, and these are the chart
18    notes on May 30th and the other one on June 1st.
19              Are either of those your notes?
20         A    The one on May 30 where it says, monthly
21    Progress note completed," that is my note.
22         Q    Okay.  So those would be your monthly
23    progress notes, the psychiatric monthly progress note.
24    That's kind of a standard monthly report that you
```

Page 176

1   prepare?

2       A    It is a different section in the chart where

3   we keep those notes.

4       Q    Yes.  We have those.  We're not going to go

5   through those today.

6            The other two notes, do you see -- can you

7   read those notes?

8       A    One is primary care physician.

9       Q    Yep.

10      A    Patient as per Dr. Ready (phonetic)

11  recommendation -- canceled PT as per Dr. Ready

12  recommendation.

13      Q    Right.  No mention of him being locked in the

14  office, is there?

15      A    No, there's not.

16      Q    And there's no restriction of rights on that

17  day either, is there?

18      A    No.

19      Q    I'm not sure why this is not working, but

20  I think we're going to make it before 6 for sure.

21           So -- okay.  So this is the notes beginning

22  on June 29th from Ben's chart.

23      A    Correct.

24      Q    So on this day it looks like the activity

Page 177

1    therapist made a note at 1544.  It's 3:44 p.m.  Met

2    with the patient on June 27th.  His therapy interview

3    was done.  And at lines three and four it says, patient

4    was cooperative throughout the interview.

5         So this is supporting your -- he was stable,

6    right?

7         A    Correct.

8         Q    And then the next one is June 30th.  I think

9    that's your note.  Can you read the next -- the note

10   that's the entry of June 30th at 9:30 a.m.?

11        A    "Mr. Hurt had a room search by security.

12   There is a security investigation going on, and it was

13   recommended by security to hold his passes and not

14   allow any off-unit activities.  It was also recommended

15   to transport him in waist belt, hand and ankle cuffs.

16   The treatment team met with Mr. Hurt, and he stated,

17   'I have no clue what is going on.' He agreed to

18   cooperate with the investigation.  Counseling

19   provided."

20        Q    Okay.  So the counseling provided note, did

21   you counsel him?

22        A    Yes, we provided support.  We were very

23   supportive.  We told him that this is an investigation.

24   We don't know what's going on.  So, yes, we provided

Page 178

1    **support and counseling and educated him about what we**

2    **knew what was going on.**

3        Q    Well, what did you tell him that you knew?

4        **A    We told him that there was some investigation**

5    **going on, and we were told by security to do all of**

6    **this.**

7        Q    Okay.  Did anyone tell you as his treating

8    psychiatrist that when they did the room search they

9    found an audio recording of Ben Hurt and Christy

10   Lenhardt engaging in -- and where Christy Lenhardt

11   performed oral sex on Ben?

12       **A    No one told me that.**

13       Q    Did anyone tell you there was another audio

14   recording detailing the intimacy that Christy had with

15   ███████ that she was romantically involved with him,

16   and she admitted that on an audio recording to Ben

17   Hurt?

18       **A    No one told me that.**

19       Q    Did anyone ever tell you that there was -- as

20   part of the audio recording that Ben Hurt and Christy

21   discussed how Christy helped ██████ ██████ to escape

22   from Elgin Mental Health Center and how she was

23   romantically and sexually involved with him while he

24   was a patient before ████████

1    **A     No.**

2    Q     So you knew nothing about the fact that these

3    audio recordings had been discovered with fairly

4    compelling information about a sexual relationship

5    between not only Ben and Christy but Christy and other

6    patients?  You knew nothing about that, and no one told

7    you?

8    **A     When the investigation started, when we**

9    **started hearing from the news and all these rumors, I**

10   **did hear that there was some recording found, but at**

11   **that point when I was treating Ben, no one told me**

12   **that.**

13   Q     So -- and this is June 30th.  And

14   I appreciate you volunteering the information about

15   what happened four months later.  I'm just worried

16   about June 30th.  No information was provided to you as

17   the treating psychiatrist that Ben and Christy were

18   engaging in sex?

19   **A     At that time, no.**

20   Q     With that information, would you have

21   concluded that Ben had been sexually abused by Christy?

22   **A     Can you rephrase your question?  I don't**

23   **understand.**

24   Q     Sure.  If you had been able to hear the audio

LISA A. KOTRBA & ASSOCIATES, LTD. (312) 855-1834

Page 180

1  recording or even if someone had told you that the

2  audio recording indicated that Christy Lenhardt had

3  performed oral sex on Ben Hurt, would you have been

4  able to conclude that Ben Hurt had been sexually abused

5  on June 30th?

6      A    Yes.

7      Q    Do you think having that information may have

8  factored into the counseling that you provided to Ben?

9      A    Yes.

10     Q    Now, we know that we just went through the

11 restrictions of rights.  Do you need me to re-call

12 those documents up, or do you remember looking at them

13 starting on June 30th where his telephone privileges

14 were removed?

15     A    You don't need to bring them back.

16     Q    So his telephone -- obviously, his telephone

17 privileges were, in fact, removed.

18          Do you recall looking at the policy on

19 consensual sex -- non-consensual sex between two

20 patients, where it mentions how the patient is allowed

21 to call family --

22     A    Yes.

23     Q    -- because they have experienced abuse, and

24 they might want to hear from a loved one, right?

Page 181

1      A     Correct.

2      Q     That's not what happened to Ben, though,

3   right?

4      A     Ben had a telephone restriction for the

5   patient phone.  My understanding is -- I do not recall

6   completely, but when patients have restriction of the

7   patient phone, they are still allowed to use the social

8   worker phone in the social worker's presence.  So my

9   understanding is that he was allowed to make phone

10  calls to his family.

11     Q     Okay.  Well, let's look at that.  This is

12  page 14510, and it looks here at the top, June 30th,

13  1600 hours "P," line one, "ROR," restriction of rights

14  "for phone use per administration."

15     A     Right.

16     Q     So who -- when it says per administration,

17  I'm just curious.  Who would that be that is per

18  administration restricting his rights?

19     A     I remember that it was chief of security who

20  probably told us.  I'm not a hundred percent sure, but

21  my understanding is that it was chief of security.

22     Q     So Bill Epperson is the one who would have

23  said, as administration, don't let him make phone

24  calls?

Page 182

1       **A**    **Correct.**

2       Q    And, in fact, I can't really read it.  It

3   says, "ROR for phone use by --"

4       **A**    **Social worker.**

5       Q    "-- social worker and explained to

6   patient" -- something to patient.  I can't really read

7   it.  I don't know if you can read that line.

8       **A**    **Yeah, I'm having a hard time reading it.  It**

9   **says, "patient" something "ROR given to patient.**

10  **Copy" -- "copy of ROR given to patient."**

11      Q    Great.  Great.

12           But then it goes on to say -- the last line

13  says, "stated that the social worker explained it to

14  him."  So this is the note indicating he is being -- on

15  June 30th they are telling him why he has got the ROR,

16  right?

17      **A**    **Correct.**

18      Q    And then it seems like the date is out of

19  order here.  We've got July 3rd next.  And then the

20  third entry is June 30th, '17, social Worker 2 at 1515,

21  and it looks like something 7/3 at 1100.  I'm not sure

22  why there --

23      **A**    **It's a late entry.**

24      Q    It's a late entry.

Page 183

1      Okay.  So he's writing about what happened on
2  June 30th, but he is writing the note on July 3rd?
3      A    Correct.
4      Q    Or she?
5      A    Yes.  I don't know who that is.  Yeah.
6      Q    So here it says, "This" --
7      A    Writer.
8      Q    -- "writer" --
9      A    "Met with patient per request of" --
10     Q    "Nurse manager"?
11     A    Nurse manager, right.
12     Q    And then it says what?
13     A    "Patient given ROR for telephone until --
14  from 7/3/17, 1600."
15     Q    It looks like Monday 7/3/17, 1600?
16     A    Right.  Correct.
17     Q    Okay.  Then what does it say next?  Patient?
18     A    Informed this to -- I'm having a hard time.
19     Q    "This is due to administrative directive"?
20     A    Correct.
21          "Due to investigation involving patient.
22  Patient asked what would happen if he" --
23     Q    Appeal it?
24     A    -- "appeal it.  Patient informed."

Page 184

1       Q    "No" something needed?"

2       **A    Signature needed.**

3       Q    Do you know what that means?  That he doesn't

4   have to sign the ROR, is that what that means?

5       **A    Yeah, I think so.**

6       Q    Okay.  Because he didn't agree with it?

7       **A    Yes, he did not.**

8       Q    Did he tell you he didn't agree with it?

9       **A    When we met with him, he said he would**

10  **comply, you know, with whatever is going on.**

11       Q    Okay.  Well, at least here he is saying he

12  doesn't agree.

13       **A    Right.**

14       Q    Then it says, "Patient then asked what would

15  happen if he used phone.  Patient informed that

16  security would be" -- "would likely have to be called"?

17       **A    Correct.**

18       Q    He agreed to the restriction.  "Patient

19  denied to take off --"

20       **A    Copy --**

21       Q    What does it say?

22       **A    "Copy of ROR."**

23       Q    And then was clearly not -- well, the bottom

24  says he was clearly not pleased.  It's ROR, and it

Page 185

 1    seems like it says, "closed mind as we left

 2    conference."

 3        **A    "Patient was calm throughout discussion but**

 4    **was clearly not pleased."**

 5        Q    So he is kind of maintaining his composure,

 6    but he is saying I don't need an ROR for the phone?

 7        **A    Correct.**

 8        Q    Okay.  Then this is a bit more of the

 9    typewritten what we have just gone through.  But he is

10    getting ready to leave, right?  This is a progress note

11    on July 3rd, typed up by, it looks like -- I think on

12    the next page it looks like it's -- his social worker

13    is Robert Lee.

14            Do you remember working with Robert Lee at

15    the end of Ben's stay?

16        **A    Yes, I do.**

17        Q    Who was Bob Lee?

18        **A    He was a social worker who was transferred to**

19    **K Unit from another unit.**

20        Q    Okay.  So in this typewritten note, if we can

21    get down to this next page, which is -- apparently this

22    was on July 3rd.  It says here June 30th.  Do you see

23    where it says, "On June 30th"?

24        **A    Yes.**

Page 186

1      Q    You know, "conducted a room inspection,

2   confiscated a bag of items from his room.  Clinical

3   team were not offered particulars concerning the

4   investigation."

5           Is that you, the clinical team?

6      A    Yes.

7      Q    "And are acting on restrictions set forth by

8   administration.  A spork" -- which is, I guess, it's

9   like a fork and a spoon --

10     A    Correct.

11     Q    -- "device to eat was also discovered.  He

12  was given a loss of privileges."

13          So he is not allowed to have that in his

14  room, right?

15     A    Yes, they are not allowed to have a spork or

16  any -- anything -- any food items in their room.

17     Q    So this says his GED instructor was notified

18  they can still conduct lessons on the unit.

19          Do you know, was he restricted in any other

20  way other than the telephone?  Because it seems like he

21  had to get permission to keep going to the GED classes.

22     A    He was restricted to the unit, and he was cut

23  off of the phone, and his passes were all placed on

24  hold.

Page 187

1    Q    So he basically lost whatever privilege

2  he had other than staying on the unit and going to his

3  GED classes?

4    **A    I think that -- yeah, I think the GED**

5  **instructor was coming to the unit to conduct class.**

6    Q    Okay.  Did he continue with groups and social

7  worker interaction?

8    **A    Social worker, yes; groups, I don't recall.**

9    Q    And then it says, on 6/30 at 1515, co-worker,

10  social worker, was directed by the nurse manager to

11  issue Mr. Hurt an ROR, restriction of rights, for phone

12  privileges until Monday, June 3rd.

13        On June 3rd his social worker was advised by

14  nursing and security to extend his ROR.  We saw that,

15  right?  It went from July 3rd to his Thiem date then,

16  he wasn't allowed to use the phone?

17    **A    Correct.**

18    Q    He was asked if he wanted a copy sent to

19  anyone, including guardian advocate.  He replied no.

20  He was provided a copy, and the original was filed in

21  the chart.

22        Now there is a note on 7/3.  "Security came

23  to the unit and spoke to Mr. Hurt."

24        Were you aware of that?

1       **A**      **No, I was not.**

2       Q      I'm going to jump down to page 1415.  I'm

3    going fast to be done by 6.

4       **A**      **Thank you.**

5       MS. JOHNSTON:  Do you mean 14 and 15 of the PDF

6    or --

7       MR. CECALA:  The Bates stamp is 14515.

8       MS. JOHNSTON:  Okay.

9    BY MR. CECALA:

10      Q      So we have a similar note here, but it's

11   at -- now we're out to July 11th in his chart, and it

12   says, "Standing information."  It talks about

13   June 30th, the inspection.  The clinical team didn't

14   know anything.  At the direction of security, his

15   passes were pulled.  It's the same thing from before,

16   same thing until July 3rd.  His social worker was

17   advised the ROR would continue.

18           It's the same note from June 30th, right?

19      **A**      **Right.**

20      Q      Then on July 11th, a large bag of items was

21   returned to Mr. Hurt?

22      **A**      **Right.**

23      Q      Are you aware that a large bag of items from

24   his room search was returned to him on July 11?

Page 189

1    **A    No, I was not aware.**

2    Q    Have you ever reviewed his chart?

3    **A    I've reviewed part of it, but I have not**

4    **reviewed these notes.**

5    Q    You never saw these before?

6    **A    No, I don't remember reading these notes.**

7    Q    Okay.  Then it says:  On July 11, this writer

8    was directed by email to issue another ROR to Mr. Hurt

9    on the following items:  Four flash drives, one

10   journal, one iPod Nano.

11        So he wasn't able to get at the devices on

12   which these recordings, these sexual recording, were

13   taken from him.  Is that -- do you see that?

14   **A    Yes, I see that.**

15   Q    But you didn't know that the sex -- I'm not

16   implying you knew that they were having -- that the

17   audio recording of them having sex was there.  I'm just

18   saying there's these electronic devices and a journal

19   that were not returned to him.

20   **A    I don't recall this --**

21   Q    By the way, I forgot to ask this before.

22        Are you aware that Ben detailed in his

23   journal in great detail conversations he had with

24   Christy about her sexual relationship with ███████

Page 190

1    ████████ and how she helped him to escape from Elgin by

2    putting ████████ in her car in that journal that they

3    took from him?

4    **A    No, I was not aware.**

5    Q    Is this the first time you're hearing of it?

6    **A    Yes.**

7    Q    And then it also says, "Mr. Hurt claims there

8    was another iPod Shuffle, green in color, that he is

9    missing.  An email was sent to administration inquiring

10    about those items, and a copy was issued."

11    So he's having a bone of contention over

12    getting his property back here, correct?

13    **A    Correct.**

14    MR. CECALA:  Okay.  And then, this is 5 -- 14520,

15    Mary.

16    BY MR. CECALA:

17    Q    So he is getting really close to his Thiem

18    date here.  These notes are -- July 13th is the first

19    entry, then July 14th, a second one on July 14th at

20    11:05, and then July 14th at 1538.  Is it possible to

21    read this note?  It was written, it looks like -- it

22    was written by Social Worker 2.  Can you read this

23    note?

24    **A    Okay.  I'm going to try, "Patient asked this**

1    **writer to make up call to his mother.  When I dialed**

2    **mother, patient then said he wanted to talk to**

3    **great-grandmother and explained that my understanding**

4    **is that he can only talk to mother, so I told patient**

5    **I" -- it's hard to read the word -- "needed**

6    **verification" --**

7         Q    First?

8         **A    -- "first.  Chief Epperson was called by**

9    **nurse manager."**

10        Q    So let's go down on to the next, because this

11   is kind of a continuation of the same note.  It's kind

12   of hard to read these, but can you start with, it looks

13   like, "Tom Comeford"?

14        **A    Okay.  So it's dated 7/14/17.  Tom Comeford**

15   **about clarification of ROR.  Copy not in chart.  He was**

16   **not" -- I don't know this word.**

17        MR. KRETCHMAR:  Not quite interested?

18   BY THE WITNESS:

19        **A    Yeah, "not quite interested."**

20   BY MR. CECALA:

21        Q    I don't know what those two words are, but it

22   says, "Tom to call Vicky Ingram"?

23        **A    Right.**

24        Q    "She was not able to be reached, not" -- I

Page 192

1  can't read that.  Can you read what it says next?

2      A    No, I cannot.

3      Q    Well, then it says, "Bob thinks -- "Bob

4  thinks"?  Bob -- Bob Hanks" --

5      A    Bob Hanks.

6      Q    -- "got involved and was able to" --

7      MR. KRETCHMAR:  Able to reach.

8  BY MR. CECALA:

9      Q    -- "reach" another name --

10     A    Yes, and clarified --

11     Q    "Clarified that ROR, that the patient was

12  only to call mother."

13     A    I'm having a hard time reading this.

14     Q    And then the one, two, three -- fourth line

15  from the bottom, it says, "Patient was informed of ROR.

16  Investigating the call and will clarify issues with him

17  on Monday 7/17."  It says something "report allows him

18  to call mother," and then there's a signature.

19         I think the gist of the note -- I mean, with

20  the difficulty, would you agree that it's -- he's

21  really being restricted only to calling his mother;

22  they won't let him talk to his great-grandmother unless

23  he gets permission from someone else, correct?

24     A    Correct.

Page 193

1      Q   And then this is also on 7/14, "Social work

2  note.  Mr. Hurt approached this writer" -- I don't know

3  what that is.  "Social Worker Dan Malone" --  oh, "this

4  writer and Social Worker Dan Malone asked to call

5  grandmother.  The writer was in contact with" somebody

6  "and Dr. Ingram and" somebody else, "Tom Comeford,

7  and" -- it looks like Ann Boisclair.  And he sent them

8  a copy of the ROR regarding phone which indicates that

9  he only call to -- I can't read that.  If you can read

10  it, I would -- you know, I don't know if I'm . . .

11      **A**   **Yeah, I'm having a hard time reading that.**

12      Q   But you see what I'm reading.  If you think

13  something I'm reading is incorrect, please let me know.

14      **A**   **Sure.**

15      Q   "This writer and" -- something with -- "Dan

16  Malone to work Mr. Hurt to explain this to him and

17  indicate that on Monday, 7/17, we would" -- something

18  -- "write administration and the security chief whether

19  he could be allowed to contact his great-grandmother.

20  Request discharge.  The plan was given and accepted by"

21  somebody "and Vicky Ingram."

22      So it looks like he is appealing to different

23  people to try to call his great-grandmother is the

24  second note, correct, on the same day?

Page 194

1      A     Correct.

2      Q     Okay.  Going fast.

3            So your interpretation of the restriction of

4   rights as you saw it before was that Ben would be

5   permitted to call his family?

6      A     Yes.  Like I said, generally we allow

7   patients, and I do not remember -- I was not able to

8   recall the specifics of that.

9      Q     Can you explain in this circumstance why Ben

10  wasn't allowed to call anybody but his mother?

11     A     I do not know because it came from

12  administration and security.  I do not know.

13                          (Whereupon, Plaintiff's Exhibit

14                          No. 6 was marked for

15                          identification.)

16  BY MR. CECALA:

17     Q     So what I'm showing you now is there's a lot

18  of pages here but not a lot of questions.

19            Are you familiar with this document, Doctor?

20     A     Yes.  Comprehensive Psychiatric Evaluation

21  done by Dr. Javed.

22     Q     And it looks like the date of this is

23  July 15th, 2014, correct?

24     A     Right.

Page 195

1      Q    Oh, no.  I'm sorry.  It's July -- yes, that's

2  the date it was, yeah, dictated, July 15, 2014?

3      **A    Correct.**

4      Q    So that would have been about when Ben

5  arrived?

6      **A    Yes.  He came -- yes, correct.  This is**

7  **initial psychiatric evaluation.**

8      MS. JOHNSTON:  Can I put into the record that this

9  is Exhibit 6 --

10     MR. CECALA:  Oh, yeah.

11     MS. JOHNSTON:  -- Hurt Subpoena 015394?

12     MR. CECALA:  Thank you, Mary.  I'm trying to go

13  fast and missing stuff.

14  BY MR. CECALA:

15     Q    So that's the beginning of this exhibit.

16          Now, in this there's different sections.  So

17  the next page has his psychiatric history, item one,

18  two, three.  We're going back.  History of present

19  episode of the psychiatric illness.  There's a lot of

20  historical information, his past psychiatric history,

21  going back when he was a child.  And then here it says

22  drug and alcohol history, medical history,

23  developmental history.  And then there's the Part B,

24  mental status examination, right?

Page 196

1          So this is Dr. Javed as a psychiatrist doing

2     her mental status exam, correct?

3          **A     Correct.**

4          Q     And then here there's different parts.

5     Part C is potential for violence.  Sorry my computer is

6     going slow again.  So on this page, which is 15399,

7     there's Item G and Item F.  Item F says, Risk Factors

8     For Restraint.

9          Would restraint be considered only restraint

10    in the event the patient is becoming violent within the

11    facility and needs to be, you know, restrained, tied

12    down inside the facility, or does restraint mean

13    general restraint, like if he is going to go to court,

14    does he have to wear leg irons, and does he need to be

15    restrained then?  What does restrained -- risk factors

16    for restraint mean in this evaluation?

17         **A     When they are referring to the restraints in**

18    **this evaluation, it's full leather restraints.  In**

19    **patients with developmental disability, we do not use**

20    **full leather restraints, we only use Velcro restraints.**

21    **So in this, what they are referring is full leather**

22    **restraints.**

23         Q     Right.  And you have to factor in, you know,

24    if we do that to the patient, then he -- you know, he

LISA A. KOTRBA & ASSOCIATES, LTD. (312) 855-1834

Page 197

1    is obese or they are pregnant, then we have to

2    determine the risk factors for doing that, right?

3        **A    Correct.**

4        Q    And it says here, "The patient does not have

5    any psychological trauma, physical or sexual assault,

6    or any other contraindications for restraint use."

7             So you can use restraints on him, right?

8        **A    Correct.**

9        Q    Then G says, "Other factors:  Arson,

10   elopement, sexual acting out, restraints."  And it

11   says, "The patient has no arson or sexual acting out,"

12   right?

13       **A    Correct.**

14       Q    So this is on his arrival?

15       **A    Yes.**

16       Q    Okay.  And this is -- it looks like it's

17   signed June 16, 2014 by Dr. Javed.

18            Now, when you do your chart reviews, like you

19   did his discharge, right?

20       **A    Yes.**

21       Q    Did you get a chance to look at the annual

22   psych assessments?  He was only there three years.  Did

23   you see this one?

24       **A    I must have.  I don't recall.  When I did my**

Page 198

1   **annual -- I think I did one annual on him, so I'm sure**

2   **I did.**

3       Q    Okay.  And I just want to go to the bottom

4   here.

5           Problem identification and treatment:

6   Disorder of mood and psychosis, substance abuse and

7   aftercare planning is really all that's in there,

8   right?

9       **A    Correct.**

10      Q    So the next report is another exam, same --

11  same page one.  Now, it's not -- it's not signed here,

12  but it's July 16th, 2015, so after Ben had been there

13  one year, right?

14      **A    Right.**

15      Q    And Dr. Javed was his psychiatrist at that

16  time to your knowledge, right?

17      **A    Correct.**

18      Q    Okay.  So it's another report, and -- sorry

19  for the slowness.

20          So on page 15405, it says here on

21  November 29th, he exposed himself to a female nurse who

22  was providing treatment to his ankle --

23      **A    Right.**

24      Q    -- right?

1          He later denied the incident and had

2 difficulty accepting the wrongfulness of his behavior.

3          So as I looked through the chart, and as we

4 look through documents, and you're welcome to look at

5 it. We can all look at it later. But there's no

6 incident where he is exposing himself until this chart

7 entry or he is doing anything that would be

8 considered -- and I guess I should ask.

9          Would this be considered sexually abnormal

10 behavior?

11     **A   Yes, this is considered sexually**

12 **inappropriate behavior.**

13     Q   So the first instance of it happens right

14 here in his chart. It's actually not in his chart.

15 It's in the annual eval. We can go back in the chart

16 and find what happened, but it was -- a special note of

17 it was made in the annual evaluation.

18          Is there a reason why that would have been

19 noted at the annual psychiatric evaluation?

20     **A   I don't have his record. So you did not find**

21 **anything in the progress note, monthly progress note,**

22 **treatment plan, court report?**

23     Q   It actually says exactly what it says here in

24 his progress notes. On November 29th, that's where the

Page 200

1   information comes from.  It's in his progress notes

2   that he exposed himself.

3       **A    Okay.  So what is your question?**

4       Q    Is there a particular reason why --

5   there's a -- his progress notes are hundreds of pages

6   with all kinds of various information.  I'm wondering

7   why this particular instance was selected to be put in

8   his annual psychiatric review.

9       MS. JOHNSTON:  Object to speculation, but please

10  answer.

11  BY MR. CECALA:

12      Q    If you know as a psychiatrist having prepared

13  these, if you were the one putting it in -- you are

14  not -- understood, I am not asking you to speculate.

15  But from your professional opinion, a note like this,

16  why would it -- why would you have put a note in like

17  this?

18      **A    This is an incident of significant**

19  **importance, so when an annual psychiatric evaluation is**

20  **completed, all of the incidents of significant**

21  **important are mentioned, and in this incident when**

22  **patients have their symptoms because of sexual**

23  **inappropriate behavior, it is considered a symptom of**

24  **mania.  So this is the significance of it being**

Page 201

1   **documented in his annual evaluation.**

2       Q     Right.  And in that same paragraph -- can you

3   see where I'm pointing to here?  It says, "there was no

4   further sexual inappropriate behavior."

5       **A     Correct.**

6       Q   So that -- that kind of ended that episode.

7   It looks like he was on frequent ob's until

8   December 8th?

9       **A     Correct.**

10      Q   Okay.  But then "March 13th," down here, "he

11  received a 24-hour loss of privilege for making an

12  inappropriate comment toward a female staff, 'Nice

13  pants.  That's a tight" -- probably ass.  "When the

14  patient was called on the inappropriateness of his

15  comment, he stated, 'Pardon my French.'"

16          Is this also something -- it says

17  inappropriate.  Is this inappropriate sexual behavior?

18      **A     It is an inappropriate comment.**

19      Q   Well, yes.  What is -- but I'm just asking,

20  would you consider that comment to be sexual in nature,

21  "Nice tight ass"?

22      **A     Yes.**

23      Q   Then -- come on.  I'm sorry the computer is

24  as slow as it is.  Okay.  Great.  I'll stop it right

LISA A. KOTRBA & ASSOCIATES, LTD. (312) 855-1834

Page 202

1    there.

2         So I'm going back to letter F and G when

3    we're doing the -- this is the psych eval that the

4    psychiatrist did.  So letter F and G, they look to be

5    identical to the prior year, do they not?

6         A    Correct.

7         Q    Take a look at those.  They are?

8         A    Yes.

9         Q    Is there a reason that sexual acting out like

10   was just mentioned wouldn't be mentioned in this

11   section of the report?

12        MS. JOHNSTON:  Objection.  Speculation.

13   BY MR. CECALA:

14        Q    Okay.  Going back.  I'm asking you your

15   professional opinion about Dr. Javed's report.  I don't

16   want you to guess about what Dr. Javed may or may not

17   be thinking.  Just you looked at the chart.  You've

18   already testified you've looked at the chart, you

19   looked at these when you did his discharge, correct?

20        A    Correct.

21        Q    And even though you may not remember exactly

22   what you saw when you did his discharge, you did see

23   this document once before, right?

24        A    I'm sure I did.

1     Q    Okay.  I'm just building a foundation for

2  Mary.

3          So I don't -- I'm not asking you to tell me

4  what Dr. Javed was thinking about.  I'm asking you as a

5  psychiatrist who -- maybe I should ask.

6          Have you prepared these reports many times?

7     **A    Yes, I have.**

8     Q    So as a psychiatrist who has prepared the

9  report, can you help me understand why there would be a

10 mention of these inappropriate sexual acting out

11 incidents earlier and then not under letter G here?

12    **A    I'm not sure why she did not mention it.  I**

13 **did not prepare this report, so I cannot comment on it.**

14    Q    Okay.  But it's something that, perhaps,

15 should have been mentioned, right?

16    **A    Correct.**

17    Q    Okay.  So -- and then the signature page

18 here, it looks like Dr. Javed signed this on June --

19 July 22nd, 2015?

20    **A    Correct.**

21    Q    I'm going as fast as I can here, guys.

22         Page 15412, so if you look at this on the

23 Hospital Course, because it's an annual evaluation, on

24 July -- in July of 2015 he was placed on shift notes

Page 204

 1   and building -- his building permit was placed on hold

 2   on July 20th when a peer complained that Mr. Hurt was

 3   making sexual comments toward him.  He denied making

 4   sexual comments and accused the peer of making sexual

 5   comments toward him, saying -- calling him gay.

 6          Would Ben making sexual comments toward

 7   another patient be considered sexually inappropriate

 8   behavior?

 9      **A     Yes.**

10      Q    And this is in 2015.  We're outlining all of

11   the frequent ob's in the interest of saving time.

12          It doesn't look like he was put on frequent

13   ob's for this, correct?  It would say that, wouldn't

14   it?

15      **A     Yes.**

16      Q    So once again, this is the next year report,

17   and like you said, it's not your report, so I'm not

18   asking you to speculate -- gosh.  I got it.  Stop.

19          Same thing, Section F and Section G on the

20   restraints and on the other risk factors, it says

21   again, no sexual acting out.  We now have at least

22   three incidents, maybe four.  That's not mentioned

23   again.

24          Would you change your answer about your prior

Page 205

1   answer?  Because this isn't your report, I understand,

2   but is there any explanation you can offer for why that

3   may not be in there?

4       **A    I cannot offer explanation because it's not**

5   **my report.**

6       Q    Okay.  At the end of this, which is page

7   413 -- oh, jeez.  It's going fast.  Sorry.  I'm trying

8   to save time.

9            This is page 15413.  The last paragraph here,

10  it says, "In April, May, June and July of 2016,

11  Mr. Hurt was enrolled into the janitorial program and

12  is regularly attending.  He is also working on his

13  substance abuse issues by independently working on

14  12-Steps Program.  Due to his short Thiem date, the

15  team is pursuing privileges and will then work with the

16  patient toward a conditional discharge once appropriate

17  placement has been secured."  So here he is working on

18  substance abuse on his unit with his social worker,

19  right, or working independently?

20      **A    Yes.**

21      Q    So there's no mention of him needing to do

22  MISA at this time, right?

23      **A    Yes.**

24      Q    And again -- now, we're all of the way to

Page 206

1    July of -- this report is a July of 2016 report.

2    Again, Sections F and G are identical to what they have

3    been for the previous three reports.  Patient has no

4    arson or sexual acting out, and the restraints are the

5    same?

6         A    Correct.

7         Q    As you said, this is not your report, so

8    no -- I won't even bother asking you, but this looks

9    like it's the 2016 report signed by Dr. Javed, right?

10        A    Correct.

11        Q    Okay.  So this last one, Comprehensive Psych

12   Evaluation, it looks like this is dated July 3rd of

13   2017.  So this is prepared three days after the

14   incident, right, after his room was turned upside down?

15        A    Correct.

16        Q    And then if we look at -- just to verify what

17   we have been talking about, sources of information and

18   chief complaint number two on page 15418, "Chief

19   Complaint:  I am not happy that I can't use my passes."

20             Do you remember Ben telling you that?

21        A    Yes.

22        Q    Why did he say that?  Was he not able to use

23   his passes at that time?

24        A    Yes, his passes were placed on hold on

LISA A. KOTRBA & ASSOCIATES, LTD. (312) 855-1834

Page 207

**June 30th.**

    Q    Were his passes ever restored?

    **A    After that incident on June 30th --**

    Q    Yes.

    **A    No.  As far as I remember, no.**

    Q    And you now know that he was put on restriction of rights because he was sexually abused by Christy, right?

    **A    Now we know that, but at that time we did not know, and we knew that there was some investigation going on.**

    Q    Right.  But you didn't know that he had been being sexually abused by Christy, right?

    **A    I did not know it at that time.**

    Q    Right.  And then it says, "Sources of information are the following."  So you had to review documents to prepare the comprehensive annual psych evaluation, which was the one -- it was going to be his final one before he is released into the public, right?

    **A    Correct.**

    Q    And numbers four and five are interview of the patient, review of records from Elgin Mental Health Center.  So that's when what we're talking about is the review of his chart, his chart notes.  There's each of

Page 208

1    the different disciplines, activity therapy, social

2    worker notes, all of those various chart information

3    was made available to you to get this final psychiatric

4    eval done before he was going to be released to the

5    public, right?

6         A    Right.

7         Q    And that's what review of records means,

8    correct?

9         A    Correct.

10        Q    And you looked at those records?

11        A    Yes.

12        Q    Okay.  Sorry it's so slow.  Only because

13   we're trying to hurry.

14             So in his hospital course, item number ten --

15        A    Yes.

16        Q    -- what you've been saying, he maintained

17   psychiatric and behavioral stability, and that was from

18   your interview with him and review of the chart notes

19   and all of the information you had available, right?

20        A    Yes.  So this review is every year.  So it

21   just talks about the progress during the last year.

22        Q    Exactly.  So this is from July of the prior

23   year to July of -- July 3rd of 2017, right?

24        A    Yes.

Page 209

1      Q    Okay.  And on April 14th, his

2   great-grandfather died, right?

3      **A    Correct.**

4      Q    And you said he was able to deal with the

5   loss appropriately.

6           Did you talk to him about that?

7      **A    Yes.**

8      Q    And then this final part here is on

9   June 30th, "Mr. Hurt was restricted to the unit, and

10  all his passes were placed on hold.  He received ROR

11  for telephone due to an investigation against him."

12  Right?

13     **A    Right.**

14     Q    So you were aware of that when you did this

15  report.

16          Did you feel it was important in any way to

17  know why he was being investigated when you filled out

18  this report?

19     **A    We knew that there was an investigation, but**

20  **the administration was not telling us anything.**

21     Q    Yeah, no.  My question is different than

22  that.  You've said that many times.

23          Did you as his treating psychiatrist feel it

24  was important in providing this information for this

1    report to find out anything about that investigation?

2        A    It was important.

3        Q    What did you do to find anything out about

4    it?

5        A    I did not do anything because I knew that if

6    administration is not telling us anything that they

7    would not, so I did not do anything.

8        Q    Well, how did you know -- so if you didn't do

9    anything, how did you know that they weren't going to

10   tell you anything?

11       A    Because if they wanted to volunteer that

12   information, they would have done it themselves.

13       Q    So you didn't feel it incumbent upon you as

14   his treating psychiatrist to ask?

15       A    No, I don't think it was appropriate --

16   appropriate or my place to go and ask administration

17   why they were hiding it, why they were not telling me.

18   It was not my place to do that.

19       Q    Well, did you feel as though they were hiding

20   it?

21       A    Well, if they are not telling us anything,

22   then they are hiding it.

23       Q    So what information if you were speculating

24   as his psychiatrist out of necessity did you feel would

Page 211

1   have been unnecessary -- in other words -- let me

2   rephrase that.

3           He's about to be released.  It's his final

4   annual psychiatric review.  He is under an obvious

5   investigation about security.  They've turned his room.

6   They've gotten his stuff.  He can't call anyone.  Did

7   it ever cross your mind as his treating psychiatrist

8   that he may have done something dangerous and wrong?

9       **A      I thought about it, but he was**

10  **psychiatrically doing very well.  I did not see any**

11  **symptoms for me to think that he was dangerous to self**

12  **or others.  I knew there was an investigation and the**

13  **administration was not telling me anything.  So that's**

14  **all I can say.**

15      Q    Right.  But I'm just -- weren't you curious

16  at all?

17      **A      Yes, definitely I was curious.**

18      Q    And in your curiosity, what conclusions were

19  you drawing that made you believe it wasn't necessary

20  as his treating psychiatrist to getting any information

21  about this?

22      **A      I don't recall what conclusions I was**

23  **drawing.**

24      Q    Section D of your report, there's the

Page 212

1    assessment of suicide potential.

2       A    Yes.

3       Q    Can you read that, and when you're done, let

4    me know?

5       A    "To a reasonable degree of psychiatric

6    certainty, it is my opinion that while on medication in

7    the inpatient facility, the risk of suicide is low.

8    However, if he stops his medication and uses drugs, his

9    risk will increase."

10      Q    But there's also a whole paragraph before

11   that, that is part of the assessment for suicide

12   potential.  Do you see that whole paragraph before?

13      A    Yes.  Yes.

14      Q    That was also factored into your evaluation

15   and to provide your medical opinion about the risk of

16   suicide?

17      A    Correct.

18      Q    Are you aware that Ben had three suicide

19   attempts before February of 2018 after he was released

20   from Elgin?

21      A    At this time I don't recall that.

22      Q    Are you aware of it?

23      A    I'm sure I was at that time.  I don't

24   remember.

Page 213

```
 1      Q    No, no.  You were aware that after Ben's

 2  Thiem date, between July 22nd, 2017 and March 1st of

 3  2018 --

 4      A    I don't remember.

 5      Q    -- that he had -- let me finish my

 6  question -- that he attempted suicide three separate

 7  times; are you aware of that?

 8      A    I don't recall at this time.

 9      Q    I'm not asking you to recall it.  I'm asking

10  you if you're aware now that from July 22nd, 2017 to

11  March 1st of 2018, Ben Hurt attempted suicide three

12  times?

13      A    I think I will have to look at his records in

14  order to say that.

15      Q    Okay.  What records would you be referring

16  to?

17      A    His previous hospitalization records, his

18  previous records to see that it was a suicide attempt.

19      Q    Maybe you're misunderstanding my question.

20           Ben Thiemed out on July 22nd, 2017.

21      A    Correct.

22      Q    He left Elgin.  He never returned.  He has no

23  more records at Elgin whatsoever.  Do you understand

24  that?
```

Page 214

1      **A    Yes.  After -- after July 22nd, 2017, there**
2  **are no Elgin records.**
3      Q    Right.  From July 22nd, 2017 --
4      **A    Okay.**
5      Q    -- until March of 2018, after he left Elgin,
6  Ben Hurt attempted suicide three times.  Are you aware
7  that?
8      **A    Okay.  Now I'm understanding your question.**
9  **You are asking about after he left Elgin.**
10     Q    Yes.
11     **A    Okay.  Thank you for explanation.**
12          **I am aware during my preparation for the**
13  **testimony, I was made aware of this by my attorney.**
14     MS. JOHNSTON:  Objection.  Beyond that --
15  objection to the extent that it calls for any
16  attorney-client privilege.
17     MR. CECALA:  Well, I --
18     MR. JOHNSTON:  That came up fast.  I'm fine with
19  that, but beyond that --
20     MR. CECALA:  Well, you are -- she is aware of it.
21  BY MR. CECALA:
22     Q    I'm not interested in how you became aware of
23  it.  You are aware that that happened.  You don't have
24  to tell me what you talked about with your lawyer.  I

Page 215

```
 1   don't want to know that.  It's not appropriate for you

 2   to tell me about your lawyer conversations.

 3        MS. JOHNSTON:  We have been going for a long time.

 4        MR. CECALA:  Yes.

 5        MR. JOHNSTON:  I think she is getting very tired.

 6        MR. CECALA:  Yeah, we're almost there.

 7        THE WITNESS:  I just want to tell you I am

 8   actually not even comprehending all your questions

 9   because we're talking about suicide after, and

10   I thought we were talking about suicide in the past,

11   you know.

12   BY MR. CECALA:

13        Q    No, we're talking about suicide after he

14   left, after you prepared this report.

15        A    Now I understand.

16        MS. JOHNSTON:  She has answered the question.

17             Can we jump onto the next one then?

18   BY MR. CECALA:

19        Q    Okay.  Great.  So you're aware now.

20        A    Yes.

21        Q    Then letters F and G here --

22        A    Yes.

23        Q    -- risk factors for restraint use, none?

24        A    None.
```

LISA A. KOTRBA & ASSOCIATES, LTD. (312) 855-1834

Page 216

1      Q    G:  Mr. Hurt has no arson or sexual acting

2    out?

3      **A    Yes.  And here we are even talking about**

4    **during the last year.**

5      Q    Okay.  So that's why that would be there in

6    your report?

7      **A    Yes.**

8      Q    And just to make sure the record is complete,

9    last pages, is that your signature?

10     **A    Yes.**

11     Q    And you prepared the report and finalized it

12   on July 3rd, 2017?

13     **A    Correct.**

14     MR. CECALA:  I know we're past the time.  Give me

15   one second, and maybe we can just end.  Give me one

16   second, okay?

17   BY MR. CECALA:

18     Q    Okay.  I just want to ask you if you signed

19   his discharge summary, and then I think we're done.

20          I'm going to show you the page.  Okay.  This

21   is the wrong file.  Oh, these are the morning meeting

22   notes.  Okay.  Hang on.  Sorry.  One more second.

23     MS. JOHNSTON:  Do you know what exhibit you're

24   looking for, Joe?

Page 217

 1      MR. CECALA:  Yeah.  Sorry about our confusion, but

 2  I thought I had his discharge summary.

 3  BY MR. CECALA:

 4      Q    I can just ask you.  Dr. Javed (sic), you

 5  were the doctor who discharged Ben on July 22nd -- I'm

 6  sorry.  Dr. Kareemi?

 7      **A    Yes, I was.**

 8                    **(Whereupon, Plaintiff's Exhibit**

 9                    **No. 7 was marked for**

10                    **identification.)**

11      MR. CECALA:  Okay.  And I don't need to go through

12  this.  I have the discharge summary.  I thought it --

13  oh, I know.  It was Exhibit 7.

14          Mary, can we just stipulate that she was the

15  discharging doctor and she signed the discharge

16  summary?  I'm pretty sure it's her signature, but

17  that's all I wanted to ask her.

18      MS. JOHNSTON:  One second.

19      MR. CECALA:  It's on June -- July 21st, 2017, and

20  my computer is so slow.

21      MS. JOHNSTON:  I'll stipulate to it.

22      MR. CECALA:  Okay.  Well -- shoot.

23      MS. JOHNSTON:  Here, how about this.

24          Can you stop sharing your screen?

Page 218

1      MR. CECALA:  Here.  If it's okay -- I mean, it's

2  just the discharge summary.

3      MS. JOHNSTON:  Yeah, I have no problem with that.

4  I found it.  I can share it on my screen if you want.

5      MR. CECALA:  It's okay with me.  I mean, I know

6  that the document is Bates stamped 16789, and the page

7  number is 16814 with her signature.

8      MS. JOHNSTON:  Yes.

9      MR. CECALA:  Okay.  Fine.  We're stipulating to

10  that page in the discharge summary.

11          And then one last thing is this.  I just want

12  to make sure that you have seen this, Doctor.  I don't

13  want any surprises if we're going to trial.  Last

14  questions.

15          Why is this page out of order?  I don't think

16  I gave you this exhibit, which means that it's on me,

17  and we didn't get it.

18                          (Whereupon, Plaintiff's Exhibit

19                          No. 12 was marked for

20                          identification.)

21      MS. JOHNSTON:  We got Exhibit 12.

22      MR. CECALA:  Yeah, the pages are incorrect.

23  Something is wrong with the page numbers because

24  there's a July 3rd, it's actually page 48.  It says

Page 219

1    there's 53 pages, but somehow page 48 is wrong.

2        MS. JOHNSTON:  It's going in reverse order.

3        MR. CECALA:  Well, it's December -- oh, it's

4    reverse order.  So she scanned it backwards.  I'm

5    sorry, guys.

6        MS. JOHNSTON:  It's page six of that PDF.

7        MR. CECALA:  We'll beat up the paralegal.

8            Sorry, but there's the delay, which causes

9    this type of scrolling situation.

10       MR. KRETCHMAR:  That's 53.

11       MR. CECALA:  43.

12       MR. KRETCHMAR:  You want 48.

13       MS. JOHNSTON:  Page six in the PDF.

14       MR. CECALA:  Yeah.  I'm trying to go fast without

15   going so slow.  Well, here, 50 -- let's just start with

16   page -- let's just start with the one that it's giving

17   me.  Page six.  Come on.  I know it's so incredibly

18   slow.  All right.  Here we go.

19   BY MR. CECALA:

20       Q    I just want to ask you quickly.  So do you

21   see what is on the screen, Doctor?

22       **A    Yes, morning report.**

23       Q    Right.  And it's from Robert Lee?

24       **A    Correct.**

Page 220

```
 1        Q    And I think you're in here.  Do you see your

 2   name?

 3        A    Let me -- yes -- yes, I do.

 4        Q    Right here?

 5        A    Yes.

 6        Q    Faiza Kareemi?

 7        A    Yes.

 8        Q    So you get the morning report email every

 9   day?

10        A    Yes.

11        Q    And you got this one on July 3rd?

12        A    Yes.

13        Q    So all of these people were informed of the

14   morning report on July 3rd?

15        A    Yes.

16        Q    And I just want to make sure it's -- where is

17   his ROR?  Sorry.  I'm just as tired, and I really want

18   to be done just as much as you do.

19        MS. JOHNSTON:  Page 49.  It has one, at least,

20   that's from July 8 -- or July 5th.

21   BY MR. CECALA:

22        Q    The point is that in the morning report is a

23   summary of the morning meetings, and at the morning

24   meetings everyone would have received the -- this is
```

Page 221

1    47, 48, 49.  Oh, there it is.  Okay.  Right in the

2    middle of the page, Doctor.

3           This was a standard note of the morning

4    report starting on June 30th, which says, "ROR for

5    phone from Friday, 6/30, to Monday due to an ongoing

6    security investigation.  Security recommended this

7    should be extended.  He is restricted to the unit.  All

8    passes are on hold until further notice from security.

9    See nurse notes below."

10          But the point I'm making about this is you

11   received the email.  Everyone that's on this email

12   which is here would have received notice that there's

13   this investigation concerning Ben and on the same day

14   that Christy was walked off the facility, right?

15       **A    Correct.**

16       Q    I have one last question.  It seems like

17   there's a lot of security in all facets in various ways

18   that Elgin has.  There's trained behavioral experts

19   like yourself, security team, social worker,

20   psychologists, security therapy aides.  It's a secure

21   psychiatric facility where patients can be put on --

22   when they say 15-minutes ob's, they are actually

23   watching them and writing down every 15 minutes what

24   they observed them do for the last 14 minutes, so it's

Page 222

1   really constant observation, and every 30 minutes

2   patients need to have head counts, all of this

3   incredible security that goes on at Elgin with people

4   who are on high alert and do the reports to OIG that

5   we've talked about.

6          My question is:  Considering all of this high

7   intense behavioral expert and security, how do you

8   think it was that Christy Lenhardt was able to get away

9   with having sex with Ben Hurt in her office for all of

10  those years?

11     **A     I don't know.  I don't know how to answer it.**

12     Q     Okay.

13     **A     One thing I want to say that patients who are**

14  **not on frequent observation, they are monitored every**

15  **half hour.  Patients who are on frequent observation,**

16  **they are monitored every 15 minutes.**

17     Q     Right.  That was the point of my question.

18  Every patient has to be observed by a staff person

19  every 30 minutes.

20         I'm just wondering if you have any insight as

21  to how Christy carried on a sexual affair with Ben Hurt

22  for nearly two and a half years.

23     **A     I don't.**

24     MR. CECALA:  We don't have any further questions.

Page 223

1     MS. JOHNSTON:  No questions for me, Dr. Kareemi.

2  Thank you so much --

3     MR. CECALA:  Doctor, I'm so grateful.  Thank you

4  for your time and patience.

5     MR. JOHNSTON:  -- for your extreme patience.

6     MR. CECALA:  Yeah.  We are very gracious.

7     MS. JOHNSTON:  Do you want to reserve signature

8  and review this transcript for accuracy, or do you want

9  to trust that Lisa has taken everything down and waive

10  signature and then you're all done?

11     THE WITNESS:  I would like to review it.

12     MS. JOHNSTON:  Okay.  Great.  We'll reserve

13  signature.

14     MR. CECALA:  We're ordering.

15     MS. JOHNSTON:  Same.

16          AND FURTHER DEPONENT SAITH NOT

17

18

19

20

21

22

23

24

Page 224

1              IN THE UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF ILLINOIS
2                      EASTERN DIVISION

3   BENAHDAM HURT,                    )
                                      )
4                   Plaintiff,        )
                                      )
5              -vs-                   )  No. 17-cv-7909
                                      )
6   HASINA JAVED, FAIZA KAREEMI,      )
    COLLEEN DELANEY, DIANA HOGAN and  )
7   DREW BECK,                        )
                    Defendants.       )
8   _____ )
    MARK OWENS,                       )
9                   Plaintiff,        )
               -vs-                   )  No. 18-cv-0334
10                                    )
    HASINA JAVED,                     )
11                  Defendant.        )

12

13          I hereby certify that I have read the

14   foregoing transcript of my deposition given at the time

15   and place aforesaid, consisting of pages 1 to 223,

16   inclusive, and I do again subscribe and make oath that

17   the same is a true, correct, and complete transcript of

18   my deposition so given as aforesaid and includes

19   changes, if any, so made by me.

20

21                        _____
                                   FAIZA KAREEMI, M.D.

22   SUBSCRIBED AND SWORN TO
    before me this _____ day
23   of _____, A.D. 2022.

24   _____

Notary Public

Page 225

1        I, LISA A. KOTRBA, a Certified Shorthand
Reporter within and for the State of Illinois, do
2  hereby certify:

3        That previous to the commencement of the
examination of the witness, the witness was duly sworn
4  to testify the whole truth concerning the matters
herein;

5

6        That the foregoing deposition was reported
stenographically by me, was thereafter reduced to a
printed transcript by me, and constitutes a true record
7  of the testimony given and the proceedings had;

8        That the said deposition was taken before me
at the time and place specified;

9

        That the reading and signing by the witness
10  of the deposition transcript was agreed upon as stated
herein;

11

12        That I am not a relative or employee or
attorney or counsel, nor a relative or employee of such
attorney or counsel for any of the parties hereto, nor
13  interested directly or indirectly in the outcome of
this action.

14

15        IN WITNESS WHEREOF, I do hereunto set my hand
at Chicago, Illinois, this 12th day of July, 2022

16

17

18                                
        Certified Shorthand Reporter
19        State of Illinois

20

21  CSR License No. 084-002777.

22

23

24

**A**

**A's** 59:4
**A.D** 224:23
**a.m** 164:23
165:2,3 177:10
**Aah** 116:14
166:6
**able** 25:1 61:23
134:21 135:2
137:7 158:1
166:3 179:24
180:4 189:11
191:24 192:6,7
194:7 206:22
209:4 222:8
**abnormal** 199:9
**absolutely** 51:1
87:10 104:7
119:22 120:11
120:11 122:3,7
146:17
**abuse** 18:5 56:3
57:4 59:14,15
65:8,10 66:24
67:10 68:11
73:24 76:14
83:12,21 84:23
104:11 112:1
112:14,22
113:13 114:16
116:20 152:16
168:3 180:23
198:6 205:13
205:18
**abused** 49:7
76:6 179:21
180:4 207:7,13
**abusive** 55:14
56:17,21
**accelerate** 173:1
**accepted** 193:20
**accepting** 199:2
**access** 164:1
**accessibility**
148:16
**accident** 87:6
**account** 12:8
19:12 148:14
**accuracy** 223:8

**accurately**
175:10
**accused** 140:8
204:4
**accusing** 149:21
152:16
**acoustics** 6:19
**act** 74:16 134:22
135:3 139:10
**acted** 46:13,18
49:16,20,24
**acting** 186:7
197:10,11
202:9 203:10
204:21 206:4
216:1
**action** 149:4
225:13
**actions** 147:14
**activities** 177:14
**activity** 11:19,21
17:22 56:19
61:9 102:21
112:11 124:10
129:9 135:16
135:23 136:6
143:19 176:24
208:1
**actual** 118:9
**add** 53:5
**addition** 8:10
45:16 134:2
**address** 153:4
**addressed**
149:13
**adjudicated**
154:2
**administering**
4:3
**administration**
38:22 41:8
43:10 52:7
66:2,9,16,21
67:13,14,15,16
80:6,7,13 81:8
102:24 134:18
159:8 181:14
181:16,18,23
186:8 190:9

193:18 194:12
209:20 210:6
210:16 211:13
**administratio...**
66:3,5
**administrative**
10:16,22 11:1
11:9 66:11,13
66:17 156:23
183:19
**administrator**
11:7
**admissions**
112:1
**admitted** 132:18
135:6 136:13
143:9,24
178:16
**admitting**
136:17
**advised** 187:13
188:17
**advocate** 147:17
147:18 152:1,2
152:10 187:19
**affair** 222:21
**affirmative** 46:9
**aforesaid** 224:15
224:18
**aftercare** 198:7
**aggressive** 95:24
**ago** 43:21 60:6
78:22 79:15
81:15 86:7,13
108:3 109:13
116:1 128:4,4
**agree** 4:2 111:2
184:6,8,12
192:20
**agreed** 177:17
184:18 225:10
**agreement** 4:5
19:21 170:7
**agrees** 19:24
**ahead** 13:23
29:24 34:14
76:4,7 132:9
145:19 159:24
160:3

**aides** 124:11
221:20
**alarms** 149:19
**alcohol** 195:22
**alert** 222:4
**allegation** 81:2
83:8,10,11,11
83:12,14,21,22
84:4 111:1,2,6
111:12 129:5,7
147:13 150:5
**allegations** 6:9
23:13 24:10
33:8 47:10
48:23 59:3,8
59:14 109:6
129:4,13
137:17 149:11
150:12 152:15
**allege** 108:22
**alleged** 137:8
148:4,14 149:8
150:18,24,24
**allegedly** 49:6
**alleging** 149:10
**allow** 8:17 158:2
177:14 194:6
**allowed** 34:1
42:22 118:4
154:4,9,10
157:4,22
180:20 181:7,9
186:13,15
187:16 193:19
194:10
**allows** 192:17
**aloud** 69:10
**altercation**
64:11,14,16
160:20 161:2
161:11 162:18
163:5 166:21
166:23 170:1
171:3
**alternative** 68:5
**amount** 24:21
**and/or** 111:12
116:22 158:8
**Anderson** 145:8

145:10
**Andrew** 39:5
145:13
████████ 106:17
106:23 107:11
108:7,10,16,23
109:3 110:12
110:17,21,22
178:21 189:24
190:2
**ankle** 177:15
198:22
**Ann** 144:14,15
144:18,24
145:17,21
193:7
**annual** 197:21
198:1,1 199:15
199:17,19
200:8,19 201:1
203:23 207:17
211:4
**answer** 5:2 6:2
15:1,1,1
18:20 22:15,16
22:20 25:1
27:1 28:16
30:2,17 31:6
31:21 32:3,7
33:12,13 35:17
38:15 45:24
46:10,12 47:20
50:20,20,24
53:15 54:1,3,5
54:19 55:20
59:8,13 60:21
61:1 62:12
63:20 64:5
69:5,20 71:9
71:10 72:11
73:16 74:3,6
74:18 76:1
77:20 82:22,23
82:24 83:7,20
83:24 84:17
85:11 86:5
88:6,6,19 89:4
89:15 91:18
96:2 104:5,6

105:3,5,6
106:9,14
111:18 113:22
115:10 117:3
117:13,14
118:19 119:8
119:22 120:1,9
122:3,6,12,19
123:17 127:13
128:22 129:23
130:22,23
131:5 133:7
139:22 154:7
200:10 204:24
205:1 222:11
**answered** 25:4
28:13 31:5
45:2 59:24
70:18 78:11
126:10 215:16
**answering** 33:12
48:10 72:9
83:1,3
**answers** 7:10
21:3 33:24
59:4,18 60:2,7
60:11 80:7
**Antoinette** 26:22
27:2
**anxiety** 116:20
**anxious** 85:11
**anybody** 4:24
39:10,14 46:22
47:16 77:17,18
78:16 83:15
84:1 112:12
119:16 123:16
136:10 144:4
169:5 194:10
**anybody's** 10:1
**anyway** 173:22
**apologize** 24:19
51:11
**apparently**
185:21
**appeal** 183:23
183:24
**appealing**
193:22

**appear** 24:20
**APPEARANC...**
2:1
**appointed** 152:2
**appreciate** 38:15
179:14
**approached**
193:2
**appropriate**
74:10 118:5
133:16 205:16
210:15,16
215:1
**appropriately**
209:5
**appropriateness**
96:10
**approval** 66:3,5
66:8,15 67:12
67:14,15 146:7
**approve** 66:2
**approves** 66:21
**approving** 67:18
**approximate**
64:5
**April** 86:18
205:10 209:1
**area** 19:12 89:10
146:6 150:17
151:3,10
157:24
**areas** 11:23
12:10
**argue** 31:24 34:5
**arrival** 197:14
**arrived** 168:9
195:5
**arson** 197:9,11
206:4 216:1
**Aside** 106:11
**asked** 5:1 11:4
11:13 12:24
13:11 32:8
38:18 41:24
42:16 48:8,11
56:1 59:17
62:10 64:1
71:3 76:22
80:18 85:2,8

85:17 97:4
113:20,24
114:2 115:6
127:11,14
183:22 184:14
187:18 190:24
193:4
**asking** 23:22
25:6,12 28:12
28:15,17 29:23
30:14 31:20
32:10 33:5,7
34:7,23 42:18
48:1,4,9 52:22
57:2 59:3 60:2
60:9,16 68:24
71:6,7 74:22
77:11 79:19
88:2,5 89:20
98:2 106:3
113:3,6 121:23
138:14,19
152:6 159:12
159:13 200:14
201:19 202:14
203:3,4 204:18
206:8 213:9,9
214:9
**asks** 21:22,23
50:6 53:10
59:10,15 78:10
82:9,17 88:15
104:14 106:5
111:7 116:21
120:7 122:8,17
128:19 130:20
**ass** 201:13,21
**assault** 197:5
**assaulted** 104:2
**assertion** 49:16
**assertive** 121:3
**assesses** 153:9
**assessment**
212:1,11
**assessments**
197:22
**assistance**
141:16
**assume** 26:24

27:9 86:2,3
**assumed** 86:4,6
125:6,10
**assuming** 84:23
85:1,21 121:4
126:6
**attachment**
141:8,10
**attacked** 101:8
**attempt** 213:18
**attempted** 213:6
213:11 214:6
**attempts** 212:19
**attend** 61:10
99:8 110:1
**attendance** 62:1
**attending** 61:17
166:2 205:12
**attention** 69:16
71:24
**attorney** 2:12
22:18,19 89:8
214:13 225:12
225:12
**attorney-client**
214:16
**attractive** 133:6
**audio** 136:17
178:9,13,16,20
179:3,24 180:2
189:17
**August** 7:15
155:11,17
170:23
**automatically**
139:1 164:7
**available** 118:22
120:8 140:20
208:3,19
**Avenue** 2:8
**average** 172:4,7
**aware** 6:5 27:16
27:19,20 28:2
28:3,4,6,7,11
28:18,22 29:2
29:6,9,17,19
29:24 30:9,10
30:11,21 36:18
38:22 40:3,4

40:20 46:22
47:5,7 49:1,23
49:24 50:1
52:3,11 54:7,9
54:11 57:20
70:24 72:3
73:10 76:16,19
76:22 77:1
81:1 92:8,15
96:17,20
104:10,15,23
112:11 113:16
114:19 115:7
117:1,10 121:9
122:18 135:6,8
135:15 137:17
143:9,14,19
144:1 157:1
159:2,4,13,14
159:18 170:11
170:14 187:24
188:23 189:1
189:22 190:4
209:14 212:18
212:22 213:1,7
213:10 214:6
214:12,13,20
214:22,23
215:19

---

**B**

**B** 3:6 147:13
148:2 195:23
**back** 9:15 11:12
21:17 27:23
45:20 65:2,6
68:6,21 72:11
87:17,21 88:13
103:4 111:8,9
113:3,14 115:5
121:14,17,19
127:9 128:24
165:9,17,20
169:18,21
171:15 174:20
175:12 180:15
190:12 195:18
195:21 199:15
202:2,14
**backtrack** 33:1

33:5
**backwards**
219:4
**bad** 78:12
164:17
**bag** 186:2
188:20,23
**balance** 16:6
120:22
**banging** 161:2,6
161:12
**based** 37:1 53:2
114:10,12,14
149:10
**basically** 18:2
19:6 187:1
**Bates** 188:7
218:6
**beat** 167:5 171:4
219:7
**Beck** 1:8 39:5,11
40:17 43:4,18
43:19 45:10,12
124:19 126:2
126:14 145:13
168:20 169:4
224:7
**becoming**
169:17 196:10
**beginning** 21:20
118:24 176:21
195:15
**begins** 84:17
111:3,18
157:11 160:6
**behalf** 2:6,11,17
**behavior** 96:10
111:15 149:12
152:20 155:20
163:8 199:2,10
199:12 200:23
201:4,17 204:8
**behavioral**
208:17 221:18
222:7
**believe** 8:5 9:9
10:10 15:2
34:13 47:15
53:18 54:21

56:12 83:15,21
84:1,12,15
90:5,6,11,15
90:20 113:8
125:2 131:21
136:14 137:11
211:19
**believed** 84:4
**belt** 177:15
**Ben** 4:9 24:14
41:7 42:21
43:2 44:13
46:21 51:3
52:3 53:13,24
54:8,18,23,23
55:7,9,24 56:8
57:15 59:23
63:20 64:11
65:11 66:23
68:13 70:24
71:4 72:4
76:17,18,24
83:22 85:21
86:15 95:21
96:8 99:5,19
99:23 100:3,7
100:24 102:20
111:3,6,14,14
112:9 113:8,13
116:19 117:11
119:14 120:12
120:22 122:19
123:8 124:4
125:5,5,11,22
125:22 127:2,3
127:12,19
128:10,21,23
129:9,17 130:1
130:10,14,15
132:18 140:8
140:20 141:19
141:23 143:6
143:10,15,22
154:16 155:8
155:16 156:9
157:2 158:22
158:22 159:15
159:16 161:2,5
161:11,13

162:22 164:4
167:1 169:14
169:18,21
170:7,14,17
171:3 173:17
175:2,16 178:9
178:11,16,20
179:5,11,17,21
180:3,4,8
181:2,4 189:22
194:4,9 195:4
198:12 204:6
206:20 212:18
213:11,20
214:6 217:5
221:13 222:9
222:21
**Ben's** 41:24 52:7
54:13 65:8
96:10 97:7,23
98:10,15 113:3
155:21 157:17
160:9 163:19
166:16 171:8
176:22 185:15
213:1
**Ben/Christy**
141:15
**BENAHDAM**
1:4 224:3
**best** 54:4 74:6
150:20
**better** 16:19
20:14 22:6,7
**beyond** 72:14,16
73:20 74:8,9
74:15 214:14
214:19
**big** 78:7 82:5
85:4 151:20
156:19
**bigger** 93:14,17
93:21
**Bill** 145:11
181:22
**binding** 4:3
**bipolar** 19:8,16
**bit** 6:15 69:15
70:10 72:18,21

73:15 79:18
90:8 95:15
155:22 166:18
185:8
**blind** 94:3,23
95:4,7
**blood** 16:3
**blows** 64:15
**board** 7:12
**Bob** 38:19 39:1
39:11 40:19
42:6 43:3,13
44:14,19,23
45:9,11,15,23
79:7,11,11
123:2 124:18
126:2,14
127:12,13
128:14,15
129:10 143:7
143:22 168:20
169:4 175:2,17
185:17 192:3,3
192:4,4,5
**Bob's** 125:8
**Boisclair** 144:14
144:15 145:17
193:7
**bone** 190:11
**bother** 206:8
**bothering** 112:8
112:20
**bottle** 62:5
**bottom** 21:9
110:23 117:7
118:16,21
121:22 122:2
122:17 141:4
144:12 146:1,2
146:24 154:18
170:10 184:23
192:15 198:3
**box** 158:7
**brain** 16:6
**Bread** 115:23
**break** 5:10,11
24:21 87:9,20
119:24 121:10
121:16

**breasts** 136:19
**bring** 69:4 166:7
180:15
**broken** 105:4
**building** 78:5
115:9 203:1
204:1,1
**bunch** 144:10
149:18
**burden** 152:17
**burning** 33:3

_____

C

**C** 148:2 149:8
196:5
**C-e-c-a-l-a** 4:11
**call** 5:16,19,22
31:1 35:8
36:11,19 51:11
52:18 72:17,17
72:23 73:1,4,5
73:16,20,24
74:10 104:3
114:17,18
118:23,24
119:1,24 120:3
120:5,5,15
152:7,8 157:7
157:22 180:21
191:1,22
192:12,16,18
193:4,9,23
194:5,10 211:6
**called** 4:18 8:6
25:14 56:24
66:10 119:19
158:11 184:16
191:8 201:14
**calling** 42:1
80:12 115:13
118:17,20,21
143:16 192:21
204:5
**calls** 30:19 41:10
42:1,23 102:15
159:17 181:10
181:24 214:15
**calm** 155:5
185:3
**canceled** 176:11

**CANNON** 2:21
**capacity** 74:16
**car** 190:2
**care** 16:22 35:14
    99:10 115:1
    125:15 130:7
    147:23 148:11
    148:12 149:2,5
    151:5 152:13
    176:8
**career** 17:14
    18:14
**carefully** 152:6
**carried** 222:21
**carrying** 106:1
**case** 2:18,18
    4:15,15 10:3
    12:13 17:5
    22:24 47:12
    60:13 65:8
    68:9 70:12
    74:1 87:13
    100:9 102:23
    103:1 134:23
    136:15
**caseload** 17:21
    71:19
**cases** 94:24
    140:16
**casual** 35:20
**cause** 18:18 19:2
    19:4 112:8
    159:15
**caused** 159:5
    163:21
**causes** 219:8
**Cecala** 2:2,2,7
    2:23 3:5 4:11
    4:11 7:5 15:11
    20:1,3,10,13
    20:16,18 24:6
    24:8 27:23
    28:1 29:21
    30:1,7 32:8,17
    32:23 33:2,10
    33:24 34:8,15
    34:18 41:20
    44:8,9 45:19
    45:22 51:14,19

51:23 52:1
58:1,18,20
62:6,8 68:22
70:8 86:20,23
87:1,6,10,17
87:21,23 103:5
103:10,15,17
121:11,13,17
121:19,21
127:6,9 128:18
141:1 144:9
154:14 159:22
160:3,5,23
161:1 174:2,17
174:19,21,23
175:13,15
188:7,9 190:14
190:16 191:20
192:8 194:16
195:10,12,14
200:11 202:13
214:17,20,21
215:4,6,12,18
216:14,17
217:1,3,11,19
217:22 218:1,5
218:9,22 219:3
219:7,11,14,19
220:21 222:24
223:3,6,14
**Center** 7:13,16
8:4,8 9:19
14:13 27:8
47:6 48:22
178:22 207:23
**certain** 17:12
94:24 172:15
**certainty** 212:6
**certificate**
100:21
**certified** 1:19
7:12 146:8
225:1,18
**certify** 32:2
100:11,16,17
101:4 224:13
225:2
**cetera** 170:13
**chain** 142:5

**chance** 60:7
197:21
**change** 55:19
60:11 103:6
155:20 170:12
204:24
**changed** 9:7,8
60:10
**changes** 24:7
53:1 224:19
**channels** 118:22
119:21 120:7
**characterized**
66:18
**characterizing**
96:8
**charge** 9:24 10:4
10:13,15
147:14,15
148:19 149:14
**charges** 140:5
**chart** 97:7,8,24
98:8,15 99:2,3
151:1 154:17
160:10 166:11
166:16 171:8
174:3,4,12
175:17 176:2
176:22 187:21
188:11 189:2
191:15 197:18
199:3,6,14,14
199:15 202:17
202:18 207:24
207:24 208:2
208:18
**charts** 150:23
**check** 87:12
152:23
**checked** 158:7
**checking** 173:1
**checklist** 150:12
**Chicago** 2:15
225:15
**chief** 141:7,12
141:18 142:16
181:19,21
191:8 193:18
206:18,18

**child** 195:21
**Christmas** 63:15
**Christy** 24:14
26:20 38:4
41:13 42:23
43:2 44:12
49:10 50:9,11
51:3 53:12,13
53:24 54:18,22
55:7,9 56:1,9
56:11 57:15
59:11,23 60:16
60:18,23 61:16
61:18,23 62:11
62:17,24 63:7
63:12 67:20,22
70:23 71:3
72:4 76:17,18
76:23 77:19
78:2,4 79:10
81:24 82:1
83:22 85:21
86:15 104:17
105:15,24
106:9,12,21
108:7,10,15
109:3 110:12
110:16,21
111:3,6 113:20
115:7 117:11
121:8 122:18
123:7,18 125:7
127:12,19
129:5 130:1,10
130:12,15,21
131:4,5,15,18
131:19,23,24
132:10,18
135:6,10
136:13,15,17
140:3,19,20
141:19,23
143:6,9,10,15
143:22 168:21
169:4,13,17,20
175:2,16 178:9
178:10,14,20
178:21 179:5,5
179:17,21

180:2 189:24
207:8,13
221:14 222:8
222:21
**Christy's** 86:16
**circumstance**
194:9
**circumstances**
65:4 73:5 74:2
74:17,20 75:24
**civil** 1:17 109:17
**claims** 24:5 27:1
29:19 30:5,12
34:20 39:2,13
45:17 46:14,19
190:7
**clarification**
191:15
**clarified** 192:10
192:11
**clarify** 5:10 9:12
24:3 48:9
51:23 62:22
86:22 139:22
139:24 157:20
192:16
**clarity** 52:21
**class** 187:5
**classes** 186:21
187:3
**clear** 32:3,10,15
32:17 70:2
80:7 98:21
**clearly** 95:3
161:4 184:23
184:24 185:4
**clerical** 10:22
**clinic** 89:10
**clinical** 10:9
66:18,20,23
67:5,12 148:19
153:3 186:2,5
188:13
**clinically** 67:1
**close** 45:5,7
76:17 92:22
94:8 95:6 99:9
100:5 122:9,14
134:13,15

190:17
**closed** 35:19
  85:6 91:17
  92:18,20 93:2
  185:1
**closely** 16:17
  43:17,22
**closer** 172:6,6,8
  173:6
**clue** 177:17
**CNM's** 146:8
**co-worker** 187:9
**co-workers**
  82:11
**code** 163:6
**cognitive** 19:10
**Coincidentally**
  52:14
**collaboration**
  8:18 10:2,5
**Colleen** 1:7 2:17
  44:1 124:20
  126:2,14
  142:14,15
  145:6 168:24
  169:3 224:6
**color** 190:8
**come** 19:21
  76:13 87:17
  96:6 103:4
  115:5 121:14
  123:8 129:20
  129:20 169:21
  201:23 219:17
**Comeford**
  191:13,14
  193:6
**comes** 11:14
  74:14 100:18
  111:10 133:4
  200:1
**comfortable**
  93:6
**coming** 62:15
  99:9,24 100:4
  103:19 115:12
  115:15 124:5
  125:8 136:5
  138:9,22

139:19 169:18
173:18 187:5
**commenced**
156:20 158:24
**commencement**
225:3
**comment** 201:12
201:15,18,20
203:13
**comments** 42:13
204:3,4,5,6
**commitment**
100:21 101:10
101:19 102:8
**commonplace**
64:17
**communicate**
108:23 115:7
**communicating**
116:12
**communication**
29:16 31:16
33:19 35:20,21
36:9 108:16
116:9 119:22
**compel** 34:12
**compelled** 32:3
**compelling**
179:4
**complain** 71:22
**complained**
204:2
**complaining**
69:19,23 71:12
71:15 72:3
76:5
**complains** 71:18
**complaint** 21:24
22:11 23:5,6,8
23:14,17 25:7
25:7,15,21
26:16,19 27:10
29:19 33:9
34:21 39:2,13
39:18,22 40:1
40:6,11 42:7
44:3,6,11,20
46:10,15,20
47:11 48:18,21

49:19 107:8,9
206:18,19
**complaints**
46:23 48:2
**complete** 65:11
100:1 148:3
150:19 168:1
170:8 172:2,14
173:5 216:8
224:17
**completed** 7:13
175:21 200:20
**completely**
174:21 181:6
**completing**
172:18
**compliant**
125:23
**comply** 184:10
**composition**
148:16
**composure**
185:5
**comprehend**
166:3
**comprehending**
215:8
**comprehensive**
150:23 194:20
206:11 207:17
**computer** 20:8
58:15 62:6
82:10 97:15,16
97:19 98:5,10
98:15,22 99:1
196:5 201:23
217:20
**computers** 21:19
**concede** 33:11
**concern** 105:1
143:6
**concerned** 54:24
78:15 125:21
141:15,19,23
142:3,4,16
**concerning**
76:19 186:3
221:13 225:4
**conclude** 137:3

180:4
**concluded**
179:21
**conclusion**
49:19 138:15
**conclusions**
211:18,22
**concrete** 136:9
**condition**
170:12
**conditional** 13:1
13:7 99:11
101:20,24
173:7 205:16
**conditionally**
102:1 172:22
173:2
**conduct** 32:12
186:18 187:5
**conducted** 52:11
102:14 186:1
**conference**
91:24 93:4
185:2
**confidentiality**
35:14 92:21,24
**confined** 118:8
153:20 154:2
**confiscated**
186:2
**conflict** 172:13
**confused** 32:21
33:6
**confusion** 217:1
**connection** 56:6
56:16
**consecutively**
154:19
**consensual**
118:3,13
120:19 153:17
153:21 154:1,8
180:19
**consensus** 168:2
168:5,9 169:14
170:6
**consent** 118:9
147:16
**consider** 92:7

96:13 109:21
131:19 201:20
**considered**
122:1 196:9
199:8,9,11
200:23 204:7
**Considering**
222:6
**consisted** 126:14
**consistently**
104:2
**consisting**
224:15
**constant** 222:1
**constantly** 104:1
104:7
**constitutes**
225:6
**consult** 150:19
150:21
**consultation**
148:13
**contact** 74:12
135:7,11
136:16,18
146:4 147:5
149:14 150:13
193:5,19
**contacted**
115:21,21
116:5,7
**contained** 40:11
**contempt** 32:14
32:20
**contention**
190:11
**contents** 23:12
24:1,9
**context** 70:6
**continuation**
191:11
**continue** 105:5
133:8 187:6
188:17
**continued**
108:23
**continues** 69:20
115:17
**contraindicati...**

197:6
**control** 144:19
145:17
**convene** 153:3
**conversation**
43:8,13,19,21
43:24 78:23
79:12 108:2,5
109:2 121:1,5
123:16 126:4,9
**conversations**
38:8 43:16
44:14,21 107:2
126:2 189:23
215:2
**conveyed** 33:23
**cooperate** 135:3
177:18
**cooperating**
134:24
**cooperative**
177:4
**copy** 7:3,4 97:8
98:7 99:2
182:10,10
184:20,22
187:18,20
190:10 191:15
193:8
**corner** 95:1,4
**correct** 8:12 9:1
9:15,16 10:12
12:3 13:5,14
14:21 15:19
16:24 17:1
21:16 25:5,15
25:16 29:7
34:21,22 35:21
35:22 36:23
39:19,20,23
40:7,8 44:18
46:16,17 48:3
49:3 52:8,9,12
52:13 53:4
54:13,14,20
55:21 57:17
61:5,6,11,12
61:15,21 62:1
62:2,17 63:23

63:24 64:3
65:14 66:7,12
71:5 73:9 75:2
75:13 76:11,15
77:22,23 78:5
78:6,13,14,19
81:17,18 92:4
92:5,14,15
94:1,13,19,22
98:16,17 99:5
99:6,16,17
101:1 102:2,5
102:6,12,15,16
105:21 106:2
106:13 107:17
118:15 120:21
122:10 131:6,7
140:11,21
142:3,10 148:4
148:21,22
149:22,23
150:10 151:14
151:15,17,18
152:2,3,10,11
152:19,20,22
153:13,14
155:12,23,24
156:7,8,10,11
156:13,20,21
156:23,24
157:6,8,15,19
158:12,13
159:1 162:1
163:1,11,24
165:16,19
166:14 168:7
169:8 170:4,5
170:8,9 171:13
171:14 173:4,9
173:10,15,16
174:6 175:4
176:23 177:7
181:1 182:1,17
183:3,16,20
184:17 185:7
186:10 187:17
190:12,13
192:23,24
193:24 194:1

194:23 195:3,6
196:2,3 197:3
197:8,13 198:9
198:17 201:5,9
202:6,19,20
203:16,20
204:13 206:6
206:10,15
207:20 208:8,9
209:3 212:17
213:21 216:13
219:24 221:15
224:17
**correctly** 20:23
44:12
**counsel** 4:2,7,11
51:6 53:18
175:6 177:21
225:12,12
**counseling**
177:18,20
178:1 180:8
**counts** 222:2
**couple** 4:23
166:17 167:1
**course** 203:23
208:14
**court** 1:1 4:1 5:3
12:14,20,21,22
13:3,8,10,13
13:14,16 17:8
17:18 32:13
36:17 37:9,11
37:12,13,14
69:8 85:12,14
87:22 98:12
99:12 100:22
105:3 121:18
140:16 196:13
199:22 224:1
**Courts** 1:18
**cover** 11:4 63:2
63:5 115:15
130:4
**coverage** 105:17
105:22
**covering** 93:12
105:23 125:14
**covers** 147:19

**crackerjack**
150:8
**creating** 122:13
**credibility**
138:10 139:21
**credible** 136:10
136:12 137:1,4
137:10,12
138:1,7,8,11
138:15,20,24
139:2 149:14
**criteria** 17:12
101:18
**critical** 17:7
**cross** 211:7
**crying** 169:20
**CSR** 225:21
**cuffs** 177:15
**cure** 14:16
**cured** 14:7 15:24
16:4,8
**curiosity** 211:18
**curious** 181:17
211:15,17
**cursing** 155:4
**customary** 64:24
**cut** 45:20 186:22
**CV** 7:3

**D**

**D** 3:1 148:2
211:24
**daily** 95:23
105:18
**Dan** 193:3,4,15
**danger** 100:19
102:10,21
**dangerous**
133:19 134:1
163:16 211:8
211:11
**Daniel** 9:19 27:5
29:5,18 30:4
31:8 33:8,23
34:19
**date** 53:16 58:13
86:8,20 100:4
100:18 101:1
102:5 131:12
146:16 156:9

156:19 157:17
172:23 173:22
175:5 182:18
187:15 190:18
194:22 195:2
205:14 213:2
**dated** 21:15
160:10 191:14
206:12
**dates** 99:21
**day** 7:6 16:18
52:8,15 61:11
78:1 79:10
127:14 143:12
144:4 149:3,5
152:24 157:24
158:23 175:2
175:16 176:17
176:24 193:24
220:9 221:13
224:22 225:15
**dayroom** 85:3,4
85:24
**days** 12:21
107:12 161:16
175:1 206:13
**deal** 78:7 114:24
151:20 209:4
**December** 64:6
161:7,13,14
162:23 164:5
165:9 166:17
169:12 171:2
201:8 219:3
**decide** 137:24
**decided** 65:10
67:9 68:4
137:10
**decision** 65:13
65:17,20 68:1
**decisions** 66:1
**defendant** 1:14
2:18 4:15 6:7
20:23 224:11
**defendants** 1:9
2:17 4:14 6:10
34:10 224:7
**defendants'**
46:10

**definitely** 91:21
114:19 128:11
150:1 211:17
**degree** 34:10
212:5
**Delaney** 1:7 2:17
4:14 44:1
124:20 126:3
126:14 142:14
145:6 168:24
169:3 224:6
**delay** 219:8
**deleted** 116:13
**delivered** 33:20
**delivering** 35:20
**delusional** 76:3
76:7,9,12,13
139:10,17,19
**demeanor** 95:21
**demonstrate**
173:8
**denied** 184:19
199:1 204:3
**dep** 121:20
**department** 2:21
103:23 142:21
**depending** 73:5
75:23 135:5
**depends** 13:10
14:11 16:14,22
19:17 30:20
35:11 62:20
65:4 69:12
71:21 74:2,17
134:19,22
135:4 138:10
149:1 172:1
**DEPONENT**
223:16
**deposing** 34:9
**deposition** 1:16
3:8 32:12,19
97:7 98:19
224:14,18
225:5,8,10
**depositions** 1:19
7:8
**depressed** 17:24
112:5,6,20

113:18
**depression**
19:17
**describe** 50:6,14
149:15
**described**
149:13
**describing** 99:4
**designee** 158:8
**detail** 50:6
163:22 189:23
**detailed** 126:18
189:22
**detailing** 178:14
**determine** 150:3
153:2 197:2
**determined**
118:7 153:16
**developmental**
195:23 196:19
**device** 186:11
**devices** 189:11
189:18
**diagnoses** 14:14
19:15
**diagnosis** 14:8
14:11,12 18:2
18:4,6,10,17
19:1,6,16,18
19:22
**dialed** 191:1
**Diana** 1:7 2:17
44:5 141:7
145:6 224:6
**dictated** 195:2
**died** 209:2
**difference** 15:5
15:7 47:19,23
48:6 167:4
**different** 10:18
11:16,23 12:10
17:2,3,6,21
31:1 33:12,19
34:16 35:17
38:1,9,10
41:12 47:1
51:18 55:13
56:23,24 60:11
67:6 81:9,10

100:7 105:15
107:17 110:1
125:13 134:6
135:5,14
136:11 137:13
138:3,9 143:4
155:15 159:10
176:2 193:22
195:16 196:4
208:1 209:21
**differently**
46:24 113:15
**differing** 17:17
**difficult** 5:7 6:2
161:18 162:3
**difficulty** 192:20
199:2
**Dining** 162:15
162:16
**dinner** 162:14
**Direct** 3:4 4:20
20:17
**DirectBy** 3:5
**directed** 187:10
189:8
**direction** 188:14
**directive** 156:23
183:19
**directly** 225:13
**director** 9:18
27:7,10,11,15
28:7,11,21,22
29:2,6,10,11
30:14,23 35:1
36:5,9,17 37:8
37:8,9,11
67:18 146:7
148:19 149:15
150:20,21
**directors** 29:8
35:3,5
**disability** 196:19
**disagree** 17:11
18:8,17 19:1,8
**disagreeing**
17:15
**disagreement**
19:18,20
**discharge** 45:7

97:9 99:9
100:11,13
102:24 193:20
197:19 202:19
202:22 205:16
216:19 217:2
217:12,15
218:2,10
**discharged** 45:5
63:21,22 64:6
97:9 99:15
102:4 173:21
217:5
**discharging**
217:15
**disciplines** 9:23
10:6 208:1
**disciplining** 10:1
**discovered**
179:3 186:11
**discuss** 168:2
169:11
**discussed** 38:21
38:23 39:10,12
67:20 136:2,3
163:2 168:10
169:1 178:21
**discussing** 53:8
67:22 84:7
109:4
**discussion** 29:13
68:19 90:20
101:13,14
104:20 127:7
185:3
**dismiss** 139:2,3
**dismissed**
139:20
**disorder** 19:16
198:6
**distress** 111:22
113:8,10,17
**distressed** 127:3
**distributed**
146:13,21
**District** 1:1,2,18
224:1,1
**disturbed** 79:23
80:9,24 81:6

**disturbing** 80:4
**DIVISION** 1:2
224:2
**doctor** 4:22 7:1
10:24 12:4
21:11 30:8
31:24 34:17
50:3 58:5,23
68:23 87:24
95:10 132:24
133:4 160:7
170:22 174:3
194:19 217:5
217:15 218:12
219:21 221:2
223:3
**doctors** 83:18
148:14 150:6
**document** 21:5
21:21 23:16,20
23:23 24:1,10
25:14 50:16
194:19 202:23
218:6
**documented**
201:1
**documents** 7:7
11:6 22:1,12
46:11 50:12,15
172:14,18
180:12 199:4
207:17
**doing** 8:7 16:19
45:7 48:14
60:12 70:4
74:6 100:4
101:9 102:20
117:1,9 151:4
152:5,16 196:1
197:2 199:7
202:3 211:10
**door** 89:4,5,12
89:13 91:16
92:4,6,14,18
93:2 94:22
123:4,6,7,9
125:19 161:12
**doors** 91:17
93:14 161:3,6

doubt 72:18,21
72:24 73:4,15
Dr 2:18 5:17,18
9:19,20 11:3,4
20:19 36:21
37:11 39:9,11
40:13 43:4
44:15 45:10,12
63:3 65:19
70:5 105:17
109:3,8,9
110:6,11
127:10 131:16
132:13,14,16
142:11 145:1
166:11 168:19
168:19 169:3
176:10,11
193:6 194:21
196:1 197:17
198:15 202:15
202:16 203:4
203:18 206:9
217:4,6 223:1
dramatic 79:16
81:17
drawing 211:19
211:23
Drew 1:8 39:11
40:17 43:3,18
43:19 44:15
45:9,12 124:19
126:2,14
168:20 169:3
224:7
drives 189:9
drug 195:22
drugs 212:8
dude 5:22
due 163:5
169:24 183:19
183:21 205:14
209:11 221:5
duly 4:18 225:3
duties 10:17,20
duty 148:20
_____
E
E 3:1,6
earlier 45:2

54:16 68:7
80:24 81:9
88:13 97:5
107:3 112:17
128:3 134:10
139:8,16
172:21 203:11
ease 20:8 51:10
easier 51:21
95:15
easily 91:6 94:1
94:21 95:10
104:3 119:14
119:18 120:14
120:20
EASTERN 1:2
224:2
eat 186:11
echoed 41:18
echoey 6:16
educated 178:1
education 6:24
Edward 8:4
eight 72:13
78:13 95:20
105:5 106:14
116:8
either 29:15,16
47:13 60:8
91:24 111:22
142:3 161:18
171:9 175:1,19
176:17
electronic
189:18
eleven 64:21
105:6,8 106:15
Elgin 7:15,18
8:8,11 9:1,19
14:12 24:11
27:8 47:6
48:22 51:17
52:2,5,6 88:4
89:23 92:13
108:24 109:16
119:3 120:8
144:18 156:19
171:19 178:22
190:1 207:22

212:20 213:22
213:23 214:2,5
214:9 221:18
222:3
elopement
108:16 197:10
email 30:20 31:2
35:7 36:11,20
141:5,9,12
142:5,12
144:13,24
145:23,24
146:1,16,18
189:8 190:9
220:8 221:11
221:11
emails 145:20
emergency
133:21
emotional
169:17
emphasize 92:17
employee 59:9,9
103:22 225:11
225:12
employment
8:10
encourage 99:7
ended 157:12
201:6
ends 144:13
157:11,14
engaged 50:8
53:11 85:22
135:11
engaging 178:10
179:18
enrolled 205:11
entail 13:2
entered 174:11
entire 154:16
entry 166:18
167:18,20
169:23 174:7
177:10 182:20
182:23,24
190:19 199:7
environment
8:24 100:13

episode 195:19
201:6
Epperson 141:7
141:12,18
142:16 145:11
181:22 191:8
equally 69:18
71:11
ER 115:3
escape 108:19
108:21 110:16
178:21 190:1
escaped 106:17
108:24
escorted 38:4
41:13 42:23
43:2 54:8 55:9
56:9,11 78:3,4
78:17 80:11,19
especially
105:10
et 170:13
ethical 118:5
eval 199:15
202:3 208:4
evaluate 8:17
115:2 150:18
evaluation 14:10
17:4 38:12
97:11 99:1
148:9 194:20
195:7 196:16
196:18 199:17
199:19 200:19
201:1 203:23
206:12 207:18
212:14
evaluations 10:1
evasive 34:14
evasiveness
34:10
event 13:15
81:17 134:8
196:10
events 40:2,6
50:6,13
eventually 8:23
19:21 132:16
everybody 10:18

12:1,9 19:23
39:15,15 53:7
69:18 71:11
82:5,7,7,12,19
87:16 100:14
103:11 106:20
110:18 115:14
115:19 140:13
168:13
everybody's 5:6
11:20,22 12:8
12:9 55:1
92:10
evidence 60:13
60:13 136:14
exact 59:20
113:4 131:12
exactly 26:6
54:22 58:13
60:6 82:13
87:8 106:1
107:13 120:4
123:15 143:18
162:13 199:23
202:21 208:22
exam 196:2
198:10
examination
4:20 20:17
147:23 195:24
225:3
examined 4:19
115:4
example 16:1
17:7,20 18:16
19:5,7 66:23
72:24 104:1
examples 56:23
57:1 72:1
excerpt 166:15
exhibit 3:8 20:3
20:4 51:15
57:22 58:2,3,8
140:22 141:2,3
141:4 142:18
144:6 151:16
154:11,15
159:19,23
160:1,3 164:4

173:23 175:14
194:13 195:9
195:15 216:23
217:8,13
218:16,18,21
**exhibits** 20:2
88:22 145:24
150:11
**expectations**
101:22
**experience**
173:17
**experienced**
180:23
**expert** 222:7
**expertise** 12:10
19:12
**experts** 221:18
**explain** 13:14
17:19 37:4
64:8 193:16
194:9
**explained**
138:16 182:5
182:13 191:3
**explaining** 12:13
12:19 13:2
**explanation**
126:18 205:2,4
214:11
**exploitation**
56:4 57:5
**exploited** 56:17
**exposed** 96:21
106:12 198:21
200:2
**exposing** 199:6
**extend** 187:14
**extended** 221:7
**extent** 137:15
214:15
**extreme** 223:5

———————

**F**

**F** 196:7,7 202:2
202:4 204:19
206:2 215:21
**F-a-i-z-a** 5:15
**facets** 221:17
**facility** 8:6 11:20

12:7 44:13
64:18 77:18
84:13,14 88:16
90:12 94:8
101:17 108:19
118:9 153:20
196:11,12
212:7 221:14
221:21
**fact** 42:23 46:13
61:5 78:10
79:20 100:11
114:10,13
120:17 136:3
139:4 156:18
169:18 179:2
180:17 182:2
**factor** 196:23
**factored** 180:8
212:14
**factors** 148:17
196:7,15 197:2
197:9 204:20
215:23
**facts** 21:24 22:2
22:11 25:8
28:4,6 46:9,11
74:4,5,19
114:14
**fail** 58:4
**fails** 7:24
**fair** 30:16 44:16
154:6
**fairly** 179:3
**faith** 46:13,19
49:17 50:1
**Faiza** 1:7,16
2:17 3:3 4:17
5:15,16 21:1,2
21:3 220:6
224:6,21
**Faizina** 20:23,24
**falls** 149:19
**false** 149:18,24
150:4 152:14
152:15,17,20
**falsely** 149:10,21
152:16
**familiar** 6:6

23:12,19 24:11
147:8 194:19
**families** 110:3
**family** 152:7
157:22 158:2
158:15,16
180:21 181:10
194:5
**far** 33:17 62:13
62:15 207:5
**fast** 34:12
161:16 188:3
194:2 195:13
203:21 205:7
214:18 219:14
**faster** 21:18
88:22 95:14,16
142:20
**fault** 117:17
120:23
**faulty** 55:1
123:5 125:7,20
127:23
**February**
212:19
**Federal** 1:17
**feel** 33:6 65:5
68:8 69:13
70:19 78:10
93:6 100:19
124:1 209:16
209:23 210:13
210:19,24
**feeling** 69:14
112:9,19
113:18 131:14
133:13 134:21
**feelings** 70:20
131:3,18,20,22
132:2,6,8,11
134:7,16
**fellow** 82:11
**felt** 74:24 78:11
78:12
**female** 111:15
198:21 201:12
**fence** 32:14
33:17
**fencing** 30:9

32:9 33:16
**fifth** 49:20
**fight** 64:11
68:13 162:22
163:21,22
165:15 167:2,5
**fighting** 101:10
**file** 32:13,19
97:15 100:20
216:21
**filed** 39:19 47:5
53:20 107:8
187:20
**files** 97:17,20
99:1
**filing** 53:19
107:9
**fill** 164:8
**filled** 209:17
**final** 21:7 142:6
207:19 208:3
209:8 211:3
**finalized** 216:11
**find** 28:17 34:24
41:12 74:15
81:5 112:14
130:17 133:6
135:24 149:24
199:16,20
210:1,3
**finding** 135:10
**fine** 24:6 25:2
30:17,17 33:16
51:23 60:1
88:13 95:17,17
111:22 175:11
214:18 217:9
**finish** 85:12
98:12 139:13
171:23 172:23
173:8,14 213:5
**first** 4:18,24
20:22 21:3
24:9 50:7 53:6
53:8,10,12,23
55:4,6 73:20
77:24 83:15
107:11 109:17
114:17 127:16

135:9,10
138:21 146:23
151:23 154:17
154:20 160:11
160:23 161:9
166:20 167:19
190:5,18 191:7
191:8 199:13
**five** 37:18 43:21
58:16,16,19,21
60:6 78:22
79:15 81:14
82:4,10,16
86:7,12 88:1
108:3 113:22
128:4 133:15
207:21
**fixed** 123:6
**flag** 122:5
**flash** 189:9
**flirtatious** 95:22
95:22 96:7,9
96:11,13
**Floor** 2:14
**flow** 121:19
**FO** 163:9
**followed** 149:16
**following** 147:14
166:10 189:9
207:16
**follows** 4:19
**fondling** 136:19
**food** 186:16
**foregoing**
224:14 225:5
**forensic** 7:2 8:16
8:21 14:13
36:4 37:8
67:18 109:18
109:20 163:13
**forgot** 189:21
**fork** 186:9
**form** 5:24 14:22
14:24 15:9
34:1 36:19
111:17
**formal** 31:19
32:9,23 35:9
35:12,19

**former** 22:22
29:5 59:9
125:11,12
130:3,6
**forms** 31:1
33:19
**formulate** 8:19
10:6
**forth** 46:9 186:7
**forward** 51:10
51:22 161:16
**found** 41:12
42:4 52:7
127:11 137:8,9
137:12 140:4
149:14 178:9
179:10 218:4
**foundation**
203:1
**founded** 136:15
136:24
**four** 32:15,18
33:17 58:18
88:1 92:19
104:5,6,9,12
107:12 115:18
147:19 177:3
179:15 189:9
204:22 207:21
**fourth** 138:23
164:21 192:14
**frame** 53:22
82:14 86:17
**French.'** 201:15
**frequent** 155:18
163:7,10,12,15
164:6 201:7
204:11,12
222:14,15
**Friday** 221:5
**friend** 109:22,23
**friendly** 95:24
**friends** 110:5
152:7
**front** 80:19
**froze** 45:18
**full** 9:1,9,11,13
14:16 20:13
196:18,20,21

**full-time** 61:20
**fully** 5:1 6:2
15:24 16:8
23:15 85:7
**further** 79:18
83:20 139:7
201:4 221:8
222:24 223:16

**G**

**G** 161:21 196:7
197:9 202:2,4
203:11 204:19
206:2 215:21
216:1
**gaining** 133:12
**gather** 111:24
**gatherings** 110:1
**gay** 204:5
**GED** 186:17,21
187:3,4
**Gee** 17:24
**gender** 148:16
**general** 2:12
30:1 72:18
77:12 196:13
**generalizations**
81:19
**generally** 99:18
100:3 124:12
169:10 194:6
**generated**
134:12,14
**getting** 32:21
40:23 80:7
94:7 102:9,11
122:9 133:22
143:11 145:23
167:14 173:12
185:10 190:12
190:17 211:20
215:5
**gist** 192:19
**give** 7:10 12:5
16:1 55:19
64:4 70:6
87:16 118:9
170:20 216:14
216:15
**given** 16:11,12

41:11 43:6
126:17 155:6
159:7 171:8
182:9,10
183:13 186:12
193:20 224:14
224:18 225:7
**gives** 41:2
**giving** 30:24
56:22 57:1
58:9 59:18
61:1 72:1
219:16
**glad** 69:20
**glass** 84:22 89:2
**go** 4:23 7:9 8:22
13:13,23 16:6
16:9 20:16
29:24 32:1,13
33:17 34:12,12
34:14 35:23
50:3 58:2,3,18
63:19 65:2,6
70:14 71:19
76:4,7 77:15
80:18 84:18
88:13,22 90:8
91:19 93:11
117:4,21
125:12 127:23
129:16 130:5
132:8,23
145:18 146:14
151:8 163:22
169:14 170:24
172:24 174:20
176:4 191:10
195:12 196:13
198:3 199:15
210:16 217:11
219:14,18
**goal** 8:22
**goes** 44:10 83:20
83:24 91:15
119:23 142:20
146:24 147:3
149:7 154:19
161:3 170:11
182:12 222:3

**going** 7:8,9,9
16:14 20:1,10
21:7,17 22:5
27:16,19 28:5
28:7 32:11,12
32:14,18,19,19
33:16,18 34:10
34:11,17 35:23
38:3,5 40:14
41:1,11,14,23
42:14,16 43:7
43:7,13 45:3,8
45:13 48:16
49:15,23 50:1
51:6,9,14 54:7
54:18 55:7,11
55:11,16 56:7
56:15,19 58:2
58:3 70:19
72:11 73:19,22
73:23 74:5,8,9
74:15 75:8
77:15,16 87:15
88:22 89:22
99:4 100:2
101:15 104:14
110:23 112:5,7
116:14,17
117:2,10
133:14 134:12
134:19 135:23
136:7 137:14
137:21 140:4
140:17 142:19
143:3 146:14
156:12 158:5
159:23 160:1
160:19 161:5
162:4 164:15
166:16 169:21
172:11,17
173:13 175:13
176:4,20
177:12,17,24
178:2,5 184:10
186:21 187:2
188:2,3 190:24
194:2 195:18
195:21 196:6

196:13 202:2
202:14 203:21
205:7 207:11
207:18 208:4
210:9 215:3
216:20 218:13
219:2,15
**good** 8:13 35:5
46:13,19 49:17
49:20 50:1
58:22 62:22
65:11 109:21
110:5 163:9
168:5
**gosh** 204:18
**gotcha** 33:2
47:18
**gotten** 33:6
211:6
**gracious** 34:8
223:6
**graduate** 172:15
**grandchildren**
5:21
**grandmother**
193:5
**grant** 13:9
**grateful** 223:3
**great** 21:21 22:8
35:15 58:19
64:8 95:18
133:5 167:14
175:13 182:11
182:11 189:23
201:24 215:19
223:12
**great-grandfa...**
209:2
**great-grandm...**
191:3 192:22
193:19,23
**green** 190:8
**group** 115:13,16
115:19 116:14
116:17
**groups** 99:8,13
99:23,24 100:2
101:16 166:2
172:11,16,18

172:24 173:14
173:18,19
187:6,8
**guardian** 158:8
187:19
**guess** 7:19 51:5
88:3 91:20
134:5 186:8
199:8 202:16
**guilty** 140:5
**Gunderson** 2:22
**guys** 62:6 121:20
203:21 219:5

**H**

**H** 3:6
**half** 163:14
222:15,22
**hallway** 31:4,8
31:13,13 35:21
**hallways** 35:13
**Hamlin** 38:20
39:1,11 40:19
42:6 43:3,14
44:20,23 45:9
45:11,16,23
79:7,9 123:2
124:18 126:2
126:14 127:13
128:14 168:20
169:4
**Hamlin's** 127:12
129:10 143:7
143:22 175:2
175:17
**hand** 177:15
225:14
**handle** 148:21
**handwriting**
167:23
**Hang** 68:16
216:22
**hanging** 173:7
**Hanks** 192:4,5
**happen** 17:10
18:12 29:3
30:13 55:12
72:2 84:13,18
84:24 85:2,5
86:1 88:15,23

90:12,16,18
91:6 132:3,4
154:10 183:22
184:15
**happened** 11:3
18:14 24:11
30:12 31:9
36:6,8 39:23
40:2 41:6
43:11,21 48:21
54:2,22 55:5
56:2 60:6
63:10 72:1
78:8,22 79:13
79:15,24 80:14
81:14,21,22
84:15,16,17
85:8,18 86:7
90:7 101:7
115:12 116:7
117:23 119:10
122:24,24
123:21 125:4,7
125:18 127:3
128:4 129:12
136:5,7,8,13
143:13,21
170:6 171:3
179:15 181:2
183:1 199:16
214:23
**happening**
28:23 29:1,6
38:12,22 39:22
40:21 43:8,10
48:2,3 74:13
79:14 105:7
109:6 111:21
113:13 119:3
119:17 140:13
143:19 150:9
**happens** 37:10
62:7 64:19,23
114:22 151:20
199:13
**happy** 51:10
206:19
**hard** 6:19 74:2
74:18 83:14,21

84:1 88:3,7
89:20,24 90:20
91:1 93:23
94:2 108:4
149:23 150:3
162:4 182:8
183:18 191:5
191:12 192:13
193:11
**Hardy** 9:19 11:3
27:5 29:5,19
30:4 31:8 33:8
33:23 34:19
36:21 145:1
**Hasina** 1:7,13
2:17,18 224:6
224:10
**hate** 15:6
**head** 5:4 173:7
222:2
**headed** 103:13
**Health** 7:16 8:8
9:19 14:13
27:8 47:6
48:22 178:22
207:22
**hear** 6:14 22:3
31:9 41:18
77:24 82:1
86:5 107:1
108:1,15
122:22 123:18
141:18,22
179:10,24
180:24
**heard** 38:10
59:3,7,12,13
77:2,4,6,21
78:1,2,11
79:21,22 80:2
81:9 106:16,24
107:5,11,14,16
108:9,12,14,20
108:22 122:20
123:2 130:20
131:1 135:13
136:11 137:6
137:14 138:4
138:21 140:18

**hearing** 39:8
40:24 57:19
107:15,15
108:17,18
109:1 137:13
137:19 138:2
142:15 179:9
190:5
**hearsay** 75:22
137:20 138:2
138:15 139:1
**held** 68:19 127:7
**help** 4:23 22:20
24:23 46:18
50:16 119:1
120:6 122:15
144:22 203:9
**helped** 108:21
178:21 190:1
**helpful** 151:17
**helping** 108:19
**hereto** 225:12
**hereunto** 225:14
**hesitation** 19:4
**hey** 31:9 58:4
122:8 153:6
**hi** 130:6,15
**hide** 93:23
**hiding** 210:17,19
210:22
**high** 222:4,6
**Highway** 2:3
**Hills** 8:6
**hindsight** 111:9
113:4,5,7
**historical** 195:20
**history** 15:23
112:22 195:17
195:18,20,22
195:22,23
**Hogan** 1:7 2:17
4:14 44:5
141:7 145:6
224:6
**hold** 41:8 45:5
127:6 177:13
186:24 204:1
206:24 209:10
221:8

**holding** 98:4,7
**home** 119:23
**honestly** 81:14
**Hopefully** 58:4
**hoping** 87:14
**hospital** 7:2
150:22 203:23
208:14
**hospitalization**
213:17
**hour** 152:24
163:14 222:15
**hours** 9:4,6
32:15,18 33:17
104:9,12 149:2
161:7 162:5
181:13
**house** 119:24
**huge** 17:13
**Human** 2:21
103:23
**hundred** 181:20
**hundreds** 200:5
**hurry** 173:15
208:13
**Hurt** 1:4 4:9,15
54:1 63:20
95:21 122:19
129:9 132:18
143:15,22
154:16 155:8
155:16 164:4
168:1 169:23
177:11,16
178:9,17,20
180:3,4 187:11
187:23 188:21
189:8 190:7
193:2,16
195:11 204:2
205:11 209:9
213:11 214:6
216:1 222:9,21
224:3
**Hurt's** 52:3
**hyper** 96:7
**hypertension**
16:2
**hypothetical**

15:1 31:21,23
70:11,18,22
71:1,6,17,24
72:9,22,23
73:6,7,13 74:8
116:21 135:21
136:8
**hypothetically**
28:5 72:10
74:3,19 114:6
116:21
**hypotheticals**
122:13

## I

**ID** 3:7
**idea** 81:23 82:2
**identical** 202:5
206:2
**identification**
20:6 57:24
140:24 144:8
154:13 159:21
174:1 194:15
198:5 217:10
218:20
**identified** 25:17
44:12
**identifies** 22:22
149:9
**identify** 4:6
21:23 22:1,10
22:11 46:8,10
50:15 137:7
**identifying**
51:21
**IDOC** 84:14
**ill** 13:20,22 14:2
14:20,20 15:8
15:17 118:8
153:16,19
154:3
**illegal** 118:5
**Illinois** 1:2,20,21
2:4,9,13,15,21
52:11 58:10
224:1 225:1,15
225:19
**illness** 14:1,3,4,7
15:18,23 19:7

**illnesses** 14:14
**immediate** 142:8
149:4
**impairment**
19:10
**Implementation**
146:5
**implies** 33:15
**implying** 189:16
**importance**
37:10 127:21
200:19
**important** 11:16
200:21 209:16
209:24 210:2
**in-person** 31:16
35:7,9
**inappropriate**
74:13 75:1,20
96:15 111:16
117:20 122:2
122:16 133:18
133:24 135:11
199:12 200:23
201:4,12,17,17
201:18 203:10
204:7
**inappropriate...**
201:14
**incentive** 173:13
**incident** 18:13
26:2,14 29:1,3
29:13,17 30:21
31:10 33:22
36:10 37:16,18
37:21 50:16
53:6,9 54:20
54:21 55:5
73:1 78:1
96:20,23 101:7
104:17 106:21
115:1 116:6
122:18,22,23
124:5,15
127:11 128:5
136:4 141:14
141:15 142:19
143:12 149:15

153:3,7 199:1
199:6 200:18
200:21 206:14
207:3
**incidents** 28:22
29:9 30:1,15
35:4,6 36:5,19
45:8 54:15
56:2 104:16
132:5 200:20
203:11 204:22
**includes** 101:10
224:18
**including** 11:21
50:9 130:11
187:19
**inclusive** 224:16
**incorrect** 193:13
218:22
**increase** 212:9
**increased** 148:3
155:19
**incredible** 222:3
**incredibly**
219:17
**incumbent**
210:13
**independently**
205:13,19
**indicate** 193:17
**indicated** 158:9
180:2
**indicates** 193:8
**indicating** 55:20
182:14
**indirectly**
225:13
**individual** 12:12
16:21 156:2
158:8
**individualized**
152:12
**individuals** 24:4
25:13 64:20
**information**
23:24 24:24
25:2,7,8,14,21
25:21 26:19
33:22 34:4

37:3 40:10,23
41:10 42:6,8
43:6 44:2,6,11
47:8,10 48:18
50:10,13,15
51:2 59:22
85:19 86:15
100:23 112:1
113:7 118:18
137:10 149:19
159:4,7,14
179:4,14,16,20
180:7 188:12
195:20 200:1,6
206:17 207:16
208:2,19
209:24 210:12
210:23 211:20
**informed** 106:8
132:13 139:6
144:3 183:18
183:24 184:15
192:15 220:13
**Ingram** 36:15,21
37:11 141:13
191:22 193:6
193:21
**initial** 195:7
**initially** 6:6 38:3
67:8 138:12
**initiate** 75:13
**initiated** 37:23
38:2,13 48:24
49:24 51:4
56:24
**initiating** 75:9
**injury** 150:19
**innuendo** 133:2
**inpatient** 8:16
212:7
**input** 11:15 18:4
**inputs** 11:17
17:3
**inquiring** 190:9
**inside** 196:12
**insight** 222:20
**insinuating**
111:12 116:22
**inspection** 186:1

188:13
**Inspector** 72:17
77:12
**instance** 158:23
167:9 199:13
200:7
**instructed** 91:21
92:9
**instructions**
147:18
**instructor**
186:17 187:5
**intelligent** 121:2
**intense** 222:7
**interacted** 62:24
63:8
**interacting**
105:18 112:4
113:11
**interaction**
60:18 61:20
95:23 105:10
105:13,14
106:4 112:18
187:7
**interactions**
59:22 60:17
**interest** 204:11
**interested**
160:15 191:17
191:19 214:22
225:13
**interject** 86:19
**internal** 134:11
**internet** 114:11
**interpret** 82:23
**interpretation**
30:16 194:3
**Interrogatories**
21:4
**interrogatory**
21:22 22:10
30:3 33:13,14
46:7 47:2 50:3
50:4 52:23
57:16
**intervention**
149:9,16,20
**interventions**

152:23
**interview** 89:7
107:7,10 153:1
177:2,4 207:21
208:18
**intimacy** 178:14
**invested** 99:22
101:23
**investigated**
139:7 159:15
209:17
**Investigating**
192:16
**investigation**
37:23 38:1,13
39:7 40:21,22
41:4,4,15,21
41:23 42:2,3,5
42:11,11,21,24
44:12,16,24
48:24 49:24
51:4,5,7,17,18
52:5,10,14,16
52:19 54:6
55:13 102:13
102:18 113:2,2
139:5 140:16
156:19,23
158:23 159:5,9
177:12,18,23
178:4 179:8
183:21 186:4
207:10 209:11
209:19 210:1
211:5,12 221:6
221:13
**investigations**
56:23
**investigative**
54:11
**invited** 168:13
**involuntary**
100:21,24
101:9,19 102:8
**involved** 99:13
106:9,18
108:11,13,14
108:19,20
110:16,16

114:21,21
129:8 134:19
135:15,20
148:23 149:6
153:5 178:15
178:23 192:6
**involving** 96:10
104:17 183:21
**iPod** 189:10
190:8
**irons** 196:14
**ISP** 51:13,17
**issue** 11:6 14:19
17:6 28:8 55:2
65:5 67:10
68:7,9,11
70:13 105:22
112:7 123:7
130:7,15
165:21 187:11
189:8
**issued** 155:11
190:10
**issues** 16:14,15
17:14,16,17
18:6 128:1
168:4 192:16
205:13
**item** 146:3 149:7
195:17 196:7,7
196:7 208:14
**items** 127:21
186:2,16
188:20,23
189:9 190:10

J

**janitorial** 205:11
**January** 146:18
164:19,20,22
165:10,11,18
**Javed** 1:7,13
2:17,18 4:14
4:15 39:9,11
40:13 43:4
44:15 45:10,12
63:3 65:19
105:17 109:3,8
109:9 110:6,11
131:16 132:13

132:14,16
166:11 168:19
169:3 194:21
196:1 197:17
198:15 202:16
203:4,18 206:9
217:4 224:6,10
**Javed's** 202:15
**jeez** 58:21 205:7
**Jeff** 36:21 67:17
**Jeffrey** 36:1,2,12
**Joanne** 26:12,12
26:16
**job** 8:2 152:1
**jobs** 8:1,9
**Joe** 20:2 32:5
34:5 41:17
45:18 51:9
70:7 87:4
127:10 160:2
216:24
joe@kretchm...
2:5
**JOHN** 2:2
**Johnston** 2:13
4:13,13 14:22
14:24 15:9,13
18:19 20:2,7
20:12 24:3
27:21 29:20,23
32:5,16,21
33:1,5,21 34:5
34:13 41:17
45:18,20 51:9
51:16,20 62:7
68:18,21 70:4
86:19,21,24
87:4,8,14
103:8,13 160:1
160:4,21
174:15,18,20
175:9 188:5,8
195:8,11 200:9
202:12 214:14
214:18 215:3,5
215:16 216:23
217:18,21,23
218:3,8,21
219:2,6,13

220:19 223:1,5
223:7,12,15
**Joseph** 2:2 4:11
**journal** 189:10
189:18,23
190:2
**judge** 32:2
**judgment**
138:17
**July** 64:6 102:2
102:5 156:13
157:11,14
173:22 182:19
183:2 185:11
185:22 187:15
188:11,16,20
188:24 189:7
190:18,19,19
190:20 194:23
195:1,2 198:12
203:19,24,24
204:2 205:10
206:1,1,12
208:22,23,23
213:2,10,20
214:1,3 216:12
217:5,19
218:24 220:11
220:14,20,20
225:15
**jump** 21:7,17
51:9 164:15
188:2 215:17
**Jumping** 130:19
**June** 1:21 51:8
52:2,15 56:12
61:16 83:4
87:2,3 102:13
106:22 156:10
156:13,18
174:7,11,12
175:1,18
176:22 177:2,8
177:10 179:13
179:16 180:5
180:13 181:12
182:15,20
183:2 185:22
185:23 187:12

187:13 188:13
188:18 197:17
203:18 205:10
207:1,3 209:9
217:19 221:4
**justification**
126:19

K

**K** 10:10 61:5,21
62:11,19 63:22
64:13 65:12
67:9 101:8
106:1 125:9
131:2,6 141:14
165:8,15 166:8
166:13 168:2,3
168:6,9,19
169:15,24
170:8,18,21
171:16,18
173:13 185:19
**K-a-r-e-e-m-i**
5:15
**Kareemi** 1:7,16
2:17 3:3 4:14
4:17 5:15,17
5:18 20:19
70:5 127:10
168:19 217:6
220:6 223:1
224:6,21
**Kareemi's** 21:3
**keep** 68:1,4
91:22 92:9
101:17 163:17
176:3 186:21
**keeps** 152:16
**Kelly** 26:22 27:2
**kind** 6:1 7:8
12:5 14:9 19:3
19:17 56:19
57:6 66:16
73:24 103:16
113:3 114:24
117:16 140:19
144:19 146:13
150:7 151:20
152:16 172:21
175:24 185:5

191:11,11
201:6
**kinds** 40:2 200:6
**knew** 29:12 38:4
42:18 46:5
47:4 55:2 76:5
76:6 82:6
100:9,15 101:3
101:5,6,11,12
102:9 116:24
117:9 119:16
123:4 125:7
127:17,23
128:1 129:12
140:13 173:21
178:2,3 179:2
179:6 189:16
207:10 209:19
210:5 211:12
**know** 5:9 6:17
7:5 13:18,19
13:22 14:2,8
15:16,20 19:23
23:4,7,10,13
24:20 25:20
26:9 27:17,20
28:3,5,9,12,18
28:19,20,24
29:2,12 30:12
30:21,22 31:6
31:11,11,15,21
31:24 32:1
33:8 34:23
35:2,11 37:15
37:24 38:3,5
39:8 41:1,11
42:14,17 43:13
43:22 45:6
46:3,4,5 47:2
48:20 49:5,6
49:14,22 51:12
51:20 52:15,16
53:18 56:6
59:16,21 62:15
63:4,16,20
68:12 69:13,14
69:15,17 70:7
70:20 72:14
73:18,20 74:1

74:4,7,9 76:2,8
76:12 77:11
78:16,18 79:24
80:17 81:20,22
82:3,13 83:15
83:15,16,17,18
84:20 85:6,11
87:14 88:24
89:17 90:17
95:1,2 99:11
99:14,20 101:5
101:12,22
102:17,24
104:24 105:18
105:21,22
106:19 107:19
111:1,14,22
113:14 114:8
114:19 115:11
117:8,13 119:7
119:8,9,18
120:13,13,22
121:4,4,6
122:14 123:18
123:20 124:1
124:19 128:13
128:23,24
129:11 130:24
131:14 133:10
133:12,17
134:12 135:13
135:19 136:18
137:15,15
138:9,24 139:9
140:5 143:18
144:15 145:7,8
145:10,11,13
146:16 160:8
162:13 164:1
164:22 169:9
175:5 177:24
180:10 182:7
183:5 184:3,10
186:1,19
188:14 189:15
191:16,21
193:2,10,10,13
194:11,12
196:11,23,24

200:12 207:6,9
207:10,12,14
209:17 210:8,9
212:4 215:1,11
216:14,23
217:13 218:5
219:17 222:11
222:11
**knowing** 107:15
121:2 128:24
132:17
**knowledge**
21:24 22:2,10
22:12,23 23:5
24:1,4 25:6,13
26:4,19 27:1
27:10 30:4,11
33:15 34:2,20
34:24 36:3
37:1 44:20
45:17 46:8,11
47:21 48:1,4,5
48:17 49:2,11
49:13,18 50:7
50:9,14 51:3
53:10,23 54:2
54:4,10,16
57:13 144:17
198:16
**known** 109:11
109:12 139:4
139:12
**knows** 30:5
150:9
**KOTRBA** 1:19
225:1
**Kretchmar** 2:2,7
2:8,23 3:4 4:8
4:8,21 7:4,17
14:23 15:3,4
15:10,15 18:23
20:14 58:17
127:10 128:7
128:12,17
191:17 192:7
219:10,12
**KWAME** 2:12

———— **L** ————

**L** 22:22 23:2

25:22 60:19
61:5,21 62:12
62:19 64:13
67:2,2 68:6,13
68:15 80:9,11
96:22 101:8
125:9 128:20
129:19 131:2,6
162:9,9,14
163:5 165:5,6
165:8,12,14
166:8,9 168:2
168:6,21
169:18,21
**lack** 12:13,19
13:3
**Langley** 26:12
26:13
**language** 152:4
**large** 188:20,23
**Larson** 22:22
23:1 25:17,20
168:23 169:7
**late** 99:24
173:19 182:23
182:24
**Laundry** 162:10
162:11
**lawsuit** 6:6 25:9
47:6 53:20,20
**lawyer** 24:23
37:22 214:24
215:2
**lawyers** 34:15
**lead** 49:19 54:21
57:14 101:9,19
113:8 133:6
**leading** 100:24
**learned** 53:6,9
**leather** 196:18
196:20,21
**leave** 56:1
122:24 168:9
185:10
**leaves** 28:15
65:12
**led** 50:7,13 51:3
54:16 78:17
**Lee** 185:13,14

185:17 219:23
**left** 11:3 44:13
61:16 160:14
185:1 213:22
214:5,9 215:14
**leg** 196:14
**legal** 104:10
**legs** 87:16
**length** 103:12
**lengthy** 104:20
**Lenhardt** 49:10
53:24 59:11
67:20,23 77:19
122:18 143:15
143:22 168:22
169:4,13
178:10,10
180:2 222:8
**lessons** 186:18
**let's** 7:18 15:10
34:14 58:18
88:13 104:2
111:6,15
121:24 181:11
191:10 219:15
219:16
**letter** 147:13
149:8 202:2,4
203:11
**letters** 215:21
**level** 16:22 17:13
25:3 111:11
134:20 135:5
**License** 225:21
**lieu** 149:17
**likes** 104:21
**limited** 24:21
105:10,14
**line** 62:4 69:11
72:13 76:2
80:16 82:10,15
84:12 91:19,20
95:20 96:2
99:4 100:6,8,8
103:16,18
104:5,15 105:2
105:2,5,6,7,8
106:7 111:3,18
111:19,19

113:19,22
115:6,10 116:4
116:8 117:3
118:19 120:9
120:10 121:23
123:17 128:19
130:22 133:15
133:15 165:7
181:13 182:7
182:12 192:14
**lines** 58:24 78:13
82:16 88:1,19
92:19 93:11
106:14 115:18
117:22 119:11
162:3 177:3
**linguistic** 148:16
**Lisa** 1:19 121:17
223:9 225:1
**list** 45:15,23
46:2
**listed** 28:17,20
**listen** 152:6
**listening** 114:13
**literally** 64:14
**little** 6:15 69:15
70:5,9 79:18
88:13,22 90:8
95:13,14 100:7
122:9 155:22
159:10 166:18
**location** 50:12
**lock** 55:1,1
123:5,20 125:6
126:20 127:16
127:17,23
128:1
**locked** 54:23
91:17 92:4,6
122:19 123:7
123:19 125:20
126:19 127:12
127:19 141:19
141:23 143:6
143:11,15
175:2,3,5,7,17
176:13
**long** 32:11 64:1
68:14 93:15,20

96:5 99:21
106:2 109:11
110:5 126:17
128:4 147:4
171:23 172:22
215:3
**long-term** 14:14
14:15
**longer** 13:19
14:2,4 15:23
16:19 172:19
**look** 30:2 46:7
50:20 58:4
70:5 86:8
90:14 95:5,6
111:8 112:3
113:14 146:1
148:1 162:3
163:2 174:15
181:11 197:21
199:4,4,5
202:4,7 203:22
204:12 206:16
213:13
**looked** 155:22
163:19 171:6,7
199:3 202:17
202:18,19
208:10
**looking** 52:7
59:20 82:16
111:9,11 113:3
133:3,5 152:14
180:12,18
216:24
**looks** 90:13
153:10 162:14
163:6,20 165:6
166:20 167:15
171:3 174:4,13
176:24 181:12
182:21 183:15
185:11,12
190:21 191:12
193:7,22
194:22 197:16
201:7 203:18
206:8,12
**loss** 186:12

201:11 209:5
**lost** 187:1
**lot** 89:17 116:23
118:16,18
147:11 151:19
152:4 194:17
194:18 195:19
221:17
**loved** 180:24
**low** 212:7
**Loyola** 7:13
**luck** 103:8

———————

## M

**M.D** 1:16 3:3
4:17 12:2
103:22 147:21
148:10 224:21
**M.D.'s** 146:10
**magnitude** 32:1
55:16,22,23
**main** 8:7 68:10
**maintained**
208:16
**maintaining**
185:5
**major** 17:9
**making** 159:16
201:11 204:3,3
204:4,6 221:10
**malfunctioning**
126:20 127:17
127:18
**Malini** 142:6
145:3
**Malone** 193:3,4
193:16
**manager** 10:16
124:19 148:19
168:23 183:10
183:11 187:10
191:9
**managers** 146:8
147:18
**mandated**
103:24
**mania** 200:24
**manner** 149:13
▮▮▮▮▮ 130:22
130:24 131:1

131:14,20,22
132:10,19
135:7,11
136:13,16,18
137:17 140:9,9
140:10 178:15
178:24
▮▮▮▮▮
134:23 136:4
**manual** 146:4,6
147:4
**March** 201:10
213:2,11 214:5
**Mark** 1:10 4:9
47:2,5 48:18
48:21 49:6
224:8
**marked** 3:7 20:5
57:23 58:8
140:23 141:3
144:7 154:12
159:20 173:24
194:14 217:9
218:19
**Mary** 2:13 4:13
14:23 32:9
34:8 87:12
103:5 190:15
195:12 203:2
217:14
**mary.johnsto...**
2:16
**mask** 153:3
**materials** 145:16
**math** 7:23
**matter** 5:20 13:7
**matters** 11:20,23
12:1,8 225:4
**mean** 14:18,19
15:24 16:3,8
51:5 60:21
69:22 70:23
72:17 83:14
84:17 87:2
88:2 89:19
98:22 100:17
105:9 124:12
125:24 129:19
132:7 143:12

147:20 163:12
172:10 188:5
192:19 196:12
196:16 218:1,5
**meaning** 88:3
104:17 118:23
130:21
**means** 23:8 26:5
111:2 153:7
161:23 164:7
172:11 184:3,4
208:7 218:16
**meant** 83:9,11
124:23 125:17
163:9
**medical** 7:13 8:4
9:18 12:4
14:19 27:7,9
27:11,15 28:6
28:10,11,21,21
29:2,5,8,10,11
30:14,22 35:1
35:3,5 36:5
37:7,8 147:23
148:9,18 149:3
149:15 150:6
150:19,21,22
195:22 212:15
**Medically**
150:17
**medication** 6:1
16:2,5,7
153:10 155:5,6
155:20 163:6
212:6,8
**medications**
8:19
**meet** 17:12
**meeting** 31:14
31:19 32:9,24
35:8,10,12
36:11,20 61:10
61:14,18,18,22
63:9 65:22
148:18,20,24
169:10,12
170:6 216:21
**meetings** 61:7
61:19,24 62:17

62:18 63:1,2,6
168:8,11,12,14
169:1,2 220:23
220:24
meets 91:16
member 49:8
75:7,19 80:17
80:20 112:18
113:17 114:21
122:14 132:16
158:15,16
members 8:18
11:18 17:2,5
17:15,17 38:9
39:4 65:23
76:16 78:21
81:10 84:7,8,9
113:12 114:19
123:14 126:7
memory 7:7
60:10
mental 7:16 8:8
9:19 13:24
14:3,4,7,13,14
15:18,23 19:7
27:8 47:6
48:22 65:9
84:14 178:22
195:24 196:2
207:22
mentally 13:19
13:22 14:2,20
14:20 15:8,16
118:8 153:16
153:19 154:2
mention 115:23
127:18 176:13
203:10,12
205:21
mentioned 10:19
17:2 41:3 68:7
98:4 103:24
111:14 112:17
136:12 172:9
200:21 202:10
202:10 203:15
204:22
mentioning 4:22
8:9 135:9

mentions 180:20
mere 139:9,16
merely 26:3,4
met 177:1,16
183:9 184:9
meticulous 15:7
mic 22:4
Michael 145:8
145:10
Michigan 2:8
microphone
22:5
middle 68:23
164:18 221:2
midway 122:10
military 161:7
164:24
mind 69:6
111:10 185:1
211:7
minimum 150:4
minor 133:21,21
minute 41:18
51:7 87:16
158:5
minutes 163:16
221:23,24
222:1,16,19
MISA 65:11
66:24 67:1,2
68:1,5 165:23
165:24 166:1,3
166:5 168:1
170:8 171:18
171:24 172:24
173:13,14
205:22
missing 99:23
173:18 174:13
174:14 190:9
195:13
misstate 136:14
Misstates 27:21
mistake 87:5
misunderstan...
213:19
Module 165:5,8
165:8,12,14
moment 33:6

71:4 150:2
Monday 183:15
187:12 192:17
193:17 221:5
monitored 16:16
163:14,15
166:9 222:14
222:16
month 16:12,24
112:10
monthly 97:21
97:21,23 98:24
175:20,22,23
175:24 199:21
months 8:7 64:3
64:7 96:5
149:12 172:3,4
172:6,7 179:15
mood 198:6
morning 60:22
60:22 61:7,10
61:13,13,17,18
61:24 62:17,18
62:24 63:2,6,9
105:11,11
123:1 124:4
164:20 168:10
169:2 216:21
219:22 220:8
220:14,22,23
220:23 221:3
mornings
105:16
mother 158:10
158:14 191:1,2
191:4 192:12
192:18,21
194:10
motion 32:13,20
motions 34:12
motivated
172:10,16,17
172:23 173:19
173:20
motivation
172:1,20
move 22:5 60:14
95:15 134:22
135:1,3 139:23

148:21
moved 109:20
131:6 133:8,19
134:1,15
148:15 163:5
moving 51:10,21
134:17
MSO 146:11,12
mushed 5:6

N

N 3:1
name 5:13 30:22
38:19 59:10
106:23,23
107:5,15 136:4
142:6,6,14
155:16 160:22
192:9 220:2
named 29:10
129:9 170:7
names 124:16
160:23 168:15
168:18
Nano 189:10
nature 69:12
104:19 134:5
201:20
nearly 222:22
necessary
163:23 211:19
necessity 210:24
need 14:9 70:5
72:15 87:12
114:23 122:15
139:13 148:15
157:22 159:5
172:14 173:2
175:11 180:11
180:15 185:6
196:14 217:11
222:2
needed 11:15
66:24 75:23
115:3 150:18
158:3 184:1,2
191:5
needing 150:16
205:21
needs 16:22

76:10 104:11
149:4 150:22
168:1 196:11
neglect 74:1
76:14
neither 47:16
neurotransmit...
16:6
never 14:6 16:23
17:14 18:14
26:16 27:17
29:12 35:19
39:21 40:13,17
40:19 47:15
54:24 62:14
77:2,4 85:8,17
91:23 92:3
98:3 103:20,21
108:22 110:20
111:14,16,23
111:23 113:13
115:20,21
116:5,7 121:1
121:5 129:17
135:22 140:18
144:3 171:12
189:5 213:22
news 38:6,7,11
38:20,21,23,23
39:7,8,18,23
39:24 40:4,5,6
40:7,9,14,24
42:5 53:7,8,14
53:17,21 57:16
57:19 82:5
84:8 106:22,23
107:18,19,21
109:5 110:18
110:20 113:1
114:11,13
137:9 140:20
179:9
newspaper
107:6,12,14
110:14 136:9
137:16
newspapers
114:14
nice 5:23 201:12

201:21
**night** 141:14
**Nikolov** 108:6
**nine** 62:5 76:2
78:13 93:11
133:15 172:3,4
172:6,8
**nod** 5:4
**non-consensual**
146:4 147:5
149:10 150:12
150:13 153:13
180:19
**normal** 16:3,4
94:18
**NORTHERN**
1:2 224:1
**Northwest** 2:3
**notable** 96:11
**notary** 4:3
**note** 151:13
160:8,9,11,16
161:3,4,17,20
162:2 165:11
166:19,22
170:10,15
174:3,4,11,22
174:24 175:21
175:21,23
177:1,9,9,20
182:14 183:2
185:10,20
187:22 188:10
188:18 190:21
190:23 191:11
192:19 193:2
193:24 199:16
199:21,21
200:15,16
221:3
**noted** 199:19
**notes** 97:21,23
98:24 133:22
150:23 151:1
153:11 161:17
162:24 164:19
166:11 167:12
167:16 175:18
175:19,23

176:3,6,7,21
189:4,6 190:18
199:24 200:1,5
203:24 207:24
208:2,18
216:22 221:9
**notice** 69:2
70:16 154:21
156:1 157:9
221:8,12
**noticed** 127:10
**notices** 155:14
**notification** 36:8
**notified** 30:15
30:18 35:3,6
36:10 37:6,11
158:8,10
186:17
**notion** 120:3
**November** 40:2
53:14,20,21
54:2,17 55:8
58:12,14 59:21
82:21 83:2,6
84:5,6 86:9,10
107:7,8,10
113:1 198:21
199:24
**NS** 161:20
**NSG** 161:23
**number** 3:7 21:9
21:23 35:17
46:1,8 50:3
52:23 115:20
116:5,10,11,12
116:15,16
141:4,8 146:3
146:23 147:1
147:14,17
206:18 208:14
218:7
**numbered** 21:8
**numbers** 207:21
218:23
**nurse** 10:16 27:3
96:22 124:19
146:8 147:15
147:15,18
148:19,19

149:14 168:23
183:10,11
187:10 191:9
198:21 221:9
**nurse's** 143:16
**nurses** 11:21
79:3 112:11
124:10,21
126:8 150:6
151:5
**nursing** 85:24
92:1 93:4
146:7 161:23
161:24 164:22
187:14

## O

**o'clock** 122:24
161:8
**oath** 4:4 33:13
33:14 224:16
**ob's** 155:19
163:10,12
201:7 204:11
204:13 221:22
**obese** 197:1
**Object** 86:19
200:9
**objection** 4:3,10
4:12,16 14:22
14:24 15:9
18:19 24:3
27:21 29:20
169:14 202:12
214:14,15
**objections**
170:17
**observation**
16:17 148:4
163:7 164:6
222:1,14,15
**observations**
163:15
**observe** 61:23
169:20
**observed** 221:24
222:18
**obvious** 211:4
**obviously** 29:15
68:1 80:2 85:3

85:10 87:5
92:23 103:24
117:17,23
119:9 125:20
133:9 134:18
180:16
**occasional**
105:16
**occasionally**
12:18
**occur** 40:7
147:14
**occurred** 53:19
131:8 162:19
162:20
**occurring** 34:16
59:23
**off-ground** 41:9
**off-grounds**
13:7
**off-unit** 177:14
**offer** 205:2,4
**offered** 155:5
186:3
**office** 35:19
72:17 77:12
84:24 85:5,9
85:18,22 86:2
86:3,16 88:4
89:7,16,23
91:3,23 92:3
93:1,5,6,8,9,20
93:24 94:11,15
95:3,7 122:19
123:8,19 125:8
127:12,24
128:21,23
129:10,15,20
130:10,16
141:17,20,24
143:7,10,11,16
143:17,23,23
158:11 175:2,7
175:17 176:14
222:9
**officer** 95:19
104:21 116:23
121:23 128:19
130:20 149:3

**offices** 84:21
85:4,20 86:1
89:1,10 92:22
93:13,21
**oh** 7:23 9:5 23:7
58:18 71:18
88:5 97:4 99:8
107:19 138:5
146:2 193:3
195:1,10 205:7
216:21 217:13
219:3 221:1
**OIG** 55:13 56:24
72:17,23 73:2
73:2,4,16,23
74:10 75:9,13
75:18,23
103:24 104:3
104:12 114:17
119:19 120:16
134:10,16
136:15,24
150:1,2,8
222:4
**okay** 5:12,19,20
6:5,14,15,18
7:12,23 8:9
10:21 13:6,23
15:3,16,20
16:9 18:16
20:10,22 21:2
21:17,21 22:8
23:4,9,10
24:18 25:4,5,6
25:12,17,19
26:1,11,21
27:5 34:17,23
35:15 37:17
38:14 41:2
45:7,15 46:7
47:17,24 48:13
48:15 49:2
52:18,20,21
58:2 59:6,21
60:13,15 61:4
61:20 62:10,22
69:1,12 70:6
70:11,13 75:12
79:8,16 82:9

82:11,18 85:13
85:16 86:23
87:24 88:14,17
88:18,20,21,23
90:5,6,11,17
90:22,22,24
91:7,8,15,21
95:17,18,19,20
100:9 103:12
106:3 117:5,13
117:23 119:7
121:12 124:18
128:17 139:14
139:15 141:12
145:20,23
146:20,21
147:11 149:7
151:16 152:23
154:6,15 155:8
156:1 158:6,21
159:23 160:4
160:17 161:13
164:16 166:6
166:15 175:8
175:13,22
176:21 177:20
178:7 181:11
183:1,17 184:6
184:11 185:8
185:20 187:6
188:8 189:7
190:14,24
191:14 194:2
197:16 198:3
198:18 200:3
201:10,24
202:14 203:1
203:14,17
205:6 206:11
208:12 209:1
213:15 214:4,8
214:11 215:19
216:5,16,18,20
216:22 217:11
217:22 218:1,5
218:9 221:1
222:12 223:12
**on-grounds** 13:6
41:9

**on.'** 177:17
**once** 14:8 16:20
16:20,21 64:23
115:23 117:18
147:13 202:23
204:16 205:16
**one-on-one**
63:17
**ones** 19:14 75:9
166:2
**ongoing** 14:7,17
221:5
**open** 28:15
91:17 92:23
123:9
**opinion** 11:15,20
11:23 12:6,8,9
13:15 19:13
200:15 202:15
212:6,15
**opinions** 11:17
12:11 17:6
34:16
**opportunity**
55:19
**oral** 178:11
180:3
**order** 76:7 95:3
127:21 150:21
163:17 182:19
213:14 218:15
219:2,4
**ordering** 223:14
**orders** 148:3
**original** 187:20
**other's** 125:16
161:3,6,12
**outcome** 225:13
**outlines** 40:1
**outlining** 204:10
**outside** 110:3
**overall** 45:7
**oversees** 10:16
**Owens** 1:10 4:9
4:15 47:3,5,10
48:21 49:6
224:8
**Owens'** 48:18

_____
**P**

**P** 181:13
**p.m** 1:22 87:11
162:22 164:21
164:22 166:19
177:1
**page** 3:2 20:22
21:8,10 34:3
50:4 58:15,16
58:17,21 59:2
60:15,15 62:3
62:4,5,12,12
64:21 68:17,23
84:11,11 87:24
90:24 91:11
92:19 95:9,10
95:19 103:6,15
103:16 106:6,6
110:23 111:4
113:19 115:6
115:17 116:18
117:4 118:16
121:22 122:17
122:21 128:19
130:19 132:23
141:4 142:18
144:12 146:2,3
146:10,23,23
154:17,17,20
155:13 156:6
157:9 160:6,16
161:16 163:4,4
164:15,18
167:11 170:12
174:7,10,13,22
181:12 185:12
185:21 188:2
195:17 196:6
198:11,20
203:17,22
205:6,9 206:18
216:20 218:6
218:10,15,23
218:24 219:1,6
219:13,16,17
220:19 221:2
**pages** 21:8,10
144:11 146:2
146:24 147:3
174:13,16

194:18 200:5
216:9 218:22
219:1 224:15
**panel** 93:19,20
93:22,24 95:3
**panel-styled**
94:21
**panels** 84:21
89:1 93:13
**Panera** 115:23
**pants** 201:13
**paper** 107:17
154:21
**paperwork**
152:18
**paragraph**
72:13 201:2
205:9 212:10
212:12
**paralegal** 219:7
**paranoid** 76:12
**Pardon** 201:15
**Park** 2:4
**part** 9:10 10:7
12:12 25:23
26:4,7 27:13
36:22 46:12
65:16,19 71:10
96:9 97:23
98:15 100:1
117:24 118:1
119:10,11
128:16 133:14
147:11,18,19
155:17 158:7
168:12 169:12
178:20 189:3
195:23 196:5
209:8 212:11
**participate**
173:1
**particular** 10:3
79:5 200:4,7
**particularly**
114:2
**particulars**
186:3
**parties** 63:15
225:12

**parts** 196:4
**party** 4:6
**pass** 41:9 172:15
**passed** 133:22
**passes** 13:7 41:8
41:24,24 45:4
177:13 186:23
188:15 206:19
206:23,24
207:2 209:10
221:8
**passing** 89:17
105:12
**Pat** 22:22 23:1
25:17,19,20
168:23 169:7
**Patel** 9:20 11:4
142:6,11 145:3
**patience** 223:4,5
**patient** 8:22
10:3 11:15
13:3,6,19,22
13:24 15:16,20
16:12,15,22,23
17:7,20,24
18:1 19:1
25:23 26:8
47:13 56:3
59:14 64:12,24
66:4,8 67:13
68:12,15 71:17
71:20,23 73:8
73:15,19,23
74:11,11,13,17
76:2,5,6,9,11
76:12 80:19
85:18,22 91:17
92:2 94:15,20
100:18 101:8
104:1,18
106:17 112:1,2
112:4,6,14,21
114:16,22,23
117:15,16,18
117:18,20,24
118:3,7,13
120:18 122:15
125:9,11,21,22
128:20 129:9

129:18,20
130:3,6,13
132:8 133:2,3
133:4,8,9,11
134:4,7,14,17
135:5 139:10
139:17 141:17
150:14 152:24
153:2,6,22,23
153:24 155:3
155:14,18,18
156:15,22
158:1,11
160:21,22
161:2,5,11
162:8 163:4
165:4,7 166:12
166:23 171:4
171:23 172:2,9
176:10 177:2,3
178:24 180:20
181:5,7 182:6
182:6,9,9,10
183:9,13,17,21
183:22,24
184:14,15,18
185:3 190:24
191:2,4 192:11
192:15 196:10
196:24 197:4
197:11 201:14
204:7 205:16
206:3 207:22
222:18
**patient's** 12:12
12:13,19 35:14
84:24 92:10
119:11 134:16
153:2 155:16
**patients** 8:17,20
14:3 15:22
16:7,13,18
31:12 45:6
55:15 63:4
64:12,20 65:1
69:1,18,22
70:15 71:12,15
71:22 72:3
78:12 79:19,23

80:9,10,24
81:1,6,11
83:16 89:17
91:23 92:21,22
93:1,4,6 95:23
99:18,20
101:10,18,21
105:17,19
106:1 113:11
113:21,24
114:5,12,13
122:10 125:12
125:16 132:1,6
133:17,24
134:20 139:19
146:5 147:5,17
150:14,15
153:13,15
154:1 163:13
163:14 164:6
165:21 166:1
179:6 180:20
181:6 194:7
196:19 200:22
221:21 222:2
222:13,15
**patients'** 11:24
84:21 85:20
89:1
**pattern** 149:12
**paying** 69:15
71:24
**PC** 2:2,7,23
**PDF** 188:5 219:6
219:13
**peer** 155:4 163:5
166:21,24
170:1 204:2,4
**penis** 136:19
**people** 5:4 16:1
17:11 23:24
24:13 34:2
36:22 37:3,10
37:18,19,24
38:6 39:12
40:24 44:14
45:16,24 54:11
55:14 79:22
80:3 83:2,3

90:21 93:24
95:23 99:10
107:3 118:22
120:8 125:2
126:5,23
136:11 137:20
138:8,9 145:7
157:20 163:18
168:16,18
172:2 173:5,6
193:23 220:13
222:3
**percent** 181:20
**perfect** 6:19
95:12
**performed**
178:11 180:3
**period** 8:3 41:3
**periods** 51:21
**permanent**
170:11
**permission**
186:21 192:23
**permit** 204:1
**permitted** 194:5
**perpetrator**
148:4 150:24
151:14 167:8
**person** 6:22 30:4
30:20 31:14
67:17 69:13,14
69:16,17,18
70:12 71:11,19
74:24 75:17
104:8 114:20
118:3,10,13
119:15 120:12
120:18 121:2
138:4,7,22,22
149:21 151:23
152:5,6 153:19
153:21 222:18
**person's** 71:19
**personal** 25:3
36:11,20
111:11
**personally** 37:15
75:2,4 91:23
97:14

**personnel** 61:21
**persons** 21:23
22:10 46:8
50:10 152:8
**pertained** 164:4
**pertaining** 1:18
42:10 106:12
**petition** 100:21
100:24 102:9
**Pharis** 36:1,2,12
36:21 67:17
**phone** 36:10,19
41:10 42:1,22
102:14 152:7,8
157:24 158:1
159:17 164:11
181:5,7,8,9,14
181:23 182:3
184:15 185:6
186:23 187:11
187:16 193:8
221:5
**phonetic** 176:10
**phrase** 137:5
**physical** 64:11
64:14,16
162:18 166:21
166:23 170:1
197:5
**physically** 115:2
115:4
**physician**
103:22 115:2
147:19,20,24
148:11 149:2,5
150:17 151:3,5
151:10 176:8
**picking** 172:7
**place** 35:13
134:2 140:14
143:20 144:21
148:21 152:9
210:16,18
224:15 225:8
**placed** 8:23
186:23 203:24
204:1 206:24
209:10
**placement** 18:5

205:17
**plaintiff** 1:5,11
4:7 50:8 53:11
224:4,9
**plaintiff's** 3:8
20:4 21:3,24
22:11 23:7
25:14 57:22
140:22 144:6
154:11 159:19
173:23 194:13
217:8 218:18
**plaintiffs** 2:6,11
4:9,12
**plan** 8:19 10:4,6
10:8 11:14
17:4 19:5,19
19:22 100:11
146:5 149:9,10
149:16 152:12
170:13 172:12
172:13 193:20
199:22
**planning** 198:7
**please** 4:5 5:13
6:24 18:22
22:3,4 88:12
90:3 96:14
121:10 193:13
200:9
**pleased** 184:24
185:4
**point** 5:11 9:2,7
21:20 47:15
51:12 54:23
55:2,10 64:19
100:19 106:12
123:21 129:17
140:6 166:4
179:11 220:22
221:10 222:17
**pointing** 162:6
201:3
**police** 52:11,19
58:10 59:2,5
60:16 61:2
62:10 63:19
68:24 74:23
77:10 84:12

89:7 103:19
110:24 112:24
113:2,19 115:6
116:18 118:17
118:20,24
120:5 140:8
156:20
**policy** 145:17
146:4,13,15,22
146:24 147:4,9
147:11,20
180:18
**position** 37:2
**possibility** 17:22
31:10 67:24
**possible** 31:7
56:16 94:2,5,6
95:1 118:2,4
118:12 120:18
128:8,13
129:11,15
130:14 152:5
153:15,18,24
154:5,5 190:20
**possibly** 126:15
**potential** 139:18
196:5 212:1,12
**potentially**
76:14 133:18
134:1 163:16
**PPM1870** 146:3
**practice** 7:14
**precise** 32:10
**prefer** 5:17 6:22
**preference**
148:15
**pregnant** 197:1
**premises** 41:13
**preparation**
214:12
**prepare** 22:16
22:20 97:6
100:24 176:1
203:13 207:17
**prepared** 23:16
23:20,23 50:15
200:12 203:6,8
206:13 215:14
216:11

**preparing** 21:5
151:2
**prescribe** 8:19
**presence** 155:6
157:23 158:3
181:8
**present** 2:20
79:3 102:8
146:8,10
195:18
**presentation**
172:13
**pressure** 16:3
**pretty** 217:16
**prevent** 49:22
113:15 159:16
**prevention**
172:12
**previous** 149:11
152:15 206:3
213:17,18
225:3
**primary** 111:24
112:13,15,16
115:1 147:23
148:11,12
149:2,5 151:5
176:8
**print** 99:2
**printed** 225:6
**prior** 9:15 60:17
102:23 157:11
202:5 204:24
208:22
**privacy** 152:8
**private** 7:14 8:6
**privilege** 187:1
201:11 214:16
**privileges** 13:1
17:8,10,13,15
180:13,17
186:12 187:12
205:15
**probably** 20:9
146:8 147:22
148:9 181:20
201:13
**probing** 34:4
**problem** 149:9

198:5 218:3
**problems** 18:18
19:2,3
**procedurally**
148:2
**procedure** 1:17
147:4,12
**procedures** 69:3
70:17 71:7
**proceed** 4:1
**proceedings**
12:24 225:7
**process** 10:1
14:6,8,17 17:4
74:22,22,23
134:21
**profession** 83:18
117:18
**professional** 7:1
63:13 109:9
111:11 117:15
133:10,11
200:15 202:15
**program** 65:11
100:2 166:1,3
166:5 168:1
170:8 205:11
205:14
**progress** 12:13
12:14,19,20
13:2,3 150:23
151:13 160:8,9
160:11,16
161:17,17
162:2,24
175:21,23,23
185:10 199:21
199:21,24
200:1,5 208:21
**proof** 133:10
**properly** 123:21
**property** 190:12
**prosecutor**
12:15
**protect** 64:20
74:16
**protocol** 133:17
133:23 149:17
**prove** 102:10

**provide** 71:9
131:23 152:8
212:15
**provided** 114:23
177:19,20,22
177:24 179:16
180:8 187:20
**provider** 132:7,7
**providers** 132:2
**providing** 23:24
198:22 209:24
**psych** 197:22
202:3 206:11
207:17
**psychiatric**
64:18 97:11
99:1 118:8
149:19 153:11
153:20 175:23
194:20 195:7
195:17,19,20
199:19 200:8
200:19 208:3
208:17 211:4
212:5 221:21
**psychiatrically**
211:10
**psychiatrist** 7:16
8:2,15 10:14
10:17,19,24
12:23 13:12,18
18:3,7,8,16,24
19:9,24 37:2
54:13 108:1
117:19 147:21
148:5,7,8,23
149:6 151:4,12
153:5,9 178:8
179:17 196:1
198:15 200:12
202:4 203:5,8
209:23 210:14
210:24 211:7
211:20
**psychiatrist/so...**
105:19
**psychiatrists**
11:22 13:12
61:8 124:9

150:7 151:2
153:1 168:17
**psychiatry** 7:12
**psychological**
19:11,14 197:5
**psychologist**
11:19 18:2,7,9
18:17,24 19:23
22:23 23:2
25:19 117:19
168:23
**psychologist's**
19:13
**psychologists**
11:22 19:10
61:8 83:19
221:20
**psychosis**
155:19 198:6
**psychotherapy**
18:5 114:24
**psychotic** 76:3
**PT** 176:11
**public** 4:3
207:19 208:5
**pull** 20:9 41:24
42:1 175:12
**pulled** 188:15
**pulling** 20:3
**purely** 66:17
**purpose** 37:2,5
**pursuant** 1:17
**pursuing** 205:15
**put** 28:16 30:22
34:3,11 45:4
99:2 103:16
111:6 157:1
161:4,19
167:22 195:8
200:7,16
204:12 207:6
221:21
**putting** 19:4
190:2 200:13

---

**Q**

**Q's** 59:4
**QM** 146:5
**qualifications**
7:1

**qualifying** 55:22
**quality** 144:19
  145:16 146:6,6
**querying** 153:6
**question** 5:1,8
  5:24 7:5 12:16
  13:21 15:6,12
  15:13 17:19
  18:22 22:16
  24:7,17,19
  25:12,20 26:11
  26:21 28:13
  29:4,14,15,21
  29:22 30:8,10
  31:5,7,23 32:4
  32:6,15,18
  33:2 34:1
  35:16 36:16
  37:4,20 38:16
  40:9 41:15,19
  41:21 42:19
  44:10,22 45:2
  45:24 47:1,19
  47:21,22 48:8
  48:9,10,11,16
  49:4,15 52:22
  55:18 57:16
  59:24 62:5,9
  62:16 68:24
  70:11,13,14,18
  70:22 71:1,2
  71:14 72:9,22
  73:12,13 74:6
  74:23 77:17
  81:1,9,12 82:9
  82:17,20,24
  83:1 85:7,17
  88:1,9,11,12
  88:18 90:1,2,2
  90:5,6,14,23
  96:14 103:18
  104:21 106:10
  110:24 112:13
  113:6 116:19
  116:23 117:5,7
  117:14 119:4
  119:20 121:23
  122:4 131:4
  132:23 133:1

134:6 137:5,22
137:24 139:13
139:23 143:4
159:10 170:24
179:22 200:3
209:21 213:6
213:19 214:8
215:16 221:16
222:6,17
**questions** 7:9
  25:1,4 31:21
  32:2,11 33:20
  47:18 59:5,17
  60:2,10 74:3
  74:18 85:12
  91:9 95:20
  113:20 144:11
  159:12 194:18
  215:8 218:14
  222:24 223:1
**quick** 7:23
  170:24
**quickly** 58:3
  146:14 151:9
  219:20
**quite** 96:5 121:2
  167:11 191:17
  191:19

      **R**
**raise** 122:4
**Randolph** 2:8,14
  4:8
**Randy** 5:19 70:7
**RAOUL** 2:12
**raped** 104:3
**re-call** 180:11
**reach** 192:7,9
**reached** 191:24
**read** 22:9 23:17
  27:23,24 50:19
  50:22 61:3
  69:5,6,8,10,24
  70:2,9,13,14
  72:12 82:22,24
  88:9,11,18,20
  91:13,18 95:10
  95:12 96:3
  100:7 104:6
  105:7 106:14

107:19,20
111:19 113:22
115:10,18
117:3,5,7
119:4,12 120:9
130:23 133:15
135:22 137:5
137:16,18
146:9 160:9
161:10,18
162:4,5,8,12
166:20 167:23
176:7 177:9
182:2,6,7
190:21,22
191:5,12 192:1
192:1 193:9,9
212:3 224:13
**reading** 69:7
  107:11,13,17
  182:8 189:6
  192:13 193:11
  193:12,13
  225:9
**ready** 17:12
  173:9,12
  176:10,11
  185:10
**really** 5:3 14:11
  16:14,21 19:17
  24:20,24 30:20
  32:11 35:11
  56:17 62:19,23
  65:4 71:21
  73:24 74:1,17
  76:8 78:12,15
  79:23 83:14
  84:1 86:21
  88:3,7 89:19
  91:1 93:7
  105:18 111:14
  113:14 128:13
  133:5,5 134:19
  134:22 135:4
  138:10 149:1
  150:3 151:7
  172:1,24 182:2
  182:6 190:17
  192:21 198:7

220:17 222:1
**reason** 5:5 27:12
  29:10 30:23
  36:4,18 45:15
  45:21,23 46:2
  62:20 64:8,9
  66:22,22 67:23
  68:10 128:21
  130:9,10 131:5
  131:21,23
  155:18 171:11
  199:18 200:4
  202:9
**reasonable**
  212:5
**reasonably**
  46:13,19 49:16
  49:20
**reasons** 55:14
  62:23 67:12
  91:22 125:13
**reassuring** 152:5
**Rebecca** 108:6
**recall** 18:12,15
  23:23 38:20
  39:3,4,9,10,14
  43:15,20,24
  45:14 54:5,12
  55:12 57:11,18
  58:13 60:6
  62:13,20 64:2
  65:24 67:22
  68:9,14 77:5,6
  78:2,23 79:1
  79:12,14,15
  80:9,22 81:14
  81:15,20 82:3
  82:4 83:9
  86:11 89:6
  96:12 97:1
  101:13 106:1
  107:2,13,14
  108:2,3,5,8,17
  108:18 109:1
  110:22 123:15
  124:5,20 126:4
  126:8 128:5,15
  128:16 132:12
  142:1 145:23

169:9,13,16,17
169:19 180:18
181:5 187:8
189:20 194:8
197:24 211:22
212:21 213:8,9
**receive** 17:8
  145:16 163:23
**received** 34:3
  36:7 145:18,20
  158:22 201:11
  209:10 220:24
  221:11,12
**reciprocated**
  131:24 132:11
**recognize** 160:7
**recollection** 54:4
**recommend**
  100:14
**recommendati...**
  176:11,12
**recommended**
  100:12 177:13
  177:14 221:6
**recommends**
  66:20
**record** 4:2,5 5:5
  5:14 27:24
  68:18,20,21
  69:6,7 87:17
  87:21 96:19
  121:13,17
  127:8 144:13
  154:18 164:2
  195:8 199:20
  216:8 225:6
**recording** 105:4
  136:17 178:9
  178:14,16,20
  179:10 180:1,2
  189:12,17
**recordings**
  50:12 179:3
  189:12
**records** 96:23,24
  97:2,12,13,16
  98:3,4,6,7,9,14
  98:18,21,22
  144:20 207:22

208:7,10
213:13,15,17
213:18,23
214:2
**recovery** 8:21,23
14:6 172:13
**red** 122:5
**reduced** 225:6
**refer** 51:17
**referring** 23:9
39:17 41:4,16
41:22 53:17
61:4,14 71:15
72:6,20,23
76:8 78:20,24
80:6,8,10 81:8
82:15 83:5
86:17 88:8
89:13,21,24
90:13,15,17,23
91:2,13 93:18
107:22 117:11
119:6 123:24
129:4,6 135:18
141:14 146:15
196:17,21
213:15
**refers** 89:3
124:7
**regard** 67:20
82:11 83:1
**regarding** 12:24
46:19 101:14
101:15 102:18
136:16 154:21
193:8
**regardless** 19:20
**regularly** 205:12
**relapse** 172:12
**relate** 22:1,12
46:11 143:1,5
**related** 11:12
40:14 47:2
48:18 55:24
73:7 145:24
**relates** 48:21
116:20
**Relating** 156:9
**relationship**

50:8,11 53:12
53:13,24 55:24
57:6,8,15
63:11 109:8
117:16 130:21
132:19 133:10
147:16 179:4
189:24
**relationships**
117:20
**relative** 225:11
225:12
**relatively** 16:18
**release** 13:1,8
99:11 101:20
101:24 173:7
**released** 102:1,9
172:22 173:3,9
173:12 207:19
208:4 211:3
212:19
**Relevance** 18:19
**relevant** 22:24
24:4 27:1 30:5
30:11 34:20
45:17 46:14
50:13 148:17
**relying** 46:12
**remained** 68:13
170:1
**remember** 6:3
21:5 38:18
44:15 47:14
54:22 57:20
58:9,11 59:17
59:19 61:1,3
62:15 77:8,8
79:5,7,11
80:20 83:5
86:6 99:23
107:4,5 108:4
111:20 122:23
123:1,13 126:5
126:24 127:22
128:8,11 131:8
131:9,12
168:22 180:12
181:19 185:14
189:6 194:7

202:21 206:20
207:5 212:24
213:4
**rememberer**
38:7
**remembering**
175:9
**remission** 14:5
14:16
**remotely** 1:21
**removed** 163:17
180:14,17
**repeat** 5:9 53:16
96:14
**repeated** 116:8
**rephrase** 5:10
12:16 18:22
41:17 179:22
211:2
**replied** 187:19
**report** 9:17
12:22 13:16
47:22 48:5
50:16 61:13
73:4 74:11
75:1,2,9,13,18
75:19,22 76:13
77:13 104:8
112:18,22
118:23 119:2
133:7 134:14
136:15 137:1
137:16 140:14
141:13 142:19
142:21 143:2,3
150:1,19
152:21 153:2
175:10,24
192:17 198:10
198:18 199:22
202:11,15
203:9,13
204:16,17
205:1,5 206:1
206:1,7,9
209:15,18
210:1 211:24
215:14 216:6
216:11 219:22

220:8,14,22
221:4
**reportable** 73:1
73:3 134:8,9
139:21 140:6
**reported** 36:5
46:21 47:9,12
47:16 49:21
74:24 75:17
76:4,10,17,20
76:21 104:12
111:23 112:2,3
112:12 113:12
113:13 119:18
120:20 121:7
123:5 125:6
127:2,4 128:3
128:9,10,14,15
131:16,17
132:14,16
135:19 136:4,9
136:10 138:12
147:13 150:2,8
151:6 225:5
**reporter** 1:20
4:1 5:3 69:8
85:12,14 87:22
98:13 105:3
121:18 225:1
225:18
**reporting** 75:16
103:24 112:15
114:20 118:20
134:2,3,24
**reports** 9:21,22
37:12,13,14
39:18,23,24
42:5 60:22
74:11,12 75:12
76:19,23
110:14 114:16
134:4,7,11
137:9 139:18
140:20 151:13
203:6 206:3
222:4
**represent** 4:6
**representing** 4:9
4:13

**request** 13:9,15
17:18 99:11
149:16 183:9
193:20
**requested** 27:24
**require** 14:15
**required** 124:3
**requirement**
104:11
**reserve** 223:7,12
**residency** 7:13
109:12 110:7,7
**resolved** 65:5
68:8,10 165:22
**resources** 41:12
**respect** 83:16
**response** 127:13
150:12
**responsibilities**
8:14,17 10:23
10:23 11:2,10
**responsibility**
17:13
**responsible** 10:7
19:9 67:18
**rest** 89:15
**restored** 207:2
**restrained**
196:11,15,15
**restraint** 196:8,9
196:9,12,13,16
197:6 215:23
**restraints**
196:17,18,20
196:20,22
197:7,10
204:20 206:4
**restrict** 42:1
**restricted** 41:9
42:22 43:2
44:13 54:8
55:10 56:1,8
102:14 156:2
156:12 164:10
186:19,22
192:21 209:9
221:7
**restricting**
181:18

**restriction**
102:15 154:16
154:21 155:7
155:21 156:7
157:1,10,12,21
157:23 158:20
158:22 159:2,6
159:16 164:5,9
171:8,13
176:16 181:4,6
181:13 184:18
187:11 194:3
207:7
**restrictions**
155:17 163:20
163:23 164:3,8
171:6,7 180:11
186:7
**restrictive** 8:23
**retained** 97:13
**retired** 23:3
**returned** 188:21
188:24 189:19
213:22
**revealed** 42:7
**reverse** 219:2,4
**review** 60:7
200:8 207:16
207:22,24
208:7,18,20
211:4 223:8,11
**reviewed** 97:1
97:10 98:18
189:2,3,4
**reviewing** 96:19
96:22,24 97:7
**reviews** 37:13
144:20 197:18
**Ridge** 2:4
**right** 5:20 8:2
10:9,11 12:2
12:20 13:4,22
15:17 16:9
20:20 24:12
27:14 30:18
31:17 33:3,9
34:12 42:4,20
43:1 44:10
48:14 49:2

50:17 58:6,19
58:23 64:15,24
66:11,17 67:1
67:3 68:2,3,6
71:8 73:17
75:3 76:1,10
79:16 83:13,22
87:9 88:4,5,8
89:24 90:9,19
90:21 91:2,3,6
91:15 94:9,12
94:18 95:6
100:6,7 102:11
102:18 103:8
105:20 111:7,9
112:13 116:5
116:10 118:3
118:14 119:13
120:1,20
129:23,24
130:13 135:12
137:22 140:7
142:9 145:4
148:10 150:4,9
150:14,16
151:10,11
152:18 155:9
155:15 156:13
156:14,16
157:5,12
158:18,19,24
160:12,13
161:15,24
162:5,17,21,24
163:10 164:2
164:10,13
165:2,4,9,18
166:12 167:6,8
167:13,16
170:15,16
171:4,9,12,19
174:8,9 175:3
176:13 177:6
180:24 181:3
181:15 182:16
183:11,16
184:13 185:10
186:14 187:15
188:18,19,22

191:23 194:24
195:24 196:23
197:2,7,12,19
198:8,13,14,16
198:23,24
199:13 201:2
201:24 202:23
203:15 205:19
205:22 206:9
206:14 207:8
207:12,13,15
207:19 208:5,6
208:19,23
209:2,12,13
211:15 214:3
219:18,23
220:4 221:1,14
222:17
**rights** 102:15
119:17 120:14
121:4 154:16
154:21 155:7
155:22 156:2,7
157:10,10,21
158:20,22
159:3,6,16
163:20,24
164:4,5,9
171:7,8,9,13
176:16 180:11
181:13,18
187:11 194:4
207:7
**risk** 196:7,15
197:2 204:20
212:7,9,15
215:23
**RN** 152:24
**RNs** 146:10
**road** 171:1
**Robert** 79:9
185:13,14
219:23
**role** 10:18 12:18
**roles** 10:18
**romantic** 57:14
131:3,18,20,22
132:2,6,8,11
**romantically**

178:15,23
**room** 52:3,8
54:23 69:2
70:16 84:24
85:18,22 89:6
89:8 91:24
93:4 113:3
162:10,11,14
162:15,16
177:11 178:8
186:1,2,14,16
188:24 206:14
211:5
**rooms** 84:21
85:20 89:1
**ROR** 158:11,17
158:20 181:13
182:3,9,10,15
183:13 184:4
184:22,24
185:6 187:11
187:14 188:17
189:8 191:15
192:11,15
193:8 209:10
220:17 221:4
**RORY** 2:21
106:17
107:11 108:7
108:10,16
109:3 110:17
110:21 178:21
190:1
106:23
**rubbing** 136:19
**rule** 92:7,9,12,13
92:16
**rules** 1:17 4:23
**rumor** 77:4,6
107:21 108:9
139:1 140:19
**rumors** 38:10
106:8,10,10,11
106:16,18,24
107:1,16 108:1
109:4 130:20
137:6,7 138:2
138:6,22

139:18,20
140:9 179:9

---

**S**

**S** 2:8 3:6
**safe** 68:8 163:18
**safety** 55:1 67:7
67:8 91:22
92:8,10,10,11
125:21 151:24
169:24 170:4
**SAITH** 223:16
**Sandoval** 104:21
**save** 91:20 119:7
132:24 205:8
**saving** 204:11
**saw** 29:17 74:14
80:10,11
103:21,21
106:22 115:24
116:1 138:4,7
138:21 187:14
189:5 194:4
202:22
**saying** 20:23
42:19 43:7
44:24 52:23
57:13 66:23
70:3 72:8
75:14 79:23
82:12,19,21
84:19 85:2,3
89:23 99:5
100:6,15 102:7
103:19 107:10
107:23 108:22
113:5 114:6
115:15,22
119:9 128:12
129:12 133:4
134:4 137:19
137:21 138:3,5
138:6,8,10,23
140:12 154:4,6
154:10 158:14
169:10 184:11
185:6 189:18
204:5 208:16
**says** 20:22 21:22
22:9 24:4 30:4

46:12 50:4
62:10,13 70:15
72:12 76:1
77:10 80:23
82:11,19 89:15
90:15,18 93:16
104:8 116:24
117:8 118:19
118:22 119:3,8
121:24 133:1,4
141:8,13,15
145:13 146:3
147:13 149:8
150:13,17
155:3,16,18
156:22 157:4
158:7,10
160:18,19
161:20 162:2
164:23 165:4,7
165:11 170:10
170:15 175:20
177:3 181:16
182:3,9,13
183:6,12
184:14,24
185:1,22,23
186:17 187:9
188:12 189:7
190:7 191:22
192:1,3,15,17
195:21 196:7
197:4,9,11
198:20 199:23
199:23 201:3
201:16 204:20
205:10 207:15
218:24 221:4
**scanned** 174:16
219:4
**scared** 119:16
120:14
**schizophrenia**
19:7,16
**schizophrenic**
18:1
**screen** 20:1,13
20:19 21:9
58:6,23 82:10

217:24 218:4
219:21
**scroll** 90:8
**scrolling** 95:14
103:11 142:20
219:9
**Sean** 2:22
**search** 52:3
177:11 178:8
188:24
**searching** 113:2
**second** 44:8
68:16,18
133:20 138:23
160:16 167:18
167:20,20,21
170:20 190:19
193:24 216:15
216:16,22
217:18
**secondly** 127:17
**section** 176:2
202:11 204:19
204:19 211:24
**sections** 195:16
206:2
**secure** 221:20
**secured** 153:20
205:17
**security** 41:13
52:6 78:3,17
89:10 114:18
123:5,8 124:10
142:19,21
155:7 156:19
158:12 175:10
177:11,12,13
178:5 181:19
181:21 184:16
187:14,22
188:14 193:18
194:12 211:5
221:6,6,8,17
221:19,20
222:3,7
**see** 7:18 9:5
15:10 16:9,17
16:20,23 20:10
20:11,14,19

21:11,18 22:13
42:18 47:23
50:4,17 58:5,5
58:13,23 59:1
59:19,20 60:14
60:19,20 63:5
73:21,22,23
88:11 91:23,24
92:21,22 93:1
93:3,3 94:1,14
95:2,3,15
96:18 103:16
105:12,16
112:6 113:9,10
113:17,17
115:2 122:9
124:2 135:2
140:18 141:9
142:6,21 143:2
144:24 147:1
157:12 162:5
166:10,22
176:6 185:22
189:13,14
193:12 197:23
201:3 202:22
211:10 212:12
213:18 219:21
220:1 221:9
**seeing** 38:6
62:21 93:6
107:5 112:9,10
112:10,19
**seen** 62:10,14,16
75:11,20,21
77:17 84:20
88:24 94:21
104:23 141:6
142:23 147:6
154:21,24
218:12
**selected** 200:7
**self** 211:11
**send** 68:5 115:14
146:6
**sending** 115:20
**seniority** 12:5
**sense** 127:20
**sent** 98:2 115:3

141:6,7 145:18
146:16,18
150:22 187:18
190:9 193:7
**sentence** 161:9
**separate** 64:12
64:19,24
150:20 164:9
213:6
**September**
21:15 53:3
**sequence** 8:1
127:15,22
128:2
**sequential**
174:12
**services** 2:21
36:17 37:9,12
103:23
**session** 16:21
**set** 21:4 46:9
84:19 85:23
93:5 154:16
186:7 225:14
**setting** 35:19
84:14
**seven** 8:6 9:2
21:10 60:15
64:7 82:16
100:6,8,9
113:23 116:8
120:10 130:23
**sex** 85:22 86:15
88:3 89:22
90:21 91:3
111:3,6 118:3
118:9,13
120:19,23
121:7 132:18
140:8 143:11
143:16,22
149:10 153:13
153:17,21
154:1,8 178:11
179:18 180:3
180:19,19
189:15,17
222:9
**sexual** 50:8,11

53:11,13,24
56:19 57:6,8
57:15 59:14,15
59:22 83:12,21
84:23 96:10
122:1 129:8
133:2 135:7,11
135:16,23
136:6,16,18,22
143:19 146:4
147:5,16
150:13 179:4
189:12,24
197:5,10,11
200:22 201:4
201:17,20
202:9 203:10
204:3,4,4,6,21
206:4 216:1
222:21
**sexually** 49:7
96:15 108:14
108:21 178:23
179:21 180:4
199:9,11 204:7
207:7,13
**shake** 5:4
**shape** 111:16
**share** 20:1,10
218:4
**shared** 50:10
60:22
**sharing** 217:24
**shift** 62:14 149:6
203:24
**shoot** 217:22
**short** 24:20 25:2
87:20 121:10
121:16 205:14
**Shorthand** 1:20
225:1,18
**shot** 103:9
**show** 173:14
216:20
**showed** 164:3
**showing** 141:3
144:10 194:17
**shrink** 95:14
142:20 166:16

**shrunk** 70:9
**Shuffle** 190:8
**sic** 217:4
**sick** 115:13,15
**side** 34:4 58:19
  60:19 62:11,12
  62:19,19 94:3
  109:18,18,20
  109:20 128:20
  163:13 175:1
**sign** 146:9 184:4
**signature** 21:13
  184:2 192:18
  203:17 216:9
  217:16 218:7
  223:7,10,13
**signatures**
  161:18
**signed** 12:22
  197:17 198:11
  203:18 206:9
  216:18 217:15
**significance**
  11:17 12:6
  37:14 127:1,2
  127:4 200:24
**significant** 16:13
  16:15 37:10
  77:7 124:2
  200:18,20
**signing** 11:5
  225:9
**silently** 69:8
**similar** 35:16
  188:10
**Simple** 133:1
**simultaneous**
  8:10
**sister** 61:5
  125:15
**sit** 23:22 54:15
  86:16 113:6
  132:19
**sitting** 94:24
  132:17
**situation** 77:19
  82:12,20,21
  110:12 135:4,4
  219:9

**situations**
  135:21
**six** 37:18 45:16
  45:24 104:6
  128:19 146:3
  147:3 149:11
  172:2,4,6,8
  219:6,13,17
**six-month** 173:6
**sixteen** 105:8
**size** 95:11,12
**skip** 159:24
**skipped** 146:2
**slightest** 72:18
  72:21 73:15
**slow** 21:9,19
  58:15 62:6
  196:6 201:24
  208:12 217:20
  219:15,18
**slow-pitched**
  32:10
**slowness** 82:10
  198:19
**small** 93:5,7
**smaller** 93:8
  95:13
**smoothly** 4:23
**snack** 128:20
  130:12
**snacks** 125:8,11
**social** 11:18,21
  12:23 13:11
  17:23 18:3
  25:23 26:8
  38:19 39:5
  61:9 69:2,3
  70:16 71:15,22
  73:7,14,18,22
  79:2 83:18
  88:4 89:7,12
  89:22 91:3,16
  92:3,21 93:8
  93:14,20 94:11
  94:15,20
  105:23 107:24
  109:10 110:1
  112:10 117:19
  117:24 119:10

  120:23 124:9
  124:18 125:13
  125:13 129:21
  130:4,5,7
  134:13,15
  141:16 150:5
  151:6 157:23
  158:3,11
  168:19,21,21
  168:22 181:7,8
  182:4,5,13,20
  185:12,18
  187:6,8,10,13
  188:16 190:22
  193:1,3,4
  205:18 208:1
  221:19
**socialize** 63:14
  109:24
**somebody** 14:19
  69:4 88:2,7
  89:16,19 91:1
  94:24 107:14
  115:12 119:23
  132:13 193:5,6
  193:21
**somewhat** 6:6
**sorry** 6:12 7:23
  12:17 14:23
  20:7 21:2,8,19
  29:24 37:19
  44:8 45:18,19
  58:15 62:6
  82:9 86:5 87:4
  88:6 102:4
  103:8,11,12
  121:19 122:2
  133:20,21
  139:14 146:12
  158:20 160:3
  167:22 174:15
  195:1 196:5
  198:18 201:23
  205:7 208:12
  216:22 217:1,6
  219:5,8 220:17
**sort** 104:16
  161:19
**sources** 206:17

  207:15
**South** 2:3
**speak** 22:4
  123:12
**speaking** 112:24
**special** 12:5
  152:1 199:16
**specific** 17:17
  33:22 38:8
  43:15,24 50:12
  78:23 79:12
  107:2 108:4
  121:5 123:15
  123:15 124:16
  126:4,9
**specifically**
  38:18 111:1
  149:9 169:9
**specifics** 194:8
**specified** 225:8
**speculate** 200:14
  204:18
**speculating** 30:3
  210:23
**speculation**
  29:20 30:6
  56:5,22 57:9
  114:9,12 200:9
  202:12
**spell** 5:13
**spend** 16:11
**spending** 69:1
  69:19,23 70:15
  70:23 71:4,12
  71:16,23 72:4
  73:8,10,14,18
  76:23
**spends** 71:20
**spent** 76:18
**spoke** 40:13,17
  79:6 81:23,24
  110:20 187:23
**spoken** 26:16,22
  27:6 36:12
  44:2,5 123:13
**spoon** 186:9
**spork** 186:8,15
**spot** 95:7 167:23
**spots** 94:3,23

  95:4
**spread** 93:15
**square** 93:21
**srandolphk@ ...**
  2:10
**STA** 79:3 107:24
  151:6
**stability** 208:17
**stable** 96:6,21
  99:5 101:6
  111:22 165:24
  166:2,5 173:12
  177:5
**staff** 7:16 8:1
  38:9 39:4 47:6
  49:7 55:15
  56:3 74:13,23
  75:2,4,5,7,12
  75:12,15,17,19
  76:16,19,22
  80:16,20 81:9
  81:12 84:7,8,9
  89:18 95:22
  107:3,18,23,24
  108:5 110:15
  111:16 112:3
  112:18 113:12
  113:16 114:21
  118:2,13
  120:18 122:14
  125:21 135:15
  135:19 136:2
  137:13 139:20
  140:19 144:22
  150:14 151:5
  155:4,4 201:12
  222:18
**staff's** 134:17
**staffing** 16:21
  170:13
**stamp** 188:7
**stamped** 218:6
**stand** 119:16
  120:13
**standard** 175:24
  221:3
**Standing** 188:12
**start** 4:22 41:18
  43:3 61:10

191:12 219:15
219:16
**started** 38:6
39:7 40:22,22
40:24,24 44:16
51:7 52:14,17
53:7 54:6
57:18,19
109:18 110:7
139:5 163:6
179:8,9
**starting** 4:7 62:3
91:19 95:19
106:6 117:3
118:19 121:22
180:13 221:4
**starts** 72:12
103:18 118:21
130:22 144:12
161:20 164:19
174:4
**STAs** 11:22
124:21 126:8
126:15 150:6
168:24
**state** 1:20 2:13
4:5 5:13 7:1
52:11,18 58:10
59:4 60:16
61:2 62:9
63:19 68:24
74:22 77:10
89:7 98:3
112:24 113:1
118:8 156:20
225:1,19
**stated** 33:7
177:16 182:13
201:15 225:10
**statement** 58:9
**statements**
23:13 24:10
**States** 1:1,18
224:1
**station** 85:24
92:1 93:4
143:16
**status** 195:24
196:2

**stay** 48:22 65:1,6
65:12 67:9
166:4 168:3
169:14 170:8
185:15
**stayed** 68:10,14
68:15 96:4
**staying** 170:18
187:2
**stenographica...**
225:6
**stipulate** 51:6,11
53:19 175:6,10
217:14,21
**stipulated** 51:24
**stipulating**
218:9
**stop** 21:19
201:24 204:18
217:24
**stopped** 69:21
**stops** 212:8
**stories** 40:15
53:14,17,21
57:17
**story** 40:7,9
110:21
**strategies**
151:17
**Street** 2:14
**stress** 114:24
**stressed** 125:5
**stretch** 87:16
**strike** 119:15
120:12
**structured**
100:13
**struggle** 160:19
**stuff** 110:17
151:19 195:13
211:6
**submit** 12:21
**subpoena** 98:2
195:11
**subpoenaed**
13:13
**subscribe**
224:16
**SUBSCRIBED**

224:22
**substance** 18:5
65:8,10 66:24
67:9 68:11
168:3 198:6
205:13,18
**successfully**
14:1
**sudden** 45:4
**sued** 25:9
**suggest** 119:14
**suggested**
134:10
**suggesting**
111:12 116:22
**suggestion**
103:10
**suicidal** 101:11
**suicide** 212:1,7
212:11,16,18
213:6,11,18
214:6 215:9,10
215:13
**Suite** 2:3
**summarize** 6:24
**summary** 97:9
216:19 217:2
217:12,16
218:2,10
220:23
**summer** 5:21
**supervised**
100:1
**supervision** 14:9
**supervisor** 9:18
26:20 72:15,16
73:2,5,20,21
75:23 114:20
134:13 139:7
142:8 145:3
**supervisors** 9:24
37:7
**support** 114:23
152:7 177:22
178:1
**supporting**
177:5
**supportive**
177:23

**suppose** 17:20
**sure** 5:1 8:20
14:10 20:15
25:3 34:6 40:1
51:19,19 60:12
70:1 73:1
75:10 82:13
86:14 88:10
90:4,4 92:12
102:23 107:22
114:1,3,5,7
117:7 119:7
132:14 137:6
138:12 139:21
144:20 145:9
146:11,17,17
150:1,8 159:11
160:23 161:15
164:8 168:20
176:19,20
179:24 181:20
182:21 193:14
198:1 202:24
203:12 212:23
216:8 217:16
218:12 220:16
**surprised** 45:4
**surprises** 218:13
**suspect** 55:3,4,5
55:6,17 56:7
56:14,18 57:3
57:6 70:12,20
73:24 131:23
**suspected** 55:15
56:15
**suspicion** 50:7
50:14 51:3
53:11,12,23
54:1,5,17
55:21,23 57:12
57:14 104:11
106:5 139:9,16
140:15
**suspicions** 50:11
106:7
**suspicious**
104:18,24
130:17 132:20
**SW** 141:16

**sworn** 4:18
224:22 225:3
**symptom** 200:23
**symptomatic**
15:8,21
**symptoms** 14:3
14:5,5,11,15
15:18,24 16:16
16:19 200:22
211:11

———————

**T**

**T** 3:6
**table** 111:7,8
**take** 5:3,11 12:8
16:2 19:12
24:21 50:19,20
69:8 73:4
77:13 85:14
87:9 98:13
111:5 119:21
121:10 125:15
130:7 134:2
152:8 171:23
184:19 202:7
**taken** 1:16,19,20
35:14 79:24
149:4 189:13
223:9 225:8
**takes** 148:20
172:19
**talk** 4:24 26:1,12
31:12 35:12
38:14,16 39:1
40:10 42:6,10
42:19 51:12,16
65:22 69:3,16
72:15 73:21,22
84:9 101:18,21
104:21 107:20
108:6 109:5
110:12 114:1,5
114:7 116:1
125:12 130:6
142:11,15
158:1,2,14
191:2,4 192:22
209:6
**talkative** 96:1
**talked** 27:17

37:15,17,20
38:11,11 39:4
39:6,21 40:19
42:21 43:12,23
44:23 84:3
101:16 107:18
110:11,17
111:14 120:17
136:5 156:18
172:20 214:24
222:5
talking 5:4 24:9
38:6 39:16
42:15,15 46:4
52:6 57:19
79:1,11,20
80:4,17,23
81:1 82:8 83:2
83:3 84:7,9
92:2 104:2
106:21 107:4
110:15,19,22
110:24 114:3,9
118:20 133:23
136:8,10 140:9
206:17 207:23
215:9,10,13
216:3
talks 147:12
188:12 208:21
taught 83:17
team 8:18 9:23
10:2,6 11:18
11:24 17:3,6
17:14,16 25:24
26:5,7 27:13
35:1 36:22
38:9 60:23
63:17 65:10,13
65:16,19,23
66:20 78:21,24
78:24 114:18
123:14 124:1,7
124:8,9,13,14
124:22 125:1
126:7,13,13,22
132:15 139:17
146:14,21
149:20,20

150:5,8 153:4
166:9,10
177:16 186:3,5
188:13 205:15
221:19
teams 61:8 66:1
168:2,6,13
telephone 35:8
157:5,21
180:13,16,16
181:4 183:13
186:20 209:11
tell 6:22 8:14
13:8 14:18
65:24 75:7
76:13 82:3
119:16 125:4,5
155:2 167:19
178:3,7,13,19
184:8 203:3
210:10 214:24
215:2,7
telling 31:3 33:3
38:1,20 43:10
75:21 100:1
135:8 143:21
147:15 151:23
182:15 206:20
209:20 210:6
210:17,21
211:13
tells 73:3 74:14
135:1
ten 62:3,12
105:2 208:14
tend 173:5
terms 18:10
113:21
testified 4:19
139:8 202:18
testify 12:24
13:10,11 225:4
testifying 58:9
testimony 27:22
27:23 118:17
118:17,18
130:11 134:11
214:13 225:7
testing 19:11,14

text 115:13,19
116:14,17
thank 5:12,16
15:3 24:16
25:5 48:15
85:16 87:8,19
103:10 119:6
121:12,15
137:22 140:2
146:20 158:4
188:4 195:12
214:11 223:2,3
Thanks 87:4
theoretically
33:21,22
therapist 11:19
17:23 177:1
therapists 61:9
112:11 124:10
therapy 11:21
124:10 177:2
208:1 221:20
they'd 152:6
Thiem 99:21
100:4,18 101:1
102:5 157:17
172:22 173:22
187:15 190:17
205:14 213:2
Thiemed 157:18
213:20
thing 6:17 17:9
27:18 33:10
43:9 45:9,9,10
78:17 86:1
102:21 117:14
151:23 188:15
188:16 204:19
218:11 222:13
things 6:3,20
15:21 35:13
38:1,10 39:8
97:18 101:21
103:20 136:2
138:3 169:11
173:2,8
think 9:9 17:24
18:1 24:6
31:20 32:5,6

32:16 45:2,18
45:20 53:2
56:20 57:3,10
61:9 68:17
69:12 72:24
78:12 82:20
83:7,13 86:20
86:22 92:17
96:20 109:19
116:24 117:8
123:19,22
124:14,20,22
125:3,18
126:12,22
128:24 129:1,3
129:14,21
131:11,17
133:5 141:5
146:5 147:22
158:21 160:18
160:19 161:20
162:8 167:14
167:15 168:24
173:20 174:10
176:20 177:8
180:7 184:5
185:11 187:4,4
192:19 193:12
198:1 210:15
211:11 213:13
215:5 216:19
218:15 220:1
222:8
thinking 55:12
111:8 128:22
129:2 202:17
203:4
thinks 192:3,4
third 138:23
165:7 182:20
thirdly 127:18
thought 57:2
99:8 104:24
121:6 129:17
211:9 215:10
217:2,12
threat 100:10,16
101:4
three 5:21 92:19

105:2 117:22
127:21 130:22
147:19 149:11
152:14 158:7
177:3 192:14
195:18 197:22
204:22 206:3
206:13 212:18
213:6,11 214:6
thumb 92:13
Thursday 1:21
tied 196:11
tight 201:13,21
till 61:16
time 8:2,3 9:1,2
9:9,10,11,13
14:13 16:11
17:10 23:3
24:14,22 25:24
26:7 27:4,8,12
28:21 29:11
33:3 39:15,17
41:3,7 42:4,9
42:17 43:1
46:15 47:14
48:2 49:1,23
50:2,19 51:21
53:6,9,22 56:8
56:10,10,14
57:10 60:24
61:24 66:7
69:1,19,23
70:3,14,16,24
71:4,13,16,20
71:23 72:4
73:8,11,14,19
76:18,23 77:9
79:4 82:13
84:5,6,10
86:17 87:12
90:2 91:14,20
96:5,9 97:1,22
98:13 102:19
103:12 104:7,8
104:22 105:11
105:21,24
106:7,13,20
107:22 109:16
112:21 116:11

119:7 124:20
125:23 126:6
128:4 129:22
130:2 132:21
132:24 134:24
135:9,10
140:12,14
143:14 149:1
151:8 156:15
161:7 163:3
164:24 165:23
165:24 166:8
179:19 182:8
183:18 190:5
192:13 193:11
198:16 204:11
205:8,22
206:23 207:9
207:14 212:21
212:23 213:8
215:3 216:14
223:4 224:14
225:8
**times** 11:2 15:22
37:24 39:5
46:14 56:23,24
63:5 76:5
94:12 132:6
174:18 203:6
209:22 213:7
213:12 214:6
**tired** 215:5
220:17
**titles** 161:19
**today** 23:22
50:24 53:1
54:16 55:20
86:16 88:3
113:6 132:17
132:19 133:5
146:10,11
176:5
**today's** 97:6
98:18
**told** 41:7 42:2
43:5 78:2,4
80:21 81:12
123:4,6,9
127:14 135:21

135:24 137:7
138:8 159:8,12
177:23 178:4,5
178:12,18
179:6,11 180:1
181:20 191:4
**Tom** 191:13,14
191:22 193:6
**top** 21:17 59:2
62:4 122:6,20
130:19 141:9
163:4 164:19
181:12
**totally** 125:19,19
132:5
**touching** 121:24
133:1 135:14
135:17,18,20
136:1,20,22
137:14,16,21
**traffic** 89:17
**train** 146:9
**trained** 150:5,7
221:18
**training** 144:22
**transcript** 58:6
86:8 223:8
224:14,17
225:6,10
**transcripts**
137:18
**transfer** 64:23
66:3,7,11,13
66:14,16,19
67:5,5,13,21
67:23 150:20
170:12
**transferred**
17:21 64:9,10
64:13 65:2,3,7
101:7 125:9
129:19 131:2
165:5,6,8,12
165:15,17,20
166:8 169:24
170:3 185:18
**transfers** 67:11
67:19
**transport**

177:15
**trauma** 197:5
**travel** 11:5
**treat** 14:12
69:17 71:11
83:16 150:18
**treated** 14:1
**treating** 147:21
151:12 178:7
179:11,17
209:23 210:14
211:7,20
**treatment** 8:18
8:19 9:23 10:2
10:4,5,6,7
11:14,24 12:14
12:20 14:9,15
16:17 17:3,4,6
17:14,16 19:5
19:19,22 25:24
26:4,7 27:13
35:1 36:22
38:8 61:8
65:13,16,19,23
66:1,24 67:6
78:21,24,24
99:13,22
101:23 114:18
123:14 124:1,7
124:8,9,12,14
124:22 125:1
125:23 126:7
126:13,13,22
132:15 134:21
135:2 149:8,16
149:20 166:9
166:10 168:2,6
169:2 170:12
177:16 198:5
198:22 199:22
**trial** 140:3,4,10
218:13
**trick** 47:18 60:1
91:8
**tried** 103:6
127:23
**trouble** 121:7
127:24 161:14
**true** 12:15 19:19

50:24 76:3
94:17 100:3,3
111:13 149:24
173:3 224:17
225:6
**trust** 175:9
223:9
**truth** 6:23 87:7
225:4
**truthful** 60:13
**truthfully** 6:2
**try** 20:1 22:3
34:17 47:24
58:3 80:12,13
112:6 124:2
141:2 142:19
161:19 162:4
190:24 193:23
**trying** 28:17
29:18 31:24
32:6 34:5,6,13
47:17,18 53:22
55:19 74:6,21
91:12,14 96:12
115:7 117:6
119:7,24
123:13 126:24
132:24 138:12
172:21 195:12
205:7 208:13
219:14
**turned** 206:14
211:5
**TV** 114:11,12
**twelve** 52:23
91:19 93:12
100:8
**twice** 16:23
112:9
**two** 15:21 17:5
34:9 35:23
46:8 51:18
56:6,16,19
81:10 90:20
113:19 116:4
118:19 120:9
125:15 135:23
147:16,17
150:14,15

153:13,15
154:1 155:13
155:17 157:9
165:21 166:20
175:1 176:6
180:19 191:21
192:14 195:18
206:18 222:22
**type** 59:15,16,22
87:5 116:19,20
121:24 135:17
135:20 219:9
**typed** 185:11
**typewritten**
185:9,20

**U**

**uh-huh** 20:12
77:15
**Uh-uh** 156:3
**ultimately** 10:4
**unable** 155:5
**uncommon**
130:8
**undergoing**
155:20
**underlying**
21:24 22:11
46:9
**understand** 5:9
6:9,21 13:21
15:11 24:2
25:9 29:4,18
30:10 32:1
44:22 46:18
47:24 48:6,7
74:21 85:1
91:12,12,13,14
103:19 128:7
139:22 151:7
179:23 203:9
205:1 213:23
215:15
**understanding**
48:10 85:6
119:5 158:17
159:11 181:5,9
181:21 191:3
214:8
**understands**

15:13 32:5
**understood** 34:6
120:22 126:21
158:16 200:14
**undertone** 122:1
**unfounded**
104:4
**uninterested**
174:22
**unit** 8:16 10:9
10:10,13,14,15
10:18,20 11:1
12:7 17:22,23
18:7 22:22
23:2 25:19,22
27:4,14 28:5,8
29:9 30:15
35:4,6 38:5,19
39:6 41:7
42:22,24 43:17
47:13,14,15
54:8,9 55:9
56:11 60:19
61:21 63:16,16
63:22 64:2,5
64:13,13 65:1
65:2,7,7,9,10
65:12 66:4,8
67:1,2,2,3 68:2
68:5,6,13,15
72:2 78:3 79:3
80:9,11 89:9
89:11,18,18
96:4,5,16,18
96:22 97:22
105:9,15,23
115:14 124:19
125:9 126:6
129:18,19
134:18,18
141:14,17
148:15 162:14
163:5 166:13
168:3,9 169:15
169:18,21,24
170:2,8,18,21
171:16,18,18
173:13 185:19
185:19 186:18

186:22 187:2,5
187:23 205:18
209:9 221:7
**United** 1:1,18
224:1
**units** 61:5 81:10
84:19 85:23
105:23 125:15
148:17
**unlock** 91:22
**unlocked** 91:18
91:22 92:9,14
92:19
**unnecessary**
211:1
**unobjectionable**
32:17
**unpredictable**
155:19 163:7
**untruth** 87:7
**unusual** 125:15
125:19 130:5
132:1,5
**updates** 145:17
**upper** 160:14
**upset** 81:11
**upside** 58:17,22
206:14
**use** 5:22 157:5
181:7,14 182:3
187:16 196:19
196:20 197:6,7
206:19,22
215:23
**uses** 212:8
**usually** 13:8
14:14 16:16
18:3 19:11
31:12 101:18
112:21

─────────
**V**
─────────
**validation** 19:15
**value** 12:10
**varied** 9:10
**various** 174:18
200:6 208:2
221:17
**Velcro** 196:20
**verbal** 5:3 29:16

56:3 57:4
**verbally** 56:20
**verification**
191:6
**verify** 60:2
206:16
**versa** 133:3
**version** 146:7
**vice** 133:2
**Vicky** 36:16,21
141:13 191:22
193:21
**victim** 150:18,22
150:24 151:13
151:17 152:2
171:4,10,12
**victim's** 148:14
149:8
**Victoria** 36:15
**videoconference**
4:4
**view** 35:18
**violation** 92:7
**violence** 196:5
**violent** 125:22
196:10
**vision** 84:21
89:1 93:13,19
93:20,21,24
94:18,21 95:3
**visiting** 5:21
**voice** 6:17
170:17
**voiced** 5:2
**voicing** 169:13
**volunteer** 24:24
210:11
**volunteered**
85:9,19
**volunteering**
25:1 158:4
179:14
**vs-** 1:6,12 224:5
224:9

─────────
**W**
─────────
**waist** 177:15
**wait** 103:11
**waive** 223:9
**walk** 94:14

**walked** 77:18
79:10 81:24
82:1 95:5
115:8 116:3
221:14
**walking** 89:18
89:18 93:24
94:11
**walks** 31:3
**want** 4:22 5:10
24:20,24 25:3
30:17 48:9
50:20 51:16
52:24 53:5
60:11 62:22
66:7 69:10
82:22,23 87:5
87:7,15 88:20
111:2,5 116:22
117:21 119:3
124:16 136:14
138:18 151:8
152:20 156:5
157:20 159:11
166:7 180:24
198:3 202:16
215:1,7 216:18
218:4,11,13
219:12,20
220:16,17
222:13 223:7,8
**wanted** 86:21
100:12 116:2
130:15 187:18
191:2 210:11
217:17
**wants** 13:6,10
53:18
**wasn't** 27:13
53:14 73:12
130:1 137:4,10
137:12,24
138:15 140:10
141:6 164:10
164:17 167:8
169:21 171:8
173:20 187:16
189:11 194:10
211:19

**watch** 114:12
**watching** 221:23
**way** 8:20 10:22
15:5 16:5
21:18 29:16
31:4,16 32:24
36:10 44:17
66:14 69:7
80:4 81:16
84:19 85:23
91:19 93:5
95:9 96:15
108:13 111:16
111:24 112:13
112:15,16
122:8 133:3
161:10 186:20
189:21 205:24
209:16
**ways** 29:18
30:14 35:18
112:17 221:17
**we'll** 43:3 87:17
103:4 115:5
121:13 219:7
223:12
**we're** 7:8,9 8:21
24:9 30:1,3,9
32:12,14,18,21
33:3 34:9,11
41:14 48:14
51:6 52:6
58:22 60:12,15
60:15 62:3
74:21 87:10
88:22 90:24
95:9 121:13,20
127:9 140:8
146:15 152:14
158:5 160:19
176:4,20
188:11 195:18
202:3 204:10
205:24 207:23
208:13 215:6,9
215:13 216:14
216:19 218:9
218:13 223:14
**we've** 126:18

163:2 182:19
222:5
**wear** 196:14
**week** 9:4,6 16:20
**welcome** 199:4
**well-described**
149:12
**went** 63:16
79:20 115:23
130:15 144:14
160:3 180:10
187:15
**weren't** 54:11
137:7 142:2
210:9 211:15
**West** 2:14
**whatsoever**
105:20 213:23
**WHEREOF**
225:14
**wide** 94:21
**wider** 93:16,17
**willing** 33:10,17
99:12
**Wilmette** 2:9
**window** 46:15
93:13,18,19
94:22 95:2,5,6
**wished** 158:8
**wishes** 158:15
**witness** 3:2 4:4
4:18 7:11
15:14 18:21
58:9 77:20
87:9,19 121:10
121:12,15
127:22 128:10
128:15 191:18
215:7 223:11
225:3,3,9,14
**witnessed** 75:10
75:15,16 77:18
**witnesses** 24:23
**wondering**
42:15 43:6,23
44:19,24 45:3
45:8,13 46:3,5
56:5 79:13
80:1 81:5

126:21 139:20
146:22 159:3
200:6 222:20
**word** 72:12
79:19 162:8
191:5,16
**words** 5:6 59:20
113:4 166:21
191:21 211:1
**work** 8:3,4,7,16
9:2 10:5,10
11:5,23,24
12:12 18:4
61:17 63:4
69:5 94:8
98:14 99:21
101:20 103:5
110:3 133:8
168:3 172:24
193:1,16
205:15
**workday** 63:8
**worked** 8:5
43:17,22 61:24
62:14 63:7
65:9 94:8
109:15
**worker** 11:18,21
12:23 17:23
25:23 26:8
38:19 39:6
69:3 71:16,22
73:8,14,18,22
79:3 89:7
91:16 94:15,20
105:19 107:24
112:10 117:19
120:24 124:18
129:21 130:7
134:13,15
141:16 151:6
157:23 158:3
158:11 168:19
168:21,21,23
181:8 182:4,5
182:13,20
185:12,18
187:7,8,10,13
188:16 190:22

193:3,4 205:18
208:2 221:19
**worker's** 69:2
70:16 88:4
89:13,22 91:3
92:3 93:9
94:11 117:24
119:10 181:8
**workers** 13:11
18:3 61:9
83:19 92:22
105:23 124:10
125:13,14
130:4,5 150:5
**workers'** 93:14
93:21
**working** 7:15
8:21 9:9 10:2
11:6 12:1
24:14 25:22
26:7 27:3
43:16 62:11
63:11 81:10
99:10 109:19
123:20 126:5,8
129:18 130:1
133:12 172:12
176:19 185:14
205:12,13,17
205:19
**works** 20:11
115:23
**worried** 179:15
**worries** 60:9
174:17,19
**worse** 167:4
**worth** 103:9
**wouldn't** 13:16
51:5 202:10
204:13
**write** 36:2,16
150:20,23
151:12 193:18
**writer** 183:7,8
189:7 191:1
193:2,4,5,15
**writing** 183:1,2
221:23
**written** 25:8

29:16 50:13
52:24 53:1
55:18 91:11
92:12,16
190:21,22
**wrong** 14:18
86:20 211:8
216:21 218:23
219:1
**wrongfulness**
199:2
**wrote** 30:6 33:11
34:19 36:1,15
53:2 114:5

---

**X**

**X** 3:1,6

---

**Y**

**yeah** 6:15,17
7:23 12:17
21:9 24:16
26:15 29:14
45:21 51:14,23
58:16 60:1,21
69:11 86:24
89:4 93:17
106:2,10
117:22 119:5
122:20 151:7
153:19 158:16
159:10 160:11
182:8 183:5
184:5 187:4
191:19 193:11
195:2,10
209:21 215:6
217:1 218:3,22
219:14 223:6
**year** 7:14 8:4
115:24 198:13
202:5 204:16
208:20,21,23
216:4
**years** 7:19,20
34:9 43:21
60:6 78:22
79:15 81:15
86:7,12 94:9
94:10 108:3

109:13,19
110:9 128:4
166:17 167:1
170:21 171:15
171:17,18,20
171:21 197:22
222:10,22
**yelling** 155:4
**Yep** 176:9
**young** 120:2

---

**Z**

**Zoom** 1:21

---

**0**

**015394** 195:11
**084-002777**
225:21

---

**1**

**1** 3:10 20:3,5
21:23 224:15
**1:00** 1:22
**10** 3:18 161:8
164:22,23
165:2,3 173:24
**100** 2:14
**11** 161:7 188:24
189:7
**11:05** 190:20
**1100** 182:21
**1170** 2:8
**11th** 161:13,14
188:11,20
**12** 3:19 50:3,4
57:16 84:12
218:19,21
**12-Steps** 205:14
**12/10/14** 160:10
160:11
**12/11/14** 160:18
**12/14/14** 161:20
163:4
**12/18/16** 166:19
**12/20** 167:15
**12/2016** 169:23
**12th** 225:15
**13** 58:24 111:18
111:19
**13th** 2:14 166:17

190:18 201:10
**14** 68:17 188:5
221:24
**140** 3:12
**14018** 160:6
**14061** 164:15
**1415** 188:2
**144** 3:13
**14477** 167:11
**14510** 181:12
**14515** 188:7
**14520** 190:14
**14th** 162:23
190:19,19,20
209:1
**15** 96:2 163:15
164:22 165:11
188:5 195:2
221:23 222:16
**15-minutes**
221:22
**1502** 174:13
**1503** 174:14
**1515** 182:20
187:9
**1538** 190:20
**15399** 196:6
**154** 3:14
**15405** 198:20
**15412** 203:22
**15413** 205:9
**15418** 206:18
**1544** 177:1
**159** 3:17
**15th** 194:23
**16** 111:19 115:6
197:17
**1600** 181:13
183:14,15
**16246** 154:18,20
**16250** 156:6
**16257** 154:19
**16789** 218:6
**16814** 218:7
**16th** 198:12
**17** 91:20 103:18
182:20
**17-9021-R3**
141:8

**17-cv-7909** 1:6
2:18 224:5
**173** 3:18
**1730** 162:5
**18** 2:3 64:6
69:11 88:19
104:15 117:4
**18-cv-0334** 1:12
2:18 224:9
**1870** 147:4
**19** 84:11 96:2
115:10 121:23
123:18
**1930** 166:19
**194** 3:15
**199** 110:8
**1993** 110:8,8
**1997** 7:14
**1998** 7:15,22
77:14
**1999** 170:23
171:17
**19th** 146:18
**1st** 174:7,11
175:1,18 213:2
213:11

**2**

**2** 3:11 57:23
58:2,8 182:20
190:22
**20** 3:5,10 87:24
90:24 94:9
99:4 123:17
**20-20** 111:9
113:4
**200** 2:3
**2000** 161:7
**2010** 131:11,13
**2012** 9:9,10,15
**2014** 9:13 11:8
46:15 61:16
96:21 161:7
162:23 164:5
166:8,13
194:23 195:2
197:17
**2015** 155:11
165:10 198:12
203:19,24

**204**:10
**2016** 64:6
166:18 171:2
205:10 206:1,9
**2017** 8:5 9:13,20
11:3,8 40:3
46:16 51:8
52:2 53:15,21
54:2,17 55:6,8
56:12 58:12,14
61:17 64:7
82:21 84:5,6
86:10,11,18
87:3 97:2
102:2 106:22
107:8 113:1
146:19 156:10
156:13 157:10
173:22 174:5,8
174:12 175:7
206:13 208:23
213:2,10,20
214:1,3 216:12
217:19
**2018** 212:19
213:3,11 214:5
**2020** 9:8,8,11
21:15 53:3
**2022** 1:21 113:6
224:23 225:15
**20th** 169:12
204:2
**21** 80:16 92:19
111:3
**217** 3:16
**218** 3:19
**21st** 217:19
**22** 88:19 171:17
171:20,21
**223** 224:15
**22nd** 64:6 102:2
102:5 155:11
157:14 173:22
203:19 213:2
213:10,20
214:1,3 217:5
**23** 7:20,21 94:10
109:13 171:18
**235-6752** 2:4

**23rd** 21:15 53:3
**24** 95:10,19
106:7 115:10
**24-hour** 201:11
**25-bed** 8:16
**25th** 174:5
**27404** 144:12
**27412** 146:24
**27418** 144:13
**27617** 141:5
**27981** 141:5
**27982** 141:5
**27th** 177:2
**28** 9:4,6
**29** 103:16,18
110:9
**29th** 155:17
176:22 198:21
199:24

**3**

**3** 3:12 62:14
122:24 140:23
141:4
**3:03** 87:11
**3:10** 87:16,18
**3:44** 177:1
**30** 103:15
175:20 222:1
222:19
**30,000** 174:16
**30th** 51:8 52:2
52:15 56:12
61:16 83:4
86:18 87:2,3
102:13 106:22
156:10,13,18
174:24 175:18
177:8,10
179:13,16
180:5,13
181:12 182:15
182:20 183:2
185:22,23
188:13,18
207:1,3 209:9
221:4
**31** 106:6,7
**312** 2:4,15
**31st** 55:6 141:24

175:3,7,16
**32** 106:6
**34** 7:19 110:23
111:4
**370-5410** 2:9
**38** 113:19 115:6
**39** 115:17
**3rd** 156:13
157:11 182:19
183:2 185:11
185:22 187:12
187:13,15
188:16 206:12
208:23 216:12
218:24 220:11
220:14

**4**

**4** 3:4,13 144:7
**4:02** 121:13
**4:07** 121:14
**41** 116:18
**413** 205:7
**42** 118:16,21
**43** 219:11
**44** 122:2
**45** 121:22 122:6
122:10,17
**46** 122:21
**47** 128:19 221:1
**48** 218:24 219:1
219:12 221:1
**49** 220:19 221:1
**4th** 53:20,21
54:2,17 107:8
107:10 164:19

**5**

**5** 3:14 154:12
190:14
**5-31-17** 141:8
**50** 219:15
**52** 130:19,20
**53** 133:1 219:1
219:10
**54** 132:23
**57** 3:11
**5th** 164:20,22
165:10,18
220:20

**6**

**6** 3:15 162:22
176:20 188:3
194:14 195:9
**6/30** 187:9 221:5
**6:37** 164:20
**60068** 2:4
**60091** 2:9
**60601** 2:15

**7**

**7** 3:16 62:14
217:9,13
**7/14** 193:1
**7/14/17** 191:14
**7/17** 192:17
193:17
**7/3** 182:21
187:22
**7/3/17** 183:14,15
**7:30** 166:19
**76** 167:14
**77** 167:15

**8**

**8** 3:17 159:20
160:3 220:20
**80-year-old**
122:15
**814-3739** 2:15
**847** 2:9
**8th** 58:12,14
59:21 82:21
86:10 107:7
174:12 201:8

**9**

**9** 1:21
**9:30** 164:21
177:10
**90** 12:21
**90-day** 37:12
**911** 118:21
119:24 120:3