**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| BENAHDAM HURT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **No. 17-cv-7909** |
| | ) | |
| JAMES CORCORAN, *et al.*, | ) | **Judge Rebecca R. Pallmeyer** |
| | ) | |
| Defendants. | ) | |
| | ) | |
| MARK OWENS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **No. 18-cv-334** |
| | ) | |
| JAMES P. CORCORAN, *et al.*, | ) | **Judge Rebecca R. Pallmeyer** |
| | ) | |
| Defendants. | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

On June 30, 2017, security officers escorted social worker Christy Lenhardt from the premises of the Elgin Mental Health Center ("EMHC"), a state-run mental health hospital that houses and treats patients who have been found not guilty by reason of insanity ("NGRI"). Earlier that day, security officers uncovered evidence that Lenhardt was sexually abusing a patient, Plaintiff Benahdam Hurt. Lenhardt has since pleaded guilty to a felony count of sexual misconduct with a person with disabilities for her sexual abuse of Hurt. Unfortunately, Lenhardt's misconduct was not isolated to Plaintiff Hurt, and other patients, including Plaintiff Mark Owens, have alleged that she made sexual advances on them. In these related cases, Plaintiffs Hurt and Owens bring suit against multiple EMHC staff members whom they believe should have taken steps to protect them. The Defendants—each state employees sued in their individual capacity—are Dr. Faisa Kareemi and Dr. Hasina Javed, psychiatrists employed by EMHC; Diana Hogan and Colleen Delaney, nurses at EMHC; and Andrew Beck, a social worker at EMHC. Plaintiffs allege that the

Defendants violated their substantive and procedural due process rights under the Fourteenth Amendment because they knew or suspected that Lenhardt had been abusing them but failed to report Lenhardt to the authorities, despite their obligations to do so. Both sides now move for summary judgment.

## BACKGROUND[1]

### A. Introduction to EMHC and Defendants

Of central importance in this case is what information was available to the individual defendants. An understanding of EMHC's physical and administrative structures is therefore helpful. EMHC is organized in different units, including, as relevant here, the K-Unit and the L-Unit, both of which house forensic patients. (Hurt DSOF ¶ 10.) Forensic patients are patients who have been committed to EMHC either because they have been deemed unfit to stand trial under 725 ILL. COMP. STAT. ANN. 5/104-16 or have been found NGRI under 730 ILL. COMP. STAT. ANN. 5/5-2-4. (Pls.' Joint Br. at 6.) The K-Unit and L-Unit are spatially separated by a common administrative area, but the staff of the two units have access to both units.[2] (Hurt DSOF ¶ 11.)

---

[1]     The facts set forth here come mainly from the parties' Local Rule 56.1 statements and related exhibits. Plaintiffs filed a joint statement, and Defendants responded to that statement jointly. Defendants filed separate statements on the two dockets, and Plaintiffs responded to them separately. (See Defs.' L.R. 56.1 Joint Statement of Material Facts in Supp. of Summ. J. ("Hurt DSOF") [Hurt 218]; Def.'s L.R. 56.1 Statement of Material Facts in Supp of Summ. J. ("Owens DSOF") [Owens 202]; Pls.' L.R. 56.1 Joint Statement of Material Facts in Supp. of Summ. J. ("PSOF") [Hurt 222, Owens 204].) The court has also accounted for each party's responsive statements. (See Hurt's Resp. to DSOF ("Hurt DSOFR") [Hurt 234]; Owens' Resp. to Owens DSOF ("Owens DSOFR") [Owens 212]; Defs.' Joint Resp. to PSOF ("PSOFR") [Hurt 236, Owens 214].)
    The court considers only those facts that are supported by record evidence. Several of Plaintiffs' statements of facts are not supported by record evidence and therefore are not addressed here. For example, in some instances the cited material does not support the statement asserted. (See, e.g., PSOF ¶¶ 35, 36, 46, 52, 56, 63, 64, 67, 68, 90, 95, 96, 111, 116, 117.) In addition, some of Plaintiffs' citations reference documents not in the record. (See, e.g., PSOF ¶¶ 2, 39, 40, 92, 118.)

[2]     The court is uncertain whether there is any other distinction between the K-Unit and the L-Unit or why a patient may be initially assigned to one unit versus the other.

Staff on the K-Unit and L-Unit typically includes nursing staff, psychologists, security therapy aides ("STAs"), social workers, activity therapists, and two psychiatrists—one for each unit. (*Id.* ¶ 12.)

EMHC patients ordinarily meet with their social workers individually every one to two weeks, but these meetings may be more frequent when a patient is first admitted or requires additional treatment for any reason. (*Id.* ¶ 13.) Social workers on the L-Unit normally meet patients in the social workers' offices, and, under EMHC rules, social workers were expected to keep their office doors closed but unlocked during these meetings. (*Id.* ¶ 14.) On their arrival at EMHC, patients would meet with their treating psychiatrist on a daily or weekly basis, but, after the patient is settled in, the frequency of those visits is reduced to bi-monthly or monthly. (*Id.* ¶ 15.) Also on a monthly basis, patients meet with their entire treatment team, including the assigned social worker and psychiatrist, along with other EMHC staff members. (*Id.* ¶ 16.) Each employee at EMHC is required by state law to call the Office of the Inspector General ("OIG") within four hours if they learn or suspect that any patient has been subject to any sort of neglect or abuse. (*Id.* ¶ 19.)

At all relevant times, Defendants in this case were staff members in the K-Unit or L-Unit. Defendant Dr. Faisa Kareemi worked as a psychiatrist on the K-Unit (*id.* ¶¶ 3, 25), and Defendant Dr. Hasina Javed worked as a psychiatrist on the L-Unit. (*Id.* ¶¶ 2, 23.) Psychiatrists at EMHC work with social workers and nursing staff as part of a treatment team, but the psychiatrists do not supervise the social workers or nursing staff, nor are psychiatrists responsible for evaluations or disciplinary action of social work or nursing staff. (*Id.* ¶¶ 17, 18.) Drs. Javed and Kareemi never worked in the social work division at EMHC and have never supervised any social workers during their employment at EMHC. (*Id.* ¶ 37.)

Defendant Colleen Delaney was a member of the EMHC nursing staff (*Id.* ¶ 4); she worked on the L-Unit as a nurse manager from approximately 2011 to 2015, when she became the Associate Director of Nursing for the Forensic Treatment Program, overseeing 11 units, including the K-Unit and L-Unit. (*Id.* ¶ 29.) Defendant Diana Hogan was also a member of the EMHC

3

nursing staff (*id.* ¶ 5); from 2008 to 2015, Hogan served as the Associate Director of Nursing of the Forensic Treatment Program, and she then became the Director of Nursing at EMHC. (*Id.* ¶ 32.) Hogan did not work on the K-Unit or the L-Unit on a daily basis and, as Associate Director of Nursing and then Director of Nursing, Hogan did not supervise social workers. (*Id.* ¶¶ 33, 34.) Defendants Delaney and Hogan never worked for the social work division of EMHC and have never supervised any social workers during their employment at EMHC. (*Id.* ¶ 37.)

Defendant Andrew ("Drew") Beck was an EMHC social worker and worked on the K-Unit beginning in 2008. (*Id.* ¶¶ 6, 36.) As a fellow social worker, Beck did not supervise Christy Lenhardt. (*Id.* ¶ 38.) For her part, Lenhardt worked as a social worker at EMHC for twenty years, from approximately 1996 to 2017 (PSOF ¶ 1; Hurt DSOF ¶ 21); she worked on the K-Unit and the L-Unit, and the details of her transfers between the two units are discussed in more detail below.

### B. Christy Lenhardt's Prior Abuse

Beyond Christy Lenhardt's educational qualifications (Lenhardt holds a master's degree in social work) and her start date of 1996 as a social worker at EMHC (PSOF ¶ 1; Hurt DSOF ¶ 20), the record includes little information about her early years with EMHC. The first document of note is an employment review Lenhardt received in 2005, when she was working on the M-Unit. At that time, Jeff Pharis, the EMHC Forensic Program Director, documented Lenhardt's "perceived overinvolvement with a male patient" and ordered Lenhardt to undertake additional training on "setting limits, clear boundaries" with patients. (Ex. D to PSOF [Hurt 222-4] at 808.) The document did not identify the source of this information nor elaborate on the nature of the specific behavior. (*See id.*; *see also* PSOFR [Hurt 236] ¶ 4.) At her deposition, however, Lenhardt filled in some of the details. She testified that EMHC staff reported to the administration that she was caught in another EMHC employee's office with a patient named A.R.[3] (Christy Lenhardt Dep., Ex. F to PSOF [Hurt 222-9] at 27:4–21 (stating that "people reported it to whoever they

---

[3]     The names of other individuals who are potential victims have been redacted.

reported it to").)  The office in question was that of Rebecca ("Nikolov") Ogrodny, a clinical staff member who had worked with Lenhardt on the M Unit.  (PSOF ¶¶ 12, 13.)  Nikolov, as the parties refer to her, s a key witness in this case.

Following her August 2005 review, Lenhardt was transferred from the M-Unit to the L-Unit.  (*Id.* ¶ 9.)  Lenhardt acknowledged that she was transferred due to concerns "about [her] boundaries with patients" and, specifically, with A.R.—the male patient referred to in her employment review.  (*Id.* ¶ 9; PSOFR ¶ 9; Lenhardt Dep. at 23:24–29:6.)  Rumors spread (to what extent, it is unclear) among some EMHC workers that Lenhardt was transferred because of suspicions that she was too close to one or more patients.  (*See* PSOF ¶¶ 32, 33; PSOFR ¶¶ 32, 33.)  For example, Audrey Boston—an activity therapist[4] who began working at EMHC in 1988 and, starting in 2012, worked in the L-Unit with Lenhardt and Dr. Javed—testified that in 2005 she heard rumors that Lenhardt had been transferred "due to some sexual or boundary issues with a patient on a prior unit."  (Boston Dep., Ex. J to PSOF [222-14] at 8:3–10, 61:24–62:19; PSOF ¶¶ 23, 24.)

Despite this transfer, Lenhardt continued to pursue a relationship with A.R.  Then, on or about February 27, 2006, A.R. escaped from EMHC.  (PSOF ¶ 10.)  The Illinois State Police ("ISP") began investigating the escape (*id.* ¶ 11), and, on March 1, 2006, they interviewed EMHC workers, including Lenhardt and Nikolov.  (*Id.* ¶¶ 12, 13, 16.)  Lenhardt denied any knowledge of A.R.'s escape plans and characterized her relationship with A.R. as "strictly professional"; however, Lenhardt did tell ISP that the EMHC "administration" had accused her of abusing and neglecting A.R., but she claimed that these allegations were unfounded.  (*Id.* ¶ 14, 17.)  For her part, Nikolov told ISP that she knew nothing about A.R.'s escape plans and did not assist in his escape.  (*Id.* ¶ 15.)  Nikolov further reported that A.R. simply walked past security and signed out, and that it seemed he acted impulsively.  (*Id.* ¶ 16.)

---

[4]      Ms. Boston testified that activity therapists "provide different modes of therapy through groups, such as coping skills, physical activity, [and] exercise."  (Boston Dep. at 9:2–7.)

In truth, A.R. fled to Europe after his escape—and Lenhardt planned to meet him there. (*Id.* ¶ 37.)  Whether Lenhardt told Nikolov of these plans in advance is not clear from the record, but Nikolov did drive Lenhardt to the airport for her flight and picked her up upon her return.  (*Id.* ¶ 37; *see also* PSOFR ¶ 36.)  Whether anyone else at EMHC ever knew of Lenhardt's travels to Europe to meet A.R. is also not clear from the record.

Staff members did know, of course, that a patient had escaped.  For example, Defendant Dr. Javed worked continuously with Lenhardt after Lenhardt's transfer from the M-Unit to the L-Unit in 2005, during the period when A.R. escaped in 2006, and continuing until Lenhardt's separation from EMHC on July 5, 2017.  (PSOF ¶ 19.)  Dr. Javed says she did not know why Lenhardt was transferred from the M-Unit to the L-Unit.  (Javed Dep., Ex. G to PSOF [222-10] 77:10–13 ("She was being transferred to our unit because of some issue on the other unit but I don't know any details of that, you know.").)  But Dr. Javed did hear the "big news" about a patient escaping "right after" it happened; only "[m]uch later" however, did the doctor learn that the patient was A.R.  (*Id.* at 83:6–23.)

Notwithstanding Lenhardt's involvement in A.R.'s escape, she continued her job as a social worker in the L-Unit for more than ten years, ostensibly because EMHC administrators were unaware of the involvement.   A few years later, in 2009 or 2010, Lenhardt's relationship with another patient, Patient M.A.H., generated concern among EMHC staff members.  (*See Id.* at 100:22–101:18.)  In a 2017 interview with ISP after Lenhardt's abuse of Plaintiff Hurt had come to light, Dr. Javed reflected on Lenhardt's earlier relationship with M.A.H., who had been Dr. Javed's patient.  Dr. Javed told police that she "believed that [M.A.H. had been] spending a lot of time in [Lenhardt's] office," and that Javed "had discussed that with the patient."  (*Id.* at 97:9–12, 100:22–101:18.)  Dr. Javed further explained that she and M.A.H. are both Muslim, and she had discussed M.A.H.'s feelings for Lenhardt in connection with his religious beliefs.  Javed reported that M.A.H. told her that Prophet Mohammed married a wife much older than he was, so there would be nothing wrong with his having a relationship with Lenhardt.  (*Id.* at 120:23–121:3.)  After

this conversation with M.A.H., Javed told Lenhart that M.A.H. had "shared with [Javed] that he had feelings for [Lenhardt] and that it would be advisable if he d[id] not continue to see her anymore." (*Id.* at 107:2–5.)  Javed reported that she was "concerned about the patient being overly fixated on the staff" in his unit, where only women worked, and she decided he should be transferred to a different unit where he could work with a male therapist.  (*Id.* at 106:2–15.)

Word of M.A.H.'s transfer also got around.  Defendant Delaney, who worked in the nursing division, testified that at some point (Delaney does not recall when), Defendant Beck told Delaney that M.A.H. had reported to his treatment team that he had developed feelings for Lenhardt.  Delaney recalls that Lenhardt had reportedly admitted she had "feelings for [M.A.H.]" and had acknowledged "that it would be better if he was moved off the unit."  (Delaney Dep., Ex. N to PSOF [222-18] 191:7–192:10.)  Whether Lenhardt and M.A.H. engaged in a sexual relationship is not clear, but it appears that there was no further issue between Lenhardt and M.A.H. after he transferred to a different unit.

### C.     Lenhardt and Plaintiff Owens

Plaintiff Mark Owens was admitted to EMHC in 2012 for charges related to the attempted assault of a police officer.  (Owens DSOF ¶ 17; Dep. of Mark Owens, Ex. M to PSOF [Hurt 222-17] at 14:11–15, 30:8–16.)  Mr. Owens was housed in the L-Unit where Lenhardt was assigned as social worker.  (PSOF ¶ 49; Owens Dep. at 48:11–49:12.)  Owens testified that other EMHC patients—namely, Plaintiff Hurt and M.A.H.—told him about sexual acts Lenhardt performed on them.  (*See* PSOF ¶ 50; Owens Dep. at 63:19–22.)  Lenhardt made Owens feel "uncomfortable."  (Owens Dep. at 36:2–3.)  For example, Owens recalled a meeting with Lenhardt during which Lenhardt said to him, "you're not going to get out of here unless you work—unless we get what we want," and he interpreted this remark as a sexual advance.  (*Id.* at 34:7–35:24.)  On another occasion, when Owens was seated across from Lenhardt in a chair in her office, she "nudg[ed] [him] to come closer."  (*Id.* at 49:20–23.)  Owens testified that Lenhardt "took [him] by the seat [of his chair] and tried to move it."  (*Id.* at 56:12–14.)  Owens further testified that on one occasion

when Lenhardt came to her office at EMHC over the weekend, he listened while Lenhardt described her personal problems to him, in tears; Lenhardt did not make any advances that Owens considered sexual during this encounter, however. (Owens DSOF ¶ 24.)

At his deposition, Owens also described an incident that occurred around June of 2014 when he and Lenhardt were meeting outside of Lenhardt's office. (PSOF ¶ 51; Owens Dep. at 38:4–39:13.) According to Owens, Dr. Javed walked by and, when she observed them, asked why Owens and Lenhardt were meeting outside of Lenhardt's office, and Owens told Javed that he "was not comfortable being in the office with [Lenhardt]." (Owens Dep. at 38:12–14.) Owens testified that Dr. Javed asked, "is it because of the Islam?" and he confirmed this, saying, "You can consider it's because of the Islam." (*Id.* at 38:18–19.) As Owens and Javed are both Muslim, Owens interpreted Javed's question as "insinuating" that the reason he was not comfortable being in the room with Lenhardt was because of his religious beliefs. (*Id.* at 38:20–23; 45:6–10.) After Dr. Javed confronted Owens about his meeting with Lenhardt outside her office, Owens says (without further explanation) that he went into Lenhardt's office hoping she "would be cool" but that "it kind of got real hot" and "awkward." (*Id.* at 39:2–13.)

Dr. Javed also recalled this episode. She testified in her deposition that when she questioned Owens, he said only that he "d[idn't] want to meet in offices," and "want[ed] to be seen in open spaces." (Javed Dep. at 166:8–18.) Dr. Javed did not understand that these concerns were directed toward Lenhardt specifically; rather, Owens "mention[ed] that he [wa]s not comfortable meeting with any staff in offices." (*Id.* at 166:19–167:1.) Dr. Javed did not believe that Owens' statements were meant to alert her to any inappropriate behavior by Lenhardt towards Owens. (Owens DSOF ¶ 45.)

Owens reports, however, that the next time he spoke with Dr. Javed after this incident, he told her that he "was uncomfortable working with Christy from that time forward." (Owens Dep. at 48:1–2.) Owens acknowledges that during this conversation, he did not tell Javed why he was uncomfortable working with Lenhardt, and Javed did not inquire. (*Id.* at 48:3–7.) It is not clear

from the deposition testimony whether Owens ever specifically asked Javed to be assigned do a different social worker, but Owens was in fact switched to another social worker after this conversation. (*Id.* at 48:8–14.)

The record also shows that on January 15, 2014, Mr. Owens had a physical altercation with another patient. (*See* Ex. R to PSOF [Hurt 222-22] at Bates 8726–27.) The next day, an unidentified social worker documented a call from Mr. Owens' parents in which they raised concerns about the January 15 incident. Page(s) are missing from Owen's medical chart on this date, however (Dr. Javed does not know why), so the full scope of the phone conversation is unknown. (*See id.*; *see also* Javed Dep. at 134:24–135:4.)

Even though Owens had been assigned to another social worker, Lenhardt completed a social work note in his medical chart several months later, on January 5, 2015. (*See* Medical Chart Social Work Note January 5, 2015, Ex. G to Owens DSOFR [Owens 212-8].) After that date, there are no notes labeled as social work progress notes in Owens' file. (*See* PSOF ¶ 65; PSOFR ¶ 65; *see also generally* Ex. U to PSOF [Hurt 222-26]; PSOF ¶ 67; PSOFR ¶ 67.) On August 12, 2017, Owens was transferred from EMHC to Chicago Read Medical Hospital, ending his five-and-a-half-year term at EMHC. (Owens DSOF ¶ 18; PSOF ¶ 115.) Although Mr. Owens believed that Lenhardt was "affectionate" toward him, it is undisputed that the two never engaged in sexual behavior with one another. (*See* PSOF ¶ 59; PSOFR ¶ 59; Owens DSOF ¶ 26–32, 34; Owens DSOFR ¶ 26–32, 34.)

### D. Lenhardt and Plaintiff Hurt

On August 14, 2014, Plaintiff Ben Hurt was admitted to EMHC as NGRI for aggravated battery of a peace officer. (Hurt DSOF ¶ 39.) When first admitted to EMHC, Hurt was housed on the L-Unit where Lenhardt was his social worker and Dr. Javed was his treating psychiatrist. (*Id.* ¶ 40.) Soon after Hurt arrived at EMHC, Lenhardt pursued him. Hurt and Lenhardt first kissed in late 2014. (PSOF ¶ 62.) Hurt's own behavior drew attention: in late November 2014, a nurse's

note in Hurt's chart described instances of Hurt's acting in sexually inappropriate ways around other patients. (*Id.* ¶ 61; Ex. T to PSOF [Hurt 222-25] at Bates Hurt 13989–91.)

Around December 14, 2014, Hurt was temporarily transferred to the K-Unit for his safety after a physical altercation with another patient. (Hurt DSOF ¶ 41.) Hurt returned to the L-Unit by January 4, 2015. (*Id.*) Around that same time, in late 2014 or early 2015, Lenhardt and Hurt started a sexual relationship and began engaging in sexual activity, including Lenhardt's performing oral sex on Hurt in her office. (*Id.* ¶ 43.) During these interactions in Lenhardt's office, Hurt would usually stand in front of Lenhardt with his back facing the door, but looking over his shoulder through a window in the door to see if anyone was approaching. (*Id.* ¶ 44.) Hurt knew that Lenhardt's behavior was placing her job at risk if other EMHC staff members learned of it. (*Id.* ¶ 45.) Specifically, Hurt believed that if EMHC staff discovered their relationship, Lenhardt would go to jail, and he would be transferred to a different mental health facility. (*Id.* ¶ 46.) Lenhardt, too, knew that discovery of the sexual relationship would have serious consequences, including the loss of her job and her social work license and damage to her relationship with her family. (*Id.* ¶ 47.) Accordingly, Hurt and Lenhardt both actively took steps to conceal their sexual relationship from other EMHS patients or staff, and neither said anything about it to other patients or staff, including any of the Defendants. (*Id.* ¶¶ 48, 49, 50.)

All Defendants in fact deny having any knowledge of Lenhardt's sexual relationship with Hurt, but both Hurt and Lenhardt have described circumstances suggesting Defendants could have had a basis for suspicion. Hurt testified that Dr. Javed noticed that he had spent a lot of time with Lenhardt and asked what they were doing together, to which Hurt offered an innocuous response. (*Id.* ¶ 51.) According to Hurt, on one occasion, Dr. Javed came to Lenhardt's office door when Lenhardt was performing oral sex; Hurt concedes he does not know whether Dr. Javed could see what was going on. (*Id.* ¶ 52.) On another occasion, Hurt testified, Lenhardt vomited after performing oral sex on him in a bathroom. (PSOF ¶ 75.) After cleaning himself up, Hurt "walk[ed] out of the bathroom, and Dr. Javed was there." (Hurt Dep. at 80:9–81:3.) According to

10

Hurt, Javed asked him "What's going on with you and [Lenhardt]?" because "[s]omething seems like it's up." (*Id.* at 80:20–22.) Hurt recalls that he "pass[ed] it off," telling Javed that nothing was going on. (*Id.* at 80:22–81:3.)

As for Defendant Delaney, the Director of Nursing, Hurt testified that Delaney noticed that he was "with Christy Lenhardt in the office a lot" and asked "[w]hat are you guys doing?" (Hurt DSOF ¶ 53.) Hurt did not tell Delaney that he was having a physical relationship with Lenhardt, but instead explained that they were engaged in "paperwork." (*Id.* ¶ 53.) Delaney, too, walked by Lenhardt's office on one occasion while Lenhardt was performing oral sex but, as with the incident involving Javed, Hurt does not know that Delaney was aware of what was happening. (*Id.* ¶ 54.) According to Audrey Boston (the activity therapist), Defendant Delaney did call Lenhardt out for "boundary issues" during nursing meetings where, among others, Defendants Dr. Javed, Dr. Kareemi, and Beck were present. (Boston Dep. at 41:5–16.) Boston estimated that Delaney admonished Lenhardt for her behavior several times between 2012 and 2017. (*Id.* at 41:20–44:24.) Lenhardt herself testified that Delaney would "attack" her in morning meetings, though she did not specify the reason for these verbal "attacks." (Lenhardt Dep. at 44:5–50:22.)

Hurt and Lenhardt testified that Defendant Beck, too, had his suspicions. Hurt testified that Beck commented on the amount of time that he spent with Lenhardt. (Hurt DSOF ¶ 55.) And, like Javed and Delaney, Beck came to Lenhardt's office on one occasion when Lenhardt was performing oral sex. (*Id.* ¶ 56.) Again, however, Hurt does not know whether Beck saw what Lenhardt was doing, and Beck never said anything to Hurt about Lenhardt's conduct. (*Id.* ¶ 56.)

Hurt described one incident when he and Lenhardt were interrupted by a knock on the door during an episode of oral sex. (Hurt Dep. at 102:22–103:2.) Hurt alerted Lenhardt that someone was at the door, and when Lenhardt opened it, Beck was there; Beck said, "Christy, I'd like to speak with you," to which Lenhardt replied, "okay." (*Id.* at 102:22–103:15.) According to Hurt, he stepped outside the office at Lenhardt's request. Lenhardt and Beck initially engaged in a conversation outside the office in Hurt's presence, but then went into Lenhardt's office, while

Hurt remained outside. (*Id.* at 103:14–24.) Hurt heard Beck and Lenhardt arguing for about ten minutes in the office, after which Beck left and Hurt reentered the room and finished his session with Lenhardt. (*Id.* at 103:20–104:6.)

According to Hurt, Lenhardt told him about her exchange with Beck and reported that Beck had asked her, "What's with you and black guys?" (*Id.* at 103:14–104:6.) In her own testimony, Lenhardt confirmed that Beck made this comment about "black guys" to her. (Lenhardt Dep. at 108:1–3.) Lenhardt also testified that Beck had warned her that "administration was watching [her] and [Hurt]." (*Id.* at 107:13–14.) Beck himself disputes having posed such a question to Lenhardt and denies telling her that the administration was suspicious of her behavior. (Andrew Beck Decl., Ex. 1 to PSOFR [Owens 214-1] ¶¶ 9–10.) Beck asserts that he "first learned of any impropriety" regarding Lenhardt and any EMHC patients during the ISP investigation in the fall of 2017. (Beck Decl. ¶ 4.)

Lenhardt continued to engage in behavior which, according to Plaintiffs, could have exposed Lenhardt's misconduct. Between September and December 2016, Lenhardt and Hurt exchanged numerous amorous emails, including naked pictures of Lenhardt. (PSOF ¶ 74.) Lenhardt used her mobile phone to communicate with an email account that she set up for Hurt. (*Id.* ¶ 74.)

On December 18, 2016, Hurt was transferred from the L-Unit to the K-Unit due to the aggressive behavior of another patient. (*Id.* ¶ 79; PSOFR ¶ 79.) Hurt's transfer to the K-Unit in 2016 resulted in his treatment team being changed. (*See* PSOF ¶ 80.) The treatment teams in both the K-Unit and L-Unit agreed that Hurt would complete the Mental Health Substance Abuse ("MISA") program in the K-Unit. (*Id.* ¶ 80; PSOFR ¶ 80.) That program typically takes patients six to nine months to complete, and Hurt was scheduled to leave EMHC in the summer of 2017, so the plan for his completion of this MISA program would have kept him housed in the K-Unit for the remainder of his time at the facility. (*See* PSOF ¶¶ 80, 112; PSOFR ¶ 80.)

Hurt's new social worker in the K-Unit was Robert ("Bob") Hamlin.[5] (*See* Bob Hamlin Dep., Ex. GG to PSOF [Hurt 222-36] at 19:17–20:11.) As a result of Hurt's transfer to the K-Unit, one of Hamlin's patients was transferred to Lenhardt in the L-Unit. (Lenhardt Dep. at 92:6–93:4.) Despite this rearrangement, Lenhardt had a reason to enter the K-Unit where Hurt was housed: Lenhardt explained that Hamlin gave his patients snacks as an incentive for good behavior, and Lenhardt continued this program for Hamlin's former patient, now assigned to the L-Unit. Lenhardt frequently visited Hamlin's office in the K-Unit to retrieve snacks. (*Id.*) In a statement he later gave to the ISP, Hamlin confirmed that he left food for patients in his office. (Ex. B to PSOF [Hurt 222-2] at 000137–38.)

Lenhardt's frequent presence on the K-Unit nevertheless drew suspicion. Activity Therapist Boston testified "on more than several occasions," she observed that Lenhardt had secluded herself in an office with Hurt and was giving him food. (Boston Dep. at 32:9–14; 34-1.) Boston testified that on one occasion she warned Lenhardt that "it looked very odd to have somebody secluded in your office . . . with food," and that "the other patients are talking about it." (*Id.* at 33:13–16.) Boston recalled that when confronted about "boundary issues" during staff meetings, Lenhardt "always made excuses to other people . . .; she would have excuses." (*Id.* at 32:23–24; 41:5-7.) In late December 2016 or early 2017, Lenhardt became emotional, openly in tears for several days during the morning staff meetings about the fact that Hurt was no longer on the L-Unit, and, according to Boston, asking with "over-excessive" tears why he wasn't being transferred back. (Id. at 133:8-134:12; PSOF ¶ 83.)

Defendant Dr. Faiza Kareemi took over as Hurt's treating psychiatrist in the K-Unit. (*Id.* ¶ 80; PSOFR ¶ 80.) Hurt testified that Dr. Kareemi made inquiries about his relationship with Lenhardt, asking him, "How are you two getting along?", "What are you two working on more than—more than work?", "What was going on in the office, why [Hurt] was there so much . . . ."

---

[5]     Defendant Drew Beck was also Hurt's social worker on the K-Unit for a brief period between April 2017 and May 2017. (PSOF ¶ 86.)

(Hurt Dep. at 54:18–24.) He also recalled Dr. Kareemi commenting that "Christy Lenhardt is really busy. You go to her office a lot. Why?" (*Id.* at 55:5–7.) Hurts responded by telling Dr. Kareemi that he visited Lenhardt's office to "[g]et services for my treatment plan." (*Id.* at 55:7–8.)

On at least one occasion, Hurt and Lenhardt engaged in sex acts in Hamlin's office. The lock on Hamlin's office was faulty; this defect had at some point previously been reported to security staff. (DSOF ¶ 69.) On May 31, 2017, while Lenhardt and Hurt were in the office, they were accidentally locked in and Lenhardt had to call security to open the door. (PSOF ¶ 91.) A security officer documented this event in a security incident report, noting that Lenhardt told him that she had asked Hurt into the office to try to fix the broken lock. (Ex. GG to PSOF [Hurt 222-36].) On June 1, 2017, Chief of Security William Epperson forwarded the report to several individuals, including Defendants Delaney and Hogan, and stated in his email that he was "[v]ery concerned that a [social worker] would ask for assistance from a patient, for an office not on her unit." (*Id.*) The following day, Medical Administrator James Corcoran attended an administrative meeting where the attendees discussed the fact that "Mr. Hurt, and a social worker, had been locked in an office inadvertently and security was called to somehow open the door." (James Corcoran Dep., Ex. HH to PSOF [222-37] at 24:14–25:20.) At that meeting, "[t]he first thing that came to [Corcoran's] mind" was "Is this reportable to the Office of the Inspector General?" (*Id.* at 29:10–17.)

Corcoran was not the only worker concerned about the incident. When later talking to ISP officers, Defendant Beck also said it was unusual for a patient to be locked in a room with a social worker, especially a social worker who was not assigned to work with that patient. (*See* PSOF ¶ 98; Beck Dep. at 106:3–107:10.) Nikolov, the woman who drove Lenhardt to the airport to visit A.R., testified that after the incident in Hamlin's office she "maybe" told Dr. Javed and Dr. Kareemi that Lenhardt had feelings for a patient in the past. (Nikolov Dep. at 59:2–16.) For their parts, however, neither Javed nor Kareemi has any memory of ever having a conversation with Nikolov about Lenhardt and Hurt or Patient A.R. (Javed Dep. at 251:12–20; Kareemi Dep. at 108:6–8.)

In early June, Richard Malis, the Acting Medical Director of EMHC, heard about the locked office incident.  (PSOF ¶ 100.)  Sometime in early June, he saw Hurt standing in the doorway of Bob Hamlin's office talking to Lenhardt, and he reported this to Hamlin, who then became angry with Lenhardt.  (*Id.* ¶ 100; Hurt PSOFR ¶ 100.)  Whether Malis or Hamlin took any further action at this point is uncertain.

Then on June 30, 2017, at around 7:30 a.m., Chief Epperson received a report that Hurt had posted on social media a photo of himself, taken within EMHC.  (PSOF ¶ 101.)  From the appearance of this photograph—which included a picture that could be seen in the background— Epperson and other security officers determined that the photo of Hurt had been taken in Lenhardt's office.  (*Id.* ¶ 101; PSOFR ¶ 102.)  Security officers proceeded to conduct a search of Hurt's room while Epperson himself was attending the morning meeting.  (William Epperson Dep., Ex. JJ to PSOF [Hurt 222-39] at 23:15–18.)  In their search, the security staff discovered evidence that included a journal and four USB drives containing audio recordings.  In one of these recordings, Lenhardt and Hurt can be heard engaged in or discussing sexual activity; in another, Lenhardt can be heard telling Hurt she had assisted in the escape of A.R. and had visited A.R. in Germany months later.  (*Id.* at 16:14-17:19; 35:1–7.)  Immediately after the search, security officer Jeremy Jackson knocked on the meeting door and asked Epperson to step outside, where Jackson showed Epperson a passage from the journal he had retrieved from Hurt's room, which made reference to Lenhardt's efforts to assist A.R.'s escape.  (*Id.* at 28:2–31.)  Epperson returned to the meeting, but did not immediately share what he had learned with others in attendance at the meeting.  (*Id.* at 28:16–23.)  Epperson did tell the hospital administrator, Brian Dawson, about his team's discovery, and advised Dawson that he intended to report the matter to the Division of Internal Investigations.  (*Id.* at 28:24–30:9.)

The room search and meeting had occurred before Lenhardt arrived at work.  (PSOF ¶ 105.)  Epperson conferred with HR Director Derek Williams and, when Lenhardt arrived, HR personnel intercepted her and took her to the administration area.  (Hurt PSOFR ¶¶ 105, 106;

Epperson Dep. at 31:13–18.)  By 11:00 a.m., Epperson had listened to the recordings of two conversations between Hurt and Lenhardt, and wrote a detailed report that included an allegation of custodial sexual abuse against Lenhardt.  (PSOF ¶ 108.)  After the recording and journal were found in Hurt's room, Lenhardt was escorted out of EMHC, never to return.[6]  (*Id.*)  At 1:00 p.m., Epperson called the ISP Division of Internal Investigation and informed them of the allegation of custodial sexual abuse.  (PSOF ¶ 109.)

Dr. Javed testified that she does not recall being present at EMHC the day that Hurt's room was searched and Lenhardt was removed from the premises.  (Javed Dep. at 258:15–265:20.)  She does recall being present soon afterwards, however, and also recalls receiving a call from Lenhardt's husband, who told Dr. Javed that Lenhardt was very upset.  (*Id.* at 256:19–258:11; *See also* PSOF ¶ 119.)  In response to a question from Lenhardt's husband about what had happened, Dr. Javed told him, "I know she was walked out relating to some patient issue but that's all I know."  (Javed Dep. at 257:4–17.)

Also on June 30, 2017, Chief Epperson or a member of the EMHC nursing staff imposed a restriction of rights ("ROR") on Hurt, restricting his movement off the unit and his telephone privileges.  (PSOFR ¶ 107.)  On July 3, 2017, EMHC staff extended the ROR until July 22, 2017, effectively prohibiting Hurt from contacting anyone other than his mother.  On July 22, 2017, Hurt's NGRI commitment expired, and he was released from EMHC.  (PSOF ¶ 110, 112.)

After the imposition of the ROR and before his release, Hurt had psychiatric sessions with Dr. Kareemi.  Dr. Kareemi testified that she did not ask Hurt about the investigation during those sessions because the administration had not told her anything about it, and she did not feel it "it was appropriate or my place to go and ask administration why they were hiding it, why they were not telling."  (*See* Kareemi Dep. at 206:11–211:17.)

---

[6]    The record is not clear as to how long Lenhardt was in the administration area before she was escorted from the facility.

16

On August 3, 2017, ISP received Chief Epperson's security report. (Ex. B to PSOF at Bates 112.) As noted, Christy Lenhardt has pleaded guilty to a felony count of sexual misconduct with a person with disabilities. (*See* Lenhardt Dep. at 80:10–16.)

## PROCEDURAL HISTORY

Hurt, through counsel, filed this suit on November 2, 2017. He has since filed several amended complaints [Hurt 23, 39, 56] and raises a host of constitutional claims pursuant to 42 U.S.C. § 1983. (*See* Third Amended Complaint [Hurt 56] ¶ 17.) Owens filed his suit on January 1, 2018. His claims in large part mirror Hurt's. The court has dismissed some of those claims on Defendants' motion. *See Hurt v. Corcoran*, No. 17 C 7909, 2019 WL 3842819, at *1 (N.D. Ill. Aug. 15, 2019). What remains are both Plaintiffs' Fourteenth Amendment claims against Dr. Javed; and Hurt's Fourteenth Amendment claim against Kareemi, Beck, Delaney, and Hogan.

Both sides now seek summary judgment [Hurt 216, 220; Owens 200, 203]. In Hurt's case, Defendants argue that they are entitled to summary judgment on all counts on the following bases: (1) Hurt's failure to intervene claim fails because Hurt cannot prove that any Defendant had actual knowledge of the sexual relationship between himself and Lenhardt; (2) Hurt's claims under a theory of supervisory liability fail because none of the Defendants ever supervised Lenhardt in any capacity; and (3) Defendants are entitled to qualified immunity because there is no evidence that any Defendant violated Plaintiff's constitutional rights. (*See generally* Defs' Joint Mem. in Supp. of Summ. J. ("Defs.' Hurt Br.") [Hurt 217].) In support of his own motion for summary judgment [220], Hurt argues that he is entitled to summary judgment on both his substantive and procedural due process claims because the record demonstrates that Defendants knew of or suspected Lenhardt's abuse but failed to report it. (*See generally* Pl.'s Joint Mot. for Summ. J. ("Pls.' Joint Br.") [Hurt 220].)

In Owens' case, Defendant Javed makes the following arguments in support of her motion for summary judgment [Owens 200]: (1) Owens' failure to intervene claim fails because Lenhardt never violated his constitutional rights, and there is no evidence that Dr. Javed had actual

knowledge of any behavior by Lenhardt that Owens perceived as inappropriate; (2) Owens' supervisory liability theory fails because Dr. Javed never supervised Lenhardt; and (3) Dr. Javed is entitled to qualified immunity. (*See generally* Def. Javed's Mem. in Supp. of Summ. J. ("Def.'s Owens Br.") [Owens 201].) Plaintiffs have submitted joint opening briefs; Owens' arguments in support of his motion [Hurt 203] are identical to Hurt's. Owens argues that he is entitled to summary judgment because the record demonstrates that Defendant Javed knew of or suspected Lenhardt's abuse but failed to report it. (*See generally* Pls.' Joint Br. [Owens 203].)

## DISCUSSION

The court will grant a motion for summary judgment only if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Garofalo v. Vill. of Hazel Crest*, 754 F.3d 428, 430 (7th Cir. 2014) (quoting *Laskin v. Siegel*, 728 F.3d 731, 734 (7th Cir. 2013)). Put differently, in order to succeed at the summary judgment stage, the record must show that "no reasonable jury could find for the non-moving party." *Dempsey v. Atchison, Topeka, & Santa Fe Ry. Co.*, 16 F.3d 832, 836 (7th Cir. 1994). When the court considers cross-motions for summary judgment, as is the case here, it must interpret any disputed facts in favor of each nonmovant. *Hotel 71 Mezz Lender LLC v. Nat'l Ret. Fund*, 778 F.3d 593, 603 (7th Cir. 2015).

Plaintiffs bring their claims under 42 U.S.C. § 1983. In order to prevail on a § 1983 claim, a plaintiff must show that "(1) the defendant deprived the plaintiff of a right secured by the Constitution and laws of the United States, and (2) the defendant acted under color of state law." *J.H. ex rel. Higgin v. Johnson*, 346 F.3d 788, 791 (7th Cir. 2003) (internal citation omitted). It is undisputed that the Defendants were acting under color of state law, so the second requirement is not at issue in this case.

As for the first requirement, § 1983 does not in and of itself provide substantive rights; rather, it "merely provides a method for vindicating federal rights elsewhere conferred." *Graham*

*v. Connor*, 490 U.S. 386, 394 (1989) (internal quotation marks and citations omitted). Additionally, a defendant can be held liable under § 1983 only if he or she is "personally responsible for the violation of the plaintiff's constitutional rights." *Green v. Beth*, 770 F. App'x 273, 275 (7th Cir. 2019) (citing *Mitchell v. Kallas*, 895 F.3d 492, 498 (7th Cir. 2018)). Section 1983 "creates a cause of action based on personal liability and predicated upon fault." *Hildebrandt v. Illinois Dep't of Nat. Res.*, 347 F.3d 1014, 1039 (7th Cir. 2003) (citation omitted). Thus, defendants are not liable under § 1983 "merely for their supervision of others," and instead the plaintiff must show that the constitutional violation occurred "at the defendant's direction or with his knowledge or consent." *Id.* Here, Plaintiffs point to the due process clause of the Fourteenth Amendment to articulate two theories of constitutional violations by the Defendants: a failure to intervene claim and a procedural due process claim.[7] The court addresses these two theories separately.

## I.    Failure to Intervene Claim

Plaintiffs' primary § 1983 claim is that Defendants violated their due process rights under the Fourteenth Amendment by failing to intervene and protect Plaintiffs from Lenhardt's sexual misconduct. An antecedent component of this claim is that there was a constitutional violation of Plaintiffs' liberty interest in bodily integrity; the second component is that the Defendants were aware of the constitutional violation and failed to intervene.

Ordinarily, the state does not have a constitutional obligation "to protect private citizens from doing harm to each other." *J.H. ex rel. Higgin*, 346 F.3d at 791–92 (citing *DeShaney v.*

---

[7]    Defendants have also moved for summary judgment as to any claim predicated on a theory of supervisory liability. (Defs.' Hurt Br. at 9; Def.'s Owens Br. at 7.) Plaintiffs have not asserted such a claim in their complaints and do not raise such a theory in their motion for summary judgment. In fact, the parties agree that none of the Defendants ever supervised Lenhardt. (Hurt DSOF ¶¶ 37, 38; Hurt DSOFR ¶¶ 37, 38.) Defendants' request for summary judgment with respect to any supervisory liability claim under § 1983 is moot.

*Winnebago County Dept. of Soc. Servs.*, 489 U.S. 189, 202 (1989)).  Courts have recognized, however, that the due process clause of the Fourteenth Amendment imposes a duty on a state where it "creates, or substantially contributes to the creation of, a danger or renders citizens more vulnerable to a danger than they otherwise would have been." *Reed v. Gardner*, 986 F.2d 1122, 1126 (7th Cir. 1993).  The paradigmatic failure-to-intervene case is one brought against a law enforcement officer who stands by and watches as his or her partner uses excessive force on an individual.  Indeed, Defendants rely on the case law in this area and cite to *Yang v. Hardin*, 37 F.3d 282, 285 (7th Cir. 1994) to assert that a failure to intervene claim requires a plaintiff to show that the defendant had actual *knowledge* of a constitutional violation and failed to intervene. *Yang* involved a § 1983 failure-to-intervene claim brought against a police officer who stood by and silently watched as his partner physically assaulted a store owner who was attempting to stop the abusive officer from stealing from his business. *Id.* at 283–84.  The district court concluded that the police officer who observed the assault was not liable as a matter of law, but the Seventh Circuit reversed.  In finding the bystander-officer liable under § 1983, the court articulated the standard for failure-to-intervene cases involving excessive force by law enforcement:

> An officer who is present and fails to intervene to prevent other law enforcement officers from infringing the constitutional rights of citizens is liable under § 1983 if that officer had reason to know . . . that any constitutional violation has been committed by a law enforcement official; and the officer had a realistic opportunity to intervene to prevent the harm from occurring.

*Id.* at 285 (citations omitted).

Plaintiffs contend that the standard for a failure-to-intervene claim is satisfied if the Defendants knew *or suspected* that the Plaintiffs were being abused.  To support this assertion, the Plaintiffs cite to a district court ruling in *Doe v. Board of Educ. of Consol. Sch. Dist. 230 Cook Cnty.*, 18 F. Supp. 2d 954, 958 (N.D. Ill. 1998). *Doe* involved a § 1983 claim against the principal of a high school who failed to protect minor students from engaging in sexual relations with a school staff member. *Id.* at 956–57.  The court in *Doe* denied summary judgment for the principal and stated "[a]lthough there is no direct evidence establishing that any of the individual defendants

20

had actual knowledge of Vasquez's relationships with plaintiffs . . . a reasonable jury [could] conclude that some or all of the individual defendants had enough knowledge to suspect some improper activity and did nothing about it." *Id.* at 958. The court did clarify, however, that "personal involvement is a prerequisite for individual liability in a § 1983 action" and that a supervisor cannot be held liable under § 1983 for "simply [being] negligent in failing to detect and prevent subordinate misconduct." *Id.* at 957 (internal quotation marks omitted) (citing *Gossmeyer v. McDonald*, 128 F.3d 481, 491 (7th Cir.1997)). Instead, the court stated, a supervisor can be held liable under § 1983 only if they "know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see" and added that they must "act either knowingly or with deliberate, reckless indifference." *Id.* 957–58. Notably, however, plaintiffs' claims in *Doe* were brought under a theory of supervisory liability, not one of failure to intervene. *Id.* at 957.

In the court's view, neither side in this case has cited directly-controlling case law, but Plaintiffs have stated the more applicable standard. Closest support for this conclusion can be found in § 1983 failure-to-intervene cases brought by victims of sexual abuse in the foster care setting. In this context, the Seventh Circuit has applied a "modified deliberate indifference standard . . . requiring actual knowledge *or suspicion of the alleged risk.*" *J.H. ex rel. Higgin*, 346 F.3d at 791 (emphasis in original); *see also K.H. ex rel. Murphy v. Morgan*, 914 F.2d 846, 852 (7th Cir. 1990) (holding that children in state custody have a right not to be placed in the custody of an individual "whom the state knows or suspects to be a child abuser"); *Lewis v. Anderson*, 308 F.3d 768, 773 (7th Cir. 2002) (applying the "knows or suspects" standard in a failure-to-intervene case involving an abusive foster care setting).

*J.H. ex rel. Higgin*, a case that neither side here has cited, is illustrative. *J.H. ex rel. Higgin* was a § 1983 suit brought by two minor siblings who were sexually abused by their respective foster fathers, both of whom were convicted of aggravated sexual assault. *Id.* at 789. The action was brought against multiple employees of the Illinois Department of Children and Family

Services ("DCFS"), who oversaw placing the minors in the two homes where they were abused. *Id.* There was evidence that the defendants knew or suspected that there was a significant risk of abuse: one of the foster fathers had two previous allegations of abuse on his record. *Id.* at 794. The plaintiffs also presented evidence of dangerous/unsanitary conditions in the homes of the two foster parents. *Id.* at 793.

Defendants in *J.H. ex rel. Higgins* prevailed on summary judgment; the court observed that even the more relaxed standard requires that the plaintiffs "show a connection between any knowledge or suspicion of risk that the defendants may have had and the injury that the children actually suffered." *Id.* at 793. Evidence of the unsanitary conditions of the homes would not have suggested to the defendants that the plaintiffs were likely to be abused, nor was the court moved by the evidence showing a record of abuse by one of the foster fathers. *Id.* More meaningful was evidence showing that the prior allegations of abuse were investigated by DCFS and determined to be unfounded, and perhaps more importantly, that the named defendants were not involved in those investigations. *Id.* at 794. The court noted that while "the underlying facts of cases like this portray a sad course of events, we nevertheless continue to require plaintiffs to demonstrate that the individual defendants had specific knowledge or suspicion of the risk of sexual abuse" in order to hold defendants liable under § 1983. *Id.* at 792.

In this court's view, the facts and law of *J.H. ex rel. Higgins* are more closely analogous to the case at hand than the law enforcement failure-to-intervene cases relied on by Defendants. In both the foster care cases discussed above and the one before this court, the plaintiffs are individuals with limited capacity—children and individuals adjudged criminally insane, respectively. Additionally, in both the foster care cases and the present case, the plaintiffs were in the long-term custody of the state when they were allegedly subjected to abuse. *Cf. Lewis*, 308 F.3d at 773 (internal quotation marks and citations omitted) (noting that an official's duty to intervene "may arise from the creation of a special relationship between the state and the individual").

In its analysis of Plaintiffs' claims in this case, then, the court will apply the standard used in *J.H. ex rel. Higgins*.[8]   Under that standard, for Plaintiffs to succeed on their § 1983 failure-to-intervene claim, they must show (1) that they suffered an underlying constitutional injury, and (2) that the defendants "knew of or suspected the specific risk facing plaintiffs and consciously ignored it or failed to stop the abuse."   *J.H. ex rel. Higgin*, 346 F.3d at 792 (citing *Lewis*, 308 F.3d at 773).  Because the two Plaintiffs' failure-to-intervene claims are distinct from each other, the court applies this standard to each one separately.

## A.    Plaintiff Owens

Plaintiff Owens and Defendant Dr. Javed filed cross-motions for summary judgment on Plaintiff's failure-to-intervene claim.  As noted above, Dr. Javed was Owens' psychiatrist at EMHC while Lenhardt was Owens' social worker.  Owens claims that Dr. Javed knew or suspected that Lenhardt was abusing him, and that Dr. Javed failed to intervene.  Owens' claim fails, however, because there is no evidence that Lenhardt ever abused him.

Owens and Lenhardt both testified that the two never engaged in any sexual activity; they never kissed, fondled each other, or engaged in any sexual activity.  (Owens DSOF ¶¶ 26–32.) The nearest allegation to physical contact between Owens and Lenhardt is Owens' claim that during one of his sessions with Lenhardt, she "took [him] by the seat and tried to move it" in an attempt to nudge him closer to her.  (Owens Dep. at 56:12–14.)  Owens does describe other nonphysical interactions he had with Lenhardt that made him feel uncomfortable and which he interpreted as seductive behavior.  For example, Owens described an incident when Lenhardt came to the EMHC on a weekend and met with him, crying about personal problems she was experiencing.  (*Id.* at 53:24–55:6.)  In another instance, during a social work session, Lenhardt allegedly told Owens, "You're not going to get out of here unless you work—unless we get what

---

[8]        As neither Plaintiffs nor Defendants cited to *J.H. ex rel. Higgins* or the other foster care cases discussed in this opinion, the court will consider additional briefing on the topic should the parties request it.

we want." (*Id.* at 34:7–35:24.)  In essence, Owens' claim is that his perception that Lenhardt was attempting to seduce him amounted to a constitutional violation.

Given the knowledge now of record concerning Lenhardt's unlawful conduct at EMHC for more than a decade, the court recognizes that Lenhardt may indeed have had lewd intentions. Nevertheless, the record does not support the claim that Owens suffered a constitutional harm at her hands.  Owens' claim here is based on the due process clause of the Fourteenth Amendment, which "does not transform every tort committed by a state actor into a constitutional violation." *Lewis*, 308 F.3d at 773 (internal quotation marks omitted) (quoting *DeShaney*, 489 U.S. at 202 (1988)).  Existing caselaw does not precisely define what actions constitute an infringement of one's liberty interest in bodily integrity, but Owens fails to cite even one case supporting the claim that his interactions with Lenhardt amounted to a constitutional violation.  Given the lack of any concrete allegation of physical or verbal harassment, the court concludes that Owens did not suffer a due process harm.  Because Lenhardt never violated Owen's constitutional rights, his failure-to-intervene case must necessarily fail.  *See Harper v. Albert*, 400 F.3d 1052, 1064 (7th Cir. 2005) (citing *Fillmore v. Page*, 358 F.3d 496, 505–06 (7th Cir. 2014) (stating that "[i]n order for there to be a failure to intervene, it logically follows that there must exist an underlying constitutional violation")).  Accordingly, the court grants Defendant Dr. Javed's motion for summary judgment on Plaintiff Owens' failure-to-intervene claim.

### B.    Plaintiff Hurt

Plaintiff Hurt and Defendants Dr. Javed, Dr. Kareemi, Beck, Delaney, and Hogan have filed cross-motions for summary judgment on Plaintiff's failure-to-intervene claim.  At the outset, the court notes that it is undisputed that Hurt suffered an underlying constitutional harm at the hands of Lenhardt, specifically that she sexually abused Hurt.  (*See* Hurt DSOF ¶ 42, 43.)  Instead, the Defendants each argue that Plaintiff's claim must fail because they did not actually know about Lenhardt's sexual misconduct involving Hurt, whereas Hurt claims that each Defendant knew of or suspected the abuse.  In their efforts to peek into the minds of each Defendant and discern

what each knew or suspected, the parties engaged in extensive discovery, including over two dozen depositions and a review of some 30,000 documents. As explained below, the weight of the evidence against each Defendant is varied. Ultimately, however, the court concludes there remain significant issues of material fact as to what each Defendant knew or suspected and therefore denies both parties' motions for summary judgment on Hurt's failure-to-intervene claim.

Some of the most forceful evidence that Plaintiffs present connecting Lenhardt's sexual abuse to Defendants is her roughly twelve-year history of abuse at EMHC and the rumors that swirled around the facility. The record shows evidence that Lenhardt had sexual relations with at least three patients at EMHC; that she engaged in sexual activities with patients at EMHC during normal business hours, in her office and other staff member's offices; and that on multiple occasions she was nearly caught in the act as staff walked by the office or knocked on the door while she was engaging in her misconduct. The record also shows evidence that Lenhardt's misconduct generated rumors among EMHC staff. Audrey Boston, an activity therapist who worked on the L-Unit with Dr. Javed, testified that "prior to my arriving to the L-Unit [in 2012], there already was . . . a reputation in the hospital" that Lenhardt was moved to the L-Unit "due to some sexual or boundary issues with a patient on a prior unit." (Boston Dep. at 62:3–12.) Others testified as to Lenhardt's shadowy reputation, including witnesses Nikolov, Desai, Boston, and Ingram. (PSOF ¶ 26, 31–33.) Lenhardt herself testified that hospital "administration" had accused her of abusing a patient. (*Id.* ¶ 17.) After Lenhardt and Hurt were caught locked in Hamlin's office, EMHC Security Chief Epperson emailed staff (including defendants Delaney and Hogan) expressing that he was "[v]ery concerned" that a [social worker] would ask for assistance from a patient, for an office not on her unit"—highlighting that even staff outside of Hurt's treatment team were on notice. (Ex. GG to PSOF.)

Plainly, the evidence that Lenhardt was abusive is voluminous and, at times, seemingly right in front of Defendants. Still, in order to succeed on a failure-to-intervene claim, Plaintiff Hurt must show that the Defendants in fact knew or suspected the existence of abuse, not merely that

they "should have known." *Pacelli v. deVito*, 972 F.2d 871, 873 (7th Cir. 1992) (internal citation omitted) ("what state officials 'should have known' is an insufficient basis of constitutional liability"). To attribute knowledge or suspicion to the Defendants from this record, Plaintiff Hurt points to statements allegedly made by each of the Defendants to either Hurt or Lenhardt. For example, Plaintiff Hurt claimed that Dr. Javed once asked him, "What's going on with you and [Lenhardt]?" because "[s]omething seems like it's up" immediately after he walked out of a room where Lenhardt vomited after performing oral sex on him. (Hurt Dep. at 80:20–22.) Hurt testified about similar interactions with Dr. Kareemi in which she asked, "What are you [and Lenhardt] working on more than—more than work?" and "Christy Lenhardt is really busy. You go to her office a lot. Why?" (*Id.* at 55:5–7.) Similarly, Hurt says that Defendant Delaney observed at least once that he was with "Lenhardt in the office a lot" and asked "[w]hat are you guys doing?" (*Id.* at 76:5–7.) Plaintiff also points to testimony from Boston claiming that she witnessed Defendant Delaney publicly accuse Lenhardt of having boundary issues in morning meetings where Dr. Javed, Defendant Dr. Kareemi, Defendant Beck were allegedly present. (Boston Dep. at 41:5–16.) Boston recalled Lenhardt's "over-excessive" tears during these meetings, in reaction to Hurt's having been moved off Lenhardt's unit. (*Id.* at 133:8-134:12.) Plaintiff and Lenhardt both testified that Defendant Beck had asked Lenhardt "What's with you and black guys?" (*Id.* at 103:14–104:6; Lenhardt Dep. at 108:1–3.) And Lenhardt testified that Beck had warned her that "administration was watching [her] and [Hurt]." (Lenhardt Dep. at 107:13–14.)

For their parts, Defendants have each vehemently denied these inferences supplied by Plaintiff and maintain that they had no knowledge or suspicion of a sexual relationship between Lenhardt and Hurt. But as the Seventh Circuit has noted, failure-to-intervene cases generally present "an issue for the trier of fact unless, considering all the evidence, a reasonable jury could not possibly conclude otherwise." *Lanigan v. Vill. of E. Hazel Crest,* 110 F.3d 467, 478 (7th Cir. 1997) (citing *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994)). In this case, there is evidence from which a reasonable jury could find that each Defendant knew of or suspected that Lenhardt

was sexually abusing Hurt for nearly three years and that, instead of intervening, each chose to bury their heads in the sand.  Similarly, a reasonable jury could conclude that each Defendant was indeed ignorant of Lenhardt's abuse, in part because of Lenhardt and Hurt's efforts to conceal their relationship and in part because of the sheer unlikelihood of the scenario.  For this reason, the court denies both Plaintiff Hurt's and Defendants' motion for summary judgment on Hurt's failure-to-intervene claim.

Briefly, the court acknowledges that Defendants have also raised qualified immunity as a defense to Plaintiff's claim.  Qualified immunity shields government officials from civil liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Knox v. Smith*, 342 F.3d 651, 657 (7th Cir. 2003) (citation omitted).  Determining if an official is entitled to qualified immunity involves two inquiries. *T.E. v. Grindle*, 599 F.3d 583, 587 (7th Cir. 2010) (citation omitted).  First, the court must decide whether the facts demonstrate that the official conduct violated a constitutional right. *Id.*  Second, if there was a constitutional violation, the court must determine whether the violated right was "clearly established." *Id.*  Defendants here address only the first prong of the qualified immunity inquiry.  Specifically, they claim that they are entitled to qualified immunity because they did not have "actual knowledge" of the sexual abuse by Lenhardt and thus, according to Defendants, there was no constitutional violation.  (Defs.' Hurt Br. at 12.)  As discussed above, however, whether Plaintiff Hurt can establish a constitutional violation by the Defendants is, for now, a matter of factual dispute.  Because the underlying factual allegations are disputed, the court denies Defendants' motion for summary judgment on the basis of qualified immunity.

## II.    Procedural Due Process Claim

Finally, Plaintiffs Owens and Hurt also assert a Fourteenth Amendment procedural due process claim.  Plaintiffs claim that Defendants' alleged violation of the Illinois Department of Human Services Act, 20 ILC 1305/1-17 et. seq. ("IDHS Act")—which creates reporting obligations for state employees on the discovery of abuse—amounts to a constitutional violation.  (Pls.' Joint

Br. at 50.)  The court finds this claim meritless.  A violation of state law, assuming one occurred here, "does not per se make a state actor liable under § 1983." *J.H. ex rel. Higgin*, 346 F.3d at 793.  That is because state law violations "do not form the basis for imposing § 1983 liability."  *Id.* (citing *Windle v. City of Marion*, Ind., 321 F.3d 658, 662–63 (7th Cir. 2003)); *see also White v. Olig*, 56 F.3d 817, 820 (7th Cir. 1995) ("It is therefore a truism, reiterated many times by this court, that mere allegations of state law infraction are insufficient to support a Section 1983 claim.").

In support of their claim, Plaintiffs cite two cases: *Hewitt v. Helms*, 459 U.S. 460, 466 (1983) and *Colon v. Schneider*, 899 F.2d 660, 666 (7th Cir. 1990), but those cases do not alter this court's conclusion.  Those cases address a different context; they specifically deal with situations when state statutes regulating *prison conditions* create a liberty interest for prisoners. More importantly, the Supreme Court has overruled the proposition for which Plaintiffs rely on the two cases.  *See Sandin v. Conner*, 515 U.S. 472, 483 (1995) (overruling *Hewitt* and holding that "the search for a negative implication from mandatory language in [state] prisoner regulations has strayed from the real concerns undergirding the liberty protected by the Due Process Clause"). Plaintiffs have failed to show that they have an actionable liberty interest created by the IDHS Act's reporting requirements.  Accordingly, the court grants Defendants' motion for summary judgment on Plaintiffs' procedural due process claim.

## CONCLUSION

For the reasons set forth above, Plaintiffs' motions for summary judgment ([220] in No. 17-cv-7909; [203] in No. 18-cv-334) are denied in full.  Defendants' motions for summary judgment ([216] in No. 17-cv-7909; [200] in No. 18-cv-334) are denied as to Plaintiff Hurt's failure-to-intervene claim and Defendants' defense of qualified immunity and granted as to Plaintiffs' supervisory liability claims and procedural due process claims.  Defendant Javed's motion for summary judgment is granted as to Plaintiff Owens' failure-to-intervene claim ([200] in No. 18-cv-334).  The Clerk is directed to enter judgment in favor of Defendant in Case No. 18-cv-334.  The parties are directed to show cause within 14 days why the seal should not be lifted on their

summary judgment submissions or, in the alternative, propose redactions that would permit otherwise sealed documents to be in the public record.

ENTER:

Dated:  September 25, 2023

REBECCA R. PALLMEYER
United States District Judge