UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| BENAHDAM HURT, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 17 C 7909 |
| | ) |
| HASINA JAVED, FAIZAL KAREEMI, | ) |
| DREW BECK, COLEEN DELANEY, | ) |
| and DIANA HOGAN | ) Judge Rebecca R. Pallmeyer |
| | ) |
| Defendants. | ) |

## MEMORANDUM OPINION AND ORDER

While confined in the Elgin Mental Health Center ("EMHC") from 2014 to 2017, Plaintiff Benahdam Hurt was the victim of sexual abuse by an EMHC staff member. The perpetrator has pleaded guilty to criminal charges. In this lawsuit brought under 42 U.S.C. § 1983, Hurt seeks damages from other EMHC staff. On September 25, 2023, this court issued an Order [245] on the parties' cross-motions for summary judgment [216, 220], denying in part and granting in part Defendants' motion and denying Plaintiff Hurt's motion in its entirety. *See Hurt v. Corcoran*, No. 17-CV-7909, 2023 WL 6213685 (N.D. Ill. Sept. 25, 2023). What remained following the court's summary judgment ruling was Plaintiff Hurt's failure-to-intervene claim against Defendants Hasina Javed, Faizal Kareemi, Colleen Delaney, Diana Hogan, and Drew Beck. The court's ruling invited Defendants to seek reconsideration, however, because its ruling applied a standard that neither party had directly addressed, referred to here as the "modified deliberate indifference" standard. This standard required Plaintiff to show that Defendants had "actual knowledge or suspicion of a substantial risk" that Hurt was being sexually abused and chose to ignore that risk.

Defendants have taken up the court's invitation. In their Motion to Reconsider [254] denial of Defendants' motion for summary judgment, Defendants argue that the court erred in applying this standard and, in the alternative, that even if the court was correct in applying the modified deliberate indifference standard, they are each immune from liability because the standard was

not clearly established with respect to the factual context of Hurt's case. The Defendants' motion also asks the court to reconsider its summary judgment ruling with respect to Defendant Diana Hogan, arguing that she is entitled to summary judgment regardless of the which standard the court applies. For the reasons explained below, the Motion to Reconsider is granted with respect to Defendant Diana Hogan but otherwise denied.

## BACKGROUND

The court assumes the parties' familiarity with the factual and procedural background of this case, set forth in detail in the court's previous opinion. *See Hurt*, 2023 WL 6213685, at *1–9. A brief summary follows.

Plaintiff Benahdam Hurt was admitted to EMHC, a state-run mental health hospital, as a patient found not guilty by reason of insanity ("NGRI") for aggravated battery of a peace officer. Within months of his admission to EMHC, Hurt found himself entangled in a deeply inappropriate relationship with his assigned social worker, Christy Lenhardt. Grossly abusing her position of authority, Lenhardt initiated a sexual relationship with Hurt, conducting illicit encounters within the confines of EMHC. The sexual affair spanned roughly three years and included Lenhardt's performing sex acts on Hurt, including in her own and other staff members' offices.

Lenhardt's and Plaintiff's attempts to conceal the abusive conduct were not entirely successful—not surprising, as other EMHC staff were often mere steps from the rooms where Lenhardt performed her sex acts. Indeed, the record contained evidence that on multiple occasions, Lenhardt was nearly caught in the act by a Defendant who knocked on the door while she was performing oral sex on Hurt. On another occasion, the two accidentally locked themselves in another employee's office while they were involved in sexual misconduct and were forced to call security staff to unlock the room for them.

The record also contained evidence that Lenhardt had inappropriate relations with other patients at EMHC years before she began her affair with Hurt. In 2005, Lenhardt was caught alone with a patient in another employee's office. A staff member reported that incident to EMHC

2

administration, which was documented in her employment review as "perceived overinvolvement with a male patient." That patient would later escape from EMHC and flee to Europe—where Lenhardt herself traveled to visit him. In fact, a co-worker (who is not a defendant in this case) drove Lenhardt to the airport for the trip and picked her up, though she contended she did not know the purpose of Lenhardt's travel. A few years later in 2009, another patient openly told staff and fellow patients that he had developed feelings for Lenhardt, and Lenhardt herself admitted to staff members that she had feelings for this patient. While the record was not clear whether Lenhardt had a sexual relationship with this patient, he was eventually transferred out of Lenhardt's unit at the hospital.

Notwithstanding the various signs that Lenhardt was having an affair with Hurt or her reputation for crossing boundaries with previous patients, the record contained no direct evidence that any EMHC staff members had actual knowledge of Lenhardt's abuse. The record does, however, include evidence of numerous instances in which Defendants expressed varying levels of suspicion regarding Lenhardt's relationship with Hurt. Suspicion became knowledge in June 2017, when EMHC security staff received a report that Hurt had posted a photo of himself on social media, taken within the facility. This report led to a search of Hurt's room by security staff, a search that uncovered journals and audio recordings saved on USB drives documenting Lenhardt's relationship with Hurt and her previous relationships with other patients.

Lenhardt eventually pleaded guilty to a felony count of "sexual misconduct with a person with disabilities" for her relationship with Hurt. 720 ILCS 5/11-9.5(b)(1).

## LEGAL STANDARD

Defendants purport to bring their motion to reconsider under Federal Rule of Civil Procedure 59(e), but that Rule applies only to final judgments. *See Galvan v. Norberg*, 678 F.3d 581, 587 n.3 (7th Cir. 2012) (noting that "a traditional Rule 59(e) motion to reconsider . . . can only follow a 'judgment' "). The court's denial of Defendants' motion for summary judgment was an interlocutory order, not a final judgment. *See, e.g., Haze v. Kubicek*, 880 F.3d 946, 950 (7th Cir.

3

2018) ("It is basic procedural law that a denial of summary judgment is an interlocutory ruling."). The court therefore construes this motion under Rule 54(b). *Galvan*, 678 F.3d at 587 n.3 ("Rule 54(b) governs non-final orders and permits revision at any time prior to the entry of judgment, thereby bestowing sweeping authority upon the district court to reconsider [interlocutory orders].").

The standard of review for motions to reconsider brought under Rules 54(b) and 59(e) are virtually identical. *See Morningware, Inc. v. Hearthware Home Prods., Inc.*, No. 09 C 4348, 2011 WL 1376920, at *2 (N.D. Ill. Apr. 12, 2011) ("The standard courts apply in reconsidering their decisions is generally the same under both Rule 59(e) and Rule 54(b)."); *Saccameno v. Ocwen Loan Servicing, LLC*, No. 15 C 1164, 2018 WL 1240347, at *2 (N.D. Ill. Mar. 9, 2018) (same). Specifically, motions for reconsideration are generally "viewed with disfavor" and are granted "only in the rarest of circumstances and where there is a compelling reason," to wit, "to correct manifest errors of law or fact or to present newly discovered evidence." *See Saccameno*, 2018 WL 1240347, at *2 (internal quotation marks omitted) (citing *Hicks v. Midwest Transit, Inc.*, 531 F.3d 467, 474 (7th Cir. 2008)). Plainly, "[a] party moving for reconsideration bears a heavy burden." *Caine v. Burge*, 897 F. Supp. 2d 714, 716–17 (N.D. Ill. 2012) (citing *Caisse Nationale de Credit Agricole v. CBI Indus.*, 90 F.3d 1264, 1270 (7th Cir. 1996)).

## **DISCUSSION**

In their motion to reconsider, Defendants contend that the court's denial of summary judgment was a manifest error of law. They present three arguments in their motion. First, Defendants argue that the court erred in applying the modified deliberate indifference standard to Hurt's case. Second, arguing in the alternative, Defendants claim that even if the modified deliberate indifference standard applied to Hurt's case, each Defendant is shielded by qualified immunity because the standard is not clearly established in law. Finally, Defendants single out Defendant Hogan and, again arguing in the alternative, contend that she is entitled to summary judgment because there is no evidence that she "knew or suspected" that Lenhardt posed a

4

substantial risk to Plaintiff Hurt. Before addressing Defendants' arguments, the court finds it useful to briefly trace the origins of the modified deliberate indifference standard.

I.     **The Modified Deliberate Indifference Standard**

The Seventh Circuit first articulated the modified deliberate indifference standard in *K.H. v. Morgan*, which held that once a state takes custody of a child, that child has a constitutional right to not be placed with a foster parent "whom the state knows or suspects to be a child abuser." 914 F.2d 846, 852 (7th Cir. 1990). The case concerned a heartbreaking instance of child abuse wherein staff of the Illinois Department of Children and Family Services ("IDCFS") removed a toddler from her parents' custody due to sexual abuse, only to have the child shuttled for four years from one foster home to nine others, where various foster parents engaged in further physical and sexual abuse of the child. *Id.* at 848. Plaintiff, through her guardian ad litem, brought a § 1983 action against multiple IDCFS employees in their individual capacities, including the Department's Director and guardianship administrator, and two social workers. *Id.* at 847. The complaint alleged two theories of liability: that the two social workers knew that K.H.'s foster placements were unsatisfactory but nevertheless placed her there, and separately, that the administrator defendants formulated and approved departmental policies that permitted these placements. *Id.* at 849. The district court rejected defendants' qualified immunity defense as to both theories.

On appeal, the Seventh Circuit held that though K.H. did not have a clearly established right to not be shuttled among foster homes, she *did* have a due process right under the Fourteenth Amendment "not to be handed over by state officers to a foster parent or other custodian, private or public, *whom the state knows or suspects to be a child abuser.*" *Id.* at 852 (emphasis added). That holding, the court explained, followed from *Youngberg v. Romeo*, 457 U.S. 307, 321 (1982)—where the Supreme Court held that a mentally disabled adult who was involuntarily committed to a state mental health facility had a due process right to safety and freedom from bodily restraint. *K.H.*, 914 F.2d at 849 (*"Youngberg v. Romeo* made clear, years

5

before the defendants in this case placed K.H. with an abusing foster parent in 1986, that the Constitution requires the responsible state officials to take steps to prevent children in state institutions from deteriorating physically or psychologically."). The *K.H.* court concluded that the analogy to *Youngberg* was so apparent that the constitutional right at issue—to not be placed in an environment where the state knows or suspects someone would be abused—was clearly established. *Id.* at 853 (*"Youngberg* made the basic duty of the state to children in state custody clear."); *id.* at 852 ("There is, made explicit by this opinion but clearly implicit in *Youngberg*, a prima facie right not to be placed with a foster parent who the state's caseworkers and supervisors know or suspect is likely to abuse or neglect the foster child."). Accordingly, the court remanded for determination of whether the defendants knew or suspected that K.H.'s foster parents were abusive. *Id.* at 854.

The Seventh Circuit had occasion to apply the "knows or suspects" standard several years later in *Lewis v. Anderson*, 308 F.3d 768 (2002), another case involving foster care. The plaintiffs in *Lewis*, five siblings, brought a § 1983 action against several officials of the Wisconsin Department of Health and Social Services ("DHSS") in their individual capacities, alleging that the defendants violated their due process rights by placing them in an abusive foster home. *Id.* at 770. The defendants in *Lewis* were the Administrator of the Division of Community Services at the DHSS, two social workers for DHSS tasked with overseeing the placement of the plaintiffs, and the DHSS official who supervised the defendant social workers. *Id.* at 771. To meet the "knowledge or suspicion" standard, the plaintiffs offered two pieces of evidence: the caseworkers' awareness that the foster father had previously slapped one of his children and a reference letter for the foster parents that was "lukewarm" in its recommendation (specifically, the letter expressed concerns over the parents' short temper and the size of their home but concluded that they were fit to adopt the children). *Id.* at 774. On this record, the district court granted the defendants' motion for summary judgment and the plaintiffs appealed.

6

The Seventh Circuit affirmed, but did not abandon the modified deliberate indifference standard. Applying that standard, the court first clarified that the state's obligations to the plaintiffs arose from the "special relationship between the state and the individual" and from the fact that "the danger to the child [was] state-created." *Id.* at 773 (internal quotation marks and citations omitted). The court went on to explain that the modified deliberate indifference standard established in *K.H.* "does not take the next step and impose some kind of duty of inquiry in these cases," but rather requires only that the plaintiffs "put forth a case that the . . . defendants actually knew of or suspected the existence of child abuse in the prospective adoptive family." *Id.* The *Lewis* plaintiffs' evidence did not meet that requirement: Evidence of "one instance of child-hitting" was not indicative of actual abuse, and the reference letter provided no basis to conclude that the foster parents would be abusive. *Id.* at 774–75. The plaintiffs had urged that the "stringent" knowledge or suspicion standard be reconsidered, but the court rejected that request, confirming that the standard is consistent with Supreme Court and Seventh Circuit case law on deliberate indifference. *Id.* at 776 (first citing *Estelle v. Gamble*, 429 U.S. 97, 104–06 (1976); then citing *Farmer v. Brennan*, 511 U.S. 825, 837 (1994); and then citing *Jones v. Simek*, 193 F.3d 485, 490 (7th Cir.1999)).

The Seventh Circuit has continued to apply this modified deliberate indifference standard in the foster care context. *See, e.g.*, *J.H. ex rel. Higgin v. Johnson*, 346 F.3d 788, 792 (7th Cir. 2003); *Waubanascum v. Shawano Cnty.*, 416 F.3d 658, 665 (7th Cir. 2005); *Xiong v. Wagner*, 700 F.3d 282, 293 (7th Cir. 2012). These cases further refine the standard's contours. In *J.H.*, the court explained that "the standard set forth in *K.H.* and *Lewis* differs from the 'deliberate indifference' standard only in the sense that it can be satisfied by proof of a state actor's knowledge or *suspicion* of the risk of harm, rather than just knowledge. Both standards are subjective." *J.H. ex rel. Higgin*, 346 F.3d at 792 (emphasis in original). That court also held that in order to hold the defendants liable, the plaintiff "must show a connection between any knowledge or suspicion of risk that the defendants may have had and the injury that the children

7

actually suffered." *Id.* at 793. In other words, a plaintiff cannot satisfy the standard merely by proffering evidence of a generalized risk; instead, there must be a nexus between the evidence of knowledge or suspicion and the abuse suffered. And, in *Waubanascum*, the court underscored that for the knowledge-or-suspicion standard to apply, "the state must have *custody* over the child." *Waubanascum*, 416 F.3d at 665 (emphasis in original) (finding that Shawano County did not have custody of child by virtue of having issued a foster care license to abusive father because child was in fact under the supervision and custody of Menominee County).

II. **Was this Court's Application of the Modified Deliberate Indifference Standard a Manifest Error of Law?**

The Defendants' central argument against this court's use of the modified deliberate indifference standard is that the Seventh Circuit has never applied the standard outside the foster care context. For this reason, they urge, the court should not apply it here. In support of this argument, Defendants cite a handful of district court opinions dealing with failure-to-intervene claims in a variety of contexts, including claims of abuse brought against officials in schools, prisons, and even in mental health facilities, none of which apply the "knowledge or suspicion" standard.

Defendants are correct that the Seventh Circuit has not explicitly endorsed applying the modified deliberate indifference standard outside of the foster care context. The Court of Appeals has not, however, foreclosed application of the standard in analogous contexts. Indeed, some courts have contemplated the applicability of the standard outside of the foster care context. *See Woods v. Ill. Dep't of Child. & Fam. Servs.*, 710 F.3d 762, 763 (7th Cir. 2013) (citing *K.H.* in case brought by minor who had been sexually abused after the state placed them in residential treatment facility, but ultimately concluding case was barred by statute of limitations); *Golbert v. Aurora Chi. Lakeshore Hosp., LLC*, No. 19-CV-08257, 2021 WL 952560, at *6 (N.D. Ill. Mar. 11, 2021) (acknowledging dispute between parties of whether the "knowledge or suspicion" standard was applicable in a safe conditions of confinement claim brought by children abused in mental

8

health facility, but not deciding issue); *K.L. v. Edgar*, 941 F. Supp. 706, 716 (N.D. Ill. 1996) (citing *K.H.* in class action brought by adult patients of mental health facility).

Notably, while Defendants have argued that the modified deliberate indifference standard should not apply here, they have failed to make a consistent case for what standard *should* apply. At some points in their motion, they argue that Plaintiff's burden is to show that the Defendants "*actually knew* about Plaintiff and Lenhardt's relationship"—the standard often used in failure-to-intervene cases involving police officers. (Defs.' Mot. to Recons. Summ. J. Ruling [254] ("Defs.' Mot. to Recons.") at 12–13 (emphasis added).) Indeed, this was the standard that the Defendants initially presented in their motion for summary judgment. (*See* Defs.' Joint Mem. in Supp. of Summ. J. [217] at 7 (quoting *Yang v. Hardin*, 37 F.3d 282, 285 (7th Cir. 1994), for the legal standard that "defendant must have actual knowledge of the constitutional violation and a realistic opportunity to intervene and prevent the harm").) Then, at other points in their reconsideration briefing, they argue that "Plaintiff must show that [Defendants] . . . actually knew that there was *a substantial risk* that Lenhardt was abusing Plaintiff and failed to take action"—which is the traditional deliberate indifference standard, often applied in prison conditions cases. (Defs.' Reply in Supp. of Their Mot. to Recons. Summ. J. Ruling ("Defs.' Reply") at 9 (emphasis added).) Neither party raised the traditional deliberate indifference standard at summary judgment.

Even the cases that Defendants cite as persuasive authority are not consistent in which standard they use; some apply the "actual knowledge" test and others apply a deliberate indifference test. For example, Defendants point to *Strong v. Wisconsin*, 544 F. Supp. 2d 748, 765 (W.D. Wis. 2008) as a model for the court to follow, which applies the "actual knowledge" standard to a failure-to-intervene claim brought by a mental health patient that alleged sexual abuse by hospital staff. (Defs.' Mot. to Recons. at 8.) Then, in the very next paragraph, the Defendants invoke *Doe v. Macleod*, No. 18-3191, 2023 WL 2698672, at *1 (C.D. Ill. Mar. 29, 2023), where the court applied a deliberate indifference standard to a claim brought by a prisoner

9

that was sexually abused by a prison employee. (Defs.' Mot. to Recons. at 8–9.) That leaves the court uncertain about which standard Defendants believe applies here.[1]

As the court sees it, counsel in this case have referred to at least three potential standards: "actual knowledge"; "actual knowledge of a substantial risk" (deliberate indifference); and "actual knowledge or suspicion of a substantial risk" (modified deliberate indifference). Without identifying which of the first two standards should apply here, Defendants focus their energy on arguing that the court should not apply the third—that is, the "knowledge or suspicion" standard. Plaintiff, for his part, argues that the court was correct in applying the "knowledge or suspicion" standard and, in any event, that Plaintiff would also survive summary judgment under the traditional deliberate indifference standard. Defendants have not established that the court's earlier ruling was a manifest error of law, and the court stands by its view that the foster care cases are most analogous to Hurt's case. Several factors guide the court's reasoning on this issue. First, Hurt was in the long-term custody of the state when he was abused, like the plaintiffs in the foster care cases. As the foster care cases point out, the "creation of a special relationship between the state and the individual," such as its taking an individual into its custody, creates an obligation on the state to protect that individual. *Lewis*, 308 F.3d at 773. Additionally, the "danger" posed to Hurt was also undoubtedly "state created"—he was sexually abused not by another detainee from whom the state failed to protect him, but by the social worker EMHC had assigned to him. *Id.* Hurt's case is also analogous to the foster care cases in the sense that by virtue of

---

[1] In the court's view, *Strong*, which the Defendants urge is most factually apposite, is distinguishable. In that case, like Hurt's, the plaintiff was a forensic patient at a state-run mental health hospital. 544 F. Supp. 2d at 761. The plaintiff alleged that while he was a patient at the facility, a staff member engaged in a sexual relationship with him. He also claimed that another staff member would watch them engage in sex acts and acted as "look out" during the episodes. *Id.* at 759. In assessing the lookout-defendant's motion for summary judgment regarding plaintiff's failure-to-intervene claim, the court stated that a reasonable juror could find the lookout had active involvement in the abuse and could therefore be liable under either an "actual knowledge" standard or under a conspiracy theory. *Id.* at 765. In this sense, *Strong*, unlike Hurt's case, was much more analogous to the paradigmatic law enforcement failure-to-intervene claim where the defendant played an active role in the constitutional violation and was present while it happened. Put differently, the claim in *Strong* is less a failure-to-intervene claim than it is conspiracy claim.

10

being adjudicated insane, he represents an individual of limited mental capacity, similar to a child. The isolation and vulnerability of these two populations make them not only more susceptible to abuse, but also less equipped to report the abuse, and if they do report it, less likely to be believed. Beyond these similarities, it is worth reiterating that the modified deliberate indifference standard established in *K.H.* spawned from *Youngberg*—a case concerning the constitutional rights of a mentally ill adult who was committed to a state-run mental health facility.

Hurt's case bears little resemblance to *Yang v. Hardin* and its progeny, cited by Defendants, making the "actual knowledge" standard particularly inapplicable. These cases chiefly involve claims against bystander-policemen who witness their partners using excessive force on a suspect or detainee and fail to stop it. The alleged constitutional violation in these cases is typically happening directly in the presence of the bystander-officer, sometimes even on public streets where others can witness the violation. In contrast, the constitutional violation suffered by Hurt and the plaintiffs in the foster care cases is sexual abuse, which by its nature happens behind closed doors—making a liability requirement of "actual knowledge" unreasonable. Moreover, the critical element of long-term custody, which places a heightened burden on state officials to protect these individuals, is absent from the police excessive-force cases. That element is instead present in the prison context, where the traditional deliberate indifference standard is often applied.

The court nevertheless believes that the foster care cases are more analogous than the prison cases. As an initial matter, incarcerated individuals bring their failure-to-intervene claims under the Eighth Amendment, whereas involuntarily committed individuals, like Hurt, bring their claims under the Due Process Clause of the Fourteenth Amendment. *Youngberg*, 457 U.S. at 321–22. This distinction is relevant, as the Supreme Court has explained, because "[p]ersons who have been involuntarily committed are entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish." *Id.* Additionally, the vulnerability and limited-mental-capacity characteristics present in Hurt's case

11

and the foster care cases are less acute in both the police and prison contexts.  For these reasons, the court continues to believe that the modified deliberate indifference standard is the most appropriate standard in this case.

Defendants attempt to distinguish Hurt's case from the foster care cases by emphasizing that Hurt was not a child.  They argue, for example, that "while Plaintiff was adjudicated NGRI, that fact alone does not mean that he had such a diminished mental capacity that he should be considered equivalent to a child."  (Defs.' Mot. to Recons. at 11.)  They note evidence that Hurt appeared to understand that Lenhardt would go to jail if staff discovered her abuse and that he concealed the fact that she performed sex acts on him—evidence, in Defendants' view, of his competence.  (*Id.* at 12.)  Hurt "could have reported the abuse" to numerous people and "could also have called the OIG hotline" to report the abuse, Defendants insist.  (*Id.* at 9.)  Finally, Defendants make the tenuous argument that as a technical matter, "Illinois law also does not presume that an adult admitted to a mental health facility is unable to consent to sexual activity." (*Id.* at 10.)  To be sure, Defendants do not go so far as to claim that Hurt actually did consent to Lenhardt's specific sex acts, nor even that he could have done so.  They do, however, gesture at this by characterizing Hurt as "an adult who was competent enough to understand that Lenhardt's activities were illegal, competent enough to understand that if their relationship were discovered, Lenhardt would lose her job and go to jail, and competent enough to actively work to conceal the relationship."  (*Id.* at 12.)

These arguments may well be convincing to a jury, but they do not alter the court's conclusion about the appropriate standard here.  Certainly the law distinguishes children from mentally ill adults.  The two groups are akin, however, in their isolation and vulnerability, which make them less able or willing to report abuse and also more susceptible to being coerced into not reporting abuse.  In any event, there is no basis in this record for a finding that Hurt and Lenhardt were in a lawful and consenting sexual relationship, and Defendants do not contend otherwise.  To the contrary, Lenhardt herself pleaded guilty to a felony count of sexual misconduct

12

with a person with disabilities, and the parties do not dispute that Hurt suffered a constitutional harm at Lenhardt's hands. *See Hurt*, 2023 WL 6213685, at *13. The suggestion that mentally ill individuals can consent to sex in some instances does little to support Defendants' argument in this case, where there is no question that Lenhardt exploited her position of authority, and Hurt's vulnerability, to sexually abuse him.

Finally, it is worth underscoring that the court's summary judgment ruling is not contingent on application of the "knowledge or suspicion" standard, and that Plaintiff's failure-to-intervene claims against Defendants Javed, Kareemi, Beck, and Delaney would survive summary judgment under the traditional deliberate indifference standard as well. To satisfy that standard, Plaintiff need not present direct evidence of "actual knowledge of a substantial risk," as the Defendants seem to suggest at points in their briefing. To the contrary, the Seventh Circuit has recognized that "except in the most egregious cases, plaintiffs generally lack direct evidence of actual knowledge. Rarely if ever will an official declare, 'I knew this would probably harm you, and I did it anyway!' Most cases turn on circumstantial evidence . . . ." *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016), *as amended* (Aug. 25, 2016). Thus, the Seventh Circuit has

> clarif[ied] that proof that the defendant had the requisite knowledge of substantial risk through circumstantial evidence of the risk's obviousness does not require evidence of past injury caused by the same risk or evidence that a defendant had recognized the risk before . . . . Actual knowledge of a substantial risk of serious harm can be inferred by the trier of fact from the obviousness of the risk . . . .

*Est. of Cole by Pardue v. Fromm*, 94 F.3d 254, 260 (7th Cir. 1996) (internal quotation marks and citations omitted). As articulated by the Seventh Circuit, the two variations of the deliberate indifference standard vary only slightly, with one requiring "knowledge of a substantial risk" and the other requiring "knowledge or suspicion of a substantial risk"—both are subjective tests. Whatever daylight exists between these two standards is even less discernible at the summary judgment stage, where all reasonable inferences must be drawn in favor of the nonmoving party. The record in this case, as the court detailed at length in its summary judgment order, depicted a disturbing picture of abuse by Lenhardt that spanned over a decade and affected multiple

13

patients. This was not a case of a single incident of abuse that went undetected; there is evidence from which a reasonable jury could find that there were abundant signs of Lenhardt's substantial risk to patient safety. Whether the individual Defendants in this case were put on notice of the obviousness of that risk is a question that a jury must ultimately decide.

### III. Are the Defendants Protected by Qualified Immunity?

Next, Defendants' claim that they are immune from liability because there is no clearly established law applying the modified deliberate indifference standard to the fact pattern of this case. In other words, Defendants argue that while the law is clear that the modified deliberate indifference standard applies to children subjected to sexual abuse by their foster parents, it is not clearly established that this standard applies to mentally ill individuals subjected to sexual abuse by hospital staff.

Whether the qualified immunity defense has merit is a close question. It is true that the Seventh Circuit has not applied the "knows or suspects" standard outside of the foster care context. Yet it is also true that this does not in and of itself defeat Plaintiff's claim, as an "appropriately defined right is clearly established if there is a closely analogous—though not necessarily identical—case identifying that right, or if the defendant's conduct was so egregious and unreasonable that . . . no reasonable [official] could have thought he was acting lawfully." *Hardeman v. Curran*, 933 F.3d 816, 820 (7th Cir. 2019) (internal quotation marks and citations omitted). Hurt's case parallels the foster care cases in most important aspects, and the underlying constitutional conduct is sufficiently egregious to raise an argument that, if the Defendants in this case knew or suspected that a patient was being sexually abused, they should have known they had a constitutional duty to intervene, given *K.H.* and its progeny.

Nevertheless, the court need not reach Defendants' qualified immunity argument at this juncture. This is because the court's summary judgment ruling did not rest on a conclusion that there was evidence that the Defendants merely suspected there was sexual abuse. Rather, the court held that "there is evidence from which a reasonable jury could find that each Defendant

14

*knew of or suspected* that Lenhardt was sexually abusing Hurt for nearly three years and that, instead of intervening, each chose to bury their heads in the sand." *Hurt*, 2023 WL 6213685, at *14. Simply put, as described above, the Plaintiff's claims would survive summary judgment under both the traditional *and* modified deliberate indifference standard, and there is no dispute that the traditional deliberate indifference standard is clearly established in law. For this reason, the Defendants' qualified immunity argument fails at the summary judgment stage.

Defendants' qualified immunity claim may well become relevant again at trial, however. For example, if after scrutinizing the facts at trial, the jury finds that a Defendant lacked "knowledge" of a substantial risk of sexual abuse, but did have a "suspicion" of that risk, Defendants' qualified immunity argument would resurface. One way the court could address this issue is to provide the jury with a general verdict form with interrogatories that separate the factual findings related to "knowledge" and "suspicion." This would preserve Defendants' ability to re-assert their qualified immunity argument in the event that the jury finds a Defendant did not meet the traditional deliberate indifference standard but did meet the modified deliberate indifference standard. The court will revisit this issue, if appropriate, at a later point in the litigation.

## IV. Is Defendant Diana Hogan Entitled to Summary Judgment?

Finally, Defendants argue that even if the modified deliberate indifference standard applies to Hurt's case, Defendant Diana Hogan is nevertheless entitled to summary judgment because, Defendants urge, there is no evidence in the record from which a reasonable juror could conclude that she actually "knew or suspected" that there was a substantial risk that Lenhardt was sexually abusing Hurt. Defendant Hogan was the Associate Director of Nursing of the Forensic Treatment Program at EMHC from 2008 until 2015, and then served as the Director of Nursing. *Hurt*, 2023 WL 6213685, at *2. In this role, Hogan did not supervise social workers such as Lenhardt and typically did not work in the hospital unit where Hurt was housed. *Id.* In fact, Hogan testified that while she knew who Lenhardt was, she never had more than a "fleeting conversation" with her.

15

(Hogan Dep. Ex. F to DSOF [218-6] at 85:18–86:3.) She also testified that she "never even met" Hurt and "couldn't tell you what he looks like." (*Id.* at 43:21–24.)

Notwithstanding Hogan's apparent separation from both Lenhardt and Hurt, Plaintiff attempts to connect Hogan to this lawsuit with two pieces of evidence. The first was the fact that after Lenhardt and Hurt were caught locked in another staff member's office, Defendant Hogan received an email from EMHC Chief of Security William Epperson that contained a report of the incident and stated in the body of the email that he was "[v]ery concerned that a [social worker] would ask for assistance from a patient, for an office not on her unit." *Hurt*, 2023 WL 6213685, at *8. Plaintiff contends that Epperson's email and report should have alerted Hogan to the possibility that Lenhardt was abusing Hurt. The other evidence against Hogan consisted of reports that EMHC "administration" had suspicions surrounding Lenhardt and Hurt. For example, Lenhardt testified that Hogan's co-defendant, Drew Beck, warned Lenhardt that "administration was watching [her] and [Hurt]." *Id.* at 6. Plaintiff claims that in light of her role at EMHC as Director of Nursing, the reference to "administration" here must be read to include Hogan.

Upon a careful reconsideration of Defendant Hogan's deposition testimony and the record evidence related to her, the court concludes that Defendants are correct that the evidence is insufficient to find Hogan liable even under the modified deliberate indifference standard. True, Chief Epperson's email and incident report could (perhaps should) have sounded alarm bells; but Plaintiff provides no evidence that Hogan was in fact at all concerned. Hogan testified that at the time she was not worried about any potential sexual misconduct, but was instead concerned that other office doors may too have faulty locks and thus pose a safety risk to hospital *staff*. (Hogan Dep. at 54:16–55:11.) This reaction was not unreasonable, given that Hogan had essentially no familiarity with either Lenhardt or Hurt and the email and report themselves make no reference to any sexual misconduct.

Likewise, Plaintiff's "administration" argument is also too tenuous. In essence, Plaintiff asks the court to construe evidence that EMHC "administration" had suspicions surrounding

16

Lenhardt as pointing directly to Defendant Hogan.  While Hogan does refer to herself as a part of the hospital's administration, the record is clear that she was one of many administrators.  (*See id.* at 56:1–7; 61:12–15.)  The fact that some unidentified administrator had concerns about Lenhardt does not mean that Defendant Hogan did.

In the end, the strongest argument against Hogan is that more hands-on supervision of all staff might have uncovered Lenhardt's activities far sooner.  But as the court understands the organizational structure of EMHC, Hogan, who was the Director of Nursing, did not supervise social workers.  In any event, § 1983 does not allow for supervisory liability where the supervisor was not personally involved in the constitutional violation.  Plaintiff's theory of liability against Defendant Hogan amounts to arguing that she *should have* known or suspected that Lenhardt was a danger to patients, without any evidence that she *actually* knew or suspected that Lenhardt was a risk.  The court therefore grants Defendants' motion for reconsideration with respect to Defendant Hogan only.

## CONCLUSION

For the reasons provided above, the court grants the Defendants' Motion to Reconsider [254] with respect to Defendant Hogan only and denies all other claims in Defendants' Motion to Reconsider.  Accordingly, Defendants' Renewed Motion to Stay Expert Discovery [262] is deemed moot and the parties are instructed to proceed with expert discovery.

ENTERED:

Dated:  February 15, 2024

REBECCA R. PALLMEYER
United States District Judge